## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ARSENAL RESOURCES DEVELOPMENT LLC, *et al.*, | ) Case No. 19-12347 (___) |
|  | ) |
|  | ) (Joint Administration Requested) |
| Debtors.[1] | ) |
|  | ) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING AND (VI) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the "***Debtors***" or the "***Company***") seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "***Interim Order***"), and a final order upon substantially similar terms (the "***Final Order***," and together with the Interim Order, the "***DIP Orders***"), pursuant to sections 105(a), 107, 361, 362, 363, 364, 503, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rules 2002-1, 4001-1, 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the

---

[1]    The debtors in the chapter 11 cases, along with the last four digits of each debtor's United States federal tax identification number, are: Arsenal Resources Development LLC (4072); Arsenal Energy Holdings LLC (6279); Arsenal Resources Intermediate Holdings LLC (5901); Arsenal Resources Energy LLC (2820); Arsenal Resources Development Holdings 2 LLC (3020); Arsenal Resources Development Holdings 1 LLC (9647); Arsenal Gas Marketing LLC (1113); Arsenal Midstream LLC (9654); Arsenal Water LLC (2465); Ulysses Gathering LLC (6546); Mar Key LLC (5428); Arsenal Resources LLC (3422); River Ridge Energy Holdings, LLC (8135); River Ridge Energy, LLC (5623); River Ridge Pennsylvania, LLC (5444); River Ridge Operating, LLC (4051); and Seneca-Upshur Petroleum, LLC (9204).  The debtors' mailing address is 6031 Wallace Road Ext., Suite 300, Wexford, PA 15090.

United States Bankruptcy Court for the District of Delaware (the "***Local Rules***") granting the relief requested herein.  In support of this motion (this "***Motion***"), the Debtors respectfully submit: (a) the *Declaration of Allen Goetz, the Debtors' Chief Financial Officer, in Support of Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***")[2] and (b) the *Declaration of Avi Robbins in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "***Robbins Declaration***").[3]

## Jurisdiction

1.      The United States Bankruptcy Court for the District of Delaware (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases (as defined below) and this Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]     Additional factual background regarding the Debtors, including their business operations, their capital and debt structures and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration, which is fully incorporated herein by reference.

[3]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration or the DIP Credit Agreement, as applicable.

2.      The statutory and legal bases for relief requested herein are sections 105(a), 107, 361, 362, 363, 364, 503, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and Local Rules 2002-1, 4001-1, 4001-2 and 9013-1.

## Background

3.      On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions in this Court commencing cases (the "***Chapter 11 Cases***") for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have been appointed.

4.      Prior to the Petition Date, the Debtors executed a Restructuring Support Agreement dated November 6, 2019 (the "***RSA***") with each Prepetition RBL Lender, Prepetition Term Loan Lender and Prepetition Seller Noteholder (each as defined below).  In accordance with the RSA, and prior to the Petition Date, the Debtors solicited votes to confirm the Plan. 100% of all persons eligible to vote on the Plan voted in favor of the Plan.  Importantly, both the RSA and the Plan provide that all allowed claims against the Debtors' operating subsidiaries (the "***OpCo Debtors***")[4] will be paid in full in the ordinary course.

## Preliminary Statement

5.      The Debtors secured a $90 million senior secured superpriority debtor-in-possession credit facility (the "***DIP Facility***"), which will provide access to $45 million of much needed liquidity to fund these Chapter 11 Cases.  As of the Petition Date, the Debtors have approximately $3 million of cash on hand, which, even if available without lender consent, is

---

[4]     The following Debtor entities comprise the "***OpCo Debtors***": Arsenal Resources Development LLC ("***ARD LLC***"), Arsenal Gas Marketing LLC, Arsenal Midstream LLC, Arsenal Water LLC, Ulysses Gathering LLC, Mar Key LLC, Arsenal Resources LLC, River Ridge Energy Holdings, LLC, River Ridge Energy, LLC, River Ridge Pennsylvania, LLC, River Ridge Operating, LLC and Seneca-Upshur Petroleum.

woefully inadequate to operate their businesses. The DIP Facility is not only critical to sustaining the Debtors' businesses in the near term but also is an integral component to implementing the RSA and the Plan, which, if approved, will best position the Company for long term success. The DIP Facility provides the Debtors with the liquidity needed to execute their reorganization by which they will obtain the $100 million new equity investment and the $130 million exit facility contemplated by the RSA and Plan. Not surprisingly, the DIP Facility is supported by 100% of the Debtors' prepetition lenders.

6.     The DIP Facility is the result of two months of extensive, good faith and arm's-length negotiations between the Debtors and Prepetition RBL Lenders, who have agreed to provide the DIP Facility (in such capacity, the "*DIP Lenders*"), and their respective advisors. After the Debtors recognized the potential need for DIP financing, they directed their advisor, PJT Partners LP ("*PJT*"), to conduct a thorough marketing process to determine if viable third-party DIP financing could be secured. Ultimately, no party was willing to provide DIP financing on a non-priming basis, and the Debtors, after consultation with their advisors, determined that a priming fight with the Prepetition RBL Lenders would carry significant risk and potentially derail the reorganization.

7.     Accordingly, the Debtors focused on achieving the most favorable terms possible with the Prepetition RBL Lenders. After months of intense negotiation, the parties agreed on the terms of a facility that will provide the Debtors with sufficient liquidity to operate their businesses, make critical payments to their vendors and pay the costs of these Chapter 11 Cases, which, in turn, will permit the Debtors to implement the RSA and the Plan. As in any negotiated process, the Debtors made (and received) concessions, but when viewed as a whole, the DIP Facility is fair and reasonable. Critically, the Prepetition Term Loan Lenders and the Prepetition

Seller Noteholders, who were regularly consulted during the negotiation process, also are fully supportive of the DIP Facility, including the associated priming liens.

8.      Several compelling reasons justify approval of the DIP Facility.    *First,* the Debtors' ability to enter into the DIP Facility and utilize cash collateral is vital to preserving the value of the Debtors' enterprise.    Substantially all of the Debtors' cash is potentially the cash collateral of the Prepetition RBL Lenders and therefore, absent their consent or authorization from this Court, the Debtors cannot utilize such cash.    In any event, the Debtors' current cash balance of $3 million is insufficient to meaningfully fund their businesses, particularly given the sizable balance owed to various vendors and suppliers whose services are needed going forward. Without access to this cash and the additional liquidity that the DIP Facility will provide, there is a significant likelihood that the Debtors will have to curtail operations and potentially begin a liquidation that will cause irreparable harm to the Debtors and their estates.

9.      *Second,* the DIP Facility is an essential component of the broader restructuring transaction contemplated by the RSA and the Plan that will allow the Debtors to eliminate over $400 million of financial indebtedness.    In conjunction with the DIP Facility, the Prepetition RBL Lenders also committed to provide a $130 million exit financing facility on the Effective Date of the Plan (the "***New RBL Facility***") pursuant to a commitment letter executed contemporaneously with the RSA (the "***New RBL Facility Commitment Letter***").[5]    The proceeds of the New RBL Facility will be used to repay the DIP Facility on the Effective Date and provide critical working capital for the Debtors' businesses, and without the Prepetition RBL Lenders' commitment to provide this crucial exit financing, the Prepetition Term Loan Lenders and Prepetition Seller Noteholders would not have committed to invest $100 million of new

---

[5]      The form of the New RBL Facility Commitment Letter is attached hereto as **Exhibit C**.

equity capital pursuant to the RSA.  Together, these transactions provide the path for an orderly reorganization and an adequately funded emergence from these Chapter 11 Cases, thereby preserving the value of the Debtors' estates for the benefit of all their stakeholders.

10.     *Third,* the terms of the DIP Facility are fair and reasonable, and the DIP Facility is in the best interests of the Debtors and their estates.  The DIP Facility will provide (i) $45 million of new money loans, $30 million of which will be available upon entry of the Interim Order, (ii) a roll-up of $45 million of the Prepetition RBL Loans (as defined below) upon entry of the Final Order and (iii) a $5 million letter of credit sub-facility that the Debtors may utilize to secure operating obligations, in each case subject to interest rates and fees that are consistent with market rates for facilities of this type in the oil and gas exploration and production industry. Additionally, the DIP Facility will deem the Debtors' obligations under existing hedge agreements with certain Prepetition RBL Lenders or their affiliates (the "***Secured Swap Parties***") as secured obligations under the DIP Facility, benefitting from the DIP Liens (as defined below) on a *pari passu* basis, and further gives the Debtors flexibility to enter into new hedge agreements and similarly treat the obligations as DIP Obligations.  As a result of this protection, the Secured Swap Parties have agreed to maintain their swaps outstanding during these Chapter 11 Cases (subject to the terms of the RSA) notwithstanding their right to terminate under the Bankruptcy Code's "safe harbor" rules.  Finally, the six-month term of the DIP Facility is well outside the RSA milestones, which impose a deadline of 105 days after the Petition Date to have the Plan confirmed, and the DIP Facility does not automatically cross-default to the RSA, thereby affording the Debtors time to orderly transition in the event the RSA terminates.

11.     The Debtors' consummation of the RSA, coupled with their access to the DIP Facility and, upon effectiveness of the Plan, the New RBL Facility, will provide the greatest

chance of avoiding negative impacts to the Debtors' businesses, vendors, customers and employees by providing certainty that the Debtors will be able to continue operating "business as usual." Accordingly, the Debtors, in consultation with their advisors, have determined that the DIP Facility and the New RBL Facility will maximize value and are in the best interests of the Debtors and their estates. The relief requested by this Motion is necessary both to preserve the Debtors' operations as well as to provide the Debtors with a path forward in these Chapter 11 Cases. For these reasons, the Debtors respectfully request that the Court grant the Motion.

### **Prepetition Capital Structure**

12.     As of the Petition Date, the Debtors have approximately $506 million in total funded debt obligations (exclusive of accrued and unpaid interest), consisting of (i) approximately $117 million in aggregate principal amount outstanding under the Prepetition RBL Credit Agreement (as defined below) plus an issued and outstanding letter of credit in the amount of approximately $28.5 million; (ii) approximately $233 million in aggregate principal amount outstanding under the Prepetition Term Loan Facility (as defined below); and (iii) approximately $128 million in aggregate principal amount outstanding under the Prepetition Seller Notes (as defined below).

A.     **Prepetition RBL Credit Agreement**

13.     ARD LLC entered into that certain Credit Agreement, dated as of December 21, 2018 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition RBL Credit Agreement***") by and among ARD LLC, as borrower, Citibank, N.A., as administrative agent (in such capacity, the "***Prepetition RBL Agent***") and the lenders thereto (the "***Prepetition RBL Lenders***"). The Prepetition RBL Credit Agreement provided for an initial aggregate commitment of $145 million, $50 million of which could be used for the issuance of letters of credit (the "***Prepetition RBL Facility***"). The Prepetition RBL Facility is guaranteed by

the other OpCo Debtors and the obligations thereunder are secured by a first priority security interest and lien on substantially all of the assets of the OpCo Debtors, including substantially all oil and gas reserves and cash, subject to certain exceptions (the "***Prepetition RBL Collateral***"). The Prepetition RBL Facility is structurally senior to the Prepetition Term Loan Facility and the Prepetition Seller Notes because it is secured by the OpCo Debtors' assets, whereas the Prepetition Term Loan Lenders and Prepetition Seller Noteholders are secured only by assets of certain Debtor holding companies.

14.     The scheduled maturity date of the Prepetition RBL Credit Agreement is June 21, 2022. The Prepetition RBL Credit Agreement is fully drawn, and the commitments thereunder have terminated.

### B.    Prepetition Term Loan Facility

15.     Also on December 21, 2018, Debtor Arsenal Resources Development Holdings 1 LLC ("***ARD Holdings I***") entered into that certain term loan Credit Agreement (as may be amended, supplemented, or otherwise modified from time to time, the "***Prepetition Term Loan Facility***") by and among ARD Holdings I, as borrower, Chambers Energy Management, LP, as administrative agent (the "***Prepetition Term Loan Agent***") and certain funds affiliated with Chambers Energy Management, LP (such funds, collectively, "***Chambers***") and Mercuria Energy Company, LLC ("***Mercuria***"), as lenders thereto (the "***Prepetition Term Loan Lenders***," and together with the Prepetition Term Loan Agent, the "***Prepetition Term Loan Secured Parties***"). The Prepetition Term Loan Facility provided for initial term loans in the aggregate amount of $220 million.

16.     The Prepetition Term Loan Facility is guaranteed by Debtor Arsenal Resources Energy LLC and is secured by liens on the assets of ARD Holdings I, which consist primarily of the equity interests in ARD LLC (the "***Prepetition Term Loan Collateral***"). The Prepetition

Term Loan Facility is structurally junior to the Prepetition RBL Facility but senior to the Prepetition Seller Notes.

17.    The scheduled maturity date of the Prepetition Term Loan Facility is December 21, 2023.  On July 31, 2019 the Debtors and the Prepetition Term Loan Lenders amended the Prepetition Term Loan Facility to postpone interest payments for one month, and the Debtors thereafter withheld all interest payments coming due under the Prepetition Term Loan Facility up to the Petition Date.

### C.    Prepetition Seller Notes

18.    Arsenal Energy Holdings LLC ("***AEH***" or the "***Seller Note Issuer***") is the issuer of  (i) that certain Seller Note, dated as of October 14, 2014, in the original principal amount of $39,047,625.00 issued in favor of PDC Energy, Inc., which was later sold and assigned to affiliates of Chambers (the "***Chambers Seller Note***"); and (ii) that certain Seller Note, dated as of October 14, 2014, in the original principal amount of $39,047,625.00 issued in favor of LR-Mountaineer Holdings, L.P. ("***Lime Rock***," and together with Chambers, the "***Prepetition Seller Noteholders***") (the "***LRMH Seller Note***," and collectively with the Chambers Seller Note, each as amended, supplemented, or otherwise modified from time to time, the "***Prepetition Seller Notes***").

19.    The Prepetition Seller Notes are guaranteed by Arsenal Resources Development Holdings 2 LLC ("***ARD Holdings II***" and together with AEH, the "***Prepetition Seller Note Grantors***").   AEH and ARD Holdings II  granted to Lime Rock, as collateral agent (the "***Prepetition Seller Note Agent***"), for the benefit of the Prepetition Seller Note Agent and the Prepetition Seller Noteholders (collectively, the "***Prepetition Seller Note Secured Parties***"), a first priority security interest and lien on substantially all of the Prepetition Seller Note Grantors' assets, which predominantly consist of ARD Holdings II's equity interest in ARD Holdings I and

AEH's equity interest in Arsenal Resources Intermediate Holdings LLC (the "***Prepetition Seller Note Collateral***," and together with the Prepetition RBL Collateral and Prepetition Term Loan Collateral, the "***Prepetition Collateral***").

20.    The Prepetition Seller Notes are structurally subordinate to the Prepetition Term Loan Facility and the Prepetition RBL Facility.  Together, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties and the Prepetition Seller Note Secured Parties are referred to as the "***Prepetition Secured Parties***."

## The DIP Facility

21.    In the summer of 2019, facing industry-wide and Company-specific challenges that placed significant constraints on the Company's liquidity, the Company determined that it required a holistic restructuring transaction.  *See* First Day Decl. ¶¶ 7, 48-49.  In July 2019, the Company, with the assistance of its advisors, began exploring possible transactions, including potential acquisitions, mergers or new equity investments.  *Id.* ¶ 49.  In furtherance of such a transaction, the Company engaged in negotiations with Chambers, Lime Rock and Mercuria regarding a potential out-of-court equitization of their debt and an infusion of additional capital into the Company.  *Id.*  However, ultimately the Company concluded that it would need time to pursue a comprehensive restructuring transaction.  *Id.* ¶ 50.  To that end, by August 2019 the Company had retained restructuring professionals, including Alvarez & Marsal North America, LLC ("***A&M***") and PJT to assist with its restructuring and securing postpetition financing.  *Id.*

22.    In advance of soliciting potential financing providers, the Debtors, with the assistance of PJT and A&M, undertook an analysis of how much postpetition financing would be required to operate the Debtors' business, pay administrative costs during the chapter 11 process and capitalize the restructured Company.  Robbins Decl. ¶ 14.  Based on this analysis, the Debtors estimated that they would need up to six (6) months to implement a restructuring in a

chapter 11 case and determined that they would require incremental liquidity of approximately $45 million to operate in the ordinary course postpetition and satisfy all administrative costs and expenses.  *Id.*

23.    In August 2019, the Debtors and their advisors began approaching creditors about a potential restructuring and the need for postpetition financing.  *Id.* ¶ 15.  In mid-August, one of the Debtors' non-Prepetition RBL Lenders submitted a non-binding DIP financing offer to be secured by priming liens on all of the Debtors' collateral.  *Id.*  However, after review, the Debtors' Prepetition RBL Lenders were unequivocal that they would not consent to being primed.  *Id.*  In subsequent discussions, this party indicated it was not willing to provide DIP financing, other than on a priming basis.  *Id.*  Therefore, the Debtors sought a DIP financing proposal from the Prepetition RBL Lenders and third-party lenders.  *Id.*

24.    Concurrent with these negotiations, the Debtors also directed PJT to solicit third party DIP proposals.  *Id.* ¶ 16.  In September 2019, PJT began contacting parties that it believed were most likely to fund a DIP financing facility.  *Id.*  PJT solicited interest from seventeen (17) third-party lenders to determine the extent to which third parties would be willing to provide postpetition financing to the Debtors.  *Id.*  Of these third-party lenders, two executed confidentiality agreements and received access to confidential diligence materials.  *Id.*  However, no third-party lender was willing to provide the Debtors with an executable postpetition financing facility on an unsecured, junior-lien or *pari passu* basis.  *Id.*

25.    While continuing conversations with third parties, PJT negotiated a postpetition financing facility with the Prepetition RBL Lenders.  *Id.* ¶ 17.  After two months of vigorous, good faith and arm's-length negotiations, the Debtors ultimately agreed to the terms of the $90 million DIP Facility with the Prepetition RBL Lenders.  *Id.* ¶¶ 17, 19.

26.     Pursuant to the RSA, the Prepetition RBL Lenders have committed to provide the DIP Facility with a maturity date of six months from the Petition Date, which is adequate for the projected timeline of these Chapter 11 Cases based on budgets prepared by A&M.  *See* Robbins Decl. ¶ 14.  The DIP Facility consists of a revolving credit facility for up to $45 million in new money, including a letter of credit sub-facility for up to $5 million, and, subject to entry of the Final Order, refinances $45 million of the outstanding principal amount of the Debtors' loans under the Prepetition RBL Facility ("***Prepetition RBL Loans***").  The DIP Facility allows the Debtors to immediately access up to $30 million upon entry of the Interim Order to pay amounts authorized by the "first day" orders and to pay administrative costs during chapter 11, in accordance with a budget that the Debtors prepared and has been approved by the DIP Agent (subject to permitted variances).  The interest rates and fees associated with the DIP Facility are described below, as well as in the DIP Engagement Letter.[6]

27.     The DIP Facility contains the following milestones:

a.  the Debtors shall obtain approval of the Interim Order by the date that is no later than five (5) days following the Petition Date;

b.  the Debtors shall obtain approval of the Final Order by the date that is no later than thirty (30) days following the Petition Date;

c.  unless the Court has entered the Confirmation Order prior to such date, the Debtors shall obtain approval of the Approved Bidding Procedures no later than seventy-five (75) days after the Petition Date; and

d.  unless the Approved Plan of Reorganization is consummated prior to such date, an Approved Sale must be consummated by the date that is no later than one hundred seventy (170) days following the Petition Date.

*See* Ex. B (DIP Credit Agreement) § 8.17.

---

[6]  The "***DIP Engagement Letter***" means that certain engagement letter by and between ARD LLC and Citigroup Global Markets Inc., entered into in connection with the DIP Facility and dated as of November 6, 2019, attached hereto as **Exhibit D**.  The DIP Engagement Letter has been filed with this Court under seal pursuant to the Debtors' separate *Motion to Seal*, which is filed contemporaneously herewith.

28.     Importantly, the DIP Facility does not have a cross-default to the RSA so long as, within fifteen (15) business days following an RSA "termination event," the Debtors commence a sale process.  *See* Ex. B (DIP Credit Agreement) § 10.01(k); Robbins Decl. ¶ 18.  The absence of an unqualified cross-default to the RSA was an important feature for the Debtors.  *Id.*  In the event the RSA and Plan cannot be consummated, the DIP Facility will remain outstanding, allowing the Debtors to pivot to an orderly sale process or other alternative transaction acceptable to the DIP Lenders.  *Id.*

29.     As described above, the DIP Obligations include certain obligations arising under Secured Swap Agreements (as defined in the DIP Credit Agreement (defined below)), which are hedge agreements that the Debtors have entered into with Prepetition RBL Lenders or their affiliates.  Historically the Company has hedged a significant portion of its forecasted natural gas production to reduce exposure to commodity price fluctuations and provide long-term cash flow predictability to manage their business.  *See* First Day Decl. ¶ 32.  The Company did not have to post collateral specific to these Secured Swap Agreements because they are secured under the RBL Credit Agreement.  *Id.*  The Company's hedging activities are vital to the success of the Company's business and directly affect the ability of the Company to generate stable cash flows to fund their drilling and completion activities as well as other operating and corporate expenses. *Id.*

30.     In order to ensure that the Secured Swap Parties (*i.e.,* the counterparties to a Secured Swap Agreement) do not terminate their agreements after the commencement of these Chapter 11 Cases as permitted under the Bankruptcy Code's "safe harbor" rules, the Debtors secured limited waivers from the Secured Swap Parties under the RSA.[7]  In exchange for these

---

[7]     *See* Section 4.03(c) of the RSA, attached as **Exhibit B** to the First Day Declaration.

waivers, the obligations under the Secured Swap Agreements will be elevated to DIP Obligations, which status provides the Secured Swap Parties comfort that they are not incurring incremental risk by maintaining their Secured Swap Agreements postpetition.

31.     Finally, in conjunction with providing their DIP Facility commitment, the Prepetition RBL Lenders also committed to provide the New RBL Facility on the Effective Date. The New RBL Facility will be a first lien reserve-based revolving credit facility with an initial borrowing base of $130 million, and the proceeds will be used to refinance the DIP Facility and provide working capital.[8]   The Prepetition RBL Lenders' commitments are set forth in the New RBL Facility Commitment Letter that was executed in tandem with the RSA.

32.     The New RBL Facility Commitment Letter contemplates certain fees to be paid by the Debtors at closing.  At this time, however, the Debtors' only obligations with respect to the commitments for the New RBL Facility are limited to general indemnities and expense reimbursement set forth in sections E.2 and E.3 of the letter (the "***Commitment Letter Indemnity Obligations***").  *See* Ex. C (New RBL Facility Commitment Letter), § E.  No arrangement or other fees related to the New RBL Facility are payable unless and until the New RBL Facility closes.  Pursuant to this Motion, the Debtors are seeking authority to perform under the Commitment Letter Indemnity Obligations and treat such obligations as DIP Obligations (as defined in the Interim Order).  The Prepetition RBL Lenders indicated they would not commit to provide the New RBL Facility unless the Debtors obtained authorization to perform the Commitment Letter Indemnity Obligations during the Chapter 11 Cases.  *See* Robbins Decl. ¶ 13.

---

[8]     *See* New RBL Term Sheet, attached as **Exhibit A** to the New RBL Facility Commitment Letter.

## Relief Requested

33.     By this Motion, the Debtors seek entry of the Interim Order and the Final

Order providing for the following relief with respect to the DIP Facility:

a.  authorizing the Debtors to obtain a senior secured priming and superpriority debtor-in-possession revolving credit facility pursuant to the terms of the *Senior Secured Super-Priority Debtor-in-Possession Credit Agreement* substantially in the form attached hereto as **Exhibit B** (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "***DIP Credit Agreement***");

b.  authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements, arrangement letters, commitment letters, including the DIP Engagement Letter and (in respect of the Commitment Letter Indemnity Obligations only) the New RBL Facility Commitment Letter, and other Loan Documents (as defined in the DIP Credit Agreement), each as may be amended, restated, supplemented, waived and/or modified from time to time, in accordance with the terms hereof and thereof, collectively, and together with the DIP Credit Agreement, the "***DIP Loan Documents***") and to perform such other acts as may be necessary, desirable or appropriate in connection with the DIP Loan Documents;

c.  authorizing the Debtors to use "cash collateral," as that term is defined in section 363 of the Bankruptcy Code (the "***Cash Collateral***"), including Cash Collateral (if any) of the DIP Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties and the Prepetition Seller Note Secured Parties;

d.  granting to the DIP Agent, for the benefit of all DIP Secured Parties, automatically perfected security interests in and liens on all of the DIP Collateral (as defined below) (the "***DIP Liens***") and providing superpriority claims (the "***DIP Superpriority Claims***") with respect to such postpetition financing;

e.  approving the forms of adequate protection to be provided by the Debtors to the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties and the Prepetition Seller Note Secured Parties;

f.  modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the DIP Loan Documents and the DIP Orders;

g.  scheduling a final hearing (the "***Final Hearing***") to consider the relief requested in the DIP Motion, on a final basis, and approving the form of notice with respect to the Final Hearing; and

h.  granting related relief.

## Summary of the DIP Credit Agreement

34.    The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B).[9]

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
| --- | --- |
| **Parties to the DIP Credit Agreement** Bankruptcy Rule 4001(c)(1)(B) | **Borrower**:    Arsenal Resources Development LLC, as debtor-in-possession in these Chapter 11 Cases. **Guarantors**:  (a) Arsenal Energy Holdings LLC, (b) Arsenal Resources Intermediate Holdings LLC, (c) Arsenal Resources Energy LLC, (d) Arsenal Resources Development Holdings 2 LLC, (e) Arsenal Resources Development Holdings 1 LLC and (f) the subsidiaries of ARD LLC which are listed on Schedule 1.1(a) of the DIP Credit Agreement (the "***DIP Guarantors***"). **Administrative Agent**:  Citibank, N.A. (in such capacity, the "***DIP Agent***"). **DIP Lenders**: The lenders from time to time party to the DIP Credit Agreement (together with the DIP Agent, the "***DIP Secured Parties***"). *See* DIP Credit Agreement, Preamble, § 1.01. |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The maturity date with respect to the DIP Facility shall be the earliest of:     (a)  six (6) months after the Petition Date;     (b)  the effective date of an Approved Plan of Reorganization (as defined in DIP Credit Agreement); and     (c)  the closing of a sale of substantially all of the equity or assets of the Debtors (unless done pursuant to an Approved Plan of Reorganization). *See* DIP Credit Agreement, § 1.01. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) | $90 million, which will consist of (i) a new money revolving loan facility in the aggregate principal amount of up to $45 million and (ii) upon entry of the Final Order, a $45 million roll up of a portion of the Prepetition RBL Credit Agreement (the "***Roll Up***"). The DIP Facility shall include a sub-facility of up to $5,000,000 for the issuance of letters of credit, which shall reduce availability under the revolving facility on a dollar-for-dollar basis. *See* DIP Credit Agreement, Recitals, §§ 1.01, 2.01, 2.07. |
| **Conditions of Borrowing** Bankruptcy Rule | The DIP Orders include standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lender to make DIP Loans. |

---

9    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced including, without limitation, the DIP Loan Documents and the Interim Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents or the Interim Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| 4001(c)(1)(B) | *See* DIP Credit Agreement, § 6.03. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | **Interest Rates**. The Borrower may elect to request either "Eurodollar Loans" or "ABR Loans" at the interest rates set forth below.<br><br>**Eurodollar Loan**. London Interbank Offered Rate (as adjusted) ("*LIBOR*") +5.50% *per annum*.<br><br>**ABR Loan**. Alternate Base Rate[10] + 4.50% *per annum*.<br><br>**Default Interest Rate**. Applicable Eurodollar Loan or ABR Loan interest rate + 2.00%.<br><br>**Commitment Fees**. The Borrower shall pay a commitment fee which accrues at a rate equal to 1.00% on the daily amount of unused Commitments (taking into account the Availability Limit for the Interim Period).<br><br>**Letter of Credit Fees**. The Borrower shall also pay (i) to the administrative agent, for the account of each lender, a letter of credit participation fee, which fee will accrue at the rate of LIBOR + 5.50% per annum on the daily amount of such Lender's letter of credit exposure, (ii) a fronting fee to each applicable Issuing Bank, which fee will accrue at the rate of 0.125% per annum on the daily amount of the letter of credit exposure and (iii) to applicable Issuing Banks, for their own account, standard fees for the issuance, amendment renewal or extension of any letter of credit (or processings or drawings thereunder).<br><br>*See* DIP Credit Agreement, §§ 1.01, 3.02, 3.03, 3.05. |
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) | The proceeds of the DIP Facility shall be used to, among other things, (a) to pay related transaction costs, fees and expenses; (b) to provide working capital and for other general corporate purposes of the Debtors in accordance with the Budget; (c) to make adequate protection payments as authorized by the Court in the Interim Order or the Final Order, as applicable; (d) to pay obligations arising from or related to the Carve-Out; (e) to pay restructuring costs incurred in connection with the Chapter 11 Cases; and (f) in the case of the Prepetition Credit Agreement, to refinance amounts outstanding thereunder, pursuant to the terms set forth in Article II of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, § 8.16. |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The following secured parties have an interest in Cash Collateral:<br><br>    (a)  the DIP Secured Parties;<br><br>    (b)  the Prepetition RBL Secured Parties;<br><br>    (c)  the Prepetition Term Loan Secured Parties; and<br><br>    (d)  the Prepetition Seller Note Secured Parties.<br><br>*See* Interim Order, ¶ D(ii), E(ii) and F(ii). |
| **Fees** Bankruptcy Rule | The Interim Order provides that the Debtors shall pay all fees, costs, indemnities, expenses (including reasonable and documented out-of-pocket legal and other professional |

---

[10] "***Alternate Base Rate***" means, for any day, a fluctuating rate per annum equal to the greatest of (a) the Federal Funds Effective Rate plus one-half of one percent, (b) the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its Prime Rate and (c) the adjusted LIBOR rate having an interest period of one (1) month on such day (or if such day is not a business day, the immediately preceding business day) plus one percent.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| 4001(c)(1)(B) | fees and expenses of the DIP Agent and the Commitment Letter Indemnity Obligations), and other charges payable under the terms of the DIP Loan Documents as and when due thereunder. |

The Interim Order also provides that the Debtors shall pay the reasonable and documented professional fees, costs, and expenses of the Prepetition RBL Agent's advisors, the Prepetition Term Loan Secured Parties' advisors, and the Prepetition Seller Note Secured Parties' advisors in accordance with the Interim Order whether incurred prepetition or postpetition.

The DIP Facility also includes the following fees:

- Certain fees as set forth in the DIP Engagement Letter.

- **Upfront Fees**: an upfront fee for each Lender in an amount equal to 2.00% of the portion of its aggregate commitment to provide the new money borrowings under the DIP Facility, due and payable upon entry of the Interim Order.

*See* Interim Order ¶¶ 2(e), 2(g), 3(d), 4(c), 5(c);  DIP Credit Agreement, § 3.05, DIP Engagement Letter § E.

| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and proceeds from the DIP Facility is subject to the Initial Approved Budget, attached to the Interim Order as **Schedule 1**. |

Commencing on November 8, 2019 and continuing on the last Friday of each four-week period occurring thereafter (i.e., every four weeks) (each, a "***Subsequent Reporting Date***" and, each such Subsequent Reporting Date together with the Initial Reporting Date, a "***Reporting Date***"), the Debtors shall prepare and deliver simultaneously to the DIP Agent, the Prepetition Term Loan Agent, and the Prepetition Seller Note Agent an updated "rolling" 13-week budget (a "***Proposed Supplemental Budget***"), which shall be in form and substance reasonably satisfactory to the DIP Agent, and which, once approved in writing by the DIP Agent shall supplement and replace the Initial Approved Budget or Supplemental Approved Budget (as defined in the Interim Order).  The Initial Approved Budget, as modified by all Supplemental Approved Budgets, shall constitute the "***Approved Budget***."

The Debtors shall only expend Cash Collateral and other DIP Collateral proceeds in accordance with the Approved Budget (and, in the case of the costs and expenses of the DIP Agent, the Prepetition RBL Agent, the Prepetition Term Loan Secured Parties and the Prepetition Seller Note Secured Parties, in accordance with the DIP Loan Documents and the Interim Order without being limited by the Approved Budget), subject to the Permitted Variances (as defined below and in the Interim Order), which shall be tested on (i) the first Friday (or, if such Friday is not a Business Day, the immediately preceding Business Day) following each Reporting Date (the "***Testing Date***"), and (ii) the third Friday (or, if such Friday is not a Business Day, the immediately preceding Business Day) following each Reporting Date (the "***Alternative Testing Date***," and together with each Testing Date, a "***Variance Testing Date***") (in each case, testing as of the most recent Variance Testing Date for the immediately preceding four-week period then ended (each such period, a "***Testing Period***," and each such report, a "***Variance Report***")).

*See* Interim Order, § 2(e), 2(f), Schedule 1.

| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B) | As of any Variance Testing Date, for the Testing Period ending on such Variance Testing Date, the Debtors shall not allow the aggregate disbursements made by the Debtors during such Testing Period (excluding disbursements in respect of professional fees incurred in the Cases by the Debtors and any Committee, debt service and all royalty and working |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | interest obligations during such Testing Period) to be greater than 115% of the aggregate disbursements for the Debtors set forth in the Approved Budget for such Testing Period, *provided* that the Debtors may carry forward budgeted but unused disbursements in such Testing Period set forth in the Budget (a "***Permitted Variance***"). <br><br>*See* DIP Credit Agreement, § 9.01; Interim Order § 2(f). |
| **Reporting Information** <br> Bankruptcy Rule 4001(c)(l)(B) | The Debtors shall deliver to the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties and the Prepetition Term Loan Secured Parties all information, reports, documents, and other material that the Debtors provide to the DIP Secured Parties pursuant to the DIP Loan Documents. <br><br>*See* Interim Order ¶ 3(e); 4(e), 5(e). |
| **Chapter 11 Milestones** <br> Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall comply with the following deadlines (each of which may be extended with the written consent of the Required Lenders without further order of the Court): <br><br>• the Debtors shall have obtained approval of the Interim Order by the date that is no later than five (5) days following the Petition Date; <br><br>• the Debtors shall have obtained approval of the Final Order by the date that is no later than thirty (30) days following the Petition Date; <br><br>• unless the Court has entered the Confirmation Order prior to such date, the Debtors shall have obtained approval of the Approved Bidding Procedures no later than seventy-five (75) days after the Petition Date; and <br><br>• unless the Approved Plan of Reorganization is consummated prior to such date, an Approved Sale must be consummated by the date that is no later than one hundred seventy (170) days following the Petition Date. <br><br>*See* DIP Credit Agreement, 8.17. |
| **Liens and Priorities** <br> Bankruptcy Rule 4001(c)(l)(B)(i) | Subject to the "Carve Out," the DIP Facility and the DIP Obligations shall at all times be secured, subject to customary permitted liens, by the following security interests and Liens on all property of the Debtors now existing or hereinafter acquired but excluding the Excluded Assets (as defined in the DIP Credit Agreement) (the "***DIP Collateral***"): <br><br>• a perfected and non-avoidable first priority Lien on and security interest in all DIP Collateral that is not otherwise subject to a valid, perfected and enforceable security interest or Lien in existence as of the Petition Date or a valid Lien perfected (but not granted) after the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code), including, subject to the entry of the Final Order, the proceeds of Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law (collectively, the "***Avoidance Actions***"); <br><br>• a perfected and non-avoidable Lien on and security interest in all DIP Collateral that is subject solely to the Prepetition Prior Liens (as defined in the Interim Order), which DIP Lien shall be junior only to such Prepetition Prior Liens and the Carve Out; <br><br>• perfect and non-avoidable first priority, senior priming Lien on and security interest in all other DIP Collateral (including Cash Collateral), which (x) shall be senior to the Prepetition RBL Adequate Protection Liens (defined below) and senior and priming to (A) the Prepetition RBL Liens, the Prepetition Term Loan |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | Liens and the Prepetition Seller Note Liens and (B) any Liens that are junior to the Prepetition RBL Liens or the RBL Adequate Protection Liens, after giving effect to any intercreditor or subordination agreements and shall be junior only to the Prepetition Prior Liens and the Carve Out.<br><br>*See* Interim Order, ¶ 2(j). |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection, the Prepetition RBL Agent, for the benefit of all Prepetition RBL Secured Parties, shall receive:<br><br>(i) valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions, which liens and security interests shall (a) be junior and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition RBL Liens and the Carve Out (the "***Prepetition RBL Adequate Protection Liens***");<br><br>(ii) allowed superpriority administrative expense claims in the Chapter 11 Cases having priority over all administrative expenses, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, subject only to the Carve Out and the DIP Superpriority Claims and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to the entry of the Final Order, the proceeds of Avoidance Actions) (the "***Prepetition RBL Adequate Protection Superpriority Claim***");<br><br>(iii) after entry of the Interim Order, the Prepetition RBL Agent shall be entitled to reimbursement of any and all fees, costs, expenses and charges (including the reasonable and documented fees and expenses of one primary counsel, one local counsel and its financial advisor) regardless of whether such fees and expenses were incurred before or after the commencement of the Chapter 11 Cases;<br><br>(iv) payment to the Prepetition RBL Secured Parties of interest at the non-Default Rate (as defined in the Prepetition RBL Credit Agreement) on the principal amount outstanding under the Prepetition RBL Credit Agreement (as such principal amount is reduced by the Roll Up upon entry of the Final Order).  During the Chapter 11 Cases, Default Rate interest shall continue to accrue *provided* that the Prepetition RBL Secured Parties have agreed to waive the payment of such interest under the Plan (as defined in the RSA) so long as such Plan becomes effective in accordance with the terms of the RS.<br><br>As adequate protection, the Prepetition Term Loan Agent, for the benefit of all Prepetition Term Loan Secured Parties, shall receive until the earlier of (i) a Termination Event (as defined in the Interim Order) or (ii) the date of termination of the RSA as to the Prepetition Term Loan Lenders, the following adequate protection:<br><br>(i) to the extent there is a diminution in value of the Prepetition Term Loan Collateral, valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral constituting assets of ARD Holdings I including, subject to the entry of the Final Order, the proceeds of Avoidance Actions of ARD Holdings I, which liens and security interests shall (a) be junior and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition RBL Adequate Protection Liens and the Carve Out (the "***Prepetition Term Loan Adequate Protection Liens***"); |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | (ii) to the extent there is a diminution in value of the Prepetition Term Loan Collateral, allowed superpriority administrative expense claims in the Chapter 11 Cases having priority over all administrative expenses and priority and other unsecured claims against ARD Holdings I, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, subject only to the Carve Out, the DIP Superpriority Claims and the Prepetition RBL Superpriority Claims and payable from and having recourse to all prepetition and postpetition property of ARD Holdings I and all proceeds thereof (including, subject to the entry of the Final Order, the proceeds of Avoidance Actions of ARD Holdings I) (the "*Prepetition RBL Adequate Protection Superpriority Claim*"); and<br><br>(iii) after entry of the Interim Order, the Prepetition Term Loan Agent shall be entitled to reimbursement of all reasonable out-of-pocket third party fees, costs, expenses and charges (including the reasonable and documented fees and expenses of one primary counsel and one local counsel for each of the Prepetition Term Loan Lenders) regardless of whether such fees and expenses were incurred before or after the commencement of the Chapter 11 Cases.<br><br>As adequate protection, the Prepetition Seller Note Agent, for the benefit of all Prepetition Seller Note Secured Parties, shall receive until the earlier of (i) a Termination Event (as defined in the Interim Order) or (ii) the date of termination of the RSA as to the Prepetition Seller Noteholders, the following adequate protection:<br><br>(i) to the extent there is a diminution in value of the Prepetition Seller Note Collateral, valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral constituting assets of the Prepetition Seller Note Grantors, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions of the Prepetition Seller Note Grantors, which liens and security interests shall (a) be junior and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition RBL Adequate Protection Liens and the Carve Out (the "*Prepetition Seller Note Adequate Protection Liens*");<br><br>(ii) to the extent there is a diminution in value of the Prepetition Seller Note Collateral, allowed superpriority administrative expense claims in the Chapter 11 Cases having priority over all administrative expenses and priority and other unsecured claims against the Prepetition Seller Note Grantors, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, subject only to the Carve Out, the DIP Superpriority Claims and the Prepetition RBL Superpriority Claims and payable from and having recourse to all prepetition and postpetition property of the Prepetition Seller Note Grantors and all proceeds thereof (including, subject to the entry of the Final Order, the proceeds of Avoidance Actions of the Prepetition Seller Note Grantors) (the "*Prepetition Seller Note Adequate Protection Superpriority Claim*"); and<br><br>(iii) after entry of the Interim Order, the Prepetition Seller Note Agent shall be entitled to reimbursement of all reasonable out-of-pocket third party fees, costs, expenses and charges (including the reasonable and documented fees and expenses of one primary counsel and one local counsel for each of the Prepetition Seller Note Lenders) regardless of whether such fees and expenses were incurred before or after the commencement of the Chapter 11 Cases. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | *See* Interim Order, ¶¶ 3–5. |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of a Final Order, the DIP Collateral shall include the proceeds of Avoidance Actions and the DIP Liens, the Prepetition RBL Adequate Protection Liens, the Prepetition Term Loan Adequate Protection Liens and the Prepetition Seller Noteholder Adequate Protection Liens shall attach to such proceeds, *provided,* that the Prepetition Term Loan Adequate Protection Liens shall only attach to the proceeds of Avoidance Actions of ARD Holdings I, and the Prepetition Seller Note Adequate Protection Liens shall only attach to the proceeds of Avoidance Actions of the Prepetition Seller Grantors. <br><br> Interim Order ¶¶ 2(j), 3(a), 4(a), 5(a). |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) | The Interim Order provides a "Carve Out" of certain statutory fees, professional fees of the Debtors and all allowed post-notice professional fees in an amount not to exceed $2,750,000. <br><br> *See* Interim Order, ¶ 8. |
| **Challenge Period** Bankruptcy Rule 4001(c)(1)(B) | The Interim Order provides for a standard and customary challenge period of the earlier of (x) the deadline to object to confirmation of the Plan; (y) in the case of an adversary proceeding or other contested matter filed by a party in interest with required standing other than the Committee (if any), no later than seventy-five (75) days from the date of entry of the Interim Order; and (z) in the case of an adversary proceeding or other contested matter filed by the Committee (if any), no later than sixty (60) days after the appointment of the Committee (if any) (such time period established by the earlier of clauses (x), (y) or (z), as the same may be extended in accordance with the Interim Order). <br><br> *See* Interim Order, ¶ 7. |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B) | Events of default under the DIP Credit Agreement include but are not limited to, the following (subject to certain grace periods): <br><br> 1.  failure of the Loan Parties to make any payment when due; <br><br> 2.  failure to observe or perform any covenant, condition or agreement in the DIP Credit Agreement (including failure to meet the milestones); <br><br> 3.  failure of any representation or warranty made by any Loan Party under the DIP Credit Agreement or other Loan Documents; <br><br> 4.  any event or condition that results in indebtedness for borrowed money, incurred after the Petition Date, in an aggregate principal amount in excess of $1,000,000, becoming due prior to its scheduled maturity, or that permits the holders of such indebtedness to accelerate such maturity date; <br><br> 5.  judgments entered against the Debtors, following the Petition Date, in an aggregate amount exceeding $1,000,000, to the extent not covered by insurance, or entry of a judgment which would have a material adverse effect; <br><br> 6.  failure of the Loan Documents to be in full force and effect; <br><br> 7.  occurrence of a Change of Control; <br><br> 8.  (i) termination of the RSA or failure of the RSA to be in full force and effect, and (ii) the Debtors have not filed a motion for approval of Approved Bidding Procedures within 15 business days of the date of such termination or failure; <br><br> 9.  dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to a |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
| --- | --- |
| | chapter 7 case; |
| | 10. an order is entered appointing a chapter 11 trustee, examiner (other than fee examiner) or other person with enlarged powers in these Chapter 11 cases; |
| | 11. (i) the bankruptcy court's grant of a superpriority claim or lien on the DIP Collateral which is *pari passu* with, or senior too, the Lenders' superpriority claims or liens, other than with respect to the Carve-Out or (ii) payment by the Debtors of any principal, interest or other amount on account of pre-petition indebtedness or payables, whether by way of adequate protection or otherwise; |
| | 12. failure of the Final Order to be entered within 30 days after the Petition Date; |
| | 13. (i) failure of the Debtors to comply with the DIP Orders or (ii) failure of any material provision of the DIP Order to be in full force and effect or any reversal, modification, amendment, stay, vacation or other modification of the DIP Order, without the prior consent of the Administrative Agent and the Majority Lenders (in their reasonable discretion); |
| | 14. entry of an order in the Chapter 11 cases charging any of the DIP Collateral, including under Section 506(c) or Section 552(b) of the bankruptcy code, or commencement of any action by a Loan Party which is adverse to the Lenders under the DIP Facility; |
| | 15. entry of an order in the Chapter 11 Cases granting relief from the automatic stay so as to allow a third party to proceed against assets of the Debtors valued in excess of $5,000,000, or that would have a material adverse effect on any Debtor or its estate; and |
| | 16. prior to the consummation of an Approved Sale, the filing of a plan of reorganization by any party to the RSA, other than an Approved Plan of Reorganization. |
| | DIP Credit Agreement § 10.01 |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The Interim Order provides that, upon a Termination Event, the automatic stay is modified without further order to the extent necessary to permit the DIP Secured Parties to exercise all rights and remedies available under the Interim Order, DIP Loan Documents and/or applicable non-bankruptcy law. |
| | The Interim Order further provides that upon a Termination Declaration, the Debtors and any Committee may, within five (5) business days, seek an emergency hearing on an expedited basis to consider whether a Termination Event has occurred.  If the Court has not determined that a Termination Event has not occurred after five (5) days of the Termination Declaration Date, the automatic stay is modified without further order to permit the DIP Agent to foreclose on, or otherwise enforce and realize on, the DIP Liens. |
| | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order. |
| | *See* Interim Order, ¶¶ 2(g), 15–16. |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) Local Rule | Subject to entry of the Final Order, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties and/or the Prepetition RBL Secured Parties, the Prepetition RBL Collateral, the Prepetition Term Loan Secured Parties, the Prepetition Term Loan Collateral, the Prepetition Seller Note Secured Parties or the Prepetition Seller Note Collateral, the DIP Collateral and the Cash Collateral, in each case pursuant to |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| 4001-2(a)(i)(C) | section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition RBL Agent (with respect to Prepetition RBL Collateral), the Prepetition Term Loan Agent (with respect to Prepetition Term Loan Collateral) and the Prepetition Seller Note Agent (with respect to Prepetition Seller Note Collateral). <br><br>*See* Interim Order, ¶ 9. |
| **Section 552(b) Waiver** <br> Bankruptcy Rule 4001(c)(1)(B) | In light of the subordination of their respective liens and superpriority administrative claims to (i) the Carve Out, in the case of the DIP Secured Parties, and (ii) the Carve Out and the DIP Liens, in the case of the Prepetition Secured Parties, each of the DIP Secured Parties and the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply. <br><br> Interim Order, ¶ K, 2(n), 3(c). |
| **Indemnification** <br> Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Credit Agreement contains customary expense and indemnification provisions substantially similar to those set forth in Section 12.03 of the Prepetition Credit Facility, as modified as necessary to reflect these Chapter 11 Cases.  Such indemnification provisions provide customary carve-outs for the bad faith, gross negligence and willful misconduct of the indemnified parties. <br><br> *See* DIP Credit Agreement, ¶ 12.03. <br><br> Additionally, pursuant to the Interim Order, the Debtors shall pay the fees and expenses of the DIP Agent, the Issuing Bank and the DIP Lenders, all in accordance with the terms of the DIP Loan Documents. <br><br> *See* Interim Order, Preamble, (i). |

## Provisions to be Highlighted Pursuant to Local Rule 4001-2

35.     The Debtors believe the following provisions of the DIP Credit Agreement must be highlighted pursuant to Local Rule 4001-2.

a.   <u>Cross-Collateralization (Local Rule 4001-2(a)(i)(A))</u>.  Not applicable.

b.   <u>Binding the Estate to Validity, Perfection or Amount of Secured Debt (Local Rule 4001-2(a)(i)(B))</u>.  Paragraphs D, E and F of the Interim Order contain customary stipulations of the Debtors regarding the validity, perfection, priority and amount of the (i) the Prepetition RBL Credit Agreement and the obligations thereunder; (ii) the Prepetition Term Loan Facility and the obligations thereunder; and (iii) the Prepetition Seller Notes and the obligations thereunder (each as defined below). Paragraph 16 provides for up to $50,000 to a Committee, if appointed, to inquire into and investigate such matters.  Paragraph 7 gives (a) the Committee, if appointed, sixty (60) days from the date of formation, and (b) any other party in interest with requisite standing, seventy-five (75) days from the date of entry of the Interim Order (or in the alternative to (a) or (b), until the objection deadline to

any plan of confirmation, if earlier), to investigate such matters and commence a challenge.

c.   <u>Waiver of Rights under Section 506(c) (Local Rule 4001-2(a)(i)(C))</u>.  Subject to entry of the Final Order, the Debtors shall grant a waiver of section 506(c) rights against the DIP Agent (with respect to the DIP Collateral), Prepetition RBL Secured Parties (with respect to their collateral), the Prepetition Term Loan Secured Parties (with respect to their collateral) and the Prepetition Seller Note Secured Parties (with respect to their collateral).  *See* Interim Order ¶ 9.

d.   <u>Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D))</u>.  The DIP Agent shall receive first priority, valid, perfected, enforceable liens on all the proceeds of any Avoidance Actions pursuant only to the Final Order but shall not be granted such liens pursuant to the Interim Order.  *See* Interim Order ¶ 2.  Additionally, the Prepetition RBL Agent, the Prepetition Term Loan Agent and the Prepetition Seller Note shall receive replacement liens, to the extent there is an aggregate diminution in value of their respective collateral, on the DIP Collateral, which shall include the proceeds of any Avoidance Actions (in the case of the Prepetition Term Loan Agent and Prepetition Seller Note Agent, such replacement liens shall only attach to proceeds of Avoidance Actions of ARD Holdings I and the Prepetition Seller Grantors, respectively), pursuant only to the Final Order but shall not be granted such liens pursuant to the Interim Order.  See Interim Order ¶¶ 3–5.

e.   <u>Provisions that Deem Prepetition Debt to be Postpetition Debt (Local Rule 4001-2(a)(i)(E))</u>.  Subject to the entry of the Final Order, $45 million of loans under the Prepetition RBL Credit Agreement shall be fully-rolled into the DIP Facility and shall constitute DIP Obligations.  *See* DIP Agreement, Recitals, § 2.01(b); Interim Order ¶ 2(i).  In addition, any Secured Swap Obligations (as defined in the Prepetition RBL Credit Agreement) of Swap Parties that have signed the RSA shall constitute DIP Obligations.

f.   <u>Provisions that Provide Disparate Treatment of Professionals Retained by a Creditors' Committee (Local Rule 4001-2(a)(i)(F))</u>.  The Interim Order does not currently provide for any Committee appointed in these Chapter 11 Cases in the Carve Out.

g.   <u>Provisions that Prime any Secured Liens without Consent of the Lienholder (Local Rule 4001-2(a)(i)(G))</u>.  Not applicable.  The Prepetition Secured Parties have each provided their consent to any priming of their respective liens and the use of their respective Cash Collateral.  Interim Order ¶¶ 3(g), 4(d), 5(d).

h.   <u>Provisions that Affect the Court's Power to Consider the Equities of the Case under Section 552(b)(1) (Local Rule 4001-2(a)(i)(H))</u>.  Subject to entry of a Final Order, each of the DIP Secured Parties and the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code,

and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.  See Interim Order ¶ K.

### Basis for Relief

I.  **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Loan Documents.**

    A.  **Entering into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

36.  The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents (including performing the Commitment Letter Indemnity Obligations set forth in the New RBL Facility Commitment Letter), obtain access to the DIP Facility, and continue using the Cash Collateral.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

37.  Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a

similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

38.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks*, *Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. **Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization**. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

39.    The Debtors' determination to move forward with the DIP Facility is a sound exercise of their sound business judgment following a thorough marketing process and careful evaluation of alternatives.   Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of these Chapter 11 Cases and their ongoing operations, and the terms of the DIP Facility were necessary to secure postpetition financing, achieve consensus with the Prepetition Secured Parties and accomplish the Debtors' comprehensive restructuring plan.   The Debtors negotiated the DIP Loan Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors and in consultation with the Prepetition Term Loan Lenders and Prepetition Seller Noteholders.   The Debtors believe that they have obtained the best financing available under the circumstances.   Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents as a reasonable exercise of the Debtors' business judgment.

40.    The proposed Roll Up is also an exercise of the Debtors' sound business judgment.   Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.   Courts in the Third Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.   *See, e.g., In re Just For Feet, Inc.,* 242 B.R. 821, 824–25 (D. Del. 1999) (noting that Bankruptcy Code permits courts to "authorize the payment of pre-petition claims if such payment was essential to the continued operation of the debtor") (citing cases).   Moreover, the business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.,* 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code

favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.")

41.    Repayment of prepetition debt is a common feature in debtor-in-possession financing arrangements, particularly when done pursuant to final order only. Courts in this and other jurisdictions have approved similar DIP features in other cases. *See e.g., In re BPS U.S. Holdings Inc.*, No. 16-12373 (KJC) (Bankr. D. Del. Oct. 31, 2016) (authorizing $331.3 million repayment of prepetition obligations from proceeds of the DIP loan); *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Oct. 6, 2015) (authorizing a DIP facility consisting of a $60 million roll up and a $30 million new money loan); *In re The Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing $725 million DIP facility with a $486 million roll up and payment of the remaining $25 million with cash from proceeds); *In re Gastar Exploration, Inc.*, No. 18-36057 (MI) (Bankr. S.D. Tex. Nov. 26, 2018) (authorizing approximately $383 million DIP that included repayment of approximately $283 million of prepetition debt); *In re Shoreline Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) (authorizing approximately $50 million DIP that included refinancing of $32 million in prepetition debt); *In re Black Elk Energy Offshore Operations, LLC*, No. 15-34287 (MI) (Bankr. S.D. Tex. Mar. 18, 2016) (authorizing approximately $15 million DIP that included refinancing of approximately $7.5 million in prepetition debt); *In re Toys "R" US, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Sept. 20, 2017) (authorizing $1.305 billion repayment of prepetition obligations from proceeds of DIP loan).[11]

42.    Further, the Roll Up will not prejudice any rights a party may otherwise have to challenge the amount, validity, perfection, enforceability, priority or extent of the debt or liens

---

[11]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

associated therewith.  Pursuant to the procedures set forth in the Interim Order, any Committee appointed in these Chapter 11 Cases and any other parties in interest have the ability to bring a challenge proceeding in accordance with applicable law and the terms of the Interim Order. Interim Order ¶ 7.  These procedures were developed to ensure that no party in interest would be prejudiced by the relief requested herein and to provide the Court with comfort that any amounts provided on account of the refinancing can be disgorged, refunded or repaid to the extent the Prepetition RBL Facility debt or the liens granted thereunder are successfully challenged.

43.    The Prepetition RBL Lenders' willingness to provide the DIP Facility was expressly conditioned upon the Roll Up.  Absent the DIP Facility, the Debtors' ability to continue operating will be jeopardized to the detriment of all parties in interest.  Further, the Prepetition Secured Parties representing all of the Debtors' prepetition capital structure have consented to the terms of the DIP Facility in their entirety, including the Roll Up.  Given these circumstances, repayment of $45 million of the Prepetition RBL Loans, subject to entry of the Final Order, is reasonable, appropriate and a sound exercise of the Debtors' business judgment.

**B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

44.    The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide the DIP Lenders with perfected first priority claims and fully consensual "priming liens" and security interests in the DIP Collateral with the exception of certain excluded property as well as the Prepetition Secured Parties with superpriority claims as adequate protection.

45.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to

obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and proposed lenders. *See In re L.A. Dodgers LLC*, 457 B.R. at 312 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp.*, 71 B.R. at 549.

46.     As described above and as set forth in the First Day Declaration, the Debtors are in need of an immediate capital infusion, yet substantially all of the Debtors' operating assets are encumbered under their existing capital structure. Moreover, none of the existing creditors, nor any that PJT contacted as part of the marketing process was interested in providing, or willing to provide, DIP financing to the Debtors on an unsecured basis or, in fact, on *any* basis that would not have involved a non-consensual priming. In light of the foregoing, the Debtors, in consultation with their advisors, have concluded that the success of the Chapter 11 Cases hinges on whether any DIP financing had the support of, or could be provided by, the Prepetition RBL Lenders.

47.     Without DIP financing, the Debtors lack sufficient funds to operate their businesses, continue paying their debts as they come due, pursue the sale of their assets, if

necessary, and cover the projected costs of the Chapter 11 Cases.  Absent the DIP Facility, which will provide the Debtors with sufficient liquidity to administer the Chapter 11 Cases through the reorganization  process, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the current circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are fair, reasonable and adequate.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

48.      Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).   Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").   Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented, or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.  Here, each of the Prepetition Secured Parties has consented to the terms of the DIP Facility.

49.      Furthermore, the Prepetition Secured Parties will receive adequate protection of their interests in their respective Prepetition Collateral under the DIP Orders.  Specifically, the Prepetition RBL Secured Parties will receive adequate protection in the form of replacement liens over the DIP Collateral (junior to the DIP Liens and the Carve Out), superpriority

administrative expense claims (junior to the Carve Out and the DIP Superpriority Claims), reimbursement of the fees and expenses of the Prepetition RBL Agent and payment of interest at the non-Default Rate (as defined in the Prepetition RBL Credit Agreement).  The Prepetition Term Loan Secured Parties and the Prepetition Seller Note Secured Parties will each receive adequate protection in the form of junior replacement liens over the Prepetition Term Loan Collateral and Prepetition Seller Note Collateral, respectively, superpriority administrative expense claims against their respective obligors (junior to the Carve Out, the DIP Superpriority Claims and the superpriority claims in favor of the Prepetition RBL Secured Parties) and the reimbursement of their reasonable and documented out-of-pocket third party fees and expenses. The adequate protection provided to the Prepetition Term Loan Secured Parties and the Prepetition Seller Note Secured Parties will terminate upon the termination of the RSA as to such parties.

50.     Accordingly, the Debtors submit that relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

51.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, as here, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that

credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (requiring a debtor to show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)).

52.    As described above and in the First Declaration and the Robbins Declaration, the Debtors and their advisors diligently solicited postpetition financing proposals from both existing lenders and third-party lending institutions.  However, the Prepetition RBL Lenders have senior liens on substantially all of the Debtors' assets and were unwilling to consent to the priming of their prepetition liens, and no party was willing to provide postpetition financing on any basis other than a priming basis.  *See supra ¶¶* 23-24.  The Debtors, in consultation with their advisors, did not believe a priming fight with the Prepetition RBL Lenders was prudent at the outset of the Chapter 11 Cases, especially because the Debtors' lack unrestricted cash to fund the cases pending such a litigation.

53.    The proposed DIP financing was negotiated by the Debtors in consultation with their legal and financial advisors, and was negotiated in good faith and at arms' length. Critically, the Debtors solicited feedback from the Prepetition Term Loan Lenders and Prepetition Seller Noteholders during each step of the negotiations, and those parties have consented to the final terms.

54.    The proposed postpetition financing provides desperately needed liquidity to the Debtors and avoids a potentially costly and uncertain priming fight.  Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the

circumstances to fund the Chapter 11 Cases.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**II.    The Debtors Should Be Authorized to Continue to Use the Cash Collateral.**

55.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Here, each of the Prepetition Secured Parties has consented to the Debtors' use of any Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

56.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case").

57.    The Prepetition Secured Parties will inherently benefit from the Debtors' proposed use of the Cash Collateral by enhancing the likelihood of preserving the Debtors' overall going concern value as the Debtors move toward confirmation of the Plan approved by their key stakeholders.  Preservation of the Debtors' business as a going concern in and of itself

serves to provide such parties "adequate protection" for Bankruptcy Code purposes. *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. at 114 ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

58.    In any event, under the terms of the Interim Order, the Debtors have agreed to provide the Prepetition Secured Parties with a variety of adequate protection measures to protect against the postpetition diminution in value of their collateral, including Cash Collateral (if any), resulting from the use, sale, or lease of the Cash Collateral by the Debtors, the priming of their prepetition liens and the imposition of the automatic stay, including (i) replacement security interests and liens, (ii) administrative expense claims under sections 503(b) and 507(a)(2) of the Bankruptcy Code, subject to the payment in full of amounts due under the Carve Out and the DIP Facility and (iii) payment of reasonable and documented out-of-pocket third party fees and expenses.

59.    The Debtors submit that the proposed adequate protection measures protect the Prepetition Secured Parties from any diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed adequate protection to be provided for the benefit of the Prepetition Secured Parties is appropriate and sufficient.  Thus, the proposed adequate protection is not only necessary to protect against any diminution in value, but is fair and appropriate under the circumstances of

these Chapter 11 Cases to ensure the Debtors' use of Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

### III.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders under the DIP Loan Documents.

60.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders as described in the table in Paragraph 34 above.  Additionally, pursuant to the proposed Interim Order, the Debtors have agreed to pay the prepetition and postpetition fees and expenses of the DIP Secured Parties and reasonable and documented out-of-pocket third party expenses for the Prepetition Secured Parties.

61.    The Debtors, in consultation with their advisors, believe that the payment of the fees and expenses of the advisors to the DIP Lenders is an integral component of the overall terms of the DIP Facility, was required by the DIP Lenders as consideration for the extension of postpetition financing, and is reasonable and customary for similar transactions.  Accordingly, the Court should authorize the Debtors to pay the fees and expenses of advisors provided under the DIP Loan Documents and the Interim Order.

### IV.    The DIP Secured Parties Should Be Afforded Good-Faith Protection under Section 364(e).

62.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith,

> whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).  As explained herein, in the First Day Declaration and the Robbins Declaration, the DIP Loan Documents are the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (b) vigorous, arm's-length and good-faith negotiations between the Debtors and the DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.  Furthermore, the Debtors submit that the Prepetition Secured Parties have acted in good faith in their consenting to the DIP Facility and the use of their respective Prepetition Collateral.

63.     Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Secured Parties in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

**V.     The Automatic Stay Should Be Modified on a Limited Basis.**

64.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit (i) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Lenders may request to assure the perfection and priority of the DIP Liens; (ii) the Debtors to take all appropriate action to grant the replacement liens and to take all appropriate action to ensure that such replacement liens are perfected and maintain the priority set forth in the Interim Order; (iii) the Debtors to

incur all liabilities and obligations to the DIP Lenders as contemplated under the DIP Loan Documents; (iv) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the Interim Order and the DIP Loan Documents; and (v) the implementation of the terms of the Interim Order.

65.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.  *See, e.g., In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default).

## VI.     Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

66.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

67.     The Debtors request that the Court conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.  The Debtors require the initial funding, in the amount of $30 million under the DIP Facility, prior to the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses and implement the relief requested in the Debtors' other "first day" motions.  Absent receipt of the initial funding

amount and access to cash collateral, the Debtors will be unable to continue operating during these Chapter 11 Cases or consummate their value-maximizing restructuring.  *See* Robbins Decl. ¶ 26.  Accordingly, this relief will enable the Debtors to preserve and maximize value and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## VII.    The Debtors Should be Authorized to Perform the Commitment Letter Indemnity Obligations.

68.    The Debtors also seek approval to perform their Commitment Letter Indemnity Obligations.  At this time, the Debtors have no immediate obligations with respect to the New RBL Facility Commitment Letter except for such indemnity and expense reimbursement obligations.

69.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Additionally, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Courts in the Third Circuit have generally held that a non-ordinary transaction should be approved if the proposed use of estate assets is within the debtor's reasonable business judgment.  *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (stating that the court generally defers to the trustee's judgment so long as there is a legitimate business justification); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *In re Bridgeport Holdings, Inc.,* 388 B.R. 548, 567 (Bankr. D. Del. 2008; *In re Tower Air, Inc.,* 416 F.3d 229, 238 (3d Cir. 2005) (stating that overcoming the business judgment rule is a "near-Herculean task" and requires a showing that the business

decision "go[es] so far beyond the bounds of reasonable business judgment that its only explanation is bad faith").

70.     The Debtors' need for the New RBL Facility is supported by clear, valid business reasons.  Although the Debtors are not at this time seeking approval of the New RBL Facility, it is critical that the Prepetition RBL Lenders commit to providing such facility on the Effective Date, subject to satisfaction of the conditions precedent.  Without this commitment, the Prepetition Term Loan Lenders and Prepetition Seller Noteholders would not have committed to provide $100 million of new equity capital upon emergence.  The Prepetition RBL Lenders' commitment is set forth in the New RBL Facility Commitment Letter and as a condition to signing that letter, the Prepetition RBL Lenders want assurance that they will be indemnified and have their expenses reimbursed in connection with negotiating and documenting the New RBL Facility.  Accordingly, the Debtors believe it is appropriate and an exercise of their business judgement to perform under the Commitment Letter Indemnity Obligations during the Chapter 11 Cases and to treat those obligations as DIP Obligations.

### Request for Final Hearing

71.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is no later than 30 days after the entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

72.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their

businesses without interruption and to preserve value for their estates.  For this reason and those set forth above, the Debtors submit that cause exist to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable

73.    The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed.  R.  Bankr.  P. 6004(h).

## Notice

74.    The Debtors will provide notice of this Motion to certain parties in interest, including: (a) the United States Trustee for the District of Delaware; (b) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (c) the United States Attorney's Office for the District of Delaware; (d) the attorneys general for the states in which the Debtors conduct business; (e) the Prepetition Seller Noteholders and counsel thereto; (f) the Prepetition Term Loan Lenders and counsel thereto; (g) the Consenting Equity Holders and counsel thereto; (h) the Prepetition RBL Agent and Prepetition RBL Lenders and counsel thereto; (i) the DIP Agent and counsel thereto; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (m) the state attorneys general for states in which the Debtors conduct business; (n) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (o) all other parties entitled to notice pursuant to Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: November 8, 2019
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Kara Hammond Coyle*

Pauline K. Morgan (No. 3650)
Kara Hammond Coyle (No. 4410)
Ashley E. Jacobs (No. 5635)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:         pmorgan@ycst.com
               kcoyle@ycst.com
               ajacobs@ycst.com
               ejustison@ycst.com

- and -

**SIMPSON THACHER & BARTLETT LLP**

Michael H. Torkin (*pro hac vice* pending)
Kathrine A. McLendon (*pro hac vice* pending)
Nicholas E. Baker (*pro hac vice* pending)
Edward R. Linden (*pro hac vice* pending)
Jamie J. Fell (*pro hac vice* pending)
425 Lexington Avenue
New York, New York 10017
Telephone:    (212) 455-2000
Facsimile:    (212) 455-2502
Email:         michael.torkin@stblaw.com
               kmclendon@stblaw.com
               nbaker@stblaw.com
               edward.linden@stblaw.com
               jamie.fell@stblaw.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARSENAL RESOURCES DEVELOPMENT | ) | Case No. 19-12347 (___) |
| LLC, *et al.*, | ) | |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |
| | ) | **Ref. Docket No. ____** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING AND (VI) GRANTING RELATED RELIEF**

Upon the motion, dated November 8, 2019 (the "**DIP Motion**"), of the DIP Borrower (defined below), and the other debtors and debtors-in-possession (collectively, the "**Debtors**"), in the above-referenced chapter 11 cases (the "**Cases**"), seeking entry of an interim order (this "**Interim Order**") pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507, and 552 of chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-1, 4001-2 and 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") that, among other things:

(i)  authorizes Arsenal Resources Development LLC, a Delaware limited liability company ("**ARD LLC**") designated as the "Borrower" under, and as defined in, the DIP Credit

---

[1]  The debtors in the chapter 11 cases, along with the last four digits of each debtor's United States federal tax identification number, are:  Arsenal Resources Development LLC (4072); Arsenal Energy Holdings LLC (6279); Arsenal Resources Intermediate Holdings LLC (5901); Arsenal Resources Energy LLC (2820); Arsenal Resources Development Holdings 2 LLC (3020); Arsenal Resources Development Holdings 1 LLC (9647); Arsenal Gas Marketing LLC (1113); Arsenal Midstream LLC (9654); Arsenal Water LLC (2465); Ulysses Gathering LLC (6546); Mar Key LLC (5428); Arsenal Resources LLC (3422); River Ridge Energy Holdings, LLC (8135); River Ridge Energy, LLC (5623); River Ridge Pennsylvania, LLC (5444); River Ridge Operating, LLC (4051); and Seneca-Upshur Petroleum, LLC (9204).  The debtors' mailing address is 6031 Wallace Road Ext., Suite 300, Wexford, PA 15090.

Agreement (defined below) (the "**DIP Borrower**") to obtain, and the other guarantors under the DIP Loan Documents (defined below) (collectively, the "**DIP Guarantors**") to unconditionally guaranty, jointly and severally, the DIP Borrower's obligations in respect of, senior secured priming and superpriority postpetition financing, which if approved on a final basis would consist of a revolving credit facility for up to $45,000,000 (the "**DIP Revolver Facility**"), including a letter of credit sub-facility for up to $5,000,000, which, for the avoidance of doubt, shall reduce availability under the DIP Revolver Facility on a dollar-for-dollar basis (the "**DIP LC Sub-Facility**"), and together with the DIP Revolver Facility, and the Roll Up (defined below), collectively, the "**DIP Facility,**" and the loans extended under the DIP Facility, including the Roll Up DIP Loans (defined below) the "**DIP Loans**"), pursuant to the terms of (x) this Interim Order, (y) that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "**DIP Credit Agreement**"),[2] by and among the DIP Borrower, Citibank, N.A., as administrative agent (in such capacity, the "**DIP Agent**"), and the other financial institutions that are from time to time party to the DIP Credit Agreement as "Lenders" under, and as defined in, the DIP Credit Agreement (the "**DIP Lenders**," together with the DIP Agent, the Issuing Banks, the Secured Swap parties and the other Secured Parties (as such terms are defined in the DIP Credit Agreement) and any other party to which DIP Obligations (defined below) are owed, the "**DIP Secured Parties**"), substantially in the form attached to the DIP Motion, and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, the "**DIP Loan Documents**") to: (A) fund, among other things, ongoing working capital, general corporate expenditures, and other financing needs of the Debtors, (B) provide letters of credit for the account of any of the

---

[2]        A form of the substantially final DIP Credit Agreement is attached to the DIP Motion as **Exhibit B**.

Debtors, (C) subject to entry of a Final Order (defined below), convert to DIP Obligations under the DIP Loan Documents, as provided in such Final Order, $45,000,000 of the outstanding principal amount of the Revolving Loans (as defined in the Prepetition RBL Credit Agreement (defined below)) held by the DIP Lenders as of the Petition Date (defined below) ratably in accordance with their respective shares of the DIP Revolver Facility (including the DIP LC Sub-Facility) (the "**Roll Up,**" and such converted Revolving Loans, the "**Roll Up DIP Loans**"), (D) pay certain transaction fees and other costs and expenses of administration of the Cases, and (E) pay fees and expenses (including reasonable attorneys' fees and expenses) and interest and other payments owed to the DIP Secured Parties under the DIP Loan Documents and this Interim Order;

(ii)      approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Loan Documents and authorizes and directs the Debtors to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Interim Order, including to perform the Commitment Letter Indemnity Obligations (as defined in the DIP Motion);

(iii)      subject to the Carve Out, grants (x) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, Liens (as defined in the DIP Credit Agreement) on all of the DIP Collateral (defined below) pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (defined below) and the Adequate Protection Liens (defined below), and shall be junior solely to any valid, enforceable, and non-avoidable Liens (including Excepted Liens (under and as defined in the DIP Credit Agreement)) that are (A) in existence on the Petition Date, (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b)

of the Bankruptcy Code, and (C) senior in priority to the Prepetition RBL Liens, the Prepetition

Term Loan Liens, or the Prepetition Seller Note Liens (each defined below; all such Liens,

collectively, the "**Prepetition Prior Liens**") and (y) to the DIP Secured Parties, pursuant to

section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to

all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired

and the proceeds of each of the foregoing, including, upon entry of this Interim Order, any

Debtor's rights under section 549 of the Bankruptcy Code and the proceeds thereof, and upon

entry of the Final Order, the proceeds of Avoidance Actions (defined below);

   (iv)  authorizes the Debtors to use "cash collateral," as such term is defined in section

363 of the Bankruptcy Code (the "**Cash Collateral**"), including Cash Collateral (if any) in which

(a) the DIP Secured Parties and/or the Prepetition RBL Secured Parties (defined below) have a

Lien or other interest, (b) the Prepetition Term Loan Secured Parties (defined below) have a Lien

or other interest, and (c) the Prepetition Seller Note Secured Parties (defined below) have a Lien

or other interest, in each case whether existing on the Petition Date, arising pursuant to this

Interim Order or otherwise;

   (v)  vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely

to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan

Documents and this Interim Order;

   (vi)  authorizes the DIP Borrower at any time prior to the entry of the Final Order to

borrow under the DIP Facility in an aggregate outstanding principal amount that, when taken

together with the aggregate face amount of letters of credit outstanding under the DIP LC Sub-

Facility, will not exceed $30,000,000, and authorizes the DIP Guarantors to unconditionally

guaranty such obligations jointly and severally; *provided* that any amounts of New Money Loans

(as defined in the DIP Credit Agreement) repaid under the DIP Revolver Facility may be reborrowed, subject to the terms of the DIP Loan Documents and this Interim Order;

(vii)    subject to the Carve Out, solely to the extent of any diminution in value of their collateral, grants (x) the Prepetition RBL Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition RBL Adequate Protection (defined below), which consists of, among other things, Prepetition RBL Adequate Protection Liens (defined below), Prepetition RBL Adequate Protection Superpriority Claims (defined below), and, subject to entry of the Final Order, the Roll Up; (y) the Prepetition Term Loan Secured Parties (defined below), as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition Term Loan Adequate Protection (defined below); and (z) the Prepetition Seller Note Secured Parties (defined below), as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition Seller Note Adequate Protection (defined below);

(viii)    schedules a final hearing on the DIP Motion (the "**Final Hearing**") to consider entry of a final order that grants all of the relief requested in the DIP Motion on a final basis and which final order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or this Court (defined below)) reasonably acceptable to the DIP Secured Parties, the Prepetition RBL Agent, the Prepetition Term Loan Secured Parties and the Prepetition Seller Note Secured Parties (each defined below) (the "**Final Order**");

(ix)    waives, solely upon entry of the Final Order, the Debtors' right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code;

(x)      provides that the DIP Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties and the Prepetition Seller Note Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply; and

(xi)     provides for the immediate effectiveness of this Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the DIP Motion, the DIP Credit Agreement, the *Declaration of Allen Goetz, the Debtors' Chief Financial Officer, in Support of Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"), the *Declaration of Avi Robbins in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Robbins Declaration**") and the evidence submitted or proffered at the hearing on this Interim Order (the "**Interim Hearing**"); and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(c), 4001(d), and 9014, and all applicable Local Rules, notice of the DIP Motion and the Interim Hearing having been provided pursuant to Bankruptcy Rule 4001; an Interim Hearing having been held and concluded on November 12, 2019; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Loan Documents is a sound

and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.      **Petition Date**.  On November 8, 2019 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (this "**Court**").  The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (to the extent such committee is appointed, the "**Committee**"), trustee, or examiner has been appointed in the Cases.

B.      **Jurisdiction and Venue**.  This Court has core jurisdiction over the Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and other predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and the Local Rules.

C.      **Notice**.  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties in interest, including: (a) the Office of the United States Trustee for the District of Delaware (the "**United States Trustee**"); (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the DIP Agent and

---

[3]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

counsel thereto; (d) the Prepetition RBL Agent and counsel thereto; (e) the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders and counsel thereto; (f) the Prepetition Seller Note Agent and the Prepetition Seller Noteholders and counsel thereto; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (j) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (k) the state attorneys general for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Under the circumstances, such notice of the DIP Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c), and (d) and the Local Rules, and no other notice need be provided for entry of this Interim Order.

D. **Debtors' Stipulations Regarding the Prepetition RBL Facility**.  Subject only to the rights of parties in interest that are specifically set forth in Paragraph 7 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (Paragraph D hereof shall be referred to herein collectively as the "**Debtors' RBL Stipulations**") as follows:

(i) Prepetition RBL Credit Facility.  Pursuant to that certain Credit Agreement, dated as of December 21, 2018 (as amended, restated, or otherwise modified from time to time, the "**Prepetition RBL Credit Agreement**," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition RBL Loan Documents**"), among (a) ARD LLC, as Borrower (defined therein), (b) the lenders from time to time party thereto (collectively, the

"**Prepetition RBL Lenders**"), (c) Citibank, N.A., as administrative agent (in such capacity, the

"**Prepetition RBL Agent**"), (d) BMO Harris Bank, N.A. and Société Générale, as Co-

syndication Agents, (e) CIT Finance LLC, as Documentation Agent, and (f) Citigroup Global

Markets Inc., as Lead Arranger (the Prepetition RBL Lenders, Prepetition RBL Agent, and all

other Secured Parties (as defined in the Prepetition RBL Credit Agreement), the "**Prepetition**

**RBL Secured Parties**"), the Prepetition RBL Secured Parties agreed to extend loans and other

financial accommodations to, and issue letters of credit for the account of, the Borrower (as

defined in the Prepetition RBL Credit Agreement) pursuant to the Prepetition RBL Loan

Documents.  All obligations of the Debtors arising under the Prepetition RBL Credit Agreement

(including the "Obligations" as defined therein, whether or not arising under the Prepetition RBL

Loan Documents) or the other Prepetition RBL Loan Documents shall collectively be referred to

herein as the "**Prepetition RBL Obligations**."

       (ii)    <u>Prepetition RBL Liens and Prepetition RBL Collateral</u>.  Pursuant

to the Security Instruments (as defined in the Prepetition RBL Credit Agreement and as such

documents were amended, restated, supplemented, or otherwise modified from time to time, the

"**Prepetition RBL Collateral Documents**"), by and among ARD LLC, and its subsidiaries party

thereto (collectively, the "**Prepetition RBL Grantors**") and the Prepetition RBL Agent, each

Prepetition RBL Grantor granted to the Prepetition RBL Agent, for the benefit of the Prepetition

RBL Agent and the other Prepetition RBL Secured Parties, to secure the Prepetition RBL

Obligations, a first priority security interest in and continuing Lien (the "**Prepetition RBL**

**Liens**") on substantially all of such Prepetition RBL Grantors' assets and properties (which, for

the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents,

and profits thereof, in each case whether then owned or existing or thereafter acquired or arising

(other than "Excluded Assets," as such term is defined in the Prepetition RBL Credit Agreement). All "Collateral" as defined in the Prepetition RBL Credit Agreement granted or pledged by such Prepetition RBL Grantors pursuant to any Prepetition RBL Collateral Document or any other Prepetition RBL Loan Document shall collectively be referred to herein as the "**Prepetition RBL Collateral**." As of the Petition Date, (a) the Prepetition RBL Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to, or for the benefit of, the Prepetition RBL Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (IV) are subject and subordinate only to (A) the DIP Liens (defined below), (B) the Carve Out (defined below), and (C) the Prepetition Prior Liens, and (b) (I) the Prepetition RBL Obligations constitute legal, valid, and binding obligations of the Loan Parties (as such term is defined in the Prepetition RBL Credit Agreement), enforceable in accordance with the terms of the applicable Prepetition RBL Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition RBL Obligations exist, (III) no portion of the Prepetition RBL Obligations or any payments made to any or all of the Prepetition RBL Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of each Guarantor (as defined in the Prepetition RBL Credit Agreement) under that certain Guaranty Agreement (as defined in the Prepetition RBL Credit Agreement), the Security Instruments (as defined in the Prepetition RBL Credit Agreement), and the other Prepetition

RBL Loan Documents shall continue in full force and effect to unconditionally guaranty the Prepetition RBL Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.

   (iii) <u>Amounts Owed under Prepetition RBL Loan Documents</u>.  As of the Petition Date, the applicable Debtors owed the Prepetition RBL Secured Parties, pursuant to the Prepetition RBL Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made, letters of credit issued, and other financial accommodations made by the Prepetition RBL Secured Parties, an aggregate principal amount of approximately $116.5 million, plus an issued and outstanding letter of credit in the amount of approximately $28.5 million *plus* all accrued and hereafter accruing and unpaid interest thereon, *plus* any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition RBL Loan Documents) and other amounts now or hereafter due under the Prepetition RBL Loan Documents.

   (iv) <u>Release of Claims</u>.  Subject to Paragraph 7 below and entry of the Final Order, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition RBL Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives of the foregoing (all of the foregoing, collectively, the "**<u>Prepetition RBL Secured Party Releasees</u>**") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other

offset rights, and other rights of disgorgement or recovery against any and all of the Prepetition

RBL Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in

connection with the Prepetition RBL Obligations, the Prepetition RBL Liens, or the debtor-

creditor relationship between any of the Prepetition RBL Secured Parties, on the one hand, and

any of the Debtors, on the other hand, including (a) any recharacterization, subordination,

avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of

the Bankruptcy Code or under any other similar provisions of applicable state law, federal law,

or municipal law and (b) any right or basis to challenge or object to the amount, validity, or

enforceability of the Prepetition RBL Obligations or any payments or other transfers made on

account of the Prepetition RBL Obligations, or the validity, enforceability, priority, or non-

avoidability of the Prepetition RBL Liens securing the Prepetition RBL Obligations, including

any right or basis to seek any disgorgement or recovery of payments of cash or any other

distributions or transfers previously received by any of the Prepetition RBL Secured Party

Releasees.

> E. **Debtors' Stipulations Regarding the Prepetition Term Loan Facility**.

Subject only to the rights of parties in interest that are specifically set forth in Paragraph 7 below,

the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and

agree (Paragraph E hereof shall be referred to herein as the "**Debtors' Term Loan**

**Stipulations**") as follows:

> (i)      Prepetition Term Loan Facility.   Pursuant to that certain Credit

Agreement, dated as of December 21, 2018 (as amended, restated, or otherwise modified from

time to time, the "**Prepetition Term Loan Credit Agreement**," and collectively with any other

agreements and documents executed or delivered in connection therewith, including the "Loan

Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition Term Loan Documents**"), among (a) Arsenal Resources Development Holdings 1 LLC ("**ARD Holdings I**"), as Borrower (as defined therein and, as defined herein, the "**Prepetition Term Loan Borrower"**), (b) the Lenders (as defined therein) from time to time party thereto (collectively, the "**Prepetition Term Loan Lenders**"), and (c) Chambers Energy Management, LP, as administrative agent (in such capacity, the "**Prepetition Term Loan Agent**" and together with the Prepetition Term Loan Lenders and any other party to which Prepetition Term Loan Obligations (defined below) are owed, the "**Prepetition Term Loan Secured Parties**"), the Prepetition Term Loan Secured Parties agreed to extend term loans and other financial accommodations to the Prepetition Term Loan Borrower pursuant to the Prepetition Term Loan Documents.  All obligations of the Debtors arising under the Prepetition Term Loan Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition Term Loan Documents) or the other Prepetition Term Loan Documents shall collectively be referred to herein as the "**Prepetition Term Loan Obligations**."

(ii)     _Prepetition Term Loans and Prepetition Term Loan Collateral_. Pursuant to the Security Instruments (as defined in the Prepetition Term Loan Credit Agreement and as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition Term Loan Collateral Documents**"), by and among ARD Holdings I and the Prepetition Term Loan Agent, ARD Holdings I granted to the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties, to secure the Prepetition Term Loan Obligations, a first priority security interest in and continuing Lien on substantially all of ARD Holdings I's assets and properties and all

proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising. All "Collateral" as defined in the Prepetition Term Loan Credit Agreement granted or pledged by ARD Holdings I pursuant to any Prepetition Term Loan Collateral Document or any other Prepetition Term Loan Document shall collectively be referred to herein as the "**Prepetition Term Loan Collateral**," and the Liens thereon shall be referred to as the "**Prepetition Term Loan Liens**." As of the Petition Date, (a) the Prepetition Term Loan Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to, or for the benefit of, the Prepetition Term Loan Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (IV) are subject and subordinate only to (A) the DIP Liens, (B) the Carve Out, and (C) the Prepetition Prior Liens, and (b) (I) the Prepetition Term Loan Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Term Loan Obligations exist, (III) no portion of the Prepetition Term Loan Obligations or any payments made to any or all of the Prepetition Term Loan Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of each Guarantor (as defined in the Prepetition Term Loan Credit Agreement) under any Guarantee (as defined in the Prepetition Term Loan Credit Agreement), the Security Instruments (as defined in

the Term Loan Credit Agreement), and the other Prepetition Term Loan Documents shall continue in full force and effect to unconditionally guaranty the Prepetition Term Loan Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.

(iii)    <u>Amounts Owed under Prepetition Term Loan Documents</u>.  As of the Petition Date, the applicable Debtors owed the Prepetition Term Loan Secured Parties, pursuant to the Prepetition Term Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition Term Loan Secured Parties, an aggregate principal amount (including capitalized interest) of approximately $227,823,186.38 *plus* all accrued and unpaid cash interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Term Loan Documents), and other amounts now or hereafter due under the Prepetition Term Loan Documents.

(iv)    <u>Release of Claims</u>.  Subject to Paragraph 7 below and entry of the Final Order, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition Term Loan Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives of the foregoing (all of the foregoing, collectively, the "**Prepetition Term Loan Secured Party Releasees**") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"),

01:25563033.2
15

defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the Prepetition Term Loan Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition Term Loan Obligations, the Prepetition Term Loans, or the debtor-creditor relationship between any of the Prepetition Term Loan Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Term Loan Obligations or any payments or other transfers made on account of the Prepetition Term Loan Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Term Loans securing the Prepetition Term Loan Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Term Loan Secured Party Releasees.

F.    **Debtors' Stipulations Regarding the Prepetition Seller Notes**. Subject only to the rights of parties in interest that are specifically set forth in Paragraph 7 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (Paragraph F hereof shall be referred to herein as the "**Debtors' Seller Note Stipulations**" and, together with the Debtors' RBL Stipulations and the Debtors' Term Loan Stipulations, the "**Debtors' Stipulations**") as follows:

(i)    Prepetition Seller Notes.  Pursuant to: (a) that certain Seller Note, dated as of October 14, 2014 (as amended, supplemented, or otherwise modified from time to time, the "**Chambers Seller Note**"), in the original principal amount of $39,047,625.00, issued

by Arsenal Energy Holdings LLC (f/k/a Mountaineer Energy Holdings, LLC and referred to herein as the "**Seller Note Issuer**") in favor of PDC Energy, Inc., as original seller, which note was sold and assigned pursuant to the Note Purchase Agreement, dated April 28, 2017, to Chambers Energy Capital II, LP, Chambers Energy Capital II, TE, LP and Chambers Energy Capital III, LP, as assignees and purchasers (the "**Chambers Noteholders**"); and (b) that certain Seller Note, dated as of October 14, 2014 in the original principal amount of $39,047,625.00, issued by the Seller Note Issuer in favor of LR-Mountaineer Holdings, L.P. (together with the Chambers Noteholders, the "**Prepetition Seller Noteholders**"), (as amended, supplemented, or otherwise modified from time to time, the "**LRMH Seller Note**," and, together with the Chambers Seller Note, the "**Prepetition Seller Notes**"; the Prepetition Seller Notes, together with the ARHD 2 Guaranty, the ARDH 2 Collateral Agreement, the Collateral Agency Agreement, and the Subordination Agreement (each as defined in the Prepetition Seller Notes, as amended), are referred to herein as  the "**Prepetition Seller Note Documents**"), the Prepetition Seller Noteholders (or their respective predecessors) agreed to extend financial accommodations to the Seller Note Issuer pursuant to the Prepetition Seller Note Documents.  All obligations of the Debtors arising under the Prepetition Seller Notes (including the "Obligations" as defined therein, whether or not arising under the Prepetition Seller Note Documents) or the other Prepetition Seller Note Documents shall collectively be referred to herein as the "**Prepetition Seller Note Obligations**."

(ii)      Prepetition Seller Notes and Prepetition Seller Note Collateral.  Pursuant to the Collateral Agreement, the Guaranty Agreement, the Collateral Agency Agreement (each as defined in the Prepetition Seller Notes) and the other Security Documents (as defined in the Collateral Agency Agreement) and as such documents were amended, restated,

17

supplemented, or otherwise modified from time to time, the "**Prepetition Seller Note Collateral Documents**"), by and among the Seller Note Issuer and Arsenal Resources Development Holdings 2 LLC, as applicable (collectively, the "**Prepetition Seller Note Grantors**") and LR-Mountaineer Holdings, L.P., as collateral agent (the "**Prepetition Seller Note Agent**"), each Prepetition Seller Note Grantor granted to the Prepetition Seller Note Agent, for the benefit of the Prepetition Seller Note Agent and the Prepetition Seller Noteholders (collectively, the "**Prepetition Seller Note Secured Parties**"), to secure the Prepetition Seller Note Obligations, a first priority security interest in and continuing Lien on substantially all of such Prepetition Seller Note Grantors' assets and properties and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.   All "Collateral" as defined in the Prepetition Seller Notes granted or pledged by such Prepetition Seller Note Grantors pursuant to any Prepetition Seller Note Collateral Document or any other Prepetition Seller Note Document shall collectively be referred to herein as the "**Prepetition Seller Note Collateral**" and the Liens thereon shall be referred to as the "**Prepetition Seller Note Liens**."   As of the Petition Date, (a) the Prepetition Seller Note Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to, or for the benefit of, the Prepetition Seller Note Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (IV) are subject and subordinate only to (A) the DIP Liens, (B) the Carve Out, and (C) the Prepetition Prior Liens, and (b) (I) the Prepetition Seller Note Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Seller Note Documents (other than in respect of the stay of enforcement arising from

section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Seller Note Obligations exist, (III) no portion of the Prepetition Seller Note Obligations or any payments made to any or all of the Prepetition Seller Note Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of the Guarantor (as defined in the Collateral Agency Agreement) under the Guaranty Agreement (as defined in the Collateral Agency Agreement), the Security Documents (as defined in the Collateral Agency Agreement), and the other Prepetition Seller Note Documents shall continue in full force and effect to unconditionally guaranty the Prepetition Seller Note Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.

      (iii)    <u>Amounts Owed under Prepetition Seller Note Documents</u>.  As of the Petition Date, the applicable Debtors owed the Prepetition Seller Note Secured Parties, pursuant to the Prepetition Seller Note Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition Seller Note Secured Parties, an aggregate principal amount of approximately $129,383,036.48 *plus* all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Seller Note Documents), and other amounts now or hereafter due under the Prepetition Seller Note Documents.

(iv)   <u>Release of Claims</u>.  Subject to Paragraph 7 below and entry of the Final Order, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition Seller Note Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives of the foregoing (all of the foregoing, collectively, the "**Prepetition Seller Note Secured Party Releasees**") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the Prepetition Seller Note Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition Seller Note Obligations, the Prepetition Seller Notes, or the debtor-creditor relationship between any of the Prepetition Seller Note Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Seller Note Obligations or any payments or other transfers made on account of the Prepetition Seller Note Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Seller Notes securing the Prepetition Seller Note Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Seller Note Secured Party Releasees.

G.    <u>Cash Collateral</u>.  All of the cash of ARD LLC and the Prepetition RBL Grantors, including any cash in deposit accounts of the Debtors (except as set forth in this Paragraph below with respect to the Parent Company Debtors (as defined in the DIP Credit Agreement)), wherever located, that constitutes Prepetition RBL Collateral is Cash Collateral of the Prepetition RBL Agent and the other Prepetition RBL Secured Parties.  The Prepetition RBL Lenders have reserved their right to assert that cash of the Parent Company Debtors, including any cash in deposit accounts of the Parent Company Debtors, is Cash Collateral of the Prepetition RBL Agent and the other Prepetition RBL Secured Parties; and the Prepetition Term Loan Secured Parties and Prepetition Seller Note Secured Parties have reserved their right to contest any such assertions; and nothing in this Interim Order shall prejudice the right of any Prepetition RBL Secured Party or any other party in interest to assert, determine or contest that any cash of a Parent Company Debtor is (or is not) Cash Collateral of such Prepetition RBL Secured Party.  All cash of ARD Holdings I (if any), including any cash in deposit accounts of ARD Holdings I, wherever located, that constitutes Prepetition Term Loan Collateral is Cash Collateral of the Prepetition Term Loan Agent and the other Prepetition Term Loan Secured Parties.  All cash of the Seller Note Issuer and the other Prepetition Seller Note Grantors (if any), including any cash in deposit accounts of the Seller Note Issuer and any of the other Prepetition Seller Note Grantors, wherever located, that constitutes Prepetition Seller Note Collateral is Cash Collateral of the Prepetition Seller Note Secured Parties.

H.    **<u>Findings Regarding the DIP Facility</u>**.

(i)    <u>Need for Postpetition Financing</u>.  The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors,

suppliers, and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to otherwise preserve the value of the Debtors' estates. The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to a successful reorganization and/or to otherwise preserve the enterprise value of the Debtors' estates. Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Interim Order and the DIP Loan Documents.

(ii)     <u>No Credit Available on More Favorable Terms</u>. The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Loan Documents and this Interim Order. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claims (defined below), (b) allowing the DIP Secured Parties to provide the loans, letters of credit, and other financial accommodations under the DIP Facility (including, subject to entry of the Final Order, the Roll Up DIP Loans) on the terms set forth herein and in the DIP Loan Documents, (c) granting to the Prepetition RBL Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the Prepetition RBL Adequate Protection and, subject to entry of the Final Order, the conversion of certain

Prepetition RBL Obligations into the Roll Up, (d) granting to the Prepetition Term Loan Secured Parties the rights, remedies, privileges, benefits, and protections provided herein, including the Prepetition Term Loan Adequate Protection, and (e) granting to the Prepetition Seller Note Secured Parties the rights, remedies, privileges, benefits, and protections provided herein, including the Prepetition Seller Note Adequate Protection (the foregoing described in clauses (a), (b) and (c), collectively, the **DIP Protections**").

        I.     **Interim Financing**.  During the Interim Period (defined below), the DIP Secured Parties and, as applicable, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties (together, the "**Prepetition Secured Parties**") are willing to provide financing to the Debtors and/or consent to the use of Cash Collateral by the Debtors, subject to (i) the entry of this Interim Order and (ii) the terms and conditions of the DIP Loan Documents.

        J.     **Adequate Protection**.  The Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties each have agreed   to permit the Debtors' continued use of, respectively the Prepetition RBL Collateral, the Prepetition Term Loan Collateral, and the Prepetition Seller Note Collateral, including the Cash Collateral, during the Interim Period, subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  In addition, the DIP Facility contemplated hereby provides for a priming of the Primed Liens pursuant to section 364(d) of the Bankruptcy Code.  The Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties are entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record

presented to this Court at the Interim Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties. The Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties consent to the relief set forth herein, pursuant to the Prepetition RBL Loan Documents, Prepetition Term Loan Documents, and Prepetition Seller Note Documents, and, in any event, the prepetition Liens and security interests of such parties are adequately protected pursuant to the terms of this Interim Order. Notwithstanding anything to the contrary herein, the consent of the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties to the DIP Facility and to the priming of the Prepetition RBL Liens, the Prepetition Term Loan Liens, and the Prepetition Seller Note Liens by the DIP Liens is expressly limited to the present DIP Facility and the DIP Liens securing same and shall not be applicable to any other debtor-in-possession credit facility, even if it contains substantially the same economic terms as this DIP Facility.

K.      **Section 552**.  In light of the subordination of their Liens and superpriority administrative claims to (i) the Carve Out, in the case of the DIP Secured Parties, and (ii) the Carve Out and the DIP Liens, in the case of the Prepetition Secured Parties, each of the DIP Secured Parties and the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.

L.        **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)       The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Interim Order.

(ii)      The terms and conditions of the DIP Facility (including, subject to the entry of the Final Order, the Roll Up) as set forth in the DIP Loan Documents and this Interim Order, and the fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, are fair, reasonable, and the best available under the circumstances, and the Debtors' agreement to the terms and conditions of the DIP Loan Documents and to the payment of such fees reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  Such terms and conditions are supported by reasonably equivalent value and fair consideration.

(iii)     The DIP Secured Parties, each of the Prepetition Secured Parties and the Debtors, with the assistance and counsel of their respective advisors, have acted in good faith and at arm's-length in, as applicable, negotiating, consenting to, and/or agreeing to, the DIP Facility (including, subject to the entry of the Final Order, the Roll Up), the Debtors' use of the DIP Collateral, the Prepetition RBL Collateral, the Prepetition Term Loan Collateral, and the Prepetition Seller Note Collateral (including, in each case, any Cash Collateral), the DIP Loan Documents, and the DIP Protections.  The DIP Obligations (including all advances that are made at any time to the Debtors under the DIP Loan Documents and including, subject to entry of the Final Order, the Roll Up DIP Loans) and the Debtors' use of the DIP Collateral, the Prepetition RBL Collateral, the Prepetition Term Loan Collateral, and the Prepetition Seller Note Collateral (including, in each case, any Cash Collateral) shall be deemed to have been extended and/or

consented to by the DIP Secured Parties and each of the Prepetition Secured Parties, as applicable, for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express and good faith reliance upon the protections offered by section 364(e) of the Bankruptcy Code and this Interim Order, and, accordingly, the DIP Liens, the DIP Superpriority Claims, and the DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and this Interim Order in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified on appeal or otherwise.

M.    **Relief Essential: Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates, their businesses and properties, and their ability to successfully reorganize or otherwise preserve the enterprise value of the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and authorization of the use of Cash Collateral in accordance with this Interim Order and the DIP Loan Documents are therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.  Based on all of the foregoing, sufficient cause exists for immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE,** based on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Prepetition RBL Agent, the requisite Prepetition RBL Secured Parties (on behalf of all of the Prepetition RBL Secured Parties), the Prepetition Term Loan Agent, the requisite Prepetition Term Loan Secured Parties (on behalf of all Prepetition Term Loan Secured Parties), the Prepetition Seller Note Agent, the

requisite Prepetition Seller Note Secured Parties (on behalf of all the Prepetition Seller Note Secured Parties), and the DIP Agent (on behalf of all of the DIP Secured Parties), in each case, to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

> **IT IS ORDERED** that:

1.      **Motion Granted**.  The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.   Any objections to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.      **DIP Loan Documents and DIP Protections**.

(a)      Approval of DIP Loan Documents.   The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents, including the DIP Engagement Letter (as defined in the DIP Motion) and, with respect to the Commitment Letter Indemnity Obligations, the New RBL Facility Commitment Letter (as defined in the DIP Motion), and this Interim Order, to incur the DIP Obligations (defined below) (including, subject to the entry of the Final Order, to convert to DIP Obligations under the DIP Loan Documents each DIP Lender's ratable share of $45,000,000 of the outstanding principal amount of the Revolving Loans (with each DIP Lender's ratable share based on the ratio of such DIP Lender's share of the DIP Revolver Facility, including the DIP LC Sub-Facility)), in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents that may be required or necessary for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Interim Order and the DIP Loan Documents.

The Debtors are hereby authorized to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, including all closing fees, administrative fees, commitment and arrangement fees, and reasonable and documented attorneys', financial advisors', and accountants' fees, and disbursements arising under the DIP Loan Documents and this Interim Order, which amounts shall not be subject to further approval of this Court and shall be non- refundable and not subject to challenge in any respect; *provided* that the payment of the fees and expenses of the Lender Professionals (defined below) shall be subject to the provisions of Paragraph 22(b).  Upon their execution and delivery, the DIP Loan Documents shall represent the legal, valid, and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms.   Each officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

(b)    DIP Obligations.   For purposes of this Interim Order, the term "**DIP Obligations**" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement and other DIP Loan Documents (which includes all Secured Swap Obligations and all other "Obligations," each as defined in the DIP Credit Agreement), and, subject to the entry of the Final Order, the Roll Up DIP Obligations) (defined below) and shall include the principal of, interest on, and fees, costs, expenses, premiums, and other charges owing in respect of, such amounts (including any reasonable and documented attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan Documents and/or this Interim Order), and any

obligations in respect of indemnity claims, whether contingent or otherwise. Notwithstanding anything to the contrary herein, the relative rights and priorities of the DIP Secured Parties in respect of the DIP Collateral shall be as provided in this Interim Order and the other DIP Loan Documents.

(c)     Authorization to Incur DIP Obligations and Use Cash Collateral.    To enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, during the period from the entry of this Interim Order through and including the earliest to occur of (i) the entry of the Final Order, or (ii) the Termination Declaration Date (defined below), in each case unless extended by written agreement of the DIP Agent and the Prepetition RBL Agent (and, with respect to any use of the Cash Collateral (if any) of ARD Holdings I, the written agreement of the Prepetition Term Loan Agent and, with respect to any use of the Cash Collateral (if any) of the Prepetition Seller Note Grantors, the written agreement of the Prepetition Seller Note Agent) (the period from the entry of this Interim Order through and including such earliest date, the "**Interim Period**"), the Debtors are hereby authorized: (x) to use Cash Collateral; (y) to enter into new Secured Swap Agreements (as defined in the DIP Credit Agreement) and continue performing under any Secured Swap Agreements that are in effect as of the Petition Date (and all Secured Swap Obligations shall be deemed to be DIP Obligations); and (z) to borrow and obtain letters of credit under the DIP Facility; *provided* that (I) during the Interim Period the aggregate outstanding amount for all such borrowings and letters of credit shall not exceed $30,000,000 under the DIP Facility, (II) any amounts repaid under the DIP Revolver Facility may be reborrowed, subject to the terms of the DIP Loan Documents and this Interim Order, and (III) any proposed use of the proceeds of DIP Loans or use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order and the DIP Loan

Documents, including the Approved Budget (defined below) and the Budget Covenants (defined below), subject to any applicable Permitted Variance (as defined and contained in the DIP Credit Agreement).   Following the entry of the Final Order, the DIP Borrower's and each DIP Guarantor's authority to incur further DIP Obligations, if any, and use further Cash Collateral will be governed by the terms of such Final Order and the DIP Loan Documents.   All DIP Obligations shall be unconditionally guaranteed, on a joint and several basis, by the DIP Guarantors, as further provided in the DIP Loan Documents.

(d)    <u>Roll Up</u>.   Subject to the entry of the Final Order, each DIP Lender's ratable share of $45,000,000 of the outstanding principal amount of the Revolving Loans (with each DIP Lender's ratable share based on the ratio of such DIP Lender's share of the DIP Revolver Facility, including the DIP LC Sub-Facility) shall immediately, automatically, and irrevocably be deemed to have been converted into Roll Up DIP Obligations and, except as otherwise provided in the Final Order and the DIP Loan Documents, shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under the Final Order and the DIP Loan Documents.   The conversion of the Roll Up DIP Obligations shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lenders to fund amounts under the DIP Revolver Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition RBL Obligations.   The Prepetition RBL Lenders would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Revolver Facility or extend credit to the Debtors thereunder without the inclusion of the Roll Up within the DIP Facility.   The Final Order shall provide that the full amount of the Roll Up DIP Obligations will be required to be

repaid in cash on the Maturity Date (as defined in the DIP Credit Agreement). As used herein, the term "**Roll Up DIP Obligations**" shall mean the Roll Up DIP Loans and all interest accrued and accruing thereon and all other amounts owing by the respective Debtors in respect thereof.

(e)     Budget.    Attached hereto as Schedule 1 is a rolling 13-week cash flow budget (the "**Initial Approved Budget**") that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales), (ii) weekly projected disbursements, including professional fees, debt service and any non-recurring or other disbursements, (iii) the sum of weekly unused availability under the DIP Facility plus unrestricted cash on hand (collectively, "**Aggregate Liquidity**") and (iv) the weekly outstanding principal balance of the loans made and letters of credit issued under the DIP Facility (including the principal amount of the Roll Up from and after the entry of a Final Order). Commencing on November 8, 2019 (the "**Initial Reporting Date**") and continuing on the last Friday of each four-week period occurring thereafter (*i.e.,* every four weeks) (each, a "**Subsequent Reporting Date**" and, each such Subsequent Reporting Date together with the Initial Reporting Date, a "**Reporting Date**"), the Debtors shall prepare and deliver simultaneously to the DIP Agent, the Prepetition Term Loan Agent, and the Prepetition Seller Note Agent an updated "rolling" 13-week budget (a "**Proposed Supplemental Budget**"), which shall be in form and substance reasonably satisfactory to the DIP Agent, and which, once approved in writing by the DIP Agent shall supplement and replace the Initial Approved Budget or Supplemental Approved Budget (defined below), as applicable, then in effect (each such updated budget that has been approved in writing by each of the DIP Agent (a "**Supplemental Approved Budget**") without further notice, motion, or application to, order of, or hearing before, this Court; *provided* that the DIP Agent shall have five (5) Business Days (as defined in the DIP Credit Agreement) to approve

each Proposed Supplemental Budget (any such party that fails to timely provide the Debtors written notice of any objection to such Proposed Supplemental Budget shall be deemed to have approved such Proposed Supplemental Budget); *provided, further* that unless and until the DIP Agent has approved in writing (or be deemed to have approved as provided above) such Proposed Supplemental Budget or any other proposed modification to the Initial Approved Budget or any Supplemental Approved Budget, as applicable, then in effect, the Debtors shall still be subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect in accordance with this Interim Order, and the DIP Secured Parties and the Prepetition RBL Secured Parties shall, as applicable, have no obligation to fund under any such Proposed Supplemental Budget or otherwise fund any amounts not otherwise provided for in the Initial Approved Budget or Supplemental Approved Budget or permit the use of Cash Collateral with respect thereto.  The Initial Approved Budget, as modified by all Supplemental Approved Budgets, shall constitute the "**Approved Budget**." Notwithstanding anything to the contrary in this Interim Order, the professional fees, costs, and expenses of the DIP Agent's advisors, the Prepetition RBL Agent's advisors, the Prepetition Term Loan Secured Parties' advisors, and the Prepetition Seller Note Secured Parties' advisors, respectively, shall be due, payable, and paid in accordance with the terms of this Interim Order notwithstanding any budgeted amounts for such fees, costs, and expenses set forth in the Approved Budget, and the Debtors shall not be deemed to have breached the terms of the Approved Budget or the Budget Covenants to the extent the actual amount of such fees, costs, and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget.

(f)    <u>Budget Covenants</u>.  The Debtors shall only expend Cash Collateral and other DIP Collateral proceeds in accordance with the Approved Budget (and, in the case of the

costs and expenses of the DIP Agent, the Prepetition RBL Agent, the Prepetition Term Loan Secured Parties and the Prepetition Seller Note Secured Parties, in accordance with the DIP Loan Documents and this Interim Order without being limited by the Approved Budget), subject to the Permitted Variances (defined below), which shall be tested on (i) the first Friday (or, if such Friday is not a Business Day, the immediately preceding Business Day) following each Reporting Date (each such Friday or the immediately preceding Business Day, as applicable, a "**Testing Date**") and (ii) the third Friday (or, if such Friday is not a Business Day, the immediately preceding Business Day) following each Reporting Date (each such Friday or the immediately preceding Business Day, an "**Alternative Testing Date**" and, together with each Testing Date, a "**Variance Testing Date**") (in each case, testing as of the most recent Variance Testing Date for the immediately preceding four-week period then ended (each such period, a "**Testing Period**," and each such report, a "**Variance Report**")).   On or before 5:00 p.m. (prevailing Eastern Time) on each Variance Testing Date, the Debtors shall prepare and deliver simultaneously to the DIP Agent, and counsel to the Prepetition RBL Agent, the Prepetition Term Loan Secured Parties, the Prepetition Seller Note Secured Parties and counsel to any Committee a Variance Report, in form and substance reasonably satisfactory to the DIP Agent, setting forth on a line-item basis (i) the actual cash receipts, expenditures, disbursements, and outstanding revolving loan balance (separating out the amount of the Roll Up during the Interim Period) of the Debtors for the applicable Testing Period and the Aggregate Liquidity and outstanding letter of credit exposure as of the end of the applicable Testing Period, and (ii) the variance in dollar amounts and percentage (whether positive or negative) of the actual cash receipts, expenditures, disbursements, and outstanding revolving loan balance for the applicable Testing Period, and the actual Aggregate Liquidity and outstanding letter of credit exposure as of

the end of the applicable Testing Period, from those budgeted amounts for, or as applicable, as of the end of, the corresponding period reflected in the Approved Budget.  As of any Variance Testing Date, for the Testing Period ending on such Variance Testing Date, the Debtors shall not allow the aggregate disbursements made by the Debtors during such Testing Period (excluding disbursements in respect of professional fees incurred in the Cases by the Debtors and any Committee, debt service and all royalty and working interest obligations during such Testing Period) to be greater than 115% of the aggregate disbursements for the Debtors set forth in the Approved Budget for such Testing Period, *provided* that the Debtors may carry forward budgeted but unused disbursements in such Testing Period set forth in the Budget (a "**Permitted Variance**").  Nothing in the Approved Budget or the covenants contained in this Paragraph 2(f) or the DIP Credit Agreement shall limit the Debtors' expenditures to the Professional Persons (defined below) retained in these Cases.  Additional variances, if any, from any Approved Budget, and any proposed changes to any Approved Budget, shall be subject to the written consent of the DIP Agent and the Prepetition RBL Agent (such consent not to be unreasonably conditioned, delayed, or withheld).  In addition to and without limiting the foregoing, on or before 5:00 p.m. (prevailing Eastern Time) on each Variance Testing Date, the Debtors shall deliver a report to the DIP Agent, the Prepetition RBL Agent, the Prepetition Term Loan Agent, the Prepetition Seller Note Agent, the United States Trustee, and counsel to any Committee, showing estimated accrued and unpaid professional fees and expenses for the Applicable Testing Period which, if allowed, would be Allowed Professional Fees (defined below) benefitting from the Carve Out. The foregoing budget-related covenants are collectively referred to herein as the "**Budget Covenants**."

(g) <u>Interest, Fees, Costs, Indemnities, and Expenses</u>.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court. The Debtors shall pay all fees, costs, indemnities, expenses (including reasonable and documented out-of-pocket legal and other professional fees and expenses of the DIP Agent and the Commitment Letter Indemnity Obligations), and other charges payable under the terms of the DIP Loan Documents as and when due thereunder.  All such fees, costs, indemnities, expenses, and disbursements, whether incurred, paid or required to be paid prepetition or postpetition and whether or not budgeted in the Approved Budget, are hereby affirmed, ratified, authorized, and payable (and any funds held by the DIP Agent and/or its professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses, and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Loan Documents, and, subject to the provisions of Paragraph 22(b) with respect to the fees and expenses of the Lender Professionals, shall be non-refundable and not subject to challenge in any respect and shall be payable without need to obtain further Court approval.

(h) <u>Use of DIP Facility and Proceeds of DIP Collateral</u>.  The DIP Borrower shall apply the proceeds of all DIP Collateral solely in accordance with this Interim Order, the DIP Loan Documents, and the Approved Budget (subject to any applicable Permitted Variance. Without limiting the foregoing, the Debtors shall not be permitted to make any payments (from the DIP Collateral, the proceeds of DIP Loans, or otherwise) on account of any prepetition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except: (i) as set forth in this Interim Order and a Final Order; (ii) as

provided in the orders entered by the Court in the Cases (other than this Interim Order) pursuant to motions and applications filed by the Debtors within ten (10) days after the Petition Date (the "**First Day Orders**"), which First Day Orders shall be in form and substance reasonably acceptable to the DIP Agent and consistent with the RSA (as defined in the DIP Motion); (iii) as expressly provided in other motions, orders, and requests for relief; or (iv) as otherwise expressly provided in the DIP Credit Agreement.

(i)　　　_Conditions Precedent_.　The DIP Secured Parties have no obligation to extend credit under the DIP Facility during the Interim Period unless and until all conditions precedent to the extension of credit under the DIP Loan Documents and this Interim Order have been satisfied in full or waived in writing by the DIP Secured Parties in accordance with the DIP Loan Documents.

(j)　　　_DIP Liens_.　Subject to the Carve Out, as security for the DIP Obligations (including all Secured Swap Obligations), effective as of the Petition Date, the following security interests and Liens, which shall immediately and without any further action by any Person be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable upon the entry of this Interim Order, are hereby granted by the Debtors to the DIP Agent, for itself and the other DIP Secured Parties (all such security interests and Liens granted to the DIP Agent for the benefit of all the DIP Secured Parties pursuant to this Interim Order and the DIP Loan Documents, the "**DIP Liens**"), on all property of the Debtors, (including ARD Holdings I and the Prepetition Seller Note Grantors) now existing or hereinafter acquired, including all cash and cash equivalents (whether maintained with the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable (including those owed to the Debtors generated by intercompany transactions), other rights to payment,

intercompany loans and other investments, securities and other investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, permits, franchise rights, capital stock and other equity interests of domestic and foreign subsidiaries and in other entities, tax and other refunds, insurance proceeds, claims (including commercial tort claims), causes of action (including, upon entry of the Final Order, the proceeds of Avoidance Actions), and products, offspring, profits, and proceeds relating thereto, rights under section 549 of the Bankruptcy Code (whether received by judgment, settlement, or otherwise), all other Collateral (as defined in the DIP Loan Documents), and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever located; *provided* that the Avoidance Actions themselves shall not be DIP Collateral; *provided*, *further*, that the DIP Collateral shall not include any Excluded Assets (as such term is defined in the DIP Credit Agreement; all of the foregoing collateral collectively, the "**DIP Collateral**"):

> (A)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable first priority Lien on and security interest in all DIP Collateral that is not otherwise subject to a valid, perfected, and enforceable security interest or Lien in existence as of the Petition Date or a valid Lien perfected (but not granted) after the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code), including, subject to the entry of the Final Order, the proceeds of Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law

(collectively, the "Avoidance Actions," which for avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise;

(B)    pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable Lien on and security interest in all DIP Collateral that is subject solely to the Prepetition Prior Liens, which DIP Lien shall be junior only to such Prepetition Prior Liens and the Carve Out; and

(C)    subject to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable first priority, senior priming Lien on and security interest in all other DIP Collateral (including Cash Collateral), which DIP Lien (x) shall be senior to the Prepetition RBL Adequate Protection Liens  and senior and priming to (A) the Prepetition RBL Liens, the Prepetition Term Loan Liens, and the Prepetition Seller Note Liens and (B) any Liens that are junior to the Prepetition RBL Liens or the Prepetition RBL Adequate Protection Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A) and (B), collectively, the "**Primed Liens**") and shall be junior only to the Prepetition Prior Liens and the Carve Out.

(k)    DIP Lien Priority.  Notwithstanding anything to the contrary contained in this Interim Order or the DIP Loan Documents, for the avoidance of doubt, the DIP Liens granted to the DIP Agent for the benefit of the DIP Secured Parties shall in each and every case be first priority senior Liens that (i) are subject only to the Prepetition Prior Liens, and to the extent provided in this Interim Order and the DIP Loan Documents, shall also be subject to the Carve Out, and (ii) except as provided in the immediately preceding sub-clause (i), are senior to all prepetition and postpetition Liens or other interests of any kind of any other person or entity (including the Primed Liens and the RBL Adequate Protection Liens), whether created voluntarily or involuntarily (including by order of a court).

(l)    Enforceable Obligations.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto (including any trustee

or other estate representative in any Successor Case (defined below)), and their creditors and other parties-in-interest, in accordance with their terms.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable, or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, surcharge, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(m)    Superpriority Administrative Claim Status.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve Out in accordance with this Interim Order, over all administrative expense claims, adequate protection and other diminution claims (including the Prepetition RBL Adequate Protection Superpriority Claims (defined below)), priority and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 9), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims

may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment (the "**DIP Superpriority Claims**"). The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions.  Other than as expressly provided in the DIP Credit Agreement and/or this Interim Order with respect to the Carve Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising under the DIP Loan Documents and/or this Interim Order.

(n)     <u>Priority of DIP Liens and DIP Superpriority Claims</u>.  The DIP Liens and the DIP Superpriority Claims: (i) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (ii) shall not be subordinate to, or *pari passu* with, (A) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (B) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (iii) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of

the foregoing (each, a "**Successor Case**"), and/or upon the dismissal of any of the Cases, and (iv) notwithstanding anything to the contrary in any First Day Order of this Court in any of the Cases, shall be senior to any administrative claims arising under any such First Day Order.

        3.      **Adequate Protection for Prepetition RBL Secured Parties**.  In consideration for the use of the Prepetition RBL Collateral (including Cash Collateral) and the priming of the Prepetition RBL Liens, the Prepetition RBL Agent, for the benefit of the Prepetition RBL Secured Parties, shall receive the following adequate protection (collectively, the "**Prepetition RBL Adequate Protection**"):

        (a)      <u>Prepetition RBL Adequate Protection Liens</u>.  Subject to the Carve Out, to the extent there is an aggregate diminution in value of the interests of the Prepetition RBL Secured Parties in the Prepetition RBL Collateral (including Cash Collateral) from and after the Petition Date, resulting from the use, sale, or lease by the Debtors of the applicable Prepetition RBL Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition RBL Liens thereto and to the Carve Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code ("**Diminution in Prepetition RBL Collateral Value**"), the Prepetition RBL Agent, for the benefit of all the Prepetition RBL Secured Parties, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "**Prepetition RBL Adequate Protection Liens**"), which Prepetition

RBL Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens,  and the Carve Out.

(b)        Prepetition RBL Adequate Protection Superpriority Claims.  Subject and subordinate to the Carve Out, to the extent of Diminution in Prepetition RBL Collateral Value, the Prepetition RBL Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "**Prepetition RBL Adequate Protection Superpriority Claims**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 9), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and the Carve Out, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions); *provided* that the Prepetition RBL Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Prepetition RBL Adequate Protection Superpriority Claims unless and until all DIP Obligations (including, subject to entry of the Final Order, the Roll Up DIP Obligations) have been Paid in Full.  Subject to the relative priorities set forth above, the Prepetition RBL Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.  For purposes of this Interim Order, the terms "**Paid in Full**," "**Repaid in Full**," "**Repay in Full**," "**Pay in Full**," and "**Payment in Full**" shall mean,

with respect to any referenced DIP Obligations and/or Prepetition RBL Obligations, (i) the indefeasible payment in full in cash of such obligations, (ii) the termination or cash collateralization, in accordance with the DIP Loan Documents or Prepetition RBL Loan Documents, as applicable, of all undrawn letters of credit outstanding thereunder, and (iii) the termination of all credit commitments under the DIP Loan Documents and/or Prepetition RBL Loan Documents, as applicable.

(c)    Priority of Prepetition RBL Adequate Protection Liens and Prepetition RBL Adequate Protection Superpriority Claims.  The Prepetition RBL Adequate Protection Liens and the Prepetition RBL Adequate Protection Superpriority Claim (i) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (ii) shall not be subordinate to, or *pari passu* with, (A) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (B) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (iii) shall be valid, binding, perfected, and enforceable against any trustee or any other estate representative elected or appointed in the Cases or any Successor Cases, and/or upon the dismissal of any of the Cases, and (iv) notwithstanding anything to the contrary in any First Day Order of this Court in any of the Cases, shall be senior to any administrative claims arising under any such First Day Order.

(d)    Payment of Interest to and Professional Fees and Expenses of Prepetition RBL Agent.  As further adequate protection, and without limiting any rights or defenses of the Prepetition RBL Agent and the other Prepetition RBL Secured Parties under section 506(b) of the Bankruptcy Code, which rights and defenses are hereby preserved, and in consideration, and

43

as a requirement, for obtaining the consent of the Prepetition RBL Secured Parties to the entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall pay or reimburse in cash (i) to the Prepetition RBL Secured Parties, interest at the non-Default Rate (as defined in the Prepetition RBL Credit Agreement) under the Prepetition RBL Credit Agreement, payable on the last Business Day of each month on the principal amount outstanding thereunder (as such principal amount is reduced by the Roll Up DIP Loans upon entry of the Final Order) beginning with November 29, 2019, and (ii) to the Prepetition RBL Agent, any and all fees, costs, expenses, and charges (including the reasonable and documented fees, costs, and expenses of one primary counsel, one local counsel, and the financial advisor for the Prepetition RBL Agent) to the extent, and at the times, payable under the Prepetition RBL Loan Documents, including any unpaid fees, costs, and expenses accrued prior to or after the Petition Date within five (5) Business Days after the presentment of any such invoices to the Debtors, but subject to Paragraph 22(b) with respect to any postpetition reimbursement for professional fees.  During the Cases, Default Rate interest shall continue to accrue *provided* that the Prepetition RBL Secured Parties have agreed to waive the payment of such interest under the Plan (as defined in the RSA) so long as such Plan becomes effective in accordance with the terms of the RSA.

(e)    The Debtors shall deliver to the Prepetition RBL Agent all information, reports, documents, and other material that the Debtors provide to the DIP Secured Parties pursuant to the DIP Loan Documents.

(f)    Notwithstanding the Payment in Full of the DIP Obligations and the termination of the DIP Loan Documents, the covenants set forth in the DIP Loan Documents and any order of this Court relating thereto shall continue in full force and effect for the benefit of the

Prepetition RBL Agent and the Prepetition RBL Secured Parties, and may be enforced by the Prepetition RBL Agent.    Unless otherwise expressly set forth herein or in the DIP Loan Documents, any consent or approval rights or similar rights granted or referenced in this Interim Order or in the DIP Loan Documents in favor of any or all of the DIP Agent, the other DIP Secured Parties, the Prepetition RBL Agent, and the other Prepetition RBL Secured Parties may be exercised (or not exercised) in the sole discretion of such party.

(g)    <u>Consent to Priming and Adequate Protection</u>.  The Prepetition RBL Agent, and the other Prepetition RBL Secured Parties that have consented, consents to the Prepetition RBL Adequate Protection and the priming provided for herein; *provided*, *further* that such consent of the Prepetition RBL Agent and the other Prepetition RBL Secured Parties to the priming of the Prepetition RBL Liens and the use of Cash Collateral is expressly conditioned upon the entry of this Interim Order (and, after the Interim Period, upon entry of the Final Order), and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Loan Documents; *provided*, *further*, that such consent shall be of no force and effect in the event (i) this Interim Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition RBL Agent) or the DIP Loan Documents and DIP Facility as set forth herein are not approved or (ii) after the Interim Period, the Final Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition RBL Agent) or the DIP Loan Documents and DIP Facility as set forth herein are not approved.

(h)    <u>Right to Seek Additional Adequate Protection</u>.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, this Court finds that the adequate protection provided herein is reasonable to protect the interests of the Prepetition RBL Secured Parties.  However, the Prepetition RBL Agent, on behalf of the Prepetition RBL Secured Parties, may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the grant of any additional or alternative adequate protection; *provided* that any such additional or alternative adequate protection shall at all times be subordinate and junior to the Carve Out and claims and Liens of the DIP Secured Parties granted under this Interim Order and the DIP Loan Documents; *provided*, *further*, that nothing in this Paragraph shall authorize the Prepetition RBL Agent or Prepetition RBL Secured Parties to deny the Debtors access to Cash Collateral or DIP Loans in accordance with the Approved Budget, subject to any Permitted Variance, pursuant to the terms of this Interim Order during the pendency of such request for additional or alternative adequate protection.  The consent of the Prepetition RBL Secured Parties to the priming of the Prepetition RBL Liens by the DIP Liens and the Debtors' use of Cash Collateral on the terms set forth herein does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition RBL Secured Parties that their respective interests in the Prepetition RBL Collateral are adequately protected pursuant to this Interim Order or otherwise.

4.    **Adequate Protection for Prepetition Term Loan Secured Parties**.    In consideration for the use of the Prepetition Term Loan Collateral (including Cash Collateral) and the priming of the Prepetition Term Loans, the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Secured Parties, shall receive, until the earlier of the (i) occurrence of

a Termination Event (defined below) and (ii) date of termination of the RSA as to the Prepetition Term Loan Lenders, subject to the Carve Out, the following adequate protection (collectively, the "**Prepetition Term Loan Adequate Protection**"):

        (a)      <u>Prepetition Term Loan Adequate Protection Liens</u>.  Subject to the Carve Out and the other provisions of this Interim Order, to the extent there is an aggregate diminution in value of the interests of the Prepetition Term Loan Secured Parties in the Prepetition Term Loan Collateral (including any Cash Collateral) from and after the Petition Date resulting from the use, sale, or lease by the Debtors of the applicable Prepetition Term Loan Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the granting of the Prepetition RBL Adequate Protection Liens, the subordination of the Prepetition Term Loan Liens thereto and to the Carve Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code ("**Diminution in Prepetition Term Loan Collateral Value**"), the Prepetition Term Loan Agent, for the benefit of all the Prepetition Term Loan Secured Parties, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral constituting assets of ARD Holdings I, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions of ARD Holdings I (such adequate protection replacement Liens, the "**Prepetition Term Loan Adequate Protection Liens**"), which Prepetition Term Loan Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition RBL Adequate Protection Liens, and the Carve Out.

(b)    <u>Prepetition Term Loan Adequate Protection Superpriority Claims</u>.  Subject to the Carve Out and the other provisions of this Interim Order, to the extent of Diminution in Prepetition Term Loan Collateral Value, the Prepetition Term Loan Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "**Prepetition Term Loan Adequate Protection Superpriority Claims**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against ARD Holdings I or its estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 9), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims, the Prepetition RBL Adequate Protection Superpriority Claims, and the Carve Out to the extent provided herein and in the DIP Loan Documents and the Prepetition RBL Loan Documents, and payable from and having recourse to all prepetition and postpetition property of ARD Holdings I and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions of ARD Holdings I). Notwithstanding the foregoing, each of the Prepetition Term Loan Secured Parties (i) agrees that, solely under the Plan (as defined in the RSA), any Prepetition Term Loan Adequate Protection Superpriority Claim shall not receive any recovery or distribution and there shall be no Prepetition Term Loan Adequate Protection Liens solely for purposes of the Plan; and (ii) hereby consents to such treatment of its Prepetition Term Loan Adequate Protection Superpriority Claims and Prepetition Term Loan Adequate Protection Liens solely under the Plan.

(c)    <u>Professional Fees of Prepetition Term Loan Agent</u>.    As adequate

protection, and without limiting any rights or defenses, of the Prepetition Term Loan Agent and

the other Prepetition Term Loan Secured Parties under section 506(b) of the Bankruptcy Code,

which rights and defenses are hereby preserved, and in consideration, and as a requirement, for

obtaining the consent of the Prepetition Term Loan Secured Parties to the entry of this Interim

Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall

pay or reimburse in cash the Prepetition Term Loan Agent and the Prepetition Term Loan

Secured Parties for any and all reasonable out-of-pocket third party fees, costs, expenses, and

charges (including the reasonable and documented fees, costs, and expenses of Kirkland & Ellis

LLP, Vinson & Elkins LLP, and one local counsel for each of the Prepetition Term Loan

Lenders) to the extent, and at the times, payable under the RSA, including any unpaid fees, costs,

and expenses accrued prior to or after the Petition Date, subject to Paragraph 22(b) hereof.

(d)    <u>Consent to Priming and Adequate Protection</u>.  The Prepetition Term Loan

Agent, on behalf of the Prepetition Term Loan Secured Parties, consents to the Prepetition Term

Loan Adequate Protection and the priming provided for herein; *provided* that such consent of the

Prepetition Term Loan Agent to the priming of the Prepetition Term Loans and the use of any

Cash Collateral is expressly conditioned upon the entry of this Interim Order and the receipt of

Prepetition Term Loan Adequate Protection.

(e)    The Debtors shall deliver to the Prepetition Term Loan Agent all

information, reports, documents, and other material that the Debtors provide to the DIP Secured

Parties pursuant to the DIP Loan Documents.

5.    **Adequate Protection for Prepetition Seller Note Secured Parties**.

In consideration for the use of the Prepetition Seller Note Collateral (including Cash Collateral)

and the priming of the Prepetition Seller Notes, the Prepetition Seller Note Secured Parties, shall receive, until the earlier of the (i) occurrence of a Termination Event and (ii) date of termination of the RSA as to the Prepetition Seller Noteholders, subject to the Carve Out, the following adequate protection (collectively, the "**Prepetition Seller Note Adequate Protection**" and, together with the Prepetition RBL Adequate Protection and the Prepetition Term Loan Adequate Protection, the "**Prepetition Adequate Protection**"):

(a)      *Prepetition Seller Note Adequate Protection Liens*.  Subject to the Carve Out, to the extent there is a diminution in value of the interests of the Prepetition Seller Note Secured Parties in the Prepetition Seller Note Collateral (including Cash Collateral) from and after the Petition Date resulting from the use, sale, or lease by the Debtors of the applicable Prepetition Seller Note Collateral (including any Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the granting of the Prepetition RBL Adequate Protection, the granting of the Prepetition Term Loan Adequate Protection, the subordination of the Prepetition Seller Note Liens thereto and to the Carve Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code and/or any other reason for which adequate protection may be granted under the Bankruptcy Code ("**Diminution in Prepetition Seller Note Collateral Value**"), the Prepetition Seller Note Secured Parties are hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral of the Prepetition Seller Note Grantors, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions of the Prepetition Seller Note Grantors (such adequate protection replacement Liens, the "**Prepetition Seller Note Adequate Protection Liens**," and, together with the Prepetition RBL Adequate Protection Liens and the Prepetition Term Loan Adequate

Protection Liens, the "**Adequate Protection Liens**"), which Prepetition Seller Note Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition RBL Adequate Protection Liens, and the Carve Out.

(b)  Prepetition Seller Note Adequate Protection Superpriority Claims. Subject to the Carve Out, to the extent of Diminution in Prepetition Seller Note Collateral Value, the Prepetition Seller Note Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "**Prepetition Seller Note Adequate Protection Superpriority Claims**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Prepetition Seller Note Grantors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 9), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims, the Prepetition RBL Adequate Protection Superpriority Claims, and the Carve Out to the extent provided herein and in the DIP Loan Documents and the Prepetition RBL Loan Documents, and payable from and having recourse to all prepetition and postpetition property of the Prepetition Seller Note Grantors and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions of the Prepetition Seller Note Grantors).  Notwithstanding the foregoing, each of the Prepetition Seller Note Secured Parties (i) agrees that, solely under the Plan, any Prepetition Seller Note Adequate Protection Superpriority Claim shall not receive any recovery or distribution and there shall be no Prepetition Seller Note Adequate Protection Liens solely for purposes of the Plan; and (ii)

hereby consents to such treatment of its Prepetition Seller Note Adequate Protection Superpriority Claims and Prepetition Seller Note Adequate Protection Liens solely under the Plan.

(c)    _Professional Fees of Prepetition Seller Note Secured Parties_.  As adequate protection, and without limiting any rights or defenses, of the Prepetition Seller Secured Parties under section 506(b) of the Bankruptcy Code, which rights and defenses are hereby preserved, and in consideration, and as a requirement, for obtaining the consent of the Prepetition Seller Note Secured Parties to the entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall pay or reimburse in cash the Prepetition Seller Note Agent and the Prepetition Seller Note Secured Parties for any and all reasonable out-of-pocket third party fees, costs, expenses, and charges (including the reasonable and documented fees, costs, and expenses of Kirkland & Ellis LLP, Baker Botts L.L.P, and one local counsel for each of the Prepetition Seller Noteholders) to the extent, and at the times, payable under the RSA, including any unpaid fees, costs, and expenses accrued prior to or after the Petition Date, subject to Paragraph 22(b) hereof with respect to the reimbursement of professional fees.

(d)    _Consent to Priming and Adequate Protection_.  The Prepetition Seller Noteholders consent to the Prepetition Seller Note Adequate Protection and the priming provided for herein; _provided_ that such consent of the Prepetition Seller Noteholders to the priming of the Prepetition Seller Notes and the use of Cash Collateral is expressly conditioned upon the entry of this Interim Order.

(e)    The Debtors shall deliver to the Prepetition Seller Note Secured Parties all information, reports, documents, and other material that the Debtors provide to the DIP Secured Parties pursuant to the DIP Loan Documents.

6.      **Automatic Postpetition Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document that may otherwise be required under the law of any jurisdiction, obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral (and the DIP Agent and, after Payment in Full of the DIP Facility, the Prepetition RBL Agent shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts, and commodities accounts within the meaning of such Uniform Commercial Code and other law), or (b) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent and each holder of Adequate Protection Liens (in the latter case, solely with respect to such Adequate Protection Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed, or recorded as of the Petition Date.  The applicable Debtors shall execute and deliver to the DIP Agent and/or each holder of Adequate Protection Liens, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens, as applicable, granted pursuant hereto.  Without

limiting the foregoing, each of the DIP Agent and each holder of Adequate Protection Liens may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized and hereby is directed to file or record such copy of this Interim Order.  Subject to the entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or other monetary obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order or in favor of the Prepetition Secured Parties in accordance with this Interim Order.  To the extent that the Prepetition RBL Agent, any Prepetition Term Loan Secured Party or any Prepetition Seller Note Secured Party is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies, or is the secured party under any of the Prepetition RBL Loan Documents, the Prepetition Term Loan Documents or the Prepetition Seller Note Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the Debtors' insurance policies, and

the secured party under each such Prepetition RBL Loan Document, shall have all rights and powers attendant to that position (including rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan Documents and second, subsequent to Payment in Full of all DIP Obligations, for the benefit of the Prepetition RBL Secured Parties.  The Prepetition RBL Agent, the Prepetition Term Loan Agent and the Prepetition Seller Note Secured Parties, as applicable, shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

7. **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.  The Debtors' Stipulations shall be binding upon the Debtors and their estates in all circumstances upon entry of this Interim Order.  The Debtors' Stipulations shall be binding upon each party in interest (other than the Debtors), including the Committee and any chapter 11 trustee (or if the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (defined below), the chapter 7 trustee in such Successor Case), except to the extent and only to the extent such party in interest with standing *first,* commences by the earlier of (x) the deadline to object to confirmation of a plan in the Debtors' chapter 11 cases, (y) in the case of such adversary proceeding or other contested matter filed by a party in interest with required standing other than the Committee (if any) no later than seventy-five (75) days from the date of entry of this Interim Order, or (z) in the case of an adversary proceeding or other contested matter filed by the Committee (if any), no later than sixty (60) days after the appointment of the Committee (if any) (such time period established by the earlier of clauses (x),

(y) or (z), as the same may be extended in accordance with this Paragraph 7, shall be referred to as the "**Challenge Period**") and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "**Challenge Period Termination Date**") (A) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations, or (B) a contested matter or adversary proceeding against any or all of the Prepetition RBL Secured Parties, Prepetition Term Loan Secured Parties, or Prepetition Seller Note Secured Parties, as applicable, in connection with or related to the Prepetition RBL Obligations, Prepetition Term Loan Obligations, or Prepetition Seller Note Obligations, as applicable, or the actions or inactions of any of the Prepetition RBL Secured Parties, Prepetition Term Loan Secured Parties, or Prepetition Seller Note Secured Parties, as applicable, arising out of or related to the Prepetition RBL Obligations, the Prepetition RBL Loan Documents, the Prepetition Term Loan Obligations, the Prepetition Term Loan Documents, the Prepetition Seller Note Obligations, or the Prepetition Seller Note Documents, as applicable, including any claim against any or all of the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, or the Prepetition Seller Note Secured Parties, as applicable in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition RBL Obligations, the Prepetition Term Loan Obligations, or the Prepetition Seller Note Obligations, as applicable (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, or the Prepetition Seller Note Secured Parties, as applicable) (clauses (A) and

(B) collectively, the "**Challenges**" and, each individually, a "**Challenge**"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "**Successful Challenge**"). If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) days after the date on which such trustee is appointed or elected. Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Cases and any Successor Cases (and after the dismissal of these Cases or any Successor Cases), (i) all payments made to or for the benefit of the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, or the Prepetition Seller Note Secured Parties, as applicable pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery, or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition RBL Obligations, the Prepetition Term Loan Obligations, and the Prepetition Seller Note Obligations, as applicable, shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code (which claims and Liens shall have been deemed satisfied to the extent the Prepetition RBL Obligations are converted into Roll Up DIP Obligations as provided herein), and (iv) the Debtors' RBL Stipulations, the Debtors' Term Loan Stipulations, and the Debtors' Seller Note Stipulations, as applicable, including the release provisions therein, shall be binding on all parties in interest in

these Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' RBL Stipulations, the Debtors' Term Loan Stipulations, and the Debtors' Seller Note Stipulations, as applicable, and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' RBL Stipulations, the Debtors' Term Loan Stipulations, and the Debtors' Seller Note Stipulations, as applicable, or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.  The Challenge Period may be extended (x) with respect to a Challenge related to the Prepetition RBL Obligations or Prepetition RBL Liens, only with the written consent of the Prepetition RBL Agent in its sole discretion, (y) with respect to a Challenge related to the Prepetition Term Loan Obligations or the Prepetition Term Loan Liens, only with the written consent of the Prepetition Term Loan Agent in its sole discretion, and (z) with respect to a Challenge related to the Prepetition Seller Note Obligations or Prepetition Seller Note Liens, only with the written consent of the Prepetition Seller Noteholders in their sole discretion or, in each case, pursuant to a Court order for good cause shown.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on or authority to any party in interest, including any Committee, to pursue or bring any cause of action, including any Challenge, on behalf of the Debtors or their Debtors' estates.  The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge

Period Termination Date as required under this Paragraph 7 or to require or permit an extension of the Challenge Period Termination Date.  For the avoidance of doubt, as to the Debtors, upon entry of this Interim Order, all Challenges, and any right to assert any Challenge, are hereby irrevocably waived and relinquished as of the Petition Date, and the Debtors' Stipulations shall be binding in all respects on the Debtors irrespective of the filing of any Challenge.

       8.     **<u>Carve Out</u>**.

       (a)     <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**<u>Allowed Professional Fees</u>**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**<u>Professional Persons</u>**") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,750,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**<u>Post-Carve Out Trigger Notice Cap</u>**").  For purposes of the foregoing, "**<u>Carve Out Trigger Notice</u>**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead

restructuring counsel, lead counsel to the Prepetition RBL Agent, lead counsel to the Prepetition Term Loan Secured Parties, lead counsel to the Prepetition Seller Note Secured Parties, the United States Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors under the DIP Credit Agreement, in an amount equal to (a) the maximum amount provided for in Paragraph 8(a)(i) and 8(a)(ii) above; plus (b) the then unpaid amounts (including the good-faith estimate Professional Fees accrued and not yet invoiced) of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans), as provided for in Paragraph 8(a)(iii) of the Carve Out and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the amount described in this Paragraph 8(b).  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims to the fullest extent allowable under the Bankruptcy Code and applicable non-bankruptcy law.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a draw request by the Debtors under the DIP Credit Agreement, in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans).  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such

Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims. On the first business day after the DIP Agent provides notice of a Carve Out Trigger Notice to the DIP Lenders (which notice shall be delivered to the DIP Lenders contemporaneously with delivery to the Debtors), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Credit Agreement, any termination of the Commitments (as defined the DIP Credit Agreement) (the "**DIP Loan Commitments**") following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), each DIP Lender (on a *pro rata* basis based on the DIP Lenders' then-outstanding Commitment) shall make available to the DIP Agent such DIP Lender's *pro rata* share with respect to such borrowing in accordance with the DIP Facility; *provided, however*, that notwithstanding anything to the contrary in this Paragraph 8, no DIP Lender shall be required to make DIP Loans in excess of its DIP Loan Commitment. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until Paid in Full and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed ratably (based on the proportion of the Pre-Carve Out Trigger Notice Reserve funded by or from the DIP Lenders or the DIP Collateral) to the DIP Agent on behalf of the DIP Lenders.

(c)     All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed ratably (based on the proportion of the Post-Carve Out Trigger Notice Reserve funded by or from the DIP Lenders or the DIP Collateral) to the DIP Agent on behalf of the DIP Lenders.  Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, if either of the Carve Out Reserves are not funded in full in the amounts set forth in Paragraph 8(b) or this Paragraph 8(c), then any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in Paragraph 8(b) or this Paragraph 8(c), prior to making any payments to the DIP Agent.  Notwithstanding anything to the contrary in the DIP Loan Documents, this Interim Order, or the Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, the Prepetition Term Loan Agent, the Prepetition Seller Note Agent and the other DIP Secured Parties, Prepetition RBL Secured Parties, Prepetition Term Loan Secured Parties and Prepetition Seller Note Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the DIP Agent shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid in accordance with clauses (a) and (b) above.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Advances (as that term is used in section 9.05 of the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full

the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Credit Agreement, Prepetition RBL Credit Agreement, Prepetition Term Loan Agreement or Prepetition Seller Note Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facilities, the DIP Liens, the DIP Superpriority Claims, and the Adequate Protection Liens, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations.  Notwithstanding anything herein, but subject to Paragraphs 7 and 16, no proceeds of DIP Collateral, Prepetition Collateral, Cash Collateral, the DIP Loans, or the Carve Out shall be used for the purpose of:  (a) investigating, objecting to, challenging, or contesting in any manner, or in raising any defense to, the amount, validity, extent, perfection, priority, enforceability, or avoidability of the Prepetition RBL Obligations, the Prepetition RBL Liens, the Prepetition Term Loan Obligations, the Prepetition Term Loan Liens, the Prepetition Seller Note Obligations, or the Prepetition Seller Note Liens or any liens or security interests with respect thereto, or any other rights or interests of any of the Prepetition Secured Parties, whether in their capacity as such or otherwise, including with respect to the Adequate Protection Liens, or in asserting any claims or causes of action against any of the Prepetition Secured Parties (whether in their capacity as such or otherwise), including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise.

01:25563033.2

(d)    <u>Payment of Allowed Professional Fees Prior to Trigger Notice Date</u>.  Prior to the occurrence of the Trigger Notice Date, the Debtors shall be permitted to pay allowed fees and expenses of the Debtors' Professional Persons, subject to this Interim Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any interim compensation procedures order entered by this Court.

(e)    <u>No Direct Obligation to Pay Allowed Professional Fees; No Waiver of Right to Object to Fees</u>.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Case under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall (i) be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement or (ii) require any DIP Lender to make DIP Loans in excess of its DIP Loan Commitment. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Cases or any Successor Case or of any other person or entity, or shall affect the right of the DIP Agent, the DIP Lenders, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, or the Prepetition Seller Note Secured Parties to object to the allowance and payment of any such fees and expenses.

(f)    <u>Payment of Allowed Professional Fees Prior to Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(g)     <u>Payment of Carve Out On or After Termination Declaration Date</u>.  Any payment or reimbursement from the Carve Out Reserves made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

9.     **<u>Waiver of 506(c) Claims</u>**.  Subject to the entry of the Final Order, as a further condition of (i) the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties to the payment of the Carve Out to the extent provided herein) and (ii) the Debtors' use of Cash Collateral pursuant to this Interim Order and a Final Order, (a) no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties and/or the Prepetition RBL Secured Parties, the Prepetition RBL Collateral, the Prepetition Term Loan Secured Parties, the Prepetition Term Loan Collateral, the Prepetition Seller Note Secured Parties or the Prepetition Seller Note Collateral, the DIP Collateral, and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition RBL Agent (with respect to Prepetition RBL Collateral), the Prepetition Term Loan Agent (with respect to Prepetition Term Loan Collateral), and the Prepetition Seller Note Agent (with respect to Prepetition Seller Note Collateral), (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP

Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties and (c) the exercise prior to the entry of the Final Order of any rights under section 506(c) of the Bankruptcy Code or otherwise to charge any costs or expense of administration of the Cases or any Successor Cases from or against the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, or the Prepetition Seller Note Secured Parties or their respective Liens on or other interests in any or all of the DIP Collateral, the Prepetition RBL Collateral, the Prepetition Term Loan Collateral, the Prepetition Seller Note Collateral, and the Cash Collateral shall not impair and shall be subject to, and junior to, the DIP Liens on and the DIP Secured Parties' other interests in the DIP Collateral, the Prepetition RBL Collateral, the Prepetition Term Loan Collateral, or the Prepetition Seller Note Collateral and the Cash Collateral and the other DIP Protections.

10.     **After-Acquired Property**.   Except as otherwise expressly provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date (or a valid, enforceable, and unavoidable Lien that is perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code) that is not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

11.    **Protection of DIP Secured Parties' Rights**.

(a)    Unless the requisite DIP Secured Parties under the DIP Loan Documents shall have provided their prior written consent or all DIP Obligations have been Paid in Full, there shall not be entered in any of these Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, other than the Carve Out, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, and/or the other DIP Protections provided to the DIP Secured Parties, unless the proceeds of such credit or indebtedness are used to Pay in Full the DIP Obligations; (ii) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations or as otherwise permitted in the DIP Loan Documents and this Interim Order, or (iii) any modification of any of the DIP Secured Parties' rights under this Interim Order, or the DIP Loan Documents with respect to any DIP Obligations.

(b)    The Debtors will, whether or not the DIP Obligations have been Paid in Full, (i) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents, (ii) reasonably cooperate with, consult with, and provide to the DIP Secured Parties all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the DIP Secured Parties) to provide under the DIP Loan Documents or the provisions of this Interim Order, (iii) upon reasonable advance notice, permit consultants, advisors, and other representatives (including third party representatives) of each of the DIP Agent reasonable access to any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business

premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) in each case as and to the extent required by the DIP Loan Documents, (iv) permit the DIP Agent and their respective consultants, advisors, and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets, and (v) upon reasonable advance notice, permit the DIP Agent to conduct, at their discretion and at the Debtors' cost and expense, reasonable field audits, collateral examinations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral, in each case as and to the extent required by the DIP Loan Documents. Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Agent or their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product.

12.    **Proceeds of Subsequent Financing**.    Without limiting the provisions and protections of the Carve Out and Paragraph 11 above, if at any time prior to the Payment in Full of all the DIP Obligations (including subsequent to the confirmation of any chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent for application to the DIP Obligations until Paid in Full.

13.    **Disposition of DIP Collateral; Credit Bid**.

(a)    Unless the DIP Obligations and the Prepetition RBL Obligations are Paid in Full upon the closing of a sale or other disposition of the DIP Collateral or Prepetition RBL Collateral, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or any Prepetition RBL Collateral (or enter into any binding agreement to do so) (other than the sale of crude oil, natural gas, or other hydrocarbons in the ordinary course of business) without the prior written consent of the DIP Agent and, solely with respect to the Prepetition RBL Collateral, the Prepetition RBL Agent (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or Prepetition RBL Secured Party or any order of this Court), except as permitted in the DIP Loan Documents and/or the Prepetition RBL Loan Documents, as applicable, and this Interim Order. Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance, or other disposition of any DIP Collateral (other than the sale of crude oil, natural gas, or other hydrocarbons in the ordinary course of business) shall be remitted to the DIP Agent for application to the DIP Obligations, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.  In addition, the Debtors are authorized and directed to enter into such blocked account agreements (with cash dominion, if the DIP Agent so elects) with the DIP Agent and such financial institutions as the DIP Agent may require, and, if it so elects, the DIP Agent shall be entitled to enjoy the benefit of all control agreements to which the Prepetition RBL Agent is a party without the need to enter into new blocked account agreements.

(b)    Subject to Paragraph 7 of this Interim Order and the RSA, (i) the DIP Agent (or one or more of its designees, affiliates, or assignees) shall have the unqualified right to

credit bid up to the full amount of any DIP Obligations in any sale of the DIP Collateral (or any

DIP Collateral subject to any Prepetition RBL Adequate Protection Liens) under or pursuant to

(A) section 363 of the Bankruptcy Code, (B) any plan of reorganization or plan of liquidation

under section 1129 of the Bankruptcy Code to the extent any sale contemplated thereunder does

not result in Payment in Full of all of the DIP Obligations on the effective date of such plan, or

(C) section 725 of the Bankruptcy Code, (ii) subject to Paragraph 7 of this Interim Order and the

RSA, the Prepetition RBL Agent (or one or more of its designees, affiliates, or assignees) shall

have the right to credit bid up to the full amount of any Prepetition RBL Obligations in any sale

of the Prepetition RBL Collateral (or any DIP Collateral subject to any Prepetition RBL

Adequate Protection Liens) under or pursuant to (A) section 363 of the Bankruptcy Code, (B)

any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code to

the extent any sale contemplated thereunder does not result in Payment in Full of all of the

Prepetition RBL Obligations on the effective date of such plan, or (C) section 725 of the

Bankruptcy Code, in each case so long as all DIP Obligations are immediately Paid in Full in

cash upon consummation of such credit bid, (iii) subject to Paragraph 7 of this Interim Order and

the RSA, the Prepetition Term Loan Agent (or one or more of its designees, affiliates, or

assignees) shall have the right to credit bid up to the full amount of any Prepetition Term Loan

Obligations in any sale of the Prepetition Term Loan Collateral (or any DIP Collateral subject to

any Prepetition Term Loan Adequate Protection Liens) under or pursuant to (A) section 363 of

the Bankruptcy Code, (B) any plan of reorganization or plan of liquidation under section 1129 of

the Bankruptcy Code to the extent any sale contemplated thereunder does not result in Payment

in Full of all of the Prepetition Term Loan Obligations on the effective date of such plan, or (C)

section 725 of the Bankruptcy Code, in each case so long as all DIP Obligations are immediately

Paid in Full in cash upon consummation of such credit bid, and (iv) subject to Paragraph 7 of this Interim Order and the RSA, the Prepetition Seller Note Agent (or one or more of its designees, affiliates, or assignees) shall have the right to credit bid up to the full amount of any Prepetition Seller Note Obligations in any sale of the Prepetition Seller Note Collateral (or any DIP Collateral subject to any Prepetition Seller Note Adequate Protection Liens) under or pursuant to (A) section 363 of the Bankruptcy Code, (B) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code to the extent any sale contemplated thereunder does not result in Payment in Full of all of the Prepetition Seller Note Obligations on the effective date of such plan, or (C) section 725 of the Bankruptcy Code, in each case so long as all DIP Obligations are immediately Pain in Full in cash upon consummation of such credit bid. If the DIP Agent, the Prepetition RBL Agent, the Prepetition Term Loan Agent, or the Prepetition Seller Note Agent or their respective designees, affiliates, or assignees make a credit bid in connection with any auction or other sale process relating to the sale or other disposition of any DIP Collateral, Prepetition RBL Collateral, Prepetition Term Loan Collateral, or Prepetition Seller Note Collateral, as applicable, then for purposes of such auction or sale process or any applicable order of this Court, the DIP Agent, Prepetition RBL Agent, Prepetition Term Loan Agent, and/or Prepetition Seller Note Agent shall be automatically deemed to be a qualified bidder and its bid shall be automatically deemed to constitute a qualified bid, regardless of whether the qualified bidder or qualified bid requirements are satisfied.

14.   **Termination Events**.  The following shall constitute a termination event under this Interim Order and the DIP Loan Documents unless waived in writing by each of the DIP Agent and the Prepetition RBL Agent (each, a "**Termination Event**"):

(a)    The occurrence of an "Event of Default" under the DIP Credit Agreement, as set forth therein (a "**DIP Default Termination Event**"), including, for avoidance of doubt, the failure to obtain entry of the Final Order, in form and substance acceptable to the DIP Secured Parties and the Prepetition RBL Agent, on or before the date that is thirty-five (35) days following the Petition Date.

(b)    Any other breach, default, or other violation by any of the Debtors of the terms and provisions of this Interim Order, which breach, default or violation (other than any payment default, to which no grace period shall apply) is not cured within four (4) Business Days of the Debtors having notice of the occurrence thereof.

15.    **Rights and Remedies Upon Termination Event**.

(a)    Any automatic stay otherwise applicable to the DIP Secured Parties is hereby modified, without requiring prior notice to or authorization of this Court, subject to the Carve Out, to the extent necessary to permit the DIP Secured Parties to (i) exercise immediately upon the occurrence and during the continuance of any Termination Event, all rights and remedies under this Interim Order, the DIP Loan Documents, and/or applicable non-bankruptcy law (other than those rights and remedies against the DIP Collateral and with respect to the Debtors' use of Cash Collateral in accordance with an Approved Budget during the five (5) Business Days after the Termination Declaration Date, each as provided in Paragraph 15(b) below), including the right to (A) declare all DIP Obligations to be immediately due and payable, (B) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, and/or (C) terminate the DIP Facility and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the other DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens

securing the DIP Obligations or affecting the obligations to advance DIP Loans to fund the Carve Out Reserves pursuant to Paragraph 8; and/or (ii) declare a termination, reduction, or restriction on the ability of the Debtors to use any Cash Collateral, subject to the obligation to fund the Carve Out Reserves (any such declaration under any of clauses 15(a)(i)(A), (B) or (C) or 15(a)(ii) shall be made to the respective lead counsel to the Debtors, the Committee, and the United States Trustee, and shall be referred to herein as a "**Termination Declaration**" and the date that is the earliest to occur of any such Termination Declaration being herein referred to as the "**Termination Declaration Date**")).

(b)　　In addition to the rights and remedies described above, five (5) Business Days following the Termination Declaration Date, unless prior to such time this Court determines that a Termination Event has not occurred and/or is not continuing, the DIP Agent is hereby granted relief from the automatic stay, without further notice, hearing, motion, order, or other action of any kind, to foreclose on, or otherwise enforce and realize on, its DIP Liens on all or any portion of the DIP Collateral, including by collecting accounts receivable and applying the proceeds thereof to the DIP Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral.  Solely during the five (5) Business Day period after a Termination Declaration Date, the Debtors and any Committee shall be entitled to an emergency hearing before this Court (which, as to the Debtors, shall be for the sole purpose of contesting whether a Termination Event has occurred) and section 105 of the Bankruptcy Code may not be invoked by the Debtors in an effort to restrict or preclude any DIP Secured Party from exercising any rights or remedies set forth in this Interim Order or the DIP Loan Documents.  During such five (5) Business Day period, the Debtors may not use Cash Collateral or any amounts

previously or thereafter advanced under the DIP Facility except in accordance with the Approved Budget or to fund the Carve Out Reserves.

(c)    In the event that the DIP Obligations have been Paid in Full, any automatic stay otherwise applicable to the Prepetition Secured Parties is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the Prepetition Secured Parties to (i) exercise immediately upon the occurrence and during the continuance of any Termination Event, all rights and remedies under this Interim Order, the Prepetition RBL Loan Documents, the Prepetition Term Loan Documents the Prepetition Seller Note Documents and/or applicable non-bankruptcy law (other than those rights and remedies against the DIP Collateral, Prepetition RBL Collateral and the Debtors' use of Cash Collateral in accordance with an Approved Budget during the five (5) Business Days after the RBL Termination Declaration Date, each as provided in Paragraph 15(d) below), including the right to (A) declare all Prepetition RBL Obligations, Prepetition Term Loan Obligations, or Prepetition Seller Note Obligations, as applicable, to be immediately due and payable, (B) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, and/or (C) terminate the Prepetition RBL Credit Agreement and any other Prepetition RBL Loan Documents as to any future liability or obligation of the Prepetition RBL Agent and the other Prepetition RBL Secured Parties, but without affecting any of the Prepetition RBL Obligations or the Prepetition RBL Liens securing the Prepetition RBL Obligations; and/or (ii) declare a termination, reduction, or restriction on the ability of the Debtors to use any Cash Collateral subject to the obligation to fund the Carve Out Reserves (any such declaration under any of clauses 15(c)(i)(A), (B) or (C) or (ii) shall be made to the respective lead counsel to the Debtors, the Committee, and the United States Trustee, and

shall be referred to herein as a "**RBL Termination Declaration**" and the date that is the earliest to occur of any such Termination Declaration being herein referred to as the "**RBL Termination Declaration Date**").

(d)      In addition to the rights and remedies described in Paragraph 15(c) above, in the event that the DIP Obligations have been Paid in Full, five (5) Business Days following the RBL Termination Declaration Date, unless prior to such time this Court determines that a Termination Event has not occurred and/or is not continuing, the Prepetition RBL Agent is hereby granted relief from the automatic stay, without further notice, hearing, motion, order, or other action of any kind, to foreclose on, or otherwise enforce and realize on, its Prepetition RBL Liens on all or any portion of the Prepetition RBL Collateral, including by collecting accounts receivable and applying the proceeds thereof to the Prepetition RBL Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the Prepetition RBL Collateral. Solely during the five (5) Business Day period after a RBL Termination Declaration Date, the Debtors and any Committee shall be entitled to an emergency hearing before this Court (which, as to the Debtors, shall be for the sole purpose of contesting whether a Termination Event has occurred) and section 105 of the Bankruptcy Code may not be invoked by the Debtors in an effort to restrict or preclude any Prepetition RBL Secured Party from exercising any rights or remedies set forth in this Interim Order or the Prepetition RBL Loan Documents. During such five (5) Business Day period, the Debtors may not use Cash Collateral or any amounts previously or thereafter advanced under the Prepetition RBL Credit Agreement except in accordance with the Approved Budget or to fund the Carve Out Reserves.

(e)      Upon the effectiveness of any relief from the automatic stay with respect to the DIP Facility pursuant to Paragraph 15(b) hereof, the Prepetition RBL Agent shall have

relief from the automatic stay to the same extent as the DIP Agent, and without further notice, hearing, motion, order, or other action of any kind, to foreclose on, or otherwise enforce and realize on its Prepetition First Priority Liens and the Prepetition RBL Adequate Protection Liens on, all or any portion of the DIP Collateral or Prepetition RBL Collateral (including by collecting accounts receivable and applying the proceeds thereof to the Prepetition RBL Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral or Prepetition RBL Collateral) or otherwise exercise remedies against the DIP Collateral or Prepetition RBL Collateral permitted by this Interim Order, the Prepetition RBL Loan Documents, and/or applicable non-bankruptcy law; *provided*, *however*, that any such foreclosure or other enforcement by the Prepetition RBL Agent of any Prepetition RBL Liens or any Prepetition RBL Adequate Protection Liens or any other such exercise of remedies by the Prepetition RBL Agent against the DIP Collateral or Prepetition RBL Collateral shall not interfere with or otherwise be inconsistent with any foreclosure or other enforcement by the DIP Agent of any DIP Liens or other DIP Protections or any other exercise of remedies by the DIP Agent, and any proceeds received by the Prepetition RBL Agent in connection with such foreclosure, enforcement, or other exercise of remedies shall be turned over to the DIP Agent for application to the DIP Obligations until Paid in Full.

(f)     Subject to the provisions of Paragraph 7 hereof, and subject to the Carve Out, all proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties or the Prepetition RBL Secured Parties shall be turned over *first* to the DIP Agent for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents and this Interim Order until Payment in Full of all of the DIP Obligations, *then* to the Prepetition RBL Agent for application to the Prepetition RBL Obligations under, and

in accordance with the provisions of, the Prepetition RBL Loan Documents and this Interim Order until Payment in Full of the Prepetition RBL Obligations, *then*, with respect to the Prepetition Term Loan Borrower, to the Prepetition Term Loan Agent for application to the Prepetition Term Loan Obligations under, and in accordance with the provisions of, the Prepetition Term Loan Documents and this Interim Order until Payment in Full of the Prepetition Term Loan Obligations, and *then*, with respect to the Prepetition Seller Note Grantors, to the Prepetition Seller Note Agent for application to the Prepetition Seller Note Obligations under, and in accordance with the provisions of, the Prepetition Seller Note Documents and this Interim Order until Payment in Full of the Prepetition Seller Note Obligations.

(g)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the Prepetition Seller Note Adequate Protection Liens, the Prepetition Term Loan Adequate Protection Liens, the Prepetition RBL Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition RBL Secured Parties under the DIP Loan Documents, the DIP Facility, and this Interim Order, (ii) authorize the DIP Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents, the Prepetition RBL Loan Documents, the Prepetition Term Loan Documents, the Prepetition Seller Note Documents, and/or this Interim Order, (iii) to permit each of the DIP Agent, the other DIP Secured Parties, the Prepetition RBL Agent, the other Prepetition RBL Secured Parties, the Prepetition Term Loan Agent, the other Prepetition Term Loan Secured Parties, the Prepetition Seller Note Agent, and the other Prepetition Seller Note Secured Parties to perform any act

authorized under this Interim Order and the DIP Loan Documents, and (iv) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Loan Documents.

16. **Restriction on Use of Proceeds**.    Notwithstanding anything herein to the contrary, no loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Prepetition RBL Collateral, Prepetition Term Loan Collateral, Prepetition Seller Note Collateral, or any portion of the Carve Out may be used by (a) any Debtor, Committee, or trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Professional Persons retained by the Debtors, the Committee, or the members of any Committee ("**Committee Members**")) to investigate or prosecute any Challenge (including any litigation or other action) in connection with the value of the DIP Collateral or the Prepetition RBL Collateral (or to pay any professional fees and disbursements incurred in connection therewith) at any time; or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Professional Persons retained by the Debtors, the Committee or any Committee Members) to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, or otherwise, other than from the DIP Secured Parties, or to seek any modification to this Interim Order not approved by the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and (x) the Prepetition RBL Agent (after obtaining the approval of the requisite Prepetition RBL Secured Parties under the Prepetition

RBL Credit Agreement) (only to the extent such modification would affect the rights of any of the Prepetition RBL Secured Parties), (y) the Prepetition Term Loan Agent (only to the extent such modifications would affect the rights of any of the Prepetition Term Loan Secured Parties), or (z) the Prepetition Seller Note Agent (only to the extent such modification would affect the rights of any of the Prepetition Seller Note Secured Parties); (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter- claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, the Prepetition Seller Note Secured Parties, their respective affiliates, assigns, or successors and the respective officers, directors, employees, agents, attorneys, representatives, and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including (A) any Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations, the Prepetition RBL Obligations, the Prepetition Term Loan Obligations, and/or the Prepetition Seller Note Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition RBL Liens, the Prepetition RBL Adequate Protection Liens, the Prepetition Term Loan Liens, the Prepetition Term Loan Adequate Protection Liens, the Prepetition Seller Note Liens, or the Prepetition Seller Note Adequate Protection Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Prepetition RBL Liens, the Prepetition RBL Adequate Protection Liens, the other Prepetition RBL Adequate

Protection, the Prepetition Term Loan Liens, the Prepetition Term Loan Adequate Protection

Liens, the other Prepetition Term Loan Adequate Protection, the Prepetition Seller Note Liens,

the Prepetition Seller Note Adequate Protection Liens, or the other Prepetition Seller Note

Adequate Protection; (D) any "lender liability" cause of action; (E) except to contest in good

faith the occurrence or continuance of any Termination Event as permitted in Paragraph 15, any

action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of

the DIP Secured Parties', and, after the Payment in Full of the DIP Obligations, the Prepetition

RBL Secured Parties', and, after Payment in Full of the Prepetition RBL Obligations, the

Prepetition Term Lenders', and, after Payment in Full of the Prepetition Term Loan Obligations,

the Prepetition Seller Noteholders', assertion, enforcement, or realization on the Cash Collateral,

the DIP Collateral, or the Prepetition RBL Collateral in accordance with the DIP Loan

Documents or the Prepetition RBL Loan Documents, as applicable, or this Interim Order); and/or

(F) any action seeking to modify any of the rights, remedies, priorities, privileges, protections,

and benefits granted to any or all of the DIP Secured Parties, the Prepetition RBL Secured

Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured

Parties hereunder or under the DIP Loan Documents or the Prepetition RBL Loan Documents,

the Prepetition Term Loan Documents, or the Prepetition Seller Note Documents, as applicable,

or any payments made thereunder or in respect thereof; *provided*, *however*, up to $50,000 in the

aggregate of the Carve Out, any DIP Collateral, any Prepetition RBL Collateral, any Prepetition

Term Loan Collateral, any Cash Collateral, and proceeds of the DIP Facility may be used by the

Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the

claims and/or Liens of the Prepetition RBL Agent and the other Prepetition RBL Secured Parties

under the Prepetition RBL Loan Documents, the Prepetition Term Loan Agent and the other

Prepetition Term Loan Secured Parties under the Prepetition Term Loan Documents, or the Prepetition Seller Note Agent and other Prepetition Seller Noteholders under the Prepetition Seller Note Documents (but not the claims and/or Liens of the DIP Agent and the other DIP Secured Parties) so long as such investigation occurs within the Challenge Period; (iii) pay any fees or similar amounts to any person (other than the Prepetition RBL Secured Parties) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Agent and the Prepetition RBL Agent; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral or Prepetition RBL Collateral, unless otherwise permitted hereby, without the prior written consent of the DIP Agent and the Prepetition RBL Agent, as applicable.

17.    **Proofs of Claim**.  The Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.  The Debtors' RBL Stipulations, Debtors' Term Loan Stipulations, and Debtors' Seller Note Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition RBL Secured Parties in respect of all Prepetition RBL Obligations, the Prepetition Term Loan Secured Parties in respect of all Prepetition Term Loan Obligations, and the Prepetition Seller Note Secured Parties in respect of all Prepetition Seller Note Obligations.  In addition, the Prepetition Seller Note Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition RBL Secured Parties and the DIP Secured Parties will not be required to file any request for allowance and/or payment of any administrative expenses, and this Order shall be deemed to constitute a timely filed request for allowance and/or payment of any Prepetition RBL Obligations, Prepetition Term Loan Obligations, or any Prepetition Seller Note Obligations constituting

administrative expenses or any DIP Obligations, as applicable.   Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, each of the Prepetition RBL Agent, for the benefit of itself and the other Prepetition RBL Secured Parties, the DIP Agent, for the benefit of itself and the other DIP Secured Parties, the Prepetition Term Loan Agent, for the benefit of itself and the other Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Agent, for the benefit of itself and the other Prepetition Seller Note Secured Parties, is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) in each of the Cases or Successor Cases (i) in the case of the Prepetition RBL Agent, the Prepetition Term Loan Agent, and the Prepetition Seller Note Agent, a proof of claim and/or aggregate proofs of claim in respect of any Prepetition RBL Obligations, Prepetition Term Loan Obligations, or Prepetition Seller Note Obligations, as applicable, and (ii) in the case of each of the Prepetition RBL Agent, the Prepetition Term Loan Agent, the Prepetition Seller Note Agent, and the DIP Agent, a request or aggregate requests for allowance and/or payment of any portion of the Prepetition RBL Obligations, Prepetition Term Loan Obligations, or Prepetition Seller Note Obligations constituting administrative expenses or any DIP Obligations, as applicable.

18.    **<u>Preservation of Rights Granted Under the Interim Order</u>**.

(a)    <u>No Non-Consensual Modification or Extension of Interim Order</u>.   In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash authorized or made hereby or pursuant to the DIP Loan Documents, or Lien, claim, priority, or other DIP Protections authorized or created

hereby or pursuant to the DIP Loan Documents. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or any DIP Protections (including the Prepetition Adequate Protection) incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Agent, the Prepetition RBL Agent the Prepetition Term Loan Agent or the Prepetition Seller Note Agent, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the original provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order), and the DIP Secured Parties and the Prepetition RBL Secured Parties shall be entitled to all of the DIP Protections (including the Prepetition Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted pursuant to section 364(e) of the Bankruptcy Code, this Interim Order, or the DIP Loan Documents.

(b)    Dismissal.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, then notwithstanding any such dismissal, (i) the DIP Protections (including the Prepetition Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively, shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the

provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order) until all DIP Obligations, all Prepetition RBL Obligations, all Prepetition Term Loan Obligations, and all Prepetition Seller Note Obligations have been Paid in Full, and such order of dismissal shall so provide (in accordance with sections 105 and 349 of the Bankruptcy Code), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections (including the Prepetition Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively.

(c)     Survival of Interim Order.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections (including the Prepetition Adequate Protection), and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case or Successor Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Cases or any Successor Case in this Court, or terminating the joint administration of these Cases or any Successor Case or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections (including the Prepetition Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively, shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order, and such DIP

Protections (including the Prepetition Adequate Protection), and such other rights, remedies, Liens, priorities, privileges, protections, and benefits, shall continue in full force and effect in these proceedings and in any Successor Cases and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order the DIP Obligations shall not be discharged by the entry of an order confirming any such chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

19.    **Insurance Policies**.   Upon entry of this Interim Order, the DIP Agent, the other DIP Secured Parties, the Prepetition RBL Agent, or the other Prepetition RBL Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, and the Debtors shall take such actions as are reasonably requested by the DIP Agent or the Prepetition RBL Agent from time to time to evidence or effectuate the foregoing.

20.    **Swap Agreements**.   The Debtors are authorized to enter into new Swap Agreements,[4] which shall be entered into solely in accordance with the DIP Credit Agreement. Pursuant and subject to section 4.03(c) of the RSA, the counterparties to the Pre-Petition Swap Agreements have agreed to waive termination rights that may result from certain Potential Events of Default and Events of Defaults (as defined in such Pre-Petition Swap Agreement) related to the commencement of the Cases, and the Debtors and the counterparties to the Pre-Petition Swap Agreements  are authorized to continue to perform under such Pre-Petition Swap Agreements, subject to the waivers and agreements set forth in the RSA.  All Swap Obligations owing to a Secured Swap Counterparty (other than Excluded Swap Obligations) under a Pre-

---

[4]    All defined terms used in this Paragraph 20 shall have the meanings ascribed to such terms in the DIP Credit Agreement.

Petition Swap Agreement or any post-petition Secured Swap Agreement shall constitute DIP Obligations for all purposes hereunder and under the DIP Loan Documents, subject to the terms of the DIP Credit Agreement.

21.     **Preservation of Prepetition Priorities and Interests**.

(a)     Nothing in this Interim Order is intended to change or otherwise modify the prepetition priorities among secured creditors of the Debtors, including any sureties', operators', or nonoperators' recoupment rights to the extent their rights are valid, enforceable, nonavoidable, and perfected, and nothing in this Interim Order shall be deemed to have changed or modified such prepetition priorities, all of which are hereby expressly preserved; *provided*, *however*, that the Debtors, the Committee, the DIP Secured Parties, and all other parties in interest reserve all rights to object to any of the foregoing claims or liens.

(b)     Nothing in this Interim Order or any other interim or final order related to the DIP Facility is intended to, or shall have the effect of voiding, waiving, changing, disallowing, subordinating or otherwise modifying (i) the terms of any agreements between any of the Debtors and Equitrans, L.P. or any of its parents, subsidiaries or affiliates (collectively, "**EQM**"); or (ii) the rights and priorities of EQM with respect to any lien, interest or covenant created by or arising in connection with (a) applicable law including, but not limited to, section 7-307 or the like (relating to a lien of a carrier) of any applicable Uniform Commercial Code, (b) the Credit Agreement, dated August 18, 2010, (c) the Transportation Service Agreement CW2239335-510, dated August 1, 2017, (d) the Credit Agreement dated July 29, 2011, (e) the Transportation Service Agreement CW2239579-700 dated August 1, 2017, (f) the Gas Tariff, First Revised Volume No. 1 effective August 5, 2017, (g) any other gas gathering or other agreements between EQM and Arsenal Resources Energy LLC and (h) any exhibits, schedules,

annexes, modifications, amendments and ratifications related to subparts (b) through (g) of this Paragraph.

22. **Other Rights and Obligations**.

(a) <u>Expenses</u>. To the extent provided in the DIP Loan Documents (and without limiting the Debtors' respective obligations thereunder), the applicable Debtors will pay all reasonable and documented expenses incurred by the DIP Agent (including the reasonable fees and disbursements of all counsel for the DIP Agent and any internal or third-party appraisers, consultants, advisors, and auditors engaged by or for the benefit of the DIP Agent and/or its counsel) in connection with the Cases, including the preparation, execution, delivery, and administration of the DIP Loan Documents, this Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

(b) <u>Notice of Professional Fees</u>. Professionals for the DIP Agent, the Prepetition RBL Agent (including professionals engaged by counsel to the DIP Agent or Prepetition RBL Agent, as applicable), the Prepetition Term Loan Secured Parties (including professionals engaged by counsel to the Prepetition Term Loan Secured Parties), and the Prepetition Seller Note Secured Parties (including professionals engaged by counsel to the Prepetition Seller Note Secured Parties) (collectively, the "**Lender Professionals**") shall not be required to comply with the United States Trustee fee guidelines or submit invoices to this Court, United States Trustee, any Committee or any other party in interest. Copies of summary invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the United States Trustee, counsel for any Committee, and such other parties as this

Court may direct.  The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; *provided*, *however*, that such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.  If the Debtors, United States Trustee, or any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten (10) days of receipt of such invoices, then the Debtors, United States Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professionals an objection (the "**Fee Objection**") limited to the issue of the reasonableness of such fees and expenses, and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice.  Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs, and expenses on any invoice to which no Fee Objection has been timely filed.  All such unpaid fees, costs, expenses, and charges of the DIP Agent that have not been disallowed by this Court on the basis of an objection filed by the Debtor, the United States Trustee, or the Committee (or any

subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral as specified in this Interim Order. Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the DIP Agent or the other DIP Secured Parties in connection with or with respect to the DIP Facility, the DIP Credit Agreement, or the other DIP Loan Documents are hereby approved in full and non-refundable and shall not otherwise be subject to any Challenge.

(c)    Binding Effect.   Subject only to Paragraph 7 above, the provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Cases and any Successor Cases, including the DIP Secured Parties, the Prepetition Secured Parties, any Committee, and the Debtors and their respective estates, successors, and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; *provided*, *however*, that the DIP Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties shall have no obligation to permit the use of their respective Cash Collateral (if any) or any other Prepetition RBL Collateral, Prepetition Term Loan Collateral or Prepetition Seller Note Collateral, as applicable, or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(d)      No Waiver.  The failure of the Prepetition Seller Note Secured Parties, the

Prepetition Term Loan Secured Parties, the Prepetition RBL Secured Parties or the DIP Secured

Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the

Prepetition Seller Note Documents, the Prepetition Term Loan Documents, the Prepetition RBL

Loan Documents, the DIP Loan Documents, or otherwise (or any delay in seeking or exercising

same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or

otherwise.  Nothing contained in this Interim Order (including the authorization of the use of any

Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity

to any Prepetition Seller Note Secured Party, Prepetition Term Loan Secured Party, Prepetition

RBL Secured Party or any DIP Secured Party, including rights of a party to a swap agreement,

securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor

to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a

Debtor to contest such assertion).  Except as prohibited by this Interim Order, the entry of this

Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly,

or otherwise impair, any right or ability of the Prepetition Seller Note Secured Parties, the

Prepetition Term Loan Secured Parties, the Prepetition RBL Secured Parties, or the DIP Secured

Parties under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the

Cases or any Successor Cases to cases under chapter 7, dismissal of the Cases or any Successor

Cases, or the appointment of a trustee or examiner in the Cases or any Successor Cases, or to

oppose the use of Cash Collateral in any Successor Case or on terms other than those set forth in

this Interim Order, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy

Code, any chapter 11 plan or plans with respect to any of the Debtors or seek early termination

of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (iii) except as

expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, or the Prepetition Seller Note Secured Parties respectively, under the DIP Loan Documents, the Prepetition RBL Loan Documents, the Prepetition Term Loan Documents, or the Prepetition Seller Note Documents, the Bankruptcy Code, or otherwise.  Except to the extent otherwise expressly provided in this Interim Order or by law, neither the commencement of the Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties under the Prepetition RBL Loan Documents, the Prepetition Term Loan Documents, or the Prepetition Seller Note Documents, as applicable, or with respect to any non-Debtor entities or their respective assets, whether such rights and remedies arise under the Prepetition RBL Loan Documents, the Prepetition Term Loan Documents, the Prepetition Seller Note Documents, applicable law, or equity.

(e)     No Third Party Rights.  Except as explicitly provided for herein or in any DIP Loan Document, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition RBL Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States

Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(f)    No Marshaling.  None of the DIP Secured Parties nor the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, or the Prepetition Seller Note Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, the Prepetition RBL Collateral, the Prepetition Term Loan Collateral, or the Prepetition Seller Note Collateral, as applicable.

(g)    Amendments.  The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver (i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of all of the DIP Lenders in respect of the DIP Facility by more than $5,000,000, (iii) shortens the Maturity Date (as defined in the DIP Credit Agreement), or (iv) adds or amends (in any respect unfavorable to the Debtors) any Event of Default.  No waiver, modification, or amendment of any of the provisions of the DIP Loan Documents shall be effective unless set forth in writing, signed by or on behalf of all the Debtors and the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and, except as provided herein, approved by this Court.  Notwithstanding the foregoing, no waiver, modification or amendment of any of the provisions of this Interim Order or the DIP Loan Documents that would directly and adversely affect the rights or interests of the Prepetition RBL Secured Parties shall be effective unless also consented to in writing by the Prepetition RBL

Agent on behalf of the Prepetition RBL Secured Parties (after obtaining the approval of the requisite Prepetition RBL Secured Parties under the Prepetition RBL Credit Agreement). Nothing in this Paragraph 22(g) shall deemed or construed to authorize the Debtors to amend, modify, supplement, or waive any provision of the DIP Loan Documents in a manner that would directly and adversely affect the rights or interests of the Prepetition Term Loan Secured Parties or the Prepetition Seller Note Secured Parties.

(h)    Inconsistency.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.   In the event of any inconsistency between the terms or conditions of this Interim Order and the terms or conditions of any other order entered by this Court in the nature of a First Day Order, the provisions of this Interim Order shall govern and control.

(i)    Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(j)    Reservation of Rights.  Nothing in this Interim Order shall be deemed to constitute the consent of the DIP Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, or the Prepetition Seller Note Secured Parties, and each of the foregoing expressly reserve the right to object, to entry of any Order of the Court that

provides for the sale or other disposition of all or substantially all of the assets of the Debtors (or any other sale or other disposition of assets of any of the Debtors outside the ordinary course of business) to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the DIP Obligations, the Prepetition RBL Obligations, the Prepetition RBL Adequate Protection, the Prepetition Term Loan Obligations, the Prepetition Term Loan Adequate Protection, the Prepetition Seller Note Obligations, and the Prepetition Seller Note Adequate Protection and all of the foregoing are Paid in Full on the closing date of such sale.

(k)     No Requirement to Accept Title to Collateral.  The DIP Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties shall not be obligated to accept title to any portion of the DIP Collateral, the Prepetition RBL Collateral, the Prepetition Term Loan Collateral, or the Prepetition Seller Note Collateral in payment of any of the DIP Obligations, Prepetition RBL Obligations, Prepetition Term Loan Obligations, or Prepetition Seller Note Obligations as applicable, in lieu of payment in cash or cash equivalents, nor shall the DIP Secured Parties, the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, and the Prepetition Seller Note Secured Parties be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any person or entity other than the DIP Secured Parties or the Prepetition RBL Secured Parties, the Prepetition Term Loan Secured Parties, or the Prepetition Seller Note Secured Parties, as applicable.

(l)     Headings.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

01:25563033.2

94

23.    **Final Hearing**

(a)    The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for ____, 2019, at _____ (prevailing Eastern Time) at the United States Bankruptcy Court for the District of Delaware.   The proposed Final Order shall be substantially the same as the Interim Order except that (i) those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification, and (ii) where appropriate, references to this Interim Order shall be changed to references to the Final Order.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)    Final Hearing Notice.  As soon as reasonably practicable following entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (i) notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**") and (ii) a copy of this Interim Order on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the United States Bankruptcy Court for the District of Delaware no later than ____, 2019, at ___ p.m. (prevailing Eastern Time) which objections shall be served so that the same are received on or before such date by: (a) proposed counsel to the Debtors, (i) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attn: Michael H. Torkin and Nicholas E. Baker (michael.torkin@stblaw.com,

nbaker@stblaw.com); and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Pauline K. Morgan and Kara Hammond Coyle (Pmorgan@ycst.com, Kcoyle@ycst); (b) the Office of the United States Trustee for the District of Delaware, 844 North King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Benjamin A. Hackman (Benjamin.A.Hackman@usdoj.gov); (c) counsel to the DIP Agent and Prepetition RBL Agent, Paul Hastings LLP, 200 Park Avenue, New York, New York 10166, Attn: Andrew V. Tenzer (andrew.tenzer@paulhastings.com) and Richards Layton & Finger LLP, One Rodney Square, 920 North King Street, Washington D.C. 19801 , Attn: Mark Collins (collins@rlf.com); (d) counsel to Chambers, as a Prepetition Term Loan Lender and a Prepetition Seller Noteholder, Kirkland & Ellis LLP, 609 Main Street, Houston Texas 77002, Attn: Matt Pacey (matt.pacey@kirkland.com) and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Ryan B. Bennett, Travis M. Bayer and Timothy R. Bow (ryan.bennett@kirkland.com, travis.bayer@kirkland.com and timothy.bow@kirkland.com); (e) counsel to Mercuria, as a Prepetition Term Loan Lender, Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3900, Dallas, Texas 75201, Attn: David Meyer, Harry Perrin and Garrick Smith (dmeyer@velaw.com, hperrin@velaw.com and gsmith@velaw.com); (f) counsel to LR-Mountaineer Holdings, L.P., as Prepetition Seller Note Agent, Baker Botts L.L.P., 2001 Ross Avenue, Suite 900, Dallas, Texas 75201, Attn: Jim Prince (jim.prince@bakerbotts.com); (g) counsel to any Committee appointed in these cases; and (h) any other party that has filed a request for notices with this Court, and such objections shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, in each case to allow actual receipt of the foregoing no later than____, 2019, at ____ p.m. (prevailing Eastern time).

24.    **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: _____, 2019
      Wilmington, Delaware

                                                 _____
                                               United States Bankruptcy Judge

**<u>Schedule 1 to Interim Order</u>**

**DIP Budget**

**Project Venice**
**Consolidated Weekly Cash Flow Forecast**

*(USD in 000s)*

| | Forecast Wk-1 8-Nov | Forecast Wk-2 15-Nov | Forecast Wk-3 22-Nov | Forecast Wk-4 29-Nov | Forecast Wk-5 6-Dec | Forecast Wk-6 13-Dec | Forecast Wk-7 20-Dec | Forecast Wk-8 27-Dec | Forecast Wk-9 3-Jan | Forecast Wk-10 10-Jan | Forecast Wk-11 17-Jan | Forecast Wk-12 24-Jan | Forecast Wk-13 31-Jan | Forecast 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RECEIPTS** | | | | | | | | | | | | | | |
| Net Receipts | $ - | $ - | $ - | $ 7,502 | $ 5,661 | $ - | $ - | $ 12,100 | $ (1,455) | $ - | $ - | $ - | $ 7,858 | $ 31,665 |
| Hedge Settlements | 505 | 199 | - | - | 831 | (102) | - | - | - | (30) | - | - | - | 1,403 |
| **NET RECEIPTS** | **505** | **199** | **-** | **7,502** | **6,492** | **(102)** | **-** | **12,100** | **(1,455)** | **(30)** | **-** | **-** | **7,858** | **33,068** |
| | | | | | | | | | | | | | | |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | |
| *Employee Related:* | | | | | | | | | | | | | | |
| Payroll, Benefits & Other Emp Costs | $ (70) | $ - | $ (70) | $ (478) | $ (70) | $ (478) | $ (70) | $ (478) | $ (70) | $ (478) | $ (70) | $ (478) | $ (70) | $ (2,876) |
| *Non-Employee Related:* | | | | | | | | | | | | | | |
| Transportation & Gathering | (400) | (1,800) | - | - | - | - | (837) | - | - | - | - | (1,882) | - | (4,920) |
| Capex / LOE | (150) | (25,729) | (986) | (1,196) | (1,021) | (10,507) | (774) | (338) | (307) | (659) | (150) | (150) | (225) | (42,192) |
| G&A and Other Disbursements | - | (1,713) | (418) | (195) | (205) | (144) | (274) | (468) | (102) | (193) | (143) | (434) | (190) | (4,478) |
| **Total Operating Disbursements** | **(620)** | **(29,242)** | **(1,474)** | **(1,868)** | **(1,295)** | **(11,129)** | **(1,955)** | **(1,283)** | **(479)** | **(1,330)** | **(363)** | **(2,944)** | **(484)** | **(54,466)** |
| | | | | | | | | | | | | | | |
| **OPERATING CASH FLOW** | $ (115) | (29,043) | (1,474) | 5,634 | 5,197 | (11,231) | (1,955) | 10,817 | (1,934) | (1,360) | (363) | (2,944) | 7,373 | (21,398) |
| | | | | | | | | | | | | | | |
| *One Time / Non-Recurring Items* | | | | | | | | | | | | | | |
| Professional Fees | (2,470) | (1,450) | - | - | (1,223) | - | - | - | (997) | - | - | (2,088) | - | (8,228) |
| Other Items | (628) | - | - | - | - | - | - | - | - | - | - | - | - | (628) |
| **Total Non-Recurring Items** | **(3,098)** | **(1,450)** | **-** | **-** | **(1,223)** | **-** | **-** | **-** | **(997)** | **-** | **-** | **(2,088)** | **-** | **(8,856)** |
| | | | | | | | | | | | | | | |
| Interest & Bank Fees | (693) | (950) | - | - | (751) | - | (13) | - | (1,008) | - | - | - | - | (3,414) |
| | | | | | | | | | | | | | | |
| **TOTAL DISBURSEMENTS** | $ (4,410) | (31,642) | (1,474) | (1,868) | (3,269) | (11,129) | (1,967) | (1,283) | (2,484) | (1,330) | (363) | (5,032) | (484) | (66,736) |
| | | | | | | | | | | | | | | |
| DIP Funding | - | 28,498 | 1,474 | - | - | 2,375 | 1,967 | - | - | - | - | - | - | 34,314 |
| | | | | | | | | | | | | | | |
| **NET CASH FLOW** | $ (3,905) | (2,945) | - | 5,634 | 3,223 | (8,857) | - | 10,817 | (3,939) | (1,360) | (363) | (5,032) | 7,373 | 646 |
| | | | | | | | | | | | | | | |
| **CASH AND BORROWINGS** | | | | | | | | | | | | | | |
| **Beginning Book Cash Balance** | $ 7,350 | 3,445 | 500 | 500 | 6,134 | 9,357 | 500 | 500 | 11,317 | 7,378 | 6,018 | 5,655 | 623 | 7,350 |
| ( +/- ) Net Cash Flow | (3,905) | (2,945) | - | 5,634 | 3,223 | (8,857) | - | 10,817 | (3,939) | (1,360) | (363) | (5,032) | 7,373 | 646 |
| ( +/- ) Voids/Reversals/Other | - | | | | | | | | | | | | | |
| **Ending Book Cash Balance** | $ 3,445 | 500 | 500 | 6,134 | 9,357 | 500 | 500 | 11,317 | 7,378 | 6,018 | 5,655 | 623 | 7,996 | 7,996 |
| | | | | | | | | | | | | | | |
| *RBL Excess Availability* | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | |
| **DIP Facility** | $ - | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 |
| | | | | | | | | | | | | | | |
| **Beginning DIP Balance** | $ - | - | 28,498 | 29,972 | 29,972 | 29,972 | 32,347 | 34,314 | 34,314 | 34,314 | 34,314 | 34,314 | 34,314 | - |
| ( +/- ) DIP Draw / (Paydown) | - | 28,498 | 1,474 | - | - | 2,375 | 1,967 | - | - | - | - | - | - | 34,314 |
| Ending DIP Facility Balance | $ - | 28,498 | 29,972 | 29,972 | 29,972 | 32,347 | 34,314 | 34,314 | 34,314 | 34,314 | 34,314 | 34,314 | 34,314 | 34,314 |
| *DIP Availability* | $ - | 16,502 | 15,028 | 15,028 | 15,028 | 12,653 | 10,686 | 10,686 | 10,686 | 10,686 | 10,686 | 10,686 | 10,686 | 10,686 |
| | | | | | | | | | | | | | | |
| *Total Liquidity* | $ 3,445 | 17,002 | 15,528 | 15,528 | 21,162 | 24,385 | 13,153 | 11,186 | 22,003 | 18,064 | 16,704 | 16,341 | 11,309 | 18,683 |

*Readiness Date*

Notes:
*Global Note: Forecast is subject to material changes as assumptions may be revised*

# **EXHIBIT B**

**DIP Credit Agreement**

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

dated as of November [●], 2019,

among

ARSENAL RESOURCES DEVELOPMENT LLC,
as Borrower,

and

the other Loan Parties party hereto,

and

CITIBANK, N.A.,
as Administrative Agent

and

the Lenders party hereto

CITIGROUP GLOBAL MARKETS INC.,
as Lead Arranger and Bookrunner

# TABLE OF CONTENTS

**Page**

### ARTICLE I
### DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    Terms Defined Above ...................................................................................... 1
Section 1.02    Certain Defined Terms .................................................................................... 1
Section 1.03    Types of Loans and Borrowings .................................................................. 32
Section 1.04    Terms Generally; Rules of Construction ..................................................... 32
Section 1.05    Accounting Terms and Determinations; GAAP ......................................... 33
Section 1.06    Reserved. ...................................................................................................... 33
Section 1.07    Times of Day ................................................................................................ 33
Section 1.08    Timing of Payment or Performance ............................................................ 33
Section 1.09    Currencies Generally .................................................................................... 33
Section 1.10    Negative Covenant Compliance ................................................................... 33
Section 1.11    Letter of Credit Amounts ............................................................................. 33
Section 1.12    Rounding ...................................................................................................... 34
Section 1.13    Divisions ....................................................................................................... 34

### ARTICLE II
### THE CREDITS

Section 2.01    Commitments ................................................................................................ 34
Section 2.02    Loans and Borrowings .................................................................................. 34
Section 2.03    Requests for Borrowings .............................................................................. 35
Section 2.04    Interest Elections .......................................................................................... 36
Section 2.05    Funding of Borrowings ................................................................................. 37
Section 2.06    Termination and Reduction of Aggregate Commitments .............................. 38
Section 2.07    Letters of Credit ........................................................................................... 38
Section 2.08    Collateral; Guarantee ................................................................................... 44

### ARTICLE III
### PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01    Repayment of Loans ..................................................................................... 45
Section 3.02    Interest .......................................................................................................... 45
Section 3.03    Inability to Determine Rates ......................................................................... 46
Section 3.04    Prepayments ................................................................................................. 47
Section 3.05    Fees ............................................................................................................... 49

### ARTICLE IV
### PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ................... 50
Section 4.02    Presumption of Payment by the Borrower .................................................... 51
Section 4.03    Disposition of Proceeds ................................................................................ 51
Section 4.04    Defaulting Lenders ....................................................................................... 51

### ARTICLE V
### INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01    Increased Costs ............................................................................................ 53
Section 5.02    Break Funding Payments .............................................................................. 55
Section 5.03    Taxes ............................................................................................................ 55

i

Section 5.04    Matters Applicable to All Requests for Compensation ............................... 58
Section 5.05    Mitigation Obligations ............................................................................. 59
Section 5.06    Illegality .................................................................................................. 59

ARTICLE VI
CONDITIONS PRECEDENT

Section 6.01    Interim Facility Effective Date ................................................................ 59
Section 6.02    Final Facility Effective Date ................................................................... 61
Section 6.03    Conditions Precedent to Each Borrowing ............................................... 62

ARTICLE VII
REPRESENTATIONS AND WARRANTIES

Section 7.01    Organization; Powers .............................................................................. 63
Section 7.02    Authority; Enforceability ........................................................................ 63
Section 7.03    Approvals; No Conflicts .......................................................................... 63
Section 7.04    Financial Condition; No Material Adverse Change ................................. 64
Section 7.05    Litigation ................................................................................................ 64
Section 7.06    Environmental Matters ............................................................................ 64
Section 7.07    Compliance with Laws ............................................................................ 65
Section 7.08    Investment Company Act ......................................................................... 65
Section 7.09    Taxes ...................................................................................................... 65
Section 7.10    ERISA ..................................................................................................... 65
Section 7.11    Disclosure; No Material Misstatements ................................................... 66
Section 7.12    Subsidiaries ............................................................................................ 66
Section 7.13    Location of Business and Offices ............................................................ 66
Section 7.14    Properties; Maintenance of Properties; Titles, Etc. ................................ 67
Section 7.15    Gas Imbalances, Prepayments ................................................................ 67
Section 7.16    Marketing of Production .......................................................................... 67
Section 7.17    Swap Agreements .................................................................................... 68
Section 7.18    Use of Loans and Letters of Credit ......................................................... 68

ARTICLE VIII
AFFIRMATIVE COVENANTS

Section 8.01    Financial Statements; Other Information ................................................. 68
Section 8.02    Notices of Material Events ...................................................................... 70
Section 8.03    Existence; Conduct of Business .............................................................. 70
Section 8.04    Payment of Tax Obligations .................................................................... 71
Section 8.05    Operation and Maintenance of Properties ............................................... 71
Section 8.06    Insurance ................................................................................................. 71
Section 8.07    Books and Records; Inspection Rights .................................................... 71
Section 8.08    Compliance with Laws ............................................................................ 72
Section 8.09    Environmental Matters ............................................................................ 72
Section 8.10    Further Assurances .................................................................................. 72
Section 8.11    Additional Collateral; Additional Guarantors ......................................... 73
Section 8.12    ERISA Compliance ................................................................................. 73
Section 8.13    Swap Agreements .................................................................................... 73
Section 8.14    [Reserved] ............................................................................................... 73
Section 8.15    Cash Management .................................................................................... 73
Section 8.16    Use of Proceeds ...................................................................................... 73
Section 8.17    Milestones ............................................................................................... 74
Section 8.18    Post-Interim Facility Effective Date Covenants ...................................... 74

ARTICLE IX
NEGATIVE COVENANTS

Section 9.01    Financial Performance Covenant ................................................................ 74
Section 9.02    Indebtedness ........................................................................................... 74
Section 9.03    Liens ....................................................................................................... 75
Section 9.04    Dividends, Distributions and Redemptions ........................................... 75
Section 9.05    Investments, Loans and Advances .......................................................... 76
Section 9.06    Nature of Business; International Operations ........................................ 76
Section 9.07    Limitation on Operating Leases ............................................................. 77
Section 9.08    Mergers, Etc. .......................................................................................... 77
Section 9.09    Sale of Properties ................................................................................... 77
Section 9.10    Transactions with Affiliates ................................................................... 78
Section 9.11    Subsidiaries ............................................................................................ 78
Section 9.12    Negative Pledge Agreements; Dividend Restrictions ............................ 78
Section 9.13    Gas Imbalances, Take-or-Pay or Other Prepayments ........................... 79
Section 9.14    Swap Agreements ................................................................................... 79
Section 9.15    Marketing Activities ............................................................................... 79
Section 9.16    Accounting Changes ............................................................................... 80
Section 9.17    Key Employee Plans ............................................................................... 80
Section 9.18    Superpriority Claims .............................................................................. 80

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

Section 10.01    Events of Default .................................................................................. 80
Section 10.02    Remedies .............................................................................................. 82

ARTICLE XI
THE ADMINISTRATIVE AGENT

Section 11.01    Appointment; Powers ........................................................................... 83
Section 11.02    Duties and Obligations of Administrative Agent .................................. 83
Section 11.03    Action by Administrative Agent ............................................................ 84
Section 11.04    Reliance by Administrative Agent ......................................................... 84
Section 11.05    Subagents .............................................................................................. 85
Section 11.06    Resignation or Removal of Administrative Agent ................................. 85
Section 11.07    Administrative Agent as Lender ............................................................ 86
Section 11.08    No Reliance ........................................................................................... 86
Section 11.09    Administrative Agent May File Proofs of Claim ................................... 86
Section 11.10    Authority of Administrative Agent to Release Guarantors, Collateral and
                 Liens ...................................................................................................... 87
Section 11.11    The Arranger ......................................................................................... 87
Section 11.12    Secured Cash Management Agreements ................................................ 87

ARTICLE XII
MISCELLANEOUS

Section 12.01    Notices ................................................................................................... 88
Section 12.02    Waivers; Amendments .......................................................................... 90
Section 12.03    Expenses; Indemnity; Damage Waiver ................................................. 92
Section 12.04    Successors and Assigns; Holdings Term Loan Creditors ....................... 94
Section 12.05    Survival; Revival; Reinstatement .......................................................... 98
Section 12.06    Counterparts; Integration; Effectiveness ............................................. 98
Section 12.07    Severability ............................................................................................ 99

Section 12.08    Right of Setoff ................................................................................................99
Section 12.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF
                 PROCESS.................................................................................................100
Section 12.10    Headings ...................................................................................................101
Section 12.11    Confidentiality ..........................................................................................101
Section 12.12    Interest Rate Limitation ............................................................................102
Section 12.13    Collateral Matters; Secured Swap Agreements ........................................102
Section 12.14    PATRIOT Act Notice................................................................................102
Section 12.15    Electronic Execution of Assignments........................................................103
Section 12.16    Release of Liens and Release from Loan Guarantee ..................................103
Section 12.17    Flood Insurance Provisions .......................................................................104
Section 12.18    No Advisor or Fiduciary Responsibility.....................................................104
Section 12.19    Cashless Settlement ..................................................................................105
Section 12.20    Acknowledgement Regarding Any Supported QFCs...................................105

ARTICLE XIII
LOAN GUARANTEE

Section 13.01    Guarantee...................................................................................................106
Section 13.02    Guarantee of Payment ...............................................................................106
Section 13.03    Special Guaranty to Confer ECP Status ....................................................106
Section 13.04    No Limitations ...........................................................................................106
Section 13.05    Reinstatement ............................................................................................107
Section 13.06    Contribution; Subrogation ........................................................................107
Section 13.07    Information .................................................................................................108
Section 13.08    Taxes .........................................................................................................108
Section 13.09    Limitation of Liability .................................................................................108
Section 13.10    Indemnity; Subrogation and Subordination................................................108
Section 13.11    Representations and Warranties ................................................................109

<u>Annexes, Exhibits and Schedules</u>

Annex I                 Refinanced Loan Amounts
Annex II                New Money Loan Commitments and LC Issuance Limits

Exhibit A               Form of Note
Exhibit B               Form of Borrowing Request
Exhibit C               Form of Interest Election Request
Exhibit D               Form of Compliance Certificate
Exhibit E               Form of Assignment and Assumption
Exhibit F               Form of Interim Order
Exhibit G               Form of Partial Release of Liens
Exhibit H               Form of Cash Management Order

Schedule 1.1(a)         Interim Facility Effective Date Guarantors
Schedule 1.1(b)         Existing Letters of Credit
Schedule 7.05           Litigation
Schedule 7.06           Environmental Matters
Schedule 7.12           Subsidiaries and Partnerships
Schedule 7.15           Gas Imbalances
Schedule 7.16           Marketing Contracts
Schedule 7.17           Swap Agreements

iv

Schedule 9.02(b)      Interim Facility Effective Date Indebtedness
Schedule 9.03(b)      Interim Facility Effective Date Liens
Schedule 9.12(a)      Negative Pledge Agreements
Schedule 12.01        Certain Addresses for Notices

LEGAL_US_E # 144284119.14

This **SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of November [●], 2019, is among Arsenal Resources Development LLC, a Delaware limited liability company (the "Borrower"), each of the Lenders from time to time party hereto, Citibank, N.A., as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent"), and each Issuing Bank from time to time party hereto.

## R E C I T A L S

The Borrower has entered into a Credit Agreement, dated as of December 21, 2018 (as amended and in effect prior to the date hereof, the "Pre-Petition Credit Agreement"), among the Borrower, Citibank, N.A., as administrative agent, and each lender and each issuing bank from time to time party thereto.

On November [●], 2019, (the "Petition Date"), each of the Loan Parties (collectively, the "RBL Debtors") filed a voluntary petition for relief (collectively, the "Cases") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

In conjunction with the Cases, Arsenal Energy Holdings LLC, a Delaware limited liability company, Arsenal Resources Intermediate Holdings LLC, a Delaware limited liability company, Arsenal Resources Energy LLC, a Delaware limited liability company, Arsenal Resources Development Holdings 2 LLC, a Delaware limited liability company and Arsenal Resources Development Holdings 1 LLC, a Delaware limited liability company, (the "Parent Company Debtors" and, collectively with the RBL Debtors, the "Debtors") have also filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

The Borrower has requested that the Lenders provide the Borrower with a senior secured super-priority debtor-in-possession revolving credit facility in an aggregate principal amount of up to $90,000,000 (the "DIP Facility") in commitments and loans from the Lenders, which shall consist of (a) a new money revolving loan facility in the aggregate principal amount of up to $45,000,000, which shall include a sub-facility of up to $5,000,000 for the issuance of Letters of Credit (collectively, the "New Money Facility") and (b) a $45,000,000 term loan upon entry of the Final Order, to roll up a portion of the existing outstanding obligations under the Pre-Petition Credit Agreement (the "Refinancing Facility"), in each case to be afforded the liens and priority set forth in the DIP Order and as set forth in the other Loan Documents and to be used during the Cases for the purposes set forth in Section 8.16, and up to $30,000,000 of which New Money Facility shall be available for borrowings and other extensions of credit as of the Interim Facility Effective Date.

In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    Terms Defined Above. As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02    Certain Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"ABR" when used in reference to any Loan or Borrowing, refers to such Loan, or the Loans comprising such Borrowing, bearing interest at a rate determined by reference to the Alternate Base Rate.

"Adequate Protection Obligations" means the entitlement of parties to adequate protection of their interests in certain pre-petition collateral in an amount equal to the aggregate diminution in value of such interests as set forth (a) in respect of parties to the Pre-Petition Credit Agreement, the definition of "Prepetition First Lien Adequate Protection", (b) in respect of parties to the Holdings Term Loan Facility, the definition of "Prepetition Term Loan Adequate Protection" and (c) in respect of parties to the Seller Notes, the definition of "Prepetition Seller Note Adequate Protection", in each case as defined in and to the extent set forth in the DIP Order.

"Adjusted Aggregate Commitments" means, at any time, the Aggregate Commitments minus the aggregate amount of the Commitments of all Defaulting Lenders.

"Administrative Agent" has the meaning set forth in the preamble hereto.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent Parties" has the meaning set forth in Section 12.01(e).

"Aggregate Commitments" means the sum of the Commitments of all New Money Lenders. The Aggregate Commitments shall be $45,000,000.

"Agreement" means this Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Alternate Base Rate" means, for any day a fluctuating rate per annum equal to the greatest of (a) the Federal Funds Effective Rate plus one-half of one percent (1/2 of 1.0%), (b) the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its Prime Rate and (c) the Eurodollar Rate having an Interest Period of one (1) month on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus one percent (1.0%). "Prime Rate" means a rate of interest per annum publicly announced by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Eurodollar Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Eurodollar Rate, respectively.

"Applicable Margin" means for any day with respect to Loan that is (a) an ABR Loan, 4.50% and (b) a Eurodollar Loan, 5.50%.

"Applicable Percentage" means, with respect to any New Money Lender, the percentage of the Aggregate Commitments represented by such Lender's Commitment.

2

"Approved Bidding Procedures" means bidding procedures for the sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Administrative Agent.

"Approved Counterparty" means (a) any Lender or any Affiliate of a Lender or (b) any other Person whose long term senior unsecured debt rating is BBB-/Baa3 by S&P or Moody's (or their equivalent) or higher (or any other Person whose obligations under Swap Agreements entered into with the Borrower or any of its Subsidiaries are guaranteed by a Person whose long term senior unsecured debt is BBB-/Baa3 by S&P or Moody's (or their equivalent) or higher).

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

 "Approved Plan of Reorganization" means either (a) the plan of reorganization, dated November [●], 2019, and filed with the Bankruptcy Court [Docket No. [●]], as such plan may be, amended or modified in accordance with its terms and the RSA, which has been accepted by each class of creditors entitled to vote thereon, (b) such other plan of reorganization which (i) provides for termination of the Commitments under the DIP Facility and, except as may be provided herein with respect to the Refinanced Loans, including under Section 2.01(b), payment in full in cash of all Obligations under the Loan Documents owed to the Lenders in respect of the DIP Facility on the effective date of such Approved Plan of Reorganization and (ii) does not impair the Pre-Petition Obligations or (c) a plan of reorganization which is otherwise approved by the Administrative Agent and the Majority Lenders in their sole discretion.

"Approved Sale" means a sale of all or substantially of all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code consummated in accordance with the Approved Bidding Procedures.

"Arranger" means Citigroup Global Markets Inc., in its capacity as lead arranger and bookrunner hereunder.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, substantially in the form of Exhibit E or any other form approved by the Administrative Agent.

"Attorney Costs" means and includes all reasonable fees, expenses and disbursements of any law firm or other external legal counsel.

 "Availability Limit" means (a) during the Interim Period, Interim Facility Cap and (b) during the Final Period, the Aggregate Commitments.

"Availability Period" means the period from the Interim Facility Effective Date to the earlier of (a) the Business Day immediately preceding the Maturity Date and (b) the termination of the Commitments in full.

"Available Funds" means, as of any date of determination, the amount by which the Availability Limit on such date exceeds the total Revolving Credit Exposure of all Lenders on such date.

"Avoidance Action Proceeds" means any and all proceeds of any Avoidance Action.

"Avoidance Actions" means all claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11, U.S. Code, as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Bankruptcy Law" means the Bankruptcy Code or any similar federal or state law for the relief of debtors.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" has the meaning set forth in the preamble.

"Borrower Materials" has the meaning set forth in Section 12.01(d).

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Budget" means the "Initial Budget" or any "Supplemental Approved Budget," as such term is defined in the DIP Order, as such Budget may be amended, modified or otherwise updated from time to time by the Borrower as set forth in the DIP Order.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Houston, Texas are authorized or required by law to remain closed and if such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, or the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment, prepayment, conversion or Interest Period, any day which is also a day on which dealings in dollar deposits are carried out in the London interbank market.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of that Person.

4

"Capital Stock" means:

(a)        in the case of a corporation, corporate stock or shares;

(b)        in the case of an association or business entity that is not a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(c)        in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(d)        any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Capitalized Lease Obligations" means, as applied to any Person, all obligations under Capital Leases of such Person or any of its Subsidiaries, in each case, taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Carve-Out" has the meaning assigned to such term in the applicable DIP Order.

"Cases" has the meaning specified in the recitals hereto.

"Cash Collateralize" means, with respect to any amount to be cash collateralized, to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Banks (and/or the Lenders, other Secured Parties and other Person as the context requires) as collateral such (a) cash or deposit account balances in an amount equal to such amount required to be Cash Collateralized (the "Required Cash Collateral Amount") or (b) if the relevant Issuing Bank benefiting from such collateral shall agree in its reasonable discretion, other forms of credit support (including any backstop letter of credit) in a face amount equal to one-hundred-three percent (103.0%) of the Required Cash Collateral Amount from an issuer reasonably satisfactory to such Issuing Bank, in each case under clause (a) and (b) above pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant Issuing Bank (which documents are hereby consented to by the Lenders).  Derivatives of Cash Collateralize shall have a corresponding meaning.

 "Cash Equivalents" means:

(a)        United States dollars;

(b)        securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (provided that the full faith and credit of the United States is pledged in support of those securities) having maturities of not more than two (2) years from the date of acquisition;

(c)        securities or readily marketable direct obligations issued or fully guaranteed by any state, territory or commonwealth of the United States of America or any political subdivision of any such state, territory or commonwealth or any public instrumentality thereof or any political subdivision of any such state, territory or commonwealth or any public instrumentality thereof having maturities of not more than two (2) years from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's of at least "A+" and "A-1", respectively (or, if at

5

any time neither S&P nor Moody's shall be rating such obligations, then from another nationally-recognized rating service);

(d)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one (1) year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one (1) year and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus in excess of 250,000,000;

(e)    repurchase obligations for underlying securities of the types described in clauses (b), (c) and (d) above entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)    commercial paper issued by a corporation (other than an Affiliate of the Borrower) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and, in each case, maturing within one (1) year after the date of acquisition;

(g)    money market and investment funds at least ninety-five percent (95.0%) of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (e) of this definition;

(h)    money market funds and similar funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $500,000,000; and

(i)    indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A-2" from Moody's with maturities of two (2) years or less from the date of acquisition.

"Cash Management Bank" means any Person that (a) at the time it provides Cash Management Services, (b) on Interim Facility Effective Date or (c) at any time after it has provided any Cash Management Services, in each case is a "Bank" (as such term is defined in the Cash Management Order) and is a Lender, the Administrative Agent or an Affiliate of a Lender or the Administrative Agent.

"Cash Management Obligations" means all debt, liabilities and obligations owed by any Loan Party or any Subsidiary in connection with, or in respect of, any Cash Management Services.

"Cash Management Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit H, or as otherwise reasonably acceptable to the Administrative Agent.

"Cash Management Services" means (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automated clearing house services, return items, interstate depository network services, electronic funds transfer services, lockbox services and stop payment services), (c) any other demand deposit or operating account relationships and (d) any other cash management services, including for collections and for operating, payroll and trust accounts of any Loan Party or any of the Borrower's Subsidiaries.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Collateral of the Debtors having a fair market value in excess of $500,000.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

6

"Chambers" means, collectively, Chambers Energy Capital II LP, Chambers Energy Capital II TE, LP, Chambers Energy Capital III, LP, and each of their Sponsor Fund Affiliates.

"Change in Law" means the occurrence, after the Interim Facility Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued to the extent, but only to the extent, that a Lender is generally imposing applicable increased costs or costs on similarly situated borrowers in connection with capital adequacy and liquidity requirements similar to those described in Sections 5.01(a) and 5.01(b) under other syndicated credit facilities to which such borrowers and Lender are a party.

"Change of Control" means that the Permitted Holders shall collectively cease to own beneficially (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the Interim Facility Effective Date), directly or indirectly, Equity Interests representing at least a majority of the aggregate ordinary voting power and economic interest represented by the issued and outstanding Equity Interests of the Borrower.

"Chapter 11 Milestones" has the meaning assigned to such term in Section 8.17.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Collateral" means the "DIP Collateral" as defined in the DIP Order; provided that the Collateral shall not include the Excluded Assets; provided, further, that the Collateral shall not include any assets or property upon which, and solely to the extent that, the grant of a "DIP Lien" as contemplated in the DIP Order would constitute a default or event of default under any of the Debtors' contracts or leases (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable non-bankruptcy law), but shall include the proceeds thereof and; provided, further, notwithstanding anything in this Agreement or any other Loan Document to the contrary, the Collateral does not include any Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Insurance Regulations) and no Building or Manufactured (Mobile) Home will be encumbered by any Loan Documents unless and until the Lenders are given 30 days' prior written notice thereof and each Lender confirms within such 30 day period to the Administrative Agent that its flood due diligence has been completed and flood insurance compliance has been confirmed (including the receipt of evidence of any required flood insurance).

"Commitment" means, with respect to each Lender, the obligation of such Lender to make or continue New Money Loans and to incur or acquire participations in Letters of Credit hereunder in an aggregate principal amount at any one time outstanding not to exceed the amounts set forth opposite such Lender's name as its "Commitment" on Annex II, as such obligation may be (a) modified from time to time pursuant to Section 2.06, (b) modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04(b) or (c) otherwise modified pursuant to the terms of this Agreement.

"Commitment Fee Rate" means a percentage per annum equal to 1.00%.

7

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time, and any successor statute.

"Compliance Certificate" means the Compliance Certificate substantially in the form of Exhibit D.

"Confirmation Order" means an order, in form and substance reasonably satisfactory to the Administrative Agent, confirming an Approved Plan of Reorganization (it being understood and agreed that the Confirmation Order shall be deemed reasonably satisfactory to the Administrative Agent so long as the Bankruptcy Court approves the Approved Plan of Reorganization (and does not modify, amend or supplement the Approved Plan of Reorganization to the extent such modification, amendment or supplement would require the consent of the Administrative Agent and the Majority Lenders as set forth in the definition of "Approved Plan of Reorganization" and such consent has not been obtained).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Continuing Directors" means the directors of the Borrower or a Subsidiary, as applicable, on the Petition Date, and each other director, if, in each case, such other director's nomination for election to the Board of Directors of the Borrower, the Borrower or such Subsidiary, as applicable, is recommended by a majority of the then Continuing Directors or such other director receives the vote of the Permitted Holders in his or her election by the stockholders of the Borrower, the Borrower or such Subsidiary, as applicable.

"Contractual Requirement" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Debtors" has the meaning specified in the recitals hereto.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived or otherwise remedied, become an Event of Default.

"Defaulting Lender" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of "Lender Default".

"Developed Producing Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves".

"DIP Facility" has the meaning specified in the recitals hereto.

"DIP Order" means the Interim Order and the Final Order, as applicable.

"Disclosure Restrictions" has the meaning set forth in Section 8.07.

"Dispose" or "Disposed of" has a correlative meaning to the defined term of "Disposition".

"Disposition" has the meaning set forth in Section 9.09.

"<u>Disqualified Stock</u>" means, with respect to any Person, any Equity Interest of such Person that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Equity Interest), or, upon the happening of any event, matures or is mandatorily redeemable (other than solely for Qualified Equity Interests) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is ninety-one (91) days after the Maturity Date hereunder as in effect at the time of issuance.   Notwithstanding the preceding sentence, any Capital Stock will not constitute Disqualified Stock because (a) the holders of the Capital Stock have the right to require the Borrower to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale, (b) with respect to any Capital Stock issued pursuant to any plan for the benefit of employees of any Debtor or by any such plan to such employees, any Debtor may be required to repurchase it in order to satisfy applicable statutory or regulatory obligations or (c) with respect to any Capital Stock held by any future, present or former employee, director, manager or consultant of the Debtors or any of their Parent Entities or any other entity in which any Debtor has an Investment and is designated in good faith as an "affiliate" by the board of directors or managers of the Borrower, in each case pursuant to any equity holders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement, any Debtor may be required to repurchase it.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Borrower and its Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"<u>Distressed Person</u>" has the meaning set forth in the definition of Lender-Related Distress Event.

"<u>Dollar Equivalent</u>" means, at any time, with respect to any amount denominated in any currency other than dollars, the equivalent amount thereof in dollars, at the rate at which such currency may be exchanged into dollars, as set forth at approximately 12:00 noon (New York time) on such day on the Reuters Fedspot page for such currency.

"<u>dollars</u>" or "<u>$</u>" refers to lawful money of the United States of America.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in <u>clause (a)</u> of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in <u>clauses (a)</u> or <u>(b)</u> of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Engagement Letter</u>" means that certain letter dated as of November [•], 2019 entered into by an among the Borrower and the Arranger.

"Environmental Laws" means any and all applicable Governmental Requirements relating to the protection of the environment, the preservation or reclamation of natural resources, or the prevention of human exposure to Hazardous Material, including without limitation, the Oil Pollution Act of 1990, as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980, as amended, the Federal Water Pollution Control Act, as amended, the Resource Conservation and Recovery Act of 1976, as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended and the Superfund Amendments and Reauthorization Act of 1986.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) human exposure to any Hazardous Materials, (c) the Release or threatened Release of any Hazardous Materials into the environment or (d) any contract, agreement or other legally binding consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, the regulations promulgated thereunder, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower or a Subsidiary would be deemed to be a "single employer" within the meaning of subsections (b) or (c) of section 414 of the Code.

"ERISA Event" means (a) a "reportable event" described in section 4043 of ERISA and the regulations issued thereunder (other than an event for which the thirty (30) day notice period is waived), (b) the failure to meet the minimum funding standard of section 412 of the Code or section 302 of ERISA with respect to any Plan (whether or not waived in accordance with section 412(c) of the Code), (c) the withdrawal of the Borrower, a Subsidiary or any ERISA Affiliate from a Plan during a year in which it was a "substantial employer" as defined in section 4001(a)(2) of ERISA, (d) the filing of a notice of intent to terminate a Plan in a distress termination under section 4041 of ERISA or the treatment of a Plan amendment by the PBGC as a termination under section 4041 or 4041A of ERISA, (e) the institution of proceedings to terminate a Plan or to appoint a trustee to administer a Plan by the PBGC, (f) a complete or partial withdrawal within the meaning of ERISA section 4203 or 4205 by the Borrower, Subsidiary or any ERISA Affiliate from a Multiemployer Plan or a cessation of operations which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization within the meaning of ERISA section 4241 or is insolvent within the meaning of ERISA section 4245, (g) the Borrower, a Subsidiary or any ERISA Affiliate incurs a substantial cessation of operations with respect to any Plan under ERISA section 4062(e), (h) the imposition of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under ERISA section 4007 upon the Borrower, a Subsidiary or any ERISA Affiliate or (i) any other event or condition that might reasonably be expected to constitute grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar" when used in reference to any Loan or Borrowing, refers to such Loan, or the Loans comprising such Borrowing, bearing interest at a rate determined by reference to clause (a) of the definition of Eurodollar Rate.

10

"Eurodollar Rate" means (a) for any Interest Period with respect to a Eurodollar Loan, the rate per annum equal to the London Interbank Offered Rate ("LIBOR") or a comparable or successor rate, which rate is approved by the Administrative Agent and Borrower, as published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(b)      for any interest calculation with respect to an ABR Loan on any date, the rate per annum equal to LIBOR, at approximately 11:00 a.m., London time determined two (2) Business Days prior to such date for dollar deposits with a term of one (1) month commencing that day;

provided that to the extent a comparable or successor rate is approved by the Administrative Agent and Borrower in connection herewith or Section 3.03, the approved rate shall be applied in a manner consistent with market practice; provided, further, that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent, in consultation with the Borrower, and; provided, further, that the Eurodollar Rate shall not be less than zero.

"Event of Default" has the meaning set forth in Section 10.01.

"Excepted Debt" means:

(a)      Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations that are (i) required by Governmental Requirements or by Governmental Authorities in connection with the operation of the Oil and Gas Properties and (ii) not incurred in connection with money borrowed, which are provided in the ordinary course of business or consistent with past practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice;

(b)      endorsements of negotiable instruments for collection in the ordinary course of business;

(c)      Indebtedness (other than Indebtedness for borrowed money) secured by Liens permitted under clauses (b) and (n) of the definition of Excepted Liens;

(d)      Cash Management Obligations incurred in the ordinary course of business;

(e)      Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business or consistent with past practice or industry practice in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(f)      Indebtedness (other than Indebtedness for borrowed money) arising from agreements of the Debtors providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case assumed or entered into in connection with the Transactions, the Exchange Agreement, any Permitted Acquisitions, other Investments permitted by Section 9.05 and the Disposition of any business, assets or Equity Interests not prohibited hereunder;

(g)      Indebtedness of the Debtors consisting of obligations to pay insurance premiums;

11

(h)     Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Borrower (or, to the extent such work is done for the Debtors, any direct or indirect parent thereof) and the Subsidiaries incurred in the ordinary course of business;

(i)     Indebtedness consisting of promissory notes issued by the Borrower or any Guarantor to current or former officers, managers, consultants, directors and employees (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) to finance the purchase or redemption of Equity Interests of the Borrower (or any direct or indirect parent thereof) permitted by Section 9.04;

(j)     Indebtedness in respect of Adequate Protection Obligations to the extent, and subject to the conditions set forth in, the DIP Order;

(k)     Indebtedness (other than Indebtedness for borrowed money) existing on the Petition Date and consisting of obligations of the Debtors under deferred compensation or other similar arrangements incurred by such person in connection with the Prior Transactions or as a permitted Investment.

"Excepted Liens" means:

(a)     Liens for taxes, assessments or governmental charges or claims (i) which are not yet overdue, (ii) the nonpayment of which is permitted by the Bankruptcy Code, or (iii) that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP (or in the case of any Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction), or for property taxes on property that any Debtor has determined to abandon if the sole recourse for such tax, assessment, charge or claim is to such property;

(b)     Liens in respect of property or assets of the Debtors imposed by law, such as landlords', vendors', suppliers', carriers', warehousemen's, repairmen's, construction contractors', workers' and mechanics' Liens and other similar Liens arising in the ordinary course of business or which are incidental to the exploration, development, operation or maintenance of Oil and Gas Properties, in each case so long as such Liens (i) are not overdue for a period of more than sixty (60) days or (ii) are being contested in good faith by appropriate action and for which the applicable Loan Party maintains adequate reserves in accordance with GAAP;

(c)     Liens arising from judgments or decrees in circumstances not constituting an Event of Default under Section 10.01(g);

(d)     Liens (i) incurred or pledges or deposits (A) made in connection with workers' compensation, unemployment insurance and other types of social security, old age pension, public liability obligations or similar Governmental Requirements, in each case, in the ordinary course of business, or (B) securing (or securing the Liens securing) (1) liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations or (2) for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Debtors or (ii) on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(e)     deposits and other Liens securing (or securing the bonds or similar instruments securing) the performance of tenders, statutory obligations, plugging and abandonment obligations, surety, stay, customs and appeal bonds, completion and performance guarantees, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (including letters of credit issued in lieu of such bonds or to support the issuance thereof) incurred in the ordinary course of

12

business and not securing Indebtedness for borrowed money, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(f)     ground leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Debtors are located;

(g)     easements, rights-of-way, restrictive covenants, licenses, restrictions (including zoning restrictions), title defects, exceptions, deficiencies or irregularities in title, encroachments, protrusions, servitudes, permits, conditions and covenants and other similar charges or encumbrances (including in any rights-of-way or other property of the Debtors for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil or other minerals or timber, and other like purposes, or for joint or common use of real estate, rights of way, facilities and equipment) not interfering in any material respect with the business of the Debtors, taken as a whole;

(h)     (i) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease, liens reserved in oil, gas or other Hydrocarbons, minerals, leases for bonus, royalty or rental payments and for compliance with the terms of such lease, (ii) any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under any lease, sublease, license or sublicense entered into by the Debtors in the ordinary course of business or otherwise permitted by this Agreement or (iii) the rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Debtors or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit or bankers' acceptance issued for the account of the Debtors; provided that such Lien secures only the obligations of the Debtors in respect of such letter of credit or bankers' acceptance to the extent permitted under Section 9.02;

(k)     (i) leases, licenses, consignments, bailments, subleases or sublicenses granted to others not interfering in any material respect with the business of the Debtors, taken as a whole and (ii) the prior right of consignees and their lenders under consignment arrangements entered into in the ordinary course of business (including agreements to subordinate any interest of the Debtors in any accounts receivable or other proceeds arising from inventory consigned by the Debtors pursuant to an agreement entered into in the ordinary course of business);

(l)     Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Debtors in the ordinary course of business;

(m)     Liens (including the right of set-off and similar rights and remedies) (i) created in the ordinary course of business in favor of banks and other financial institutions over credit balances of, or attaching to, any bank accounts, commodity trading accounts or other brokerage accounts of the Debtors held at such banks or financial institutions, as the case may be, (ii) relating to pooled deposit or sweep accounts of the Debtors to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Debtors or (iii) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection.

13

(n)       (i) Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, Farm-Out Agreements, Farm-In Agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements that are usual or customary in the oil and gas business and are for claims which are not delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP; provided that any such Lien referred to in this clause does not materially impair the use of the property covered by such Lien for the purposes for which such property is held by the Debtors and (ii) Liens arising pursuant to Section 9.343 of the Texas UCC or other similar statutory provision of other states or sovereigns with respect to production purchased from others in the ordinary course of business;

(o)       Liens on pipelines and pipeline facilities that arise by operation of law or other like Liens arising by operation of law in the ordinary course of business and incident to the exploration, development, operation and maintenance of Oil and Gas Properties, each of which is in respect of obligations that do not constitute Indebtedness for borrowed money and are not yet overdue for a period of more than thirty (30) days or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(p)       any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Debtors, taken as a whole;

(q)       Liens on equipment of the Debtors granted in the ordinary course of business to the Debtors' client at which such equipment is located;

(r)       security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business;

(s)       Liens (i) that are contractual rights of set-off relating to purchase orders and other agreements entered into with customers of the Debtors in the ordinary course of business and (ii) arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Debtors in the ordinary course of business permitted by this Agreement;

(t)       Liens deemed to exist or arise under repurchase agreements in connection with Investments permitted under Section 9.05;

(u)       To the extent existing on the Petition Date, Liens relating to or in connection with the Joint Development Agreement; and

(v)       Pre-Petition Prior Liens;

provided that (i) all such Liens described in clauses (a) through (e) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced (except any such action that is subject to the automatic stay of Section 362 of the Bankruptcy Code or as otherwise permitted by a final order of the Bankruptcy Court) and no intention to subordinate the Liens granted in favor of the Administrative Agent and/or the other Secured Parties is to be hereby implied or expressed by, or as a result

of, the permitted existence of such Excepted Liens and (ii) except with respect to clause (u) above, the term "Excepted Liens" shall not include any Lien securing Indebtedness for borrowed money other than the Obligations.

"Excluded Accounts" means (a) each account all or substantially all of the deposits in which consist of amounts utilized to fund payroll, employee benefit or tax obligations of the Debtors, (b) fiduciary accounts and accounts consisting solely of deposits or similar arrangements in connection with Liens permitted by Section 9.03 and (c) "zero balance" accounts.

"Excluded Assets" means (a) Avoidance Actions, (b) the Excluded Accounts, (c) Excluded Equity Interests and any assets or property upon which, and solely to the extent that, the grant of a Lien for the benefit of the Secured Parties would constitute a default or event of default under any contract or lease (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable law) and (d) proceeds of any of the foregoing, but only to the extent such proceeds would otherwise independently constitute "Excluded Assets" under clauses (a) through (d); provided that "Excluded Assets" shall not include any Avoidance Action Proceeds.

"Excluded Equity Interests" means (a) any Equity Interests to the extent the pledge thereof would be prohibited by any Governmental Authority, and (b) in the case of any Equity Interests of any Subsidiary to the extent the pledge of such Equity Interests is prohibited by Contractual Requirements (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable Governmental Requirements) in existence on the Interim Facility Effective Date.

"Excluded Subsidiary" means (a) each Subsidiary that is prohibited by any applicable Contractual Requirement or Governmental Requirement from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Subsidiary, including in connection with any Permitted Acquisition, (and for so long as such restriction or any replacement or renewal thereof is in effect) or that would require consent, approval, license or authorization of a Governmental Authority to guarantee or grant Liens to secure the Obligations at the time such Subsidiary becomes a Subsidiary (unless such consent, approval, license or authorization has been received), (b) any captive insurance subsidiaries and (c) any not-for-profit subsidiaries.

"Excluded Swap Obligations" means any obligation of any Guarantor to pay or perform under any Swap Agreement, if, and to the extent that, all or a portion of the guarantee by such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Agreement (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) or any other applicable Governmental Requirement.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, each Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such recipient being organized under the laws of, or having its principal office (or in the case of a Lender, its applicable lending office) located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, any U.S. federal withholding Tax that is imposed pursuant to a law in effect on the date on which such Lender becomes a party to this Agreement or designates a new lending office, except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding tax pursuant to Section 5.03(a) or Section 5.03(b), (c) any

withholding Tax that is attributable to a Lender's failure to comply with Section 5.03(e) and (d) U.S. federal withholding Taxes imposed under FATCA.

"Exit Facility Commitment Letter" means that certain Commitment Letter dated as of November [•], 2019 entered into by an among the Borrower and each of the Lenders party to this Agreement on the date hereof."

"Facility" means, collectively, the DIP Facility and the Refinancing Facility.

"Fair Market Value" means, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a Disposition of such asset at such date of determination assuming a Disposition by a willing seller to a willing purchaser dealing at arm's-length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as determined by the Borrower in good faith.

"Farm-In Agreement" means an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of one or more exploratory or development wells (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interests therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well or wells as all or a part of the consideration provided in exchange for an ownership interest in an Oil and Gas Property.

"Farm-Out Agreement" means a Farm-In Agreement viewed from the standpoint of the party that transfers an ownership interest to another.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreements entered into in connection with the implementation of such Section of the Code (or any such amended or successor version thereof).

"FCPA" has the meaning set forth in Section 7.07(d).

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates (not less than zero) on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published on the next succeeding Business Day by the Federal Reserve Bank of New York; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Final Facility Effective Date" has the meaning set forth in Section 6.02.

"Final Order" means the order or judgment of the Bankruptcy Court in substantially in the form of the Interim Order with such changes as are reasonably acceptable to the Administrative Agent.

"Final Period" means the period from and including the Final Facility Effective Date to but excluding the Termination Date.

"Financial Officer" means, for any Person, the chief financial officer, president, any vice president of such Person, principal accounting officer, comptroller, treasurer or assistant treasurer of such Person. Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"Financial Performance Covenant" means the covenants of the Borrower set forth in Section 9.01.

"Flood Insurance Regulations" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, *et seq.*), as the same may be amended or recodified from time to time, (d) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder and (e) the Biggert-Waters Flood Insurance Reform Act of 2012 and the regulations issued in connection therewith by the Office of the Comptroller of the Currency, the Federal Reserve Board and other Governmental Authorities.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"FRC" has the meaning set forth in the definition of Sponsors.

"Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to any Issuing Bank, such Defaulting Lender's Pro Rata Share of the outstanding LC Exposures other than LC Exposures as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time, as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), subject to the terms and conditions set forth in Section 1.05; provided that the accounting for operating leases and capital leases under GAAP as in effect on the date hereof (including, without limitation, Accounting Standards Codification 840) shall apply for the purposes of determining compliance with the provisions of this Agreement, including the definition of Capitalized Lease Obligations (it being understood, for avoidance of doubt, that no operating leases, or obligations in respect of operating leases, shall be treated as Capital Leases or Capitalized Lease Obligations, respectively, hereunder).

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government over the Borrower, any Subsidiary, any of their Properties, the Administrative Agent, any Issuing Bank or any Lender.

"Governmental Requirement" means, collectively, all applicable international, foreign, state and local statutes, treaties, rules, regulations, ordinances, codes and legally binding administrative or judicial precedents or authorities, and all applicable legally binding administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Guarantors" means, collectively, (a) each of the Parent Company Debtors, (b) the Subsidiaries of the Borrower (other than any Excluded Subsidiary), which are listed on Schedule 1.1(a) and (c) those Subsidiaries that enter into a Joinder Agreement after the Interim Facility Effective Date pursuant to Section 8.11(b), in each case, until any such Person is released from its obligations under the Loan Guarantee in accordance with the terms hereof.

"Guaranty Obligations" means, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain financial condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; provided, however, that the term "Guaranty Obligations" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and indemnity obligations in effect on the Interim Facility Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guaranty Obligation shall be deemed to be an amount equal to the lesser of (x) the stated or determinable amount of the Indebtedness in respect of which such Guaranty Obligation is made and (y) the maximum amount of the Indebtedness in respect of which such Person may be liable under such Guaranty Obligation or, if not so stated or determinable or no maximum amount is determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Hazardous Material" means any substance regulated as hazardous or deleterious or as to which liability would reasonably be expected to arise under any applicable Environmental Law and including, without limitation: (a) any chemical, compound, material, product, byproduct, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; (b) petroleum hydrocarbons, petroleum products, natural gas, oil, oil and gas waste, crude oil, and any fractions thereof; and (c) radioactive materials, asbestos containing materials, polychlorinated biphenyls or radon.

"Highest Lawful Rate" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loans or on other Indebtedness under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Holdings Term Loan Facility" means that certain Credit Agreement, dated as of December 21, 2018 (as amended, restated, or otherwise modified from time to time, including the "Loan Documents" (as defined therein)) entered into in connection therewith, among Arsenal Resources Development Holdings 1 LLC, as borrower, the lenders from time to time party thereto, and Chambers Energy Management, LP, as administrative agent.

"Holdings Term Loan Creditor" means the holders of any Claim (as defined in the RSA) on account of the Holdings Term Loan Facility against any of the Debtors.

18

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests relating to oil, gas or other hydrocarbons, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Impacted Loans" has the meaning set forth in Section 3.03.

"Indebtedness" of any Person means the following, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be required to be shown as a liability on the balance sheet of such Person (other than obligations resulting under firm transportation contracts or take/ship or pay contracts), (d) the face amount of all bankers' acceptances and letters of credit issued for the account of such Person, (e) the principal component of all Capitalized Lease Obligations of such Person, (f) all indebtedness (excluding prepaid interest thereon) of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (g) the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase in respect of Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock), (h) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment and (i) without duplication, all Guaranty Obligations of such Person in respect of the items described in clauses (a) through (h) above; provided that Indebtedness shall not include (i) ordinary-course accounts payables and accrued expenses, (ii) deferred or prepaid revenues, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) in the case of the Debtors, all unsecured intercompany Indebtedness incurred in the ordinary course of business having a term not exceeding three hundred sixty-four (364) days (inclusive of any roll-over or extensions of terms), (v) Production Payments and Reserve Sales, (vi) in-kind obligations relating to net oil, natural gas liquids or natural gas balancing positions arising in the ordinary course of business and (vii) any obligation in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property.

The amount of Indebtedness of any Person for purposes of clause (g) above shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness, (ii) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith and (iii) the maximum amount for which such Person may be liable in respect of such Indebtedness.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" has the meaning set forth in Section 12.03(b).

"Information" has the meaning set forth in Section 12.11.

"Initial Budget" has the meaning set forth in Section 6.01(n).

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each calendar month and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than one (1) months' duration, each day prior to the last day of such Interest Period that occurs at intervals of one (1) months' duration after the first day of such Interest Period.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one (1), two (2), three (3) or six (6) months (or, if available to each Lender, a period shorter than one (1) month) thereafter, as the Borrower may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) and that has a duration of one (1) month or longer shall end on the last Business Day of the last calendar month of such Interest Period and (c) no Interest Period may have a term which would extend beyond the Scheduled Maturity Date.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Facility Cap" means $30,000,000.

"Interim Facility Effective Date" has the meaning set forth in Section 6.01.

"Interim Facility Effective Date Financial Statements" means the consolidated financial statement or statements of the Borrower and its Subsidiaries referred to in Section 7.04(a).

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court in the Cases substantially in the form of Exhibit F and otherwise reasonably acceptable to the Administrative Agent, approving, inter alia, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by the Borrower of interim secured indebtedness in accordance with this Agreement, (b) providing for the lifting of the automatic stay (to the extent applicable) arising under section 362 of the Bankruptcy Code to enable the Administrative Agent or any Lender effectuate, among other things, their respective rights and remedies under Section 10.02 and the Loan Documents, and (c) subject to the terms thereof, approving the payment by the Borrower of the fees and other amounts contemplated by this Agreement.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on (but excluding) the earlier to occur of (i) the Final Facility Effective Date and (ii) the Maturity Date.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of another Person; (b) the making of any advance, loan or capital contribution to, or the purchase or other acquisition of any other Indebtedness or equity participation or interest in, any other Person (but excluding (i) any such advance or loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory, services or supplies sold by such Person in the ordinary course of business and (ii) in the case of the Debtors, all unsecured

intercompany Indebtedness incurred in the ordinary course of business having a term not exceeding three hundred sixty-four (364) days (inclusive of any roll-over or extensions of terms)) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be (i) the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment minus (ii) the amount of the amount of dividends or distributions received in connection with such Investment and any return of capital and any payment of principal received in respect of such Investment that in each case is received in cash, cash equivalents or short-term marketable debt securities by the Person holding such Investment.  For the purpose of clarity, a Swap Agreement shall not be considered an Investment.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"Issuing Banks" means (a) Citibank, N.A., each in its capacity as the issuers of Letters of Credit hereunder, and their successors in such capacity as provided in Section 2.07(i) and (b) if requested by the Borrower and reasonably acceptable to the Administrative Agent, any other Person who is a Lender at the time of such request and who accepts such appointment (it being understood that, if any such Person ceases to be a Lender hereunder, such Person will remain an Issuing Bank with respect to any Letter of Credit issued by such Person that remained outstanding as of the date such Person ceased to be a Lender).  Each Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.  References herein and in the other Loan Documents to an Issuing Bank shall be deemed to refer to such Issuing Bank in respect of the applicable Letter of Credit or to all Issuing Banks, as the context requires.  Any Lender may, from time to time, become an Issuing Bank under this Agreement with the protections and rights afforded to Issuing Banks hereunder by executing a joinder, in a form reasonably satisfactory to (and acknowledged and accepted by) the Administrative Agent and the Borrower, indicating such Lender's "LC Issuance Limit" and upon the execution and delivery of any such joinder, such Lender shall be an Issuing Bank for all purposes hereof.

"Joinder Agreement" has the meaning set forth in Section 8.11(a).

"Joint Development Agreement" means the joint development agreement entered into between certain of the Debtors and IOG Resources, LLC (or its affiliates), relating to the funding of the development of certain assets located in Barbour, Harrison and Taylor Counties, West Virginia as amended, restated, supplemented or otherwise modified from time to time.

"LC Borrowing" means a LC Disbursement which has not been reimbursed or refinanced as a Borrowing.

"LC Commitment" at any time means, $5,000,000.

"LC Disbursement" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, as at any date of determination, the sum of (a) the aggregate amount available to be drawn under all outstanding Letters of Credit plus (b) the aggregate of all LC Borrowings. The LC Exposure of any New Money Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.  For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.11.  For all

21

purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"LC Issuance Limit" means, at any time, with respect to any Issuing Bank, the amount of its LC Issuance Limit set forth on Annex II, as modified or supplemented from time to time in accordance with this Agreement.  Any reduction in the LC Commitment shall reduce the LC Issuance Limit of Citibank, N.A. each other Issuing Bank on a pro rata basis (except to the extent otherwise agreed by the applicable Issuing Bank).

"Lender Default" means (a) the refusal (which may be given verbally or in writing and which has not been retracted) or failure of any Lender to make available its portion of any incurrence of revolving loans or reimbursement obligations required to be made by it, which refusal or failure is not cured within two (2) Business Days after the date of such refusal or failure; (b) the failure of any Lender to pay over to the Administrative Agent, any Issuing Bank or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, unless subject to a good faith dispute; (c) a Lender has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations, or has made a public statement to that effect with respect to its funding obligations, under the Facility or under other agreements generally in which it commits to extend credit; (d) a Lender has failed, within three (3) Business Days after request by the Administrative Agent, to confirm that it will comply with its prospective funding obligations under the Facility; (e) a Lender has admitted in writing that it is insolvent or such Lender becomes subject to a Lender-Related Distress Event or (f) a Lender has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action.  For the avoidance of doubt, a Lender Default shall only apply with respect to a Lender in respect of each Facility with respect to which such Lender Default applies; unless, in the case of clauses (a) and (c) above, such Lender has notified the Administrative Agent in writing that such failure is the result of such Lender's reasonable determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied.

"Lender-Related Distress Event" means, with respect to any Lender or any person that directly or indirectly controls such Lender (each, a "Distressed Person"), as the case may be, a voluntary or involuntary case with respect to such Distressed Person under any debtor relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person or any person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any Equity Interests in any Lender or any person that directly or indirectly Controls such Lender by a Governmental Authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Lenders" means, collectively, the New Money Lenders and the Refinancing Lenders.

"Letter of Credit" means any letter of credit issued pursuant to this Agreement (including the Existing Letters of Credit pursuant to Section 2.07(m)).

"Letter of Credit Agreements" means all Letter of Credit Applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower, or entered into by the Borrower, with an Issuing Bank relating to any applicable Letter of Credit.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by an Issuing Bank.

"Letter of Credit Expiration Date" has the meaning set forth in Section 2.07(a)(ii).

"LIBOR" has the meaning set forth in the definition of Eurodollar Rate.

"Lien" means, with respect to any asset, (a) any mortgage, preferred mortgage, deed of trust, lien, notice of claim of lien, hypothecation, pledge, charge, security interest or similar encumbrance in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset or (c) Production Payments and Reserve Sales payable out of Oil and Gas Properties; provided that in no event shall an operating lease be deemed to be a Lien.

"Loan Documents" means this Agreement (including, without limitation, the Loan Guarantee set forth herein), the Notes and the Letters of Credit, in each case, in effect, and the Security Instruments and all other agreements, instruments, consents and certificates heretofore or hereafter executed and delivered by the Borrower, any other Loan Party or any of their respective Affiliates in connection with this Agreement.

"Loan Guarantee" means Article XIII of this Agreement.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Loans" means, individually, any New Money Loan or Refinanced Loan made by any Lender pursuant to this Agreement, and collectively, the New Money Loans and Refinanced Loans made by the Lenders to the Borrower pursuant to this Agreement.

"Long-Term Debt" means all Indebtedness of the Borrower and the Subsidiaries that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of the Borrower or any Subsidiary, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all amounts of Long Term Debt required to be paid or prepaid within one year from the date of its creation. For the avoidance of doubt, LC Exposure shall not constitute Long Term Debt.

"LRMH" means LR-Mountaineer Holdings, L.P. and its Sponsor Fund Affiliates.

"Majority Lenders" means, (a) at any time while no Loans or LC Exposure is outstanding, Lenders having more than fifty percent (50.0%) of the Adjusted Aggregate Commitments and (b) at any time while any Loans or LC Exposure is outstanding, Lenders holding more than fifty percent (50.0%) of (i) the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit minus the principal amounts of Loans and participation interests in Letters of Credit of Defaulting Lenders (in each case, without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)) and (ii) the unused Adjusted Aggregate Commitments.

"<u>Management Group</u>" means the group consisting of the directors, executive officers and other management personnel of the Borrower, any Subsidiary or Parent Entity, as the case may be, on the Interim Facility Effective Date together with (a) any Continuing Directors and (b) executive officers and other management personnel of the Borrower, any Subsidiary or Parent Entity, as the case may be, hired at a time when the Continuing Directors constituted a majority of the directors of the Borrower, any Subsidiary or Parent Entity, as the case may be.

"<u>Material Adverse Effect</u>" means a material adverse change in, or material adverse effect on (a) the business, operations, Property or financial condition of the Borrower and the Subsidiaries, taken as a whole, other than any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Bankruptcy Cases or the announcement of the filing or commencement of the Cases, (b) the ability of the Borrower and the other Loan Parties, taken as a whole, to perform their payment obligations under the Loan Documents, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of the Administrative Agent, any Issuing Bank or any Lender under any Loan Document.

"<u>Maturity Date</u>" means the earliest of (a) the Scheduled Maturity Date; (b) the effective date of an Approved Plan of Reorganization; and (c) the closing of a sale of substantially all of the equity or assets of the Debtors (unless consummated pursuant to an Approved Plan of Reorganization).

"<u>Mercuria</u>" means Mercuria Energy Company, LLC and its Sponsor Fund Affiliates.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"<u>Mortgage</u>" means a mortgage, deed of trust or similar security document entered into by any Loan Party and the Administrative Agent for the benefit of the Secured Parties in respect of Mortgaged Property owned by such Loan Party, that is substantially in the form of <u>Exhibit K</u>, subject to any modifications that may be required based on the State in which the Mortgaged Property is located or as may otherwise be agreed by the Borrower and the Administrative Agent (it is understood that each mortgage and deed of trust shall be governed by the law of the state in which the properties that are the subject of the applicable mortgage or deed of trust are located).  The term "Mortgage" as a verb has a corresponding meaning.

"<u>Mortgaged Property</u>" means, as of any date of determination, any Property which is subject to a Lien and security interest in favor of the Administrative Agent (or its designee pursuant to any mortgage and/or any other Loan Document) and existing under the terms of the Pre-Petition Security Instruments to secure the Pre-Petition Obligations.

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in section 3(37) or 4001(a)(3) of ERISA, to which the Borrower, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six (6) plan years, has made or been obligated to make contributions.

"<u>Net Income</u>" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"<u>New Money Facility</u>" has the meaning specified in the recitals hereto.

"<u>New Money Lenders</u>" means the Persons listed on <u>Annex II</u> and any Person that becomes a party hereto pursuant to an Assignment and Assumption (other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption) with respect to a New Money Loan or a Commitment

24

and, as the context requires, includes any Issuing Bank and, in each case, includes their respective successors and permitted assigns.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Notes" means the promissory notes of the Borrower described in Section 2.02(d) and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"Obligations" means (a) any and all advances to, and debts, liabilities, covenants and obligations of, any Loan Party arising under any Loan Document whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, and including interest and fees that accrue after the commencement by any Loan Party in any proceeding under any debtor relief laws naming any Loan Party as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding; (b) all Secured Cash Management Obligations; (c) all Secured Swap Obligations; and (d) all renewals, extensions and/or rearrangements of any of the above. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include the obligation (including Guaranty Obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnitees and other amounts to the extent required to be paid by any Loan Party under any Loan Document.

"OFAC" has the meaning set forth in Section 7.07(c).

"OID" means original issue discount.

"Oil and Gas Properties" means (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Ongoing Swaps" has the meaning set forth in Section 9.14(a).

"Other Connection Taxes" means, with respect to the Administrative Agent or any Lender, Taxes imposed as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction imposing such Tax (other than connections arising from the Administrative Agent's or such Lender's having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced in, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes arising from any payment made hereunder or from the execution, delivery, performance, registration, or enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Parent Company Debtors" has the meaning specified in the recitals hereto.

"Parent Entity" means any Person that is a direct or indirect parent company (which may be organized as a partnership) of the Borrower.

"Participant" has the meaning set forth in Section 12.04(c)(i).

"Participant Register" has the meaning set forth in Section 12.04(c)(i).

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"Payment in Full" means, subject to the terms of Section 12.02(g), the time at which (a) no Lender or Issuing Bank shall have (i) any Commitments, Loan or other amounts payable under the Loan Documents unpaid, unsatisfied or outstanding (other than in respect of contingent obligations, indemnities and expenses related thereto that are not then payable or in existence) and (ii) any Letters of Credit outstanding that (A) have not been Cash Collateralized in a manner reasonably satisfactory or (B) have not had other arrangements made with respect to them that are reasonably satisfactory, in each case, to the applicable Issuing Bank and (b) the Commitments and the LC Commitments have been terminated.

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"Permitted Acquisition" means any acquisition, merger or similar transaction permitted as an Investment under Section 9.05.

"Permitted Holders" means (a) the Sponsors, (b) the Management Group and any immediate family member of any such individual, (c) Chambers, (d) Mercuria and (e) LHRM.

"Permitted Variance" has the meaning set forth in Section 9.01.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals hereto.

"Petroleum Industry Standards" means the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"Plan" means any employee pension benefit plan, as defined in section 3(2) of ERISA other than a Multiemployer Plan, that is subject to Title IV of ERISA and (a) is sponsored, maintained or contributed to by the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six (6) calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower or a Subsidiary or an ERISA Affiliate and with respect to which the Borrower or a Subsidiary or an ERISA Affiliate may have any liability, contingent or otherwise.

"Platform" has the meaning set forth in Section 12.01(d).

"Pre-Petition" means the time period ending immediately prior to the filing of the Cases.

"Pre-Petition Collateral Agreement" means the "Collateral Agreement" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Credit Agreement" has the meaning specified in the recitals hereto.

"Pre-Petition Guaranty Agreement" means the "Guaranty Agreement" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Lenders" means the lenders party to the Pre-Petition Credit Agreement.

"Pre-Petition Letters of Credit" means the outstanding letters of credit issued by the Issuing Banks under the Pre-Petition Credit Agreement and set forth on Schedule 1.1(b) hereto.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loans" means the "Loans" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Obligations" means all of the "Obligations" as set forth in the Pre-Petition Credit Agreement.

"Pre-Petition Prior Liens" shall have the meaning set forth in the DIP Order.

"Pre-Petition Security Instruments" means the "Security Instruments" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Swap Agreements" means all Swap Agreements entered into by the Borrower or any of its Subsidiaries that were outstanding immediately prior to the Petition Date.

"Prime Rate" has the meaning set forth in the definition of Alternate Base Rate.

"Prior Transactions" means the transactions related to the incurrence of the Term Loan Holding Facility, the effectiveness of the Joint Development Agreement and the closing of the Pre-Petition Credit Facility.

"Pro Rata Share" means, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the

Commitments such Lender at such time and the denominator of which is the amount of the Aggregate Commitments at such time; provided that, if such Commitments have been terminated, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"Proceeding" has the meaning set forth in Section 12.03(b).

"Production Payments and Reserve Sales" means the grant or transfer by the Borrower or any of its Subsidiaries to any Person of a royalty, overriding royalty, net profits interest, production payment (whether volumetric or dollar-denominated), partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties where the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the oil and gas business, including any such grants or transfers.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proposed Plan" has the meaning set forth in Section 12.02(g).

"Public Lender" has the meaning set forth in Section 12.01(d).

"Qualified Equity Interests" means any Equity Interests of any Person other than Disqualified Stock.

"RBL Debtors" has the meaning specified in the recitals hereto.

"Redemption" means with respect to any Indebtedness, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value of such Indebtedness. "Redeem" has the correlative meaning thereto.

"Refinanced Loans" has the meaning set forth in Section 2.01(b).

"Refinanced Loan Amount" means, as to each Refinancing Lender, the amount set forth opposite such Refinancing Lender's name on Annex I under the caption "Refinanced Loan Amount".

"Refinancing Facility" has the meaning specified in the recitals hereto.

"Refinancing Lenders" means the Persons listed on Annex I and any Person that becomes a party hereto pursuant to an Assignment and Assumption (other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption) with respect to a Refinanced Loan and includes their respective successors and permitted assigns.

"Register" has the meaning set forth in Section 12.04(b)(iv).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the respective directors, officers, employees and agents of such Person and such Person's Affiliates.

"<u>Release</u>" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping or disposing into the environment.

"<u>Reserve Report</u>" means that certain Reserve Report dated as of September 4, 2019 and delivered to the Administrative Agent prior to the Petition Date.

"<u>Resignation Effective Date</u>" has the meaning set forth in <u>Section 11.06(a)</u>.

"<u>Responsible Officer</u>" means, as to any Person, (a) any chief executive officer, president, vice president, general counsel, chief operating officer, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party, (b) any manager, managing member or general partner, in each case, of such Person, (c) any other similar officer designated as such in writing to the Administrative Agent by such Person and (d) as to any corporate document, any secretary or assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references to a Responsible Officer herein means a Responsible Officer of the Borrower.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in any Debtor, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of (a) any such Equity Interests in any Debtor or (b) any option, warrant or other right to acquire any such Equity Interests in any Debtor.

"<u>Revolving Credit Exposure</u>" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans and its LC Exposure at such time.

"<u>RSA</u>" means the Restructuring Support Agreement, dated as of November [●], 2019, among the Debtors, the Lenders, and the other Consenting Stakeholders (as defined in RSA) as such agreement may be amended, modified or supplemented from time to time.

"<u>Scheduled Maturity Date</u>" means the date that is the six (6) month anniversary of the Petition Date.

"<u>SEC</u>" means the Securities and Exchange Commission or any successor Governmental Authority.

"<u>Secured Cash Management Agreement</u>" means any agreement related to Cash Management Services by and between the Borrower or any of its Subsidiaries and any Cash Management Bank.

"<u>Secured Cash Management Obligations</u>" means any Cash Management Obligations owing to any Cash Management Bank under a Secured Cash Management Agreement.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, each Issuing Bank, each Lender, each Secured Swap Party that is party to any Secured Swap Agreement, each Cash Management Bank that is a party to any Secured Cash Management Agreement, Indemnitees, and each sub-agent appointed by the Administrative Agent pursuant to <u>Section 11.05</u>.

"<u>Secured Swap Agreement</u>" means any Swap Agreement between the Borrower or any Subsidiary and any Person that is entered into during the time, that such Person was a Lender or an Affiliate of a Lender

(including any Pre-Petition Swap Agreements), even if such Person ceases to be a Lender or an Affiliate of a Lender for any reason; provided that, for the avoidance of doubt, the term "Secured Swap Agreement" shall not include any transactions entered into after the time that such Secured Swap Party ceases to be a Lender or an Affiliate of a Lender.

"Secured Swap Obligations" means all Swap Obligations owing to any Secured Swap Party under any Secured Swap Agreement other than Excluded Swap Obligations.

"Secured Swap Party" has the meaning set forth in the definition of Secured Swap Agreement.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Instruments" means, collectively, each security agreement, the DIP Order, the Loan Guarantee, mortgages, deeds of trust and any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by the Borrower or any other Person (other than any Secured Cash Management Agreements, Secured Swap Agreements or participation or similar agreements between any Lender and any other lender or creditor with respect to any Obligations pursuant to this Agreement) in connection with, or as security for the payment or performance of the Obligations, the Notes, this Agreement or reimbursement obligations under the Letters of Credit, as such agreements may be amended, modified, supplemented or restated from time to time.

"Seller Notes" means, collectively, (a) that certain Seller Note, dated as of October 14, 2014 (as amended, supplemented, or otherwise modified from time to time), in the original principal amount of $39,047,625.00, issued by Arsenal Energy Holdings LLC (f/k/a Mountaineer Energy Holdings, LLC) in favor of PDC Energy, Inc., as original seller, which note was sold and assigned pursuant to the Note Purchase Agreement, dated April 28, 2017, to Chambers Energy Capital II LP, Chambers Energy Capital II TE, LP and Chambers Energy Capital III, LP, as assignees and purchasers; and (b) that certain Seller Note, dated as of October 14, 2014 in the original principal amount of $39,047,625.00, issued by issued by Arsenal Energy Holdings LLC (f/k/a Mountaineer Energy Holdings, LLC) in favor of LR-Mountaineer Holdings, L.P.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Sponsor Fund Affiliate" means (a) each Controlled Affiliate, as applicable, of (i) FRC Founders Corporation, (ii) Chambers, (iii) Mercuria, and (iv) LHRM, in each case that is neither a portfolio company nor a company Controlled by a portfolio company and (b) each general partner or managing member of any such Affiliate.

"Sponsors" means FRC Founders Corporation and each of its Sponsor Fund Affiliates.

"Subsidiary" means, with respect to any Person: (a) any corporation, association or other business entity of which more than fifty percent (50.0%) of the total ordinary voting power of Equity Interests entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof) and (b) any partnership (i) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (ii) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof). Unless otherwise indicated herein, each reference to the term "Subsidiary" means a Subsidiary of the Borrower.

30

"Subsidiary Guarantor" means each Subsidiary that is a Guarantor.

"Superpriority Claim" means a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code against a Debtor in any of the Cases having priority over any or all administrative expense claims, adequate protection and other diminution claims, priority and other unsecured claims, and all other claims against a Debtor or its estate, including claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546, 552(b), 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more interest rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that (a) no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement and (b) any right of a Person to 'put' an asset to another Person that arises in connection with any acquisition agreement or disposition agreement shall not be a Swap Agreement.

"Swap Obligations" means, with respect to the Borrower or any Subsidiary, all debt, liabilities and obligations of such Person under Swap Agreements to the counterparties under such Swap Agreements.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Agreements (which may include a Lender or any Affiliate of a Lender) (it being understood that any such termination values and marked-to-market values shall take into account any assets posted as collateral or security for the benefit of a party to the Swap Agreement).

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, assessments, fees or other charges, or withholdings (including backup withholdings) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of: (a) the Maturity Date; (b) the date of Payment in Full and (c) the date of termination of the Commitments (including the LC Commitment) and/or the acceleration of all of the Obligations under this Agreement and the other Loan Documents following the occurrence and continuance of an Event of Default in accordance with Section 10.02.

"Test Period" means, for any date of determination under this Agreement, the most recent four consecutive fiscal quarters of the Borrower ending with the most recently ended fiscal quarter for which financial statements were required to have been delivered pursuant to Section 8.01.

"Transaction Expenses" means any fees or expenses incurred or paid by any Debtor in connection with the Transactions and the transactions contemplated thereby.

"Transactions" means, collectively, (a) any extensions of credit hereunder on or after the Interim Facility Effective Date and the execution and delivery of the Loan Documents on the Interim Facility Date, and (b) the payment of Transaction Expenses.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Eurodollar Rate.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the time of issuance).

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"Up-Front Fees" has the meaning set forth in Section 3.05(d).

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 5.03(e)(ii)(C).

"Variance Testing Period" means "Testing Period" as set forth in the applicable DIP Order.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.03    Types of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (e.g., a "Eurodollar Loan" or a "Eurodollar Borrowing").

Section 1.04    Terms Generally; Rules of Construction.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument, certificate, organization document or other document herein shall be construed as referring to such agreement, instrument, certificate or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents), (b) any reference herein to any Governmental Requirement shall be construed as referring to such Governmental Requirement as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" and "until" means "to but excluding" and the word "through" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.05    Accounting Terms and Determinations; GAAP.    Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP, applied on a basis consistent with the Interim Facility Effective Date Financial Statements or the December 31, 2018 financial statements of the Borrower, except for changes in which the Borrower's independent certified public accountants concur and which are disclosed to the Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a); provided that, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed and all such computations shall be conducted utilizing financial information presented consistently with prior periods.

Section 1.06    Reserved.

Section 1.07    Times of Day.    Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.08    Timing of Payment or Performance.    When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

Section 1.09    Currencies Generally.    For purposes of any determination under any other provision of this Agreement requiring the use of a current exchange rate, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than dollars shall be translated into dollars at the Dollar Equivalent then in effect on the date of such determination; provided, however, that for purposes of determining compliance with Article IX with respect to the amount of any Indebtedness, Investment, Disposition, Restricted Payment or other relevant amount in a currency other than dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred or Disposition, Restricted Payment or other relevant amount is made.

Section 1.10    Negative Covenant Compliance.    With respect to determining whether the Debtors comply with any negative covenant in Article IX (other than the Financial Performance Covenant), to the extent that any obligation or transaction could be attributable to more than one exception to any such negative covenant, the Borrower may elect to categorize all or any portion of such obligation or transaction to any one or more exceptions to such negative covenant that permit such obligation or transaction.  It is understood that, with respect to any negative covenant in Article IX (other than the Financial Performance Covenant), if an exception to any such negative covenant permits Permitted Refinancing Indebtedness, such exception shall be deemed to permit any subsequent Permitted Refinancing Indebtedness of such Permitted Refinancing Indebtedness.

Section 1.11    Letter of Credit Amounts.    Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Letter of Credit Agreement related thereto, provides for one or more automatic increases in the stated amount thereof which are not subject to the approval of the relevant Issuing Bank, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit that is available for drawing after giving effect to all such potential increases, whether or not such maximum stated amount is in effect at such time, that is identified in writing by the Issuing Bank to the Administrative Agent and the

Borrower at the time of issuance (or at the time of any amendment thereto, if such amendment relates to such maximum stated amount) (it is understood that this proviso only applies to automatic reinstatement Letters of Credit, which are identified to the Administrative Agent and Borrower as such at the time of issuance).

Section 1.12    Rounding.    Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.13    Divisions.    For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II
## THE CREDITS

Section 2.01    Commitments.

(a)    Subject to the applicable terms and conditions set forth herein, each Lender agrees to make new money loans (the "New Money Loans") in dollars to the Borrower from time to time on any Business Day during the Availability Period in an aggregate principal amount that will not result in (i) such Lender's Revolving Credit Exposure exceeding such Lender's Commitment, (ii) during the Interim Period, such Lender's Revolving Credit Exposure exceeding its Applicable Percentage of the Interim Facility Cap and (iii) the aggregate Revolving Credit Exposures of the Lenders exceeding the lesser of (x) the Aggregate Commitments of the New Money Lenders and (y) the Availability Limit.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the New Money Loans.

(b)    Subject to the terms and conditions set forth herein, including entry of the Final Order, upon entry of the Final Order (i) the Pre-Petition Loans under the Pre-Petition Credit Agreement shall be deemed refunded, refinanced, replaced and made hereunder and, on and after the entry of the Final Order, shall constitute Loans for all purposes hereunder and under the Loan Documents in the principal amount for each Lender set forth on Annex I beneath the column entitled "Existing Loans" (the "Refinanced Loans").  Amounts rolled up under this Section 2.01(b) and repaid or prepaid may not be reborrowed.

Section 2.02    Loans and Borrowings.

(a)    Borrowings; Several Obligations.    Each New Money Loan shall be made as part of a Borrowing consisting of New Money Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any New Money Loan required to be made by it shall not relieve any other New Money Lender of its obligations hereunder; provided that the Commitments are several and no New Money Lender shall be responsible for any other New Money Lender's failure to make Loans as required.

(b)    Types of Loans.    Subject to Section 3.03, each Borrowing of New Money Loans shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance

34

herewith. Each New Money Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such New Money Lender to make such Loan; provided that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such New Money Loan and (ii) in exercising such option, such New Money Lender shall use its reasonable efforts to minimize any cost to the Borrower resulting therefrom that would arise under Article V (so long as, in the reasonable judgment of such New Money Lender, such efforts would not subject such New Money Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such New Money Lender).

(c)    Minimum Amounts; Limitation on Number of Borrowings. At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $1,000,000. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $500,000 and not less than $500,000; provided that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.07(e). Borrowings of more than one Type may be outstanding at the same time, provided that there shall not at any time be more than a total of ten (10) Eurodollar Borrowings outstanding. Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(d)    Notes. If requested by a New Money Lender, the New Money Loans made by such New Money Lender shall be evidenced by a single promissory note of the Borrower in substantially the form of Exhibit A, dated, in the case of (i) any New Money Lender party hereto as of the Interim Facility Effective Date, as of such date or (ii) any New Money Lender that becomes a party hereto pursuant to an Assignment and Assumption, as of the effective date of the Assignment and Assumption, payable to the order of such Lender in a principal amount equal to its Commitment as in effect on such date, and otherwise duly completed. Upon reasonable request from a Lender, in the event that any Lender's Commitment increases or decreases for any reason (whether pursuant to Section 2.06, Section 12.04(b) or otherwise), the Borrower shall promptly deliver or cause to be delivered a new Note payable to the order of such Lender in a principal amount equal to its Commitment after giving effect to such increase or decrease, and otherwise duly completed, and, upon receipt by such Lender of such new Note, the existing Note of the Lender shall be deemed cancelled and the Lender shall promptly return its prior Note to the Borrower upon the request of the Borrower. The date, amount, Type, interest rate and, if applicable, Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be endorsed by such Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by such Lender. Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans.

Section 2.03    Requests for Borrowings. To request a Borrowing of New Money Loans, the Borrower shall notify the Administrative Agent of such request by email or telephone (a) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., New York time, three (3) Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York time, on the date of the proposed Borrowing; provided that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in Section 2.07(e). Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery, email or fax to the Administrative Agent of a written Borrowing Request in substantially the form of Exhibit B and signed by the Borrower. Each such telephonic and written Borrowing Request shall specify the following information:

(i)    the aggregate amount of the requested Borrowing;

(ii)     the date of such Borrowing, which shall be a Business Day;

(iii)     whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)     in the case of a Eurodollar Borrowing, the Interest Period to be applicable thereto;

(v)     the amount of (A) the then-effective Aggregate Commitments, (B) the amount of Available Funds and the then-effective Availability Limit, (C) the current total Revolving Credit Exposures (without regard to the requested Borrowing) and (D) the pro forma total Revolving Credit Exposures (giving effect to the requested Borrowing);

(vi)     the location and number of the Borrower's account to which funds are to be disbursed; and

(vii)     a certification that the intended use of proceeds of such Borrowing are in accordance with the Budget.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one (1) month's duration.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04     Interest Elections.

(a)     Conversion and Continuance.  Each Borrowing of New Money Loans initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.04. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the New Money Lenders holding the New Money Loans comprising such Borrowing, and the New Money Loans comprising each such portion shall be considered a separate Borrowing.

(b)     Interest Election Requests.  To make an election pursuant to this Section 2.04, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such telephonic Interest Election Request shall be irrevocable, and shall be confirmed promptly by hand delivery or fax to the Administrative Agent of a written Interest Election Request in substantially the form of Exhibit C and signed by the Borrower.

(c)     Information in Interest Election Requests.  Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)      the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to Section 2.04(c)(ii) and (iii) shall be specified for each resulting Borrowing);

(ii)      the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)      whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)      if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one (1) month's duration.

(d)      Notice to New Money Lenders by the Administrative Agent.  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each New Money Lender of the details thereof and of such New Money Lender's portion of each resulting Borrowing.  Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from a Responsible Officer of the Borrower.

(e)      Effect of Failure to Deliver Timely Interest Election Request and Events of Default on Interest Election.  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  If an Event of Default has occurred and is continuing on the date when an Interest Period continuation or conversion from an ABR Borrowing to a Eurodollar Borrowing is to take place and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation or conversion, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05      Funding of Borrowings.

(a)      Funding by Lenders.  Each New Money Lender shall make each New Money Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the New Money Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower designated by the Borrower in the applicable Borrowing Request; provided that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.07(e) shall be remitted by the Administrative Agent to the applicable Issuing Bank.

(b)    Presumption of Funding by the Lenders.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.05(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a New Money Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from the date such amount is made available to the Borrower to the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such New Money Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrower, the interest rate applicable to such Borrowing hereunder.  If such New Money Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.06    Termination and Reduction of Aggregate Commitments.

(a)    Scheduled Termination of Commitments.  Unless previously terminated, the Commitments shall terminate on the Maturity Date.  If at any time the Aggregate Commitments are terminated or reduced to zero, then the Commitments shall terminate on the effective date of such termination or reduction.

(b)    Optional Termination and Reduction of Aggregate Commitments.

(i)    The Borrower may at any time terminate, or from time to time reduce, the Aggregate Commitments; provided that (A) each reduction of the Aggregate Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 and (B) the Borrower shall not terminate or reduce the Aggregate Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c), the total Revolving Credit Exposures would exceed the Aggregate Commitments.

(ii)    The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Commitments under Section 2.06(b)(i) at least three (3) Business Days (or such shorter time as the Administrative Agent may agree) prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Any election by the Borrower to terminate or reduce the Maximum Credit Amounts pursuant to a notice delivered by the Borrower pursuant to this Section 2.06(b)(ii) may be made to be contingent upon the consummation of a refinancing or other event and such notice may otherwise be extended or revoked, in each case, with the requirements of Section 5.02 to apply to any failure of the contingency to occur and any such extension or revocation.  Any termination or reduction of the Aggregate Commitments shall be permanent and may not be reinstated. Each reduction of the Aggregate Commitments shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

Section 2.07    Letters of Credit.

(a)    Generally.  (i) Subject to the terms and conditions set forth herein, the Borrower may request any Issuing Bank to issue dollar denominated Letters of Credit for the account of the Borrower or for the account of any of its Subsidiaries, in a form reasonably acceptable to the Administrative Agent and the applicable Issuing Bank, at any time and from time to time during the Availability Period; provided

that the Borrower may not request the issuance, amendment, renewal or extension of Letters of Credit hereunder if, immediately after giving effect to the requested issuance, amendment, renewal or extension, as applicable, (A) the LC Exposure would exceed the LC Commitment, (B) the total Revolving Credit Exposures would exceed the lesser of (I) the Aggregate Commitments of the Lenders and (II) the Availability Limit or (C) the sum of (I) the aggregate undrawn amount of all outstanding Letters of Credit issued by any Issuing Bank plus (II) the aggregate amount of all LC Disbursements made by such Issuing Bank that have not yet been reimbursed by or on behalf of the Borrower would exceed such Issuing Bank's LC Issuance Limit.  No Issuing Bank shall be under any obligation to issue any Letter of Credit if any Lender is at that time a Defaulting Lender, unless such Issuing Bank has entered into arrangements reasonably satisfactory to such Issuing Bank with the Borrower or such Lender to eliminate or Cash Collateralize such Issuing Bank's actual or potential Fronting Exposure (after giving effect to Section 4.04(a)(iv)) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or any LC Exposure as to which such Issuing Bank has actual or potential Fronting Exposure.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any Letter of Credit Agreement or any Letter of Credit, the terms and conditions of this Agreement shall control.

(ii)    In addition, an Issuing Bank shall not issue or amend any Letter of Credit, if the expiry date of the requested Letter of Credit would occur after the close of business on the date that is five (5) Business Days prior to the Scheduled Maturity Date (the "Letter of Credit Expiration Date"), unless such Letter of Credit has been Cash Collateralized in a manner reasonably satisfactory or has had other arrangements made with respect to it that is reasonably satisfactory, in each case, to such Issuing Bank.

(iii)    An Issuing Bank shall not be under any obligation to issue any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing the Letter of Credit, or any Governmental Requirement applicable to the Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit, or request that the Issuing Bank refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon the Issuing Bank with respect to the Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Bank is not otherwise compensated hereunder) not in effect on the Interim Facility Effective Date, or shall impose upon the Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Interim Facility Effective Date and which the Issuing Bank in good faith deems material to it;

(B)    except as otherwise agreed by the Administrative Agent and the Issuing Bank, the Letter of Credit is in an initial stated amount less than $100,000;

(C)    the Letter of Credit is to be denominated in a currency other than dollars;

(D)    the Letter of Credit contains any provisions for automatic reinstatement of the stated amount after any drawing; or

(E)    other than the Pre-Petition Letters of Credit, the expiry date of the requested Letter of Credit would occur more than one (1) year (or eighteen (18) months with respect to Letters of Credit issued for the benefit of the Texas Railroad Commission) after the date of issuance or last extension of such Letter of Credit.

(iv)    Each Issuing Bank shall be under no obligation to amend any Letter of Credit if (A) the Issuing Bank would have no obligation at such time to issue the Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of the Letter of Credit does not accept the proposed amendment to the Letters of Credit.

(v)    Each Issuing Bank shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the Issuing Bank shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article XI with respect to any acts taken or omissions suffered by the Issuing Bank in connection with Letters of Credit issued by it or proposed to be issued by it and Letter of Credit Agreements pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article XI included the Issuing Banks with respect to such acts or omissions and (B) as additionally provided herein with respect to it.

(b)    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions.    To request the issuance of a Letter of Credit or the amendment, renewal or, the Borrower shall hand deliver or fax (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to such Issuing Bank and the Administrative Agent (not less than three (3) Business Days in advance of the requested date of issuance, amendment, renewal or extension) a notice:

(i)    requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)    specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)    specifying the date on which such Letter of Credit is to expire (which shall comply with Section 2.07(a)(ii));

(iv)    specifying the amount of such Letter of Credit; and

(v)    specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit.

If requested by the applicable Issuing Bank, the Borrower also shall submit a Letter of Credit Application on such Issuing Bank's standard form in connection with any request for a Letter of Credit.

(c)    [Reserved].

(d)    Participations.    By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable Issuing Bank or the New Money Lenders, such Issuing Bank hereby grants to each New Money Lender, and each New Money Lender hereby acquires from such Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.    In consideration and in furtherance of the foregoing, each New Money Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of such Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by such Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.07(e), or of any reimbursement payment required to be refunded to the Borrower for any reason.    Each New Money Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.07(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, the aggregate

40

Revolving Credit Exposure exceeding the Availability Limit, or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    <u>Reimbursement</u>.  If an Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement (i) if such Issuing Bank provides notice to the Borrower prior to 10:00 a.m., New York time on the date of such payment or disbursement, on such date or (ii) if such notice is received after such time, on the next Business Day following the receipt of such notice; <u>provided</u> that if such LC Disbursement is not less than $1,000,000, the Borrower shall be deemed to have requested, and the Borrower does hereby request under such circumstances, that such payment be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing, which shall not be subject to the conditions to Borrowing set forth herein.  If the Borrower fails to make such payment when due, the Administrative Agent shall notify each New Money Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such New Money Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each New Money Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in <u>Section 2.05</u> with respect to Loans made by such New Money Lender (and <u>Section 2.05</u> shall apply, *mutatis mutandis*, to the payment obligations of the New Money Lenders), and the Administrative Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from the New Money Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this <u>Section 2.07(e)</u>, the Administrative Agent shall distribute such payment to the applicable Issuing Bank or, to the extent that New Money Lenders have made payments pursuant to this <u>Section 2.07(e)</u> to reimburse the applicable Issuing Bank, then to such New Money Lenders and such Issuing Bank as their interests may appear.  Any payment made by a New Money Lender pursuant to this <u>Section 2.07(e)</u> to reimburse the applicable Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)    <u>Obligations Absolute</u>.  The Borrower's obligation to reimburse LC Disbursements as provided in <u>Section 2.07(e)</u> shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the applicable Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not strictly comply with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this <u>Section 2.07(f)</u>, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Administrative Agent, the New Money Lenders nor any Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the applicable Issuing Bank; <u>provided</u> that the foregoing shall not be construed to excuse the applicable Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the

41

Borrower that are caused by the applicable Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of proof of gross negligence or willful misconduct on the part of the applicable Issuing Bank (as finally determined by a court of competent jurisdiction), the applicable Issuing Bank shall be deemed to have exercised all requisite care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the applicable Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)    _Disbursement Procedures_. The applicable Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The applicable Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by electronic transmission) of such demand for payment and whether the applicable Issuing Bank has made or will make an LC Disbursement thereunder; <u>provided</u> that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the applicable Issuing Bank and the New Money Lenders with respect to any such LC Disbursement.

(h)    _Interim Interest_. If the applicable Issuing Bank shall make any LC Disbursement, then until the Borrower shall have reimbursed the applicable Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under Section 2.07(e)), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made, but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Loans. Interest accrued pursuant to this Section 2.07(h) shall be for the account of the applicable Issuing Bank, except that interest accrued on and after the date of payment by any New Money Lender pursuant to Section 2.07(e) to reimburse the applicable Issuing Bank shall be for the account of such New Money Lender to the extent of such payment.

(i)    _Replacement of an Issuing Bank_. Each Issuing Bank may be replaced or retire at any time by written agreement among the Borrower, the Administrative Agent and as applicable, such Issuing Bank or a successor Issuing Bank. The Administrative Agent shall notify the New Money Lenders of any such replacement or retirement of the applicable Issuing Bank. At the time any such replacement or retirement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 3.05(b). In the case of a replacement, from and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the replaced Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor and any other Issuing Banks or to any previous Issuing Bank, or to such successor and any other Issuing Banks and all previous Issuing Banks, as the context shall require. After the replacement or retirement of any Issuing Bank hereunder, the replaced or retired Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement or retirement until such time as those Letters of Credit have expired, or until the Borrower has fully and finally repaid such Issuing Bank for any LC Disbursement under such Letters of Credit, but shall not be required to issue additional Letters of Credit.

(j)    _Cash Collateralization_. If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent or the Majority Lenders demanding the deposit of cash collateral pursuant to this Section 2.07(j), or (ii) the Borrower is required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment

42

pursuant to Section 3.04(c), then the Borrower shall Cash Collateralize, in the case of an Event of Default, the LC Exposure, and in the case of a payment required by Section 3.04(c), the amount of such excess as provided in Section 3.04(c), as of such date plus any accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower or any Subsidiary. At any time that there shall exist a Defaulting Lender, within one (1) Business Day of a request of the Administrative Agent or the applicable Issuing Bank, the Borrower shall deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover the remaining Fronting Exposure of the Defaulting Lender (after giving effect to Section 4.04(a)(iv) and any Cash Collateral provided by the Defaulting Lender) for so long as such Fronting Exposure exists (it being understood that if such Fronting Exposure is reduced and both the Defaulting Lender and the Borrower have provided Cash Collateral, the Borrower will receive its Cash Collateral back first). The Borrower hereby grants to the Administrative Agent, for the benefit of the applicable Issuing Bank and the Secured Parties, a first priority and continuing perfected security interest in and Lien on such account and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in such account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor. The Borrower's obligation to deposit amounts pursuant to this Section 2.07(j) shall be absolute and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a Letter of Credit, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which any Debtor may now or hereafter have against any such beneficiary, the applicable Issuing Bank, the Administrative Agent, the Lenders or any other Person for any reason whatsoever (other than payment). Such deposit shall be held as collateral securing the payment and performance of the Borrower's and the Guarantors' obligations to reimburse Letters of Credit and any other obligations under this Agreement and the other Loan Documents. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. In addition to any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the applicable Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors under this Agreement or the other Loan Documents. If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three (3) Business Days after all Events of Default have been cured or waived.

(k)     Applicability of ISP and UCP. Unless otherwise expressly agreed by an Issuing Bank and the Borrower when a Letter of Credit is issued, the rules of the ISP shall apply to each standby Letter of Credit and the rules of the UCP shall apply to each commercial Letter of Credit.

(l)     Issuing Bank Reports to the Administrative Agent. Unless otherwise agreed by the Administrative Agent, the Issuing Bank shall, in addition to its notification obligations set forth elsewhere in this Section, report in writing to the Administrative Agent (i) periodic activity (for such period or recurrent periods as shall be requested by the Administrative Agent) in respect of Letters of Credit issued

by the Issuing Bank, including issuances, extensions, amendments and renewals, expirations and cancelations and disbursements and reimbursements, (ii) at least one Business Day prior to the time that the Issuing Bank issues, amends, renews or extends a Letter of Credit, the date of such issuance, amendment, renewal or extension and the stated amount of the applicable Letters of Credit after giving effect to such issuance, amendment, renewal or extension (and whether the amounts thereof shall have changed), (iii) on each Business Day on which the Issuing Bank makes a payment pursuant to a Letter of Credit, the date and amount of such payment, (iv) on any Business Day on which the Borrower fails to reimburse a payment made pursuant to a Letter of Credit required to be reimbursed to the Issuing Bank on such day, the date of such failure and the amount of such payment and (v) on any other Business Day, such other information as the Administrative Agent shall reasonably request as to the Letters of Credit issued by the Issuing Bank.

(m)    <u>Pre-Petition Letters of Credit</u>.  Simultaneously with the occurrence of the Interim Facility Effective Date, and subject to execution and delivery by the Issuing Banks, the Administrative Agent and the Borrower of an issuer acknowledgement regarding the Pre-Petition Letters of Credit, in form and substance reasonably satisfactory to the Issuing Banks and the Administrative Agent, each of the Existing Letters of Credit shall be deemed issued under this Agreement (and shall comprise Letters of Credit under this Agreement and the other Loan Documents).

Section 2.08    <u>Collateral; Guarantee</u>.

(a)    <u>Priority and Liens</u>.  The parties hereto acknowledge and agree that, upon entry of the DIP Order and the delivery and execution of this Agreement, the Obligations shall at all times be secured and perfected pursuant to, and have the superpriority claims and liens as set forth in the DIP Order, subject at all times to the Carve-Out.

(b)    <u>Payment of Obligations</u>.  On the Termination Date, the Lenders shall be entitled to immediate payment of all Obligations without further application to, or order of, the Bankruptcy Court.

(c)    <u>No Discharge; Survival of Claims</u>.  Each Debtor agrees that (i) any Confirmation Order entered in the Cases shall not discharge or otherwise affect in any way any of the Obligations, other than after Payment in Full and termination of the Commitments on or before the effective date of an Approved Plan of Reorganization and (ii) to the extent the Obligations are not satisfied in full, (A) the Obligations shall not be discharged by the entry of a Confirmation Order (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (B) the Superpriority Claim granted to the Secured Parties pursuant to the DIP Order and the Liens granted to the Administrative Agent pursuant to the DIP Order shall not be affected in any manner by the entry of a Confirmation Order.

(d)    <u>Perfection and Protection of Security Interests and Liens</u>.  The Loan Parties will from time to time deliver to the Administrative Agent all financing statements, amendments, assignments and continuation statements, extension agreements and other documents, properly completed and executed (and acknowledged when required) by each Loan Party, as applicable, in form and substance reasonably satisfactory to the Administrative Agent, in each case, which the Administrative Agent reasonably requests for the purpose of perfecting, confirming, or protecting its lien and security interest in Collateral for the purpose of securing the Obligations; <u>provided</u> that the Loan Parties acknowledge that all such liens and security interests are perfected upon entry of the Interim Order.

(e)    [Reserved]

(f)    [Reserved]

44

(g)    The Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (i) the motions seeking approval of the Loan Documents and the DIP Facility and (ii) the hearings for the approval of the Interim Order and the Final Order were given in each case.  The Borrower has given, on a timely basis as specified in the Interim Order, all notices required to be given on or prior to the date of this representation to all parties specified in the Interim Order.

(h)    All Obligations of the Debtors to the Lenders under the Loan Documents, including all Loans made under the DIP Facility, shall, subject to the Carve-Out, at all times:

(i)    pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several Superpriority Claim status in the Case, which claims in respect of the New Money Facility and the Refinancing Facility shall be *pari passu* and shall be senior in priority and payment to the obligations under the Pre-Petition Credit Agreement;

(ii)    pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority Lien on the Collateral to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date or liens that were in existence immediately prior to the Petition Date that are perfected as expressly permitted by the Bankruptcy Code; provided that Avoidance Action Proceeds shall not be so secured or perfected until entry of the Final Order;

(iii)    pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected junior lien on the Collateral that is subject only to the Pre-Petition Prior Liens; and

(iv)    pursuant to Bankruptcy Code section 364(d), be secured by a perfected first priority senior priming Lien on all other Collateral not described in clauses (ii) and (iii) above, which Lien (x) shall be senior to the Prepetition First Lien Adequate Protection Liens (as defined in the DIP Order) and senior and priming to (A) the Liens securing the Pre-Petition Credit Agreement, Holdings Term Loan and Sellers Notes,  and (B) any Liens that are junior to the Liens securing the Pre-Petition Credit Agreement or the First Lien Adequate Protection Liens (as defined in the DIP Order), after giving effect to any intercreditor or subordination agreements and shall be junior only to the Pre-Petition Prior Liens and the Carve-Out.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01    Repayment of Loans.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Maturity Date.

Section 3.02    Interest.

(a)    ABR Loans.  The outstanding principal amount of the Loans comprising each ABR Borrowing shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b)    Eurodollar Loans.  The outstanding principal amount of the Loans comprising each Eurodollar Borrowing shall bear interest at a rate per annum equal to the Eurodollar Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)     Default Rate.  If any principal of or interest on any Loan or any fee or other amount payable by the Borrower or any Guarantor hereunder or under any other Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, then such overdue amount shall bear interest, after as well as before judgment, from the date of such non-payment to the date on which such amount is paid in full at a rate per annum, not to exceed the Highest Lawful Rate, equal to two percent (2.0%) plus (i) in the case of overdue principal, the rate that would otherwise be applicable thereto and (ii) in the case of overdue interest or other overdue amount, the rate applicable to ABR Loans as provided in Section 3.02(a); provided that no such interest shall accrue or be payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(d)     Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Maturity Date; provided that (i) interest accrued pursuant to Section 3.02(c) shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Maturity Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     Interest Rate Computations.  All interest hereunder shall be computed on the basis of a year of three hundred sixty (360) days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), except that interest computed by reference to clause (b) of the Alternate Base Rate definition shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Eurodollar Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error and be binding upon the parties hereto.

Section 3.03     Inability to Determine Rates.  If in connection with any request for a Eurodollar Loan or a conversion to or continuation thereof, (a) the Administrative Agent reasonably determines that (i) dollar deposits are not being offered to banks in the London interbank market for the applicable amount and Interest Period of such Eurodollar Loan, or (ii) (A) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Loan or in connection with an existing or proposed ABR Loan, or (B) the administrator (or supervisor thereof) of LIBOR, or a Governmental Authority having jurisdiction over the Administrative Agent, has made a public statement identifying a specific date after which LIBOR will permanently or indefinitely cease to be published (and there is no successor administrator that will continue publication of LIBOR) or used for determining interest rates for loans (in each case with respect to clause (a) above, "Impacted Loans"), or (b) the Majority Lenders reasonably determine that for any reason the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Loan does not adequately and fairly reflect the cost to such Lenders of funding such Eurodollar Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter (in the case of clause (a)(ii)(B) above, being after the date of cessation of publication of LIBOR or, if earlier, such date as indicated by the applicable Governmental Authority), (x) the obligation of the Lenders to make or maintain Eurodollar Loans shall be suspended (to the extent of the affected Eurodollar Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence is made with respect to the Eurodollar Rate component of the Alternate Base Rate, the utilization of the Eurodollar Rate component in determining the Alternate Base Rate shall be suspended, in each case until the Administrative Agent revokes such notice (upon the instruction of the Majority Lenders, in the case of clause (b) above, who agree to so instruct the Administrative Agent once the relevant circumstances giving rise to such notice no longer exist); provided that, in the case of clause

46

(a)(ii) above, the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to LIBOR that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Loans (to the extent of the affected Eurodollar Loans or Interest Periods) and may revise such request to be a Borrowing of, conversion to, or continuation of Eurodollar Loans of a non-affected Interest Period in the event that the circumstances set forth in clause (b) apply or, failing that, will be deemed to have converted such request into a request for a ABR Loans in the amount specified therein.

Notwithstanding the foregoing, (a) if the Administrative Agent has made the determination described in Section 3.03(a) (other than with respect to an actual or potential cessation of the publication of LIBOR), the Administrative Agent with the consent of the Borrower and in consultation with the affected Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (1) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans, which it agrees to do once the relevant circumstances giving rise to such notice no longer exist, or (2) the Majority Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans and (B) if the Administrative Agent has made the determination described in Section 3.03(a) with respect to an actual or potential cessation of the publication of LIBOR, then the Administrative Agent and the Borrower shall endeavor to enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin) (provided that, if such alternate rate of interest as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement) and, notwithstanding anything to the contrary in Section 12.02, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Majority Lenders stating that such Majority Lenders object to such amendment; provided that, in the case of each of the foregoing clause (a) and (b), if any Lender reasonably determines that any Governmental Requirement has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof then the provisions of Section 5.06 shall apply to such Lender as if such Impacted Loans of such Lender were Eurodollar Loans.

Section 3.04     Prepayments.

(a)     Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part without premium or penalty, subject to prior notice in accordance with Section 3.04(b).

(b)     Notice and Terms of Optional Prepayment.  The Borrower shall notify the Administrative Agent by telephone (confirmed by fax or other method acceptable to the Administrative Agent) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., New York time, three (3) Business Days (or such shorter time as the Administrative Agent may agree) before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York time, on the date of prepayment.  Each such notice shall specify the prepayment date and the principal amount of such prepayment and the Type(s) of Loans to be prepaid and, if Eurodollar Loans are to be prepaid, the Interest Period(s) of such Loans.  Promptly following receipt of any such notice

relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02. Any election by the Borrower to voluntarily prepay any Borrowing pursuant to a notice delivered by the Borrower pursuant to this Section 3.04(b) may be made to be contingent upon the consummation of a refinancing or other event and such notice may otherwise be extended or revoked, in each case, with the requirements of Section 5.02 to apply to any failure of the contingency to occur and any such extension or revocation.

(c)    Mandatory Prepayments.

(i)    Upon Optional Terminations and Reductions. If, after giving effect to any termination or reduction of the Aggregate Commitments pursuant to Section 2.06(b), or for any other reason, the aggregate Revolving Credit Exposure exceeds the Availability Limit, then the Borrower shall (A) prepay the New Money Loans, to be applied ratably to each New Money Loan on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (B) if such excess remains after prepaying all of the Borrowings as a result of LC Exposure, Cash Collateralize such remaining deficiency as provided in Section 2.07(j). The Borrower shall be obligated to make such prepayment and/or deposit of Cash Collateral substantially concurrently with the effectiveness of such termination or reduction.

(ii)    Subject to the payment priorities set forth in the DIP Order, if the Debtors (A) sell any Property outside of the ordinary course of business pursuant to Section 9.09 or otherwise sell any Property outside of the ordinary course of business as not otherwise permitted by this Agreement or (B) receive any insurance proceeds or condemnation proceeds, in each case, including when an Event of Default exists, then the Borrower shall prepay the Refinanced Loans (ratably to each Refinancing Lender) in an aggregate amount equal to the lesser of (x) 100% of net cash proceeds received from such sale or proceeds and (y) the aggregate principal amount of Refinanced Loans then outstanding. The Borrower shall be obligated to make such prepayment and/or Cash Collateralize such excess on the date it or any Subsidiary receives net cash proceeds, provided that payments required to be made pursuant to this Section 3.04(c)(ii) must be made on or prior to the Termination Date. Each prepayment made pursuant to this Section 3.04(c)(ii) shall be applied ratably to the Refinanced Loans. Prepayments pursuant to this Section 3.04(c)(ii) shall be accompanied by accrued interest to the extent any interest under such Loans being repaid remains unpaid.

(iii)    Application of Prepayments to Types of Borrowings. Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied, first, ratably to any ABR Borrowings then outstanding, and, second, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto.

(iv)    Interest to be Paid with Prepayments. Prepayments pursuant to this Section 3.04(c) shall be accompanied by accrued interest to the extent required by Section 3.02.

(d)    No Premium or Penalty. Prepayments permitted or required under this Section 3.04 shall be without premium or penalty, except as required under Section 5.02.

48

(e)    No Effect on Secured Swap Agreements and Secured Cash Management Agreements. Prepayments permitted or required under this Section 3.04 shall not affect the Borrower's obligation to continue making payments under any Secured Swap Agreement or Secured Cash Management Agreement, as applicable, each of which shall remain in full force and effect notwithstanding such prepayment, subject to the terms of such Secured Swap Agreement or Secured Cash Management Agreement, as applicable.

Section 3.05    Fees.

(a)    Commitment Fees. The Borrower agrees to pay to the Administrative Agent for the account of each New Money Lender, in accordance with each such Lender's Applicable Percentage, a commitment fee, which shall accrue at a rate equal to the Commitment Fee Rate on the daily amount of the unused amount of the Commitments (taking into account the Availability Limit for the Interim Period) of such Lender during the period from the date of this Agreement to the Maturity Date. Accrued commitment fees shall be payable in arrears on the third Business Day following the last day of each month of each year and on the Maturity Date, commencing on the first such date to occur after the date hereof. All commitment fees shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)    Letter of Credit Fees. The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Eurodollar Loans on the daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from the date of this Agreement to the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, (ii) to the applicable Issuing Bank a fronting fee, which shall accrue at the rate of one-eighth of one percent (0.125%) per annum on the daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, and (iii) to the applicable Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder. Participation fees and fronting fees accrued through and including the last day of each month of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after the date of this Agreement; provided that all such fees shall be payable on the Maturity Date and any such fees accruing after the Maturity Date shall be payable on demand. Any other fees payable to the applicable Issuing Bank pursuant to this Section 3.05(b) shall be payable within thirty (30) days after demand. All participation fees and fronting fees shall be computed on the basis of a year of three hundred sixty (360) days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)    Administrative Agent Fees. The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon in writing between the Borrower and the Administrative Agent.

(d)    Up-Front Fees. The Borrower agrees to pay to the Administrative Agent, for the ratable benefit of each New Money Lender, an up-front fee (the "Up-Front Fee") in an amount equal to 2.00% of the Aggregate Commitments of New Money Loans, which fee shall be earned and due and payable

in full on the Interim Facility Effective Date (and which shall be paid out of (or netted from) the proceeds of a Borrowing made on the Interim Facility Effective Date).

## ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    Payments by the Borrower.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Sections 5.01, 5.02 or 5.03 or otherwise) prior to 1:00 p.m., New York time, on the date when due, in immediately available funds.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except payments to be made directly to the planned Issuing Bank as expressly provided herein and except that payments pursuant to Sections 5.01, 5.02, 5.03 and Section 12.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.  Fees, once paid, shall be fully earned and shall not be refundable under any circumstances.

(b)    Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)    Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 4.01(c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from, or setoff happening as a result of the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary (as to which the provisions of this Section 4.01(c) shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender

50

acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 4.02    Presumption of Payment by the Borrower.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders and/or any applicable Issuing Bank that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders and/or any applicable Issuing Bank, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders and/or any applicable Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender and/or any applicable Issuing Bank with interest thereon, for each day from the date such amount is distributed to it to the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03    Disposition of Proceeds.  The Security Instruments contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Administrative Agent for the benefit of the Lenders of all of the Borrower's or each Guarantor's interest in and to production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property.  The Security Instruments further provide in general for the application of such proceeds to the satisfaction of the Obligations and other obligations described therein and secured thereby.  Notwithstanding the assignment contained in such Security Instruments, until the occurrence of an Event of Default, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Debtors and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Subsidiaries.

Section 4.04    Defaulting Lenders.

(a)    Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 12.02(f).

(ii)    Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article X or otherwise), shall be applied at such time or times as may be determined by the Administrative Agent as follows:  first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a *pro rata* basis of any amounts owing by that Defaulting Lender to any Issuing Bank hereunder; third, if so determined by the Administrative Agent or requested by any Issuing Bank, to be held as Cash Collateral or deposit balances for future funding obligations of that Defaulting Lender of any participation in any Letter of Credit; fourth, as the Borrower may request (so long as no Default or Event of Default has occurred and is continuing), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so

51

determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; sixth, to the payment of any amounts owing to the Lenders and Issuing Banks as a result of any judgment of a court of competent jurisdiction obtained by any Lender and/or Issuing Bank against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default has occurred and is continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and eighth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or LC Borrowings in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans or LC Borrowings were made at a time when the conditions set forth in Section 6.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and LC Borrowings owed to, all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of, or LC Borrowings owed to, that Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateralized cash or deposit account balances pursuant to this Section 4.04(a)(ii) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     Certain Fees.  That Defaulting Lender (A) shall not be entitled to receive any commitment fee pursuant to Section 3.05(a) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender) and (B) shall not be entitled to receive any Letter of Credit participation fee pursuant to Section 3.05(b)(i) for any period during which such Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to such Defaulting Lender); provided that the Borrower shall pay (A) to such Defaulting Lender the portion of such fee which is proportionate to the portion of the Defaulting Lender's LC Exposure for which it has provided Cash Collateral satisfactory to the applicable Issuing Bank pursuant to Section 2.07(a), (B) to each Non-Defaulting Lender that portion of any such fee which is proportionate to its Pro Rata Share of the Defaulting Lender's LC Exposure which has been allocated to it pursuant to Section 4.04(a)(iv) and (C) to pay to the Issuing Bank the remaining portion of such fee (except to the extent that the Borrower has Cash Collateralized the LC Exposure attributable thereto (it being understood that the Borrower shall not be required to pay such fees on the portion of the Defaulting Lender's LC Exposure that it has Cash Collateralized)).

(iv)     Reallocation of Pro Rata Share to Reduce Fronting Exposure.  During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each Non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit pursuant to Section 2.07, the "Pro Rata Share" of each Non-Defaulting Lender's Loans and LC Exposure shall be computed without giving effect to the Commitment of that Defaulting Lender (except to the extent that the Defaulting Lender has Cash Collateralized any LC Exposure attributable to it); provided that (i) each such reallocation shall be given effect only if, at the date the applicable Lender becomes a Defaulting Lender, no Default or Event of Default has occurred and is continuing; and (ii) the aggregate obligation of each Non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit shall not exceed the positive difference, if any, of (A) the Commitment of that Non-Defaulting Lender minus (B) the aggregate Revolving Credit Exposure of that Lender.  Subject to clause (c) of this Section 4.04, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(b)        Defaulting Lender Cure.  If the Borrower, the Administrative Agent and each Issuing Bank agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateralized cash or deposit account balances), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a *pro rata* basis by the Lenders in accordance with their Pro Rata Share (without giving effect to Section 4.04(a)(iv)), whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

(c)        Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i)        the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(ii)        the effects of any Bail-In Action on any such liability, including, if applicable:

(A)        reduction in full or in part or cancellation of any such liability;

(B)        a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(C)        the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

## ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01        Increased Costs.

(a)        Eurodollar Changes in Law.  If any Change in Law shall:

(i)        impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender;

(ii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender; or

(iii)    subject any Lender to any Taxes (other than (A) Indemnified Taxes or Other Taxes, (B) Taxes described in clauses (b) through (e) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its Loans, Loan principal, Letters of Credit, Commitments, or other Obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or otherwise), excluding for purposes of this Section 5.01(a) any such increased costs or reduction in amount resulting from capital requirements contemplated by Section 5.01(b) or any amount owed under Section 5.01(f), then from time to time upon written demand of such Lender setting forth in reasonable detail such increased costs or reduction suffered, the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)    Capital Requirements.  If any Lender or Issuing Bank reasonably determines that any Change in Law regarding capital adequacy or liquidity requirements occurring after the Interim Facility Effective Date has the effect of reducing the rate of return on such Lender's or any Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy or liquidity), then from time to time, upon receipt of a certificate of a Lender as required under Section 5.01(c), the Borrower will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender and/or Issuing Bank or such Lender's and/or such Issuing Bank's holding company for any such reduction suffered.

(c)    Certificates.  A certificate of a Lender or Issuing Bank setting forth in reasonable detail the calculation and the amount or amounts necessary to compensate such Lender or such Issuing Bank or its holding company, as the case may be, as specified in Section 5.01(a) or Section 5.01(b) shall be delivered to the Borrower and the Administrative Agent and shall be conclusive absent manifest error. The Borrower shall pay such Lender or such Issuing Bank, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

(d)    Requests for Compensation.  If any Lender requests compensation from the Borrower under Section 5.01, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another applicable Eurodollar Loan, or, if applicable, to convert ABR Loans into Eurodollar Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 5.01(e) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(e)    Making, Continuing or Converting Loans.  If the obligation of any Lender to make or continue any Eurodollar Loan, or to convert ABR Loans into Eurodollar Loans shall be suspended pursuant to Section 5.01(d) hereof, such Lender's applicable Eurodollar Loans shall be automatically

54

converted into ABR Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such Eurodollar Loans and:

(i)        to the extent that such Lender's Eurodollar Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurodollar Loans shall be applied instead to its ABR Loans;

(ii)        all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurodollar Loans shall be made or continued instead as ABR Loans (if possible), and all ABR Loans of such Lender that would otherwise be converted into Eurodollar Loans shall remain as ABR Loans; and

(iii)        if any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 5.01 hereof that gave rise to the conversion of any of such Lender's Eurodollar Loans pursuant to this Section 5.01 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Loans made by other Lenders hereunder are outstanding, if applicable, such Lender's ABR Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurodollar Loans hereunder and by such Lender are held *pro rata* (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments.

(f)        Eurocurrency Liabilities.  The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits in respect of Eurodollar Loans, additional interest on the unpaid principal amount of each Eurodollar Loan equal to the actual cost of such reserves allocated to such Loan by such Lender (as reasonably determined by each such Lender in good faith), which shall be due and payable on each date on which interest is payable on such Loan; provided that the Borrower shall have received a ten (10) days' prior written notice (with a copy to the Administrative Agent) of such additional interest from such Lender.  If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

Section 5.02        Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan into an ABR Loan other than on the last day of the Interest Period applicable thereto or (c) the failure by the Borrower (for reasons other than the failure of a Lender to make a Loan) to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, then, upon written demand of any Lender (with a copy to the Administrative Agent), the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event (exclusive of lost profits or opportunity costs).

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

Section 5.03        Taxes.

(a)        Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if the Borrower or any Guarantor shall

be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all such required deductions or withholdings of Indemnified Taxes or Other Taxes (including deductions applicable to additional sums payable under this Section 5.03(a)), the Administrative Agent, Lender or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Borrower or such Guarantor shall make such deductions or withholdings and (iii) the Borrower or such Guarantor shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b)       Payment of Other Taxes by the Borrower.  The Borrower shall timely pay, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)       Indemnification by the Borrower.   The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.03) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate of the Administrative Agent, a Lender or the Issuing Bank as to the amount and reasonable detail as to basis and calculation of such payment or liability under this Section 5.03 shall be delivered to the Borrower and shall be conclusive absent manifest error.

(d)       Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower or a Guarantor to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)       Withholding Documentation.  Any Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement or any Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Each Lender shall promptly notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any such claimed exemption or reduction, or notify the Borrower and Administrative Agent in writing of its legal inability to do so.

Without limiting the generality of the foregoing,

(i)       any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent),

executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(ii)    any Foreign Lender, to the extent it is legally entitled to do so, shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(A)    duly completed originals of Internal Revenue Service Form W 8BEN or Form W-8BEN-E;

(B)    duly completed originals of Internal Revenue Service Form W 8ECI;

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, such Foreign Lender shall deliver to Borrower and the Administrative Agent a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate");

(D)    to the extent a Foreign Lender is not the beneficial owner, executed originals of Internal Revenue Service Form W-8IMY, accompanied by Internal Revenue Service Form W-8ECI, Internal Revenue Service Form W-8BEN or Form W-8BEN-E, a U.S. Tax Compliance Certificate, Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; and/or

(E)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or Administrative Agent to determine the withholding or deduction required to be made (however, the completion, execution and submission of documentation pursuant to this Section 5.03(e) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender).

(f)    Tax Refunds.  If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 5.03, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 5.03 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this clause (f), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this clause (f) the payment of which would place the Administrative Agent or Lender in a less favorable net after-Tax position than the Administrative Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted,

57

withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 5.03 shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

(g)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA, or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 5.03(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement. Each Lender shall promptly notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any such previously delivered documentation, and shall update such documentation or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes or Other Taxes attributable to such Lender (but only to the extent that the Borrower or any Guarantor has not already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Borrower and Guarantors to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to setoff and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this clause (h).

Section 5.04     Matters Applicable to All Requests for Compensation.

(a)     The Administrative Agent or any Lender claiming compensation under Section 5.01 and Section 5.03 shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.   In determining such amount, the Administrative Agent or such Lender may use any reasonable averaging and attribution methods.

(b)     With respect to any Lender's claim for compensation under Section 5.01 or Section 5.03, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; provided that, if the circumstance giving rise to such claim is retroactive, then such one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.05    Mitigation Obligations.  If any Lender requests compensation under Section 5.01, if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03 or if any Lender provides notice pursuant to Section 5.06, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 or Section 5.03 or eliminate the need to give a notice pursuant to Section 5.06, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.

Section 5.06    Illegality.  If any Lender reasonably determines that as a result of any Change in Law it has become unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its lending office to make, maintain or fund Eurodollar Loans, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (a) any obligation of such Lender to make or continue Eurodollar Loans or to convert ABR Loans to Eurodollar Loans shall be suspended and (b) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Eurodollar Rate component of ABR, the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of ABR, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist (it being understood that such Lender agrees to so advise the Administrative Agent once the relevant circumstances giving rise to such determination no longer exists).  Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Loans of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of ABR), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurodollar Loans and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar Rate, the Administrative Agent shall during the period of such suspension compute ABR applicable to such Lender without reference to the Eurodollar Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate (it being understood that such Lender agrees to so advise the Administrative Agent once such illegality no longer exists).  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**ARTICLE VI**
**CONDITIONS PRECEDENT**

Section 6.01    Interim Facility Effective Date.  The obligation of each Lender to enter into and execute this Agreement and make Loans and of the Issuing Bank to issue Letters of Credit, in each case, during the Interim Period shall commence when each of the following conditions precedent shall have been satisfied (or waived in accordance with Section 12.02) (such date, the "Interim Facility Effective Date"):

(a)    the Petition Date shall have occurred.

(b)    (i) within three (3) Business Days following the Petition Date, the Interim Order shall have been entered on the docket of the Bankruptcy Court, (ii) the Interim Order shall be in full force

59

and effect and shall not have been (A) vacated, stayed or reversed, or (B) modified or amended in any respect without the prior written consent of the Administrative Agent in its reasonable discretion, and (iii) the Loan Parties shall be in compliance with the terms of the Interim Order in all material respects.

(c)     (i) all first-day motions filed by the Loan Parties in the Cases (including any motions related to cash management or any critical vendor or supplier motions)  shall not be materially inconsistent with  the RSA or the Approved Plan of Reorganization and (ii) the Cash Management Order entered by the Bankruptcy Court shall be in form and substance reasonably acceptable to the Administrative Agent.

(d)     the Administrative Agent shall have received (i) duly executed and delivered counterparts (in such numbers as may be requested by the Administrative Agent) of this Agreement and the other Loan Documents to be executed and delivered on or prior to such date, from each party hereto or thereto, as applicable, signed on behalf of such party, in each case in form and substance acceptable to the Administrative Agent and Lenders, and (ii) the duly executed Notes payable to each Lender that requests a Note in the principal amount equal to such Lender's Commitment and Loans.

(e)     the Administrative Agent shall have received a certificate of a Responsible Officer of the Loan Parties setting forth as of the Interim Facility Effective Date (i) resolutions of the board of directors or other appropriate governing body with respect to the authorization of each of the Loan Parties to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of each Loan Party (A) who are authorized to sign the Loan Documents to which such Loan Party is a party and (B) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers and (iv) the articles or certificate of incorporation and by-laws or other applicable organizational documents of the Loan Parties, certified as being true and complete.  The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from the Borrower to the contrary.

(f)     the RSA shall have been executed and shall be in full force and effect.

(g)     the Administrative Agent shall have received certificates of good standing (to the extent such concept exists) from the applicable Secretary of State (or equivalent) of the state of organization of each Loan Party as of a recent date prior to the Petition Date.

(h)     an Approved Plan of Reorganization shall have been filed with the Bankruptcy Court.

(i)     the Administrative Agent shall have received three (3) Business Days prior to the Interim Facility Effective Date (or such later date as the Administrative Agent reasonably agree) all documentation and other information required by regulatory authorities with respect to the Borrower and the Guarantors under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that has been reasonably requested by the Administrative Agent at least ten (10) days in advance of the Interim Facility Effective Date.  No later than three (3) Business Days prior to the Interim Facility Effective Date, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, then the Borrower shall have delivered to the Administrative Agent a Beneficial Ownership Certification, which shall be true and correct in all respects.

(j)     subject to the Interim DIP Order, all reasonable and documented pre- and post-petition fees, charges and expenses including, without limitation, (i) the fees, charges and expenses of Paul

Hastings LLP, RPA Advisors, LLC and Richards, Layton & Finger, PA, in each case pursuant to invoices delivered to the Borrower at least three (3) Business Days before the Interim Facility Effective Date, (ii) the Up-Front Fee, (iii) the fees agreed to in the Engagement Letter and (iv) all other amounts due and payable under Section 12.03 pursuant to invoices delivered to the Borrower at least three (3) Business Days before the Interim Facility Effective Date, in each case as required to be paid to the Administrative Agent and Lenders on or before the Interim Facility Effective Date, shall have been paid or shall be paid out of (or netted from) the proceeds of the Initial Borrowing.

(k)    the Administrative Agent shall have received a budget in form satisfactory to the Administrative Agent in its reasonable discretion and in substance reasonably acceptable to the Administrative Agent, the Majority Lenders and RPA Advisors, LLC (the "Initial Budget"), together with a certificate of the Borrower stating that such Initial Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Borrower to be reasonable at the time made and from the best information then available to the Borrower.

(l)    there shall not exist any action, suit, investigation, litigation or proceeding pending or threatened (other than the Cases) in any court or before any Governmental Authority or facts or circumstances that, in the reasonable opinion of the Administrative Agent and the Majority Lenders, materially and adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to result in a Material Adverse Effect.

(m)    all Obligations shall be secured by a perfected lien and security interest on all Collateral of the Loan Parties pursuant to, and such Lien and security interest shall have the priorities set forth in the Interim Order, subject only to the Liens permitted by Section 9.03 and the Carve-Out and all filing and recording fees and taxes with respect to such Liens and security interests that are due and payable as of the Interim Facility Effective Date shall have been duly paid.

(n)    the Administrative Agent shall have received the duly executed Engagement Letter.

(o)    all Pre-Petition Swap Agreements shall continue to be in full force and effect after giving effect to the Petition Date, without any amendments thereto that are adverse to the interests of the Borrower or its applicable Subsidiaries.

For purposes of determining compliance with the conditions specified in this Section 6.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Interim Facility Effective Date specifying its objection thereto.

Section 6.02    Final Facility Effective Date.  The obligation of each Lender to make its Loans hereunder and the obligation of the Issuing Bank to issue Letters of Credit hereunder during the Final Period shall commence as of the Business Day when each of the following conditions precedent shall have been satisfied (or waived in accordance with Section 12.02) (the "Final Facility Effective Date"):

(a)    the Bankruptcy Court shall have entered the Final Order within thirty (30) days (or such later date consented to by the Administrative Agent and the Majority Lenders) following the Petition Date, which Final Order shall (i) be in substantially the form of the Interim Order, with only such modifications thereto as are reasonably satisfactory in form and substance to the Administrative Agent, (ii) shall have been entered on the docket of the Bankruptcy Court and (iii) shall be in full force and effect and

shall not have been (A) vacated, stayed or reversed, or (B) modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders in their reasonable discretion.

(b)    the Debtors shall be in compliance in all material respects with (i) the DIP Order and (ii) subject to application of the Permitted Variance, the Budget.

(c)    The RSA shall have been executed and shall be in full force and effect.

For purposes of determining compliance with the conditions specified in this Section 6.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Final Facility Effective Date specifying its objection thereto.

Section 6.03    Conditions Precedent to Each Borrowing.  The obligation of each Lender to make Loans in respect of a Borrowing (including the Refinanced Loans and the initial funding of the New Money Loans on the Interim Facility Effective Date) and of any Issuing Bank to issue, amend, renew or extend any Letters of Credit, is subject to the satisfaction (or waiver in accordance with Section 12.02) of the following conditions:

(a)    At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default or Event of Default shall have occurred and be continuing.

(b)    The representations and warranties of the Borrower and the Guarantors set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, such representations and warranties shall be true and correct in all material respects as of such specified earlier date.

(c)    The receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 or a request for a Letter of Credit in accordance with Section 2.07(b), as applicable.

(d)    At the time of and immediately after giving effect to each such Borrowing or the issuance, amendment, renewal or extension of each such Letter of Credit, or both, as applicable, the aggregate Revolving Credit Exposures for all Lenders shall not exceed the then-effective Availability Limit.

(e)    (i) the Interim Order shall be in full force and effect and shall not have been (A) vacated, stayed or reversed or (B) modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders in their reasonable discretion and (ii) the Final Order shall be in full force and effect and shall not have been (A) vacated, stayed or reversed or (B) modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders in their reasonable discretion and (iii) the Loan Parties shall be in compliance with the applicable Order.

(f)    At the time of such Borrowing, no trustee or examiner (other than a fee examiner) shall have been appointed with respect to the Loan Parties or their Property.

(g)    No amendment, waiver or other modification to any Approved Plan of Reorganization shall have been made without the consent of the Administrative Agent in its reasonable discretion.

Each request for a Borrowing and each request for the issuance, amendment, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section 6.03.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders (including on the Interim Facility Effective Date) that:

Section 7.01    Organization; Powers.    Subject to any restrictions arising on account of any Debtor's status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, each Debtor (a) is (i) duly organized and validly existing and (ii) in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted and (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such good standing, power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02    Authority; Enforceability.    Subject to any restrictions arising on account of any Debtor's status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, the Transactions are within the Borrower's and each Guarantor's corporate, limited liability company or partnership powers, as applicable, and have been duly authorized by all necessary organizational and, if required, action by any holders of its Equity Interests.  Each Loan Document to which the Borrower and each Guarantor is a party has been duly executed and delivered by the Borrower and such Guarantor and, upon entry of the Interim Order or the Final Order, as applicable, constitutes a legal, valid and binding obligation of the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to entry of each DIP Order and subject to any restrictions arising on account of any Debtor's status as a "debtor" under the Bankruptcy Code, and further subject to other applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights or enforceability thereof generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03    Approvals; No Conflicts.    Subject to the entry of the DIP Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person, nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the Transactions, except such as have been obtained or made and are in full force and effect other than the recording and filing of the Security Instruments to effect and maintain perfection of Liens granted by this Agreement and required by the applicable DIP Order, (b) will not violate any Governmental Requirements (including the PATRIOT Act and OFAC) applicable to any Loan Party, (c) will not violate the charter, by-laws or other organizational documents of any Loan Party, (d) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party, or give rise to a right thereunder to require any payment to be made by any such Loan Party and (e) will not result in the creation or imposition of any Lien on any Property of any Loan Party (other than the Liens and security interests in favor of the Administrative Agent (or any designee) created by the Loan Documents), except in each case referred to in clauses (a), (b), (d) or (e) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.04    <u>Financial Condition; No Material Adverse Change</u>.

(a)    The Borrower has heretofore furnished to the Administrative Agent (i) the audited financial statements of the Borrower for the fiscal year ended December 31, 2018 and (ii) the unaudited balance sheet and statements of income, members' equity and cash flows as of and for the fiscal quarters ended March 31, 2019, and June 30, 2019.

(b)    Each of the foregoing financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the entities for which such financial statements have been provided as of such date and for such period in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited quarterly financial statements.

(c)    Since the Petition Date, there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

(d)    Other than the Facility, no Debtor has on the Interim Facility Effective Date, after giving effect to the Transactions, any Indebtedness in excess of one million dollars ($1,000,000) in the aggregate (other than the Loans and Letters of Credit, but including Disqualified Stock) of any one or more of the Borrower and its Subsidiaries or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in the Interim Facility Effective Date Financial Statements or as otherwise disclosed to the Administrative Agent.

Section 7.05    <u>Litigation</u>.  Subject to any restrictions arising on account of the Borrower's or any Debtor's status as a "debtor" under the Bankruptcy Code and except as set forth on <u>Schedule 7.05</u>, and other than the Cases, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Debtors (a) which materially affect or pertain to the Transactions or this Agreement or any other Loan Document, (b) after giving effect to insurance, as to which there is a reasonable possibility of an adverse determination that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (c) that, as of the Interim Facility Effective Date, question the validity or enforceability of any of the Loan Documents or (d) which is not otherwise subject to the automatic stay as a result of the Cases.

Section 7.06    <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 7.06</u> or as could not be reasonably expected to have a Material Adverse Effect:

(a)    the operations of any Debtor and any Property of and Debtor are, and since December 31, 2018 have been, in compliance with all Environmental Laws;

(b)    no Property of any Debtor, nor the operations currently conducted thereon, are subject to any existing, or to the knowledge of the Borrower, threatened, administrative enforcement action, lawsuit, or proceeding by or before any court or Governmental Authority or to any order or judgment imposing remedial obligations under Environmental Laws;

(c)    all permits, licenses, exemptions, approvals or similar authorizations, if any, required under applicable Environmental Law to be obtained or filed in connection with the current operation or use of any and all Property of any Debtor have been duly obtained or filed, and each Debtor is in compliance with the terms and conditions of all such permits, licenses and similar authorizations;

64

(d)    there has been no Release or threatened Release by any Debtor, or to the Borrower's knowledge by any other Person, of Hazardous Materials at, on, under or from any of the Debtors' Properties that currently requires investigation, remediation, abatement, removal or monitoring of Hazardous Materials under applicable Environmental Laws; and

(e)    no Debtor has received any written notice asserting an alleged Environmental Liability or obligation under any applicable Environmental Laws with respect to the Debtors' Properties or with respect to real properties the Debtors do not own or operate.

Section 7.07    Compliance with Laws.

(a)    Each Debtor is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    The use of proceeds of the Loans will not violate the PATRIOT Act in any material respect.

(c)    To the extent applicable, each Debtor is in compliance, in all material respects, with the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) ("OFAC").

(d)    In all material respects, no part of the proceeds of any Loan will be used, directly or, to the knowledge of any Debtor, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended ("FCPA").

Section 7.08    Investment Company Act.    No Debtor is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 7.09    Taxes.    Each Debtor has timely filed or caused to be filed all Tax returns and reports required to have been filed by it and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Debtor has set aside on its books adequate reserves in accordance with GAAP (b) to the extent otherwise excused or prohibited by the Bankruptcy Code and not otherwise authorized by the Bankruptcy Court or (c) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

Section 7.10    ERISA. Except to the extent excused by the Bankruptcy Court or as a result of the filing of the Cases:

(a)    Except as could not reasonably be expected to result in a Material Adverse Effect, each Plan is, and has been, maintained in substantial compliance with ERISA and, where applicable, the Code.  Except as could not reasonably be expected to result in a Material Adverse Effect, there has been no non-exempt prohibited transaction under ERISA section 406 or Code section 4975 with respect to any Plan which could reasonably be expected to result in liability to any Debtor or ERISA Affiliate.

(b)    No ERISA Event has occurred which could reasonably be expected to result in a Material Adverse Effect.

(c)    As of the Interim Facility Effective Date, the excess of the present value of all benefit liabilities under the Plan of each Debtor and the ERISA Affiliates (based on those assumptions used to fund such Plan), as of the last annual valuation date applicable thereto for which a valuation is available, over the value of the assets of such Plan could not reasonably be expected to have a Material Adverse Effect, and the excess of the present value of all benefit liabilities of all underfunded Plans (based on those assumptions used to fund each such Plan) as of the last annual valuation dates applicable thereto for which valuations are available, over the value of the assets of all such underfunded Plans could not reasonably be expected to have a Material Adverse Effect.

Section 7.11    Disclosure; No Material Misstatements.  To the best of the Borrower's knowledge, no report, financial statement, certificate or other written information furnished by or on behalf of any Debtor (other than projected financial information, *pro forma* financial information, the Reserve Report and information of a general economic or industry nature) to the Administrative Agent or any Lender in connection with the Transactions and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished), when taken as a whole, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.  With respect to projected financial information, *pro forma* financial information and the Reserve Report, the Borrower represents pursuant to this Section 7.11 only that (w) such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation and when delivered to the Administrative Agent or the Lenders (it being understood that such projections may vary from actual results and that such variances may be material and that, with respect to the Reserve Report, projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in the Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Debtors do not warrant that such opinions, estimates and projections will ultimately prove to be accurate), (x) as of the Interim Facility Effective Date, there has been no decrease in the amount of the estimated Proved Reserves shown in the Reserve Report since the date thereof, except for changes which have occurred as a result of production in the ordinary course of business and (y) as of the Interim Facility Effective Date, at the time furnished, the Reserve Report did not omit any material statement or information necessary to cause the same not to be misleading to the Administrative Agent and the Lenders in any material respect.

Section 7.12    Subsidiaries.  The Debtors have maintained insurance policies sufficient to comply with Section 8.06.  As of the Interim Facility Effective Date, Arsenal Energy Holdings LLC has no Subsidiaries other than those set forth on Schedule 7.12 and no Debtor has Foreign Subsidiaries.  Each Subsidiary Guarantor or Parent Company Debtor as of the Interim Facility Effective Date (after giving effect to the Transactions) has been so designated on Schedule 7.12.

Section 7.13    Location of Business and Offices.  The Borrower's jurisdiction of organization is the State of Delaware; the name of the Borrower as listed in the public records of its jurisdiction of organization is Arsenal Resources Development LLC; the tax identification number of the Borrower is 83-2064072; and the organizational identification number of the Borrower in its jurisdiction of organization is 7078253 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to Section 8.01(i)).  The Borrower's principal place of business and chief executive office is located at the address specified in Section 12.01(a) (or as set forth in any notice delivered pursuant to Section 8.01(i) or Section 12.01(a)).  Each Subsidiary's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on Schedule 7.12 (or as set forth in any notices delivered pursuant to Section 8.01(i)).

Section 7.14    Properties; Maintenance of Properties; Titles, Etc.  Except as a result of the filing of the Cases (and subject to any necessary order or authorization of the Bankruptcy Court), and except as could not have a Material Adverse Effect:

(a)    Subject to any Liens permitted hereunder, the Debtor specified as the owner owns (or will own if and when acquired) the net interests in production attributable to the Hydrocarbon Interests as reflected in the Reserve Report, and the ownership of such Properties shall not in any material respect obligate such Debtor to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount materially in excess of the working interest of each Property set forth in the Reserve Report that is not offset by a corresponding proportionate increase in the such Debtor's net revenue interest in such Property.

(b)    All material leases and agreements necessary for the conduct of the business of the Debtors are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which, with the giving of notice or the passage of time or both, would give rise to a default under any such lease or leases.

(c)    The rights and Properties presently owned, leased or licensed by the Debtors including all easements and rights of way, include all rights and Properties necessary to permit the Debtors to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof (subject to any changes to the business resulting from transactions permitted hereunder).

(d)    Each Debtor owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual Property material to its business, and the use thereof by any Debtor does not infringe upon the rights of any other Person.  The Debtors either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons.

(e)    All of the Properties of the Debtors which are reasonably necessary for the operation of their respective businesses are in good working condition and are maintained in accordance with prudent business standards and in compliance with Section 8.05.

Section 7.15    Gas Imbalances, Prepayments.  Except (a) as set forth on Schedule 7.15 or (b) thereafter as either disclosed in writing to the Administrative Agent or included in the Reserve Report Certificate, on a net basis there are no gas imbalances, take or pay or other prepayments which would require any Debtor to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding two percent (2.0%) of the aggregate volumes of Hydrocarbons (on an Mcf equivalent basis) listed in the Reserve Report.

Section 7.16    Marketing of Production.  Except (a) for contracts listed and in effect on the date hereof on Schedule 7.16 or (b) thereafter either disclosed in writing to the Administrative Agent or included in the Reserve Report (with respect to all of which contracts the Borrower represents that the Debtors are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on sixty (60) days' notice or less without penalty or detriment for the sale of production from the Debtors' Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are

67

currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 7.17    Swap Agreements.  Schedule 7.17, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 8.01(d), sets forth, as of the date indicated on such schedule or report, a true and complete list of all material Swap Agreements of each Debtor, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof, all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 7.18    Use of Loans and Letters of Credit.  The proceeds of the Loans and the Letters of Credit shall be used in accordance with Section 8.16.

## ARTICLE VIII
## AFFIRMATIVE COVENANTS

Until Payment in Full, the Borrower covenants and agrees with the Lenders that:

Section 8.01    Financial Statements; Other Information.  The Borrower will furnish to the Administrative Agent for distribution to each Lender:

(a)    Annual Financial Statements.  As soon as available, but in any event not later than one hundred twenty (120) days after the end of each fiscal year of the Borrower, commencing with the fiscal year of the Borrower ending December 31, 2019, the audited consolidated balance sheet of the Borrower and its Subsidiaries and related consolidated statements of operations, member's equity and cash flows as of the end of and for such year and, in each case, setting forth in comparative form the figures for the previous fiscal year, all reported on by an independent public accounting firm of recognized national standing (without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Debtors on a consolidated basis in accordance with GAAP.

(b)    Quarterly Financial Statements.  As soon as available, but in any event not later than sixty (60) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, commencing with the fiscal quarter ending September 30, 2019, the consolidated balance sheet of the Borrwer and its Subsidiaries and related consolidated statements of operations, member's equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth, in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Debtors on a consolidated basis in accordance with GAAP, subject to changes resulting from normal year-end audit adjustments and the absence of footnotes.

(c)    Certificate of Financial Officer -- Compliance.  Concurrently with the delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer of the Borrower in substantially the form of Exhibit D hereto (i) certifying, to the knowledge of the certifying Financial Officer, as to whether a Default has occurred and is continuing and, if a Default has occurred and is continuing, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth a reasonably detailed calculation of the Financial Performance Covenant and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 1.05, which has not been previously disclosed pursuant to this

68

Section 8.01(c), and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(d)    <u>Certificate of Financial Officer – Swap Agreements</u>.    Concurrently with the delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer, in form and substance satisfactory to the Administrative Agent, setting forth as of the last Business Day of the most recently ended fiscal quarter or fiscal year, a true and complete list of all material Swap Agreements of each Debtor, the counterparty, type of Swap Agreement, trade date, effective date, termination date, notional amounts or volumes, the remaining notional amounts or volumes, the net mark-to-market value of each such Swap Agreement for which a mark-to-market value is reasonably available as of such day, the strike or fixed rate payor price and any new credit support agreements relating thereto not listed on Schedule 7.17 or previously disclosed to the Administrative Agent, any margin required or supplied under any credit support document and any other material terms reasonably requested to be set forth therein by the Administrative Agent in advance of delivery.

(e)    <u>Other Accounting Reports</u>.    Promptly upon receipt thereof, a copy of each other material financial accountant's letter (other than in the ordinary course of business) submitted to any Debtor by independent accountants in connection with any annual, interim or special audit made by them of the books of such Debtor.

(f)    <u>Lists of Purchasers</u>.    Concurrently with the delivery of financial statements under Section 8.01(a) or Section 8.01(b), a list of all Persons purchasing Hydrocarbons from the Debtors who collectively account for at least eighty-five percent (85.0%) of the revenues resulting from the sale of all Hydrocarbons by the Debtors during the then most recently completed fiscal quarter.

(g)    <u>Notice of Sales of Oil and Gas Properties</u>.    In the event any Debtor intends to Dispose of any Oil and Gas Properties for net cash proceeds in excess of one hundred thousand dollars ($100,000.00) individually or one million dollars ($1,000,000.00) in the aggregate, prior notice of such Disposition, the price thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent.

(h)    <u>Notice of Casualty Events</u>.    Prompt written notice of the occurrence of any Casualty Event with respect to any Oil and Gas Properties.

(i)    <u>Information Regarding Borrower and Guarantors</u>.    Promptly (and in any event within ten (10) Business Days (or such later time as the Administrative Agent may agree) of the following), written notice of any change in (i) any Debtor's corporate name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its Properties, (ii) the location of any Debtor's chief executive office or principal place of business, (iii) any Debtor's identity or corporate form, (iv) any Debtor's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization and (v) any Debtor's federal taxpayer identification number.

(j)    <u>Production Report and Lease Operating Statements</u>.    Concurrently with the delivery of financial statements under Section 8.01(a) or Section 8.01(b), a report setting forth, for each calendar month during the then current fiscal year to date, the volume of sold production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month.

(k)    <u>Notices of Certain Changes</u>.  Promptly, (and in any event within ten (10) Business Days (or such later time as the Administrative Agent may agree) of the following, after the execution thereof), copies of any material amendment, modification or supplement to the certificate or articles of incorporation, by-laws, any preferred stock designation or any other governance document of any Debtor.

(l)    <u>Other Requested Information</u>.  With reasonable promptness, following any request therefor, (i) such other information regarding the operations, business affairs and financial condition of any Debtor (including, without limitation, any Plan or Multiemployer Plan and any reports or other information required to be filed under ERISA), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent may reasonably request in writing from time to time; <u>provided</u> that notwithstanding anything to the contrary in this Section 8.01(l)(i), the obligations of the Debtors hereunder shall be subject to the Disclosure Restrictions and (ii) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering, anti-terrorism or anti-corruption laws, including Beneficial Ownership Certifications.

Section 8.02    <u>Notices of Material Events</u>.  The Borrower will furnish to the Administrative Agent and each Lender promptly, after a Responsible Officer of any Debtor obtains actual knowledge, notice of the following:

(a)    <u>Defaults</u>.  The occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(b)    <u>Governmental Matters</u>.  Other than the Cases, the filing or commencement of, or the threat in writing of, any action, suit, notice, proceeding, investigation or arbitration (alleging, without limitation, Environmental Liability) by or before any arbitrator or Governmental Authority against or affecting any Debtor not previously disclosed in writing to the Lenders or any material adverse development in any such action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lenders) that, in either case, would reasonably be expected to result in a Material Adverse Effect;

(c)    <u>ERISA Events</u>. The occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred after the date of this Agreement, would reasonably be expected to result in a Material Adverse Effect;

(d)    To the extent reasonably practicable at least one (1) day prior to filing (or such shorter period as the Administrative Agent may agree), the Borrower shall use commercially reasonable efforts to provide the Administrative Agent copies of all material pleadings and motions (other than "first day" motions and proposed orders, and other than emergency pleadings or motions where, despite such Debtor's commercially reasonable efforts, such one day notice) to be filed by or on behalf of the Borrower or any of the other Loan Parties with the Bankruptcy Court in the Cases, or to be distributed by or on behalf of the Borrower or any of the other Loan Parties to any official committee appointed in the Cases, which such pleadings shall include the Administrative Agent as a notice party;

(e)    <u>Events Resulting in MAEs</u>.  Any other development that results in, or would reasonably be expected to result in a Material Adverse Effect.

Section 8.03    <u>Existence; Conduct of Business</u>.  Each Debtor will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and take all commercially reasonable actions to maintain the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which

70

its Oil and Gas Properties is located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; <u>provided</u> that the foregoing shall not prohibit any transaction permitted under <u>Section 9.08</u>.

Section 8.04    <u>Payment of Tax Obligations</u>. Each Debtor shall pay, discharge or otherwise satisfy its obligations in respect of all Tax liabilities of the Debtors, before the same shall become due and payable, except (x) to the extent such payment is excused by, or is otherwise prohibited by the provisions of the Bankruptcy Code or order of the Bankruptcy Court and (y) where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and such Debtor has set aside on its books adequate reserves with respect thereto in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction) or (b) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 8.05    <u>Operation and Maintenance of Properties</u>. Subject to any necessary order or authorization of the Bankruptcy Court, each Debtor will, except in each case, where the failure to so comply could not reasonably be expected to result in a Material Adverse Effect (it being understood that this <u>Section 8.05</u> shall not restrict any transaction otherwise permitted by <u>Sections 9.05</u>, <u>9.08</u> or <u>9.09</u>):

(a)    operate its Oil and Gas Properties and other material Properties or take reasonable action to cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements;

(b)    keep and maintain all Property material and reasonably necessary to the conduct of its business in good working order and condition (ordinary wear and tear and casualty and condemnation excepted) in accordance with prudent business standards; and

(c)    to the extent the Borrower is not the operator of any Property, the Borrower shall use commercially reasonable efforts to cause the operator to operate such Property in accordance with customary industry practices.

Section 8.06    <u>Insurance</u>. Each Debtor will maintain, with financially sound and reputable insurance companies, insurance (subject to customary deductibles and retentions) in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations. The loss payable clauses or provisions in said insurance policy or policies insuring any of the Collateral for the Loans shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear (it being understood that, unless there is an Event of Default and the Majority Lenders instruct the Administrative Agent otherwise, the proceeds of any property insurance shall go to the Borrower) and such policies shall name the Administrative Agent and the Lenders as "additional insureds" and provide, to the extent the insurer will do so based on the commercially reasonable efforts of the Borrower, that the insurer will endeavor to give at least thirty (30) days prior notice of any cancellation to the Administrative Agent. Notwithstanding the foregoing, the Debtors may self-insure with respect to such risks with respect to which companies of established reputation in the same general line of business in the same general area usually self-insure.

Section 8.07    <u>Books and Records; Inspection Rights</u>. Each Debtor will maintain financial records in accordance with GAAP. Each Debtor will permit any representatives designated by the Administrative Agent or any Lender (who shall be accompanied by the Administrative Agent), upon reasonable prior notice to the Borrower, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times during normal business hours as often as reasonably

requested; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights under this Section 8.07 and the Administrative Agent shall not exercise such rights more often than two times during any calendar year absent the existence of a continuing Event of Default and only one such visit per fiscal year shall be at the Borrower's expense; provided, further that, when an Event of Default exists, the Administrative Agent, any Lender or any respective representatives or independent contractors of the Administrative Agent or any Lender may do any of the foregoing at any time during normal business hours upon reasonable advance notice.  The Administrative Agent and the Majority Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 8.07, no Debtor will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Governmental Requirement or any binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product (collectively, the "Disclosure Restrictions").

Section 8.08    Compliance with Laws.  Subject to any necessary order or authorization of the Bankruptcy Court, each Debtor will comply with all laws, rules, regulations and orders of any Governmental Authority, whether now in effect or hereafter enacted, applicable to it or its Property, including the PATRIOT Act, OFAC, FCPA and ERISA, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 8.09    Environmental Matters.  Subject to any necessary order or authorization of the Bankruptcy Court, and except in each case with respect to this Section to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Debtor will: (i) comply with all Environmental Laws; (ii) to the extent required of them under any Environmental Laws, conduct any investigation, study, sampling and testing required by Environmental Laws, and undertake any cleanup, removal, remedial or other action required by Environmental Laws to remove and clean up any Releases of Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws; and (iii) take reasonable action to obtain and renew all material authorizations and permits required pursuant to Environmental Law for its operations.

Section 8.10    Further Assurances.

(a)      Each Debtor will promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments necessary or proper to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings or file any notices and financing statements in connection therewith.

(b)      The Borrower hereby authorizes the Administrative Agent to file one (1) or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of the Borrower or any other Guarantor where permitted by law, which financing statements may contain a description of collateral that describes such property in any manner as the Administrative Agent may reasonably determine is necessary or advisable to ensure the perfection of the security interest in the Collateral, including describing such property as "all assets" or "all property" or words of similar effect.

(c)      Notwithstanding anything in the Loan Document to the contrary, no actions in any jurisdiction outside of the United States or that are necessary to comply with any Governmental Requirement of any jurisdiction outside of the United States shall be required in order to create any security

interest in assets located, titled, registered or filed outside of the United States or to perfect such security interests (it being understood that there shall be no collateral or pledge agreements or similar agreements governed under the laws of any jurisdiction outside of the United States).

      Section 8.11    <u>Additional Collateral; Additional Guarantors</u>.

      (a)    Each Debtor shall guarantee the Obligations pursuant to the Loan Guarantee. In connection with any such guarantee, each Debtor shall promptly, (A) execute and deliver this Agreement or a joinder to this Agreement, in form and substance reasonably acceptable to the Administrative Agent (the "<u>Joinder Agreement</u>"), and any other Loan Document reasonably requested by the Administrative Agent and (B) pledge all of the Equity Interests of owned by Debtor pursuant to a Security Instrument or other Loan Document (other than Excluded Equity Interests).

      (b)    Each Subsidiary of a Loan Party now existing or created, acquired or coming into existence after the date hereof, other than the Guarantors party hereto, shall promptly execute and deliver to the Administrative Agent a Joinder Agreement and any Security Instrument or other Loan Document (or joinder thereto) as may be required by the Administrative Agent. Such Subsidiary shall deliver to the Administrative Agent, simultaneously with its delivery of such Joinder Agreement and any such Security Instrument or other Loan Document (or joinder), (x) written evidence reasonably satisfactory to the Administrative Agent that such Subsidiary has taken all organizational action necessary to duly approve and authorize its execution, delivery and performance of such Joinder Agreement (including under the Loan Guarantee), any such Security Instrument and any other documents which it is required to execute, and (y) such additional closing documents, certificates and opinions of counsel as the Administrative Agent shall reasonably require.

      Section 8.12    <u>ERISA Compliance</u>.  Each Debtor will promptly furnish to the Administrative Agent (i) promptly after a reasonable request therefore by the Administrative Agent, a copy of each annual and other report with respect to each Plan most recently filed with the United States Secretary of Labor, the Internal Revenue Service or the PBGC and (ii) promptly upon receipt thereof, copies of any notice of the PBGC's intention to terminate or to have a trustee appointed to administer any Plan.

      Section 8.13    <u>Swap Agreements</u>.  The Pre-Petition Swap Agreements shall continue to be in full force and effect without any amendments thereto that are adverse to the interest of the Borrower or its Subsidiaries.

      Section 8.14    [Reserved].

      Section 8.15    <u>Cash Management</u>. Each Debtor shall maintain their cash management system as required by the Cash Management Order.

      Section 8.16    <u>Use of Proceeds</u>. The proceeds of the Loans and Letters of Credit shall be used (a) to pay related transaction costs, fees and expenses; (b) to provide working capital and for other general corporate purposes of the Debtors in accordance with the Budget; (c) to make adequate protection payments as authorized by the Bankruptcy Court in the Interim Order or the Final Order, as applicable; (d) to pay obligations arising from or related to the Carve-Out; (e) to pay restructuring costs incurred in connection with the Cases; and (f) in the case of the Refinancing Facility, to refinance amounts outstanding under the Pre-Petition Credit Agreement, pursuant to the terms set forth in Article II. The Borrower and the other Loan Parties are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board). No part of the proceeds of any Loan or

Letter of Credit will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

Section 8.17    Milestones. Each Debtor shall take the following actions by the following dates (such dates, collectively, the "Chapter 11 Milestones"):

(a)    the Debtors shall have obtained approval of the Interim Order by the date that is no later than five (5) days following the Petition Date;

(b)    the Debtors shall have obtained approval of the Final Order by the date that is no later than thirty (30) days following the Petition Date;

(c)    unless the Bankruptcy Court shall have entered the Confirmation Order prior to such date, the Debtors shall have obtained approval of the Approved Bidding Procedures no later than seventy five (75) days after the Petition Date;

(d)    unless the Approved Plan of Reorganization is consummated prior to such date, an Approved Sale is not consummated by the date that is no later than one hundred seventy (170) days following the Petition Date.

Section 8.18    Post-Interim Facility Effective Date Covenants. The Borrower shall have used commercially reasonable efforts to deliver to the Administrative Agent, on or prior to the date that is ten (10) days following the Interim Facility Effective Date, (a) a certificate of insurance coverage of the Borrower evidencing that the Debtors, if any, are carrying insurance in accordance with Section 8.06 and (b) title information (including customary title opinions or reports or other documents) consistent with usual and customary standards for the geographic regions in which the existing Oil and Gas Properties are located, taking into account the size, scope and number of leases and wells of the Debtors, in respect of at least eighty-five percent (85%) of the aggregate present net value of the existing Oil and Gas Properties as set forth in the Reserve Report.

## ARTICLE IX
## NEGATIVE COVENANTS

Until Payment in Full, the Borrower covenants and agrees with the Lenders that:

Section 9.01    Financial Performance Covenant.   The Debtors shall not allow, during any Variance Testing Period, the Debtors' actual aggregate cash expenses and disbursements during such Variance Testing Period to be more than one-hundred-and-fifteen percent (115%) of the projected aggregate cash expenses and disbursements for such Variance Testing Period, as set forth in the Budget (the "Permitted Variance"), provided that the cash expenses and disbursements considered for determining compliance with this covenant shall exclude (i) disbursements and expenses in respect of professional fees incurred in the Cases during such Variance Testing Period, (ii) to the extent not included in the Budget, the Up-Front Fees  and other debt service payable to the RBL Lenders, as set forth in the Exit Term Sheet (as defined in the Final Order) and (iii) disbursements owed to third parties on account of royalty interests and working interests and provided, further that the Debtors may carry forward budgeted but unused disbursements in such Testing Period set forth in the Budget.

Section 9.02    Indebtedness.   No Debtor will, incur, create, assume or suffer to exist any Indebtedness, except:

(a)    the Obligations (including any Indebtedness arising under the Loan Documents);

(b) Indebtedness (i) outstanding on the Petition Date and set forth on Schedule 9.02(b) and (ii) in respect of the Seller Notes and the Holdings Term Loan Facility;

(c) Indebtedness arising under Capital Leases incurred prior to the Petition Date;

(d) unsecured indebtedness incurred by the Debtors owing to the Debtors; provided that any such Indebtedness shall be subject to subordination terms reasonably satisfactory to the Administrative Agent;

(e) the Excepted Debt of the Debtors in existence as of the Petition Date;

(f) Guaranty Obligations of the Debtors in respect of Indebtedness of the Debtors otherwise permitted hereunder; and

(g) other Indebtedness in an amount not to exceed one million dollars ($1,000,000).

Section 9.03    Liens.  No Debtor will create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a) Liens securing the Obligations or arising pursuant to any Loan Document;

(b) (i) Liens on any Property of the Debtors existing on the Petition Date in respect of borrowed money and set forth on Schedule 9.03(b); provided that (A) no such Lien shall at any time be extended to cover any additional Property not subject thereto on the Petition Date and (B) the principal amount of the Indebtedness secured by such Liens shall not be extended, renewed, refunded or refinanced and (ii) Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code;

(c) Excepted Liens;

(d) Liens securing Indebtedness permitted pursuant to Section 9.02(c);

(e) Liens securing any Indebtedness permitted by Sections 9.02(f) (solely and to the same extent that the Indebtedness guaranteed by such Guaranty Obligations are permitted to be subject to a Lien hereunder);

(f) Liens securing Secured Cash Management Agreements and Secured Swap Obligations that were not entered into for speculative purposes;

(g) Liens securing Pre-Petition Obligations, the Holdings Term Loan Facility and the Seller Notes; provided that such Liens are subject to the terms and conditions of the DIP Order;

(h) Liens in an aggregate amount not to exceed five hundred thousand dollars ($500,000) at any time outstanding; and

(i) Liens in respect of Adequate Protection Obligations to the extent, and subject to the conditions set forth in, the DIP Order.

Section 9.04    Dividends, Distributions and Redemptions.

(a) Dividends and Distributions.  The Debtors will not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make

75

any distribution of their Property to their respective Equity Interest holders, except that (i) the Subsidiaries of the Borrower may declare and pay dividends or distributions ratably with respect to their Equity Interests and (ii) the Debtors may make Restricted Payments in an aggregate amount not to exceed five hundred thousand dollars ($500,000) in connection with stock option plans or other benefit plans for management or employees of the Debtors that have been approved by an order of the Bankruptcy Court reasonably satisfactory to the Administrative Agent.

(b)      Prepayments, Redemptions of Pre-Petition Obligations; Certain Amendments. The Debtors will not make any Redemption or any other prepayments of principal, interest or payment of fees on, or in connection with, the Pre-Petition Loan Documents, other than payments expressly provided for herein or pursuant to orders entered upon pleadings in form and substance reasonably satisfactory to the Administrative Agent. No Debtor shall consent to any amendment, supplement, waiver or other modification of the terms or provisions contained in any of (i) the Pre-Petition Loan Documents or (ii) any other Indebtedness for borrowed money.

Section 9.05    Investments, Loans and Advances.   No Debtor shall make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)      Investments in the other Debtors outstanding on the Petition Date;

(b)      (i) accounts or notes receivable arising from the grant of trade credit by the Debtors or the purchase of assets and services from the Debtors, in each case, in the ordinary course of business, (ii) in the form of a prepayment of fees and expenses by the Debtors, so long as such expenses are being paid in accordance with customary trade terms of the Debtors, (iii) advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business and (iv) Investments received in satisfaction or partial satisfaction thereof from account debtors and other credits to suppliers in the ordinary course of business arising from the settlement of delinquent obligations or disputes in respect of a secured Investment;

(c)      (i) Investments in assets that constituted Cash Equivalents at the time such Investments were made and (ii) pledges and deposits of cash earnest money and endorsements of negotiable instruments in connection with transactions otherwise permitted by Section 9.05;

(d)      Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 9.05 owing to the Debtors received as satisfaction or potential satisfaction of such debts or as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of any Debtor; provided that the Borrower shall give the Administrative Agent prompt written notice in the event that the aggregate amount of all Investments held at any one time under this Section 9.05(d) exceeds two million dollars ($2,000,000); and

(e)      Solely to the extent in existence on the Petition Date, (i) Investments in direct ownership interests in additional Oil and Gas Properties, related Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint venture or area of mutual interest agreements, gathering systems, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America and (ii) Investments in respect of the Joint Development Agreement.

Section 9.06    Nature of Business; International Operations.   Subject to any restrictions arising on account of the Debtors' status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, no

Debtor will allow any material changes (a) to the character of its business as an independent oil and gas exploration and production company and business ancillary or reasonably related thereto or a reasonable extension thereof or (b) to the Debtor's identity or corporate structure, the jurisdiction in which such Person is incorporated or formed, or any organizational documents of such Debtor.  No Debtor will acquire or make any other expenditures (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States.

Section 9.07     Limitation on Operating Leases.  No Debtor will create, incur, assume or suffer to exist any operating lease constituting an obligation for the payment of rent for office space (excluding, for avoidance of doubt, leases of Hydrocarbon Interests and any leases constituting Indebtedness permitted under Section 9.02) unless all such amounts permitted pursuant to this Section 9.07 do not, in the aggregate, exceed one million dollars ($1,000,000.00) per fiscal year.

Section 9.08     Mergers, Etc.  No Debtor will merge into or with or consolidate with any other Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of their Property (whether now owned or hereafter acquired) to any other Person, or liquidate or dissolve or divide, in each case except as permitted by Section 9.09.

Section 9.09     Sale of Properties.  No Debtor will sell, assign, farm-out, convey, dispose or otherwise transfer (including by (A) any sale and leaseback transaction or (B) an allocation of assets among newly divided limited liability companies pursuant to a "division" or "plan of division" under the Delaware Limited Liability Company Act) (each of the foregoing, a "Disposition") any Property except:

(a)     Dispositions of Hydrocarbons, inventory and other goods held for sale in the ordinary course of business;

(b)     (i) Dispositions of Hydrocarbon Interests to which no Proved Reserves are attributable and (ii) Farm-Out Agreements with respect to undeveloped acreage to which no Proved Reserves are attributable and assignments in connection with such Farm-Out Agreements;

(c)     Dispositions of (i) equipment, vehicles and immaterial assets (other than accounts receivable) that are no longer necessary for the business of the Borrower or such Subsidiary or is replaced by equipment, vehicles and other assets of at least comparable value and use and (ii) Cash Equivalents;

(d)     Dispositions of any Property of any Debtor pursuant to an order of the Bankruptcy Court; provided that such disposition shall be subject to the prior consent of the Administrative Agent and the Majority Lenders;

(e)     the Borrower and the Subsidiaries may lease, sublease, license or sublicense (on a non-exclusive basis with respect to any intellectual property) real, personal or intellectual property (other than Oil and Gas Properties) in the ordinary course of business;

(f)     transfers of Property subject to a Casualty Event or in connection with any other casualty event or condemnation proceeding with respect to Property of any Debtor;

(g)     the unwinding of any Swap Agreement;

(h)     Dispositions to the extent set forth in the Budget in an aggregate amount not to

exceed one million dollars ($1,000,000); and

(i)    Liens permitted under Section 9.03 and Restricted Payments permitted under Section 9.04 and transactions permitted by Section 9.05 (other the intercompany transactions) and Section 9.08 (other than Section 9.08(d)).

Section 9.10    Transactions with Affiliates.  No Debtor will enter into any transaction, including any purchase, sale, lease or exchange of Property or the rendering of any service, with any non-Debtor Affiliate other than (i) transactions or arrangements in place as of the Petition Date (including contractual obligations in place at such time), (ii) those approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to the Administrative Agent and the Majority Lenders (iii) transactions contemplated by the RSA or (iv) to the extent such transactions are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate; provided that the foregoing restriction will not apply to any Restricted Payment permitted by Section 9.04, and fees and compensation to, and indemnity provided on behalf of, officers, directors and employees of the Debtors in their capacity as such to the extent such fees and compensation are customary..

Section 9.11    Subsidiaries.  The Borrower shall have no Foreign Subsidiaries.

Section 9.12    Negative Pledge Agreements; Dividend Restrictions.  No Debtor will create, incur, assume or suffer to exist any Contractual Requirement (other than this Agreement, any other Loan Document, the Pre-Petition Loan Documents, the prepetition loan documents in existence on the date hereof relating to the Seller Notes and the Holdings Term Loan Facility and the documentation in existence on the date hereof related to the Joint Development Agreement) which prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Properties in favor of the Administrative Agent and the Lenders or secure the Obligations except restrictions imposed pursuant to an agreement entered into in connection with a Disposition permitted under Section 9.09:

(a)    (i) exist on the Petition Date and (to the extent not otherwise permitted by this Section 9.12) are listed on Schedule 9.12(a) and (ii) to the extent Contractual Requirements permitted by subclause (i) are set forth in an agreement evidencing Indebtedness or other obligations, are set forth in any agreement evidencing any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness or obligation so long as such Permitted Refinancing Indebtedness does not expand the scope of such Contractual Requirement;

(b)    are customary restrictions on leases, subleases or licenses otherwise permitted hereby so long as such restrictions relate to the assets subject thereto;

(c)    are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Debtors;

(d)    are customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(e)    restrict the use of cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(f)    are imposed by Governmental Requirements;

(g)    are restrictions regarding licenses or sublicenses by the Debtors of intellectual property in the ordinary course of business (in which case such restriction shall relate only to such intellectual property); or

(h)    are encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (l) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower's board of directors, no more restrictive in any material respect with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 9.13    Gas Imbalances, Take-or-Pay or Other Prepayments.  Except (a) as set forth on Schedule 7.15 or (b) thereafter either disclosed in writing to the Administrative Agent or included in the Reserve Report Certificate, the Borrower will not, and will not permit any Subsidiary to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Subsidiary that would require the Borrower or any such Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor exceeding two percent (2.0%) of the aggregate volumes of Hydrocarbons (on an Mcf equivalent basis) listed in the Reserve Report.

Section 9.14    Swap Agreements.  No Debtor will enter into any Swap Agreements (other than the Pre-Petition Swap Agreements) with any Person other than:

(a)    Swap Agreements in respect of commodities (i) with an Approved Counterparty and (ii) the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect other than puts, floors and basis differential swaps on volumes already hedged pursuant to other Swap Agreements) do not exceed, as of the date of the latest Swap Agreement entered into, eighty-five percent (85.0%) of the reasonably anticipated Hydrocarbon production from the Debtors' total Proved Reserves as forecast based on the Reserve Report, for the sixty six (66) month period from the most recent date any such Swap Agreement was entered into (the "Ongoing Swaps"); and

(b)    subject to Section 9.14(a), other Swap Agreements with an Approved Counterparty (other than Swap Agreements in respect of equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions) which are not entered into for speculative purposes (it is understood that the following Swap Agreements are not entered into for speculative purposes:  (i) any commodity Swap Agreement intended, at inception of execution, to hedge or manage any of the risks related to existing and or forecasted Hydrocarbon production of the Debtors (whether or not contracted) and (ii) any Swap Agreement intended, at inception of execution, (A) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of any Debtor, (B) for foreign exchange or currency exchange management, (C) to manage commodity portfolio exposure associated with changes in interest rates or (D) to hedge any exposure that any Debtor may have to counterparties under other Swap Agreements such that the combination of such Swap Agreements is not speculative taken as a whole).

Section 9.15    Marketing Activities.  No Debtor will engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (a) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their proved Oil and Gas Properties during the period of such contract, (b) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from proved Oil and Gas Properties of third parties during the period of such contract associated with the Oil and Gas Properties of the Debtors that any Debtor has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business, (c) transactions consistent with the terms of the RSA and as assumed by Borrower in the Cases and (d) other contracts for the purchase and/or sale of Hydrocarbons of third parties (i) which have generally offsetting provisions (i.e., corresponding pricing mechanics, delivery dates and points and

79

volumes) such that no "position" is taken and (ii) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto.

Section 9.16    <u>Accounting Changes</u>.    No Debtor will (a) make any significant change in accounting treatment or reporting practices, except as required by GAAP, or (b) change the fiscal year of any Debtor.

Section 9.17    <u>Key Employee Plans</u>.    No Debtor shall (a) enter into any key employee incentive plan, other than such plans in effect as of the Petition Date or (b) amend or modify any existing key employee retention plan and incentive plan, unless such plan, amendment or modification, as applicable, is either consistent with the terms of the RSA or reasonably satisfactory to the Administrative Agent and Majority Lenders; <u>provided</u> that the entry into any key employee incentive plan (or any amendment or modification thereof) shall be deemed reasonably satisfactory to the Administrative Agent and Majority Lenders if the aggregate plan amount contemplated to be distributed to key employees does not exceed two million dollars ($2,000,000) in the aggregate through the Scheduled Maturity Date.

Section 9.18    <u>Superpriority Claims</u>.    No Debtor will create or permit to exist any Superpriority Claim other than Superpriority Claims permitted by the DIP Order (including the Carve-Out).

## ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01    <u>Events of Default</u>.    While continuing, one or more of the following events shall constitute an "<u>Event of Default</u>":

(a)    the Borrower shall fail to pay any principal of any Loan as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

(b)    the Loan Parties shall fail to pay any interest on any Loan, any reimbursement obligation in respect of any LC Disbursement or any fee or any other amount (other than an amount referred to in <u>Section 10.01(a)</u>) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) days;

(c)    any representation or warranty made or deemed made by or on behalf of the Borrower or any Guarantor in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any certificate (or other document containing a certification from a Loan Party or a Responsible Officer thereof) delivered pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    the Borrower shall fail to observe or perform any covenant, condition or agreement contained in <u>Section 8.01(i)</u>, <u>Section 8.02(a)</u>, <u>Section 8.03</u> (solely with respect to the maintenance of the Borrower's existence), <u>Section 8.17</u>, <u>Section 8.18</u> or <u>Article IX</u>;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in <u>Section 10.01(a)</u>, <u>Section 10.01(b)</u>, <u>Section 10.01(c)</u> or <u>Section 10.01(d)</u>) or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender);

(f)     any event or condition exists that results in Indebtedness for borrowed money incurred after the Petition Date in an aggregate principal amount in excess of one million dollars ($1,000,000) (other than the Loans and Letters of Credit) of any one or more of any Parent Company Debtor, the Borrower or its Subsidiaries becoming due prior to its scheduled maturity or that enables or permits (after giving effect to any applicable grace periods) the holder or holders of such Indebtedness or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness;

(g)     (i) one or more judgments following the Petition Date for the payment of money in an aggregate amount in excess of one million dollars ($1,000,000) (to the extent not covered by independent third party insurance as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) or (ii) any one or more non-monetary judgments that have, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against any Parent Company Debtor, the Borrower or any Subsidiary or any combination thereof and such judgment shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days;

(h)     the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any material portion of the Collateral purported to be covered thereby, except, in each case, to the extent permitted by the terms of the Loan Documents, or the Borrower or any Subsidiary shall so state in writing;

(i)     an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(j)     a Change of Control shall occur;

(k)     the RSA is terminated or ceases to be in full force and effect and the Debtors have not filed a motion for approval of the Approved Bidding Procedures within fifteen (15) Business Days of the date the RSA is terminated or ceasing to be in full force and effect;

(l)     dismissal of the Cases or conversion of the Cases to a Chapter 7 case;

(m)     appointment of a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers (other than a fee examiner) beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code relating to the operation of the business of any Loan Party in the Cases;

(n)     the Bankruptcy Court's granting of any superpriority claim or lien on the Collateral which is *pari passu* with or senior to the Superpriority Claims or Liens of the Lenders in the Cases, in each case other than with respect to the Carve-Out;

(o)     failure of the Final Order to be entered within thirty (30) days (or a later date consented to by the Administrative Agent and the Majority Lenders) after the Petition Date;

(p)     (i) failure of any material provision of the Interim Order or Final Order to be in full force and effect, (ii) the Interim Order or Final Order being (A) vacated, stayed or reversed, or (B)

81

modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders in their reasonable discretion, (iii) the entry of any order in the Cases charging any of the Collateral, including under Section 506(c) or Section 552(b) of the Bankruptcy Code or (iv) the commencement of any action by any Loan Party which is adverse to the Lenders or their rights and remedies under the DIP Facility in the Cases;

(q)     failure of any Loan Party to comply with any material provisions of the applicable DIP Order;

(r)     payment by any Loan Party (by way of adequate protection or otherwise) of any principal or interest or other amount on account of any prepetition Debt or payables (other than as agreed herein or pursuant to the consent of the Majority Lenders, or as described in the Interim Order, the Final Order or pursuant to any orders approving any "first day" motions);

(s)     entry of an order or orders granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party or third parties to proceed against assets of any Loan Party valued in excess of five million dollars ($5,000,000) or to permit other actions that would have a Material Adverse Effect on any Loan Party or its estate;

(t)     Prior to the consummation of an Approved Sale, subject to Section 12.02(c), unless otherwise agreed by the Majority Lenders or pursuant to the terms of the DIP Order, the filing by the Debtors or any party to the RSA, or confirmation of, a plan of reorganization, other than an Approved Plan of Reorganization; and

(u)     failure to satisfy any of the Chapter 11 Milestones in accordance with the terms relating to such Chapter 11 Milestone.

Section 10.02    Remedies.

(a)     In the case of an Event of Default, at any time thereafter during the continuance of such Event of Default, the Administrative Agent may, and upon the request of the Majority Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments and/or LC Commitments, and thereupon the Commitments and/or LC Commitments shall terminate immediately, and (ii) declare the Notes and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.07(j)), shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor.

(b)     In the case of the occurrence of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity including, without limitation, all rights and remedies set forth in paragraph [16] of the Interim Order (and any corresponding paragraph of the Final Order), subject to any notice requirements set forth therein.

(c)     All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the Notes, whether by acceleration or otherwise, shall be applied:

(i)    first, to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Administrative Agent in its capacity as such;

(ii)    second, *pro rata* to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Lenders and the Issuing Banks;

(iii)    third, *pro rata* to payment of accrued interest on the Loans and LC Disbursements;

(iv)    fourth, *pro rata* to payment of principal outstanding on the Loans and payment of Secured Swap Obligations and Secured Cash Management Obligations;

(v)    fifth, to serve as cash collateral to be held by the Administrative Agent to secure the LC Exposure;

(vi)    sixth, *pro rata* to any other Obligations; and

(vii)    seventh, any excess, after all of the Obligations shall have been indefeasibly paid in full in cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

## ARTICLE XI
## THE ADMINISTRATIVE AGENT

Section 11.01    Appointment; Powers.    Each of the Lenders and each Issuing Bank hereby irrevocably (subject to Section 11.06) appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.

Section 11.02    Duties and Obligations of Administrative Agent.    The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; rather, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties), (b) the Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except as provided in Section 11.03, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Debtor that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article VI or elsewhere herein,

other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of the Debtors or any other obligor or guarantor or (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein.  For purposes of determining compliance with the conditions specified in <u>Article VI</u>, each Lender and Issuing Bank shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender or Issuing Bank unless the Administrative Agent shall have received written notice from such Lender or Issuing Bank prior to the proposed closing date specifying its objection thereto.

Section 11.03    <u>Action by Administrative Agent</u>.  The Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 12.02</u>) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lender or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 12.02</u>) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action.  The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders.  If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this <u>Section 11.03</u>, <u>provided</u> that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Lenders.  In no event, however, shall the Administrative Agent be required to take any action which, in its opinion, or the opinion of its counsel, exposes the Administrative Agent to liability or which is contrary to this Agreement, the Loan Documents or applicable law, including, for the avoidance of doubt, any action that may be in violation of the automatic stay under any debtor relief law or that may effect a forfeiture, modification or termination property of a Defaulting Lender in violation of any debtor relief law.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 12.02</u>), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, including its own ordinary negligence, except for its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

Section 11.04    <u>Reliance by Administrative Agent</u>.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Borrower, the Lenders and the Issuing Banks hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  The Administrative Agent may consult with legal counsel (who may

84

be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Administrative Agent may deem and treat the payee of any Note as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.

Section 11.05    Subagents.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of this Article XI shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct.

Section 11.06    Resignation or Removal of Administrative Agent.

(a)    The Administrative Agent may resign upon thirty (30)-days' notice to the Lenders, any Issuing Bank and the Borrower.  If the Administrative Agent becomes a Defaulting Lender, then the Administrative Agent may be removed as the Administrative Agent at the reasonable request of the Borrower and the Majority Lenders.  Upon receipt of any such notice of resignation or removal, the Majority Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) unless an Event of Default has occurred and is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no successor shall have been so appointed by the Majority Lenders (and, if applicable, consented to by the Borrower) and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Majority Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above.

(b)    With effect from the Resignation Effective Date (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents regardless of whether a successor has been appointed (except that in the case of any Collateral held by the Administrative Agent on behalf of the Lenders and the Issuing Banks under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such Collateral until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender or Issuing Bank directly, as the case may be, until such time, if any, as the Majority Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired or removed) Administrative Agent (other than in respect of fees payable under Section 3.05 and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 11.06).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the

85

retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article XI and Section 12.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

(c)       Any resignation of the Administrative Agent pursuant to this Section shall also constitute a resignation as Issuing Bank.  If the Administrative Agent resigns as an Issuing Bank, it shall retain all the rights, powers, privileges and duties of the Issuing Bank hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as an Issuing Bank and all LC Exposure with respect thereto, including the right to require the Lenders to make ABR Loans or fund risk participations in LC Disbursements pursuant to Section 2.07(d).  Upon the appointment by the Borrower of a successor Issuing Bank hereunder (which successor shall in all cases be a Lender other than a Defaulting Lender), (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, as applicable, (ii) the retiring Issuing Bank shall be discharged from all of the respective duties and obligations hereunder or under the other Loan Documents and (iii) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the Administrative Agent to effectively assume the obligations of the Administrative Agent with respect to such Letters of Credit.

Section 11.07    Administrative Agent as Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.  The term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Administrative Agent hereunder in its individual capacity, but not sub-agents of such Person.

Section 11.08    No Reliance.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.  The Administrative Agent shall not be required to keep itself informed as to the performance or observance by any Debtor of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of any Debtor. Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Arranger shall have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of the Administrative Agent or any of its Affiliates.  In this regard, each Lender acknowledges that Paul Hastings LLP is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document.  Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 11.09    Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or

other judicial proceeding relative to any Debtor, the Administrative Agent (irrespective of whether the principal of any Loan or LC Disbursement shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Disbursements and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Banks and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, Issuing Banks and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 2.07, Section 3.05 and Section 12.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Issuing Banks to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Banks, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 3.05 and Section 12.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 11.10    Authority of Administrative Agent to Release Guarantors, Collateral and Liens. Each Lender and Issuing Bank hereby authorizes the Administrative Agent to release (a) any Guarantor from the Loan Guarantee pursuant to a transaction permitted hereunder or pursuant to the terms hereof and (b) any collateral that is permitted to be sold or released pursuant to the terms of the Loan Documents. Each Lender and Issuing Bank hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all releases of a Guarantor, Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any sale or other disposition of Property in accordance with Section 12.16 or as otherwise authorized under the Loan Documents. Upon request by the Administrative Agent at any time, the Majority Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Loan Guarantee pursuant to Section 12.16.

Section 11.11    The Arranger.    The Arranger    shall not have any duties, responsibilities or liabilities under this Agreement and the other Loan Documents other than its respective duties, responsibilities and liabilities in its capacity as the Administrative Agent and/or a Lender hereunder.

Section 11.12    Secured Cash Management Agreements. No Cash Management Bank that obtains the benefits of Section 10.02(c), any Loan Guarantee or any Collateral by virtue of the provisions hereof or of any Loan Guarantee, any Security Instrument or any other Loan Document shall have any right to notice of any action or consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in

87

its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this <u>Section 11.12</u> to the contrary, the Administrative Agent shall not be required to verify the payment or, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements unless the Administrative Agent has received written notice of such Obligations together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01    <u>Notices</u>.

(a)    Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower (or any other Loan Party), to it at

Arsenal Resources Development LLC
6031 Wallace Road Extension, Suite 300
Wexford, Pennsylvania
Fax:  (800) 428-0981
Email:  agoetz@arsenalresources.com
Attn:  Allen Goetz, Senior Vice President, Chief Financial Officer &
Chief Accounting Officer

and

Simpson Thacher & Bartlett LLP
600 Travis St., Suite 5400
Houston, TX  77002
Fax:  713-821-5602
Email:  emodesto@stblaw.com
Attn:  Erland Modesto

(ii)    if to the Administrative Agent, to it at:

Citibank, N.A.
1615 Brett Road, Building III
New Castle, Delaware 19720
Attention:  Loan Administration
Telephone:  302-894-6010
Facsimile:  212-994-0847
Electronic Mail:  GLOriginationOps@citigroup.com

(iii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower and the Administrative Agent.

(b)      Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II, Article III, Article IV and Article V unless otherwise agreed by the Administrative Agent and the applicable Lender.  Documents required to be delivered pursuant to Section 8.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or any direct or indirect parent of the Borrower) posts such documents, or provides a link thereto on the website on the Internet at the Borrower's website address listed on Schedule 12.01 (or subsequently identified in writing to the Administrative Agent) or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions of such documents.

(c)      Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d)      The Borrower hereby acknowledges that (i) the Administrative Agent and the Arranger may, but shall not be obligated to, make available to the Lenders and the Issuing Banks materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on Debt Domain, IntraLinks, Syndtrak or another similar electronic system (the "Platform") and (ii) certain of the Lenders may be "public side" Lenders (each, a "Public Lender") that may have personnel who do not wish to receive material non-public information with respect to any Debtor, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arranger, the Issuing Banks and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 12.11); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  Notwithstanding the foregoing, the Borrower shall not be under any obligation to mark any Borrower Materials "PUBLIC."  Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal and state securities laws, to make reference to communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States federal or state securities laws.

(e)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM,

AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender, the Issuing Bank or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's, any Loan Party's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other similar electronic platform related to this Facility except to the extent that such losses, claims, damages, liabilities or expenses resulted from the bad faith, willful misconduct or gross negligence of an Agent Party, as determined by a final non-appealable judgment of a court of competent jurisdiction.

Section 12.02    Waivers; Amendments.

(a)    No failure on the part of the Administrative Agent, any Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent, any Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by this Section 12.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender or any Issuing Bank may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any provision hereof nor any Loan Document nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders and acknowledged by the Administrative Agent or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; provided that no such agreement shall (i) increase the Availability Limit or the Commitment of any Lender without the written consent of such Lender, (ii) [reserved], (iii) reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Obligations hereunder or under any other Loan Document, without the written consent of each Lender adversely affected thereby; provided that only the consent of the Majority Lenders shall be necessary to waive or postpone any obligation of the Borrower to pay interest at the default rate under, or amend, Section 3.02(c), (iv) subject to the provisos to Section 12.02(b)(ii), postpone the scheduled date of payment or prepayment of the principal amount of any Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or any other Obligations hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone or extend the Maturity Date without the written consent of each Lender adversely affected thereby, (v) change Section 4.01(b) or Section 4.01(c) in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender adversely affected thereby, (vi) waive or amend Section 10.02(c) or Section 12.13, without the written consent of each Lender; provided that any waiver or amendment to Section 10.02(c), to Section 12.13 or to this proviso in this Section 12.02(b)(vi), or any amendment or modification to any Security Instrument that results in the Secured Swap Obligations secured by such Security Instrument no longer

being secured thereby on an equal and ratable basis with the principal of the Loans, or any amendment or other change to the definition of the terms "Secured Swap Agreement," "Secured Swap Obligations" or "Secured Swap Party," shall also require the written consent of each Secured Swap Party adversely affected thereby, (vii) release substantially all of the Guarantors or Collateral (except as expressly permitted by the Loan Documents), without the consent of each Lender, or (viii) change any of the provisions of this Section 12.02(b) or the definition of "Majority Lenders" or reduce the voting rights of any Lender, without the written consent of each Lender, (ix) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or any Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or any Issuing Bank, as the case may be; provided that the LC Issuance Limit of any Issuing Bank may be increased solely with the written consent of such Issuing Bank and no other Person so long as the aggregate LC Commitment is not increased and (x) nothing in this Section 12.02 shall cause any waiver, amendment, modification or consent to (1) any engagement, fee or similar letter between the Borrower and any Lender or the Administrative Agent or the Issuing Bank to require the consent of the Majority Lenders, (2) any Letter of Credit Agreements between the Borrower or any Subsidiary of the Borrower and the Issuing Bank to require the consent of the Majority Lenders, (3) any Letter of Credit issued by the Issuing Bank pursuant to the terms of this Agreement to require the consent of the Majority Lenders except as specifically required by Section 2.07 or (4) any Secured Cash Management Agreement to require the consent of the Majority Lenders.

(c)     Notwithstanding anything to the contrary in any Loan Document, any Security Instruments or related documents executed by the Debtors in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order (i) to comply with any local Governmental Requirement or advice of local counsel or (ii) to cure ambiguities, omissions, mistakes or defects.

(d)     Notwithstanding anything to the contrary contained in the Loan Documents, the Administrative Agent, without the consent of any Lender, shall be permitted to enter into any amendments, waivers, modifications or supplements to the Engagement Letter.

(e)     Notwithstanding anything in the Loan Documents to the contrary, the Administrative Agent and the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender in order to (i) correct, amend, cure or resolve any ambiguity, omission, defect, typographical error or inconsistency or other manifest error therein, (ii) with respect to the Loan Documents, add a guarantor or collateral or otherwise enhance the rights and benefits of the Lenders, (iii) make administrative or operational changes not adverse to any Lender or (iv) adhere to any local Governmental Requirement or advice of local counsel.

(f)     Notwithstanding anything in the Loan Documents to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (A) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (B) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender, where such Defaulting Lender is an affected Lender, shall require the consent of such Defaulting Lender.

(g)     Anything herein to the contrary notwithstanding, if the Debtors' proposed plan of reorganization ("Proposed Plan") provides for (in whole or in part) the refinancing of the Refinanced Loans and the Obligations on the effective date of an Approved Plan of Reorganization in lieu of Payment in Full, then, if such Proposed Plan has been accepted by a class consisting solely of the Lenders, then the holders of not less than sixty-six-and-two-thirds percent (66 2/3%) of the Refinanced Loans (the "Required

Refinanced Lenders") may (without the consent of any other Lenders or the Administrative Agent) agree on behalf of all Lenders that the full amount of the Refinanced Loans will not be required to be repaid in cash on the Maturity Date, but instead shall be treated in any manner approved by the Required Refinanced Lenders. No amendment or waiver shall, unless signed by all Lenders, amend this clause (g) or change the definition of the term Required Refinanced Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder, in each case without the consent of all Lenders.

Section 12.03    Expenses; Indemnity; Damage Waiver.

(a)    The Borrower agrees (i) if the Interim Facility Effective Date occurs, to pay or reimburse the Administrative Agent, each Issuing Bank and the Arranger for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution, performance and administration of this Agreement, the other Loan Documents, the Exit Facility Commitment Letter and any fee letter entered into in connection therewith and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby (including all Attorney Costs, but excluding allocated costs of in-house counsel, where counsel shall be limited to one primary counsel, one local counsel as reasonably necessary in each relevant jurisdiction material to the interests of the Administrative Agent, the Issuing Banks or the Lenders, taken as a whole, one special bankruptcy counsel for each Secured Swap Party in connection with the structuring and preparation of any Secured Swap Agreement to be entered into after the Petition Date (with fees for each such counsel not to exceed fifteen thousand dollars ($15,000)) or, with the Borrower's consent (not to be unreasonably withheld or delayed), other counsel) and (ii) from and after the Interim Facility Effective Date, to pay or reimburse the Administrative Agent, each Issuing Bank, the Arranger and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement, the other Loan Documents and the Exit Facility Commitment Letter and any fee letter entered into in connection therewith (including, in each case all such costs and expenses incurred during any legal proceeding, including any enforcement or bankruptcy proceeding, and including all respective Attorney Costs (but not allocated costs of in-house counsel) which shall be limited to Attorney Costs of one counsel to the Administrative Agent, the Lenders and the Arranger (and one local counsel as reasonably necessary in each relevant jurisdiction material to the interests of the Administrative Agent, the Issuing Banks or the Lenders taken as a whole (or, with the Borrower's consent (not to be unreasonably withheld or delayed), other counsel))).  The foregoing costs and expenses shall include all reasonable search, filing and recording charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by the Administrative Agent.  The agreements in this Section 12.03 shall survive the termination of the Commitments and repayment of all other Obligations.  All amounts due under this Section 12.03 shall be paid within thirty (30) days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail including, if requested by the Borrower and to the extent reasonably available, backup documentation supporting such reimbursement request.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.  This Section 12.03 shall not apply with respect to any Taxes other than Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever resulting from a non-Tax claim.

(b)    The Borrower shall indemnify and hold harmless the Administrative Agent, the Arranger, each Issuing Bank, each Lender and each of their respective Affiliates, and each of the officers, directors, employees, partners, agents, controlling persons, members, representatives and the successors of each of the foregoing (collectively, the "Indemnitees") from and against any and all losses, claims, damages, liabilities and other expenses (including Attorney Costs but limited in the case of legal fees and expenses

92

to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interests of the Indemnitees, and solely in the case of an actual or perceived conflict of interest where the Indemnitee(s) affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retain another firm of counsel for each group of similarly situated affected Indemnitees, one additional counsel in each relevant jurisdiction) of any kind or nature whatsoever (i) relating to the use of proceeds of the Facility, including any refusal by an Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, (ii) to the extent relating to the Facility, including the execution, delivery, enforcement, performance or administration of any Loan Document, to which any Indemnitee may become subject arising out of or in connection with any actual or threatened action, suit, litigation, investigation, proceeding or any governmental or regulatory action, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (each, a "Proceeding"), (iii) to the extent relating to the foregoing, any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability related in any way to any Loan Parties or any Subsidiary or (iv) relating to the Exit Facility Commitment Letter, including the execution, delivery, enforcement, performance or administration of the Exit Facility Commitment Letter and any fee letter entered into in connection therewith, to which any Indemnitee may become subject arising out of or in connection with any Proceeding; provided that, notwithstanding the foregoing, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities and other expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its controlled Affiliates or their respective directors, officers, employees, agents, controlling persons, members and representatives (in the case of an agent or a representative, to the extent that such agent or representative acted on behalf of, or at the express instruction of, such Indemnitee), as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) a material breach of any obligations under any Loan Document by such Indemnitee or of any of its controlled Affiliates or its or their respective directors, officers, employees, members, agents, controlling persons, partners or representatives (in the case of agents and representatives, acting on behalf of, or at the express instructions of, such Indemnitee), as determined by a final non-appealable judgment of a court of competent jurisdiction or (z) any Proceeding not involving an act or omission by the Borrower or its Affiliates that is brought by an Indemnitee against another Indemnitee (other than any disputes involving claims against an Indemnitee in its capacity or in fulfilling its role as an Arranger, Issuing Bank or Administrative Agent).  No Indemnitee or Loan Party shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Interim Facility Effective Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party and for any out-of-pocket expenses); it being agreed that this sentence shall not limit the indemnification obligations of the Borrower or any Subsidiary.  In the case of a Proceeding to which the indemnity in this Section 12.03 applies, such indemnity shall be effective whether or not such Proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated.  All amounts due under this Section 12.03 shall be paid within thirty (30) days after written demand therefor (together with backup documentation supporting such reimbursement request); provided, however, that such Indemnitee shall promptly refund such amount to the extent that there is a final and non-appealable judicial determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 12.03.

LEGAL_US_E # 144284119.14

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent, the Arranger or Issuing Banks under Section 12.03(a) or (b), each Lender severally agrees to pay to the Administrative Agent, the Arranger or any Issuing Bank, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Arranger or Issuing Banks in its capacity as such.

Section 12.04    Successors and Assigns; Holdings Term Loan Creditors.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void); provided that the foregoing shall not prohibit a merger or consolidation by the Borrower with another Person that is approved by the Majority Lenders or otherwise permitted hereunder, (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.04; provided that any such assignment or participation must comply with any restrictions on assignments or participations, as applicable, as agreed to by the transferring Lender in the RSA or any other restructuring support agreement, (iii) no Lender may assign to the Borrower or to an Affiliate of the Borrower all or any portion of such Lender's rights and obligations under the Agreement or all or any portion of its Commitments or the Loans owing to it hereunder and (iv) no Lender may assign or otherwise transfer its rights or obligations hereunder to any Person that is at such time a Defaulting Lender or a natural person.

(b)     (i) Subject to the conditions set forth in Section 12.04(b)(ii), any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent and each Issuing Bank, provided that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender, an Affiliate of a Lender or an Approved Fund immediately prior to giving effect to such assignment.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     the Borrower (such consent not to be unreasonably withheld, conditioned or delayed), provided that no consent of the Borrower shall be required if such assignment is (1) to a Lender, an Affiliate of a Lender, an Approved Fund, or (2) if a Payment Event of Default has occurred and is continuing, to any other assignee and (B) subject to clause (C) below, and except in the case of an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than five million dollars ($5,000,000) (or a lesser amount if the assigning Lender's outstanding Commitment or Loans, as applicable, amounts to less than five million dollars ($5,000,000)) (and shall be in increments of one million dollars ($1,000,000) in excess thereof);

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (unless waived by the Administrative Agent in its sole discretion);

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent, (x) an Administrative Questionnaire and (y) all documentation and other information that the Administrative Agent reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act;

(E)    each assignment of any Lender's Commitment and/or Loan (including any portion thereof) hereunder shall include an assignment in the same proportion of such Lender's commitment under the Exit Facility Commitment Letter; ; and

(F)    each assignment of any Lender's Commitment and/or New Money Loan (including any portion thereof) shall include an assignment in the same proportion of such Lender's Refinanced Loans.

(iii)    Subject to Section 12.04(b)(iv) and the acceptance and recording thereof, and except in the case of an assignment to an Affiliate of a Lender, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 5.01, Section 5.02, Section 5.03 and Section 12.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.04(c).

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, any Issuing Bank and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and, if required hereunder, applicable tax forms (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 12.04(b) and any written consent to such assignment required by Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 12.04(b).  Prior to such recording, the Borrower and the Administrative Agent may continue to deal solely and directly with the assigning Lender.

(vi)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, any Issuing Bank or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans and participations in Letters of Credit in accordance with its *pro rata* share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Governmental Requirements without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Notwithstanding anything to the contrary in this Agreement, in connection with any assignment pursuant to the foregoing clause (vii), the Administrative Agent and each Issuing Bank shall be entitled to resign effective upon the consummation of such assignment and the administrative agent and/or trustee under the Holdings Term Loan Facility shall be entitled to appoint a replacement Administrative Agent; provided that, (a) the resigning Administrative Agent shall be entitled to the rights afforded to a resigning Administrative Agent pursuant to Section 11.06 (excluding its right to appoint a successor Administrative Agent) and (b) the resigning Issuing Bank shall be entitled to the rights afforded to a replaced Issuing Bank pursuant to Section 2.07(i).

(c)    (i) Any Lender may, without the consent of the Borrower, the Administrative Agent or any Issuing Bank, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) [reserved], (B) such Lender's obligations under this Agreement shall remain unchanged, (C) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (D) the Borrower, the Administrative Agent, any Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement (and for the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 12.03(c) without regard to the existence of any participation). Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver to the extent that such amendment, consent or waiver would adversely affect the superpriority status of the claims or liens on the Collateral or require unanimous consent of the Lenders or the consent of any Lender affected thereby under Section 12.02(b)(i), Section 12.02(b)(iii), Section 12.02(b)(iv), Section 12.02(b)(vi), Section 12.02(b)(vii) and Section 12.02(b)(viii). Subject to Section 12.04(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 5.01, Section 5.02 and Section 5.03 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.04(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, provided such Participant agrees to be subject to Section 4.01(c) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or

96

any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or Letters of Credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary in connection with an audit or other proceeding to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as such) shall have no responsibility for maintaining the Participant Register.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 5.01, Section 5.02 or Section 5.03 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent, not to be unreasonably withheld or delayed; for the avoidance of doubt, the Borrower shall have reasonable basis for withholding consent if such Participant after the sale would result in materially increased obligations to the Borrower or any Guarantors at such time under Section 5.01 and/or Section 5.03. A Participant shall be entitled to the benefits of Section 5.03 subject to the requirements and limitations therein, including the requirements under Section 5.03(e) (it being understood that the documentation required under Section 5.03(e) shall be delivered to the participating Lender).

(iii)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations, including to a Federal Reserve Bank, and this Section 12.04(c)(iii) shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(iv)    Notwithstanding anything to the contrary contained herein, if at any time an Issuing Bank assigns all of its Commitments and Loans pursuant to subsection (b) above, the Issuing Bank may, upon thirty (30) days' notice to the Borrower and the Lenders, resign as an Issuing Bank.  In the event of any such resignation as an Issuing Bank, the Borrower shall be entitled to appoint from among the Lenders a successor Issuing Bank hereunder; provided, however, that no failure by the Borrower to appoint any such successor shall affect the resignation of the retiring Issuing Bank; provided that on or prior to the expiration of such thirty (30) day period with respect to such resignation, the relevant Issuing Bank shall have identified a successor Issuing Bank willing to accept its appointment as successor Issuing Bank, and the effectiveness of such resignation shall be conditioned upon such successor assuming the rights and duties of the Issuing Bank.  If an Issuing Bank resigns as Issuing Bank, it shall retain all the rights, powers, privileges and duties of an Issuing Bank hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as an Issuing Bank and all LC Exposure with respect thereto (including the right to require the Lenders to make ABR Loans or fund risk participations in LC Disbursements pursuant to Section 2.07(d)).  Upon the appointment of a successor Issuing Bank, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank and (b) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

(d)    Notwithstanding anything to the contrary contained herein:

(i)        no Holdings Term Loan Creditor that is a Secured Party hereunder and/or under the other Loan Documents shall have the right to (x) receive information, reports or other materials provided solely to Lenders by the Administrative Agent or any other Lender in connection with any enforcement (or contemplated enforcement) of remedies hereunder or under the other Loan Documents, (y) attend or participate in meetings attended solely by the Lenders and the Administrative Agent relating to any enforcement (or contemplated enforcement) of remedies hereunder or under the other Loan Documents or (z) access any confidential communications from counsel to or financials advisors of the Administrative Agent or the Lenders relating to any enforcement (or contemplated enforcement) of remedies hereunder or under the other Loan Documents; and

(ii)        no Holdings Term Loan Creditor that is a Secured Party hereunder and/or under the other Loan Documents, in its capacity as such, will be entitled to challenge the attorney client privilege of the respective counsel of the Administrative Agent or any other Lender.

Section 12.05        Survival; Revival; Reinstatement.

(a)        All representations and warranties made hereunder and in any other Loan Document or other document delivered in connection with or pursuant to this Agreement or any other Loan Document shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent, the Issuing Banks and the Lenders, regardless of any investigation made by any such party or on their behalf and notwithstanding that the Administrative Agent, any Issuing Bank or any Lender may have had notice or knowledge of any Default at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated.  The provisions of Section 5.01, Section 5.02, Section 5.03 and Section 12.03 and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, Payment in Full or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)        To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights or otherwise, then (i) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall, to the fullest extent possible under provisions of applicable law, be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (ii) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Effective Rate from time to time in effect.

Section 12.06        Counterparts; Integration; Effectiveness.

(a)        This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by fax or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Administrative Agent may

also require that any such documents and signatures delivered by fax or other electronic transmission be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by fax or other electronic transmission.

(b)     **THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY SEPARATE LETTER AGREEMENTS WITH RESPECT TO FEES PAYABLE TO THE ADMINISTRATIVE AGENT CONSTITUTE THE ENTIRE CONTRACT AMONG THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND SUPERSEDE ANY AND ALL PREVIOUS AGREEMENTS AND UNDERSTANDINGS, ORAL OR WRITTEN, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**   In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof; provided, further, that in the event of any inconsistency between the terms and conditions of the DIP Loan Documents and a DIP Order, the provisions of the DIP Order shall govern and control.

(c)     This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent, and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties and thereafter shall be binding upon and inure to the benefit of the Loan Parties, the Administrative Agent and each Lender and their respective successors and assigns, in each case in accordance with Section 12.04 (if applicable).

(d)     Loan Documents may be signed electronically.  The effectiveness of any such signatures shall, subject to applicable law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Administrative Agent, any Issuing Bank and the Lenders.

Section 12.07   Severability.  If any provision of this Agreement or any other Loan Document is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 12.08   Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender, each Issuing Bank, the Administrative Agent and their respective Affiliates is authorized at any time and from time to time, to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including, without limitations Secured Swap Obligations) at any time owing by the Administrative Agent, such Lender or Issuing Bank to or for the credit or the account any Debtor against any of and all the obligations of such Debtor owed to the Administrative Agent, such Lender or Issuing Bank now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not the Administrative Agent, such Lender or such Issuing Bank shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured.  The rights of each Lender, each Issuing Bank and the Administrative Agent under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) which the Administrative Agent, such Lender or

such Issuing Bank may have.  Each Lender and each Issuing Bank agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender or Issuing Bank, as applicable; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09    GOVERNING  LAW;  JURISDICTION;  CONSENT  TO  SERVICE  OF PROCESS.

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    EACH  PARTY  HERETO  IRREVOCABLY  AND  UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR THE RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING CONTAINED HEREIN OR IN ANY OTHER LOAN DOCUMENT WILL PREVENT ANY LENDER OR THE ADMINISTRATIVE AGENT FROM BRINGING ANY ACTION TO ENFORCE ANY AWARD OR JUDGMENT OR EXERCISE ANY RIGHT UNDER THE SECURITY INSTRUMENTS OR AGAINST ANY COLLATERAL OR ANY OTHER PROPERTY OF ANY LOAN PARTY IN ANY OTHER FORUM IN WHICH JURISDICTION CAN BE ESTABLISHED.

(c)    EACH  PARTY  HERETO  IRREVOCABLY  AND  UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 12.01.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.10    <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11    <u>Confidentiality</u>.  Each of the Administrative Agent, each Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority (including any self-regulatory authority), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) if required in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this <u>Section 12.11</u>, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement for purposes of evaluating whether to become an assignee or Participant or (ii) any actual or prospective counterparty (or its advisors) to any Swap Agreement relating to the Borrower and its obligations for purposes of evaluating whether to become a Secured Swap Party, (g) with the consent of the Borrower, (h) on a confidential basis to (i) any rating agency in connection with rating any Debtor or the credit facilities provided hereunder or (ii) the CUSIP Service Bureau or any similar agency to the extent required in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this <u>Section 12.11</u> or (ii) becomes available to the Administrative Agent, any Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower and its Affiliates and, to the Administrative Agent, Issuing Bank or Lender's knowledge, such source was not subject to a confidentiality agreement with respect to such information.  For the purposes of this <u>Section 12.11</u>, "<u>Information</u>" means all information received from the Borrower or any of its Permitted Holders relating to any Debtor and their businesses, other than any such information that is available to the Administrative Agent, any Issuing Bank or any Lender on a non-confidential basis prior to disclosure by any Debtor or a Permitted Holder; <u>provided</u> that, in the case of information received from the Borrower or any Permitted Holder after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this <u>Section 12.11</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 12.12    Interest Rate Limitation.  It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Notes, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Notes shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower) and (ii) in the event that the maturity of the Obligations is accelerated by reason of an election of the holder thereof under this Agreement, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans evidenced by the Notes until Payment in Full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12.

Section 12.13    Collateral Matters; Secured Swap Agreements.  Except for as expressly set forth in Section 12.02(b)(vi), no Secured Swap Party or Cash Management Bank shall have any voting rights under any Loan Document as a result of the existence of any Secured Swap Obligations or Secured Cash Management Obligations owed to it and the Administrative Agent shall have no responsibility for determining the value of any Secured Swap Obligations or Secured Cash Management Obligations. All Secured Cash Management Agreements are independent agreements governed by the terms thereof and will remain in full force and effect, unaffected by any repayment, prepayment, acceleration, reduction, increase or change in the terms of the Loans created under this Agreement except as otherwise provided in such Secured Cash Management Agreements, and any payoff statement from any Lender relating to this Agreement shall not apply to Secured Cash Management Agreements, except as otherwise expressly provided in such payoff statement.

Section 12.14    PATRIOT Act Notice.  Each Lender that is subject to the PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower and each Guarantor that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes the name, address and tax identification number of the Borrower and the Guarantors and other information regarding the

Borrower and the Guarantors that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower and the Guarantors in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to the Lenders and the Administrative Agent.

Section 12.15    Electronic Execution of Assignments.    The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other modifications, Borrowing Request, Interest Election Request, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 12.16    Release of Liens and Release from Loan Guarantee.    Notwithstanding anything to the contrary in the Loan Documents:

(a)    after Payment in Full, the Collateral shall be automatically released from any Liens created by the Loan Documents, and the Loan Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent, the Issuing Banks, the Lenders and each Loan Party under the Loan Documents shall terminate and each Guarantor shall be released from the Loan Guarantee, all without delivery of any instrument or performance of any act by any Person;

(b)    the following Collateral shall be automatically released from the Liens created by the Loan Documents without delivery of any instrument or performance of any act by any Person:

(i)    upon a permitted Disposition of Collateral (including the termination or expiration of a lease) to any Person other than a Loan Party, any Person that was required to become a Loan Party or any Affiliate of any of the foregoing, the Disposed of Collateral;

(ii)    upon (and only for so long as) any Property no longer constituting Collateral as defined, such Property;

(iii)    upon the approval, authorization or ratification in writing by the Majority Lenders (or such other percentage of the Lenders whose consent is required by Section 12.02(b)) of the release of any Collateral, such Collateral;

(iv)    upon a release of any Collateral under the terms of each applicable Security Instrument, such Collateral;

(v)    upon a Guarantor no longer being a Guarantor by virtue of the definition thereof or a transaction permitted hereunder, the Collateral owned by such Guarantor; or

(vi)    upon a transaction permitted under Section 9.08, any releases necessary or desirable (as reasonably determined by the Administrative Agent and Borrower) to effectuate such transaction;

LEGAL_US_E # 144284119.14

(c)      a Guarantor shall be automatically released from the Loan Guarantee without delivery of any instrument or performance of any act by any Person:

(i)      in respect of a Guarantor, upon such Guarantor no longer being a Guarantor by virtue of the definition thereof or a transaction permitted hereunder, or

(ii)      upon the approval, authorization or ratification in writing by the Majority Lenders (or such other percentage of the Lenders whose consent is required by Section 12.02(b));

(d)      In connection with any termination or release of Collateral from the Liens securing the Obligations or a release of a Guarantor from the Loan Guarantee, the Administrative Agent shall:

(i)      in the case of termination or release of Collateral from the Liens securing the Obligations, (A) execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release (including (1) UCC termination statements and (2) in the case of a release of Mortgaged Property, a partial release substantially in the form of Exhibit G) and (B) return to the Borrower, the Pledged Collateral (as defined in the Pre-Petition Collateral Agreement) that is in the possession of the Administrative Agent and is the subject of such release (provided that, upon request by the Administrative Agent, the Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer certifying that such transaction has been or was consummated in compliance with the Loan Documents); and

(ii)      in the case of a release of a Guarantor, execute and deliver a written release to evidence the release of the Guarantor promptly upon the request of the Borrower;

(e)      any execution and delivery of documents by the Administrative Agent pursuant to this Section 12.16 shall be without recourse to or warranty by the Administrative Agent; and

(f)      the relevant Loan Party shall be permitted to take any action in connection therewith consistent with such release including the filing of UCC termination statements.

Section 12.17      Flood Insurance Provisions. Notwithstanding anything in this Agreement or any other Loan Document to the contrary, in no event is any "Building" (as defined in the applicable Flood Insurance Regulation) or "Manufactured (Mobile) Home" (as defined in the applicable Flood Insurance Regulation) included in the definition of "Mortgaged Property" (as defined in any Loan Document) and no "Building" or "Manufactured (Mobile) Home" is hereby encumbered by this Agreement or any other Loan Document.

Section 12.18      No Advisor or Fiduciary Responsibility. In connection with all aspects of the Loan Documents (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Debtor acknowledges and agrees that: (a) (i) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arranger, each Issuing Bank and the Lenders are arm's-length commercial transactions between the Borrower, each other Loan Party, on the one hand, and the Administrative Agent, the Arranger, each Issuing Bank and the Lenders, on the other hand, (ii) the Borrower and each of the other Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Borrower and each other Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) the Administrative Agent, the Arranger and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any other Loan Party and (ii) neither the Administrative Agent, the Arranger, each

Issuing Bank nor any Lender has any obligation to the Borrower or any other Loan Party with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Administrative Agent, the Arranger, each Issuing Bank and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and the other Loan Parties, and neither the Administrative Agent, the Arranger, each Issuing Bank nor any Lender has any obligation to disclose any of such interests to the Borrower or any other Loan Party.  To the fullest extent permitted by law, each of the Borrower and each other Loan Party hereby waives and releases any claims that it may have against the Administrative Agent, the Arranger or any Lender with respect to any breach or alleged breach of fiduciary duty in connection with any aspect of the Loan Documents.

Section 12.19    Cashless Settlement.  Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any amendment, repayment, refinancing, incremental, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender and such cashless settlement shall be deemed to comply with any requirement hereunder or any other Loan Document or DIP Order that such payment be made "in dollars," in "immediately available funds," "in cash" or any other similar concept.

Section 12.20    Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 12.20, the following terms have the following meanings:

105

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:

(i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

## ARTICLE XIII
## LOAN GUARANTEE

Section 13.01    Guarantee. Each Guarantor and the Borrower unconditionally guarantees to the Administrative Agent, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the due and punctual payment and performance of the Obligations (the "Guaranteed Obligations") for the ratable benefit of the Secured Parties.  Each Guarantor further agrees that the Guaranteed Obligations may be extended, modified, amended or renewed, in whole or in part, without notice to or further assent from it, and that it will remain bound upon its guarantee notwithstanding any extension, modification, amendment or renewal of any Guaranteed Obligation.  Each Guarantor waives presentment to, demand of payment from and protest to the Borrower or any other Loan Party of any of the Guaranteed Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment.  The guarantee made by the Borrower hereunder relates solely to the Secured Swap Obligations and Secured Cash Management Obligations of the Restricted Subsidiaries of the Borrower.

Section 13.02    Guarantee of Payment. Each Guarantor and the Borrower further agrees that its guarantee hereunder constitutes a guarantee of payment when due and not of collection, and waives any right to require that any resort be had by the Administrative Agent or any other Secured Party to any security held for the payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of the Administrative Agent or any other Secured Party in favor of the Borrower or any other person.

Section 13.03    Special Guaranty to Confer ECP Status.  The Borrower, unconditionally and irrevocably, with respect to each other Guarantor, guarantees such Guarantor's guarantee under Section 2(a) of any Secured Swap Agreement.  The obligations of the Borrower under this Section 13.03 shall remain in full force and effect until Payment in Full.  The Borrower intends that this Section 13.03 and Section 2(a) shall be deemed to constitute, a guarantee or other agreement for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 13.04    No Limitations.  Except for termination or release of a Guarantor's obligations hereunder as expressly provided for in Section 12.16 hereof, the obligations of each Guarantor hereunder

shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise (other than defense of payment or performance).  Without limiting the generality of, or the exception in, the foregoing, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by (and each Guarantor hereby waives, to the fullest extent permitted by law, any defense arising out of or relating to):  (i) the failure of the Administrative Agent or any other Secured Party to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Loan Document or otherwise; (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, any Loan Document or any other agreement, including with respect to any other Guarantor under this Guaranty; (iii) the release of, or the failure to perfect any security interest in, or the exchange, substitution, release or any impairment of, any security held by the Administrative Agent or any other Secured Party for the Guaranteed Obligations; (iv) any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations; (v) any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than Payment in Full); (vi) any illegality, lack of validity or enforceability of any Guaranteed Obligation; (vii) any change in the corporate existence, structure or ownership of the Borrower, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or its assets or any resulting release or discharge of any Guaranteed Obligation (other than Payment in Full); (viii) the existence of any claim, set-off or other rights that the Guarantor may have at any time against the Borrower, the Administrative Agent, or any other corporation or person, whether in connection herewith or any unrelated transactions; provided that nothing herein will prevent the assertion of any such claim by separate suit or compulsory counterclaim; and (ix) any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Administrative Agent that might otherwise constitute a defense to, or a legal or equitable discharge of, the Borrower or any other Loan Party (other than Payment in Full).  Each Guarantor expressly authorizes the Secured Parties to take and hold security for the payment and performance of the Guaranteed Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the Guaranteed Obligations, all without affecting the obligations of any Guarantor hereunder.  The Administrative Agent and the other Secured Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with the Borrower or any other Loan Party or exercise any other right or remedy available to them against the Borrower or any other Loan Party, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Guaranteed Obligations have been Paid in Full.

Section 13.05    Reinstatement.   Notwithstanding the provisions of Section 12.16 or anything herein or in any other Loan Document to the contrary, the Borrower and each Guarantor agrees that its guarantee hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation is rescinded or must otherwise be restored or returned by the Administrative Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any other Loan Party, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any other Loan Party or any substantial part of its property, or otherwise, all as though such payment had not been made.

Section 13.06    Contribution; Subrogation.   Upon payment by any Guarantor or the Borrower of any sums to the Administrative Agent as provided above, all rights of such Guarantor against the Borrower

or Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be fully subordinated to the indefeasible Payment in Full.

Section 13.07    Information.  Each Guarantor and the Borrower assumes all responsibility for being and keeping itself informed of the Borrower's and each other Loan Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that neither the Administrative Agent nor any other Secured Party will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

Section 13.08    Taxes.  The provisions of Section 5.03 shall apply mutatis mutandis to all payments by the Guarantors of the Guaranteed Obligations.

Section 13.09    Limitation of Liability.  Each Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each other Secured Party, hereby confirms that it is the intention of all such Persons that this Guaranty and the Guaranteed Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Guaranteed Obligations of each Guarantor hereunder.  To effectuate the foregoing intention, the Administrative Agent, the other Secured Parties and the Guarantors hereby irrevocably agree that the Guaranteed Obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Guaranteed Obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

Section 13.10    Indemnity; Subrogation and Subordination.

(a)    Indemnity and Subrogation.  In addition to all such rights of indemnity and subrogation as the Guarantors may have under applicable law (but subject to Section 13.10(c)), the Borrower agrees that (i) in the event a payment shall be made by any Guarantor under this Guaranty in respect of any Obligation of the Borrower, the Borrower shall indemnify such Guarantor for the full amount of such payment and such Guarantor shall be subrogated to the rights of the person to whom such payment shall have been made to the extent of such payment and (ii) in the event any assets of any Guarantor shall be sold pursuant to this Guaranty or any other Security Instrument to satisfy in whole or in part an Obligation of the Borrower, the Borrower shall indemnify such Guarantor in an amount equal to the greater of the book value or the fair market value of the assets so sold.

(b)    Contribution and Subrogation.  Each Guarantor (a "Contributing Guarantor") agrees (subject to Section 13.10(c)) that, in the event a payment shall be made by any other Guarantor hereunder in respect of any Obligation or assets of any other Guarantor shall be sold pursuant to any Security Instrument to satisfy any Obligation owed to any Secured Party and such other Guarantor (the "Claiming Guarantor") shall not have been fully indemnified by the Borrower as provided in Section 13.10(a), the Contributing Guarantor shall indemnify the Claiming Guarantor in an amount equal to the amount of such payment or the greater of the book value or the fair market value of such assets, as applicable, in each case multiplied by a fraction of which the numerator shall be the net worth of such Contributing Guarantor on the date hereof and the denominator shall be the aggregate net worth of all the Guarantors on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 8.11 of the Credit Agreement, the date of the supplement hereto executed and delivered by such Guarantor). Any Contributing Guarantor making any payment to a Claiming Guarantor pursuant to this Section 13.10(b) shall be subrogated to the rights of such Claiming Guarantor under Section 13.10(a) to the extent of such payment. The provisions of this Section 13.10(b) shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the other Secured Parties, and each Guarantor shall remain

108

liable to the Administrative Agent and the other Secured Parties for the full amount guaranteed by such Guarantor hereunder.

(c)    Subordination. Notwithstanding any provision of this Guaranty to the contrary, all rights of the Guarantors under Sections 13.10(a) and 13.10(b) and all other rights of indemnity, contribution or subrogation of any Guarantor under applicable law or otherwise shall be fully subordinated until Payment in Full.  Notwithstanding any payment or payments made by any of the Guarantors hereunder or any set-off or appropriation or application of funds of any of the Guarantors by any Secured Party, no Guarantor shall be entitled to be subrogated to any of the rights of the Administrative Agent or any other Secured Party against the Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by any Secured Party for the payment of the Obligations until Payment in Full, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrower or any other Guarantor in respect of payments made by such Guarantor hereunder until Payment in Full.  If any amount shall be paid to any Guarantor on account of such subrogation rights at any time prior to Payment in Full, such amount shall be held by such Guarantor in trust for the Administrative Agent and the other Secured Parties, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be paid to the Administrative Agent to be credited and applied against the Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement.  No failure on the part of the Borrower or any Guarantor to make the payments required by Sections 13.10(a) and 13.10(b) (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder

Section 13.11    Representations and Warranties. Each Guarantor hereby represents and warrants to the Administrative Agent and each Lender that:

(a)    the representations and warranties set forth in Article VII as they relate to such Guarantor or to the Loan Documents to which such Guarantor is a party are true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects after giving effect to such qualification), provided that each reference in each such representation and warranty to the Borrower's knowledge shall, for the purposes of this clause, be deemed to be a reference to such Guarantor's knowledge.

(b)    on the date hereof, the correct legal name of such Guarantor, all names and trade names that such Guarantor has used in the last five (5) years, such Guarantor's jurisdiction of organization and each jurisdiction of organization of such Guarantor over the last five (5) years, organizational number, taxpayor identification number, and the location(s) of such Guarantor's chief executive office or sole place of business over the last five years are specified on Schedule 1.1(a).

[SIGNATURES BEGIN NEXT PAGE]

109

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**BORROWER:**                          **ARSENAL RESOURCES DEVELOPMENT LLC**

By: _____
Name: _____
Title: _____

**CITIBANK, N.A.**, as Administrative Agent

By: _____
Name: _____
Title: _____

**CITIBANK, N.A.**, as Lender and Issuing Bank

By: _____
Name: _____
Title: _____

**[  ]**, as a Lender

By:      _____
Name:  _____
Title:    _____

## **EXHIBIT C**

**New RBL Facility Commitment Letter**

*Execution Version*

**CITIGROUP GLOBAL MARKETS INC.**
388 Greenwich Street
New York, New York 10013

*Highly Confidential*

November 6, 2019

Arsenal Resources Development LLC
6031 Wallace Road Extension, Suite 300
Wexford, Pennsylvania
Attention:  Allen Goetz, Senior Vice President, Chief Financial Officer & Chief Accounting Officer

**Arsenal Resources – Commitment Letter**

Ladies and Gentlemen:

Arsenal Resources Development LLC, a Delaware limited liability company (the "<u>Company</u>" or "<u>you</u>") has advised Citi (as defined below), BMO Harris Bank, N.A. ("<u>BMO</u>"), Société Générale ("<u>SG</u>"), CIT Finance LLC ("<u>CIT</u>"), The Huntington National Bank ("<u>Huntington</u>"), Goldman Sachs Bank USA ("<u>Goldman</u>") and Mercuria Energy Company, LLC (together with its affiliates, "<u>Mercuria</u>" and, together with Citi, BMO, SG, CIT, Huntington and Goldman, collectively, the "<u>Commitment Parties</u>") that you intend to obtain a senior secured revolving credit facility (the "<u>Revolving Facility</u>" and the loans thereunder, the "<u>Revolving Loans</u>") to, *inter alia*, (a) refinance loans outstanding under the senior secured super-priority debtor-in-possession revolving credit facility to be entered into by the Company in connection with the Chapter 11 Cases (as defined below), (b) pay transaction fees, liabilities and expenses and other administration costs incurred in connection with the negotiation, syndication, documentation (including this letter agreement (together with the exhibits and annexes hereto, this "<u>Commitment Letter</u>"), execution and closing of the Revolving Facility and (c) fund general working capital and corporate needs (collectively, the "<u>Transactions</u>"). The date of effectiveness of the Revolving Facility is referred to herein as the "<u>Closing Date</u>". For purposes of this Commitment Letter, "<u>Citi</u>" shall mean Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the transactions contemplated hereby.  Reference is made to the Restructuring Support Agreement, dated as of  November 6, 2019 among the Company and the other parties thereto (as amended, supplemented or otherwise modified from time to time, the "<u>RSA</u>") and to the "<u>Consenting RBL Lenders</u>" as defined therein.

A.      **Commitment; Conditions Precedent**

In connection with the Transactions, each of Citi, BMO, SG, CIT, Huntington, Goldman and Mercuria (the foregoing in such capacities, collectively, the "<u>Lenders</u>"), severally and not jointly, commits to provide 20.690%, 27.586%, 20.690%, 17.241%, 6.897%, 3.448% and 3.448%, respectively, of the amount of the Revolving Facility (in respect of the Borrowing Base (the "<u>Revolving Facility</u>") on the terms set forth in the "Senior Revolving Facility Summary of Principal Terms and Conditions" attached hereto as <u>Exhibit A</u> (the "<u>Term Sheet</u>").

The commitment of the Lenders hereunder and their agreement to perform the services described herein are subject solely to (i) the approval by the Bankruptcy Court (as defined below) of the Interim DIP Order (as defined in the RSA) and (ii) from and after the approval by the Bankruptcy Court of the Interim

DIP Order, the satisfaction of the conditions expressly set forth in the "Summary of Conditions Precedent" attached hereto as Exhibit B and in the section of the Term Sheet entitled "Conditions Precedent to the Closing Date" (the foregoing clauses (i) and (ii), collectively, the "Conditions"); it being understood that there are no conditions (implied or otherwise) to the commitments hereunder, including compliance with the terms of this Commitment Letter, the Agency Fee Letter and the Loan Documents other than those expressly stated in this Paragraph (A). The terms of the Credit Documentation shall be in a form such that they do not impair the availability of the Revolving Facility on the Closing Date if the Conditions are satisfied. Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the Credit Documentation in a manner consistent with this Commitment Letter.

B.    **Commitment Termination**

This Commitment Letter shall automatically (without the need for any notice or further action from any party hereto) terminate with respect to each of the parties hereto upon the earlier of (a) the date that is 105 days following the Petition Date (provided that if the milestone for effectiveness of the plan under the RSA is extended in accordance with the terms of the RSA, then the 105 days referred to in this clause (a) shall be automatically extended by a like amount) and (b) the date of the termination of the RSA by the Consenting RBL Lenders in accordance with the terms thereof (the "Termination Date").

C.    **Appointment of Roles; Waiver**.

You hereby appoint (a) Citi to act as lead arranger and bookrunning manager in connection with the Revolving Facility (in such capacity, the "Lead Arranger") and (b) Citi to act as administrative agent and collateral agent for the Revolving Facility (in such capacity, the "Administrative Agent"), in each case upon the terms and subject to the conditions set forth or referred to in this Commitment Letter.

You agree that Citi shall have "left" placement on all marketing materials in connection with the Revolving Facility and will hold the roles and responsibilities conventionally understood to be associated with such placement. You further agree that no additional agents, co-agents or lead arrangers will be appointed, or other titles conferred, except as you and the Lead Arranger shall so agree. You agree that no Lender will receive any compensation of any kind to obtain its commitment under the Revolving Facility, except as expressly provided in this Commitment Letter and in the Agency Fee Letter.

You acknowledge that each Commitment Party may currently be a lender or agent under that certain Credit Agreement, dated as of December 21, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Existing Credit Agreement"), and your and your affiliates' rights and obligations under the Existing Credit Agreement and any related agreement with one or more Commitment Parties that currently or hereafter may exist are, and shall be, separate and distinct from the rights and obligations of the parties pursuant to this Commitment Letter, and none of such rights and obligations under such other agreements shall be affected by any Commitment Party's performance or lack of performance of services hereunder. You hereby agree that the Commitment Parties may render its services under this Commitment Letter notwithstanding any actual or potential conflict of interest presented by the foregoing, and the you hereby waive any conflict of interest claims relating to the relationship between you and your affiliates and one or more Commitment Parties in connection with the transactions contemplated hereby, on the one hand, and the exercise by any Commitment Party or any of their respective affiliates of any of their respective rights and duties under any credit or other agreement (including the Existing Credit Agreement), on the other hand. The terms of this paragraph shall survive the expiration or termination of this Commitment Letter for any reason whatsoever.

Page 3

D.    **Information Requirements**.

You hereby represent and warrant to the Commitment Parties that (a) all written information (other than Projections (as defined below) and information of a general economic or industry specific nature) that has been or will be made available to the Commitment Parties or any of the Lenders or potential Lenders by you or any of your respective representatives (or on your behalf) in connection with the Revolving Facility or any of the Transactions (the "<u>Information</u>"), taken as a whole, is or, in the case of Information made available after the date hereof, will be complete and correct in all material respects and does not or, in the case of Information made available after the date hereof, will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not materially misleading; and (b) the written financial and reserve projections (the "<u>Projections</u>") have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished and at the time made available to the Commitment Parties or any Lender (it being understood that the Projections are subject to significant uncertainties and contingencies, many of which are beyond the control of you and the Sponsors, that actual results during the period or periods covered by any such Projections may differ significantly from the projected results and such differences may be material, and that no assurances can be given that any such Projections will be realized). If, at any time from the date hereof until the earlier of the Closing Date and the Termination Date, any of the representations and warranties in the preceding sentence would be incorrect in any material respect if the information or Projections were being furnished, and such representations and warranties were being made, at such time, then you will promptly supplement the information and the Projections so that such representations and warranties will be correct in all material respects under those circumstances. In issuing this Commitment Letter and providing the commitments set forth herein, the Commitment Parties are relying on the Information and the Projections furnished to them by or on behalf of you, or any of your representatives without responsibility for independent verification thereof.

E.    **Fees; Expenses; Indemnification**.

1.    <u>Fees</u>.    The Company shall pay an administrative fee to the Administrative Agent as set forth in the agency fee letter entered into between the Company and the Administrative Agent in connection herewith (the "<u>Agency Fee Letter</u>").

Additionally, as consideration for the Lenders' providing the commitments under the Revolving Facility, the Company agrees to pay to the Lenders, for their ratable account, upfront fees (the "<u>Upfront Fees</u>") in an amount equal to 0.45% of the portion of its aggregate commitment in respect of the Revolving Facility on the Closing Date. The Upfront Fees will be earned and due and payable in full in cash (or netted against the initial borrowing under the Revolving Facility) on, and subject to the occurrence of, the Closing Date.

You agree that, once paid, the fees or any part thereof payable hereunder shall not be refundable under any circumstances. All fees payable hereunder shall be paid in immediately available funds and shall be in addition to any reimbursement of our out-of-pocket expenses to the extent reimbursable pursuant to this Commitment Letter. The agreements in this paragraph shall survive the closing of the Revolving Facility. The Commitment Parties reserve the right to allocate, in whole or in part, to their respective affiliates certain fees payable to the Commitment Parties hereunder in such manner as the Commitment Parties and their respective affiliates shall agree in their sole discretion. The foregoing fees will not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute you may have.

2.    <u>Expenses</u>.    You hereby agree (a) to pay, or to reimburse the Commitment Parties

reasonably promptly following written demand therefor, all reasonable and documented out-of-pocket costs and expenses incurred by the Commitment Parties and the Administrative Agent (whether incurred before or after the date hereof) in connection with the Revolving Facility, the preparation, negotiation, execution and delivery of the definitive documentation evidencing such Revolving Facility (such documentation, the "Credit Documentation"), this Commitment Letter, any security arrangements in connection therewith and the due diligence therefor and the syndication thereof, including (i) reasonable and documented fees and disbursements of Paul Hastings LLP, Richards, Layton & Finger, PA and, if reasonably necessary, a single local counsel for the Commitment Parties and the Administrative Agent, taken as a whole, in each relevant jurisdiction and (ii) the reasonable and documented fees and out-of-pocket expenses of RPA Advisors, LLC and all other advisors and professionals engaged by the Commitment Parties and the Administrative Agent, in each case reasonably incurred in connection therewith and (b) to pay all reasonable and documented out-of-pocket costs and expenses of the Commitment Parties and the Administrative Agent (including reasonable and documented fees and disbursements of a single counsel (and, if reasonably necessary, a Delaware bankruptcy counsel and, if reasonably necessary, a single local counsel for the Commitment Parties and the Administrative Agent, taken as a whole, in each relevant jurisdiction and, solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction)) incurred in connection with the enforcement of any of its rights and remedies hereunder. You acknowledge that we may receive a benefit, including without limitation, a discount, credit or other accommodation on other matters, from any of such counsel based on the fees such counsel may receive on account of their relationship with us including, without limitation, fees paid pursuant hereto.

3.    Indemnification.  You hereby agree to indemnify and hold harmless the Commitment Parties, the Administrative Agent, their respective affiliates and the respective directors, officers, employees, partners, controlling persons, agents, representatives, legal counsel and successors of each of the foregoing (each, an "Indemnified Person") against, and to reimburse each Indemnified Person promptly upon its written demand for, any losses, claims, damages, liabilities or other expenses (including reasonable fees and disbursements of a single counsel to the Indemnified Persons taken as a whole (and, if reasonably necessary, a single local counsel for all Indemnified Persons taken as a whole in each relevant jurisdiction and, solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected Indemnified Persons similarly situated taken as a whole) and other reasonable out-of-pocket expenses) incurred in connection with this Commitment Letter, the Agency Fee Letter, the Transactions, the Chapter 11 Case, the Revolving Facility or the performance by the parties hereto or thereto of their respective obligations hereunder or thereunder, the use of proceeds thereof or any related transaction, including investigating or defending an investigation, litigation or proceeding related thereto)) (collectively, "Losses"), jointly or severally, to which any such Indemnified Person is subject as a result of (i) any actual or threatened claim, action, suit, litigation, investigation, proceeding or governmental or regulatory action (each, a "Proceeding") relating to the foregoing, (ii) the use of proceeds of the Revolving Facility or (iii) any third party seeking damages, contribution, indemnification, cost recovery, compensation, or injunctive relief relating to the presence, release or threatened release of hazardous materials with respect to the properties of the Company and their respective subsidiaries, and to reimburse each Indemnified Person promptly following written demand for any legal or other expenses incurred in connection with any Proceeding, whether or not such Indemnified Person is a party to any such Proceeding or the Proceeding is brought by a third party or you or any of your affiliates; *provided* that you shall not be liable to an Indemnified Person pursuant to this indemnity for any Losses to the extent that (a) a court having competent jurisdiction shall have determined by a final judgment (not subject to further appeal) that such Loss resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Person (or that of its directors, officers, employees, partners, controlling persons agents, representatives, legal counsel or consultants) (in the case of agents, representatives and consultants, acting on behalf of, or at the express instructions of, such Indemnified Person), (b) a court having competent jurisdiction shall have determined by a final judgment (not subject to further appeal) that such Loss resulted from a material breach of this

Commitment Letter by such Indemnified Person, or (c) such Loss resulted from a dispute among or between Indemnified Persons that did not result directly or indirectly from any act or omission of you or any of your subsidiaries or affiliates (other than any Proceeding against Citi solely in its capacity or in fulfilling its role as Administrative Agent or Lead Arranger or similar role under the Revolving Facility), and, to the extent you have paid any expenses or made any indemnification payments with respect to items covered by clauses (a), (b) or (c) above, you shall be entitled to reimbursement of such amounts from the applicable party whose expenses were paid or who obtained indemnification.  You shall not effect any settlement of any pending or threatened Proceeding in respect of which such Indemnified Person is a party and indemnity has been sought hereunder by such Indemnified Person without the prior written consent of any Indemnified Person affected thereby (such consent not to be unreasonably withheld, conditioned or delayed, except where such settlement contains an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person), unless such settlement (i) includes an unconditional release of such Indemnified Person from all liability  on claims that are the subject matter of such Proceeding in a manner reasonably satisfactory to the Indemnified Person and (ii) does not contain an admission of fault, culpability or a failure to act by or on behalf of such Indemnified Person.  No Indemnified Person seeking indemnification or reimbursement under this Commitment Letter will, without your prior written consent (not to be unreasonably withheld, conditioned or delayed), settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any Proceeding; but if settled with your prior written consent or if there is a judgment by a court of competent jurisdiction in any such Proceeding, you agree to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this paragraph.

No Indemnified Person shall be responsible or liable  for any Losses arising from the use by others of the Information or other materials obtained through electronic, telecommunications or other information transmission systems (absent the bad faith, gross negligence or willful misconduct of such Indemnified Person (or that of its directors, officers, employees, or agents acting on behalf of, or at the express instructions of, such Indemnified Person) as determined by a final judgment (not subject to further appeal) of a court having competent jurisdiction).  Except in the case of damages owing to any Indemnified Person pursuant to the foregoing indemnity, neither any Indemnified Person nor the Company or any of its subsidiaries or affiliates shall be responsible or liable  for any special, indirect, punitive, exemplary or consequential damages that may be alleged as a result of this Commitment Letter, the Agency Fee Letter, the Revolving Facility, the use of proceeds or the Transactions or any related transaction.

In the event that an Indemnified Person is requested or required to appear as a witness in any action brought by or on behalf of or against you or any of your subsidiaries or affiliates in which such Indemnified Person is not named as a defendant, you agree to reimburse such Indemnified Person for all reasonable expenses incurred by it in connection with such Indemnified Person's appearing and preparing to appear as such a witness, including the reasonable fees and expenses of its legal counsel.

On and after the Petition Date, the expense reimbursements and indemnification provisions of this Commitment Letter and the Agency Fee Letter shall, in each case, constitute superpriority administrative expenses under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code (as defined below) in the Chapter 11 Cases with respect to you and certain of your affiliates as debtors-in-possession, to be commenced in the Bankruptcy Court on or about November 8, 2019 (the actual date of commencement of the Chapter 11 Cases, the "Petition Date") without the need to file any motion (other than any motion as may be necessary to obtain the approvals of this Commitment Letter or the Agency Fee Letter, as applicable), application or proof of claim and notwithstanding any administrative claims bar date, and shall be immediately payable in accordance with the terms hereof without further notice or order of the Bankruptcy Court.

Page 6

F.    **Miscellaneous**.

        1.        [Reserved].

        2.        No Third-Party Beneficiaries.   This Commitment Letter is solely for the benefit of the Company, the Commitment Parties and the Indemnified Persons; no provision hereof shall be deemed to confer rights on any other person or entity.

        3.        No Assignment; Amendment.   This Commitment Letter may not be assigned by any party hereto; *provided* that (a) you may assign your respective rights and obligations under this Commitment Letter and the Agency Fee Letter to the reorganized Company after giving effect to the emergence of the Company from the Chapter 11 Cases, (b) any Lender may assign its respective rights and obligations under this Commitment Letter with the Company's prior written consent (not to be unreasonably withheld, conditioned or delayed) (*provided* that no such consent will be required for assignments between Goldman and Goldman Sachs Lending Partners LLC) and (c) any other attempted assignment shall be null and void. All of the obligations of the parties hereunder and all obligations of the Company under the Agency Fee Letter shall be binding upon the successors and permitted assigns of such parties.  This Commitment Letter and the Agency Fee Letter may not be amended or modified except in a writing executed by each of the parties hereto or thereto, as applicable.

        4.        Use of Name and Information.   Subject to your prior review and approval (not to be unreasonably withheld, delayed or conditioned), the Commitment Parties shall be permitted to use information related to the syndication and arrangement of the Revolving Facility in connection with marketing, press releases or other transactional announcements or updates provided to investor or trade publications, including, but not limited to, the placement of "tombstone" advertisements in publications of its choice at its own expense.  You agree that you will permit the Commitment Parties to review and approve (such approval not to be unreasonably withheld, delayed or conditioned) any reference to it or any of its affiliates in connection with the Revolving Facility or the Transactions contained in any press release or similar public disclosure prior to public release.

        5.        Governing Law; Jury Trial; Jurisdiction.   This Commitment Letter will be governed by, and construed in accordance with, the laws of the state of New York and, to the extent applicable, the Bankruptcy Code.

        Each of the Company and the Commitment Parties irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or related to this Commitment Letter, the Agency Fee Letter, the Revolving Facility, the use of proceeds thereof, any of the Transactions or the actions of Citi in the negotiation, performance or enforcement hereof. Each of the Company and the Commitment Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court or any other Federal court having jurisdiction over the Chapter 11 Cases, and, to the extent that the Bankruptcy Court or Federal court do not have jurisdiction, any state court in the State of New York, or any Federal court of the United States of America sitting in the Borough of Manhattan for the purpose of any suit, action or proceeding arising out of or relating to this Commitment Letter, the Agency Fee Letter, the Revolving Facility, the use of proceeds thereof or any of the Transactions and irrevocably agrees that all claims in respect of any such suit, action or proceeding shall be heard and determined in any such court.   Each of the Company and the Commitment Parties irrevocably and unconditionally waives any objection that it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.   A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction the Company or the

Commitment Parties are or may be subject, by suit upon judgment.  Service of any process, summons, notice or document on any party hereto may be made by registered mail addressed to such party at the address appearing at the beginning of this letter for any suit, action or proceeding brought in any such court pursuant to this Commitment Letter.

6.    Survival.  The fees, expenses, indemnification, confidentiality, absence of fiduciary duty, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect regardless of whether the Closing Date shall occur and notwithstanding the termination of this Commitment Letter; *provided* that your obligations under this Commitment Letter other than those relating to confidentiality, shall automatically terminate and be superseded (to the extent covered thereby) by the corresponding provisions of the Revolving Facility upon the occurrence of the Closing Date, and you shall be automatically released from all liability in connection therewith at such time.

7.    Confidentiality.

(a)    You shall not disclose or permit disclosure of this Commitment Letter or the contents hereof to any person or entity (including, without limitation, any Lender), either directly or indirectly, orally or in writing, without the prior consent of the Commitment Parties, except (i) to the Parties (as defined in the RSA), your affiliates and each such parties' respective directors, officers, employees, agents, representatives, legal counsel, consultants and advisors (and the directors, officers, employees, agents, representatives, legal counsel, consultants and advisors of your respective subsidiaries and affiliates), in each case to the extent involved in the Transactions and on a confidential basis, (ii) you may make public disclosures of the terms and conditions hereof to the extent such terms and conditions have become publicly available as a result of disclosures thereof by persons other than you or (iii) as required by law or regulation or requested by any governmental agency or other regulatory authority (in which case you agree, to the extent permitted by law, rule or regulation or such body, to inform the Commitment Parties promptly thereof and to redact the fee amounts contained herein); *provided* that after this Commitment Letter and the Agency Fee Letter have been accepted by you, and upon the commencement of the cases (the "Chapter 11 Cases") under title 11 of the United States Code (the "Bankruptcy Code") by the Company (or any portion thereof), you may (A) disclose this Commitment Letter and the Agency Fee Letter (but after redacting the fees contained herein and therein) to the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), to the extent required to obtain court approval in connection with any acts or obligations to be taken pursuant to this Commitment Letter, the Agency Fee Letter or the Transactions contemplated hereby or thereby, (B) make disclosures as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (C) make disclosures as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided, that prior to any disclosure under this clause (C), the disclosing party agrees to provide the Commitment Parties with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to the Commitment Parties pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule or regulation, (D) make disclosures as may be agreed to in advance in writing by the Commitment Parties (including to an unsecured creditor's committee and its advisors), and (E) make disclosures as requested or as required by any governmental authority pursuant to any subpoena or other legal process; provided, that prior to any disclosure under this clause (E) the disclosing party agrees to provide the Commitment Parties with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to the Commitment Parties pursuant to the terms of the subpoena or other legal process. Notwithstanding anything to the contrary in the foregoing, the parties agree that the fees provided for herein are required to be disclosed with the Bankruptcy Court for purposes of obtaining approval to pay any fees provided for herein and you shall accordingly file a motion or an *ex parte* request pursuant to Sections 105(a) and 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 seeking an order of the Bankruptcy

Page 8

Court authorizing you to file an unredacted copy of this Commitment Letter and the Agency Fee Letter under seal or in a redacted manner in form and substance reasonably satisfactory to the Commitment Parties and, in connection therewith, you may provide an unredacted copy of this Commitment Letter and the Agency Fee Letter to the Bankruptcy Court, the Office of the United States Trustee and advisors to any statutory committees appointed; *provided*, in each case, that the disclosure to such advisors is on a confidential, "professional eyes only" basis.

(b)     The Commitment Parties shall use all confidential information provided to it by or on behalf of you hereunder solely for the purpose of providing the services which are the subject of this Commitment Letter and otherwise in connection with the Transactions and shall treat confidentially all such information; *provided, however*, that nothing herein shall prevent the Commitment Parties from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law, rule or regulation or compulsory legal process (in which case the Commitment Parties agree to inform you promptly thereof prior to such disclosure to the extent permitted by applicable law, rule or regulation), (b) upon the request or demand of any regulatory authority (including self-regulatory authority) having jurisdiction over the Commitment Parties or any of their respective affiliates (in which case the Commitment Parties agree to inform you promptly thereof prior to such disclosure, except with respect to any audit or examination conducted by bank accountants or any governmental authority exercising examination or regulatory authority and unless the Commitment Parties are prohibited by applicable law from, or is requested by such regulatory authority to refrain from, so informing you or except in connection with any request as part of a regulatory examination), (c) to the extent that such information becomes publicly available other than by reason of improper disclosure in violation of this <u>Section 7</u> by the Commitment Parties or any of their respective affiliates, officers, directors, employees, accountants, attorneys and other advisors, (d) to the Commitment Parties' and each of their respective officers, directors, employees, accountants, attorneys and other advisors (collectively "<u>Representatives</u>") who need to know such information in connection with the Transactions and then only on a confidential and "need to know" basis in connection with the transactions contemplated hereby, (e) to any affiliates of the Commitment Parties and their respective Representatives who need to know such information in connection with the Transactions and then only on a confidential and "need to know" basis in connection with the transactions contemplated hereby, (f) to potential or prospective Lenders or participants and their Representatives, in each case who are advised of the confidential nature of such information (*provided,* that any such disclosure shall be made in accordance with the standard syndication or marketing process for the Commitment Parties or customary market standards for dissemination of such type of information), (g) to the extent that such information is received by the Commitment Parties from a third party that is not to the Commitment Parties' knowledge subject to confidentiality obligations to you or the Sponsors, (h) to the extent that such information is independently developed by the Commitment Parties or their respective Representatives, in each case, so long as not based on information obtained in a manner that would otherwise violate this provision, (i) for purposes of establishing a "due diligence" defense, (j) with your prior approval of the information to be disclosed, any such information and (k) to enforce its rights hereunder and under the Agency Fee Letter.  The provisions of this paragraph shall automatically terminate upon the earlier of (i) the execution and delivery of the Credit Documentation and (ii) the first anniversary hereof.

The Commitment Parties reserve the right to employ the services of its affiliates in providing services contemplated by this letter and to allocate, in whole or in part, to such affiliates certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their respective affiliates may agree in their sole discretion (it being understood that each such affiliate shall keep any information given to it in connection with any services it may provide pursuant to this sentence confidential).   You acknowledge that the Commitment Parties may share with any of their respective affiliates, and such affiliates may share with the Commitment Parties, any information related to the Transactions, you, any of

your subsidiaries or any of the matters contemplated hereby solely in connection with the Transactions (it being understood that each such affiliate shall keep such information given to it pursuant to this sentence confidential). The Commitment Parties may, subject to your written prior consent (not to be unreasonably withheld, delayed or conditioned), at its expense, publicly announce as it may choose the capacities in which it or its affiliates have acted hereunder. Any notice given pursuant hereto shall be mailed or hand delivered in writing to you at your address set forth on page one hereof.

8.    No Fiduciary Duty. The Commitment Parties may be full service securities firms and may from time to time effect transactions, for its own or its affiliates' own account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, your affiliates and of other companies that may be the subject of the transactions contemplated by this Commitment Letter. You acknowledge and agree that (a) the agreement with respect to the Revolving Facility by the Commitment Parties pursuant to this Commitment Letter is an arm's-length commercial transaction among you, on the one hand, and the Commitment Parties, on the other, and you are capable of evaluating and understanding, and do understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter; (b) in connection with the transactions contemplated hereby and the process leading to such transactions, the Commitment Parties are and have been acting solely as a principal and not as advisor, agent or fiduciary of the Company, the Company, or their respective affiliates, stockholders, creditors, employees or any other party; (c) the Commitment Parties have not assumed an advisory responsibility or fiduciary duty in favor of the Company or the Company with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether the Commitment Parties have advised or are currently advising the Company or the Company on other matters); (d) the Commitment Parties and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Company, the Company or their respective affiliates, and the Commitment Parties have no obligation to disclose any of such interests by virtue of any fiduciary or advisory relationship as a consequence of this Commitment Letter; and (e) the Commitment Parties have not provided any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby and you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate.

9.    Sharing Information. You acknowledge that the Commitment Parties and their respective affiliates may provide debt financing, equity capital or other services (including financial advisory services) to parties whose interests regarding the transactions described herein or otherwise may conflict with your interests. Consistent with each Commitment Party's policy to hold in confidence the affairs of its clients and except as permitted pursuant to Section 7 above, the Commitment Parties will not furnish confidential information obtained from you or your affiliates to any of its other clients. Furthermore, the Commitment Parties will not use in connection with the transactions contemplated hereby, or furnish to you, confidential information obtained by the Commitment Parties or their respective affiliates from any other person.

10.    Counterparts. This Commitment Letter may be executed in multiple counterparts, and by different parties hereto in any number of separate counterparts, all of which taken together shall constitute one original. Delivery of an executed counterpart of a signature page to this Commitment Letter by telecopier or by electronic transmission (e.g. in pdf form) shall be as effective as delivery of a manually executed counterpart hereof.

11.    Entire Agreement. This letter shall become effective as of the date hereof. This Commitment Letter, the Agency Fee Letter and the RSA embody the entire agreement and understanding among the Commitment Parties, the Company, and their affiliates with respect to the Revolving Facility and supersede all prior understandings and agreements among the parties relating to the subject matter hereof.

Page 10

12.     <u>PATRIOT Act; Beneficial Ownership Regulation</u>.  The Commitment Parties hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "<u>PATRIOT Act</u>") and the requirements of 31 C.F.R. §1010.230 (the "<u>Beneficial Ownership Regulation</u>"), it and its affiliates are required to obtain, verify and record information that identifies you and each guarantor, which information includes the name, address, tax identification number and other information regarding you and each guarantor that will allow the Lead Arranger, the Administrative Agent and the Lenders to identify you and each guarantor in accordance with the PATRIOT Act and the Beneficial Ownership Regulation.  This notice is given in accordance with the requirements of the PATRIOT Act and 31 C.F.R. § 1010.230 and is effective for the Lead Arranger, the Administrative Agent, each Lender and their respective affiliates.  In addition to the foregoing, you shall, promptly upon the request by any Commitment Party, deliver to such Commitment Party all documentation and other information reasonably requested by any Commitment Party or the Administrative Agent under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

*[Remainder of page intentionally left blank; signature pages follow]*

# **EXHIBIT A**

## **Term Sheet**

**Execution Version**

CONFIDENTIAL

## ARSENAL RESOURCES DEVELOPMENT LLC

EXIT REVOLVING FACILITY

Summary of Principal Terms and Conditions

_____

Set forth below is a statement of the principal indicative terms and conditions for the exit revolving loan facility to be made available to the Borrower (as defined below) and used as described under "Purpose and Availability".   It does not purport to summarize all terms of the Credit Documentation (as defined below).

## I. Parties and Transactions

| | |
|---|---|
| Borrower: | Arsenal Resources Development LLC, a Delaware limited liability company (the "Borrower"), a direct wholly-owned subsidiary of Arsenal Resource Development Holdings 1, LLC ("Holdings"). |
| Pre-Petition RBL Credit Agreement: | That certain Credit Agreement, dated as of December 21, 2018, among the Borrower, as the borrower thereunder, the lenders party thereto, and Citibank, N.A., as administrative agent (as amended, modified, refinanced and/or restated prior to the date hereof, the "Pre-Petition RBL Credit Agreement"). |
| Existing DIP Credit Agreement: | That certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated on or around the Petition Date, among the Borrower, as the borrower thereunder, the lenders party thereto, and Citibank, N.A., as administrative agent (as amended, modified, refinanced and/or restated prior to the date hereof, the "Existing DIP Credit Agreement"). |
| Transactions: | In connection with the Restructuring Transactions (as defined in the Restructuring Support Agreement to which this Exit Revolving Facility Summary of Principal Terms and Conditions is attached (the "RSA")), the Borrower intends, among other things, that on the Plan Effective Date (as such term is defined in the RSA): |

(a) the Borrower will obtain the Revolving Facility described herein;

(b) (i) all existing indebtedness of the Borrower under the Existing DIP Credit Agreement will be refinanced or repaid in full, all commitments in respect thereof terminated, and all security and guaranties in respect thereof discharged and released and (ii) all existing indebtedness of the Borrower under the Pre-Petition RBL Credit Agreement will be refinanced or repaid in full, all commitments in respect thereof terminated, and all security and guaranties in respect thereof discharged and released (clauses (i) and (ii), collectively, the "Refinancing");

1

(c) (i) Holdings will issue the Class A Units and the Borrower will receive the proceeds of the New Capital Commitment (as defined in the Restructuring Term Sheet), in each case, in accordance with the terms of the New Equity Term Sheet (as defined in the RSA) and (ii) all indebtedness under the Term Loans and the Seller Notes (each as defined in the RSA) shall be cancelled and extinguished; and

(d) the Borrower shall pay the fees and expenses in connection with the foregoing (the "Transaction Costs").

The foregoing transactions (including payment of the Transaction Costs) are collectively referred to herein as the "Transactions".

| | |
|---|---|
| Guarantors: | Holdings and each of the Borrower's existing and subsequently acquired or organized direct and indirect wholly-owned domestic material restricted subsidiaries (other than any unrestricted subsidiaries, captive insurance companies and not-for-profit subsidiaries) (the "Guarantors"; the Guarantors and the Borrower, the "Credit Parties") shall unconditionally guarantee, on a joint and several basis (the "Guarantees"), all obligations of the Credit Parties (the "Obligations") under (a) the Revolving Facility and (b) each interest rate or commodity price protection or other hedging arrangements and cash management agreements entered into (i) with a Lender (as defined below) or an agent under the Revolving Facility or any affiliate of a Lender or agent under the Revolving Facility at the time of the entering into of such arrangements or (ii) prior to the Closing Date (as defined in the Commitment Letter) with a person that on the Closing Date becomes a Lender or an agent under the Revolving Facility, or an affiliate thereof, in each case. to the extent otherwise permitted by applicable law, regulation and, to the extent existing on the Closing Date (or applicable acquisition date), contractual provisions and to the extent such guarantee would not result in material adverse tax consequences as reasonably determined by the Borrower. |
| Lead Arranger and Bookrunner: | Citi (as defined below) (the "Arranger"). |
| | "Citi" shall mean Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the Transactions contemplated hereby. |
| Administrative Agent: | Citi (in its capacity as administrative agent, the "Administrative Agent"). |
| Lenders: | As set forth in the commitment letter (the "Commitment Letter") to which this Summary of Principal Terms and Conditions is attached (such lenders, the "Lenders"). |

| | |
|---|---|
| Majority Lenders: | Lenders holding more than 50.0% of the aggregate amount of the Loans (as defined below) and participations in Letters of Credit (as defined below) and unused Commitments (as defined below) under the Revolving Facility (the "Majority Lenders"). |
| Required Lenders: | Lenders holding not less than 66.67% of the aggregate amount of the Loans and participations in Letters of Credit and unused Commitments under the Revolving Facility (the "Required Lenders"). |

## II. Facility

| | |
|---|---|
| Exit Revolving Facility: | A senior secured first lien reserve-based revolving credit facility (the "Revolving Facility"; the definitive financing documentation with respect thereto, subject to the Documentation Principles (as defined below), the "Credit Documentation") having a maximum aggregate credit amount of $200.0 million (the commitments under Revolving Facility, which are subject to the Borrowing Base (as defined below) then in effect, the "Commitments"; the loans thereunder, the "Loans"). |
| Initial Borrowing Base: | The Borrowing Base shall be $130.0 million on the Closing Date until the completion of the Initial Redetermination, subject to any permitted interim redetermination and any required interim adjustments to the Borrowing Base, in each case, as more fully set forth herein; provided that no interim redeterminations will occur prior to the completion of the Initial Redetermination. |
| Closing Date: | The date of the consummation of the Refinancing and the satisfaction or waiver of the Initial Conditions (the "Closing Date"). |
| Maturity Date: | The Revolving Facility will mature, and lending Commitments will terminate, on April 1, 2023 (the "Maturity Date"). |
| | The Credit Documentation shall provide the right for individual Lenders under the Revolving Facility to agree to extend the maturity date of their outstanding Loans upon the request of the Borrower and without the consent of any other Lender (it being understood that each Lender under the tranche that is being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other Lender under such tranche). |
| Ranking: | The Revolving Facility will be senior secured on a first priority basis with the Collateral (as defined below). |
| Purpose and Availability: | The proceeds of Loans will be used by the Borrower (i) for the Refinancing and (ii) for working capital and other general corporate purposes (which may include consummating the Transactions and paying transaction costs, fees and expenses in |

3

connection therewith). Subject to the Borrowing Base then in effect and satisfaction of the conditions precedent set forth herein, Loans will be available on and after the Closing Date and at any time before the final maturity of the Revolving Facility, in minimum principal amounts as set forth in the Credit Documentation. Amounts repaid under the Revolving Facility may be reborrowed.

Extensions of credit under the Revolving Facility will be available in an amount equal to the lesser of (x) the Commitments and (y) the then-applicable Borrowing Base at such time, in each case, after giving effect to all outstanding borrowings of Loans, unreimbursed Letter of Credit drawings and outstanding Letters of Credit thereunder.

Borrowing Base:                The borrowing base (the "<u>Borrowing Base</u>") shall be the loan value to be assigned to the proved reserves attributable to the Borrower's and the Guarantors' oil and gas properties located in the United States (the "<u>Borrowing Base Properties</u>"). The Borrowing Base will be redetermined on a semi-annual basis, with the parties having the right to interim unscheduled redeterminations as described below. Scheduled Borrowing Base redeterminations will be on a semi-annual basis on or about April 1st and October 1st, based upon a reserve report evaluating such proved reserves as of the immediately preceding January 1st and July 1st, respectively; <u>provided</u> that the initial redetermination of the Borrowing Base following the Closing Date shall occur on or about the earlier of (i) the first anniversary of the Closing Date and (ii) April 1, 2021 (the "<u>Initial Redetermination</u>"). The January 1st reserve report will be prepared by certain approved petroleum engineering firms as set forth in the Credit Documentation or other independent petroleum engineering firms reasonably acceptable to the Administrative Agent and such reserve report will be accompanied by a 12-month cash flow and capital expenditure forecast, and the July 1st reserve report will be prepared internally by the Borrower in a form reasonably acceptable to the Administrative Agent.

Based in part on the reserve report, the Administrative Agent shall, within 15 days after receipt of such report (or such later date, within 30 days thereof, as the Borrower and Administrative Agent may agree), make an initial determination of the Borrowing Base and promptly notify the Lenders and the Borrower of such determination. Within 15 days after receipt of such proposed amounts, each Lender will, in good faith in accordance with its customary oil and gas lending criteria as its exists at such time, approve or reject the Administrative Agent's initial determination of the Borrowing Base. In the case of any decreases in, or reaffirmations of, the Borrowing Base, if at the end of such 15-day period, any Lender has not communicated its

approval or disapproval in writing to the Administrative Agent, it shall be deemed to have approved the Administrative Agent's initial determination of the Borrowing Base, unless the Administrative Agent and Borrower otherwise agree. Any increase in the Borrowing Base shall require (a) the consent of all Lenders, each acting in good faith in accordance with its customary oil and gas lending criteria as it exists at such time and (b) the consent of the Borrower. The consent of the Required Lenders, each acting in good faith in accordance with its customary oil and gas lending criteria as it exists at such time, will be required for decreases in, or reaffirmations of, the Borrowing Base; provided that the Borrower on any redetermination date may elect to reduce the Borrowing Base.

Following the completion of the Initial Redetermination, the Borrower may request two additional unscheduled Borrowing Base redeterminations during any calendar year and the Administrative Agent, at the request of the Required Lenders, may request two additional unscheduled Borrowing Base redeterminations during any calendar year. The Borrower shall also have the right to request customary additional interim redeterminations in connection with material acquisitions as set forth in the Credit Documentation.

In addition to the foregoing, the Borrowing Base will be subject to interim adjustments in connection with (subject to certain customary exceptions as set forth in the Credit Documentation):

(a) the incurrence of unsecured or subordinated debt and junior lien debt;

(b) the termination of hedging arrangements;

(c) sales of oil and gas properties, including, without limitation, the pipeline assets owned by or equity interest in Midstream (as defined below) (such interim adjustments pursuant to clauses (a), (b) and (c), collectively, the "Specified Interim Borrowing Base Adjustments"); and

(d) unresolved title deficiencies on the oil and gas properties evaluated in the most recent reserve report to the extent such title information is required to be provided pursuant to the "Title Information" Affirmative Covenant.

The thresholds for Borrowing Base adjustments in connection with clauses (b) and (c) above will be set at 5.0% of the Borrowing Base in the aggregate for all such events, determined from the later of the most recent scheduled redetermination date and the last date of any such adjustments of the Borrowing Base (and in the case of clause (b), giving effect to any hedging arrangements executed during such period, including those executed substantially concurrently with the taking of any such

action); <u>provided</u> that in the case of any adjustment pursuant to <u>clause (c)</u> above, the Borrower shall have the right (but not the obligation) to provide updated reserve engineering to be considered in connection with such adjustment.

The Borrowing Base adjustment in connection with clause (a) above, will (i) in the case of any such incurrence of unsecured, subordinated or junior lien debt prior to the completion of the Initial Redetermination, reduce the Borrowing Base by an amount equal to the product of 1.0 multiplied by the stated principal amount of such unsecured, subordinated or junior lien debt and (ii) in the case of any such incurrence of unsecured, subordination or junior lien debt from and after the completion of the Initial Redetermination, reduce the Borrowing Base by an amount equal to the product of 0.25 multiplied by the stated principal amount of such unsecured, subordinated debt and junior lien debt.

| | |
|---|---|
| <u>Letters of Credit</u>: | Up to $10.0 million of the Revolving Facility shall be available for the issuance of letters of credit (the "<u>Letters of Credit</u>") by Citi and one or more Revolving Lenders that agree to serve in the capacity as an issuing bank (in such capacity, each an "<u>Issuing Lender</u>"); <u>provided</u>, <u>however</u>, the fronting exposure in respect of Letters of Credit shall be borne by each Issuing Lender on a *pro rata* basis. No Letter of Credit shall have an expiration date after the earlier of (a) one (1) year (or eighteen (18) months with respect to Letters of Credit issued for the benefit of the Texas Railroad Commission) or such longer period as the Issuing Lender may agree after the date of issuance and (b) five (5) business days prior to the final maturity of the Revolving Facility; <u>provided</u> that any Letter of Credit with a one-year (or eighteen (18) months, with respect to Letters of Credit issued for the benefit of the Texas Railroad Commission) tenor may provide for the renewal thereof for additional one-year or eighteen month, as applicable, periods or such longer periods as the Issuing Lender may agree (which shall in no event extend beyond the date referred to in <u>clause (b)</u> above, except to the extent the applicable Letter of Credit is cash collateralized or backstopped in a manner reasonably acceptable to the applicable Issuing Lender). |

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Loans (with any borrowings of Loans for such purpose not being subject to the conditions to borrowing)), within one business day. To the extent that the Borrower does not so reimburse the Issuing Lender within one business day, the Lenders under the Revolving Facility shall be irrevocably and unconditionally obligated to reimburse the Issuing Lender on a *pro rata* basis based on their respective Commitments.

Interest Rates and Fees:    As set forth on <u>Annex I</u> hereto.

**III. <u>Collateral</u>**

<u>Security</u>:    The Obligations and Guarantees shall, subject to the exceptions set forth in the Credit Documentation, be ratably secured, subject to permitted liens, by a perfected first priority lien on the assets as described below (the "<u>Collateral</u>"):

- A perfected pledge of all the capital stock directly held by the Borrower or any Guarantor in (a) any wholly-owned restricted subsidiary (which pledge, in the case of the capital stock of any foreign subsidiary of a U.S. entity or of a U.S. entity substantially all of whose assets consist of capital stock and/or indebtedness of one or more foreign subsidiaries and any other assets incidental thereto, shall be limited to 65% of the voting stock and 100% of the non-voting stock of such foreign subsidiary or such U.S. entity, as the case may be) and (b) Arsenal Midstream LLC ("<u>Midstream</u>");

- A first priority, perfected lien on the Borrowing Base Properties comprising not less than 90.0% of with respect to proved reserves, the PV-10 of the oil and gas properties evaluated in the most recently completed reserve report delivered to the Administrative Agent and after giving effect to exploration and production activities, acquisitions, dispositions and production;

- A first priority, perfected lien and security interest on deposit accounts, securities accounts and commodities accounts of the Borrower and the Guarantors in a manner consistent with the Pre-Petition RBL Credit Agreement;

- A first priority, perfected lien and security interest on substantially all hedging agreements of the Borrower and the Guarantors; and

- A first priority, perfected lien and security interest on (a) substantially all other personal property (including, without limitation, property of Midstream, general intangibles, accounts, investment property and intellectual property (including, but not limited to, such assets and property related to the Borrowing Base Properties)) of the Borrower and the Guarantors and (b) all pipelines owned by Midstream.

The Borrower shall provide title information (including customary title opinions or reports or other documents) consistent with usual and customary standards for the

geographic regions in which the Borrowing Base Properties are located, taking into account the size, scope and number of leases and wells of the Borrower and the Guarantors, in respect of at least 90.0% of the aggregate net present value of the Borrowing Base Properties (the "Title Diligence Obligation").

Notwithstanding anything to the contrary, the Collateral shall not include (a) those assets as to which the Administrative Agent shall determine in its reasonable discretion that the costs of obtaining such security interest are excessive in relation to the value of the security to be afforded thereby and (b) those assets over which the granting of security interests in such assets would be prohibited by contract (to the extent existing on the Closing Date or upon the acquisition of a subsidiary, and in each case, not in contemplation thereof), applicable law or regulation or the organizational documents of any non-wholly owned subsidiary (including permitted liens, leases and licenses) (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code), or to the extent that such security interests or the granting thereof would result in material adverse tax consequences as reasonably determined by the Borrower. The Borrower and its restricted subsidiaries will not be required to take any action with respect to the perfection of security interests in motor vehicles or other assets subject to certificates of title.

Notwithstanding anything to the contrary in the foregoing, no actions in any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. or to perfect any security interests in such assets, including any intellectual property registered in any non-U.S. jurisdiction (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction).

## IV.  Certain Payment Provisions

Optional Prepayments and Reductions in Commitments:

Optional prepayments of borrowings under the Revolving Facility, and optional reductions of the unutilized portion of the Commitments, will be permitted at any time, in minimum principal amounts as set forth in the Credit Documentation, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period.

Mandatory Prepayments:

If, between scheduled Borrowing Base determinations, there occurs a Specified Interim Borrowing Base Adjustment, the Borrower shall eliminate any Borrowing Base Deficiency (as defined below) resulting from such adjustment on the third business day after the Required Lenders determine the

8

appropriate adjustment to the Borrowing Base and the Borrower receives the proceeds associated with such Specified Interim Borrowing Base Adjustment.  In addition to the foregoing, in the event the Borrower or any of its restricted subsidiaries incurs junior lien, unsecured or subordinated indebtedness prior to the completion of the Initial Redetermination, 100% of the net cash proceeds of any such incurrence of indebtedness shall be required to be applied to repay the Loans and permanently reduce the Commitments pro rata among the Lenders on a dollar-for-dollar basis within one business day of the incurrence thereof.

Other than the prepayments set forth above, if the Borrowing Base or Commitments at any time are less than the outstanding principal balance of the Revolving Facility (including the aggregate amount of all issued and outstanding Letters of Credit (including all unreimbursed disbursements on any Letter of Credit but excluding all Letters of Credit that have been cash collateralized or backstopped in a manner reasonably satisfactory to the Issuing Lender)) (a "<u>Borrowing Base Deficiency</u>"), the Borrower will eliminate such deficiency by one or a combination of the following methods and, within 10 business days after being notified of the deficiency, indicate by written notice to the Administrative Agent, its election to do one or a combination of the following:

(i)     prepay such Borrowing Base Deficiency within 30 days of such election;

(ii)    prepay such Borrowing Base Deficiency in six equal consecutive monthly installments (with the first installment to occur 30 days after the Borrower receives notice of such Borrowing Base Deficiency) and, in connection therewith, dedicate a sufficient amount of monthly cash flow from the oil and gas properties of the Borrower to satisfy such payments;

(iii)   provide new reserve and engineering reports (and, to the extent necessary to satisfy mortgage coverage requirements, perfected security interests) on properties not evaluated previously, the value of which shall be sufficient to cover such Borrowing Base Deficiency (or remaining portion thereof), and otherwise reasonably acceptable to the Administrative Agent, within 30 days of such election; or

(iv)    a combination of the foregoing options (i), (ii) and (iii) sufficient to eliminate such Borrowing Base Deficiency.

Except as expressly set forth above, any mandatory prepayment made by the Borrower shall not require or trigger a reduction of the Commitments under the Revolving Facility.

Application of Prepayments:

All optional prepayments applicable to the Revolving Facility shall be applied to the Loans of each Lender on a *pro rata* basis.

## V. Certain Conditions

Conditions Precedent to the Closing Date:

The availability of the initial borrowing under the Revolving Facility on the Closing Date shall be conditioned only upon satisfaction or waiver of the conditions set forth in Exhibit B (such requirements, the "Initial Conditions").

Conditions Precedent to Borrowings after the Closing Date:

Conditions precedent to each borrowing or issuance under the Revolving Facility will be (a) the absence of any default or event of default at the time of such borrowing, (b) the accuracy in all material respects of all representations and warranties and (c) the delivery of a borrowing notice.

## VI. Documentation

Documentation Principles:

The Credit Documentation shall be negotiated in good faith and shall contain only those conditions, mandatory prepayments, prepayment premiums (if any), representations, warranties, covenants and events of default expressly set forth in this Summary of Principal Terms and Conditions (applicable to Holdings, the Borrower and each of its restricted subsidiaries, as applicable) and, except as set forth herein, those terms and conditions usual for facilities and transactions of this type and which will be based on, and give due regard to, the Pre-Petition RBL Credit Agreement and related credit documentation, in each case, as modified to reflect the Transactions and the terms and conditions set forth herein or as otherwise mutually agreed and with standards, limitations, qualifications, thresholds, exceptions, "baskets" and grace and cure periods and other changes necessary to be agreed upon in order to take into account (i) the Plan, (ii) the post-bankruptcy business, operational and strategic requirements of Holdings, the Borrower and its subsidiaries in light of their capitalization, size, geographic location and business industries and practices and (iii) the Borrower's proposed business plan and financial model after giving effect to the Transactions; provided that, except as expressly set forth herein, prior to the completion of the Initial Redetermination, the thresholds, exceptions and baskets shall be set as if a Restructuring Completion Date under the Pre-Petition RBL Credit Agreement had not occurred. The principles set forth in this paragraph are referred to as the "Documentation Principles".

## VII. Certain Documentation Matters

| | |
|---|---|
| <u>Representations and Warranties</u>: | Limited to the following representations and warranties (to be applicable to Holdings (in certain customary cases), the Borrower and its restricted subsidiaries): |

1. Organization; Powers.

2. Authority; Enforceability.

3. Approvals; No Conflicts.

4. Financial Condition; No Material Adverse Change.

5. Litigation.

6. Environmental Matters.

7. Compliance with Laws.

8. Investment Company Act.

9. Taxes.

10. ERISA.

11. Disclosure; No Material Misstatements.

12. Subsidiaries.

13. Location of Business and Offices.

14. Properties; Maintenance of Properties; Title; Etc.

15. Gas Imbalances, Prepayments.

16. Marketing of Production.

17. Swap Agreements.

18. Use of Loans and Letters of Credit.

19. Solvency.

| | |
|---|---|
| <u>Affirmative Covenants</u>: | Limited to the following affirmative covenants (to be applicable to Holdings (in certain customary cases), the Borrower and its restricted subsidiaries): |

1. Financial Statements of the Borrower and its restricted subsidiaries; Other Information.

2. Notice of Material Events.

3.    Existence; Conduct of Business.

4.    Payment of Tax Obligations.

5.    Operation and Maintenance of Properties.

6.    Insurance.

7.    Books and Records; Inspection Rights.

8.    Compliance with Laws.

9.    Environmental Matters.

10.    Further Assurances.

11.    Reserve Reports.

12.    Compliance with the Title Diligence Obligation.

13.    Additional Collateral; Additional Guarantors.

14.    ERISA Compliance.

15.    Swap Agreements.

16.    Marketing Activities.

17.    Unrestricted Subsidiaries; Designation and Re-Designation.

18.    On or prior to the date that is thirty (30) days after the Closing Date (subject to extension (i) by the Administrative Agent as may be reasonably agreed or (ii) for a period to be agreed in the event that the counterparties to the hedge agreements are unable to hedge within such initial time period), the Borrower shall have entered into hedge agreements that are reasonably satisfactory to the Administrative Agent (it being understood that hedge agreements which are substantially similar to the hedge agreements existing pursuant to the Pre-Petition RBL Credit Agreement shall be deemed to be reasonably satisfactory to the Administrative Agent), in each case, for notional volumes equaling at least 80% of the reasonably anticipated hydrocarbon production from the Credit Parties' total proved developed producing reserves (as such production is projected by the most recently delivered reserve report) for a period of at least 12 months following the Closing Date.

Negative Covenants:    Limited to the following negative covenants (to be applicable to Holdings (in the case of the passive holdings covenant set forth below), the Borrower and its restricted subsidiaries):

1.    Debt (provided that there shall be a debt basket for the incurrence of any unsecured, subordinated and/or junior lien debt, subject to (i) the Borrowing Base adjustment and mandatory prepayment provisions set forth herein, (ii) there being no default or event of default at the time of any such incurrence and (iii) compliance with the Financial Covenants (set forth below) calculated on a pro forma basis).

2.    Liens.

3.    Dividends, Distributions and Redemptions (which covenant shall include a basket exception for, among other things, (a) customary tax and overhead payment distributions to the extent (i) attributable to Holdings' ownership of the Borrower and its subsidiaries or (ii) relating to ordinary course Holdings operating expenses, but limited, in the case of this clause (ii) to an amount to be agreed, and (b) following the completion of the Initial Redetermination, a restricted payments basket for dividends, distributions on or redemptions of capital stock and unsecured or subordinated debt or junior lien debt, subject to (i) there being no default or event of default, (ii) the Borrower having available, undrawn Commitments, calculated on a pro forma basis, equal to or greater than 17.5% of the then-effective Borrowing Base, (iii) compliance with a Consolidated Total Net Leverage Ratio (as defined below) of less than 2.75:1.00, calculated on a pro forma basis, and (iv) there being no Borrowing Base Deficiency after giving effect to such dividends, distributions or redemptions (the "Restricted Payment Conditions").

4.    Investments, Loans and Advances; provided that, following the completion of the Initial Redetermination, there shall be an investment basket for investments, loans and advances, subject to the Restricted Payments Conditions.

5.    Nature of Business; International Operations.

6.    Limitation on Operating Leases.

7.    Mergers, Etc.

8.    Sale of Properties.

9.      Transactions with Affiliates.

10.     No Foreign Subsidiaries.

11.     Negative Pledge Agreements; Dividend Restrictions.

12.     Gas Imbalances; Take-or-Pay or Other Prepayments.

13.     Swap Agreements (it being understood that the Borrower and its restricted subsidiaries shall be permitted to enter into (a) hedging arrangements with respect to notional volumes not to exceed 85% of the reasonably anticipated hydrocarbon production of its and its restricted subsidiaries' proved reserves for a period not exceeding 60 months from the date of entry into any such hedging arrangement, where compliance with such threshold shall be determined as of the date the latest such hedging arrangement is entered into based on the most recently delivered reserve reports, subject to updates, (b) hedge interest rate risk in a manner that is not speculative in nature and (c) incremental hedging arrangements in respect of reasonably anticipated projected production from oil and gas properties to be acquired not to exceed 15% of the reasonably anticipated hydrocarbon production of the Borrower and its restricted subsidiaries prior to such acquisition (based on the most recently delivered reserve report) for a period not exceeding 36 months from the date any such incremental hedging arrangement is created, during the period from (i) the date on which the Borrower or a restricted subsidiary signs a definitive acquisition agreement in connection with such acquisition to (ii) the earliest of (A) the date such acquisition is consummated, (B) the date such acquisition is terminated and (C) 90 days after such definitive acquisition agreement was executed (or such longer period as to which the Administrative Agent may agree)). It is understood that the foregoing limitations on the amount of commodity hedges that may be put in place shall not restrict the ability of the Borrower and its subsidiaries to enter into puts, floors and basis differential swaps.

14.     Passive nature of Holdings.

<u>Unrestricted Subsidiaries</u>:     The Credit Documentation will contain provisions pursuant to which, subject to customary pro forma compliance with the Borrowing Base (and subject to limitations on investments, loans, advances to, and other investments in unrestricted subsidiaries as described in the immediately following proviso), the Borrower will be permitted to designate, subject to compliance with the investment covenant, any existing or

14

subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary; provided that the applicable investment basket for the designation of such unrestricted subsidiaries shall (i) only be available following the Initial Redetermination, (ii) be capped at an amount to be agreed upon and (iii) in any case subject to the Restricted Payment Conditions. Unrestricted subsidiaries will not be subject to the representations and warranties, affirmative or negative covenants or event of default provisions of the Credit Documentation and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of determining any financial ratio or covenant contained in the Credit Documentation and assets of unrestricted subsidiaries will not be included in the Borrowing Base.

<u>Financial Covenants</u>:

1.    Maximum Consolidated Total Net Leverage Ratio for the Borrower and its restricted subsidiaries of 3.75:1.00 (the "<u>Leverage Ratio</u>"), with testing to be done quarterly (on a rolling four quarter basis) commencing with the first fiscal quarter ending after the Closing Date.

Subject to the Documentation Principles, Consolidated Total Net Leverage Ratio (and the financial definitions included therein) will be defined in the Credit Documentation to be the ratio of total net debt to consolidated adjusted EBITDAX (but which shall, in any event (i) be calculated net of up to $25.0 million of unrestricted cash and cash equivalents of the Credit Parties as of the Closing Date, subject to step-ups of $5.0 million for every $50 million increase in the Borrowing Base and (ii) include the maximum face amount of all issued and outstanding letters of credit that are not cash collateralized in the calculation of consolidated indebtedness); provided that (a) fees, expenses and other restructuring transaction costs which are incurred through the date that is 120 days following the Closing Date, in connection with the Transactions, the Chapter 11 Cases (as defined in the RSA) and the other transactions contemplated hereby or thereby and other non-recurring costs and expenses and (b) certain expenses attributable to Arsenal Water LLC from the provision of water services to the Borrower and its restricted subsidiaries, will each be permitted to be added back when calculating consolidated adjusted EBITDAX.

For purposes of calculating the Consolidated Total Net Leverage Ratio, (A) for the first full fiscal quarter ending after the Closing Date, consolidated adjusted EBITDAX shall be calculated by multiplying consolidated adjusted EBITDAX for such fiscal quarter by 4, (B) for the period of the first two full fiscal quarters ending after the Closing Date, consolidated adjusted EBITDAX shall be calculated by multiplying consolidated adjusted EBITDAX for such two fiscal quarters by 2, and (C) for the

period of the first three full fiscal quarters ending after the Closing Date, consolidated adjusted EBITDAX shall be calculated by multiplying consolidated adjusted EBITDAX for such three fiscal quarters by 4/3.

2.      Minimum Current Ratio (and the financial definitions included therein) will be defined in the Credit Documentation (subject to the Documentation Principles) to be the ratio of consolidated current assets to consolidated current liabilities of not less than 1.00:1.00, with testing to be done quarterly (on a rolling four quarter basis) commencing with the first fiscal quarter ending after the Closing Date.

3.      The PV-10 of the oil and gas properties constituting proved developed producing reserves (as evaluated in the most recently completed reserve report delivered to the Administrative Agent and after giving effect to exploration and production activities, acquisitions, dispositions and production) shall be no less than 1.50x total funded indebtedness (net of cash equivalents) of the Borrower, with testing to be done quarterly (on a rolling four quarter basis) commencing with the first fiscal quarter ending after the Closing Date and ending upon the occurrence of the Initial Redetermination (it being understood that such covenant shall not be required to be tested from and after the date of the Initial Redetermination).

4.      Liquidity (to be defined in a manner consistent with the Documentation Principles) shall not, at any time, be less than $10.0 million.

For purposes of determining compliance with the foregoing financial covenants, any equity contribution (which equity shall be common equity or other qualified equity interests on terms and conditions reasonably acceptable to the Administrative Agent) made, directly or indirectly, to the Borrower after the last day of a fiscal quarter and on or prior to the day that is 12 business days after the day on which financial statements are required to be delivered for such applicable fiscal quarter (or, solely in the case of the Liquidity covenant set forth above, within five business days after the breach thereof), will, at the request of the Borrower, be included in the calculation of EBITDAX, and current assets and/or Liquidity, as applicable, for the purposes of determining compliance with the applicable financial covenants (any such equity contribution so included in the calculation of one or more financial covenants, a "Specified Equity Contribution"); provided that (a) in each four fiscal quarter period, there shall be at least two fiscal quarters in which no Specified Equity Contribution is made, (b) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Borrower and its subsidiaries to be in pro forma compliance with the financial covenants, (c) there

16

shall be no more than four Specified Equity Contributions during the life of the Revolving Facility, (d) all Specified Equity Contributions shall be disregarded for all purposes under the Credit Documentation other than for determining compliance with the financial covenants and (e) there shall be no pro forma reduction of indebtedness in connection with such Specified Equity Contribution for the fiscal quarter with respect to which such Specified Equity Contribution was made.

Events of Default:

While continuing, limited to the following Events of Default:

1.    Failure to pay principal when due.

2.    Failure to pay any reimbursement obligation, interest, fees or any other amount when due, subject to a five (5) day grace period.

3.    Representations and warranties materially incorrect when given.

4.    Failure to comply with negative covenants, certain hedging obligations set forth in the Credit Documentation, maintain the Borrower's existence or deliver notice of a default or event of default and certain information about the Credit Parties (with cure periods as set forth in the Credit Documentation).

5.    Failure to comply with other provisions (with notice and cure periods as set forth in the Credit Documentation).

6.    Cross-acceleration and cross-default to debt aggregating the greater of (a) $10.0 million and (b) 7.5% of the Borrowing Base by the Borrower or any of its significant subsidiaries (or a group of the Borrower's restricted subsidiaries that taken as a whole would constitute a significant subsidiary of the Borrower).

7.    Bankruptcy or insolvency with respect to Holdings, the Borrower or any of its significant subsidiaries (or a group of the Borrower's restricted subsidiaries that taken as a whole would constitute a significant subsidiary of the Borrower).

8.    Failure of Holdings, the Borrower or any of its significant subsidiaries (or a group of the Borrower's restricted subsidiaries that taken as a whole would constitute a significant subsidiary of the Borrower) to pay final and non-appealable judgments aggregating in excess of the greater of (a) $10.0 million and (b) 7.5% of the Borrowing Base.

9.   Credit Documentation ceases to be valid and enforceable or create a valid and perfected lien except as permitted or due any action or omission by the Administrative Agent.

10.  Change of Control (to be defined in a manner to be reasonably agreed).

11.  ERISA.

12.  Certain matters relating to Holdings.

<u>Voting:</u>

Amendments and waivers of the Credit Documentation will require the approval of the Majority Lenders, except that (a) the consent of each directly and adversely affected Lender shall be required with respect to: (i) increases in Commitments, (ii) reductions of principal, interest or fees, (iii) extensions of scheduled amortization, final maturity or other payment dates, (iv) releases of all or substantially all of the Collateral (other than in connection with any permitted sale of the Collateral) or Guarantees (other than in connection with a release or sale of the relevant Guarantor permitted by the Credit Documentation) and (v) changes to the Required Lender and Majority Lender definitions and the amendment provisions of the Credit Documentation and (b) the consent of the Required Lenders shall be required with respect to any redetermination which does not increase the Borrowing Base and the consent of all Lenders shall be required with respect to any redetermination which increases the Borrowing Base (it being understood that (x) a scheduled redetermination or the delivery of a reserve report may be postponed with the consent of the Majority Lenders and (y) the Commitments of a Lender may not be increased without its written consent). The Administrative Agent and the Borrower may agree to amend, modify or supplement the Credit Documentation from time to time, without the consent of any Lender or the Majority Lenders, as may be necessary to correct, amend, cure or resolve any ambiguity, omission, defect, typographical error, inconsistency or other manifest error therein, add collateral or otherwise enhance the rights and benefits of the Lenders, make administrative or operational changes not adverse to any Lender or adhere to local law or to the reasonable advice of local counsel.

For avoidance of doubt: (a) amendments and waivers of the financial covenants (or any of financial definitions included in (and for purposes of) the financial covenants) will require only the consent of the Majority Lenders and (b) the Credit Documentation may be amended in order to modify any provision relating to *pro rata* sharing of payments among the Lenders (and, in any case, any provision requiring *pro rata*

payments or sharing of payments in connection with "amend and extend" transactions) with the consent of the Majority Lenders.

In the event a prohibited lender becomes a Lender or participant despite the restrictions in the Credit Documentation preventing such occurrence, the voting and other rights of such prohibited lender shall be limited as set forth in the Credit Documentation (in their capacity as a lender or participant).  No prohibited lender shall, in any event, be permitted to attend any lender conference calls or meetings or receive any related information.

The Credit Documentation shall include customary "yank-a-bank" provisions relating to non-consenting Lenders and prohibited lenders and customary defaulting lender provisions.

| | |
|---|---|
| Assignment and Participation: | After the Closing Date, the Lenders will have the right to assign Loans and Commitments under the Revolving Facility: (a) to Lenders holding Commitments under the Revolving Facility and affiliates of such Lenders and (b) to other financial institutions, not constituting a prohibited lender with the consent, not to be unreasonably withheld or delayed, of the Administrative Agent, each Issuing Lender and, so long as no event of default shall have occurred and be continuing, the Borrower.  Minimum aggregate assignment level (except to other Lenders) of $5.0 million and increments of $1.0 million in excess thereof will apply to assignments of Loans and Commitments under the Revolving Facility. |
| | Each Lender will have the right to sell participations in its rights and obligations under the Credit Documentation to financial institutions that are not prohibited lenders (so long as the list of prohibited lenders is made available to all Lenders) without restriction and in accordance with applicable law.  Voting rights of participants shall be limited to matters set forth in clause (a) of the first paragraph of "Voting" above. |
| Yield Protection, Taxes and Other Deductions, Etc.: | Subject to the Documentation Principles, usual and customary for facilities and transactions of this nature. |
| EU Bail-in Provisions: | Subject to the Documentation Principles, usual and customary for facilities and transactions of this nature. |
| QFC Provisions: | Subject to the Documentation Principles, usual and customary for facilities and transactions of this nature. |
| Expenses and Indemnification: | Subject to the Documentation Principles, usual and customary for facilities and transactions of this nature. |
| Governing Law and Forum: | State of New York (except with respect to any mortgages, where in each case the governing law shall be the law of State where |

the properties that are the subject of the applicable mortgage are located).

<u>Counsel to the Arranger and Administrative Agent</u>:  Paul Hastings LLP.

## ANNEX I
### Senior Secured First Lien Revolving Facility
### Interest Rates and Fees

All capitalized terms used herein but not defined herein shall have the meanings provided in the term sheet to which this Annex I is attached.

| | | | |
|---|---|---|
| Interest Rates: | The Borrower will be entitled to make borrowings based on ABR plus the Applicable Margin or LIBOR plus the Applicable Margin. |

"Applicable Margin" and "Commitment Fee Rate" will be determined based upon the Borrowing Base Utilization Percentage (to be defined in the Credit Documentation) then being utilized, as follows:

| Borrowing Base Utilization Percentage | < 25% | ≥ 25% and < 50% | ≥ 50% and < 75% | ≥ 75% and < 90% | ≥ 90% |
|---|---|---|---|---|---|
| LIBOR Margin | 3.00% | 3.25% | 3.50% | 3.75% | 4.00% |
| ABR Margin | 2.00% | 2.25% | 2.50% | 2.75% | 3.00% |
| Commitment Fee Rate | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% |

The Borrower may elect interest periods of 1, 2, 3 or 6 months (or if available to all Lenders, 12 months or a period shorter than 1 month) for LIBOR borrowings.

Calculation of interest shall be on the basis of actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR Loans based on the prime rate). Interest will be payable in arrears (a) for Loans accruing interest at a rate based on LIBOR, at the end of each interest period (or every 90 days in arrears for interest periods greater than 90 days) and on the applicable maturity date and (b) for Loans accruing interest based on the ABR, quarterly in arrears and on the applicable maturity date.

"ABR" means the highest of (a) the rate that the Administrative Agent announces from time to time as its prime or base commercial lending rate, as in effect from time to time, (b) the Federal Funds Effective Rate plus ½ of 1% and (c) LIBOR for a one-month interest period plus 1%.

LIBOR is the London interbank offered rate for dollars, adjusted for customary Eurodollar reserve requirements, if any.

The Credit Documentation will contain customary replacement LIBOR provisions reasonably acceptable to the Administrative Agent and the Borrower.

Upfront Fees:        The Borrower shall pay an upfront fee (the "Upfront Fee") in an amount equal to 0.45% of the Borrowing Base in effect on the Closing

Date, which Upfront Fee shall be earned, due and payable in full on the Closing Date and shall be paid to each Lender ratably in accordance with its Commitment in respect of the Revolving Facility as in effect on the Closing Date.

Default Rate:

The applicable interest rate <u>plus</u> 2% <u>per</u> <u>annum</u> on amounts overdue, payable upon demand.

Commitment Fees:

An amount computed on a daily basis equal to the Commitment Fee Rate for the relevant day multiplied by the undrawn portion of the Borrowing Base on such day, payable quarterly in arrears.

Letter of Credit Fees:

The Borrower shall pay a fee on all outstanding Letters of Credit at a <u>per</u> <u>annum</u> rate equal to the Applicable Margin then in effect with respect to LIBOR Loans under the Revolving Facility on the face amount of each such Letter of Credit. Such fee shall be shared ratably among the Lenders participating in the Revolving Facility and shall be payable quarterly in arrears.

Fronting fee equal to 0.125% <u>per</u> <u>annum</u>. Customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account.

Exhibit B

**ARSENAL RESOURCES DEVELOPMENT LLC**
EXIT REVOLVING FACILITY
Conditions Precedent

Capitalized terms used but not defined in this <u>Exhibit B</u> shall have the meanings set forth in the Summary of Principal Terms and Conditions to which this <u>Exhibit B</u> is attached.

The Closing Date and the making of the initial extensions of credit under the <u>Revolving Facility</u> will be subject to the satisfaction of only the following conditions precedent:

1.       The Administrative Agent shall have received: (a) the Credit Documentation, which shall, in each case, be consistent with the terms of the Summary of Principal Terms and Conditions to which this <u>Exhibit B</u> is attached, shall have been executed and delivered by each of parties thereto, including all documents and instruments required to create and perfect the Administrative Agent's security interest in the Collateral, (b) customary officer's closing certificates (including incumbency certificates of officers), organizational documents, customary evidence of authorization and good standing certificates in jurisdictions of formation/organization, in each case, with respect to the Credit Parties, (c) customary legal opinions related to the Loan Documents, including an opinion on no conflicts with applicable laws in addition to other customary opinions, (d) a solvency certificate (with respect to the Borrower and its subsidiaries on a consolidated basis as of the Closing Date after giving effect to the Transactions contemplated to occur on the Closing Date) certified by a senior authorized financial officer of the Borrower, (e) a customary borrowing notice and (f) such other documents and instruments as are customary for transactions of this type (including evidence of insurance in accordance with the Credit Documentation).

2.       The Administrative Agent and the Lenders shall have received the Upfront Fee and all other accrued fees and all reasonable and documented out-of-pocket costs and expenses due and payable by the Borrower to the Administrative Agent, the Arranger and the Lenders on or prior to the Closing Date pursuant to the terms of the Commitment Letter and the Agency Fee Letter (as defined in the Commitment Letter), and in the case of expenses, to the extent invoiced at least one business days prior to the Closing Date.

3.       After the making of the Loans on the Closing Date, the application of the proceeds thereof and after giving effect to the other Transactions contemplated hereby, the Borrower and the Guarantors shall have aggregate liquidity (which shall include cash and cash equivalents and the amount of unused Commitments) of not less than $40.0 million.

4.       After the making of the Loans on the Closing Date, the application of the proceeds thereof and after giving effect to the other Transactions contemplated hereby, the Borrower and the Guarantors shall have unused availability under the Revolving Facility of not less than 20% of the Borrowing Base.

5.       The Administrative Agent shall have received an internal reserve report dated as of a recent date, prepared in a manner consistent with (or otherwise reasonably acceptable to the Administrative Agent) the last reserve report prepared by an independent third party engineer and delivered to the administrative agent under the Pre-Petition RBL Credit Agreement.

6.       All actions necessary to establish that the Administrative Agent will have a perfected first priority security interest in the Collateral (as described in the section titled "<u>Collateral</u>" in the Summary of Principal Terms and Conditions) shall have been taken, including: (a) delivery of counterparts and exhibits for mortgages or deeds of trust, as applicable, which are necessary and appropriate for filing in the

Annex I-1

appropriate jurisdictions and (b) the Borrower's execution and delivery of control agreements in connection with its deposit accounts, commodities accounts or securities accounts (other than excluded accounts to be agreed), as applicable.

7.      The Administrative Agent shall have received from the Borrower title information (including customary title opinions or reports or other documents) consistent with usual and customary standards for the geographic regions in which the Borrowing Base Properties are located, taking into account the size, scope and number of leases and wells of the Borrower and the Guarantors, in respect of at least 90.0% of the aggregate net present value of the Borrowing Base Properties.

8.      The occurrence of the "Plan Effective Date" and the entry of a Confirmation Order (as defined in the RSA) in form and substance reasonably satisfactory to the Administrative Agent with respect to the Plan (as defined in the RSA) (it being understood and agreed that the Confirmation Order shall be deemed reasonable satisfactory to the Administrative Agent so long as the Bankruptcy Court approves the Plan (and does not modify, amend or supplement the Plan to the extent that such modification, amendment or supplement would require the consent of the Consenting RBL Lenders as set forth in the RSA), which Confirmation Order shall be in full force and effect, final and non-appealable, and shall not have been vacated, reversed, or stayed or modified or amended without the consent of the Administrative Agent in its reasonable discretion.)

9.      The Administrative Agent and each Lender who has requested the same shall have received, at least three (3) business days prior to the Closing Date: (a) all documentation and other information regarding the Borrower in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, and (b) to the extent applicable, in connection with "beneficial ownership" rules and regulations, a customary certification regarding beneficial ownership or control of the Borrower in a form reasonably satisfactory to the Administrative Agent and each requesting Lender, in the case of clauses (a) and (b), to the extent reasonably requested in writing at least ten (10) business days prior to the Closing Date.

10.      (i) The Borrower shall have received the proceeds of the New Capital Commitment in accordance with the terms of the New Equity Term Sheet and (ii) the Refinancing shall have occurred, in each case, substantially contemporaneously with the proceeds of the initial funding under the Revolving Facility.

11.      All representations and warranties shall be true and correct in all material respects with the same effect as though made on and as of such date, except in the case of any representation and warranty which (a) expressly relates to a given date, such representation and warranty shall be true and correct in all material respects as of the respective date and (b) is qualified by a materiality or material adverse effect standard in which case such representation and warranty shall be true and correct in all respects.

12.      No default or event of default under the Credit Documentation shall have occurred that is continuing.

13.      Since the Execution Date (as defined in the RSA), there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.  As used herein, "Material Adverse Effect" shall mean any event, change, effect, circumstance, occurrence, development, condition, result, state of facts or change of facts (each, an "Event") occurring after the date hereof that, individually or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on the business, results of operations or condition (financial or otherwise) of the Borrower or the Guarantors, or the properties, assets, finances or liabilities of the Borrower or the Guarantors, taken as a whole; provided that "Material Adverse Effect" shall not include any Event occurring after the date hereof and arising out of or resulting from: (a) conditions or effects that generally affect persons

or entities comparable in size and scale to the Borrower or the Guarantors engaged in the industries, businesses, markets (financial or otherwise) or geographic areas in which the Borrower or the Guarantors operate, taking into consideration any Event that is related to the operations of the Borrower or the Guarantors in the specific geographical and geological areas in which they operate, (b) general economic conditions in regions and markets in which the Borrower or the Guarantors operate, (c) regional, national or international political or social conditions, including acts of war, terrorism or natural disasters, escalation or material worsening of hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or its territories, possessions, diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (d) financial, banking, securities, credit, or commodities markets, prevailing interest rates or general capital markets conditions, (e) changes in United States generally accepted accounting principles, (f) changes in laws, orders, or other binding directives issued by any governmental entity, (g) the taking of any action or any inaction required by the RSA (including the Restructuring Term Sheet, the DIP Term Sheet, the Equity Term Sheet, the Governance Term Sheet, the Plan, or any action or inaction in connection with the Chapter 11 Cases, including the commencement, announcement and pendency of the Chapter 11 Cases, in each case, with such defined terms as defined in the RSA), (h) the execution, announcement or performance of this Agreement or the other transaction agreements contemplated by the RSA or the transactions contemplated hereby or thereby (including any act or omission of the Borrower or the Guarantors expressly required or prohibited, as applicable, by the RSA), or (i) any action or inaction consented to or requested by the Consenting Stakeholders (as defined in the RSA); provided, further, that exceptions set forth in clauses (a), (b), (c) and (d) of this definition shall not apply to the extent that such Event is disproportionately adverse to the Borrower or the Guarantors, taken as a whole, as compared to other companies comparable in size and scale to the Borrower or the Guarantors operating in the industries and same geographical areas in which the Borrower or the Guarantors operate.

14.     Entry by the Bankruptcy Court of an order (which order may be the Confirmation Order (as defined in the RSA)) approving the Revolving Facility and all related documentation (including, for the absence of doubt, this Commitment Letter and the Agency Fee Letter), in form and substance satisfactory to the Administrative Agent, which order shall: (i) specifically provide that the right to receive all amounts due and owing, including indemnification obligations, the fees and other payments as set forth herein and in the Agency Fee Letter, and reimbursement of all reasonable costs and expenses incurred in connection with the transactions contemplated herein and as set forth herein and in the Agency Fee Letter, shall be entitled to priority as administrative expense claims under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, regardless of whether the Closing Date occurs (except to the extent the payment of such fee or amount is expressly subject to the occurrence of the Closing Date by the terms of the Commitment Letter or Agency Fee Letter) and (ii) be in full force and effect, final and non-appealable, and shall not have been have been vacated, reversed, or stayed or modified or amended without the consent of the Administrative Agent in its reasonable discretion.

## EXHIBIT D

**DIP Engagement Letter**

**[Redacted in Full]**