**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ARSENAL RESOURCES DEVELOPMENT LLC, *et al.*, | ) Case No. 19-12347 (___) |
| | ) |
| | ) (Joint Administration Requested) |
| Debtors.[1] | ) |
| | ) |

---

## DISCLOSURE STATEMENT FOR JOINT PRE-PACKAGED PLAN OF REORGANIZATION OF ARSENAL RESOURCES DEVELOPMENT LLC AND ITS DEBTOR AFFILIATES

---

Dated: November 7, 2019

| | |
|---|---|
| SIMPSON THACHER & BARTLETT LLP | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| Michael H. Torkin, Esq. | Pauline K. Morgan, Esq. (No. 3650) |
| Kathrine A. McLendon, Esq. | Kara H. Coyle, Esq. (No. 4410) |
| Nicholas E. Baker, Esq. | Ashley Jacobs, Esq. (No. 5635) |
| Edward R. Linden, Esq. | Elizabeth Justison, Esq. (No. 5911) |
| Jamie J. Fell, Esq. | Rodney Square |
| 425 Lexington Avenue | 1000 North King Street |
| New York, NY 10017 | Wilmington, Delaware 19801 |
| T: (212) 455-2000 | T: (302) 571-6600 |
| F: (212) 455-2502 | F: (302) 571-1253 |

*Proposed Counsel to the Debtors and Debtors in Possession*

**THE ABOVE CAPTIONED DEBTORS AND DEBTORS IN POSSESSION (COLLECTIVELY, THE "DEBTORS") INTEND TO REQUEST THAT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") SCHEDULE A HEARING TO APPROVE THIS DISCLOSURE STATEMENT AND CONFIRM THE ASSOCIATED PLAN OF REORGANIZATION NO LATER THAN DECEMBER 18, 2019, AND TO ESTABLISH DECEMBER 11, 2019, AS THE DATE BY WHICH OBJECTIONS, IF ANY, TO THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN OF REORGANIZATION MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS. SEE <u>ARTICLES III.A</u> AND <u>VI.A-B</u> OF THIS DISCLOSURE STATEMENT FOR THE ANTICIPATED TIMETABLE FOR THE CHAPTER 11 CASES, AND PROCESS AND TIMING TO FILE OBJECTIONS.**

---

[1]   The debtors in the chapter 11 cases, along with the last four digits of each debtor's United States federal tax identification number, are:  Arsenal Resources Development LLC (4072); Arsenal Energy Holdings LLC (6279); Arsenal Resources Intermediate Holdings LLC (5901); Arsenal Resources Energy LLC (2820); Arsenal Resources Development Holdings 2 LLC (3020); Arsenal Resources Development Holdings 1 LLC (9647); Arsenal Gas Marketing LLC (1113); Arsenal Midstream LLC (9654); Arsenal Water LLC (2465); Ulysses Gathering LLC (6546); Mar Key LLC (5428); Arsenal Resources LLC (3422); River Ridge Energy Holdings, LLC (8135); River Ridge Energy, LLC (5623); River Ridge Pennsylvania, LLC (5444); River Ridge Operating, LLC (4051); and Seneca-Upshur Petroleum, LLC (9204).  The debtors' mailing address is 6031 Wallace Road Ext., Suite 300, Wexford, PA 15090.

THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING COMMENCED TO OBTAIN ACCEPTANCES OF THE PLAN (DEFINED BELOW) BEFORE THE FILING OF THE VOLUNTARY CASES (THE "CHAPTER 11 CASES") UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE"). BECAUSE THE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK (I) BANKRUPTCY COURT APPROVAL OF (A) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, AND (B) THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (II) CONFIRMATION OF THE PLAN.

**DISCLOSURE STATEMENT, DATED NOVEMBER 7, 2019**

**Solicitation of Votes on the**
**Joint Pre-Packaged Plan of Reorganization of**

**ARSENAL RESOURCES DEVELOPMENT LLC AND ITS DEBTOR AFFILIATES**

**from the holders ("Holders") of outstanding**

**AEH SELLER NOTES CLAIMS**
**ARDH2 SELLER NOTES CLAIMS**
**ARE TERM LOAN CLAIMS**
**ARDH1 TERM LOAN CLAIMS**

THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., PREVAILING EASTERN TIME ON NOVEMBER 7, 2019, UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE").

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS ("CLAIMS") MAY VOTE ON THE PLAN IS NOVEMBER 6, 2019 (THE "VOTING RECORD DATE").

THE DEBTORS INTEND TO REQUEST THAT THE BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE SCHEDULE A HEARING TO APPROVE THIS DISCLOSURE STATEMENT AND CONFIRM THE

**ASSOCIATED PLAN OF REORGANIZATION (THE "CONFIRMATION HEARING") ON DECEMBER 18, 2019, AND TO ESTABLISH DECEMBER 11, 2019 AS THE DATE BY WHICH OBJECTIONS, IF ANY, TO THE ADEQUACY OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN OF REORGANIZATION MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE PARTIES SET FORTH IN <u>ARTICLE VI.B</u> OF THIS DISCLOSURE STATEMENT.**

**RECOMMENDATION BY THE DEBTORS**

**The sole member of Arsenal Resources Development LLC ("ARD") and the board of directors, members, board of managers, manager, general partner or managing member, as applicable, of each of its affiliated Debtors have unanimously approved the transactions contemplated by the Solicitation and the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.**

**Pursuant to the RSA (defined below), as of the date hereof, Holders of 100% of the OpCo RBL Claims (defined below) (the "Consenting RBL Lenders"), Holders of 100% of the Seller Notes Claims (defined below) (the "Consenting Seller Noteholders"), Holders of 100% of the Term Loan Claims (defined below) (the "Consenting Term Loan Lenders") and Holders of a substantial majority of equity interests in AEH (defined below) (collectively, the "Consenting Equityholders" and, together with the Consenting RBL Lenders, the Consenting Seller Noteholders, and the Consenting Term Loan Lenders, the "Consenting Stakeholders") already have agreed to support the transactions contemplated by the Plan and, as applicable, to vote in favor of the Plan.**

THIS DISCLOSURE STATEMENT IS BEING FURNISHED TO THE HOLDERS OF (A) AEH SELLER NOTES CLAIMS, (B) ARDH2 SELLER NOTES CLAIMS, (C) ARE TERM LOAN CLAIMS AND (D) ARDH1 TERM LOAN CLAIMS (COLLECTIVELY, THE "VOTING CLAIMS"). THE DEBTORS RESERVE THE RIGHT TO AMEND THIS DISCLOSURE STATEMENT WITH RESPECT TO ANY INDIVIDUAL RECIPIENT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES OFFERED HEREBY BY ANY PERSON IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL FOR SUCH PERSON TO MAKE SUCH AN OFFER OR SOLICITATION.

IF YOU ARE A HOLDER OF A VOTING CLAIM, YOU HAVE RECEIVED THIS DISCLOSURE STATEMENT, THE BALLOT AND THE OTHER ENCLOSED MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.

EACH PERSON RECEIVING THIS DISCLOSURE STATEMENT ACKNOWLEDGES THAT (I) SUCH PERSON HAS BEEN AFFORDED AN OPPORTUNITY TO REQUEST AND REVIEW, AND HAS RECEIVED, ALL ADDITIONAL INFORMATION CONSIDERED BY IT TO BE NECESSARY TO VERIFY THE ACCURACY OF, OR TO SUPPLEMENT, THE INFORMATION CONTAINED HEREIN, (II) SUCH PERSON HAS NOT RELIED ON ANY OTHER PERSON IN CONNECTION WITH ANY INVESTIGATION OF THE ACCURACY OF SUCH INFORMATION OR ITS INVESTMENT DECISION AND (III) NO OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION CONCERNING THE DEBTORS OR THE NEW ARDH1 EQUITY (DEFINED BELOW) AND, IF GIVEN OR MADE, ANY SUCH OTHER INFORMATION OR REPRESENTATION SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

NONE OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC"), ANY OTHER SECURITIES COMMISSION, INCLUDING ANY STATE SECURITIES COMMISSION, OR ANY COURT OR REGULATORY AUTHORITY HAS APPROVED, DISAPPROVED OR RECOMMENDED THE PLAN OR THE NEW ARDH1 EQUITY NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE PLAN OR THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ISSUED PURSUANT TO THE PLAN WILL BE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM, AND THE REORGANIZED OPCO DEBTORS CONSTITUENT DOCUMENTS (DEFINED BELOW). HOLDERS OF NEW ARDH1 EQUITY ISSUED PURSUANT TO THE PLAN SHOULD BE AWARE THAT THEY MAY BE REQUIRED

TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, AND PROJECTED FINANCIAL INFORMATION MAY CONSTITUTE "FORWARD-LOOKING STATEMENTS" AND ARE BASED ON ESTIMATES AND ASSUMPTIONS. ANY STATEMENTS THAT REFER TO EXPECTATIONS OR OTHER CHARACTERIZATION OF FUTURE EVENTS, CIRCUMSTANCES OR RESULTS ARE FORWARD-LOOKING STATEMENTS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, YOU ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT, INCLUDING THOSE SET FORTH UNDER THE HEADING "RISK FACTORS" IN <u>ARTICLE IX</u> OF THIS DISCLOSURE STATEMENT. THESE FACTORS SHOULD BE CONSIDERED CAREFULLY AND READERS SHOULD NOT PLACE UNDUE RELIANCE ON THE FORWARD-LOOKING STATEMENTS. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

IN MAKING A DECISION IN CONNECTION WITH THE PLAN, YOU MUST RELY ON YOUR OWN EXAMINATION OF THE DEBTORS' BUSINESS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. YOU SHOULD CONSULT WITH YOUR OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (THE "RESTRUCTURING TRANSACTIONS").

HOLDERS OF ALLOWED OPCO GENERAL UNSECURED CLAIMS (DEFINED BELOW) AND ALLOWED UNSECURED CLAIMS AGAINST ARIH (DEFINED BELOW), IF ANY, WILL NOT BE IMPAIRED BY THE PLAN AND, AS A RESULT, THE RIGHT OF SUCH HOLDERS TO RECEIVE PAYMENT IN FULL ON

ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PLAN. WHILE HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS AGAINST ARE, AEH, ARDH1 AND ARDH2 (EACH AS DEFINED BELOW), IF ANY, SHALL BE IMPAIRED AND SHALL RECEIVE THE TREATMENT SET FORTH IN THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT BELIEVE ANY GENERAL UNSECURED CLAIMS AGAINST ARE, AEH, ARDH1 OR ARDH2 EXIST.

DURING THE CHAPTER 11 CASES, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE AND, TO THE EXTENT APPLICABLE, WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL TRADE CREDITORS, CUSTOMERS AND EMPLOYEES OF THE OPCO DEBTORS (DEFINED BELOW) OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN. THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. NEITHER THIS DISCLOSURE STATEMENT'S DISTRIBUTION NOR THE PLAN'S CONSUMMATION WILL, UNDER ANY CIRCUMSTANCE, CREATE ANY IMPLICATION THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME AFTER THE DATE HEREOF. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE. IN ANY CONTESTED MATTER OR ADVERSARY PROCEEDING, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY, BUT SHALL BE DEEMED A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN, AND, FOR THE AVOIDANCE OF DOUBT, CAPITALIZED TERMS USED IN ANY SUCH EXHIBIT BUT NOT DEFINED THEREIN HAVE THE RESPECTIVE MEANINGS ASCRIBED TO THEM HEREIN.

# TABLE OF CONTENTS

I. Summary ........................................................................................................................... 1

II. Background ................................................................................................................... 14

    A.   Overview of the Company ................................................................................... 14

    B.   Operations ........................................................................................................... 15

    C.   The Company's History ...................................................................................... 15

    D.   The Company's Organizational Structure .......................................................... 18

    E.   The Company's Capital Structure ...................................................................... 19

    F.   Gathering Agreements ........................................................................................ 21

    G.   Regulation of the Company's Business ............................................................. 23

    H.   Prior and Pending Litigation Proceedings ........................................................ 23

    I.   Reasons for the Restructuring ............................................................................ 23

    J.   Restructuring Support Agreement ..................................................................... 24

III. Anticipated Events During the Chapter 11 Cases ...................................................... 26

    A.   Timetable for the Chapter 11 Cases .................................................................. 26

    B.   Commencement of the Chapter 11 Cases and First Day Motions ..................... 27

    C.   Procedural Motions and Retention of Professionals ......................................... 29

    D.   Rejection Bar Date ............................................................................................. 29

    E.   Automatic Stay ................................................................................................... 30

IV. Summary of Certain Provisions of the Plan ............................................................... 30

    A.   Treatment of Unclassified Claims ..................................................................... 30

    B.   Means for Implementation of the Plan .............................................................. 32

    C.   Treatment of Executory Contracts and Unexpired Leases ............................... 39

    D.   Conditions Precedent to the Effective Date ...................................................... 45

    E.   Effects of Confirmation ..................................................................................... 46

V. Voting Procedures and Requirements ......................................................................... 52

    A.   Parties Entitled to Vote on the Plan ................................................................... 52

    B.   Voting Deadline .................................................................................................. 53

    C.   Submission of the Completed Ballots ............................................................... 53

    D.   Voting Procedures .............................................................................................. 53

    E.   Waivers of Defects, Irregularities, etc. ............................................................. 55

VI. Confirmation of the Plan ........................................................................................... 56

    A.   Confirmation Hearing ........................................................................................ 56

    B.   Objections to Confirmation ............................................................................... 56

    C.   Requirements for Confirmation of the Plan ...................................................... 59

VII. Alternatives to the Plan .................................................................................................. 63

    A.   Alternative Plan of Reorganization ....................................................................... 63

    B.   Sale Under Section 363 of the Bankruptcy Code.................................................. 63

    C.   Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ...................... 63

VIII. Securities Law Matters.................................................................................................. 64

    A.   The Solicitation .................................................................................................... 64

    B.   Issuance of Securities Pursuant to the Plan.......................................................... 64

    C.   Subsequent Transfers of Restricted Securities .................................................... 65

IX. Risk Factors .................................................................................................................... 67

    A.   Risk Factors Relating to the Company's Business ............................................... 67

    B.   Risk Factors Relating to the New ARDH1 Equity............................................... 81

    C.   Risk Factors Relating to the Bankruptcy Process ............................................... 84

    D.   Additional Risk Factors ........................................................................................ 90

X. Certain U.S. Federal Income Tax Consequences of the Plan............................................ 1

XI. Conclusion and Recommendation ..................................................................................... 1

## DISCLOSURE STATEMENT EXHIBITS

Exhibit A  Plan
Exhibit B  RSA
Exhibit C  Structure Chart
Exhibit D  Financial Projections
Exhibit E  Liquidation Analysis

# I.
# SUMMARY

This Disclosure Statement (as may be amended, supplemented or otherwise modified from time to time, this "**Disclosure Statement**") is being provided to Holders of Claims entitled to vote on the Plan to provide them with information regarding the Debtors and the proposed Restructuring Transactions to assist them in making a decision regarding whether or not to vote in favor of the *Joint Pre-Packaged Plan of Reorganization of Arsenal Resources Development LLC and its Debtor Affiliates* substantially in the form attached as **Exhibit A** hereto (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and/or the RSA, the "**Plan**"). Unless otherwise noted, capitalized terms used but not defined herein have the respective meanings ascribed to them in the Plan. All summaries herein are qualified by reference to the actual terms of the Plan.

The Debtors hereby transmit this Disclosure Statement for use in the solicitation of the Holders of AEH Seller Notes Claims, ARDH2 Seller Notes Claims, ARE Term Loan Claims and ARDH1 Term Loan Claims (collectively, the "**Voting Parties**") to vote to accept the Plan. The Debtors anticipate commencing the Chapter 11 Cases on or prior to November 8, 2019 or at such other time as agreed by the Debtors (or, collectively, the "**Company**") and the Required Consenting Stakeholders (defined below) in accordance with the RSA. Following commencement of the Chapter 11 Cases, the Debtors will seek entry of the order confirming the Plan ("**Confirmation**") as soon as practicable. The Plan constitutes a separate plan of reorganization for each of the Debtors and notwithstanding anything herein, the Plan may be confirmed and consummated as to each of the Debtors separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor. Each Debtor reserves the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting class (each, a "**Class**") of Claims or equity interests ("**Equity Interests**").

The Company is an independent exploration and production company engaged in the acquisition and development of unconventional natural gas resources in the Appalachian Basin. For a further description of the Company's history and operations, see Article II of this Disclosure Statement, and, for the Structure Chart (defined below), see **Exhibit C**.

The Company conducts operations through certain operating subsidiaries (the "**Operating Subsidiaries**") owned, directly and indirectly, by Arsenal Resources Development LLC ("**ARD**"). One or more of the OpCo Debtors[2] employs the Company's workforce, owns the Company's working interests and corresponding infrastructure, and produces and markets gas for

---

[2]    The following Debtors comprise "**OpCo Debtors**": ARD, Arsenal Gas Marketing LLC, Arsenal Midstream LLC, Arsenal Water LLC, Ulysses Gathering LLC, Mar Key LLC, Arsenal Resources LLC, River Ridge Energy Holdings, LLC, River Ridge Energy, LLC, River Ridge Pennsylvania, LLC, River Ridge Operating, LLC, and Seneca-Upshur Petroleum, LLC.

Arsenal Resources Development Holdings 1 LLC ("**ARDH1**") owns ARD, the top OpCo Debtor in the corporate organization.  Under the Plan, Reorganized ARDH1 will be the new parent of the reorganized OpCo Debtors.

sale. Accordingly, all of the Company's vendors, suppliers and other trade creditors contract with one or more OpCo Debtors (aside from the Gathering Agreement Counterparties,[3] as described below). As set forth in the Structure Chart, the OpCo Debtors are wholly-owned by a series of holding companies, which have no assets other than the equity interests in their immediate wholly-owned subsidiary and *de minimis* cash on hand.[4]

As of the date of this Disclosure Statement, the Debtors had outstanding funded indebtedness in an aggregate principal amount of approximately $506 million:

> A. approximately $117 million in principal amount of secured loans outstanding under the RBL Facility (defined below) and a single letter of credit issued and currently outstanding in the face amount of approximately $28 million;[5]
>
> B. approximately $233 million in principal amount (including interest and fees that have been paid-in-kind and capitalized) of secured loans outstanding under the Term Loan Facility (defined below) (the "**Term Loans**"); and
>
> C. approximately $128 million in principal amount (including interest that has been paid-in-kind and capitalized) of secured loans outstanding under the Seller Notes (defined below).

The Company is privately owned with three classes of common units (the "**Existing AEH Equity Interests**") in AEH held by various different financial institutions.

ARE also has unsecured obligations arising under or related to the Gathering Agreements (defined below) (collectively with any Claims that may also arise in connection with the rejection of any of the Gathering Agreements during the Chapter 11 Cases, the "**ARE Gathering Agreement Claims**"). ARE is the sole obligor in respect of these Gathering Agreements. Accordingly, as illustrated in the Structure Chart, any ARE Gathering Agreement Claims are unsecured obligations and are structurally subordinated to the obligations of the Operating Subsidiaries and claims arising under each of the RBL Facility, the Term Loan Facility (other than the ARE Term Loan Claims (defined below) which are unsecured and *pari passu* with any ARE Gathering Agreement Claims) and the Seller Notes (other than the AEH Seller Notes Claims (defined below)).

---

[3]    The following entities comprise "**Gathering Agreement Counterparties**": Goff Connector LLC ("**Fullstream**"), Equitrans, L.P. ("**EQM**"), Stonewall Gas Gathering, LLC ("**DTE-SGG**"), DTE Appalachia Gathering, LLC ("**DTE-ASG**", and together with DTE-SGG, "**DTE**") and Columbia Gas Transmission LLC ("**TCO**").

[4]    The following Debtors comprise "**HoldCo Debtors**": Arsenal Energy Holdings LLC ("**AEH**"), Arsenal Resources Intermediate Holdings LLC ("**ARIH**"), Arsenal Resources Energy LLC ("**ARE**") and Arsenal Resources Development Holdings 2 LLC ("**ARDH2**").

[5]    In the event this letter of credit is drawn, obligations arising from such draw would become loans outstanding under the RBL Facility, constitute OpCo RBL Claims under the Plan and share ratably in the treatment of OpCo RBL Claims.

In December 2018, the Company commenced a recapitalization (the "**First Recapitalization**") of its business with a new term loan facility (the "**Term Loan Facility**") in the aggregate principal amount of approximately $220 million, full repayment of approximately $112 million outstanding under an existing second lien term loan, the extension of senior secured bank revolving credit facility through 2022 and partial paydown of amounts outstanding under that credit facility. The First Recapitalization was completed in February 2019 through the consummation of a pre-packaged plan of reorganization (the "**Prior Plan**") of AEH resulting in the conversion to common equity of approximately $872 million of outstanding subordinated unsecured notes. Notwithstanding the successful execution of the First Recapitalization, a combination of industry-wide and Company-specific issues necessitated the contemplated Restructuring Transactions.

The Debtors, in consultation with their advisors, have determined that a restructuring is necessary to significantly reduce funded indebtedness, including secured debt, to address the Gathering Agreements and the ARE Gathering Agreement Claims, and to improve their capital structure, obtain access to longer term financing and permit the incremental funding necessary to implement their business plan, provide appropriate operating liquidity, and position the Debtors to more effectively compete in their industry.  For a further description of the Company's capital structure, the First Recapitalization and Prior Plan, the Gathering Agreements and the reasons for the restructuring, see Article II of this Disclosure Statement.

The Debtors are pleased that, after extensive, good-faith negotiations with the Consenting Stakeholders, they have achieved agreement on a consensual restructuring to be implemented swiftly through a joint pre-packaged chapter 11 plan of reorganization, the primary purpose of which is to (a) effectuate the conversion of the Term Loans and Seller Notes into 100% of the equity of reorganized ARDH1 ("**Reorganized ARDH1**"), the proposed new parent of the reorganized OpCo Debtors (together with Reorganized ARDH1, the "**Reorganized OpCo Debtors**") (subject to dilution from the New Capital Commitment (defined below)), (b) consummate the $100 million New Capital Commitment, (c) refinance the Debtors' existing RBL Facility with proceeds of the New RBL Facility (defined below) and the New Capital Commitment, (d) reject and/or consensually amend, assume and/or assign the DTE Gathering Agreements (defined below),[6] (e) liquidate and discharge any remaining Gathering Agreement claims against ARE and (f) preserve and maintain the ongoing business operations of the Company with limited interruption.

The Plan contemplates, among other things, the occurrence of the following Restructuring Transactions on the effective date of the Plan (the "**Effective Date**"), pursuant to and subject to the terms of the Plan and the RSA, which are attached to this Disclosure Statement as **Exhibits A** and **B**, respectively:

- Reorganized ARDH1 shall become the new parent of the Reorganized OpCo Debtors.

---

[6]    In addition to reaching agreement on a consensual restructuring with the Consenting Stakeholders, the Company has successfully negotiated amendments to two key Gathering Agreements, as further described below.

- Holders of Claims under the RBL Facility ("**OpCo RBL Claims**") shall be paid in full in cash from proceeds of a new revolving credit facility (the "**New RBL Facility**")—which New RBL Facility includes an initial borrowing base of not less than $130 million and other terms set forth in the related commitment letter, dated November 6, 2019 (the "**New RBL Facility Commitment Letter**"), between ARD and the lenders under the New RBL Facility and the term sheet attached thereto—and/or the New Equity Issuance (defined below).[7]

- Term Loan Lenders (defined below) shall have their claims exchanged for class A common membership interests in Reorganized ARDH1 ("**New ARDH1 Class A Interests**") as follows:

  o If each Holder of an Allowed Claim in both Classes of Seller Notes Claims submits a ballot to accept the Plan, Term Loan Lenders shall receive the following number of New ARDH1 Class A Interests on account of both of the Classes of Term Loan Claims:[8]

    a. 104,080,965 to Chambers Energy Capital II, LP ("**CEC II**"),

    b. 12,746,181 to Chambers Energy Capital II TE, LP ("**CEC II TE**"), and

    c. 128,321,603 to Mercuria Investments US, Inc. or its affiliates ("**Mercuria**"); or

  o If each Holder of an Allowed Claim in both Classes of Seller Notes Claims does not submit a ballot to accept the Plan, Term Loan Lenders shall receive their pro rata share of 196,436,500 New ARDH1 Class A Interests.

Term Loan Lenders also shall be entitled to receive their ratable share of the ARE Available Cash[9] on account of their Term Loan Claims.[10]

---

[7] In addition, subject to the terms of the RSA, each counterparty to an outstanding Secured Swap Agreement (as defined in the credit agreement for the RBL Facility or DIP Facility (defined below), as applicable) as of the Effective Date has agreed to maintain such Secured Swap Agreement as outstanding following the Effective Date, to be secured as an obligation under the New RBL Facility unless otherwise agreed by such counterparty and the applicable Reorganized OpCo Debtor, and such counterparties shall accordingly not have any OpCo RBL Claims or Claims under the DIP Facility.

[8] Pursuant to the Term Loan Facility and as further described below, Term Loan Lenders hold Claims against both ARDH1 ("**ARDH1 Term Loan Claims**") and ARE ("**ARE Term Loan Claims**", and together with the ARDH1 Term Loan Claims, the "**Term Loan Claims**").

[9] "**ARE Available Cash**" means Cash in an amount equal to $100,000.

[10] Although the Term Loan Lenders are entitled to their ratable share of the ARE Available Cash, the Term Loan Lenders have agreed to waive that recovery.

- Seller Noteholders (defined below) shall have their claims converted into New ARDH1 Class A Interests (subject to the foregoing) as follows:

  o If each Holder of an Allowed Claim in both Classes of Seller Notes Claims[11] submits a ballot to accept the Plan, Seller Noteholders shall receive the following number of New ARDH1 Class A Interests:

    a. 7,570,392 to CEC II,

    b. 927,101 to CEC II TE,

    c. 25,780,361 to Chambers Energy Capital III, LP ("**CEC III**", and together with CEC II and CEC II TE, "**Chambers**"), and

    d. 22,783,397 to LR-Mountaineer Holding, L.P. ("**LRMH**"); or

  o If each Holder of an Allowed Claim in both Classes of Seller Notes Claims does not submit a ballot to accept the Plan, all Seller Notes Claims shall be cancelled, released and discharged without any distribution.

- The $100 million new capital commitment in Reorganized ARDH1 ("**New Capital Commitment**") to be provided on the Effective Date by (i) Chambers and/or certain of its affiliated funds and/or their respective limited partners and (ii) Mercuria and/or certain of its affiliated funds and/or their respective limited partners ((i) and (ii) collectively, the "**New Capital Parties**") will be consummated in accordance with the RSA in exchange for New ARDH1 Class A Interests (the "**New Equity Issuance**").

- All Equity Interests in the HoldCo Debtors, including all Existing AEH Equity Interests, and the Equity Interests in ARDH1 shall be cancelled without any distribution.

- On the Effective Date, each of the HoldCo Debtors shall be dissolved.

---

[11] Pursuant to the Seller Notes, Seller Noteholders hold Claims against both AEH ("**AEH Seller Notes Claims**") and ARDH2 ("**ARDH2 Seller Notes Claims**", and together with the AEH Seller Notes Claims, the "**Seller Notes Claims**").

- After giving effect to the conversion of the Term Loan Claims and the Seller Notes Claims (assuming the Seller Noteholders vote to accept the Plan) and the New Equity Issuance, Reorganized ARDH1 will have the following equity ownership:

| Holder | # (and %) of New ARDH1 Class A Interests to be distributed on the Effective Date |
|---|---|
| Term Loan Lenders | 245,148,749 (53.8%) |
| Seller Noteholders | 57,061,251 (12.5%) |
| New Capital Parties | 153,846,153 (33.7%) |
| **Total:** | **456,056,153 (100%)** |

- Unless a Gathering Agreement Counterparty agrees to consensually amend its agreement(s), the Plan provides that Holders of Allowed ARE Gathering Agreement Claims will receive their ratable share of the ARE Available Cash and that, as a condition to the Plan's effectiveness, the Gathering Agreements either must be amended or be rejected, in either case, with the consent of certain of the Consenting Stakeholders.[12] As further discussed below, (1) the Company ultimately reached a critical deal with each of Fullstream and EQM to consensually amend (and assume and assign) their respective Gathering Agreements; (2) the remaining Gathering Agreements with DTE remain unmodified, and, unless a consensual amendment can be reached with DTE on terms satisfactory to the Required Consenting Term/Seller Stakeholders, the DTE-SGG Gathering Agreements (defined below) will be rejected effective as of the Petition Date (defined below) unless otherwise determined by the Debtors; and (3) the TCO Gathering Agreements (defined below) automatically terminates on November 8, 2019.

- Beyond the Gathering Agreements, each HoldCo Debtor shall be deemed to have rejected each executory contract (an "**Executory Contract**") and unexpired lease (an "**Unexpired Lease**") to which it is a party unless the applicable Debtor assumes and assigns it to Reorganized ARDH1 or to another Reorganized OpCo Debtor. Except as otherwise provided in the Plan, each of ARDH1 and each OpCo Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party.

- *General Unsecured Claims*:

  o All allowed general unsecured Claims against the OpCo Debtors (the "**OpCo General Unsecured Claims**") shall be Unimpaired and thus, holders of such claims will receive cash equal to their allowed Claims on the Effective Date, as and when such claims become due, or on terms agreed with such claim holder.

---

[12]   To the extent that any Gathering Agreement Counterparty and the Debtors agree to amend a Gathering Agreement and ARE assumes and assigns the amended agreement, such counterparty will not have Claims against ARE subject to treatment under the Plan.

- o Except with respect to ARE (the party to the Gathering Agreements) and ARIH (an intermediate holding company with no creditors), the Plan provides that general unsecured claims against the HoldCo Debtors will receive no recovery. That said, the Company is unaware of any creditors at any HoldCo Debtor (other than the Gathering Agreement Counterparties and the Voting Parties).

- Claims arising under the $90 million debtor-in-possession financing facility of the Debtors (the "**DIP Facility**") shall be paid in full in cash from proceeds of the New RBL Facility and/or the New Equity Issuance. The agreements to provide financing under the DIP Facility and the New RBL Facility are pursuant to, and subject to the conditions set forth in the New RBL Facility Commitment Letter.

- On or as soon as reasonably practicable following the Effective Date, the New Board (defined below) is expected to implement a management incentive plan of the Reorganized OpCo Debtors (the "**MIP**") that will reserve a percentage to be determined by the New Board (acting in its sole discretion) of up to 10% of the New ARDH1 Equity (which may be in the form of a combination of profits interests and/or full value units awards, as determined by the New Board in its sole discretion), on a fully diluted basis, to be issued to management and/or other employees of the Reorganized OpCo Debtors after the Effective Date at the discretion of the New Board and on terms to be determined by the New Board (including with respect to allocation, timing and structure of such issuance and the MIP).

- The Company has adopted an employee retention program on terms consistent with the RSA, which shall be assumed pursuant to the Plan.

- The initial board of Reorganized ARDH1 (the "**New Board**") will consist of four (4) managers: three (3) voting managers, one (1) appointed by each of Chambers, Mercuria and LRMH, and one (1) non-voting manager, the CEO of Reorganized ARDH1.

- The Plan includes customary releases, exculpatory and injunctive protection, including consensual third-party releases in favor of the Released Parties (the "**Releases**"), which includes the Debtors, the reorganized Debtors (the "**Reorganized Debtors**"), the Consenting Stakeholders (in their various capacities), the respective administrative and collateral agents, the Holders of the Existing AEH Equity Interests and each of their respective related parties.

Pursuant to and subject to the terms of the RSA, unless the Confirmation Order has been entered within 75 days of the Petition Date, the Company shall seek approval of bidding procedures (the "**Approved Bidding Procedures**") by such date and conduct a process to sell substantially all of the Company's assets.

Pursuant to the RSA, the Plan may not be withdrawn, amended, or otherwise modified in a manner inconsistent with the RSA, the restructuring term sheet attached to the RSA, or the Plan without a waiver by, as of the relevant date, (a) each of the Consenting Term Loan Lenders (the "**Required Consenting Term Loan Lenders**", subject to the proviso in the definition thereof in the RSA) and (b) each of the Consenting Seller Noteholders (the "**Required Consenting Seller**

Noteholders", subject to the proviso in the definition thereof in the RSA; and, collectively with the Required Consenting Term Loan Lenders, the "**Required Consenting Term/Seller Stakeholders**").  Certain waivers and amendments also require the consent of Consenting RBL Lenders holding at least 50.01% of the aggregate outstanding principal amount of the OpCo RBL Claims that are held by the Consenting RBL Lenders (the "**Required Consenting RBL Lenders**", and, collectively with the Required Consenting Term/Seller Stakeholders, the "**Required Consenting Stakeholders**").

The supplement to the Plan (the "**Plan Supplement**")—which may include, among other things, the limited liability company operating agreement of Reorganized ARDH1 (the "**New ARDH1 Operating Agreement**", and, together with any other constituent documents of the Reorganized OpCo Debtors, the "**Reorganized OpCo Debtors Constituent Documents**"), the New RBL Credit Agreement, a list of the members of the New Board, and a valuation analysis— shall be filed with the Bankruptcy Court no later than seven (7) days prior to the deadline to object to Confirmation of the Plan and may be amended from time to time prior to the Effective Date consistent with the terms of the Plan and the RSA, as further described in Article V.B of this Disclosure Statement.  Parties may obtain a copy of the Plan Supplement from Prime Clerk, LLC (the "**Voting Agent**") by: (1) calling the Debtors' restructuring hotline at 844-339-4103 (domestic/toll-free) or 929-247-2934 (international/toll); (2) visiting the Debtors' restructuring website, http://cases.primeclerk.com/arsenal or (3) writing to the Voting Agent (as defined below) at One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.

The following table summarizes (i) the treatment of Claims and Equity Interests under the Plan, (ii) which Classes are Impaired by the Plan, (iii) which Classes are entitled to vote on the Plan and (iv) the estimated amount of Allowed Claims for each Class of Claims. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of other terms and provisions of the Plan, see Article IV of this Disclosure Statement.

| Class | Claim or Equity Interest | Treatment | Status | Voting Rights | Estimated Amount of Allowed Claims or Interests[13] |
|-------|--------------------------|-----------|--------|---------------|------------------------------------------------------|
| 1A | AEH Seller Note Claims | In accordance with the RSA, on the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all Allowed AEH Seller Notes Claims, the Holders of such Allowed AEH Seller Notes Claims shall be entitled to receive the treatment specified in Article III.C(iv)(1)(B). | Impaired | Entitled to Vote | $129.8 million |
| 1B | AEH General | Holders of AEH General Unsecured Claims shall | Impaired | Deemed to | $0 |

---

[13]   The amounts set forth in this table are estimates of the total amount of Allowed Claims for each Class of Claims and therefore include principal (including any interest and fees that have been paid-in-kind and capitalized) and any accrued and unpaid interest.  As a result, these amounts may be different than those estimated amounts of principal only (which amounts may include any interest and fees that have been paid-in-kind and capitalized but not any accrued and unpaid interest) set forth elsewhere in this Disclosure Statement.

| Class | Claim or Equity Interest | Treatment | Status | Voting Rights | Estimated Amount of Allowed Claims or Interests[13] |
|---|---|---|---|---|---|
| | Unsecured Claims | be cancelled, released and discharged without any distribution. The Debtors believe that no Allowed AEH General Unsecured Claims exist. | | Reject | |
| 1C | AEH Equity Interests | On the Effective Date, all AEH Equity Interests shall be cancelled, Holders of AEH Equity Interests shall receive no recovery under the Plan and the Reorganized Debtors shall file a certificate of dissolution for AEH, in accordance with Article V.I of the Plan. | Impaired | Deemed to Reject | N/A |
| 2A | ARIH General Unsecured Claims | All Allowed ARIH General Unsecured Claims shall be Unimpaired by the Plan. The legal, equitable and contractual rights of a Holder of an Allowed ARIH General Unsecured Claim are unaltered. The Debtors believe that no Allowed AEH General Unsecured Claims exist. | Unimpaired | Presumed to Accept | $0 |
| 2B | ARIH Equity Interests | On the Effective Date, all ARIH Equity Interests shall be cancelled, Holders of ARIH Equity Interests shall receive no recovery under the Plan and the Reorganized Debtors shall file a certificate of dissolution for ARIH, in accordance with Article V.I of the Plan. | Impaired | Deemed to Reject | N/A |
| 3A | ARE Gathering Agreement Claims | Within sixty (60) days of the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all Allowed ARE Gathering Agreement Claims, each Holder of an Allowed ARE Gathering Agreement Claim shall be entitled to receive its Ratable Share of the ARE Available Cash. | Impaired | Deemed to Reject | Unliquidated |
| 3B | ARE Term Loan Claims | In accordance with the RSA, on the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all ARE Term Loan Claims, the Holders of such Allowed ARE Term Loan Claims shall be entitled to receive their Ratable Share of the ARE Available Cash,[14] in addition to the treatment specified in Article III.C(v)(1)(B) of the Plan. | Impaired | Entitled to Vote | $242.3 million |
| 3C | ARE General Unsecured Claims | Within sixty (60) days of the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, the Allowed | Impaired | Deemed to Reject | $0 |

---

[14]   Notwithstanding any entitlement of the Holders of Allowed ARE Term Loan Claims to receive their Ratable Share of ARE Available Cash under the Plan, all Holders of Allowed ARE Term Loan Claims have agreed to waive any such distribution in favor of Holders of Claims in Classes 3A and 3C.

9

| Class | Claim or Equity Interest | Treatment | Status | Voting Rights | Estimated Amount of Allowed Claims or Interests[13] |
|---|---|---|---|---|---|
| | | ARE General Unsecured Claims, each Holder of an Allowed ARE General Unsecured Claim shall be entitled to receive its Ratable Share of the ARE Available Cash. The Debtors believe that no Allowed ARE General Unsecured Claims exist. | | | |
| 3D | ARE Equity Interests | On the Effective Date, all ARE Equity Interests shall be cancelled, Holders of ARE Equity Interests shall receive no recovery under the Plan and the Reorganized Debtors shall file a certificate of dissolution for ARE, in accordance with Article V.I of the Plan. | Impaired | Deemed to Reject | N/A |
| 4A | ARDH2 Seller Notes Claims | In accordance with the RSA, on the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all Allowed ARDH2 Seller Notes Claims, the Holders of such Allowed ARDH2 Seller Notes Claims shall be entitled to receive the following treatment:<br><br>(1) If each Holder of an Allowed Claim in each of Classes 1A and 4A submits a ballot to accept the Plan:<br><br>a  7,570,392 New ARDH1 Class A Interests shall be issued to Chambers Energy Capital II, LP (or its successors or assigns), on account of the Allowed ARDH2 Seller Notes Claims it beneficially owns;<br><br>b  927,101 New ARDH1 Class A Interests shall be issued to Chambers Energy Capital II TE, LP (or its successors or assigns), on account of the Allowed ARDH2 Seller Notes Claims it beneficially owns;<br><br>c  25,780,361 New ARDH1 Class A Interests shall be issued to Chambers Energy Capital III, LP (or its successors or assigns), on account of the Allowed ARDH2 Seller Notes Claims it beneficially owns; and<br><br>d  22,783,397 New ARDH1 Class A Interests shall be issued to LRMH (or its successors or assigns), on account of the Allowed ARDH2 Seller Notes Claims it beneficially owns; or<br><br>(2) If each Holder of an Allowed Claim in each of Classes 1A and 4A does not submit a | Impaired | Entitled to Vote | $129.8 million |

10

| Class | Claim or Equity Interest | Treatment | Status | Voting Rights | Estimated Amount of Allowed Claims or Interests[13] |
|-------|--------------------------|-----------|--------|---------------|---------------------------------------------------|
| | | ballot to accept the Plan, all Seller Notes Claims shall be cancelled, released and discharged without any distribution.<br><br>(3) For the avoidance of doubt, each Holder of an Allowed AEH Seller Notes Claim and an Allowed ARDH2 Seller Notes Claim shall receive only one recovery in full and complete satisfaction of all Seller Notes Claims that may be held by such Holder, which single recovery is specified in Article III.C(iv)(1)(B) of the Plan. | | | |
| 4B | ARDH2 General Unsecured Claims | ARDH2 General Unsecured Claims shall be cancelled, released and discharged without any distribution. The Debtors believe that no Allowed ARDH2 General Unsecured Claims exist. | Impaired | Deemed to Reject | $0 |
| 4C | ARDH2 Equity Interests | On the Effective Date, all ARDH2 Equity Interests shall be cancelled, Holders of ARDH2 Equity Interests shall receive no recovery under the Plan and the Reorganized Debtors shall file a certificate of dissolution for ARDH2, in accordance with Article V.I of the Plan. | Impaired | Deemed to Reject | N/A |
| 5A | ARDH1 Term Loan Claims | In accordance with the RSA, on the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all ARDH1 Term Loan Claims, the Holders of such Allowed ARDH1 Term Loan Claims shall be entitled to receive the following treatment:<br><br>(1) If each Holder of an Allowed Claim in each of Classes 1A and 4A submits a ballot to accept the Plan:<br><br>a 104,080,965 New ARDH1 Class A Interests shall be issued to Chambers Energy Capital II, LP (or its successors or assigns), on account of the ARDH1 Term Loan Claims it beneficially owns;<br><br>b 12,746,181 New ARDH1 Class A Interests shall be issued to Chambers Energy Capital II TE, LP (or its successors or assigns), on account of the ARDH1 Term Loan Claims it beneficially owns; and<br><br>c 128,321,603 New ARDH1 Class A Interests shall be issued to Mercuria (or its successors or assigns), on account of the ARDH1 Term Loan Claims it beneficially | Impaired | Entitled to Vote | $242.3 million |

11

| Class | Claim or Equity Interest | Treatment | Status | Voting Rights | Estimated Amount of Allowed Claims or Interests[13] |
|---|---|---|---|---|---|
| | | owns; or <br><br> (2) If each Holder of an Allowed Claim in each of Classes 1A and 4A does not submit a ballot to accept the Plan, each Holder of an Allowed ARDH1 Term Loan Claim shall receive its Pro Rata share of 196,436,500 New ARDH1 Class A Interests. <br><br> (3) For the avoidance of doubt, each Holder of an Allowed ARE Term Loan Claim and an Allowed ARDH1 Term Loan Claim shall receive only one recovery in full and complete satisfaction of all Term Loan Claims that may be held by such Holder, which single recovery is specified in Article III.C(v)(1)(B) of the Plan. | | | |
| 5B | ARDH1 General Unsecured Claims | Holders of ARDH1 General Unsecured Claims shall be cancelled, released and discharged without any distribution. The Debtors believe that no Allowed ARDH1 General Unsecured Claims exist. | Impaired | Deemed to Reject | $0 |
| 5C | ARDH1 Equity Interests | On the Effective Date, all ARDH1 Equity Interests shall be cancelled, Holders of ARDH1 Equity Interests shall receive no recovery under the Plan and the Reorganized Debtors shall file a certificate of dissolution for ARDH1, in accordance with Article V.I of the Plan. | Impaired | Deemed to Reject | N/A |
| 6A | OpCo RBL Claims | On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all Allowed OpCo RBL Claims, each Holder of an Allowed OpCo RBL Claim shall receive an amount of Cash equal to such Holder's Allowed OpCo RBL Claim from the proceeds of the New RBL Facility and/or the New Equity Issuance, unless a Holder of an OpCo RBL Claim accepts a less favorable treatment. | Unimpaired | Presumed to Accept | $145 million |
| 6B | OpCo General Unsecured Claims | Class 6B is Unimpaired by the Plan. In full and final satisfaction, settlement, discharge and release of, and in exchange for, any Allowed OpCo General Unsecured Claim, each Holder of an Allowed OpCo General Unsecured Claim may, at the option of the Reorganized OpCo Debtors: (i) receive Cash equal to such Allowed Claim on the later of (x) the Effective Date, and (y) the date payment on account of such Allowed Claim is due, (ii) receive payment on terms as the | Unimpaired | Presumed to Accept | $40.3 million |

| Class | Claim or Equity Interest | Treatment | Status | Voting Rights | Estimated Amount of Allowed Claims or Interests[13] |
|---|---|---|---|---|---|
| | | Reorganized OpCo Debtors and the Holder thereof may agree, (iii) have such Allowed Claim Reinstated or (iv) receive such treatment so as to render such Allowed Claim "unimpaired" within the meaning of section 1124 of the Bankruptcy Code. | | | |
| 6C | OpCo Equity Interests | On the Effective Date, each OpCo Equity Interest shall be Reinstated and Unimpaired under the Plan. | Unimpaired | Presumed to Accept | N/A |
| 7A | Other Secured Claims | All Allowed Other Secured Claims are Unimpaired by the Plan. In full and final satisfaction, settlement, discharge and release of, and in exchange for, any Other Secured Claim, each Holder of an Allowed Other Secured Claim may, at the option of the Reorganized OpCo Debtors: (i) receive Cash equal to such Allowed Claim on the later of (x) the Effective Date, and (y) the date payment on account of such Allowed Claim is due, (ii) receive payment on terms as the Reorganized OpCo Debtors and the Holder thereof may agree, (iii) have the collateral securing such Allowed Claim conveyed to it, (iv) have such Allowed Claim Reinstated or (v) receive such treatment so as to render such Allowed Claim "unimpaired" within the meaning of section 1124 of the Bankruptcy Code. | Unimpaired | Presumed to Accept | $0 |
| 7B | Other Priority Claims | On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, the Other Priority Claims, at the option of the Reorganized Debtors, each Allowed Other Priority Claim shall be treated (i) consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (ii) on such other terms as the Reorganized OpCo Debtors and the Holder thereof may agree. | Unimpaired | Presumed to Accept | $1.7 million |
| 7C | Intercompany Claims | On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Claim, at the option of the Reorganized Debtors, each Allowed Intercompany Claim shall be (i) Unimpaired and Reinstated or (ii) Impaired and cancelled and released without any distribution. | Unimpaired; Impaired | Presumed to Accept; Deemed to Reject | N/A |
| 7D | Section 510(b) Claims | Holders of Section 510(b) Claims shall be cancelled, released and discharged without any distribution. The Debtors believe that no Section | Impaired | Deemed to Reject | N/A |

13

| Class | Claim or Equity Interest | Treatment | Status | Voting Rights | Estimated Amount of Allowed Claims or Interests[13] |
|---|---|---|---|---|---|
| | | 510(b) Claims exist. | | | |

> **THE DEBTORS BELIEVE THAT THE RESTRUCTURING AND COMPROMISE CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES AND WILL PROVIDE THE BEST RECOVERY TO CLAIM AND EQUITY INTEREST HOLDERS.**
>
> **FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTORS URGE ALL PARTIES ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.**

## II.
## BACKGROUND

### A.    Overview of the Company

The Company is an independent exploration and production company engaged in the acquisition and development of unconventional natural gas resources in the Appalachian Basin. The Company has approximately 177,000 net acres in the dry gas window of the Marcellus Shale, a formation characterized by the U.S. Energy Information Administration as one of the most prolific natural gas-producing formations in the country.

The Company creates value by leveraging its technical expertise and local knowledge to assemble a portfolio of concentrated, high-quality drilling locations, develop its acreage position safely and efficiently and install midstream infrastructure to support its upstream activities.

The Company's asset base represents one of the largest acreage positions in West Virginia, and the Company believes its geographic concentration positions it to capture cost and scale efficiencies that give it a competitive advantage over other Appalachian Basin operators. As of October 31, 2019, the Company has identified more than 949 gross (426 net) potential drilling locations and approximately 4,100,000 net undeveloped lateral feet in the Company's development area.

The Company's principal executive offices are located at 6031 Wallace Road Ext., Suite 300, Wexford, Pennsylvania 15090.

For the year ended December 31, 2018, the Company had total revenues of $120,186,000. For the six months ended June 30, 2019, the Company had total revenues of $59,315,000.

B.    **Operations**

The Company was formed and began operations in 2011.

As of October 31, 2019, the Company operated 82 producing horizontal wells and five (5) non-producing horizontal wells.  All of those wells are located in West Virginia.  In the year ended December 31, 2018 and the quarter ended September 30, 2019, the Company's average net daily production of natural gas was 132.1 million cubic feet per day ("**Mmcf/d**") and 144.3 Mmcf/d, respectively.

The Company's revenues are derived from the sale of natural gas before the effects of derivatives. To achieve more predictable cash flows and to reduce its exposure to downward price fluctuations, the Company uses derivative instruments to hedge future sales prices and basis differentials on portions of its natural gas production. Its natural gas revenues may vary significantly from period to period as a result of changes in volumes of production sold or changes in commodity prices. For more information regarding the commodity derivative contracts, including the estimated net asset value, see Article II.E.1 of this Disclosure Statement.

C.    **The Company's History**

1.    **The Company's History and Overview**

The Company's operations were formed and began in 2011. Through 2013, the Company had drilled and completed three horizontal test wells in northeastern Barbour County, conducting numerous tests, including a full-bore geologic core sample, micro-seismic analysis, landing zone analytics, various drilling equipment configurations, sand concentration tests and general completion design configurations. With the increase of the Company's production performance and reduction of the average cost per lateral foot, combined with the encouraging results of its third well, the Company shifted focus to consolidation of its acreage footprint.

In October 2014, the Company completed the acquisition of PDC Mountaineer, LLC through which it acquired approximately 120,000 net acres to the west of its pre-existing acreage and largely concentrated in Harrison, Taylor and Barbour Counties and a 50% joint venture interest in the gathering system that served the existing producing assets. The acquisition added approximately 40 Mmcf/d of production in the fourth quarter of 2014, as well as 29 operated and producing horizontal wells and 24 miles of gathering lines.

In 2015, the Company developed 20 wells within its core position. During that development period, the Company further refined the technical approach while driving improved cost efficiencies in drilling and completion activities.

In November 2016, the Company consolidated Arsenal Midstream LLC through an exchange of AEH common shares for the 50% interest owned by its joint venture partners and completed a $160 million capital raise to fund 2017 exploration and production operations through an issuance of subordinated notes and warrants. In 2017 and 2018, the Company developed 23 wells, primarily within the Company's core acreage position. The Company also advanced plans for full-field upstream and midstream development to optimize value creation from its existing acreage position. In late 2017, a number of the Company's leases expired,

causing its net acreage to decline from its high of approximately 212,000 net acres in the dry gas window of the Marcellus Shale to the current approximately 177,000 net acres in the dry gas window of the Marcellus Shale.

Concurrent with the First Recapitalization, the Company initiated a one-rig development plan. Thereafter, through October 31, 2019, the Company drilled 18 wells, completed 11 wells and turned eight (8) wells to sales. Due to liquidity constraints, operational activities on the Company's six (6) wells, Pritt South pad, were paused after three (3) of six (6) wells were completed. The Pritt South pad was the Company's first pad of joint wells to be completed as part of the Company's joint development agreement (the "**Joint Development Agreement**") for a joint venture with IOG Resources LLC ("**IOG**") that was entered into in connection with the First Recapitalization. Under the Joint Development Agreement, IOG committed to fund a portion of the development costs of wells drilled within a designated "area of mutual interest" in exchange for receiving a portion of the working interests in the associated leases and wellbores.[15]

In 2019, the Company also completed the construction of two critical infrastructure projects, including the Company's first gathering line in Eastern Harrison County, West Virginia that provides pipeline access to 11 wells on the Pritt North and South pads and acts as the first link in the Company's "Simpson" gathering system and the Neptune water pipeline, which is an approximate 17 mile, 20" water pipeline that extends through the Company's western acreage position and will provide fresh water for future completion activities.

---

[15] The Company continues to engage with IOG regarding potential modifications to the Joint Development Agreement.

The following graphic illustrates the Company's acreage position and operations:



### 2.    The First Recapitalization and Prior Plan

On February 14, 2019 (the "**Prior Plan Effective Date**"), AEH consummated the Prior Plan that exchanged more than $860 million of subordinated debt for a majority of the equity of reorganized AEH.[16]

As previously discussed, the Prior Plan was the final step in the First Recapitalization transaction which, in addition to equitizing the subordinated debt under the Prior Plan, included the Company (a) obtaining $110 million of new capital, (b) refinancing approximately $225 million of revolving and term loans and (c) entering into the joint development drilling program with IOG (components (a) through (c) were effectuated consensually out of court prior to consummation of the Prior Plan).  AEH was the only debtor under the Prior Plan and, other than the claims of holders of the subordinated notes, all claims against AEH were unimpaired.  The First Recapitalization left operations unaffected and trade creditors unimpaired and was supported by a number of the Company's lenders.  Despite the Company's efforts, it was unable to consensually amend any of the Gathering Agreements in connection with the First Recapitalization.

---

[16]    See In re: Arsenal Energy Holdings LLC (Case No. 19-10226), *Order (I) Approving (A) the Adequacy of the Disclosure Statement and (B) the Prepetition Solicitation Procedures and (II) Confirming the Pre-Packaged Plan of Reorganization of Arsenal Energy Holdings LLC* [Docket No. 61] and *Final Decree and Order, Pursuant to Sections 105(a) and 350(a) of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 3022-1, Closing Chapter 11 Case and Terminating Claims and Noticing Services* [Docket No. 102].

Pursuant to the First Recapitalization, the Company continued to operate principally through its existing organizational structure. Other than the change to the ownership of AEH, the remainder of the Company's corporate structure was maintained and was unaffected by the Prior Plan.   Importantly, the Company's trade creditors were not impacted by the First Recapitalization.

### D. The Company's Organizational Structure

#### 1. Corporate Structure

The Company is privately owned and conducts its business through the Operating Subsidiaries. The Operating Subsidiaries are responsible for substantially all general corporate functions and employ all of the Company's active full-time and part-time employees.

The existing corporate structure chart, which is attached as **Exhibit C** hereto (the "**Structure Chart**"), provides an illustrative representation of the current corporate organizational structure of the Debtors.

#### 2. Employees

As of October 31, 2019, the Company had approximately 77 full-time employees and 1 part-time employee.  None of the Company's employees are covered by collective bargaining agreements or represented by an employee union.

#### 3. Management

The Company is managed by a 7-member board of managers at AEH (the "**Board**"), which consists of Brian Falik, Jonathan Farmer, Alex Krueger, Xianbing ("Tim") Luo, Mark Shoberg, Juan Diego Vargas and Jack Yang.  Guy Hoffman and Howard Stern are Board observers.

Each of the other Debtors is a member-managed limited liability company.

The Company's senior management team consists of the following individuals:

| Name | Position |
|------|----------|
| Jonathan Farmer | President & CEO |
| Allen Goetz | SVP, CFO & CAO |
| Jonathan Sheldon | SVP & COO |
| Andrew Repine | SVP, Corporate Strategy & Capital Markets |
| Craig Lavender | General Counsel |

E.    **The Company's Capital Structure**

The Company's current capital structure is the result of the consummation of the First Recapitalization (and the Prior Plan) and includes the following material funded debt:

(a)    Indebtedness in an aggregate principal amount of approximately $117 million of secured loans outstanding under the RBL Facility and a single letter of credit issued and currently outstanding in the face amount of approximately $28 million;

(b)    Indebtedness in an aggregate principal amount (including interest and fees that have been paid-in-kind and capitalized) of approximately $233 million of secured loans outstanding under the Term Loan Facility; and

(c)    Indebtedness in an aggregate principal amount (including interest that has been paid-in-kind and capitalized) of approximately $128 million of secured Seller Notes outstanding.

1.    **RBL Facility**

On December 21, 2018, in connection with the First Recapitalization, ARD entered into a reserve based revolving loan facility (the "**RBL Facility**"), which provided for an initial aggregate commitment of $145 million, $50 million of which could be used for the issuance of letters of credit.  Citibank, N.A. acts as the administrative agent (the "**RBL Agent**") for the lenders and other secured parties (the "**RBL Lenders**").

Obligations under the RBL Facility are guaranteed by the other OpCo Debtors and are secured by a first priority lien on substantially all of the assets of the OpCo Debtors, including substantially all oil and gas reserves, subject to certain exceptions.  Because the RBL Facility has secured claims against the OpCo Debtors, the RBL Facility is structurally senior to the Term Loan Facility and the Seller Notes, which only have claims against certain holding companies. The RBL Facility has a scheduled maturity date of June 21, 2022.

The RBL Facility is fully drawn and the commitments thereunder have terminated. As of the date of this Disclosure Statement, there was approximately $117 million[17] of aggregate principal amount outstanding under the RBL Facility, and there was a single letter of credit outstanding in the face amount of approximately $28 million.[18]

Historically the Company has hedged a significant portion of its forecasted natural gas production to reduce exposure to commodity price fluctuations and provide long-term cash flow predictability to manage their business. As of October 25, 2019, the estimated fair value of its commodity derivative contracts was a net asset of approximately $13.0 million.  The Company

---

[17]    $45 million of the principal amount under the RBL Facility is expected to be "rolled up" into loans under the DIP Facility.

[18]    In the event this letter of credit is drawn, obligations arising from such draw would become loans outstanding under the RBL Facility, constitute OpCo RBL Claims under the Plan and share ratably in the treatment of OpCo RBL Claims.

did not post collateral specific to any of their prepetition hedge agreements as they are secured under the RBL Facility.

Prior to the date of this Disclosure Statement, RBL Lenders constituting "Required Lenders" under the RBL Facility and the RBL Agent entered into a forbearance agreement, including several extensions and amendments thereto, in respect of certain events of default that had occurred under the RBL Facility. The forbearance agreement will terminate upon the commencement of the Chapter 11 Cases.

### 2.    Term Loan Facility

In connection with the First Recapitalization and concurrently with the entry into the RBL Facility, ARDH1 entered into the Term Loan Facility in the aggregate principal amount of approximately $220 million, with funds affiliated with Chambers and Mercuria as lenders (the "**Term Loan Lenders**") and Chambers Energy Management, LP (the "**TL Agent**") as the administrative agent. The proceeds of the Term Loans were used to refinance loans outstanding under a pre-existing second-lien term loan facility, repay a substantial portion of the borrowings under the then-existing reserve based revolving facility, as well as for working capital purposes.

Obligations under the Term Loan Facility are secured by liens on the assets of ARDH1, consisting primarily of the equity interests in its wholly-owned subsidiary ARD. The Term Loan Facility is guaranteed by ARE. The Term Loan Facility is structurally subordinate to the RBL Facility. The Term Loan Facility has a scheduled maturity date of December 21, 2023.

As of the date of this Disclosure Statement, there was approximately $233 million of aggregate principal amount (including interest and fees that have been paid-in-kind and capitalized) outstanding under the Term Loan Facility. Prior to the date of this Disclosure Statement, Term Loan Lenders constituting "Required Lenders" under the Term Loan Facility and the TL Agent entered into a forbearance agreement, including several extensions and amendments thereto, in respect of certain events of default that had occurred under the Term Loan Facility. The forbearance agreement will terminate upon the commencement of the Chapter 11 Cases.

### 3.    Seller Notes

On October 14, 2014, AEH issued two seller notes, each in the original principal amount of approximately $39 million (as amended, supplemented or otherwise modified from time to time, collectively, the "**Seller Notes**"), one in favor of PDC Energy, Inc., which was later assigned to an affiliate of Chambers, and one in favor of an affiliate of LRMH (together, in their respective capacities as holders of Seller Notes, the "**Seller Noteholders**"). LRMH serves as the collateral agent in respect of the Seller Notes. The Company used the proceeds of the Seller Notes to pay for a portion of the Company's acquisition of PDC Mountaineer, LLC (now known as Arsenal Resources LLC).

Finally, on December 21, 2018, in connection with the First Recapitalization, ARDH2, the direct parent of ARDH1, became a guarantor of the Seller Notes. ARDH2's obligations under the guaranty are secured by a lien on substantially all of its assets, which consists primarily of a pledge of its equity interest in ARDH1. The Seller Notes also are secured by liens on the

assets of AEH, including a pledge of its equity interest in ARIH.    The Seller Notes are structurally subordinate to the RBL Facility and the Term Loan Facility. The Seller Notes have a stated maturity of October 14, 2020.

As of the date of this Disclosure Statement, there was approximately $128 million in aggregate principal amount (including interest that has been paid-in-kind and capitalized) outstanding under the Seller Notes.  Prior to the date of this Disclosure Statement, the holders of the Seller Notes entered into a forbearance agreement, including several extensions and amendments thereto, in respect of certain events of default that had occurred. The forbearance agreement will terminate upon the commencement of the Chapter 11 Cases.

### 4.    Existing Equity Interests

The Company is privately owned. In connection with the First Recapitalization, AEH issued three classes of common units, including to holders of certain subordinated notes, resulting in the substantial dilution of AEH's then existing equity holders.

### F.    Gathering Agreements

The Company's wells are located in four concentrated areas, referred to as the "Simpson", "Cherry Run", "Comet" and "Goff" areas. ARE is party to five transport and gathering agreements,[19] including the TCO Gathering Agreements[20] which provide ARE with pipeline access for the transportation of produced gas to market. Certain of the Gathering Agreements impose significant minimum volume commitments ("**MVCs**") at uneconomic fixed prices, thereby requiring ARE to pay for pipeline access, whether or not it is fully utilizing that capacity.[21] Importantly, as described above, the obligations under the Gathering Agreements are structurally subordinate to all of the Debtors' lenders and trade creditors.[22]

---

[19]    The following agreements comprise the "**Gathering Agreements**": the various gathering and natural gas services agreements, amendments and other related documentation between ARE and Fullstream (the "**Fullstream Gathering Agreements**"); the various transportation service agreements, amendments and other related documentation between ARE and EQM (the "**EQM Gathering Agreements**"); the gas gathering agreement, amendments and other related documentation between ARE and DTE-SGG (the "**DTE-SGG Gathering Agreements**"); the gas gathering agreement, amendments and other related documentation between ARE and DTE-AGS (the "**DTE-AGS Gathering Agreements**", and, together with the DTE-SGG Gathering Agreement, the "**DTE Gathering Agreements**"); and the various natural gas transportation service agreements, amendments, amendments and other related documentation between ARE and TCO (the "**TCO Gathering Agreements**").

[20]    On October 29, 2019, TCO sent a termination notice to ARE, and provided notice of that event to the Federal Energy Regulatory Commission ("**FERC**"), which termination becomes effective automatically on November 8, 2019.

[21]    In the months leading up to the Petition Date, with liquidity severely constrained, ARE stopped paying for unmet MVCs and began negotiations to amend the Gathering Agreements.

[22]    The hierarchy and nature of the Company's existing capital structure was disclosed in the Disclosure Statement approved in connection with the First Recapitalization. See In re: Arsenal Energy Holdings LLC (Case No. 19-10226), *Disclosure Statement for Pre-Packaged Plan of Reorganization of Arsenal Energy Holdings LLC* [Docket No. 7].

As background, ARE (and its predecessors) entered into the Gathering Agreements at various periods in the past nine years, when natural gas prices were higher, with the expectation that such prices would support a more accelerated development plan of the Company's acreage position and thereby allow the Company to grow into the MVCs under its Gathering Agreements via increased drilling. Those MVCs were intended to ensure the ability to transport and market the Company's produced gas. Because of the significant decline in natural gas prices, unforeseen liquidity constraints and uneconomic terms under the Gathering Agreements, ARE cannot fulfill the volume requirements and other obligations under the Gathering Agreements. The Company currently is producing approximately 160,000 million British thermal units ("**Mmbtu**") per day ("**Mmbtu/d**") with MVCs of more than 500,000 Mmbtu/d (vastly exceeding the Company's aggregate production volumes). Moreover, the transportation rates in the Gathering Agreements were premised on accessing specific local markets with premium pricing relative to others, but this pricing differential has largely disappeared—making the transportation rates uneconomic. Accordingly, the Plan provides that as a condition to its effectiveness, the Gathering Agreements either must be amended to fit within the Company's current business plan, or be rejected or assumed, in either case, with the consent of certain of the Consenting Stakeholders.

After months of negotiation with the Gathering Agreement Counterparties, the Company reached agreement to amend its Gathering Agreements with both EQM and Fullstream. The amendments, which will become effective upon the Effective Date, are in full and final satisfaction of any and all Claims under their respective Gathering Agreements and have been approved by the Consenting Stakeholders. Under the amendment with Fullstream, Fullstream agreed to, among other things, modify midstream rates and eliminate the MVC obligations in exchange for an acreage dedication. Under the amendment with EQM, EQM agreed to, among other things, reduce the MVCs in the EQM Gathering Agreements to below 90% of the Company's forecasted production from currently producing wells in the Company's "Goff" and "Comet" areas. The EQM Gathering Agreements and the Fullstream Gathering Agreements will be assumed on the Effective Date and assigned to a Reorganized OpCo Debtor.

TCO sent a termination notice to ARE, and provided notice of that event to FERC, which termination becomes automatically effective on November 8, 2019. To the extent there are any executory obligations remaining thereunder, such obligations will be rejected as of the Petition Date.

As of the date of this Disclosure Statement, DTE and the Company have been unable to agree on long-term permanent amendments to the DTE Gathering Agreements. These DTE Gathering Agreements remain unmodified, and, unless a consensual amendment can be reached with DTE on terms satisfactory to the Required Consenting Term/Seller Stakeholders, the DTE-SGG Gathering Agreements will be rejected effective as of the Petition Date.[23]

---

[23]    The Company also entered into interruptible gathering agreements with DTE-SGG and DTE-AGS for month-to-month services on an "IT" basis (i.e., "interruptible"; there are no volume commitments and ARE pays only for actual volumes utilized). These interruptible gathering agreements will terminate at month-end unless the parties agree extend the termination date.

**G.      Regulation of the Company's Business**

The Company is subject to federal, state and, in some cases, local regulation in the jurisdictions in which it operates. These regulations govern and/or affect many aspects of its overall business.

All of the jurisdictions in which the Company owns or operates producing natural gas and oil properties have statutory provisions regulating the exploration for and production of oil and natural gas, including provisions related to permits for the drilling of wells, bonding requirements to drill or operate wells, the location of wells, the method of drilling and casing wells, the surface use and restoration of properties upon which wells are drilled, sourcing and disposal of water used in the drilling and completion process, the management and disposal of wastes generated in various aspects of the Company's operations, and the abandonment of wells. The Company's operations are also subject to various conservation laws and regulations. These include the regulation of the size of drilling and spacing units or proration units, the number of wells which may be drilled in an area, as well as regulations that generally restrict or prohibit the venting or flaring of natural gas, and impose certain requirements regarding the ratability or fair apportionment of production from fields and individual wells.

In order to comply with the laws and regulations applicable to its businesses, the Company has policies, standards and procedures in place for its business activities and with its third-party vendors and providers. In connection with these laws and regulations, the Company must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. Failure to comply with these laws and regulations may also result in the suspension or termination of the Company's operations as well as injunctions limiting or prohibiting its activities.  As discussed further in the risk factors in Article IX of this Disclosure Statement, any future regulatory modifications could have a substantial impact on the Company's profitability in the short, medium and long terms.

**H.      Prior and Pending Litigation Proceedings**

In the ordinary course of its business, the Company is party to various legal proceedings, for example, those brought by current or former employees, customers and competitors, the outcome of which cannot be predicted with certainty. There is no outstanding material litigation involving the Company.

The Company's policy is to defend vigorously all claims and actions brought against it. Although the Company intends to continue to defend itself aggressively against all claims asserted against it, any future claims are subject to the uncertainties attendant to litigation and the ultimate outcome of any such proceedings cannot be predicted.

**I.      Reasons for the Restructuring**

Like other similarly situated exploration & production ("**E&P**") companies, during fiscal year 2018 the Company found itself in a financially untenable position largely caused by

declining gas prices. Consequently, in February 2019 the Company closed on the fully consensual First Recapitalization and Prior Plan.[24]

As a result of drilling and the proved developed producing reserve growth described in further detail in Article II.C.1 of this Disclosure Statement, the Company anticipated increasing its availability under the RBL Facility by growing the "borrowing base". Upon achieving those results, the Company expected that it would be in a position to use the additional borrowing capacity to further expand its drilling program and continue to grow its producing production base.

Unfortunately, following the Prior Plan Effective Date, the E&P industry's declining trend continued through fiscal year 2019. Since the Prior Plan Effective Date, realized gas prices have been on average 8.1% below futures strip (and the forward looking October 22, 2019 strip is on average 8.6% lower today than February 14, 2019 strip). Indeed, since the Prior Plan Effective Date through September 30, 2019, 31 E&P companies have filed for chapter 11 protection. This represents a significant increase compared to the 22 E&P companies that filed for chapter 11 during the first 9 months of 2018.

Unfortunately, notwithstanding these achievements and the successful execution of the First Recapitalization in late-2018 and early-2019, the Company's business plan was frustrated by two significant factors: (1) a significant drop in natural gas realized prices, which led to a material decline in revenue, and (2) a decline in the strip price curve as well as bank pricing to determine the borrowing base, which led to a stagnating borrowing base under the RBL Facility and constrained liquidity.

Moreover, the Company was unable to amend a gas marketing agreement, which would have freed up approximately $28 million of availability under the RBL Facility by replacing the outstanding letter of credit currently issued under the RBL Facility. Without access to this additional liquidity and due to lower commodity prices, the Company curtailed its drilling program, which created strain on the Company's forecast and further limited the Company's access to capital.

As a result, despite the Debtors' substantial efforts to reduce long-term debt, access new sources of capital and expand their drilling program through the First Recapitalization and the Prior Plan, the Debtors' obligations under their existing debt facilities and the Gathering Agreements became unsustainable. Concurrently, the decline in commodity prices and resulting impact on revenue led to a dramatic reduction in the Company's liquidity.

## J.    Restructuring Support Agreement

On November 6, 2019, after months of negotiations, the Company, with the approval of the Board, executed a restructuring support agreement (the "**RSA**") with the Consenting Stakeholders, who collectively hold 100% of the Company's funded debt, including the Holders of Claims in the Classes entitled to vote on the Plan. Subject to the terms thereof, the RSA commits the Consenting Stakeholders to, among other things: (i) support and complete the Plan

---

[24]    *See* In re: Arsenal Energy Holdings LLC (Case No. 19-10226).

and the broader Restructuring Transactions in accordance with the RSA and the Plan; (ii) vote their Claims, as applicable, in favor of the Plan; (iii) not take any action to interfere with consummation of the Restructuring Transactions; (iv) in the case of the Consenting RBL Lenders, commit to provide the financing under the $90 million DIP Facility, which consists of a $45 million new money revolving facility and a refinancing of $45 million outstanding under the RBL Facility, and the New RBL Facility a $130 million initial borrowing base; and (v) in the case of the New Capital Parties, provide the $100 million New Capital Commitment.  The transactions contemplated by the RSA represent a comprehensive resolution of extensive and complex issues relating to the Debtors to be implemented through the Plan.

**III.**
**ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES**

The Debtors anticipate commencing the Chapter 11 Cases on November 8, 2019 or at such other time as agreed by the Company and the Required Consenting Stakeholders in accordance with the RSA. The filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefits, and become subject to the limitations, of the Bankruptcy Code.

**A.**      **Timetable for the Chapter 11 Cases**

It is critical that the Debtors emerge from the Chapter 11 Cases as expeditiously as possible because protracted bankruptcy proceedings will significantly and detrimentally impact the Company's relationships with customers, employees, financing counterparties and vendors.

Accordingly, the Debtors will request that the Bankruptcy Court confirm the Plan as soon as the Bankruptcy Court will allow and is practicable.

Accordingly, the Debtors and the Consenting Stakeholders have proposed the following timeline for the Chapter 11 Cases:

| December 11, 2019 | Plan / Disclosure Statement Objection Deadline |
|---|---|
| December 18, 2019 | Combined Hearing on Disclosure Statement / Confirmation |
| December 31, 2019[25] | Plan Effectiveness |

---

[25]   The Debtors are consulting with their accounting firm to determine whether the Effective Date should occur on December 31, 2019 or January 2, 2020.

In addition to the Debtors' proposed timeline, the RSA includes the following outside dates[26] for the achievement of the applicable milestones (capitalized terms as defined in the RSA), which milestones may be modified, waived or extended as agreed by the Debtors and the Required Consenting Stakeholders in accordance with the RSA:[27]

| November 8, 2019 | Launch Solicitation |
|---|---|
| November 11, 2019 | Commencement of the Chapter 11 Cases |
| November 11, 2019 | Filing of the Plan, the Disclosure Statement and the Scheduling Motion (seeking to schedule a Confirmation Hearing no later than December 26, 2019) |
| November 16, 2019 | Entry of the Interim DIP Order |
| December 11, 2019 | Entry of the Final DIP Order |
| January 25, 2020 | Unless entry of the Confirmation Order already has occurred, entry of an order approving the Approved Bidding Procedures |
| February 9, 2020 | Entry of the Confirmation Order |
| February 24, 2020 (or, if earlier, 15 days after entry of the Confirmation Order) | Outside Effective Date |

Achieving the various milestones under the RSA is crucial to reorganizing the Debtors successfully.  The Plan provides that the Effective Date will be the date on which a notice of effectiveness is filed with the Bankruptcy Court confirming that (a) all conditions in Article IX.A of the Plan have been satisfied or waived as provided for in Article IX.B and (b) consummation of the Restructuring Transactions has occurred.

**B.**    **Commencement of the Chapter 11 Cases and First Day Motions**

The Debtors anticipate that the Company's business will operate in the ordinary course during the pendency of the Chapter 11 Cases in the same manner as prior to the date of commencement of the Chapter 11 Cases (the "**Petition Date**"), and the Chapter 11 Cases are

---

[26]    Pursuant to the RSA, the Debtors are required to commence the Chapter 11 Cases on or before November 11, 2019.  The dates of the postpetition milestones set forth in this table assume the Chapter 11 Cases are commenced on that date, and not before, and therefore are for illustrative purposes only.

[27]    The Debtors are entitled to terminate the RSA to the extent the Board determines in good faith that the Restructuring Transactions and the Plan would be inconsistent with the exercise of its fiduciary duties or applicable law or, in an exercise of its fiduciary duties, the Board determines to pursue an Alternative Restructuring Proposal (defined in the RSA).

anticipated to have little to no impact on any of the operations of the Company, including with respect to customers, employees, vendors or other counterparties (except in respect of certain of the Gathering Agreements, the dissolution of the HoldCo Debtors and the rejection or assignment by a HoldCo Debtor to a Reorganized OpCo Debtor of an Executory Contracts or Unexpired Leases to which such HoldCo Debtor is a party, if any).

To facilitate the prompt and efficient implementation of the Plan through the Chapter 11 Cases, shortly after the Petition Date, the Debtors will seek authority to have the Chapter 11 Cases administered jointly. On the Petition Date, the Debtors will file various motions seeking relief from the Bankruptcy Court to facilitate a smooth reorganization through the Chapter 11 Cases and minimize any disruptions to the operations of the Company. The following is a brief overview of the relief the Debtors anticipate requesting to maintain their operations in the ordinary course.

### 1.    First and Second Day Relief

The Debtors anticipate filing certain motions and applications requesting various types of "first day" and "second day" relief to enable the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things: (a) an order authorizing the Debtors to enter into the DIP Facility with the lenders, the administrative agent and the issuing banks thereunder, including to obtain the borrowings thereunder, to use the cash subject to liens granted in favor of the RBL Lenders, Term Loan Lenders and Seller Noteholders (the "**Prepetition Secured Parties**"), if any, pursuant to, respectively, the documents in respect of each of the RBL Facility, the Term Loan Facility and the Seller Notes (collectively, the "**Prepetition Secured Credit Agreements**") and grant certain adequate protection for any diminution of value of the Prepetition Secured Parties' interests in the collateral, if any, securing the loans under the Prepetition Secured Credit Agreements; (b) an order authorizing the Debtors to continue using their existing cash management system and existing bank accounts, honor certain prepetition obligations related thereto, and maintain existing business forms; (c) an order authorizing the Debtors to pay certain prepetition accrued and unpaid wages, compensation and other benefits and to continue to honor their benefit programs and policies; (d) an order authorizing the Debtors to pay certain prepetition taxes, fees and similar charges, including any such amounts that become due and owing postpetition; (e) an order approving the Debtors' proposed assurance of postpetition payment to their utility providers and procedures for resolving disputes regarding assurance of payment to such providers; (f) an order authorizing the Debtors to honor their obligations under their prepetition insurance program and bonding program in the ordinary course postpetition; (g) an order authorizing the Debtors to deliver, in the ordinary course of business, the funds owed to the holders of royalty interests and working interests as required by the Debtors' oil and gas leases and related agreements and to continue to satisfy obligations in connection with these royalty interests and working interests in the ordinary course and without regard to whether such obligations related to pre- or post-petition periods; (h) an order authorizing the Debtors to remit and pay in the ordinary course of business any prepetition and postpetition amounts owing on account of lienable operating expenses; (i) an order authorizing the Debtors to pay certain prepetition claims of creditors not otherwise covered by the other "first day" motions; and (j) an order scheduling a combined hearing on the adequacy of this Disclosure Statement and confirmation of the Plan, fixing the deadline to object to this Disclosure Statement and the Plan, approving prepetition solicitation

procedures, approving the form and manner of notice of commencement, combined hearing and objection deadline, approving notice and objection procedures for the assumption or rejection of Executory Contracts and Unexpired Leases, conditionally directing the United States Trustee not to convene a section 341(a) meeting of creditors and waiving the requirement to file statements of financial affairs and schedules of assets and liabilities. The Debtors intend to request that the "second day" relief be heard at the Confirmation Hearing.

### 2. Additional Motions

The Debtors may file, on or after the Petition Date, additional motions seeking relief from the Bankruptcy Court in order to stabilize the Debtors' businesses during the pendency of the Chapter 11 Cases.

In accordance with the RSA, if the Debtors cannot confirm the Plan within 75 days of the Petition Date, the Debtors must obtain approval of the Approved Bidding Procedures by such date and conduct a process to sell substantially all of the Company's assets.

### C. Procedural Motions and Retention of Professionals

The Debtors anticipate filing several other motions that are required or common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases, authorization to continue to utilize and pay non-bankruptcy professionals in the ordinary course of business and authorization to appoint a claims and noticing agent. In particular, the Debtors anticipate filing applications, and seeking Bankruptcy Court orders, approving the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, including:

- STB, as restructuring co-counsel;

- YCST, as Delaware restructuring co-counsel;

- PJT Partners LP, as investment banker;

- Alvarez & Marsal, as financial advisor; and

- Prime Clerk LLC, as administrative advisor, noticing and voting agent.

### D. Rejection Bar Date

As set forth in the Plan, each of ARDH1 and each OpCo Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, without the need for any further notice to or action, order or approval of the Bankruptcy Court, subject to certain exceptions set forth in the Plan.

As noted above, the TCO Gathering Agreements terminate automatically on November 8, 2019.  In addition, unless a consensual amendment can be reached with DTE on terms

satisfactory to the Required Consenting Term/Seller Stakeholders, the DTE-SGG Gathering Agreements will be rejected effective as of the Petition Date.

Accordingly, as set forth in the Plan Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Proofs of Claim with respect to Claims arising from termination of the TCO Gathering Agreements, if any, must be filed with the Bankruptcy Court within 30 days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease or termination of the TCO Gathering Agreements not filed within such time(s) will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized OpCo Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized OpCo Debtors, as applicable, or further notice to, or action, order or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease or the termination of the TCO Gathering Agreements shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.

E.     **Automatic Stay**

The filing of the Debtors' bankruptcy petitions on the Petition Date will trigger the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date.

### IV.
### SUMMARY OF CERTAIN PROVISIONS OF THE PLAN

The following description of the Plan is a brief summary of certain provisions of the Plan. This summary does not purport to be complete, and other provisions of the Plan are not summarized herein.  This summary, and the other provisions of the Plan not summarized herein, is subject to, and qualified in its entirety by reference to, the Plan attached hereto as **Exhibit A**.

A.     **Treatment of Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and DIP Facility Claims are not classified and are not entitled to vote on the Plan.

1.     **Administrative Claims**

Subject to subparagraph (i) below, in full and complete satisfaction, settlement, discharge and release of each Allowed Administrative Claim (except to the extent that (a) the Holder of such Allowed Administrative Claim and either the Debtors, with the reasonable consent of the

Required Consenting Term/Seller Stakeholders, or the Reorganized OpCo Debtors, as applicable, agree in writing to less favorable treatment or (b) the Holder of such Allowed Administrative Claim has been paid in full during the Chapter 11 Cases), the Debtors or Reorganized OpCo Debtors, as applicable, (i) shall pay to each Holder of an Allowed Administrative Claim Cash in an amount equal to such Allowed Administrative Claim on the later of (x) the Effective Date, or as soon thereafter as is reasonably practicable and (y) as soon as practicable after such Allowed Administrative Claim becomes due and payable, (ii) shall provide such other treatment to render such Allowed Administrative Claim Unimpaired or (iii) shall provide such other treatment as the Holder of such Allowed Administrative Claim may agree to or otherwise as permitted by section 1129(a)(9) of the Bankruptcy Code; provided, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(a)      Professional Fee Claims

Professionals (a) asserting a Professional Fee Claim shall deliver to the Debtors their estimates for purposes of the Debtors computing the Professional Fee Reserve Amount no later than five (5) Business Days prior to the anticipated Effective Date; provided, that, for the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court; provided, further, that, if a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; and (b) asserting a Professional Fee Claim for services rendered before the Confirmation Date, for the avoidance of doubt, excluding any claims for Restructuring Expenses, must file and serve on the Reorganized OpCo Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date; provided, that any Professional who is subject to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. For the avoidance of doubt, no fee applications will be required in respect of services performed by Professionals on and after the Confirmation Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized OpCo Debtors and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice.

(b)      Professional Fee Escrow Account

On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized OpCo Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such

Allowed Professional Fee Claim by the Reorganized OpCo Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to Reorganized ARDH1. If the Professional Fee Escrow Account is insufficient to pay the full amount of all Allowed Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be promptly paid by the Reorganized OpCo Debtors without any further action or order of the Bankruptcy Court.

### 2. Priority Tax Claims

On the Effective Date, each Holder of an Allowed Priority Tax Claim will, as determined by the Debtor, or the Reorganized Debtor, as applicable, be satisfied in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

### 3. DIP Facility Claims

The DIP Facility Claims shall be deemed to be Allowed under the Plan. Notwithstanding anything to the contrary in the Plan, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all Allowed DIP Facility Claims, on the Effective Date, the Allowed DIP Facility Claims shall be paid indefeasibly in Cash in full.

### 4. Statutory Fees

Notwithstanding anything in the Plan to the contrary, on the Effective Date, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation pursuant to 28 U.S.C. § 1930(a)(6). On and after the Effective Date, to the extent the Chapter 11 Cases remains open, and for so long as the Reorganized Debtors remain obligated to pay quarterly fees, the Reorganized Debtors shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Debtors or Reorganized Debtors, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the Chapter 11 Cases being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

### B. Means for Implementation of the Plan

#### 1. Corporate and Organizational Existence; Reorganized Capital Structure and the New ARDH1 Equity

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized OpCo Debtor shall continue to exist, pursuant to its organizational documents in effect prior to the Effective Date, except as otherwise set forth in the Plan, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable law after the Effective Date. To the extent such documents are amended on or prior to the Effective Date, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order or approval of the Bankruptcy Court.

2.     **Organizational Documents of the Reorganized Debtors**

On the Effective Date, the New ARDH1 Operating Agreement shall become effective and be deemed to amend and restate the ARDH1 Operating Agreement without the need for any further notice or approvals. To the extent necessary, the Reorganized OpCo Debtors Constituent Documents will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated in the Plan. After the Effective Date, each Reorganized OpCo Debtor may amend and restate its Constituent Documents, as permitted by applicable law and pursuant to the terms contained therein.

3.     **Managers, Directors and Officers of Reorganized Debtors; Corporate Governance**

The New Board shall be selected in accordance with the New ARDH1 Operating Agreement, effective as of the Effective Date. To the extent not previously disclosed, the Debtors will disclose prior to or at the Confirmation Hearing, the affiliations of each Person proposed to serve on the New Board or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a manager, director or officer, the nature of any compensation for such Person.

4.     **New RBL Loan Documents**

On the Effective Date, the Reorganized OpCo Debtors shall execute and deliver the New RBL Credit Agreement and the other New RBL Loan Documents, and shall execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (A) further notice to or order of the Bankruptcy Court or (B) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity. On the Effective Date, upon the granting of Liens under the New RBL Loan Documents, (i) the New RBL Agent, on behalf of the lenders and other secured parties under the New RBL Loan Documents, shall have valid, binding and enforceable Liens as specified therein and (ii) the Liens granted to secure the obligations arising thereunder shall be granted in good faith as an inducement to the New RBL Agent, on behalf of the New RBL Lenders and other secured parties thereunder, to extend credit under the New RBL Facility and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such Liens shall be as set forth in the New RBL Loan Documents.

Subject to the terms of the RSA, each counterparty to an outstanding Secured Swap Agreement (as defined in the RBL Credit Agreement or DIP Credit Agreement, as applicable) as of the Effective Date has agreed to maintain such Secured Swap Agreement as outstanding following the Effective Date, to be secured as an obligation under the New RBL Credit Agreement unless otherwise agreed by such counterparty and the applicable Reorganized OpCo

Debtor, and such counterparties shall accordingly not have any OpCo RBL Claims or DIP Facility Claims.

The form of the New RBL Credit Agreement, which shall be filed with the Plan Supplement, shall be consistent with the RSA and the New RBL Term Sheet, and shall be in form and substance reasonably acceptable to the Debtors, the Required Consenting Term/Seller Stakeholders and the New RBL Agent.

### 5.    New Equity Issuance

On the Effective Date, the New Equity Issuance will be consummated, on the terms and subject to the conditions set forth in the RSA.

### 6.    Issuance of New ARDH1 Equity and Related Documents

The New ARDH1 Equity shall be authorized under the New ARDH1 Constituent Documents. On the Effective Date, subject to the RSA, (1) the New Capital Parties shall fund $100 million in exchange for the New Equity Issuance, (2) Reorganized ARDH1 shall execute the New ARDH1 Constituent Documents, (3) Reorganized ARDH1 shall issue the New ARDH1 Equity to Holders of the ARDH1 Term Loan Claims and Holders of the AEH Seller Notes Claims (if applicable, pursuant to the Plan) and (4) Reorganized ARDH1 shall be authorized to reserve New ARDH1 Equity in an amount sufficient to implement the terms of the MIP, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity subject to the terms of the Reorganized OpCo Debtors Constituent Documents.

The issuance and distribution of the New ARDH1 Equity will be made in reliance on the exemption from registration under the Securities Act provided by section 1145(a) of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, in each case to the extent applicable, and will be exempt from registration under applicable securities laws.

### 7.    Cancellation of Certain Existing Security Interests

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any termination statements, instruments of satisfaction or releases of all security interests with respect to its Allowed Other Secured Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens or *lis pendens* and take any and all other steps reasonably requested by the Debtors, the Reorganized Debtors or any administrative agent under the New RBL Loan Documents that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Other Secured Claim.

### 8.    Management Incentive Plan

The MIP shall be implemented by the New Board following the Effective Date, the terms of which shall be in form and substance as set forth in the Restructuring Term Sheet and in accordance with the New ARDH1 Constituent Documents.

### 9.    Restructuring Transactions

Following Confirmation, the Debtors and/or the Reorganized Debtors, as applicable, shall take any actions as may be necessary or appropriate to effect a restructuring of the OpCo Debtors' business or the overall organization or capital structure consistent with the terms of the Plan and the RSA. The actions taken by the Debtors and/or the Reorganized Debtors, as applicable, to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, dissolution, liquidation, merger or transfer containing terms that are consistent with the terms of the Plan and the RSA and any documents contemplated under the Plan or the RSA and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the RSA and any documents contemplated under the Plan or the RSA and having any other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation or formation, reincorporation, merger, conversion, dissolution or other organizational documents, as applicable, pursuant to applicable state law, including certificates of dissolution with respect to the HoldCo Debtors; (iv) the execution, delivery, adoption and/or amendment of all filings, disclosures or other documents necessary to obtain any necessary third-party approvals and/or (v) all other actions that the Debtors and/or the Reorganized Debtors, as applicable, determine, with the consent of the Required Consenting Term/Seller Stakeholders, to be necessary, desirable or appropriate to implement, effectuate and consummate the Plan or the Restructuring Transactions contemplated by the Plan, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions. All matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, managing members, members, managers, directors, or officers of any Debtor (as of or prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law, the provisions of the Reorganized OpCo Debtors Constituent Documents, and without any requirement of further action by the equity holders, managing members, members, managers, directors or officers of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

### 10.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Board and any other board of directors or managers of any of the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, deliver, file or record such agreements, securities, instruments, releases and other documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the Restructuring Transactions, including the New RBL Loan

Documents and any Constituent Documents of the Reorganized Debtors in the name of and on behalf of one or more of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan. The authorizations and approvals contemplated by Article V.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 11.    Vesting of Assets in the Reorganized Debtors

Except as provided elsewhere in the Plan, or in the Confirmation Order, on or after the Effective Date, all property and assets of the Reorganized Debtors' Estates (including Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been waived or released pursuant to the terms of the Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the OpCo Debtors pursuant to the Plan, will vest in the Reorganized OpCo Debtors, free and clear of all Liens or Claims. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized OpCo Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order or the Reorganized OpCo Debtors Constituent Documents.

The Debtors do not believe the HoldCo Debtors have any right to any property or other assets (including any Causes of Action or Avoidance Actions that have not been waived or released pursuant to the terms of the Plan, an order of the Bankruptcy Court or otherwise) other than the ARE Available Cash. Notwithstanding the foregoing, to the extent the HoldCo Debtors own or otherwise have rights to any property or other assets (including any Causes of Action or Avoidance Actions), any such property or other assets, and any Allowed ARIH General Unsecured Claims, will be assigned to and assumed by Reorganized ARDH1 or as Reorganized ARDH1 may direct, free and clear of all Claims and Liens, except as otherwise provided in Article VII.A of the Plan with respect to the ARE Available Cash.

### 12.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims or Equity Interests in or against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens, Claims, or Equity Interests will, if necessary, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

On the Effective Date, in exchange for the treatment described in the Plan and as set forth in Article III.C(iii)(2)(B) and Article III.C(v)(1)(B) of the Plan, the Term Loan Claims shall be

discharged, the Liens on the Collateral (as defined in the Term Loan Credit Agreement) shall be released and the Term Loan Documents shall be cancelled and be of no further force or effect. On the Effective Date, in exchange for the treatment described in the Plan and as set forth in Article III.C(i)(1)(B) and Article III.C(iv)(1)(B) of the Plan, the Seller Notes Claims shall be discharged, the Liens on the Collateral (as defined in the Seller Note Documents) shall be released and the Seller Note Documents in respect thereof shall be cancelled and be of no further force or effect. On the Effective Date, in exchange for the treatment described in the Plan and as set forth in Article III.C(vi)(1)(B) of the Plan, the OpCo RBL Claims shall be discharged, the Liens on the Collateral (as defined in the RBL Documents) shall be released and the RBL Documents in respect thereof shall be cancelled and be of no further force or effect.

### 13.    Cancellation of Stock, Certificates, Instruments and Agreements

On the Effective Date, except as provided below, all stock, units, instruments, certificates, agreements and other documents evidencing the Equity Interests of the HoldCo Debtors will be cancelled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person. On the Effective Date, the TL Agent will be released and discharged from any further responsibility under the Term Loan Credit Agreement and the Loan Documents (as defined therein). On the Effective Date, the Seller Note Agent will be released and discharged from any further responsibility under the Seller Note Documents. On the Effective Date, the RBL Agent will be released and discharged from any further responsibility under the RBL Documents.

### 14.    Preservation and Maintenance of Debtors' Causes of Action

(a)    Maintenance of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided in Article XI of the Plan or elsewhere in the Plan or the Confirmation Order, or in any contract, instrument, release or other agreement entered into in connection with the Plan, on and after the Effective Date, the Reorganized OpCo Debtors shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action of the Debtors, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding filed in the Chapter 11 Cases. The Reorganized OpCo Debtors, as the successors in interest to the Debtors and their Estates, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all such Causes of Action, without notice to or approval from the Bankruptcy Court. The Reorganized OpCo Debtors or their respective successor(s) may pursue such retained claims, rights or Causes of Action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized OpCo Debtors or their respective successor(s) who hold such rights. Upon the Effective Date, the Reorganized OpCo Debtors, as applicable, shall be deemed to have released all Preference Actions held by the OpCo Debtors, if any.

(b)      Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan (including and for the avoidance of doubt, the releases contained in Article XI of the Plan) or any Final Order (including the Confirmation Order), or (B) subject to the discharge and injunction provisions in Article XI of the Plan, and the Confirmation Order, in the case of each of clauses (A) and (B), the Debtors and the Reorganized Debtors, as applicable, expressly reserve such Cause of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

### 15.      Exemption from Certain Transfer Taxes

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by the Debtors to the Reorganized Debtors or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, UCC filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the following instruments or other documents without the payment of any such tax or governmental assessment. Such exemption under section 1146(a) of the Bankruptcy Code specifically applies to (1) the creation of any mortgage, deed of trust, Lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; (4) the issuance, distribution and/or sale of any of the New ARDH1 Equity and any other securities of the Debtor or the Reorganized Debtor; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

### 16.      Certain Tax Matters

The parties will work together in good faith and will use reasonable best efforts to structure and implement the Restructuring Transactions and the transactions related thereto in a tax-efficient and cost-effective manner for the Reorganized Debtors and the Consenting Stakeholders.

17.    **Restructuring Expenses**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; provided, that the Debtors and Reorganized Debtors (as applicable) shall have the right to review and object to any such Restructuring Expenses on reasonableness grounds. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; provided, further, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

18.    **Distributions**

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan will be paid from the proceeds of the New Equity Issuance, the New RBL Facility or the Cash balances of the Debtors or the Reorganized Debtors. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors, as applicable, or any designated Affiliates of the Reorganized Debtors on their behalf.

C.    **Treatment of Executory Contracts and Unexpired Leases**

1.    **ARDH1 and OpCo Debtors Assumption of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, as of the Effective Date, each of ARDH1 and each OpCo Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, without the need for any further notice to or action, order or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by such Debtor; (2) expired or terminated pursuant to its own terms prior to the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; (4) is otherwise identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be rejected before the Effective Date; or (5) is to be rejected pursuant to the terms of the Plan. The assumption of Executory Contracts and Unexpired Leases under the Plan may include the assignment of certain of such contracts to one or more Reorganized OpCo Debtors. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

2.    **HoldCo Debtors Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, as of the Effective Date, each Holdco Debtor shall be deemed to have rejected each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and

1123 of the Bankruptcy Code, without the need for any further notice to or action, order or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by such HoldCo Debtor; (2) expired or terminated pursuant to its own terms prior to or effective on the Effective Date; (3) is the subject of a motion to assume filed on or before the Effective Date; (4) is otherwise identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed before the Effective Date; or (5) is to be assumed pursuant to the terms of the Plan. In the case of any Executory Contract or Unexpired Lease assumed by a HoldCo Debtor, such Executory Contract or Unexpired Lease shall be assigned to any of the Reorganized OpCo Debtors, as determined by Reorganized ARDH1.  For the avoidance of doubt, (1) unless the DTE-SGG Gathering Agreements are amended consensually prior to the Confirmation Hearing, on terms satisfactory to the Required Consenting Term/Seller Stakeholders, such agreements shall be rejected effective as of the Petition Date; (2) the TCO Gathering Agreements terminated automatically on November 8, 2019, in accordance with a termination notice sent by TCO to ARE on October 29, 2019, and any Claims arising thereunder, if any, constitute ARE Gathering Agreement Claims, and, for the avoidance of doubt, to the extent there are any executory obligations remaining thereunder, such obligations shall be rejected effective as of the Petition Date; (3) the Fullstream Gathering Agreements shall be assumed on the Effective Date on the terms set forth in Exhibit F to the RSA and assigned to a Reorganized OpCo Debtor, in full and final satisfaction of any and all Claims thereunder; and (4) the EQM Gathering Agreements shall be assumed on the Effective Date on the terms set forth in Exhibit F to the RSA and assigned to a Reorganized OpCo Debtor, in full and final satisfaction of any and all Claims thereunder.

### 3.    Assumption of Executory Contracts and Unexpired Leases

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed, or amended and assumed, and, in either case, potentially assigned, pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption, or amendment and assumption, and, in either case, the potential assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 4.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Reorganized OpCo Debtors shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed under the Plan, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business. If a counterparty to any Executory Contract or Unexpired Lease believes any amounts are due as a result of such Debtor's monetary default thereunder, it shall assert a Cure Claim against the OpCo Debtors or Reorganized OpCo Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim. Any Cure Claim shall be deemed fully satisfied, released and discharged upon payment by the Reorganized OpCo Debtors of the applicable Cure Claim; provided, that nothing in the Plan shall prevent the Reorganized OpCo Debtors from paying any Cure Claim despite the failure of the relevant counterparty to assert or file such request for payment of such Cure Claim. The Debtors, with the consent of the Required Consenting Term/Seller Stakeholders, or the Reorganized OpCo Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order or approval of the Bankruptcy Court.

As set forth in the notice of the Confirmation Hearing, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, including an objection regarding the ability of the Reorganized OpCo Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), must have been filed with the Bankruptcy Court by the deadline set by the Bankruptcy Court for objecting to Confirmation of the Plan, or such other deadline as may have been established by order of the Bankruptcy Court. To the extent any such objection is not determined by the Bankruptcy Court at the Confirmation Hearing, such objection may be heard and determined at a subsequent hearing. Any counterparty to an Executory Contract or Unexpired Lease that did not timely object to the proposed assumption of any Executory Contract or Unexpired Lease by the deadline established by the Bankruptcy Court will be deemed to have consented to such assumption.

In the event of a dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized OpCo Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption or the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after entry of a Final Order or Final Orders resolving such dispute and approving such assumption. The Debtors (with the consent of the Required Consenting Term/Seller Stakeholders), or Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any unresolved dispute or upon a resolution of such dispute that is unfavorable to the Debtors or Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Claims pursuant to the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the date that the Reorganized OpCo Debtors assume

such Executory Contract or Unexpired Lease. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 5.    Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided in the Plan or the Plan Supplement, each Executory Contract and Unexpired Lease, if any, set forth on the Schedule of Rejected Executory Contracts and Unexpired Leases (which shall be included in the Plan Supplement) shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code. Each Gathering Agreement not already rejected prior to the Confirmation Hearing will be deemed rejected *nunc pro tunc* as of the Petition Date, unless the Debtors, with the consent of the Required Consenting Term/Seller Stakeholders, agree to assume, or amend and assume, or, in either case, potentially assign such Gathering Agreement. The Debtors reserve the right to alter, amend, modify or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including the Effective Date.

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Proofs of Claim with respect to Claims arising from termination of the TCO Gathering Agreements, if any, must be filed with the Bankruptcy Court within 30 days after the Effective Date.    **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease or termination of the TCO Gathering Agreements not filed within such time(s) will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized OpCo Debtors, the Estates or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized OpCo Debtors, as applicable, or further notice to, or action, order or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease or the termination of the TCO Gathering Agreements shall be deemed fully satisfied, released and discharged, notwithstanding anything in a Proof of Claim to the contrary**. Claims arising from the rejection of the Executory Contracts or Unexpired Leases to which any Debtor is a party shall be classified as general unsecured claims and shall be treated as an AEH General Unsecured Claim, ARDH1 General Unsecured Claim, ARDH2 General Unsecured Claim, ARE General Unsecured Claim, ARIH General Unsecured Claim or OpCo General Unsecured Claim, as applicable (depending on the Debtor party to such Executory Contract or Unexpired Lease), subject to any applicable limitation or defense under the Bankruptcy Code and applicable law; provided, however, that all Claims arising from the rejection of any Gathering Agreement, the termination of the TCO Gathering Agreements or otherwise related to any Gathering Agreement shall be treated as a Class 3A ARE Gathering Agreement Claim.

Except as otherwise provided in the Plan or agreed to by the Debtors (with the consent of the Required Consenting Term/Seller Stakeholders) and the applicable counterparty, each rejected Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if

any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority or amount of any Claims that may arise in connection therewith.

### 6.    Assumption of Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized OpCo Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto, including all D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized OpCo Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair or otherwise modify any indemnity obligations presumed or otherwise referenced in the foregoing insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized OpCo Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized OpCo Debtors shall take all steps necessary to secure the six-year extended reporting period under the D&O Side A DIC Liability Insurance Policies. Such steps shall include the Reorganized OpCo Debtors' communication and coordination with ESS NexTier Insurance Group, LLC to ensure the transfer of the D&O Side A DIC Tail Pre-Paid Premium to the insurers that issued the D&O Side A DIC Liability Insurance Policies to secure the six-year extended reporting period under the D&O Side A DIC Liability Insurance Policies.

After the Effective Date, the Reorganized OpCo Debtors shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors and/or officers remain in such positions after the Effective Date.

### 7.    Indemnification

The indemnification provisions in any Indemnification Agreement with respect to or based upon any act or omission taken or omitted by an indemnified party in such indemnified party's capacity under such Indemnification Agreement will be Reinstated (or assumed, as the case may be) and will survive effectiveness of the Plan. Notwithstanding the foregoing, nothing shall impair the Reorganized OpCo Debtors from prospectively modifying any such

indemnification provisions (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts or otherwise) after the Effective Date, for indemnification claims and/or rights arising after the Effective Date.

### 8.    Severance Agreements and Compensation and Benefit Programs; Employment Agreements

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all severance policies, all severance arrangements and all compensation and benefit plans, policies, and programs of the Debtors generally applicable to their employees and retirees, including all savings plans, retirement plans, healthcare plans, disability plans, severance agreements and arrangements, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized OpCo Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

### 9.    Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized OpCo Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized OpCo Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance; all such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized OpCo Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized OpCo Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

### 10.    Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtors, Reorganized OpCo Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or Reorganized OpCo Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized OpCo Debtors, as applicable, shall have forty-five (45) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date or such other date the Reorganized OpCo Debtors deem appropriate.

**D.**     **Conditions Precedent to the Effective Date**

**1.**     **Conditions to Effective Date**

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(a)     the RSA shall have been executed and shall not have been terminated and remains in full force and effect;

(b)     the Plan shall have been confirmed by the Bankruptcy Court and all related Plan exhibits and other documents shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith;

(c)     the Restructuring Transactions shall have been consummated, including the New Equity Issuance, and all transactions contemplated in the Plan, in a manner consistent in all respects with the RSA, the Restructuring Term Sheet (as defined in the RSA) and the Plan;

(d)     the orders approving the Disclosure Statement and confirming the Plan shall have been entered, consistent with the RSA, and such orders shall not have been vacated, stayed, or modified without the consent of the Required Consenting Stakeholders;

(e)     the New RBL Facility and any related documents shall have been executed and delivered, and shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred));

(f)     the New ARDH1 Class A Interests shall have been issued, including all New ARDH1 Class A Interests to be issued pursuant to the New Equity Issuance, and the New Equity Issuance shall have been fully funded;

(g)     all accrued and unpaid fees and expenses of the Consenting Stakeholders (including the reasonable and documented fees and expenses incurred by the Consenting Stakeholder Advisors) in connection with the Restructuring Transactions shall have been paid in accordance with the terms and conditions set forth in the RSA; and

(h)     any and all requisite governmental, regulatory, environmental, and third-party approvals and consents shall have been obtained.

**2.**     **Waiver of Conditions**

The conditions to the Effective Date of the Plan set forth in <u>Article IX</u> of the Plan may be waived only if waived in writing by the Debtors and the Required Consenting Term/Seller

Stakeholders; provided, that the condition requiring that the Confirmation Order shall have been entered by the Bankruptcy Court may not be waived.

### E.    Effects of Confirmation

#### 1.    General Settlement of Claims

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, the Reorganized Debtors and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

#### 2.    Binding Effect

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND EACH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT ANY SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.**

#### 3.    Discharge of the Debtors

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, and effective as of the Effective Date: (i) the rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan will be in exchange for and in complete satisfaction, settlement, discharge and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g), 502(h) or 502(i) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all Entities will be precluded from asserting against, derivatively on

behalf of, or through, the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

4.      **Exculpation and Limitation of Liability**

To the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, amendment, or filing or termination of the RSA and related transactions, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the RBL Credit Agreement, the RBL Facility, the Term Loan Credit Agreement, the Term Loan Documents, the Seller Notes, the Seller Note Documents, the DIP Facility Documents, the DIP Facility, the New RBL Loan Documents, the New RBL Facility, the New Equity Issuance, or any Restructuring Transaction, contract, instrument, release or other agreement or document relating to the foregoing created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan (including the New ARDH1 Equity), or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not operate to waive or release the rights of any Entity to enforce the Plan, the RSA, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any claim or obligation arising under the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of voting classes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.      **Releases by the Debtors**

**PURSUANT TO SECTION 1123(B) AND ANY OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY AND ITS RESPECTIVE ASSETS AND PROPERTY ARE, AND ARE DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY THE DEBTORS, REORGANIZED DEBTORS, AND THE**

**DEBTORS' ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RELATED PARTIES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, FROM ANY AND ALL CAUSES OF ACTION, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, THAT THE DEBTORS, REORGANIZED DEBTORS, OR THE DEBTORS' ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR CAUSE OF ACTION AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY (OR THAT ANY HOLDER OF ANY CLAIM, INTEREST, OR CAUSE OF ACTION COULD HAVE ASSERTED ON BEHALF OF THE DEBTORS), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' CAPITAL STRUCTURE, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN OR OUT OF COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A DEBTOR AND ANOTHER DEBTOR, AND/OR AN AFFILIATE OF A DEBTOR, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, AMENDMENT, OR FILING OF THE RSA, THE DISCLOSURE STATEMENT, THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT), THE RBL CREDIT AGREEMENT, THE RBL FACILITY, THE TERM LOAN CREDIT AGREEMENT, THE TERM LOAN FACILITY, THE SELLER NOTES, THE SELLER NOTE DOCUMENTS, THE DIP FACILITY DOCUMENTS, THE DIP FACILITY, THE NEW RBL FACILITY DOCUMENTS, THE NEW RBL FACILITY, THE NEW ARDH1 CONSTITUENT DOCUMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO BEFORE OR DURING THE CHAPTER 11 CASES, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW, THE CHAPTER 11 CASES (INCLUDING THE FILING THEREOF), THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN (INCLUDING THE NEW ARDH1 EQUITY), OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR**

ENTITY UNDER THE PLAN, THE RSA, THE NEW RBL FACILITY, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES DESCRIBED IN THE PLAN BY THE DEBTORS, REORGANIZED DEBTORS, AND THE DEBTORS' ESTATES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE ITS FINDING THAT EACH RELEASE DESCRIBED IN THE PLAN IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, A GOOD FAITH SETTLEMENT AND COMPROMISE OF SUCH CAUSES OF ACTION; (2) IN THE BEST INTEREST OF THE DEBTORS, REORGANIZED DEBTORS, AND THE DEBTORS' ESTATES AND ALL HOLDERS OF INTERESTS AND CAUSES OF ACTION; (3) FAIR, EQUITABLE, AND REASONABLE; (4) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (5) SUBJECT TO THE TERMS AND PROVISIONS IN THE PLAN, A BAR TO THE DEBTORS, REORGANIZED DEBTORS, AND THE DEBTORS' ESTATES ASSERTING ANY CAUSE OF ACTION, OR LIABILITY RELATED THERETO, OF ANY KIND WHATSOEVER, AGAINST ANY OF THE RELEASED PARTIES OR THEIR ASSETS AND PROPERTY.

6.    Releases by Holders of Claims and Equity Interests

PURSUANT TO SECTION 1123(B) AND ANY OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY AND ITS RESPECTIVE ASSETS AND PROPERTY ARE, AND ARE DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY EACH RELEASING PARTY, IN EACH CASE ON BEHALF OF THEMSELVES AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' IN OR OUT OF COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A DEBTOR,

ANOTHER DEBTOR AND/OR AN AFFILIATE OF A DEBTOR, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, AMENDMENT, OR FILING OF THE RSA, THE DISCLOSURE STATEMENT, THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT), THE RBL CREDIT AGREEMENT, THE RBL FACILITY, THE TERM LOAN CREDIT AGREEMENT, THE TERM LOAN FACILITY, THE SELLER NOTES, THE SELLER NOTE DOCUMENTS, THE DIP FACILITY DOCUMENTS, THE DIP FACILITY, THE NEW RBL LOAN DOCUMENTS, THE NEW RBL FACILITY, THE NEW ARDH1 OPERATING AGREEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT RELATING TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO BEFORE OR DURING THE CHAPTER 11 CASES, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW, THE CHAPTER 11 CASES (INCLUDING THE FILING THEREOF), THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN (INCLUDING THE NEW ARDH1 EQUITY), OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE RSA, THE NEW RBL FACILITY, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN OR (B) ANY PERSON FROM ANY CLAIM OR CAUSES OF ACTION RELATED TO AN ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE BY SUCH PERSON.

7.    **Injunction**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE XI.E</u> OR <u>ARTICLE XI.F</u> OF THE PLAN, DISCHARGED PURSUANT TO <u>ARTICLE XI.C</u> OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO <u>ARTICLE XI.D</u> OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING

**ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION DOES NOT ENJOIN ANY PARTY UNDER THE PLAN OR UNDER ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN FROM BRINGING AN ACTION TO ENFORCE THE TERMS OF THE PLAN OR SUCH DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

8.      **Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors has been associated, solely because such Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## V.
## VOTING PROCEDURES AND REQUIREMENTS

### A.    Parties Entitled to Vote on the Plan

The Debtors are soliciting the votes of the Holders of AEH Seller Notes Claims in Class 1A, the Holders of ARDH2 Seller Notes Claims in Class 4A, the Holders of ARE Term Loan Claims in Class 3B and the Holders of ARDH1 Term Loan Claims in Class 5A. If the Plan is not accepted at the requisite thresholds described below, the Debtors may seek alternatives to the consummation of the Restructuring Transactions pursuant to the Plan.

Only holders of claims against or equity interests in a Chapter 11 debtor that are in "impaired" (as defined in section 1124 of the Bankruptcy Code) classes may be entitled to vote on a plan. Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of a claim or equity interest in an impaired class will not receive or retain any distribution under a plan on account of such claim or equity interest or if the plan so provides, section 1126(g) of the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, all such holders do not actually vote on the plan. If a class of claims or equity interests is not impaired by the plan, section 1126(f) of the Bankruptcy Code conclusively presumes the holders in such class to have accepted the plan and, accordingly, such holders are not entitled to vote on the plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan, in each case, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code. The Bankruptcy Code defines "acceptance" of a plan by a class of equity interests as acceptance by holders in that class that hold at least two-thirds (2/3) in amount of the equity interests that cast ballots for acceptance or rejection of the plan, in each case, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

The Claims in the following Classes (collectively, the "**Voting Classes**") are Impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 1A – AEH Seller Notes Claims;
- Class 4A – ARDH2 Seller Notes Claims;
- Class 3B – ARE Term Loan Claims; and

- Class 5A – ARDH1 Term Loan Claims.

Because all other Classes are either Unimpaired by the Plan and are conclusively presumed to have accepted the Plan or Impaired by the Plan and are conclusively presumed to have rejected the Plan, only Voting Classes are entitled to vote.

**B.      Voting Deadline**

Before deciding whether to vote to accept or reject the Plan, each Voting Party as of the Voting Record Date should carefully review this Disclosure Statement, including the exhibits hereto. All Voting Parties are advised to follow the instructions in their applicable Ballot carefully.  All descriptions of the Plan set forth in this Disclosure Statement are subject to, and qualified in their entirety by reference to, the Plan.

Ballots will be provided to each Holder of a Claim in the Voting Classes as of the Voting Record Date to vote to (x) accept the Plan, including the Releases, or (y) reject the Plan. The Ballots contains detailed voting instructions and set forth, among other things, the deadlines, procedures and instructions for voting to (i) accept the Plan, including the Releases, or (ii) reject the Plan and/or opt out of the Releases.

The Debtors have engaged Prime Clerk LLC, the Voting Agent, to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR COMPLETED BALLOT(S) MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT IN THE MANNER SET FORTH BELOW AND ON THE BALLOTS ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M., PREVAILING EASTERN TIME, ON NOVEMBER 7, 2019, UNLESS EXTENDED BY THE DEBTORS.**

**C.      Submission of the Completed Ballots**

Voting Parties must submit the completed applicable Ballots to the Voting Agent:

| **Via electronic mail:** |
| --- |
| Arsenalballots@primeclerk.com |
| (reference "Arsenal Resources Development LLC" in the subject line) |

**D.      Voting Procedures**

The Debtors are providing copies of this Disclosure Statement and the documents attached hereto to the Voting Parties. Any Holder of a Claim in a Voting Class that has not received its applicable Ballot(s) should contact the Voting Agent. Each Holder of a Claim in a Voting Class must submit its own completed Ballot(s).

Each Holder of a Claim in a Voting Class should provide all of the information requested by its applicable Ballot(s), complete all items in its applicable Ballot(s) in accordance with the

instructions set forth therein and return such Ballot(s) directly to the Voting Agent in accordance with the instructions contained therein on or before the Voting Deadline.

All materials in the Ballots must be signed by the applicable Holder of record of the Claims in the applicable Voting Class or any person who holds a properly completed proxy from such Holder of record on such date. For purposes of the Ballots, the Holders of Claims in the Voting Classes will be deemed to be the "Holders" of the Claims represented thereby, as applicable.

If you return more than one Ballot voting different Claims in the same Class, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot, as applicable, that attempts to partially accept and partially reject the Plan will likewise not be counted. If you cast more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect your intent, and thus, to supersede any prior Ballot. If you cast Ballots received by the Voting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

The Ballots provided to the Holders of Claims in the Voting Classes will reflect the principal amount of such Holder's Claim held by such Holder, as applicable.

Except as provided below, unless a completed Ballot is timely submitted to the Voting Agent before the Voting Deadline with any other documents required by the materials contained in such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

**THE FAILURE TO VOTE ON THE PLAN DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.**

**ANY BALLOT THAT IS NOT RETURNED TO THE VOTING AGENT IN CONFORMITY WITH THE INSTRUCTIONS PROVIDED IN THE APPLICABLE BALLOT WILL NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN.  DELIVERING TO THE VOTING AGENT AN OTHERWISE PROPERLY COMPLETED BALLOT THAT IS NOT APPLICABLE TO YOUR CLASS WILL NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN.  ANY BALLOT THAT IS EXECUTED AND RETURNED, BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL, IN EACH CASE, NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN. THE DEBTORS, IN THEIR SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTING PARTIES TO CURE ANY DEFECTS IN THE BALLOTS.**

**ANY BALLOT THAT IS EXECUTED AND RETURNED THAT REJECTS THE PLAN, BUT DOES NOT AFFIRMATIVELY ELECT TO OPT OUT OF THE RELEASES DESCRIBED IN THE PLAN BY TIMELY OBJECTING TO THESE RELEASES, SHALL BE DEEMED TO HAVE ACCEPTED THE INJUNCTION,**

**RELEASE AND EXCULPATION PROVISIONS SET FORTH IN <u>ARTICLE XI</u> OF THE PLAN. AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.**

### 1. Fiduciaries and Other Representatives

*If the applicable Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Ballots of each Holder for whom they are voting.*

*UNLESS THE APPLICABLE BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.*

### 2. Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of such Holder with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan, including the injunction, release, and exculpation provisions set forth in <u>Article XI</u> therein. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the RSA.

### 3. Change of Vote

Except to the extent prohibited under the RSA with respect to the Consenting Stakeholders, any party that has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot.

### E. <u>Waivers of Defects, Irregularities, etc.</u>

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their right to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of the Voting Parties. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all

parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court, as applicable) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## VI.
## CONFIRMATION OF THE PLAN

### A.    Confirmation Hearing

**Upon commencement of the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to consider (i) the adequacy of this Disclosure Statement and (ii) confirmation of the Plan at the Confirmation Hearing to be held as soon as practicable thereafter and at such time that the Bankruptcy Court may allow, before the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.  At the Confirmation Hearing, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129 of the Bankruptcy Code. Subject to the terms of the RSA, the Debtors may modify the Plan, to the extent permitted by section 1127(a) of the Bankruptcy Code and Rule 3019 of the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended from time to time (the "Bankruptcy Rules"), as necessary to confirm the Plan. The Confirmation Hearing may be adjourned from time-to-time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.**

### B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Notice of the Confirmation Hearing and of the time to present objections will be provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") and any orders of the Bankruptcy Court.   Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

**To the Debtors:**

>Arsenal Energy Holdings, LLC
>6031 Wallace Road Ext.,
>Suite 300
>Wexford, PA 15090
>Attn: Craig Lavender, Esq. (clavender@arsenalresources.com)

**with a copy to:**

Proposed Counsel to the Debtors and Debtors in Possession

>Simpson Thacher & Bartlett LLP
>425 Lexington Avenue
>New York, NY 10017
>Attn:  Michael H. Torkin, Esq. (michael.torkin@stblaw.com)
>       Kathrine A. McLendon, Esq. (kmclendon@stblaw.com)
>       Nicholas E. Baker, Esq. (nbaker@stblaw.com)
>Fax: (212) 455-2502

>– and –

>Young Conaway Stargatt & Taylor, LLP
>Rodney Square
>1000 North King Street
>Wilmington, DE 19801
>Attn:  Pauline K. Morgan, Esq. (pmorgan@ycst.com)
>       Kara H. Coyle, Esq. (kcoyle@ycst.com)
>       Ashley E. Jacobs, Esq. (ajacobs@ycst.com)
>Fax: (302) 571-1253

**To the Consenting Term Loan Lenders and/or Consenting Seller Noteholders:**

>Kirkland & Ellis LLP
>609 Main Street
>Houston, TX 77002
>Attn:  Matt Pacey, Esq. (matt.pacey@kirkland.com)

– and –

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attn:  Ryan B. Bennett, Esq. (rbennett@kirkland.com)
          Travis M. Bayer, Esq. (travis.bayer@kirkland.com)
          Timothy Bow, Esq. (timothy.bow@kirkland.com)

– and –

Vinson & Elkins LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Attn:  David S. Meyer, Esq. (dmeyer@velaw.com)
          Harry Perrin, Esq. (hperrin@velaw.com)
          Garrick C. Smith, Esq. (gsmith@velaw.com)

– and –

Baker Botts L.L.P.
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Attn:  Jim Prince, Esq. (jim.prince@bakerbotts.com)

**To the Consenting RBL Lenders:**

Paul Hastings LLP
200 Park Avenue
New York, New York 10166
Attn:  Andrew Tenzer, Esq. (andrewtenzer@paulhastings.com)
          Randal Palach, Esq. (randalpalach@paulhastings.com)
          Shekhar Kumar, Esq. (shekharkumar@paulhastings.com)

**To a Consenting Equityholder:**

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attn:  Sean O'Neal, Esq. (soneal@cgsh.com)
          Jane VanLare, Esq. (jvanlare@cgsh.com)

**To the United States Trustee:**

Office of the United States Trustee for the District of Delaware
844 King Street
Suite 2207
Wilmington, Delaware 19801
Fax: (302) 573-6491

### C.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 are: (i) the Plan is in the "best interests" of holders of claims and equity interests; (ii) the Plan is feasible; and (iii) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class or if an Impaired Class is deemed to reject, the Plan "does not discriminate unfairly and is fair and equitable" as to such Class.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### 1.    Best Interests Test/Liquidation Analysis

The Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the "best interests" of all Holders of Claims or Equity Interests that are Impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or equity interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such member would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

The Debtors believe that, under the Plan, all Holders of Impaired Claims or Equity Interests will receive property with a value not less than the value such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Impaired Claims or Equity Interests, as described in the Liquidation Analysis attached hereto as **Exhibit E** (the "**Liquidation Analysis**"). As described in the Liquidation Analysis, a liquidation under chapter 7 would not result in a greater recovery to creditors than the recoveries, if any, provided for in the Plan.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit E** is solely for the purpose of disclosing to Holders of Claims or Equity Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the

assumptions set forth therein. There can be no assurance as to the outcomes actually realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 2.    Feasibility

In connection with Confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This is the so-called "feasibility" test. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors prepared the financial projections (the "**Financial Projections**") set forth in **Exhibit D**. Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**THE FINANCIAL PROJECTIONS ARE BY THEIR NATURE FORWARD LOOKING, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE INFORMATION SET FORTH THEREIN. ACCORDINGLY, READERS OF THIS DISCLOSURE STATEMENT ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FINANCIAL PROJECTIONS, AND SHOULD CAREFULLY REVIEW THE RISK FACTORS CONTAINED IN <u>ARTICLE IX</u> OF THIS DISCLOSURE STATEMENT THAT COULD IMPACT THE FEASIBILITY OF THE PLAN. THE FINANCIAL PROJECTIONS SHOULD NOT BE RELIED UPON AS NECESSARILY INDICATIVE OF FUTURE, ACTUAL RECOVERIES.**

Holders of Claims against the Debtors are advised that the Financial Projections were not prepared with a view toward compliance with the published guidelines of the SEC or the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles. Furthermore, the Debtors' independent certified public accountants have not compiled or examined the Financial Projections and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Projections.

The Financial Projections are based on several assumptions detailed in **Exhibit D**. Although considered reasonable by the Debtors as of the date hereof, unanticipated events and circumstances occurring after the preparation of the Financial Projections may affect actual recoveries under the Plan.

The Debtors do not intend, as a matter of course, to publish their projections, strategies, or forward-looking projections of their financial position, results of operations and cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish, update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition to the holders of Claims or Equity Interests after the date of this Disclosure Statement.

Furthermore, the Debtors do not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

### 3.        Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following sub-Section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not impaired under a plan is conclusively presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of allowed claims in that class, counting only those claims that have voted to accept or reject the plan. Bankruptcy Code section 1126(d) defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds (2/3) in amount of allowed equity interests in that class, counting only those equity interests that have voted to accept or reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number of the voting members of such class cast their ballots in favor of acceptance, and a class of equity interests will have voted to accept the plan only if voting members holding two-thirds (2/3) in amount of equity interests in such class cast their ballots in favor of acceptance.

### 4.        Additional Requirements for Non-Consensual Confirmation

In the event that any Impaired Class of Claims or Equity Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the applicable Debtor if the Plan has been accepted by at least one Impaired Class and, as to each Impaired Class of Claims or Equity Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Equity Interests, pursuant to section 1129(b) of the Bankruptcy Code.

(a)        Unfair Discrimination Test

The "unfair discrimination" test applies to Classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its holders' claims or equity interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

(b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class if there is a dissenting class. As to dissenting classes, the test sets different standards depending on the type of claims or equity interests in such class.

(i)    Secured Creditors

The Bankruptcy Code provides that each holder of an impaired secured claim either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan of reorganization, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale or (iii) receives the "indubitable equivalent" of its allowed secured claim.

(ii)    Unsecured Creditors

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization property of a value equal to the amount of its allowed claim or (ii) the holders of claims or equity interests that are junior to the claims of the dissenting class of unsecured claims will not receive any property under the plan of reorganization.

(iii)    Equity Interests

With respect to a class of equity interests, the Bankruptcy Code requires that either (i) each holder of an equity interest will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of equity interests that are junior to any dissenting class of equity interests will not receive any property under the plan of reorganization.

In the event any Class is deemed or votes to reject the Plan, the Debtors will seek confirmation of the Plan pursuant to the "cram down" provisions under section 1129 of the Bankruptcy Code with respect to such rejecting Class. Furthermore, Confirmation by the Bankruptcy Court will bind all Holders of Claims against and Equity Interests in the Debtors regardless of whether they voted for or against the Plan and regardless of whether they voted at all on the Plan.

In addition, as the Plan constitutes a separate plan of reorganization for each Debtor, the Plan may be confirmed and consummated as to each Debtor separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor.

## VII.
## ALTERNATIVES TO THE PLAN

The Debtors have evaluated several alternatives to the Restructuring Transactions. After studying these alternatives, the Debtors and the Consenting Stakeholders believe that the Plan is the preferred approach to resolving the Company's capital requirements, implementing the balance-sheet restructuring and maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies.

If the Plan is not confirmed, the Debtors may be unable to satisfy their financial obligations and the Debtors' ability to continue operating as a going concern could be severely jeopardized. The realistic alternatives likely will be either (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or (iii) a liquidation under Chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets. The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.    Sale Under Section 363 of the Bankruptcy Code

Alternatively, if the Plan is not confirmed, the Debtors could seek authorization to sell their assets under section 363 of the Bankruptcy Code.  Holders of Claims in Class 6A would be entitled to credit bid on any property to which their security interest is attached subject to any obligations under any applicable intercreditor agreement and the structural seniority of Claims as set forth in the Company's Structure Chart, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by Holders of Claims in Class 6A would attach to the proceeds of any sale of the Debtors' assets subject to any obligations under any applicable intercreditor agreement and the structural seniority of Claims as set forth in the Company's Structure Chart.

Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for Holders of Claims or Equity Interests than the Plan.

### C.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

Finally, if no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The assets available for distribution to creditors would be reduced by (a) additional expenses of the chapter 7 liquidation, (b) certain Claims that may be entitled to priority in the context of a liquidation and/or might arise by reason of the

liquidation and (c) the absence of a robust market for the liquidation of the Debtors' assets and services, which may occur at substantial discounts to fair value in a liquidation context.

The Liquidation Analysis attached hereto as **Exhibit E** describes the effect a chapter 7 liquidation would have on the recovery of Holders of Claims and Equity Interests.  As noted in Article VI.C.1 of this Disclosure Statement, the Debtors believe that Holders of Claims and Equity Interests would not have a greater recovery in a chapter 7 liquidation than provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases.

THE COMPANY AND THE CONSENTING STAKEHOLDERS THEREFORE BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO CREDITORS THAN WOULD ANY OTHER ALTERNATIVE AND SHOULD BE CONFIRMED PROMPTLY.

## VIII.
## SECURITIES LAW MATTERS

### A.    The Solicitation

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(c) and not necessarily in accordance with federal or state securities laws or other laws governing disclosure outside the context of chapter 11 of the Bankruptcy Code. The Debtors are soliciting acceptances of the Plan from all Voting Parties upon the terms and subject to the conditions set forth in this Disclosure Statement and consistent with sections 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law.  This Disclosure Statement has been neither approved nor disapproved by the SEC nor any state regulatory authority, nor has the SEC nor any state regulatory authority passed upon the accuracy or adequacy of the statements contained herein.

### B.    Issuance of Securities Pursuant to the Plan

The Plan provides for the Reorganized OpCo Debtors to distribute New ARDH1 Class A Interests (collectively with any other membership interests authorized to be issued by Reorganized ARDH1, the "**New ARDH1 Equity**") to Holders of Seller Notes Claims, Holders of Term Loan Claims and to the New Capital Parties pursuant to the New Equity Issuance.  The Debtors believe that the New ARDH1 Class A Interests will be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities laws ("**Blue Sky Laws**").

The exchange, issuance and distribution of New ARDH1 Class A Interests and any other equity interests in the Debtors will be exempt from the registration requirements of the Securities Act and Blue Sky Laws pursuant to section 1145(a)(1) of the Bankruptcy Code insofar as, for each Debtor, (i) the securities are issued by such Debtor, an affiliate participating in a joint plan therewith, or a successor thereto under the Plan; (ii) the recipients of securities hold Claims

against, interests in, or claims for administrative expenses in the Chapter 11 Cases concerning, such Debtor; and (iii) the securities are issued entirely in exchange for a recipient's Claim against or interest in such Debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property (the "**Section 1145 Securities**").

To the extent the issuance of any New ARDH1 Class A Interests is not exempted pursuant to section 1145 of the Bankruptcy Code, the issuance of such New ARDH1 Class A Interests will constitute a private placement and will be consummated without registration in reliance on Section 4(a)(2) under the Securities Act. Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering is exempt from registration under the Securities Act.  To the extent the issuance of any New ARDH1 Class A Interests is consummated in reliance on Section 4(a)(2) of the Securities Act, such New ARDH1 Class A Interests will be deemed "restricted securities" (as defined by Rule 144 under the Securities Act ("**Rule 144**")) that may only be reoffered and resold in compliance with the registration requirements of the Securities Act or in reliance on an exemption therefrom. See "*Subsequent Transfers of Restricted Securities*" below.

Rule 701 under the Securities Act provides a safe harbor exemption from registration under the Securities Act for equity securities issued as employee compensation. Accordingly, the Debtors believe that any New ARDH1 Equity issued under the MIP to management and other employees of the Reorganized OpCo Debtors will be exempt from registration under the Securities Act and any applicable Blue Sky Laws. Individuals who receive equity securities under the Plan are urged to consult their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue Sky Laws, including determination of whether such person is or is not an "underwriter", and with respect to restrictions applicable under the Securities Act and any appropriate rules and the circumstances under which securities may be sold in reliance upon any such rules.

Persons who receive equity securities under the Plan are urged to consult their own legal advisors to determine whether or not they are an "underwriter" or an "affiliate" and with respect to restrictions applicable under the Securities Act and any appropriate rules and the circumstances under which securities may be sold in reliance upon any such rules.

C.    <u>**Subsequent Transfers of Restricted Securities**</u>

In general, the Section 1145 Securities will be freely tradable and transferable; provided, however, that such securities will not be freely tradable if, at the time of transfer, the holder thereof is an "affiliate" of such Reorganized OpCo Debtor as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Transfer of any Section 1145 Securities will also be subject to (i) compliance with any applicable rules and regulations of the SEC at the time of any future transfer, (ii) any restrictions on the transferability of such securities under the Reorganized OpCo Debtors Constituent Documents (as amended from time to time) and (iii) applicable regulatory approval. Further, if the holder is an "underwriter" (as defined in section 1145(b) of the Bankruptcy Code) with respect to such securities, resales by such holder of such securities will not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such holder

65

would only be permitted to sell such securities without registration if it is able to comply with the provisions of Rule 144 under the Securities Act.

To the extent that any New ARDH1 Class A Interests are deemed not to be issued pursuant to section 1145 of the Bankruptcy Code, such securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

Rule 144 provides a limited safe harbor for the public resale of restricted and control securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer. An affiliate of an issuer that is not subject to the reporting requirements of section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. The Debtors currently expect that this information requirement will be satisfied. Any affiliate of an issuer must also comply with the volume, manner of sale and notice requirements of Rule 144 with respect to any "control securities".

The New ARDH1 Operating Agreement, and any certificates representing the New ARDH1 Class A Interests issued under the New Equity Issuance (if any) will bear a legend setting forth the restrictions on transfer outlined herein.

Reorganized ARDH1 will reserve the right to require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of any legend or to any resale of the New ARDH1 Class A Interests. Reorganized ARDH1 will also reserve the right to stop the transfer of any New ARDH1 Class A Interests if such transfer is not in compliance with an available exemption from the registration requirements of applicable securities laws, including under Rule 144 under the Securities Act, as applicable. All persons who receive New ARDH1 Class A Interests will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any such New ARDH1 Class A Interests except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, as applicable, and (b) such New ARDH1 Class A Interests will be subject to the other restrictions described above.

Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE PURSUANT TO RULE 144 UNDER THE SECURITIES ACT, THE COMPANY DOES NOT MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE COMPANY RECOMMENDS THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## IX.
## RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT, TOGETHER WITH ANY ATTACHMENTS AND EXHIBITS. THESE RISKS, UNCERTAINTIES AND OTHER IMPORTANT FACTORS COULD CAUSE THE DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM THOSE THE DEBTORS MAY PROJECT. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE COMPANY'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION. ADDITIONAL RISKS NOT PRESENTLY KNOWN TO THE DEBTORS OR WHICH THEY CURRENTLY DEEM IMMATERIAL MAY ALSO IMPAIR THE COMPANY'S BUSINESS. IF ONE OR MORE OF THESE RISKS ACTUALLY OCCUR, IT COULD HAVE A MATERIAL ADVERSE EFFECT ON THE COMPANY'S BUSINESS, FINANCIAL POSITION OR RESULTS OF OPERATIONS, AND YOU COULD LOSE ALL OR A PART OF YOUR INVESTMENT.  THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENT.

A.      **Risk Factors Relating to the Company's Business**

1.      **Natural gas prices are volatile. A reduction or sustained decline in commodity prices, or the existence of negative basis differentials, is likely to adversely affect the Company's business, financial condition or results of operations and its ability to meet capital expenditure obligations and financial commitments.**

The prices the Company receives for its natural gas production heavily influence, and, to the extent it produces natural gas liquids ("**NGLs**") and oil in the future, the prices the Company receives for NGL and oil production will heavily influence, its revenue, operating results profitability, access to capital, future rate of growth and carrying value of its properties. As in

recent years, decreases in both oil and gas prices can lead the Company to suspend or curtail drilling, which limits its ability to produce natural gas and therefore impacts its revenues. Oil, natural gas and NGLs are commodities, and therefore, their prices are subject to wide fluctuations in response to relatively minor changes in supply and demand. Historically, the commodities market has been volatile. This market will likely continue to be volatile in the future. The prices the Company receives for its production, and the levels of its production, depend on numerous factors beyond its control.

Prices for oil, natural gas and NGLs historically have been extremely volatile and are expected to continue to be volatile. If the prices of natural gas, in particular, continue their recent volatility, the Company's operations, financial condition, cash flows and level of expenditures may be materially and adversely affected.

> **2.      The Gathering Agreements are a significant burden on the Company's business, and, upon the rejection or termination of certain of the Gathering Agreements, the Company may not be able to implement alternative arrangements sufficient to support the Debtors' operations and/or the Gathering Agreements, after giving effect to any amendments thereto, may still continue to have onerous obligations on the Company's operations, including if any of the MVCs are retained.**

As described above, ARE is party to five Gathering Agreements. Certain of the Gathering Agreements impose significant MVCs at uneconomic fixed prices, thereby requiring ARE to pay for pipeline access, whether or not it is fully utilizing that capacity. Because of the significant decline in natural gas prices, unforeseen liquidity constraints and uneconomic terms under the Gathering Agreements, ARE cannot fulfill the volume requirements and other obligations under the Gathering Agreements. Accordingly, the Plan provides that as a condition to its effectiveness, the Gathering Agreements must either be amended to reflect the Company's current business plan or be rejected, in either case, with the consent of certain of the Consenting Stakeholders.

As of the date of this Disclosure Statement:

- The Company has reached agreement to amend its Gathering Agreements with both EQM and Fullstream. The amendments will become fully effective upon the Effective Date and have been approved by the Consenting Stakeholders, and the EQM Gathering Agreements and the Fullstream Gathering Agreements will be assumed on the Effective Date and assigned to a Reorganized OpCo Debtor, in full and final satisfaction of any and all Claims thereunder.

- By letters dated October 29, 2019 from TCO to ARE and FERC, the TCO Gathering Agreements will terminate automatically on November 8, 2019.

- DTE and the Company have been unable to agree on long-term permanent amendments to the DTE Gathering Agreements. These DTE Gathering Agreements remain unmodified, and, unless a consensual amendment can be reached with DTE on

terms satisfactory to the Required Consenting Term/Seller Stakeholders, the DTE-SGG Gathering Agreements will be rejected effective as of the Petition Date.

Although the Debtors intend to continue negotiations with DTE, there can be no assurances that any of the DTE Gathering Agreements will be amended and assumed.  Even if any of the DTE Gathering Agreements is amended, the scope of the modifications is not known at this time, including whether there would be ongoing MVC obligations.  The amended Fullstream Gathering Agreements are expected to eliminate the MVC obligations, and the amended EQM Gathering Agreements are expected to reduce the MVCs.  In the event that any amended and assumed Gathering Agreements contains ongoing obligations, including the amended EQM Gathering Agreements, the Company could face adverse consequences in the future similar to those that contributed to the filing of the Chapter 11 Cases.

> ### 3.    Properties that the Company decides to drill may not yield natural gas in commercially viable quantities.

Properties that the Company decides to drill that do not yield natural gas in commercially viable quantities will adversely affect its results of operations and financial condition. The Company's project areas are in various stages of development, ranging from project areas with current drilling or production activity to project areas that consist of recently acquired leasehold acreage or that have limited drilling or production history. If the wells in the process of being completed do not produce sufficient revenues to return a profit or if the Company drills dry holes in the future, it may lose leasehold acreage for undeveloped acreage, and its business may be materially affected. In addition, there is no way to predict in advance of drilling and testing whether any particular prospect will yield natural gas in sufficient quantities to recover drilling or completion costs or to be economically viable. The use of seismic data and other technologies and the study of producing fields in the same area will not enable the Company to know conclusively prior to drilling whether natural gas will be present or, if present, whether natural gas will be present in commercial quantities. The Company cannot assure that the analogies it draws from available data from other wells, more fully explored prospects or producing fields will be applicable to its drilling prospects. Further, the Company's drilling operations may be curtailed, delayed or cancelled as a result of numerous factors.

> ### 4.    The Company's estimated proved reserves are based on assumptions that may turn out to be inaccurate. Any significant inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of the Company's reserves.

The process of estimating natural gas, oil and NGLs reserves is complex. It requires interpretations of available technical data and many assumptions, including assumptions relating to current and future economic conditions and commodity prices. In order to prepare estimates, the Company must project production rates and the timing of development expenditures. It must also analyze available geological, geophysical, production and engineering data. The extent, quality and reliability of this data can vary and new horizontal wells may not produce natural gas in similar quantities when compared to historical wells, including wells in the same development unit. The process also requires economic assumptions regarding natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds. Given the current

volatility in pricing, such assumptions are difficult to make. Although the reserve information is reviewed by independent reserve engineers, estimates of natural gas reserves are inherently imprecise particularly as they relate to state-of-the-art technologies being employed such as the combination of hydraulic fracturing and horizontal drilling.

Actual future production, natural gas prices, revenues, taxes, development expenditures, operating expenses and quantities of recoverable natural gas reserves may vary from the Company's estimates. In addition, the Company may adjust estimates of proved reserves to reflect production history, results of exploration and development, prevailing natural gas prices and other factors, many of which will be beyond the Company's control.

5.      **Unless the Company replaces its reserves with new reserves and develops those reserves, its reserves and production will decline, which would adversely affect its future cash flows and results of operations.**

Producing natural gas reservoirs generally are characterized by declining production rates that vary depending upon reservoir characteristics and other factors. Unless the Company conducts successful ongoing development and exploration activities or continually acquires properties containing proved reserves, its proved reserves will decline as those reserves are produced. The Company's future reserves and production, and therefore its future cash flow and results of operations, are highly dependent on its success in efficiently developing and exploiting its current reserves and economically finding or acquiring additional recoverable reserves. The Company may not be able to develop, find or acquire sufficient additional reserves to replace its current and future production.

6.      **Certain of the Company's undeveloped leasehold acreage is subject to oil and gas leases that will expire over the next several years unless hydrocarbon production is established from such acreage.**

The Company's oil and gas leases generally require it to drill wells and establish commercial hydrocarbon production within a fixed term of years and some allow them the option to extend that term through the payment of delay rentals. If the Company does not drill within the fixed term, or the extended term where applicable, and thereafter establish and maintain commercial hydrocarbon production, then its rights under such leases could terminate.

7.      **The Company may incur losses as a result of title defects in the properties in which it invests.**

Oil and gas leases in the Appalachian Basin are particularly vulnerable to title deficiencies due to the long history of land ownership in the area, resulting in extensive and complex chains of title. In the course of acquiring the rights to develop oil and natural gas, it is standard procedure for the Company and its lessor to execute an oil and gas lease agreement with payment subject to title verification. In most cases, the Company incurs the expense of retaining lawyers to verify the rightful owners of the oil and gas interests prior to payment of such lease bonus to the lessor. There is no certainty, however, that a lessor has valid title to its lease's oil and gas interests. In those cases, such leases are generally voided and payment is not remitted to the lessor. As such, title failures may result in fewer net acres to the Company. Prior to the

drilling of an oil or natural gas well, however, it is the normal practice in the industry for the person or company acting as the operator of the well to obtain a preliminary title review to ensure there are no obvious defects in title to the well. Frequently, as a result of such examinations, certain curative work must be done to correct defects in the marketability of the title, and such curative work entails expense. The Company's failure to cure any title defects may delay or prevent it from utilizing the associated mineral interest, which may adversely impact its ability in the future to increase production and reserves. Accordingly, undeveloped acreage has greater risk of title defects than developed acreage. If there are any title defects or defects in assignment of leasehold rights in properties in which the Company holds an interest, the Company may suffer a financial loss, which could adversely affect its business, financial condition and results of operations.

8.   **The Company's development projects require substantial capital expenditures. The Company may require additional capital in the future to execute its growth strategy.**

The natural gas industry is capital intensive. The Company makes and expects to continue to make substantial capital expenditures for the development and acquisition of natural gas reserves. Historically, the Company has financed these investments through cash flows from operations, external borrowings and capital contributions. The Company may encounter difficulties in scaling up its methods of accessing capital to the level of its planned capital expenditures. A further reduction or sustained depression in natural gas prices from current levels may result in a decrease in the Company's cash flow from operations and access to third-party capital, which would reduce its actual capital expenditures and negatively impact its ability to grow production. Additionally, the Company's previous sources of capital may not be available, or sufficient, to fund its future development.

The actual amount and timing of the Company's future capital expenditures may differ materially from its estimates as a result of, among other things, natural gas prices, actual drilling results, the availability of drilling rigs and other services and equipment and the regulatory, technological and competitive environment. If the Company is unable to fund capital expenditures for any reason, the Company may not be able to capture available growth opportunities and any such failure could have a material adverse effect on its results of operations and financial condition.

9.   **Part of the Company's strategy involves using some of the latest available horizontal drilling and completion techniques, which involve risks and uncertainties in their application.**

The Company's operations involve utilizing some of the latest drilling and completion techniques as developed by its engineers and its service providers. Risks that the Company faces while drilling include, but are not limited to, the following: (1) effectively controlling the level of pressure flowing from particular wells; (2) landing its wellbore in the desired drilling zone; (3) staying in the desired drilling zone while drilling horizontally through the formation; (4) running its casing the entire length of the wellbore; and (5) being able to run tools and other equipment consistently through the horizontal wellbore. The Company also faces certain risks while completing its wells. If its drilling results are less than anticipated, the return on investment for a

particular project may not be as attractive as initially anticipated, the Company could incur material write-downs of unevaluated properties and the value of its undeveloped acreage could decline in the future.

> **10.     The Company's producing properties are concentrated in the Appalachian Basin, making it vulnerable to risks associated with operating in one major geographic area.**

The Company's producing properties are geographically concentrated in the Appalachian Basin, with a particular concentration in Barbour, Harrison, Taylor and Preston Counties in West Virginia. As of October 31, 2019, substantially all of its total estimated proved reserves were attributable to properties located in this area. As a result of this geographic concentration, an adverse development in the oil and natural gas business in the Company's operating areas could have a greater impact on its financial condition and results of operations than if it were more geographically diverse. Due to the concentrated nature of its properties, the Company may be disproportionately exposed to the impact of regional supply and demand factors, delays or interruptions of production from wells in this area caused by governmental regulation, processing or transportation capacity constraints, market limitations, water shortages or other weather-related conditions or interruption of the processing or transportation of natural gas. Such conditions could have a material adverse effect on the Company's financial condition and results of operations.

In addition, a number of areas within the Appalachian Basin have historically been subject to mining operations. For example, third parties may engage in subsurface mining operations near or under the Company's properties, which could cause subsidence or other damage to its properties, adversely impact its drilling or midstream activities or those on which the Company relies. In such event, the Company's operations may be impaired or interrupted, and the Company may not be able to recover the costs incurred as a result of temporary shut-ins, the plugging and abandonment of any of its wells or the repair of its midstream facilities. Furthermore, the existence of mining operations near the Company's properties could require coordination to avoid adverse impacts as a result of drilling and mining in close proximity. These restrictions on its operations, and any similar restrictions, can cause delays or interruptions or can prevent the Company from executing its business strategy, which could have a material adverse effect on its financial condition and results of operations.

Due to the concentrated nature of its portfolio of natural gas properties, a number of its properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on the Company's results of operations than they might have on other companies that have a more diversified portfolio of properties.

**11.    The Company's producing properties are concentrated in West Virginia, a state without a compulsory pooling statute, which may affect its ability to fully develop its properties without seeking amendments for unitization rights within its leases and leasing additional acreage to complete planned units.**

The Company's producing properties are concentrated in West Virginia, a state that relies on voluntary pooling, or unitization, of lands and leases. Under West Virginia law, in order to form a unit and pool the Company's interests with the interests of third parties within such unit, the Company must obtain leases that do not restrict pooling or unitization and that cover the entire lateral length of the planned wells the Company intends to drill. If all interest holders in a drilling unit are parties to a joint operating agreement, the joint operating agreement will govern development and pooling will not be required. However, in the absence of a joint operating agreement or other agreement that covers all interests within the unit, pooling of the interest holders who are not subject to the joint operating agreement would be economically necessary to develop that unit. Under West Virginia law, a party interested in development has no legal right to request the state of West Virginia to force pool interests for the development and operation of a drilling unit. Certain of the horizontal wells the Company intends to drill in the future may require pooling of its lease interests with the interests of third parties with whom the Company does not have a joint operating agreement in order to create a unit. If these third parties are unwilling to voluntarily pool their interests with the Company's interests or the Company is unable to lease their acreage on terms that permit pooling or unitization, the Company may be unable to integrate tracts, form units and drill long laterals on its leases, making it more difficult to fully develop properties where the Company does not hold, or have an agreement with other owners covering, 100% of the leasehold interests within a unit. As such, the absence of a compulsory pooling statute could expose the Company's operations to potential holdout costs, and result in the possibility of its actual drilling activities being materially different from those presently projected, including fewer drilling locations, shorter laterals and increased development expense. Therefore, the Company may not be able to drill and complete all of its potential drilling locations.

**12.    The unavailability or high cost of additional drilling rigs, equipment, supplies, quality personnel and oilfield services could adversely affect the Company's ability to execute its exploration and development plan within its budget and on a timely basis.**

The demand for quality field personnel to drill wells and conduct field operations, geologists, geophysicists, engineers and other professionals in the oil and natural gas industry can fluctuate significantly, often in correlation with oil and natural gas prices, causing periodic shortages. These shortages can cause escalating prices, delays in drilling and other exploration activities and the possibility of poor services coupled with potential damage to downhole reservoirs and personnel injuries. Such pressures may increase the actual cost of services, extend the time to secure such services and add costs for damages due to any accidents sustained from the overuse of equipment and inexperienced personnel.

Historically, there have been shortages of drilling and workover rigs, pipe and other equipment as demand for rigs and equipment has increased along with the number of wells being

drilled. The rigs the Company intends to add to its drilling program are not under contract yet. The Company cannot predict whether such shortages of equipment will impact its ability to enter into drilling contracts in the remainder of 2019 and beyond and, if so, what the timing and duration of such shortages will be. If the Company is unable to secure a sufficient number of drilling rigs that meet its specifications or at reasonable costs, the Company may not be able to drill all of its acreage before its oil and gas leases expire or in time to achieve its development plan. Equipment shortages could delay or cause the Company to incur significant expenditures that are not provided for in its capital budget, which could have a material adverse effect on the Company's business, financial condition or results of operations.

13. **Natural gas operations, especially those using hydraulic fracturing, are dependent on the availability of large quantities of affordable freshwater and sufficient wastewater disposal capacity. Restrictions on the ability to obtain water or dispose of wastewater may materially adversely affect the Company's operations.**

Affordable water is an essential component of natural gas production during both the drilling and hydraulic fracturing processes. If the Company is unable to obtain water to use in its operations, or to dispose of or recycle the water used in its operations, it may be unable to economically produce natural gas, which could have a material and adverse effect on its financial condition, results of operations and cash flows.

Moreover, the imposition of new environmental initiatives and regulations could include restrictions on the Company's ability to conduct certain operations such as hydraulic fracturing or waste disposal, including, but not limited to, the disposal of produced water, drilling fluids and other wastes associated with the exploration, development or production of natural gas and oil. The Clean Water Act (the "**CWA**") imposes restrictions and controls regarding the discharge of produced waters and other natural gas and oil waste into navigable waters. Permits must be obtained to discharge pollutants into waters and to conduct construction activities in or near regulated waters and wetlands. The CWA and similar state laws provide for civil, criminal and administrative penalties for any unauthorized discharges of pollutants and unauthorized discharges of reportable quantities of oil and other hazardous substances. State and federal discharge regulations prohibit the discharge of produced water and sand, drilling fluids, drill cuttings and certain other substances related to the natural gas and oil industry into bodies of water. The United States Environmental Protection Agency has also adopted regulations requiring certain natural gas and oil exploration and production facilities to obtain permits for storm water discharges. Compliance with current and future environmental regulations and permit requirements governing the withdrawal, storage and use of surface water or groundwater necessary for hydraulic fracturing of wells may increase the Company's operating costs and cause delays, interruptions, limitations or termination of its operations, the extent of which cannot be predicted.

14. **The Company may incur substantial losses and be subject to substantial liability claims as a result of its operations. Additionally, the Company may not be insured for, or its insurance may be inadequate to protect it against, these risks.**

The Company will not be insured against all risks. Losses and liabilities arising from uninsured and underinsured events could materially adversely affect its business, financial condition or results of operations.

The Company's natural gas exploration and production activities are subject to all of the operating risks associated with drilling for and producing natural gas, including the possibility of:

- landing its wellbore outside the desired formation and geologic target zone;

- environmental hazards, such as uncontrollable or unintended releases of natural gas, oil, brine, well fluids, toxic gases or other pollutants into the environment, including groundwater, atmosphere, soil and waterway contamination;

- abnormally pressured formations or irregularities in geological formations;

- mechanical difficulties, such as stuck oilfield drilling and service tools and casing collapse;

- equipment failures or accidents;

- fires, explosions and ruptures of pipelines;

- personal injuries and death;

- severe weather and natural disasters;

- terrorist attacks targeting natural gas and oil-related facilities and infrastructure; and

- hazards resulting from the presence of hydrogen sulfide or other contaminants in natural gas the Company will produce.

Any of these risks could materially adversely affect the Company's ability to conduct operations or result in substantial loss to it as a result of claims for:

- injury or loss of life;

- severe damage to and destruction of property, natural resources and equipment;

- pollution and other environmental damage;

- clean-up, reclamation or plugging and abandonment of responsibilities;

- repair and remediation costs;

- regulatory investigations and administrative, civil and criminal penalties; and

- injunctions resulting in limitation or suspension of its operations.

Although the Company will carry insurance coverage in amounts consistent with industry practice, the Company will not have insurance protection against all potential risks and losses it faces because either insurance is not available at a level that balances the costs of such insurance and the Company's desired rates of return, or the risks and losses are not fully insurable. While the Company has purchased insurance with the intention of covering most claims for bodily injury, property damage and clean-up costs stemming from a sudden and accidental pollution event, the Company may not have coverage if the operator is unaware of the pollution event and unable to report the occurrence to the insurance company within the required time frame.

Insurance costs will likely continue to increase, which could result in the Company's determination to decrease coverage and retain more risk to mitigate those cost increases. If the Company incurs substantial liability, and the damages are not covered by insurance or are in excess of policy limits, then the Company's business, results of operations and financial condition may be materially and adversely affected.

      **15.    The Company depends upon a limited number of significant purchasers for the sale of most of its production. The loss of one or more of these purchasers, if not replaced, or their inability to meet their obligations to the Company could reduce its revenues and have a material adverse effect on its financial condition and results of operations.**

The Company depends upon a limited number of significant purchasers for the sale of most of its production. The loss of these purchasers, should the Company be unable to replace them, could adversely affect its revenues and have a material and adverse effect on its financial condition and results of operations. The Company cannot assure you that any of its purchasers will continue to do business with the Company or that it will continue to have ready access to suitable markets for its future production. In addition, the Company does not require its purchasers to post collateral. The inability or failure of significant purchasers to meet their obligations to the Company or their insolvency or liquidation may adversely affect its financial condition and results of operations.

      **16.    The loss of senior management or technical personnel could adversely affect operations.**

The Company depends on the services of its senior management and technical personnel. The Company does not maintain, nor does it plan to obtain, any insurance against the loss of any of these individuals. The loss of the services of its senior management or technical personnel could have a material adverse effect on its business, financial condition and results of operations.

17.     **The Company may not be able to generate sufficient cash flow to meet its debt service and other obligations due to events beyond its control.**

The Company's ability to generate cash flows from operations and to make scheduled payments on its anticipated indebtedness post-emergence will depend on its future financial performance. The Company's future performance will be affected by a range of economic, competitive and business factors that it cannot control, such as further reductions in commodity prices, general economic and financial conditions in its industry or the economy generally and the other risks described herein. A significant reduction in operating cash flow resulting from changes in economic conditions, increased competition or other events beyond the Company's control would increase the need for additional or alternative sources of liquidity and would have a material adverse effect on its business, financial condition, results of operations, prospects and its ability to service its debt and other obligations. If the Company is unable to service its indebtedness, it will be forced to adopt an alternative strategy that differs from the Financial Projections that may include actions such as reducing capital expenditures, selling assets, restructuring or refinancing its indebtedness or seeking additional capital. The Company cannot provide any assurance that any of these alternative strategies could be affected on satisfactory terms, if at all, or that they would yield sufficient funds to make required payments on its indebtedness. In particular, its ability to restructure or refinance its indebtedness or raise additional capital would be subject to the risks and uncertainties described herein, and its ability to sell assets would be materially and adversely affected by changes in economic conditions, including declines in natural gas prices.

18.     **Increases in interest rates could adversely affect the Company's results of operations and financial condition.**

The Company's business and operating results can be harmed by factors such as the availability, terms of and cost of capital or increases in interest rates. These changes could cause the Company's cost of doing business to increase, limit its ability to pursue acquisition opportunities, reduce cash flow used for drilling and place the Company at a competitive disadvantage. If interest rates increase, so will the Company's interest costs, which may have a material adverse effect on its results of operations and financial condition. Recent and continuing disruptions and volatility in the global financial markets may lead to a contraction in credit availability impacting the Company's ability to finance its operations. The Company requires continued access to capital. A significant reduction in cash flows from operations or the availability of credit could materially and adversely affect the Company's ability to achieve its planned growth and operating results.

19.     **The Company's derivative activities could result in financial losses or could reduce its earnings.**

To achieve more predictable cash flows and reduce its exposure to adverse fluctuations in the prices of natural gas, the Company enters into derivative instrument contracts, including fixed-price swaps, for a significant portion of its natural gas production, as limited to 85% of its anticipated proved production under its revolving credit facility. As of September 30, 2019, the Company had entered into hedging contracts through March 31, 2024, covering a total of approximately 85,625,000 Mmbtu of its expected natural gas production at a weighted average

price of $2.63 per Mmbtu. Accordingly, the Company's earnings may fluctuate significantly as a result of changes in fair value of its derivative instruments.

Derivative instruments also expose the Company to the risk of financial loss in some circumstances. The Company's hedging transactions expose it to risk of financial loss if a counterparty fails to perform under a derivative contract. Disruptions in the financial markets could lead to sudden decreases in a counterparty's liquidity, which could make them unable to perform under the terms of the derivative contract, and the Company may not be able to realize the benefit of the derivative contract. As of October 25, 2019, the estimated fair value of its commodity derivative contracts was a net asset of approximately $13.0 million. Any default by the counterparties to these derivative contracts when they become due would have a material adverse effect on its financial condition and results of operations.

In addition, derivative arrangements could limit the benefit the Company would receive from increases in the prices for natural gas, which could also have an adverse effect on its financial condition. If natural gas prices exceed the price at which the Company has hedged its commodities, or if its production is less than the volume commitments under its hedging arrangements, it may be obligated to make cash payments to its hedge counterparties, which could, in certain circumstances, be significant.

20.    **The Company is subject to complex laws and regulations that could adversely affect the cost, manner or feasibility of conducting its operations or expose it to significant liabilities.**

The Company's natural gas exploration, production and transportation operations are subject to complex and stringent laws and regulations, including those relating to hydraulic fracturing and the protection of the environment and worker health and safety. In order to conduct its operations in compliance with these laws and regulations, the Company must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. The Company may incur substantial costs in order to maintain compliance with these existing laws and regulations. Failure to comply with these laws and regulations may also result in the suspension or termination of the Company's operations and subject it to administrative, civil and criminal penalties, including the assessment of natural resource damages, as well as injunctions limiting or prohibiting its activities. These regulations could change to the Company's detriment. The Company's costs of compliance may increase if existing laws and regulations are revised or reinterpreted, or if new laws and regulations become applicable to the Company's operations. Such costs could have a material adverse effect on the Company's business, financial condition and results of operations.

21.    **Conservation measures and technological advances could reduce demand for the Company's natural gas.**

Fuel conservation measures, alternative fuel requirements, increasing consumer demand for alternatives to oil and natural gas, technological advances in fuel economy and energy generation devices could reduce demand for oil and natural gas. The impact of the changing demand for the Company's natural gas may have a material adverse effect on its business, financial condition, results of operations and cash flows.

In addition, the Company can be the target of opposition to oil and natural gas drilling and development activity from certain stakeholder groups. The Company's need to incur costs associated with responding to these initiatives or complying with any new legal or regulatory requirements resulting from these activities that are substantial and not adequately provided for, could have a material adverse effect on its business, financial condition and results of operations. Furthermore, the use of social media channels can be used to cause rapid, widespread reputational harm to the Company.

> **22.    Federal and state legislative and regulatory initiatives relating to pipeline safety that require the use of new or more stringent safety controls or result in more stringent enforcement of applicable legal requirements could lead to increased capital costs and costs of operation and operational delays for the Company or the pipeline operators on which it depends.**

Pursuant to the authority under the Natural Gas Pipeline Safety Act ("**NGPSA**") and the Hazardous Liquid Pipeline Safety Act ("**HLPSA**"), as amended by the Pipeline Safety Improvement Act of 2002, the Pipeline Inspection, Protection, Enforcement and Safety Act of 2006 and the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011 (the "**2011 Pipeline Safety Act**"), the Pipeline and Hazardous Materials Safety Administration ("**PHMSA**") has promulgated regulations requiring pipeline operators to develop and implement integrity management programs for certain gas and hazardous liquid pipelines that, in the event of a pipeline leak or rupture could affect "high consequence areas", which are areas where a release could have the most significant adverse consequences, including high-population areas, certain drinking water sources and unusually sensitive ecological areas.

The 2011 Pipeline Safety Act is recent federal legislation which amends the NGPSA and HLPSA pipeline safety laws, requiring increased safety measures for gas and hazardous liquids pipelines. Among other things, the 2011 Pipeline Safety Act directs the Secretary of Transportation to promulgate regulations relating to expanded integrity management requirements, automatic or remote-controlled valve use, excess flow valve use, leak detection system installation, testing to confirm the material strength of certain pipelines, and operator verification of records confirming the maximum allowable pressure of certain intrastate gas transmission pipelines. Changes to pipeline safety laws by Congress and regulations by PHMSA or states that result in more stringent or costly safety standards could have a significant adverse effect on the Company and similarly situated midstream operators.

> **23.    Seasonal weather conditions and laws and regulations designed to protect wildlife can adversely affect the Company's ability to conduct drilling activities in some of the areas where it operates.**

Natural gas operations in the Company's operating areas can be adversely affected by seasonal weather conditions. This limits its ability to operate in those areas and can intensify competition during certain periods of the year for drilling rigs, oilfield equipment, services, supplies and qualified personnel, which may lead to periodic shortages. In addition, laws and regulations designed to protect wildlife, including the Endangered Species Act ("**ESA**"), can restrict activities that may affect endangered or threatened species or their habitats. Similar protections are offered to migratory birds under the Migratory Bird Treaty Act. For example, the

Company operates in areas that are designated as habitats for the northern long-eared bat and the Indiana bat, which are protected species under the ESA. These designations restrict or increase the cost of its operations by, among other things, limiting the Company's ability to clear trees to establish rights of way or pad locations on some of its acreage during certain periods of the year. These constraints and the resulting shortages or high costs could delay operations and materially increase the Company's operating and capital costs.

24.    **The Company may be involved in legal proceedings that may result in substantial liabilities.**

Like many oil and natural gas companies, the Company may from time to time be involved in various legal and other proceedings in the ordinary course of its business, such as title, royalty or contractual disputes, subsurface trespass, regulatory compliance matters and personal injury or property damage matters. Such legal proceedings are inherently uncertain and their results cannot be predicted.

In particular, there has been increased litigation in West Virginia related to oil and gas leases. A large concentration of the Company's leaseholds is located in West Virginia, where there has been significant litigation related to the enforceability of oil and gas leases. This litigation has been primarily focused on efforts by the owners of competing property interests to invalidate, terminate or rescind leases to which they claim an interest. In a few instances, lessors have sued to interpret or enforce lease provisions which competing property owners assert have been improperly implemented.  A second prevalent type of litigation has been tort cases by adjoining surface owners seeking to recover damages for alleged nuisances associated with horizontal drilling and fracking operations on leaseholds.

Regardless of the outcome, legal and other proceedings could have a material adverse effect on the Company because of several factors, including legal costs and the diversion of time, attention and energy of the Company. In addition, a resolution of one or more such proceedings could result in liability, penalties or sanctions, as well as judgments, consent decrees or orders requiring a change in the Company's business practices, which could materially adversely affect its business, operating results and financial condition. Accruals for such liability, penalties or sanctions may be insufficient. Judgments and estimates to determine accruals or range of losses related to legal and other proceedings could change from one period to the next, and such changes could be material. Additionally, if the Company does not prevail in any litigation, some of its oil and gas leases may be invalidated by the West Virginia courts.

25.    **The Company's business may be adversely affected by information technology disruptions.**

Cybersecurity incidents are increasing in frequency, evolving in nature and include, but are not limited to, installation of malicious software, unauthorized access to data and other electronic security breaches that could lead to disruptions in systems, unauthorized release of confidential or otherwise protected information and the corruption of data. The Company believes it has implemented appropriate measures to mitigate potential risks. However, given the unpredictability of the timing, nature and scope of information technology disruptions, the Company could be subject to manipulation or improper use of its systems and networks or

financial losses from remedial actions, any of which could have a material adverse effect on its financial condition and results of operations.

**B.    Risk Factors Relating to the New ARDH1 Equity**

**1.    The New ARDH1 Equity will be subject to certain transfer restrictions.**

The New ARDH1 Equity will be subject to restrictions, including, among others, that certain transfers must be pursuant to general terms and conditions established in the Reorganized OpCo Debtors Constituent Documents, which may include that transfers be subject to (i) a right of first refusal, drag-along rights and tag-along rights (subject to certain ownership thresholds) and (ii) compliance with laws applicable to such transfers, including applicable securities and tax laws.  Any such transfer restrictions and the terms thereof will be set forth in the Reorganized OpCo Debtors Constituent Documents.

The New ARDH1 Equity will not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any holder of such securities to freely resell such securities. The New ARDH1 Equity issued will be subject to certain resale and transfer restrictions. See Article VIII to this Disclosure Statement, entitled "*Securities Law Matters*".

**2.    The ability to transfer the New ARDH1 Equity may be limited by the absence of an active trading market.**

An active trading market for the New ARDH1 Equity may not develop or be maintained in the future or, even if developed, may not be liquid as it is unlikely that the New ARDH1 Equity will be registered pursuant to the Securities Act or listed on any securities exchange in the near future. The liquidity of any market for the New ARDH1 Equity will depend on various factors, including the number of holders of the New ARDH1 Equity and the interest of security dealers in making a market for the New ARDH1 Equity.  If an active trading market does not develop and is not maintained or such trading market is not liquid, holders of New ARDH1 Equity may be unable to sell their New ARDH1 Equity at fair market value or at all. Consequently, holders of the New ARDH1 Equity may bear certain risks associated with holding securities for an indefinite period of time, including, but not limited to, the risk that the New ARDH1 Equity will lose some or all of its value.  No assurance can be given that the liquidity of any trading market may develop, that the holders of the New ARDH1 Equity will be able to sell their New ARDH1 Equity or on the price at which holders would be able to sell their New ARDH1 Equity. In addition, holders of the New ARDH1 Equity will not have the protection afforded to equity holders of listed issuers as a result of the appointment of audit, nominating and compensation committees consisting solely of independent directors and certain other corporate governance mechanisms required of "listed issuers" as defined under Section 10A-3 of the Exchange Act.

**3.    The price of the New ARDH1 Equity may fluctuate significantly.**

As discussed above, there is no established trading market for the New ARDH1 Equity and there is no assurance that an active trading market for the New ARDH1 Equity will develop in the foreseeable future.  Even if an active trading market develops for the New ARDH1 Equity,

there can be no assurance that the value of the New ARDH1 Equity will increase over time, and it is possible that the value will decrease.  Volatility in the market price of the membership interests of New ARDH1 Equity may prevent a holder from being able to sell New ARDH1 Equity at or above the price of the New ARDH1 Equity contemplated under the Plan.

In addition, the market for equity securities generally has experienced significant price and volume fluctuations in recent years. This volatility has had a significant impact on the market price of securities issued by many companies, including companies in the oil and gas industries. Hence, the price of the New ARDH1 Equity could fluctuate based on factors that have little or nothing to do with Reorganized OpCo Debtors, and these fluctuations could materially reduce the price of the New ARDH1 Equity.

### 4.    The Reorganized OpCo Debtors are under no obligation to declare or pay any dividends or other distributions.

The Reorganized OpCo Debtors are under no obligation, and do not expect, to declare or pay any dividends or other distributions on account of the New ARDH1 Equity. The terms of any such distributions shall be set forth in the Reorganized OpCo Debtors Constituent Documents.  Any payment of dividends or other distributions may be declared upon the determination of the New Board and will depend on such business and other factors deemed relevant by the New Board.  Consequently, a holder's only ability to recognize a return on the New ARDH1 Equity may be through the sale of the New ARDH1 Equity. Additionally, covenants in the documents governing the Reorganized OpCo Debtors' indebtedness, including the New RBL Facility, may also restrict the Reorganized OpCo Debtors' ability to declare or pay dividends and make distributions and certain other payments.

### 5.    The New ARDH1 Equity is subject to dilution.

The New ARDH1 Equity issued on the Effective Date in connection with the Plan is subject to dilution as a result of the issuance of new equity securities after the consummation of the Restructuring Transactions, including on account of the MIP and any other equity issued by Reorganized ARDH1. In addition, the New Board may agree to grant equity securities to employees, consultants and directors under certain management incentive plans, including, but not limited to, the MIP, that may result in additional issuances of New ARDH1 Equity or rights with respect thereto.  Furthermore, the Reorganized OpCo Debtors may issue equity securities in connection with future investments, acquisitions or capital-raising transactions. Such grants or issuances may result in substantial dilution to ownership of the New ARDH1 Equity.

### 6.    Certain rights under the Reorganized OpCo Debtors Constituent Documents are based on the number of membership interests held by a Holder of the New ARDH1 Equity and its affiliates.

Certain rights in the Reorganized OpCo Debtors Constituent Documents, such as preemptive rights and/or information rights, may be limited to holders that hold specified numbers or percentages of the outstanding membership interests of the New ARDH1 Equity.

7.    **Reorganized ARDH1 will be a holding company and the value of the New ARDH1 Equity is dependent on its subsidiaries' performance.**

Upon consummation of the Restructuring Transactions, Reorganized ARDH1 will be holding company and, as such, it will not have any independent operations. Reorganized ARDH1's most significant asset will continue to be its direct and indirect ownership of the capital stock of its subsidiaries, including the Operating Subsidiaries. The value of New ARDH1 Equity thus will continue to be entirely dependent upon the future performance of its subsidiaries and upon the financial, business and other factors affecting its subsidiaries and the markets in which they do business, as well as general economic and financial conditions.

8.    **The business opportunity provisions in the Reorganized OpCo Debtors Constituent Documents could enable members of the New Board and their representatives to benefit from business opportunities that might not otherwise be available to the Company.**

The Reorganized OpCo Debtors Constituent Documents will contain provisions related to business opportunities that may be of interest to both the members of the New Board (and their affiliates) and the Reorganized OpCo Debtors. The Reorganized OpCo Debtors Constituent Documents will include an express waiver of any obligation on the part of the members of the New Board or any of their respective affiliates to disclose to the Company or any other member of the New Board any business opportunities, whether or not competitive with the Company's business and whether or not the Company might be interested in such business opportunity for itself. As a result, the Company's business and prospects could be adversely affected if attractive business opportunities are procured by such parties for their own benefit rather than for the Company.

9.    **An independent fairness opinion of the New ARDH1 Class A Interests has not been conducted, and Holders of Seller Notes Claims or Term Loan Claims may receive less value than what such Holder would have received if the Restructuring Transactions were not consummated.**

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the relative values of the New ARDH1 Class A Interests. If the Restructuring Transactions are consummated, Holders of Seller Notes Claims or Term Loan Claims may or may not receive more or as much value than if the Restructuring Transactions were not consummated.

10.    **Holders of the New ARDH1 Equity may not be able to recover in future cases of bankruptcy, liquidation, insolvency or reorganization.**

Holders of the New ARDH1 Equity will be subordinated to all liabilities of the Reorganized OpCo Debtors.  Therefore, the assets of the Reorganized OpCo Debtors will not be available for distribution to any holder of the New ARDH1 Equity in any future bankruptcy, liquidation, insolvency or reorganization of the Reorganized OpCo Debtors unless and until all indebtedness, if any, of the Reorganized OpCo Debtors have been paid. The remaining assets of the Reorganized OpCo Debtors may not be sufficient to satisfy the outstanding claims of its

creditors and therefore no value may remain for distribution to equity holders, including the holders of the New ARDH1 Equity.

## C.    Risk Factors Relating to the Bankruptcy Process

### 1.    The Debtors may fail to satisfy the vote requirement.

Although the Debtors intend to commence the Chapter 11 Cases after having received sufficient votes to approve the Plan, the Debtors can provide no assurance that they will receive the requisite acceptances to confirm the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan or other restructuring. There can be no assurance that the terms of any such alternative restructuring would be similar to those proposed in the Plan or as favorable to the Holders of Allowed Claims or Allowed Equity Interests as those in the Plan.

### 2.    Parties in interest may object to the Plan's classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion, and the Plan may not be confirmed if the Bankruptcy Court determines that the Plan's classification of Claims and Equity Interests was not appropriate.

### 3.    The Debtors may not be able to obtain Confirmation of the Plan.

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan.

The Bankruptcy Court may determine that this Disclosure Statement and/or the solicitation procedures did not satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules or may decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.  If the Debtors fail to achieve Confirmation of the Plan, the Chapter 11 Cases would likely continue for a protracted period without indication of how or when the Chapter 11 Cases may be completed. Some of the risks that the Company faces in a bankruptcy proceeding would become more acute in such a scenario, including certain risks that are beyond its control, such as further deterioration or other changes in economic conditions, changes in the industry in which the Company operates, potential revaluing of its assets due to chapter 11 proceedings, changes in customer demand for, and acceptance of, its products, regulatory difficulties and increasing expenses.

While the Chapter 11 Cases are anticipated to be consolidated for procedural purposes only, and the Debtors will request that they be jointly administered, the Plan constitutes a separate plan of reorganization for each Debtor. Nevertheless the Plan may be confirmed and consummated as to each Debtor separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor.

If the requisite acceptances of the Plan are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims or Equity Interests. The Bankruptcy Court may confirm the Plan pursuant to the "cram down" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one impaired class (which cannot be an "insider" class) has accepted the plan.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the plan as proposed. A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the balloting may be invalid. If the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to complete the Restructuring Transactions; (b) the distributions that Holders of Claims or Equity Interests ultimately would receive, if any, with respect to their Claims or Equity Interests are uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims or Equity Interests.

### 4.    Modifications to the Plan may result in less favorable distributions.

Section 1127 of the Bankruptcy Code permits the Debtors to modify the Plan at any time before Confirmation, but not if such modified Plan fails to meet the requirements for Confirmation. The Debtors or the Reorganized Debtors may modify the Plan at any time after Confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for Confirmation. The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.

Furthermore, if the Plan is not confirmable, the Debtors may be forced to modify the Plan.  If the Plan is not confirmed or if the Debtors determine to modify the Plan, the Debtors will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to a modified Plan. Any Holder of an Allowed Claim or Allowed Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes their previous acceptance or rejection.

Any modifications to the Plan could result in treatment less favorable to any non-accepting Class, as well as to any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such modifications could also require a re-solicitation of votes on the Plan, which could result in delays to Confirmation of the Plan.

### 5. The Debtors may fail to satisfy solicitation requirements.

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or equity interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or equity interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the Bankruptcy Court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtors are attempting to deliver this Disclosure Statement to all Holders of Claims in the Voting Classes as of the Voting Record Date. In that regard, the Debtors believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, Confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. The Debtors cannot provide any assurances that such a resolicitation would be successful.

### 6. Confirmation and consummation may be delayed if the Debtors are required to resolicit.

The Debtors may need to resolicit votes to accept or reject the Plan if, among other things, (a) the Debtors failed to receive the requisite votes for Confirmation, (b) the Debtors made changes to the terms of the Plan that constituted material changes under section 1127 of the Bankruptcy Code, (c) the Debtors waived a material condition to Confirmation, (d) the Bankruptcy Court concluded that the Debtors did not satisfy the solicitation requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) or (e) the Bankruptcy Court denied the motion seeking approval of the adequacy of this Disclosure Statement.

If the Debtors resolicit acceptances of the Plan from the Voting Parties, or if the Debtors are required to solicit the votes of the Holders of Claims or Equity Interests that have been deemed to reject the Plan, Confirmation of the Plan could be delayed and possibly jeopardized.

**7.    The Debtors may not be able to confirm and consummate the Plan quickly.**

While the Debtors intend to file the Plan in the joint pre-packaged Chapter 11 Cases and intend to seek Confirmation and consummation of the Plan as soon as practicable, the Debtors may not be able to confirm and consummate the Plan quickly if, among other things, the Effective Date is significantly delayed due to the Debtors' need to resolicit the Plan or if there are significant objections to the Plan that otherwise require the Bankruptcy Court to adjourn the Confirmation Hearing to allow the Debtors sufficient time to address the objections and, if necessary, amend the Plan, the Plan Supplement or the other documents contemplated by the Plan or file responses to objecting parties' concerns with respect to the Plan. Nonconfirmation of the Plan could result in an extended chapter 11 proceeding, during which time the Company could experience significant deterioration in its relationships with trade vendors and major customers.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.  Furthermore, if the Effective Date is delayed, there is a risk that the RSA may expire or be terminated in accordance with its terms.

**8.    The RSA may terminate.**

To the extent that events giving rise to termination of the RSA occur, including, among other things, the failure to meet certain milestones by the deadlines set forth in the RSA, subject to certain permitted extensions, the RSA may terminate prior to the Confirmation or consummation of the Plan. The Debtors, for example, intend to request relief that will allow the Company to satisfy the milestones set forth in Article III.A of this Disclosure Statement, but there can be no assurance that the Bankruptcy Court will grant such requests.  The termination of the RSA could result in the loss of support for the Plan by the parties to the RSA, including the Consenting Stakeholders, and could result in the loss of use of cash collateral by the Debtors or an event of default under the DIP Facility under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

**9.    The Debtors' emergence from Chapter 11 is not assured.**

While the Debtors expect to emerge from Chapter 11 promptly, the Debtors can give no assurance they will successfully reorganize or when this reorganization will occur, irrespective of the Debtors' obtaining Confirmation of the Plan.

10. **Releases, injunctions and exculpation provisions of the Plan may not be approved.**

Article XI of the Plan provides for certain releases, injunctions and exculpations, including third-party releases, including releases of claims that might otherwise be asserted against the Debtors, the Reorganized Debtors or the Released Parties, as applicable. The releases, injunctions and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the Releases are not approved, certain Released Parties may withdraw their support for the Plan, and the Debtors may not be able to obtain Confirmation of the Plan.

11. **The Debtors may be unsuccessful in obtaining first-day orders to permit them to pay their vendors or continue operating their businesses in the ordinary course of business.**

The Debtors will attempt to address potential concerns of their customers, vendors and other key parties in interest that might arise from the filing of the Chapter 11 Cases through a variety of motions contemplated by the RSA, including the Debtors' intention to seek appropriate Bankruptcy Court orders to permit the Debtors to pay their prepetition accounts payable to parties in interest in the ordinary course.

However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, such vendors may cease to continue their business arrangements with the Debtors or demand other financial assurances or enhanced performance.  Accordingly, the Debtors' businesses might suffer.

12. **The Bankruptcy Court may not approve the Debtors' use of cash collateral or the DIP Facility.**

Upon the commencement of the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to enter into the DIP Facility and use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the RBL Lenders, the Term Loan Lenders and the Seller Noteholders, to the extent applicable, which requests will be in accordance with the terms of the RSA. Such access to postpetition financing and cash collateral will provide liquidity during the pendency of the Chapter 11 Cases.  There can be no assurance that the Bankruptcy Court will approve the DIP Facility and/or such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the DIP Facility may mature or the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

13.    **If the Effective Date is delayed or projected proceeds are not timely received, among other reasons, the Debtors may need to seek additional postpetition financing.**

Although the Debtors believe that the Effective Date will occur soon after Confirmation, there can be no assurance as to the timing of the Effective Date. The Plan is designed to minimize the length of the bankruptcy proceedings and to ensure the loans available under the DIP Facility are sufficiently large to address any liquidity needs of the Company during the pendency of the Chapter 11 Cases. Nevertheless, there can be no assurance that the Debtors have sufficient cash available, including in order to operate their business if the Effective Date is delayed or projected proceeds are not timely received by the Debtors. In these cases, the Debtors may need additional postpetition financing, which may substantially increase the costs of consummating the Plan. There is no assurance of the terms on which such financing may be available or if such financing will be available. Any increased costs as a result of the incurrence of additional indebtedness may reduce amounts available to distribute to Holders of Allowed Claims and Holders of Allowed Equity Interests.

14.    **Restructuring under Chapter 11 of the Bankruptcy Code may adversely affect the Debtors' business.**

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, proceedings to confirm the Plan could have an adverse effect on the Company's business. Although the Company intends to continue operating its business in the ordinary course of business during the pendency of the Chapter 11 Cases, there is no guarantee that its customers will continue to conduct business with it or that qualified employees or contractors will be available to the Company in adequate numbers to staff its operating segments in light of the uncertainties inherent in the chapter 11 process. The loss of any major customer relationships or the Company's failure to retain employees could significantly impair the Company's performance. Further, the chapter 11 process may harm the Company's image and reputation, which in turn could materially and adversely affect the Company's business and operating results. This is particularly the case if the chapter 11 process requires significantly more time to complete than the Debtors anticipate, which may depend on factors beyond the Debtors' control. The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

15.    **Certain Claims may not be discharged and could have a material adverse effect on the Reorganized OpCo Debtors' financial condition and results of operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all claims that arise prior to a debtor's filing a petition for reorganization under the Bankruptcy Code or before confirmation of a plan of reorganization (a) would be subject to compromise and/or treatment under the plan and/or (b) would be discharged in accordance with the terms of the plan. Any Claims not ultimately discharged through the Plan could be asserted

against the Reorganized OpCo Debtors and may have an adverse effect on the Reorganized OpCo Debtors' financial condition and results of operations on a post-reorganization basis.

**16.    The Debtors' business may be negatively affected if the Debtors are unable to assume certain Executory Contracts and Unexpired Leases.**

An executory contract is a contract on which performance remains due to some extent by both parties to the contract.  In accordance with and subject to the RSA, the Plan provides for the assumption of all Executory Contracts and Unexpired Leases of ARDH1 and each OpCo Debtor and the rejection of all Executory Contracts and Unexpired Leases of each HoldCo Debtor, in each case unless otherwise determined by the Debtors. The Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as possible.  However, with respect to some limited classes of Executory Contracts, including licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract.  There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them, which could negatively affect the business of the Reorganized OpCo Debtors on and after the Effective Date, as contemplated under the Plan.

**D.    Additional Risk Factors**

**1.    The Debtors have no duty to update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**2.    The financial information contained in this Disclosure Statement has not been audited.**

In preparing this Disclosure Statement, the Debtors relied on financial information derived from their books and records that was available at the time of such preparation. Such financial information has not been audited, reviewed or compiled by the Debtors' independent registered public accounting firm. Accordingly, the Debtors' independent registered public accounting firm does not express an opinion or any other form of assurance with respect thereto and assumes no responsibility for, and disclaims any association with, this information.  The Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement or otherwise incorporated by reference herein is without inaccuracies.

**3.    No representations outside this Disclosure Statement are authorized.**

No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan, as applicable, are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your vote

to accept the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4.     No legal or tax advice is provided by this Disclosure Statement.

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult its own legal counsel and accountant as to legal, tax and other matters concerning its Claims.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to provide you with information regarding the Debtors and the proposed Restructuring Transactions to assist you in making a decision regarding whether or not to vote in favor of the Plan.

### 5.     No admissions made.

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Holders of Equity Interests.

**X.**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following is a summary of certain U.S. federal income tax consequences of the Plan and of the ownership of the Class 1A AEH Seller Notes Claims, Class 4A ARDH2 Seller Notes Claims, Class 3B ARE Term Loan Claims, Class 5A ARDH1 Term Loan Claims and the New ARDH1 Equity (each, solely for the purposes of this Article X, an "**Interest**") as of the date hereof. Except where noted, this summary deals only with holders of Interests that hold such Interests as capital assets. This summary does not represent a detailed description of the U.S. federal income tax consequences applicable under all circumstances and does not address the Medicare tax on net investment income or the effects of any state, local or non-U.S. tax laws. The tax consequences of the Plan are complex, and the tax treatment of certain aspects of the Plan may be subject to considerable uncertainty. You should consult your own tax advisors as to the particular U.S. federal income tax consequences to you of the Plan, as well as the consequences to you arising under other U.S. federal tax laws and the laws of any other taxing jurisdiction. This summary does not represent a detailed description of the U.S. federal income tax consequences applicable to you if you are subject to special treatment under the U.S. federal income tax laws, including if you are:

- A dealer in securities or currencies;

- A financial institution;

- A regulated investment company;

- A real estate investment trust;

- An insurance company;

- A tax-exempt organization;

- A person holding Interests as part of a hedging, integrated or conversion transaction, a constructive sale or a straddle;

- A trader in securities that has elected the mark-to-market method of accounting for its securities;

- A person required to accelerate the recognition of any item of gross income with respect to the Interests as a result of such income being recognized on an applicable financial statement;

- A person liable for the alternative minimum tax;

- A partnership or other pass-through entity for U.S. federal income tax purposes; or

1

- A U.S. Holder (as defined below) whose "functional currency" is not the U.S. dollar.

As used herein, the term "**U.S. Holder**" means a beneficial owner of Interests that is for U.S. federal income tax purposes:

- An individual citizen or resident of the United States;

- A corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- An estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- A trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a United States person.

The term "**non-U.S. Holder**" means a beneficial owner of Interests (other than a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) that is not a U.S. Holder.

If a partnership holds Interests, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding an Interest, you should consult your tax advisors.

This summary assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss tax consequences to Holders of Interests that act or receive consideration in a capacity other than as a Holder of Interests, and the tax consequences for such Holders may differ materially from that described below.

The discussion below is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), and regulations, rulings and judicial decisions thereunder as of the date hereof, and such authorities may be replaced, revoked or modified, possibly with retroactive effect, so as to result in U.S. federal tax consequences different from those discussed below. Except as otherwise noted, this discussion is limited to U.S. Holders and does not address the consequences to non-U.S. Holders.

## Consequences to the Debtors and Their Owners

The Debtors are pass-through entities for U.S. federal income tax purposes. Any U.S. federal income tax consequences of the Plan will generally not be borne by the Debtors, but instead will be taken into account by the direct or indirect owners of the Debtors.

## Consequences to U.S. Holders of Term Loans and Seller Notes

*Exchange by U.S. Holders of Term Loans and, if applicable, Seller Notes for New ARDH1 Equity*

The applicable tax rules are complex, and the application of such rules to the Restructuring Transactions and the transactions described above are subject to uncertainty and may be subject to recharacterization by the Internal Revenue Service or a court. The satisfaction of Term Loan Claims and Seller Notes Claims in exchange for New ARDH1 Equity is expected to be treated as a taxable sale of the assets of the Debtor to the applicable U.S. Holder in exchange for the extinguishment of indebtedness of Debtor followed by a tax-free transaction under section 721 of the Internal Revenue Code. Following the Restructuring Transactions, each Holder of Term Loans and, if applicable, Seller Notes will own New ARDH1 Equity. Each U.S. Holder of Term Loans and, if applicable, Seller Notes will recognize gain or loss equal to the difference between (1) such U.S. Holder's tax basis in the Term Loans or, if applicable, the Seller Notes, as applicable, and (2) the fair market value of its share of the assets of the Debtor. The character of such gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the U.S. Holder, the rules regarding accrued but untaxed interest and market discount, whether the applicable Claim constitutes a capital asset in the hands of the U.S. Holder and whether and to what extent the U.S. Holder had previously claimed a bad debt deduction with respect to its Claim.  If gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year at the time of the exchange.  A U.S. Holder's gain or loss will increase or decrease, as the case may be, such U.S. Holder's tax basis in the New ARDH1 Equity it receives.  A U.S. Holder's holding period of the New ARDH1 Equity should include the period that the U.S. Holder held the Term Loan Claims or Seller Notes Claims (as applicable), except to the extent such New ARDH1 Equity is treated as received in respect of accrued but unpaid interest, in which case the holding period would begin on the day following the Effective Date.

*Accrued but Unpaid Interest*

A portion of the consideration received by U.S. Holders of Term Loans or Seller Notes may be attributable to accrued but unpaid interest on such Term Loans or Seller Notes. Any such amount should be taxable to that U.S. Holder of Term Loans or Seller Notes as ordinary interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes.  Conversely, U.S. Holders may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent any accrued interest on the Term Loans or Seller Notes was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration (i.e., the assets of the Debtor) is not sufficient to fully satisfy all principal and interest on the Term Loans or Seller Notes, the extent to which such consideration will be attributable to accrued but unpaid interest is uncertain. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Term Loans or Seller Notes will be allocated first to the principal amount of Term Loans or Seller Notes, with any excess allocated to untaxed interest that accrued on such Term Loans or Seller Notes, if any. Certain

legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain U.S. Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by U.S. Holders of Term Loans or Seller Notes should be allocated in some way other than as provided in the Plan. U.S. Holders of Term Loans or Seller Notes should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but unpaid interest and the associated consequences.

*Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the Internal Revenue Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Term Loans or Seller Notes may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the exchanged debt.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of the debt that it acquired with market discount would be treated as ordinary income to the extent of the market discount that accrued thereon while such debt was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the exchanged debt that had been acquired with market discount is exchanged in a tax-free or other reorganization transaction for other property, any market discount that accrued on such debt but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

*Capital Loss Limitations*

U.S. Holders who recognize capital losses will be subject to limits on their use of capital losses. For U.S. Holders other than corporations, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns), or (ii) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. For corporate U.S. Holders,

unused capital losses may be carried forward for the five years following the capital loss year or carried back to the three years preceding the capital loss year.

### Medicare Tax

Certain U.S. Holders that are individuals, estates or trusts are required to pay an additional 3.8% Medicare tax on "unearned" net investment income (i.e., income received from, among other things, the sale or other disposition of certain capital assets). U.S. Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

## Consequences to U.S. Holders of Ongoing Ownership of New ARDH1 Equity

The following is a summary of certain U.S. federal income tax consequences that will apply to you if you are a U.S. Holder of the New ARDH1 Equity following the Restructuring Transactions. Tax-exempt U.S. Holders and non-U.S. Holders are not addressed in this discussion, and such holders should consult their own tax advisor regarding the ownership of the New ARDH1 Equity and whether such ownership is appropriate given their circumstances.

### General

Reorganized ARDH1 will be a Delaware limited liability company and, following the Restructuring Transactions, is intended to be treated as a partnership for U.S. federal income tax purposes. If Reorganized ARDH1 were to be a "publicly traded partnership" (as determined for U.S. federal income tax purposes), it could be taxable as a corporation unless it satisfied certain income requirements. Reorganized ARDH1 is not expected to be a publicly traded partnership, and the New ARDH1 Operating Agreement will include restrictions on transfers of the New ARDH1 Equity if such transfer would (i) cause Reorganized ARDH1 to be taxed as an association taxable as a corporation for federal or applicable state income tax purposes or (ii) cause Reorganized ARDH1 to fail to meet either the "private placement" safe harbor or another safe harbor from treatment as a "publicly traded partnership" as described in U.S. Treasury Regulations Section 1.7704-1. An organization that is classified as a partnership for U.S. federal income tax purposes is generally not subject to U.S. federal income tax itself, although it must file an annual information return reporting any items of income, gain, loss, deduction or credit and the partnership may be subject to liability for adjustments to the partnership's tax returns in certain circumstances absent an election to the contrary.

Each U.S. Holder of the New ARDH1 Equity will be required to take into account, as described below, its distributive share of each item of Reorganized ARDH1's income, gain, loss, deduction and credit for each taxable year of Reorganized ARDH1 ending with or within the U.S. Holder's taxable year. Generally, each item will have the same character and the same source (either U.S. or foreign), as though the U.S. Holder realized the item directly. U.S. Holders must report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized ARDH1 for such taxable year.

The tax liability attributable to income allocated to a U.S. Holder may exceed cash distributions, if any, made to such U.S. Holder, in which case such U.S. Holder would have to satisfy such tax liability from such U.S. Holder's own funds.

*Intangible Drilling Costs*

Reorganized ARDH1 may elect to deduct current intangible drilling costs ("**IDCs**") incurred in connection with the development of its oil and gas properties.  Upon the sale of any oil and gas properties by Reorganized ARDH1, a portion of gain realized will be treated as ordinary income to the extent any IDC has previously been deducted.

*Depletion*

Holders of economic interests in oil and gas properties are permitted to deduct a reasonable allowance for depletion equal to the greater of cost depletion (calculated on a unit of production method of cost recovery) or percentage depletion (generally 15% of gross income from the properties).  In the case of investments by an entity treated as a partnership, the depletion allowance is computed separately by the partners and not by the partnership. Accordingly, the determination of which depletion method will apply to a U.S. Holder of the New ARDH1 Equity (the cost method or percentage method) will be made separately by each U.S. Holder.  To enable each U.S. Holder of the New ARDH1 Equity to compute its depletion allowance, each U.S. Holder will be allocated its proportionate share of the adjusted tax basis in each oil and gas property which will be used by such U.S. Holder in calculating the depletion deductions and any gain or loss on the sale of property by Reorganized ARDH1.  U.S. Holders of the New ARDH1 Equity that have more than 1,000 barrels of oil production per day (or gas equivalent) or that are engaged in refining or retailing activities may not qualify for percentage depletion and should consult their tax advisors.

*Basis*

The initial tax basis of a U.S. Holder in its New ARDH1 Equity should equal the fair market value of the assets deemed surrendered therefor, plus the share of Reorganized ARDH1's liabilities allocated to such U.S. Holder. That basis will be increased by such U.S. Holder's share of Reorganized ARDH1's income and by any increases in such U.S. Holder's share of Reorganized ARDH1's liabilities. That basis will be decreased, but not below zero, by distributions from Reorganized ARDH1, by the U.S. Holder's share of Reorganized ARDH1's losses, by any decreases in its share of Reorganized ARDH1's liabilities and by such U.S. Holder's share of Reorganized ARDH1's expenditures that are not deductible in computing taxable income and are not required to be capitalized. Reorganized ARDH1's members should consult their tax advisors to determine their tax basis in the New ARDH1 Equity.

*Distributions*

Distributions of cash (including, in certain circumstances, distributions of certain "marketable securities" treated as cash distributions) from Reorganized ARDH1 to a U.S. Holder in any year will reduce the adjusted tax basis of the U.S. Holder's New ARDH1 Equity by the amount of such cash distribution. To the extent such distributions exceed the adjusted basis of a U.S. Holder's New ARDH1 Equity, such U.S. Holder will be treated as having recognized gain

from the sale or exchange of such New ARDH1 Equity. In general, distributions (other than liquidating distributions) of property other than cash will reduce the adjusted basis (but not below zero) of a U.S. Holder's New ARDH1 Equity by the amount of Reorganized ARDH1's adjusted basis in such property immediately before its distribution but will not result in the realization of taxable income to the U.S. Holder.

*Limitations on Losses*

While Reorganized ARDH1 is not intended as a "tax shelter," it is possible that losses and expenses could exceed Reorganized ARDH1's income and gain in a given year. The ability of a U.S. Holder to deduct such a net loss from its taxable income from other sources may be subject to a number of limitations under the Internal Revenue Code. These limitations include the basis limitations under Section 704 of the Internal Revenue Code and for certain U.S. Holders, such as individuals, the "at risk" rules of Section 465 of the Internal Revenue Code, and the limitations on miscellaneous itemized deductions under Section 67 of the Internal Revenue Code. Additionally, individuals will be subject to limitations on interest deductions under Section 163 of the Internal Revenue Code and the limitations on passive activity losses of Section 469 of the Internal Revenue Code. Further, Section 470 of the Internal Revenue Code may limit losses allocated to members by Reorganized ARDH1 if Reorganized ARDH1 leases property to tax-exempt lessees in certain circumstances.

*Sale or Disposition of New ARDH1 Equity*

A U.S. Holder that sells or otherwise disposes of the New ARDH1 Equity in a taxable transaction generally will recognize gain or loss equal to the difference, if any, between the adjusted tax basis of the New ARDH1 Equity and the amount realized from the sale or disposition. The amount realized will include the member's share of Reorganized ARDH1's liabilities outstanding at the time of the sale or disposition. If the U.S. Holder holds the New ARDH1 Equity as a capital asset, such gain or loss will generally be treated as capital gain or loss to the extent a sale of assets by Reorganized ARDH1 would qualify for such treatment and will generally be long-term capital gain or loss if the U.S. Holder had held the New ARDH1 Equity for more than one year on the date of such sale or disposition, provided, that a capital contribution by the U.S. Holder within the one-year period ending on such date may cause part of such gain or loss to be short-term. Gain from the sale or other disposition of New ARDH1 Equity will be treated as ordinary income to the extent of the U.S. Holder's distributive share of any "unrealized receivables" and "inventory items." Long-term capital gain of individuals are generally taxed at reduced rates.

In the event of a sale or other transfer of the New ARDH1 Equity at any time other than the end of Reorganized ARDH1's taxable years, the share of income and losses of Reorganized ARDH1 for the year of transfer attributable to the interest transferred will be allocated for U.S. federal income tax purposes between the transferor and the transferee on either an interim closing-of-the-books basis or pro rata basis reflecting the respective periods during such year that each of the transferor and the transferee owned the interest.

*Information Reporting and Backup Withholding*

In general, information reporting will apply to allocations of income in respect of the New ARDH1 Equity and the proceeds from the sale, exchange or redemption of the New ARDH1 Equity that are paid to a U.S. Holder within the United States (and in certain cases, outside the United States), unless such U.S. Holder is an exempt recipient such as a corporation. A backup withholding tax (currently at a 24% rate) generally applies if a U.S. Holder of the New ARDH1 Equity (i) fails to furnish its social security number or other taxpayer identification number ("**TIN**"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct TIN and that it is a U.S. person not subject to backup withholding. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules will be allowed as a refund or as a credit against a U.S. Holder's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY U.S. FEDERAL, STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XI.
## <u>CONCLUSION AND RECOMMENDATION</u>

**THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, THEIR CREDITORS AND THEIR OTHER STAKEHOLDERS, INCLUDING THE VOTING PARTIES. FOR THESE REASONS, THE DEBTORS URGE ALL VOTING CLASSES TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL ACTUALLY BE RECEIVED BY THE VOTING AGENT ON OR BEFORE 5:00 P.M. (PREVAILING EASTERN TIME) ON NOVEMBER 7, 2019.**

**ARSENAL RESOURCES DEVELOPMENT LLC**
**ARSENAL ENERGY HOLDINGS LLC**
**ARSENAL RESOURCES INTERMEDIATE HOLDINGS LLC**
**ARSENAL RESOURCES ENERGY LLC**
**ARSENAL RESOURCES DEVELOPMENT HOLDINGS 2 LLC**
**ARSENAL RESOURCES DEVELOPMENT HOLDINGS 1 LLC**
**ARSENAL GAS MARKETING LLC**
**ARSENAL MIDSTREAM LLC**
**ARSENAL WATER LLC**
**ULYSSES GATHERING LLC**
**MAR KEY LLC**
**ARSENAL RESOURCES LLC**
**RIVER RIDGE ENERGY HOLDINGS, LLC**
**RIVER RIDGE ENERGY, LLC**
**RIVER RIDGE PENNSYLVANIA, LLC**
**RIVER RIDGE OPERATING, LLC**
**SENECA-UPSHUR PETROLEUM, LLC**

/s/ Jonathan D. Farmer

Name:    Jonathan D. Farmer
Title:    Chief Executive Officer

DATED: November 7, 2019

**<u>Exhibit A to Disclosure Statement</u>**

**<u>Plan</u>**

*SOLICITATION VERSION*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x

In re:                      :

                           :      Chapter 11

ARSENAL RESOURCES      :

DEVELOPMENT LLC, *et al.*,   :      Case No. 19-12347 ([__])

                         :

           Debtors.[1]    :

---------------------------------------------------------x

## JOINT PRE-PACKAGED PLAN OF REORGANIZATION
## OF ARSENAL RESOURCES DEVELOPMENT LLC AND ITS DEBTOR AFFILIATES

Dated: November 7, 2019

| | |
|---|---|
| SIMPSON THACHER & BARTLETT LLP | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| Michael H. Torkin, Esq. | Pauline K. Morgan, Esq. (No. 3650) |
| Kathrine A. McLendon, Esq. | Kara Hammond Coyle, Esq. (No. 4410) |
| Nicholas E. Baker, Esq. | Ashley E. Jacobs, Esq. (No. 5635) |
| 425 Lexington Avenue | Rodney Square |
| New York, NY 10017 | 1000 North King Street |
| T: (212) 455-2000 | Wilmington, Delaware 19801 |
| F: (212) 455-2502 | T: (302) 571-6600 |
| | F: (302) 571-1253 |

*Proposed Counsel to Debtors and Debtors in Possession*

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

---

[1]    The debtors in the chapter 11 cases, along with the last four digits of each debtor's United States federal tax identification number, are: Arsenal Resources Development LLC (4072); Arsenal Energy Holdings LLC (6279); Arsenal Resources Intermediate Holdings LLC (5901); Arsenal Resources Energy LLC (2820); Arsenal Resources Development Holdings 2 LLC (3020); Arsenal Resources Development Holdings 1 LLC (9647); Arsenal Gas Marketing LLC (1113); Arsenal Midstream LLC (9654); Arsenal Water LLC (2465); Ulysses Gathering LLC (6546); Mar Key LLC (5428); Arsenal Resources LLC (3422); River Ridge Energy Holdings, LLC (8135); River Ridge Energy, LLC (5623); River Ridge Pennsylvania, LLC (5444); River Ridge Operating, LLC (4051); and Seneca-Upshur Petroleum, LLC (9204). The debtors' mailing address is 6031 Wallace Road Ext., Suite 300, Wexford, PA 15090.

# TABLE OF CONTENTS

Page

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING
LAW AND DEFINED TERMS ............................................................... 2
    A.    Rules of Interpretation, Computation of Time and Governing Law........... 2
    B.    Definitions................................................................................. 2

ARTICLE II. TREATMENT OF UNCLASSIFIED CLAIMS ................................................... 19
    A.    Administrative Claims ............................................................... 19
    B.    Priority Tax Claims.................................................................... 20
    C.    DIP Facility Claims.................................................................... 20
    D.    Statutory Fees........................................................................... 20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND
EQUITY INTERESTS....................................................................... 21
    A.    Introduction.............................................................................. 21
    B.    Summary of Classification and Treatment of Classified Claims and Equity
Interests.................................................................................. 21
    C.    Classification and Treatment of Claims and Equity Interests.................. 22
    D.    Special Provisions Regarding Unimpaired Claims................................... 34
    E.    Subordinated Claims.................................................................. 34

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ........................................... 34
    A.    Presumed Acceptance of the Plan.................................................. 34
    B.    Deemed Rejection of the Plan...................................................... 35
    C.    Voting Classes ......................................................................... 35
    D.    Acceptance by Impaired Classes of Claims...................................... 35
    E.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code........ 35
    F.    Plan Cannot Be Confirmed as to Some or All Debtors ......................... 35
    G.    Elimination of Vacant Classes .................................................... 35

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ......................................... 36
    A.    Corporate and Organizational Existence; Reorganized Capital Structure
and the New ARDH1 Equity ....................................................... 36
    B.    Organizational Documents of the Reorganized Debtors ......................... 36
    C.    Managers, Directors and Officers of Reorganized Debtors; Corporate
Governance ............................................................................ 36
    D.    New RBL Loan Documents........................................................ 36
    E.    New Equity Issuance.................................................................. 37

F.      Issuance of New ARDH1 Equity and Related Documents....................... 37

G.      Cancellation of Certain Existing Security Interests ................................. 37

H.      Management Incentive Plan....................................................................... 38

I.      Restructuring Transactions ....................................................................... 38

J.      Effectuating Documents; Further Transactions ....................................... 39

K.      Vesting of Assets in the Reorganized Debtors ........................................ 39

L.      Release of Liens, Claims and Equity Interests......................................... 39

M.      Cancellation of Stock, Certificates, Instruments and Agreements ........... 40

N.      Preservation and Maintenance of Debtors' Causes of Action ................. 40

O.      Exemption from Certain Transfer Taxes ................................................. 41

P.      Certain Tax Matters ................................................................................. 42

Q.      Restructuring Expenses............................................................................ 42

R.      Distributions............................................................................................. 42

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
        ......................................................................................................................... 42

A.      ARDH1 and OpCo Debtors Assumption of Executory Contracts and
        Unexpired Leases...................................................................................... 42

B.      HoldCo Debtors Rejection of Executory Contracts and Unexpired Leases
        ................................................................................................................... 43

C.      Assumption of Executory Contracts and Unexpired Leases.................... 43

D.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases
        ................................................................................................................... 44

E.      Rejection of Executory Contracts or Unexpired Leases .......................... 45

F.      Assumption of Insurance Policies............................................................ 46

G.      Indemnification ........................................................................................ 47

H.      Severance Agreements and Compensation and Benefit Programs;
        Employment Agreements.......................................................................... 47

I.      Workers' Compensation Benefits ............................................................ 47

J.      Reservation of Rights............................................................................... 47

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS............................................ 48

A.      Distribution Record Date ......................................................................... 48

B.      Dates of Distributions .............................................................................. 48

C.      Distribution Agent ................................................................................... 48

D.      Cash Distributions.................................................................................... 49

E.      Rounding of Payments ............................................................................. 49

F.      Allocation Between Principal and Interest ............................................... 49

G.      General Distribution Procedures.................................................. 49

H.      Address for Delivery of Distributions........................................ 49

I.       Unclaimed Distributions ............................................................ 50

J.       Withholding Taxes..................................................................... 50

K.      No Postpetition Interest on Claims ............................................ 50

L.      Setoffs ....................................................................................... 51

M.     Surrender of Cancelled Instruments or Securities ..................... 51

ARTICLE VIII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS............................ 51

A.      Disputed Claims Process............................................................ 51

B.      Claims Administration Responsibilities .................................... 52

C.      Estimation of Claims................................................................. 52

D.      Amendments to Claims; Adjustment to Claims on Claims Register........ 52

E.      No Distributions Pending Allowance ........................................ 53

F.      Distributions After Allowance ................................................... 53

G.      No Interest.................................................................................. 53

ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .......................... 53

A.      Conditions to Effective Date...................................................... 53

B.      Waiver of Conditions ................................................................ 54

ARTICLE X. RETENTION OF JURISDICTION ........................................................ 54

A.      Retention of Jurisdiction ........................................................... 54

B.      Failure of Bankruptcy Court to Exercise Jurisdiction............... 56

ARTICLE XI. EFFECTS OF CONFIRMATION ........................................................ 56

A.      General Settlement of Claims .................................................... 56

B.      Binding Effect............................................................................ 56

C.      Discharge of the Debtors ........................................................... 57

D.      Exculpation and Limitation of Liability .................................... 57

E.      Releases by the Debtors ............................................................ 58

F.      Releases by Holders of Claims and Equity Interests ................ 59

G.      Injunction .................................................................................. 61

H.      Protection Against Discriminatory Treatment ........................... 61

ARTICLE XII. MISCELLANEOUS PROVISIONS ..................................................... 62

A.      Modification of Plan .................................................................. 62

B.      Revocation of Plan..................................................................... 62

C.      Severability of Plan Provisions................................................. 63

| | | |
|---|---|---|
| D. | Closure of Certain Chapter 11 Cases on the Effective Date; Final Decree for Remaining Chapter 11 Cases | 63 |
| E. | Successors and Assigns | 63 |
| F. | Term of Injunctions or Stays | 63 |
| G. | Reservation of Rights | 63 |
| H. | Notices | 64 |
| I. | Governing Law | 66 |
| J. | Exhibits | 66 |
| K. | No Strict Construction | 66 |
| L. | Conflicts | 66 |
| M. | Immediate Binding Effect | 66 |
| N. | Entire Agreement | 66 |
| O. | Reservation of Rights | 67 |

---

JOINT PRE-PACKAGED PLAN OF REORGANIZATION OF
ARSENAL RESOURCES DEVELOPMENT LLC AND ITS DEBTOR AFFILIATES

---

## INTRODUCTION

Arsenal Resources Development LLC, a Delaware limited liability company, and each of the other above-captioned Debtors[2] hereby propose the Plan for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (distributed contemporaneously herewith) for a discussion of the Debtors' history, business, properties, projections and the events leading up to solicitation of the Plan and for a summary of the Plan and the treatment provided for herein. The Debtors urge all Holders of Claims entitled to vote on the Plan to review the Disclosure Statement and the Plan in full before voting to accept or reject the Plan. There may be other agreements and documents that will be filed with the Bankruptcy Court that are referenced in the Plan and the Plan Supplement as Exhibits. All such Exhibits are incorporated into and are a part of the Plan as if set forth in full herein. Subject to certain restrictions set forth in the RSA and the Plan, and the requirements set forth in 11 U.S.C. § 1127 and Bankruptcy Rule 3019, the Debtors reserve the right to amend, supplement, amend and restate, modify, revoke or withdraw the Plan prior to the Effective Date.

The Chapter 11 Cases will be consolidated for procedural purposes only, and the Debtors will request that they be jointly administered pursuant to an order of the Bankruptcy Court. The Plan constitutes a separate plan of reorganization for each Debtor and notwithstanding anything herein, the Plan may be confirmed and consummated as to each Debtor separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor. Each Debtor reserves the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class.

---

[2]    Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I.B of the Plan.

# ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

**A.      Rules of Interpretation, Computation of Time and Governing Law**

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit shall mean that document or exhibit, as it may thereafter be amended, amended and restated, modified or supplemented from time to time in accordance with the terms thereof; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections hereof; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (j) "$" or "dollars" means dollars in lawful currency of the U.S.; (k) any effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in a manner consistent with the overall purpose and intent of the Plan, all without further notice to or action, order or approval of the Bankruptcy Court or any other entity, and, to the extent of any dispute with respect thereto, the Bankruptcy Court shall retain jurisdiction consistent with <u>Article X</u>; and (l) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

**B.      Definitions**

1.1      "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or section 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtors' Estates and operating the Debtors' businesses, (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363 or 503(b) of the Bankruptcy Code to the extent incurred prior to and

including the Effective Date and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code. Administrative Claims exclude any superpriority or priority administrative expense Claims of the Holders of Seller Notes Claims or the Holders of Term Loan Claims pursuant to the Interim DIP Order or Final DIP Order.

       1.2    "**AEH**" means Arsenal Energy Holdings LLC, a Delaware limited liability company.

       1.3    "**AEH Equity Interests**" means all Equity Interests in AEH existing immediately prior to the Effective Date.

       1.4    "**AEH General Unsecured Claim**" means any Claim against AEH that is not an Administrative Claim, AEH Seller Notes Claim, ARE Gathering Agreement Claim, DIP Facility Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim or Section 510(b) Claim.

       1.5    "**AEH Seller Notes Claim**" means any Seller Notes Claim against AEH.

       1.6    "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

       1.7    "**Allowed**" means, with respect to any Claim or Equity Interest, such Claim or Equity Interest or any portion thereof that a Debtor, with the reasonable consent of the Required Consenting Term/Seller Stakeholders, or a Reorganized Debtor has assented to the validity of, or that has been (a) allowed by a Final Order of the Bankruptcy Court, (b) allowed pursuant to the terms of the Plan, (c) allowed by agreement between the Holder of such Claim, on one hand, and the applicable Debtor, with the reasonable consent of the Required Consenting Term/Seller Stakeholders, or Reorganized Debtor, as applicable, on the other hand or (d) allowed by a Final Order of a court in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

       1.8    "**ARD**" means Arsenal Resources Development LLC, a Delaware limited liability company.

       1.9    "**ARDH1**" means Arsenal Resources Development Holdings 1 LLC, a Delaware limited liability company.

       1.10    "**ARDH1 Equity Interests**" means all Equity Interests in ARDH1 existing immediately prior to the Effective Date.

       1.11    "**ARDH1 General Unsecured Claim**" means any Claim against ARDH1 that is not an Administrative Claim, ARDH1 Term Loan Claim, ARE Gathering Agreement Claim, DIP Facility Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim or Section 510(b) Claim.

1.12    "**ARDH1 Term Loan Claim**" means any Term Loan Claim against ARDH1.

1.13    "**ARDH2**" means Arsenal Resources Development Holdings 2 LLC, a Delaware limited liability company.

1.14    "**ARDH2 Equity Interests**" means all Equity Interests in ARDH2 existing immediately prior to the Effective Date.

1.15    "**ARDH2 General Unsecured Claim**" means any Claim against ARDH2 that is not an Administrative Claim, ARDH2 Seller Notes Claim, ARE Gathering Agreement Claim, DIP Facility Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim, or Section 510(b) Claim.

1.16    "**ARDH2 Seller Notes Claim**" means any Seller Notes Claim against ARDH2.

1.17    "**ARE**" means Arsenal Resources Energy LLC, a Delaware limited liability company.

1.18    "**ARE Available Cash**" means Cash in an amount equal to $100,000.00.

1.19    "**ARE Distribution Record Date**" means the date on which the ARE Available Cash is distributed in accordance with the Plan.

1.20    "**ARE Equity Interests**" means all Equity Interests in ARE existing immediately prior to the Effective Date.

1.21    "**ARE Gathering Agreement Claim**" means any Claim arising under or related to any of the Gathering Agreements (unless such agreement is assumed, including on amended terms, in accordance with this Plan or an order of the Bankruptcy Court), including any Claim arising from the rejection of any Gathering Agreement pursuant to section 365 of the Bankruptcy Code or this Plan, as applicable.

1.22    "**ARE General Unsecured Claim**" means any Claim against ARE that is not an Administrative Claim, ARE Gathering Agreement Claim, ARE Term Loan Claim, DIP Facility Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim or Section 510(b) Claim.

1.23    "**ARE Term Loan Claim**" means any Term Loan Claim against ARE.

1.24    "**ARIH**" means Arsenal Resources Intermediate Holdings LLC, a Delaware limited liability company.

1.25    "**ARIH Equity Interests**" means all Equity Interests in ARIH existing immediately prior to the Effective Date.

1.26     "**ARIH General Unsecured Claim**" means any Claim against ARIH that is not an Administrative Claim, ARE Gathering Agreement Claim, DIP Facility Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim, Section 510(b) Claim, Seller Notes Claim or Term Loan Claim.

1.27     "**Avoidance Actions**" means any and all avoidance, recovery or subordination claims and causes of action, whether actual or potential, to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547–553 and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent or avoidable transfer laws.

1.28     "**Bankruptcy Code**" means title 11 of the United States Code, as now in effect or hereafter amended.

1.29     "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

1.30     "**Bankruptcy Rules**" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms and the Local Rules, in each case as amended from time to time and as applicable to the Chapter 11 Cases or proceedings therein.

1.31     "**Business Day**" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York, New York.

1.32     "**Cash**" means legal tender of the U.S. or the equivalent thereof.

1.33     "**Cause of Action**" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, cross-claim, counterclaim, or recoupment, and any claim on a contract or for a breach of duty imposed by law or in equity; (b) with respect to the Debtors, the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

1.34     "**Chambers**" means, collectively, Chambers Energy Capital II LP, Chambers Energy Capital II TE, LP and Chambers Energy Capital III, LP.

1.35     "**Chapter 11 Cases**" means the cases commenced by the Debtors under chapter 11 of the Bankruptcy Code on the Petition Date in the Bankruptcy Court.

1.36    "**Claim**" means a "claim" against any Debtor as defined in section 101(5) of the Bankruptcy Code.

1.37    "**Claims Register**" means the official register of Claims against and Equity Interests in the Debtors maintained by the Solicitation Agent.

1.38    "**Class**" means a category of Claims or Equity Interests classified under Article III of the Plan pursuant to section 1122 of the Bankruptcy Code.

1.39    "**Confirmation**" means the entry by the Bankruptcy Court of the Confirmation Order on the docket of the Chapter 11 Cases, within the meanings of Bankruptcy Rules 5003 and 9021.

1.40    "**Confirmation Date**" means the date upon which Confirmation occurs.

1.41    "**Confirmation Hearing**" means the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.42    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan and approving the Disclosure Statement.

1.43    "**Consenting Equityholders**" means the holders of AEH Equity Interests that are party to the RSA and that have not breached their obligations thereunder.

1.44    "**Consenting RBL Lenders**" means the holders of OpCo RBL Claims that are party to the RSA and that have not breached their obligations thereunder.

1.45    "**Consenting Secured Swap Parties**" means the Secured Swap Parties (as defined in the RBL Credit Agreement) that are party to the RSA and that have not breached their obligations thereunder.

1.46    "**Consenting Seller Noteholders**" means the holders of, or investment advisors, sub-advisors or managers of discretionary accounts that hold, Seller Notes Claims that are party to the RSA and that have not breached their obligations thereunder.

1.47    "**Consenting Stakeholder Advisors**" means, collectively, (i) Kirkland & Ellis LLP, (ii) Baker Botts L.L.P., (iii) Vinson & Elkins LLP, (iv) the RBL Lender Advisors, (v) one Delaware counsel for each of Chambers, Mercuria and LRMH and (vi) such other advisors and/or professionals engaged by the Consenting RBL Lenders, the Consenting Term Loan Lenders and the Consenting Seller Noteholders in connection with the Restructuring Transactions.

1.48    "**Consenting Stakeholders**" means the Consenting Term Loan Lenders, the Consenting Seller Noteholders, the Consenting RBL Lenders and the Consenting Equityholders.

1.49    "**Consenting Term Loan Lenders**" means the holders of Term Loan Claims that are party to the RSA and that have not breached their obligations thereunder.

1.50    "**Constituent Documents**" means the certificate of incorporation, certificate of formation, limited liability company agreement, operating agreement, bylaws and other applicable organizational documents of any Entity.

1.51    "**Cure**" means the payment of Cash, or the distribution of other property or other action (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an Executory Contract or Unexpired Lease of the Debtors that the Debtors seek to assume under section 365(a) of the Bankruptcy Code.

1.52    "**Cure Claim**" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

1.53    "**Debtors**" means each of the above-captioned debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

1.54    "**DIP Agent**" means Citibank, N.A., as administrative agent and collateral agent under the DIP Facility, together with its successors and assigns in such capacities.

1.55    "**DIP Credit Agreement**" means that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, among ARD, as borrower, each of the other Debtors as guarantors, each of the DIP Lenders from time to time party thereto and the DIP Agent, which shall be substantially in the form attached to the Restructuring Term Sheet as Annex 1.

1.56    "**DIP Facility**" means the debtor-in-possession financing facility of the Debtors, provided by the DIP Credit Agreement, as approved by the Bankruptcy Court.

1.57    "**DIP Facility Claims**" means any Claims arising under or related to the DIP Facility Documents.

1.58    "**DIP Facility Documents**" means the Interim DIP Order, the Final DIP Order, the DIP Credit Agreement and all collateral agreements or any other documents related thereto.

1.59    "**DIP Lenders**" means the banks and other financial institutions, party to the DIP Credit Agreement as lenders.

1.60    "**Disclosure Statement**" means that certain Disclosure Statement for the Joint Pre-Packaged Plan of Reorganization of Arsenal Resources Development LLC and its Debtor Affiliates, dated November 7, 2019, that was prepared and distributed in accordance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and applicable non-bankruptcy law.

1.61    "**Disputed**" means, with respect to any Claim, or any portion thereof, (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under sections 502, 503 or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or a motion for payment has been timely filed with the Bankruptcy Court, to the extent the Debtors or

any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order; *provided*, *however*, in no event shall a Claim that is deemed Allowed under the Plan be classified as a Disputed Claim.

1.62    "**Distribution Agent**" means Reorganized ARDH1 or any party or Entity designated by Reorganized ARDH1, in its sole discretion and without need for any further order of the Bankruptcy Court, to serve as distribution agent under the Plan.

1.63    "**Distribution Record Date**" means the Confirmation Date.

1.64    "**D&O Liability Insurance Policies**" means all insurance policies (including any "tail policy") for liability of the current or former managing members, members, managers, directors and officers maintained by the Debtors as of the Petition Date or thereafter, including the D&O Side A DIC Liability Insurance Policies.

1.65    "**D&O Side A DIC Liability Insurance Policies**" means (i) D&O Liability Insurance Policy No. DOX G25583449 002 issued by Chubb for the policy period 7/15/2019 to 7/15/2020 and (ii) all D&O Liability Insurance Policies excess to Chubb D&O Liability Insurance Policy No. DOX G25583449 002.

1.66    "**D&O Side A DIC Tail Pre-Paid Premium**" means $99,658 paid to insurance broker ESS NexTier Insurance Group, LLC on November 7, 2019 as pre-payment of premiums to come due on or about July 15, 2020 for the six-year extended discovery period under the D&O Side A DIC Liability Insurance Policies.

1.67    "**DTE-AGS**" means DTE Appalachia Gathering, LLC.

1.68    "**DTE-AGS Gathering Agreements**" means, collectively, that certain (a) Gas Gathering Agreement, dated November 5, 2012 and (b) Interruptible Gathering Agreement, dated September 25, 2019, in each case by and between ARE and DTE-AGS, including all exhibits, schedules and annexes thereto.

1.69    "**DTE-SGG**" means Stonewall Gas Gathering, LLC.

1.70    "**DTE-SGG Gathering Agreements**" means, collectively, that certain (a) Gas Gathering Agreement, dated July 29, 2014 and (b) Interruptible Gathering Agreement, dated September 25, 2019, in each case by and between ARE and DTE-SGG, including all exhibits, schedules and annexes thereto.

1.71    "**Effective Date**" means the date on which a notice of effectiveness is filed with the Bankruptcy Court confirming that (a) all conditions in Article IX.A of the Plan have been satisfied or waived as provided for in Article IX.B and (b) consummation of the Restructuring Transactions has occurred.

1.72    "**Entity**" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

1.73    "**EQM**" means Equitrans, L.P..

1.74    "**EQM Gathering Agreements**" means collectively, that certain (i) Credit Agreement, dated August 18, 2010, and (ii) Transportation Service Agreement CW2239335-510, dated August 1, 2017, in each case by and between ARE and EQM, including all exhibits, schedules and annexes thereto.

1.75    "**Equity Interest**" means any ownership interest in a Person or Entity, including any interest evidenced by common or preferred stock, a limited liability company or other membership or partnership interest or unit, a warrant, an option, any other right to acquire or otherwise receive any ownership interest in such Person or any right to payment or compensation based upon any such interest.

1.76    "**Estate**" means the estate of a Debtor in the applicable Chapter 11 Case, as created under section 541 of the Bankruptcy Code.

1.77    "**Exculpated Parties**" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Holders of OpCo RBL Claims; (d) the Holders of Term Loan Claims; (e) the Holders of Seller Notes Claims; (f) the TL Agent; (g) the Seller Note Agent; (h) the RBL Agent; (i) the DIP Agent; (j) the Consenting Stakeholders; (k) the New Capital Parties; (l) each current and former Affiliate of each Entity in clause (a) through (k); and (m) each Related Party of each entity in clause (a) through (k).

1.78    "**Executory Contract**" means a contract to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.79    "**Exhibit**" means an exhibit annexed to either the Plan or the Plan Supplement or as an exhibit or appendix to the Disclosure Statement (as such exhibits may be amended, supplemented, amended and restated, or otherwise modified from time to time).

1.80    "**Final DIP Order**" means the Final Order of the Bankruptcy Court approving the DIP Facility on a final basis and authorizing the use of cash collateral, which shall be consistent with the RSA and the DIP Credit Agreement.

1.81    "**Final Order**" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (x) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, as applicable, or (y) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing

shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided* that no order shall fail to be a Final Order solely due to the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rules 59 or 60 of the Federal Rules of Civil Procedure, or Rule 9024 of the Bankruptcy Rules may be filed with respect to such order.

1.82    "**Fullstream**" means Goff Connector LLC.

1.83    "**Fullstream Gathering Agreements**" means collectively, that certain (i) Gathering and Natural Gas Services Agreement, dated as of November 9, 2017, and (ii) Amended & Restated Individual Transaction Confirmation, dated December 21, 2018, in each case by and between ARE and Fullstream, including all exhibits, schedules and annexes thereto.

1.84    "**Gathering Agreements**" means, collectively, the DTE-AGS Gathering Agreements, the DTE-SGG Gathering Agreements, the EQM Gathering Agreements, the Fullstream Gathering Agreements, the TCO Gathering Agreements and any other agreements related thereto.

1.85    "**Governance Term Sheet**" means the governance term sheet attached as Annex 4 to the Restructuring Term Sheet.

1.86    "**Governmental Unit**" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

1.87    "**HoldCo Debtors**" means each of the following Debtors: (a) AEH; (b) ARIH; (c) ARE; and (d) ARDH2.

1.88    "**Holder**" means an Entity holding a Claim against, or Equity Interest in, a Debtor as of the applicable date of determination.

1.89    "**Impaired**" means, with respect to a Claim, Equity Interest or Class of Claims or Equity Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

1.90    "**Indemnification Agreement**" means any organizational or employment and/or service agreement of or with the Debtors and currently in place that provides for the indemnification of any current or former managing member, member, manager, director, officer or employee of the Debtors.

1.91    "**Intercompany Claim**" means any Claim by a Debtor against another Debtor.

1.92    "**Interim DIP Order**" means the interim order of the Bankruptcy Court approving the DIP Facility on an interim basis and authorizing use of cash collateral, which shall be consistent with the RSA and the DIP Credit Agreement.

1.93    "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

1.94    "**Lien**" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

1.95    "**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.96    "**LRMH**" means LR-Mountaineer Holdings, L.P.

1.97    "**Mercuria**" means Mercuria Investments US, Inc. or its affiliates.

1.98    "**MIP**" means a management incentive plan of the Reorganized Debtors, consistent with the RSA, which shall reserve a percentage to be determined by the New Board (acting in its sole discretion) of up to 10% of the New ARDH1 Equity (which may be in the form of a combination of profits interests and/or full value units awards, as determined by the New Board in its sole discretion), on a fully-diluted basis, to be issued to management and/or other employees of the Reorganized Debtors after the Effective Date at the discretion of the New Board and on terms to be determined by the New Board (including with respect to allocation, timing and structure of such issuance and such management incentive plan).

1.99    "**New ARDH1 Class A Interests**" means Class A common membership interests authorized for issuance under the New ARDH1 Operating Agreement.

1.100    "**New ARDH1 Constituent Documents**" means the New ARDH1 Operating Agreement and any other Constituent Document of Reorganized ARDH1, with terms consistent with the RSA and the Governance Term Sheet.

1.101    "**New ARDH1 Equity**" means any membership interests authorized for issuance under the New ARDH1 Operating Agreement.

1.102    "**New ARDH1 Operating Agreement**" means the limited liability company operating agreement of Reorganized ARDH1, substantially in the form attached to the Plan Supplement and with terms consistent with the RSA and the Governance Term Sheet.

1.103    "**New Board**" means the initial board of managers of Reorganized ARDH1 as selected in accordance with the New ARDH1 Operating Agreement, and as disclosed in the Plan Supplement or to the Bankruptcy Court at or prior to the Confirmation Hearing.

1.104    "**New Capital Commitment**" means that certain new capital commitment of $100 million in Reorganized ARDH1 to be provided by the New Capital Parties, in accordance with the terms of the RSA, contingent upon the satisfaction of the conditions precedent therefor contained in the RSA and the documents incorporated therein.

1.105    "**New Capital Parties**" means, collectively, (i) Chambers and/or certain of its affiliated funds and/or their respective limited partners and (ii) Mercuria and/or certain of its affiliates and/or their respective limited partners, in their respective capacities as providers of the New Capital Commitment, in each case, as identified in the RSA.

1.106    "**New Equity Issuance**" means the issuance to the New Capital Parties of 153,846,153 New ARDH1 Class A Interests in exchange for funding the New Capital Commitment in accordance with the RSA and the Plan.

1.107    "**New RBL Agent**" means the administrative agent under the New RBL Credit Agreement.

1.108    "**New RBL Credit Agreement**" means that certain credit agreement governing the New RBL Facility, which shall be on the terms and subject to the conditions set forth in the New RBL Term Sheet and otherwise consistent with the RSA.

1.109    "**New RBL Facility**" means the $200 million new revolving credit facility (with an initial borrowing base of not less than $130 million) under and evidenced by the New RBL Credit Agreement, consistent with the New RBL Term Sheet and the RSA.

1.110    "**New RBL Loan Documents**" means the New RBL Credit Agreement and any related notes, guaranties, collateral agreements, certificates, documents and instruments related to or executed in connection with the New RBL Credit Agreement, which shall be consistent with the New RBL Term Sheet and on terms and conditions reasonably acceptable to the Required Consenting Term/Seller Stakeholders.

1.111    "**New RBL Term Sheet**" means the new RBL facility term sheet attached as Annex 3 to the Restructuring Term Sheet.

1.112    "**OpCo Debtors**" means each of the following Debtors: (a) Arsenal Resources Development LLC; (b) Arsenal Gas Marketing LLC; (c) Arsenal Midstream LLC; (d) Arsenal Water LLC; (e) Ulysses Gathering LLC; (f) Mar Key LLC; (g) Arsenal Resources LLC; (h) River Ridge Energy Holdings, LLC; (i) River Ridge Energy, LLC; (j) River Ridge Pennsylvania, LLC; (k) River Ridge Operating, LLC; and (l) Seneca-Upshur Petroleum, LLC.

1.113    "**OpCo Equity Interests**" means all Equity Interests in the OpCo Debtors existing immediately prior to the Effective Date.

1.114    "**OpCo General Unsecured Claim**" means any Claim against any OpCo Debtor that is not an Administrative Claim, ARE Gathering Agreement Claim, DIP Facility Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, OpCo RBL Claim, Priority Tax Claim, Section 510(b) Claim, Seller Notes Claim or Term Loan Claim.

1.115    "**OpCo RBL Claim**" means any Claim against any OpCo Debtor arising under or related to the RBL Documents.

1.116    "**Other Priority Claim**" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

1.117    "**Ordinary Course Professionals Order**" means an order of the Bankruptcy Court, if any, approving a motion to employ ordinary course professionals in the Chapter 11 Cases.

1.118   "**Other Secured Claim**" means any Secured Claim against any Debtor other than DIP Facility Claims, OpCo RBL Claim, Seller Notes Claim or Term Loan Claim.

1.119   "**Person**" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association or other Entity, whether acting in an individual, fiduciary or other capacity.

1.120   "**Petition Date**" means the date on which the Debtors filed their petition for relief commencing the Chapter 11 Cases.

1.121   "**Plan**" means, collectively, this joint pre-packaged plan of reorganization, the Exhibits, all supplements, appendices, and schedules hereto, and any document to be executed, delivered, assumed or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement.

1.122   "**Plan Supplement**" means one or more supplements to the Plan containing certain agreements, lists, documents or forms of documents and/or schedules or exhibits relating to the implementation of the Plan, which may include certain agreements, lists, documents or forms of documents and/or schedules or exhibits necessary to comply with Bankruptcy Code sections 1123(a)(7) and 1129(a)(5).

1.123   "**Preference Actions**" means any and all avoidance, recovery or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under section 547 of the Bankruptcy Code.

1.124   "**Priority Tax Claim**" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.125   "**Pro Rata**" means, at any time, the proportion that the face amount of a Claim or Equity Interest in a particular Class bears to the aggregate face amount of all Claims or Equity Interests in that Class, unless the Plan provides otherwise.

1.126   "**Professional**" means: (a) any Entity employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.127   "**Professional Claims Bar Date**" means forty-five (45) days after the Effective Date.

1.128   "**Professional Fee Claim**" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for compensation for services rendered or reimbursement of costs, expenses or other charges incurred by Professionals after the Petition Date and prior to the Confirmation Date; *provided*, that Professional Fee Claims shall not include Restructuring Expenses.

1.129  "**Professional Fee Escrow Account**" means an interest-bearing account funded by the OpCo Debtors in Cash on the Effective Date pursuant to Article II.A(ii) of the Plan, in an amount equal to the Professional Fee Reserve Amount.

1.130  "**Professional Fee Reserve Amount**" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.A(i) of the Plan.

1.131  "**Proof of Claim**" means a proof of claim filed against any Debtor in the Chapter 11 Cases.

1.132  "**Ratable Share**" means, with respect to Classes 3A or 3C only, the proportion that the face amount of a Class 3A Claim or Class 3C Claim bears to the aggregate face amount of all Claims in such Classes.

1.133  "**RBL Agent**" means Citibank, N.A., as administrative agent and collateral agent under the RBL Credit Agreement, together with its successors and assigns in such capacities.

1.134  "**RBL Credit Agreement**" means that certain Credit Agreement, dated December 21, 2018, among ARD, as borrower, the lenders from time to time party thereto and the RBL Agent.

1.135  "**RBL Documents**" means the RBL Credit Agreement, the RBL Guaranty and any related notes, certificates, documents and instruments related to or executed in connection with the RBL Credit Agreement.

1.136  "**RBL Guaranty**" means the Guaranty Agreement, dated December 21, 2018, by and among ARD, each of its subsidiaries party thereto and the RBL Agent.

1.137  "**RBL Lender Advisors**" means (i) Paul Hastings, LLP, (ii) Richards, Layton & Finger, PA, (iii) RPA Advisors and (iv) such other advisors and/or professionals engaged by the RBL Agent (or by counsel to the RBL Agent) to the extent such advisors' or professionals' fees are reimbursable pursuant to the RBL Credit Agreement and the related loan documents.

1.138  "**Reinstated**" means, with respect to any Claim: (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder of such Claim in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an

insider of any Debtor) for any actual pecuniary loss incurred by the Holder of such Claim as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder of such Claim.

1.139   "**Related Parties**" means, collectively, with respect to a Person, including each Released Party and Exculpated Party, such Person's current, former and future Affiliates, member firms and associated Entities, and with respect to each of the foregoing, their Affiliates, and such Person's, to the extent applicable, current and former directors, current and former managers, current and former officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, trustees, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals.

1.140   "**Released Party**" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Holders of OpCo RBL Claims; (d) the Holders of Term Loan Claims; (e) the Holders of Seller Notes Claims; (f) the DIP Lenders; (g) the TL Agent; (h) the Seller Note Agent; (i) the RBL Agent; (j) the DIP Agent; (k) the Consenting Stakeholders; (l) the New Capital Parties; (m) the Holders of AEH Equity Interests; (n) the current and former Affiliates of each Entity in clause (a) through (m); and (o) the Related Parties of each Entity in clause (a) through (m); *provided*, that any Holder of a Claim or Equity Interest that votes against the Plan (to the extent eligible to vote), objects to the Plan, or objects to or opts out of the third party release contained therein shall not be a "Released Party."

1.141   "**Releasing Party**" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Holders of OpCo RBL Claims; (d) the Holders of Term Loan Claims; (e) the Holders of Seller Notes Claims; (f) the DIP Lenders; (g) the TL Agent; (h) the Seller Note Agent; (i) the RBL Agent; (j) the DIP Agent; (k) the Consenting Stakeholders; (l) the Holders of AEH Equity Interests; (m) the Holders of Claims entitled to vote to accept or reject the Plan that (1) vote to accept the Plan or (2) vote to reject the Plan or do not vote to accept or reject the Plan but do not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; (n) the Holders of Claims or Interests that are Unimpaired and presumed to accept the Plan; (o) the Holders of Claims or Equity Interests that are deemed to reject the Plan that do not affirmatively elect to "opt out" of being a Releasing Party by timely objecting, formally or informally in writing, to the Plan's third-party release provisions; (p) the New Capital Parties; (q) the current and former Affiliates of each Entity in clause (a) through (p); and (r) the Related Parties of each Entity in clause (a) through (p).

1.142   "**Reorganized**" means, in reference to a Debtor, such Debtor from and after the Effective Date.

1.143   "**Reorganized OpCo Debtors**" means Reorganized ARDH1 and each Reorganized OpCo Debtor.

1.144   "**Reorganized OpCo Debtors Constituent Documents**" means the New ARDH1 Constituent Documents and the Constituent Documents of the other Reorganized Debtors.

1.145 "**Required Consenting RBL Lenders**" means, as of the relevant date, Consenting RBL Lenders holding at least 50.01% of the aggregate outstanding principal amount of the OpCo RBL Claims that are held by the Consenting RBL Lenders.

1.146 "**Required Consenting Seller Noteholders**" means each of the Consenting Seller Noteholders; *provided*, that in the event that any of the Consenting Seller Noteholders transfers some, but not all, of its interests in the Seller Notes to an unaffiliated Entity, Required Consenting Seller Noteholders shall mean Consenting Seller Noteholders holding at least 50.01% of the aggregate outstanding principal amount of Seller Notes that are held by the Consenting Seller Noteholders *plus* each of the Consenting Seller Noteholders party to the RSA as of the Agreement Effective Date (as defined in the RSA) that remains party to the RSA following such transfer.

1.147 "**Required Consenting Stakeholders**" means, collectively, the Required Consenting Term Loan Lenders, the Required Consenting Seller Noteholders and the Required Consenting RBL Lenders.

1.148 "**Required Consenting Term Loan Lenders**" means each of the Consenting Term Loan Lenders; *provided*, that in the event that any of the Consenting Term Loan Lenders transfers some, but not all, of its interests in the Term Loan Claims to an unaffiliated Entity, Required Consenting Term Loan Lenders shall mean Consenting Term Loan Lenders holding at least 50.01% of the aggregate outstanding principal amount of Term Loans that are held by the Consenting Term Loan Lenders *plus* each of the Consenting Term Loan Lenders party to the RSA as of the Agreement Effective Date (as defined in the RSA) that remains party to the RSA following such transfer.

1.149 "**Required Consenting Term/Seller Stakeholders**" means, collectively, the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders.

1.150 "**Restructuring Expenses**" means all out-of-pocket third-party reasonable and documented fees and expenses of (a) each of the Consenting RBL Lenders, the Consenting Seller Noteholders and the Consenting Term Loan Lenders up to $25,000 per class of Consenting Stakeholder incurred after the Petition Date, and (b) the Consenting Stakeholder Advisors, in each case that are due and owing after receipt of applicable invoices.

1.151 "**Restructuring Term Sheet**" means the restructuring term sheet attached as Exhibit B to the RSA.

1.152 "**Restructuring Transactions**" means the restructuring transactions for the Debtors, in accordance with, and subject to the terms and conditions set forth in, the RSA, the Plan and the Plan Supplement.

1.153 "**RSA**" means that certain Restructuring Support Agreement, dated November 6, 2019, by and among the Debtors, the Consenting Term Loan Lenders, the Consenting Seller Noteholders, the Consenting RBL Lenders, the Consenting Secured Swap Parties and the Consenting Equityholders, attached as Exhibit B to the Disclosure Statement.

1.154    "**Schedule of Rejected Executory Contracts and Unexpired Leases**" means that schedule of proposed rejected Executory Contracts and Unexpired Leases, if any, which will be filed with the Plan Supplement.

1.155    "**Section 510(b) Claim**" means a Claim subordinated pursuant to Section 510(b) of the Bankruptcy Code.

1.156    "**Secured Claim**" means a Claim against a Debtor that is secured by a Lien on property in which such Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable under applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.157    "**Securities Act**" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder.

1.158    "**Seller Note Agent**" means LRMH, as the collateral agent under the Collateral Agreement (as defined in the Seller Notes), together with its successors and assigns in such capacity.

1.159    "**Seller Note Documents**" means the Seller Notes, together with the ARHD 2 Guaranty, the ARDH 2 Collateral Agreement, the Collateral Agency Agreement and the Subordination Agreement (each as defined in the Seller Notes, as amended).

1.160    "**Seller Notes**" means the Seller Notes originally issued by AEH to (a) LRMH and (b) PDC Energy, Inc., which were subsequently assigned by PDC Energy, Inc. to affiliates of or funds managed by Chambers Energy Management LP, each dated October 14, 2014, and each issued in the original principal amount of $39,047,625.

1.161    "**Seller Notes Claim**" means any Claim arising under or related to the Seller Note Documents.

1.162    "**Solicitation**" means the Debtors' formal request for acceptances of the Plan, consistent with sections 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Bankruptcy Rules and applicable non-bankruptcy law.

1.163    "**Solicitation Agent**" means Prime Clerk, LLC, the notice, claims and solicitation agent retained by the Debtors for the Chapter 11 Cases.

1.164    "**TCO**" means Columbia Gas Transmission, LLC.

1.165    "**TCO Gathering Agreements**" means, collectively, that certain (i) Credit Support Agreement, dated February 3, 2015, (ii) FTS Service Agreement, dated January 5, 2018, and (iii) OPT60 Service Agreement, dated January 29, 2016, in each case by and between ARE and TCO.

1.166  "**Term Loan Claim**" means any Claim arising under or related to the Term Loan Documents.

1.167  "**Term Loan Credit Agreement**" means that certain Credit Agreement, dated December 21, 2018, among ARD, as borrower, each of the lenders from time to time party thereto and the TL Agent.

1.168  "**Term Loan Documents**" means the Term Loan Credit Agreement, together with the Term Loan Guaranty and any related notes, certificates, documents and instruments related to or executed in connection with the Term Loan Credit Agreement.

1.169  "**Term Loan Guaranty**" means the Guaranty Agreement, dated July 31, 2019, by and among ARE, and the TL Agent.

1.170  "**TL Agent**" means Chambers Energy Management, LP, as administrative agent and collateral agent under the Term Loan Credit Agreement, together with its successors and assigns in such capacities.

1.171  "**UCC**" means the Uniform Commercial Code as the same may from time to time be in effect in the State of Delaware or the Uniform Commercial Code as in effect in any other state to the extent it may be applicable to any security interests in property of the Debtors.

1.172  "**U.S.**" means the United States of America.

1.173  "**Unclaimed Distribution**" means any distribution under the Plan or as otherwise authorized by the Bankruptcy Court on account of an Allowed Claim to a Holder that, within six (6) months from when the distribution was first made, has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to Reorganized ARDH1 of an intent to accept a particular distribution; (c) responded to Reorganized ARDH1's request for information necessary to facilitate a particular distribution; (d) taken delivery of such distribution or where such distribution was returned for lack of a current address or otherwise; or (e) taken any other action necessary to facilitate such distribution.

1.174  "**Unexpired Lease**" means a lease to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.175  "**Unimpaired**" means any Claim or Equity Interest that is not designated as Impaired.

1.176  "**Unimpaired Claim**" means Administrative Claims, Priority Tax Claims, DIP Facility Claims and any Claim arising prior to the Effective Date in Class 2A, 6A, 6B, 6C, 7A, 7B or 7C (if so treated) of the Plan.

1.177  "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

1.178  "**Voting Classes**" means collectively, Classes 1A, 3B, 4A and 5A.

1.179    "**Voting Record Date**" means the date for determining which Holders are entitled to receive the Disclosure Statement and vote to accept or reject the Plan, as applicable, which date is November 6, 2019 for all Holders of Claims in the Voting Classes.

## ARTICLE II.

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and DIP Facility Claims are not classified and are not entitled to vote on the Plan.

## A.    Administrative Claims

Subject to subparagraph (i) below, in full and complete satisfaction, settlement, discharge and release of each Allowed Administrative Claim (except to the extent that (a) the Holder of such Allowed Administrative Claim and either the Debtors, with the reasonable consent of the Required Consenting Term/Seller Stakeholders, or the Reorganized OpCo Debtors, as applicable, agree in writing to less favorable treatment or (b) the Holder of such Allowed Administrative Claim has been paid in full during the Chapter 11 Cases), the Debtors or Reorganized OpCo Debtors, as applicable, (i) shall pay to each Holder of an Allowed Administrative Claim Cash in an amount equal to such Allowed Administrative Claim on the later of (x) the Effective Date, or as soon thereafter as is reasonably practicable and (y) as soon as practicable after such Allowed Administrative Claim becomes due and payable, (ii) shall provide such other treatment to render such Allowed Administrative Claim Unimpaired or (iii) shall provide such other treatment as the Holder of such Allowed Administrative Claim may agree to or otherwise as permitted by section 1129(a)(9) of the Bankruptcy Code; *provided*, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(i)    Professional Fee Claims

Professionals (a) asserting a Professional Fee Claim shall deliver to the Debtors their estimates for purposes of the Debtors computing the Professional Fee Reserve Amount no later than five (5) Business Days prior to the anticipated Effective Date; *provided*, that, for the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Claims filed with the Bankruptcy Court; *provided*, *further*, that, if a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; and (b) asserting a Professional Fee Claim for services rendered before the Confirmation Date, for the avoidance of doubt, excluding any claims for Restructuring Expenses, must file and serve on the Reorganized OpCo Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date; *provided*, that any Professional who is subject to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Confirmation

Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. For the avoidance of doubt, no fee applications will be required in respect of services performed by Professionals on and after the Confirmation Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized OpCo Debtors and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice.

(ii)    Professional Fee Escrow Account

On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized OpCo Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized OpCo Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to Reorganized ARDH1. If the Professional Fee Escrow Account is insufficient to pay the full amount of all Allowed Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be promptly paid by the Reorganized OpCo Debtors without any further action or order of the Bankruptcy Court.

**B.      Priority Tax Claims**

On the Effective Date, each Holder of an Allowed Priority Tax Claim will, as determined by the Debtor, or the Reorganized Debtor, as applicable, be satisfied in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

**C.      DIP Facility Claims**

The DIP Facility Claims shall be deemed to be Allowed under the Plan. Notwithstanding anything to the contrary herein, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all Allowed DIP Facility Claims, on the Effective Date, the Allowed DIP Facility Claims shall be paid indefeasibly in Cash in full.

**D.      Statutory Fees**

Notwithstanding anything herein to the contrary, on the Effective Date, the Debtors shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation pursuant to 28 U.S.C. § 1930(a)(6). On and after the Effective Date, to the extent the Chapter 11 Cases remains open, and for so long as the Reorganized Debtors remain obligated to pay quarterly fees, the Reorganized Debtors shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Debtors or Reorganized Debtors, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the Chapter 11 Cases being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### A.    Introduction

All Claims and Equity Interests, except Administrative Claims, Priority Tax Claims and DIP Facility Claims, are placed in the Classes set forth below in accordance with section 1123(a)(1) of the Bankruptcy Code. The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

### B.    Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| | **AEH Claims** | | |
| 1A | AEH Seller Notes Claims | Impaired | Entitled to Vote |
| 1B | AEH General Unsecured Claims | Impaired | Deemed to Reject |
| 1C | AEH Equity Interests | Impaired | Deemed to Reject |
| | **ARIH Claims** | | |
| 2A | ARIH General Unsecured Claims | Unimpaired | Presumed to Accept |
| 2B | ARIH Equity Interests | Impaired | Deemed to Reject |
| | **ARE Claims** | | |
| 3A | ARE Gathering Agreement Claims | Impaired | Deemed to Reject |
| 3B | ARE Term Loan Claims | Impaired | Entitled to Vote |
| 3C | ARE General Unsecured Claims | Impaired | Deemed to Reject |
| 3D | ARE Equity Interests | Impaired | Deemed to Reject |
| | **ARDH2 Claims** | | |
| 4A | ARDH2 Seller Notes Claims | Impaired | Entitled to Vote |
| 4B | ARDH2 General Unsecured Claims | Impaired | Deemed to Reject |
| 4C | ARDH2 Equity Interests | Impaired | Deemed to Reject |
| | **ARDH1 Claims** | | |
| 5A | ARDH1 Term Loan Claims | Impaired | Entitled to Vote |
| 5B | ARDH1 General Unsecured Claims | Impaired | Deemed to Reject |

| 5C | ARDH1 Equity Interests | Impaired | Deemed to Reject |
| | **OpCo Claims** | | |
| 6A | OpCo RBL Claims | Unimpaired | Presumed to Accept |
| 6B | OpCo General Unsecured Claims | Unimpaired | Presumed to Accept |
| 6C | OpCo Equity Interests | Unimpaired | Presumed to Accept |
| | **Other Claims Against Debtors** | | |
| 7A | Other Secured Claims | Unimpaired | Presumed to Accept |
| 7B | Other Priority Claims | Unimpaired | Presumed to Accept |
| 7C | Intercompany Claims | Unimpaired; Impaired | Presumed to Accept; Deemed to Reject |
| 7D | Section 510(b) Claims | Impaired | Deemed to Reject |

C.    **Classification and Treatment of Claims and Equity Interests**

    (i)    AEH Claims.

        (1)    Class 1A – AEH Seller Notes Claims.

            (A)    <u>Classification</u>: Class 1A consists of AEH Seller Notes Claims. The AEH Seller Notes Claims shall be Allowed in an aggregate principal amount of approximately $128 million (including interest that has been paid-in-kind and capitalized), *plus* any accrued and unpaid interest thereon as of the Petition Date, *plus* all other unpaid and outstanding obligations thereunder, as applicable, and such AEH Seller Notes Claims shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

            (B)    <u>Treatment</u>: In accordance with the RSA, on the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all Allowed AEH Seller Notes Claims, the Holders of such Allowed AEH Seller Notes Claims shall be entitled to receive the treatment specified in <u>Article III.C(iv)(1)(B)</u>.

            (C)    For the avoidance of doubt, each Holder of an Allowed AEH Seller Notes Claim and an Allowed ARDH2 Seller Notes Claim shall receive only one recovery in full and complete satisfaction of all Seller Notes Claims that may be

held by such Holder, which single recovery is specified in <u>Article III.C(iv)(1)(B)</u>.

    (D)    <u>Impairment and Voting</u>: Class 1A is Impaired by the Plan. Each Holder of an AEH Seller Notes Claim is entitled to vote to accept or reject the Plan.

(2)    Class 1B – AEH General Unsecured Claims.

    (A)    <u>Classification</u>: Class 1B consists of AEH General Unsecured Claims.

    (B)    <u>Treatment</u>: Holders of AEH General Unsecured Claims shall be cancelled, released and discharged without any distribution. The Debtors believe that no Allowed AEH General Unsecured Claims exist.

    (C)    <u>Impairment and Voting</u>: Class 1B is Impaired by the Plan, and each Holder of an AEH General Unsecured Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an AEH General Unsecured Claim is not entitled to vote to accept or reject the Plan.

(3)    Class 1C – AEH Equity Interests.

    (A)    <u>Classification</u>: Class 1D consists of AEH Equity Interests.

    (B)    <u>Treatment</u>: On the Effective Date, all AEH Equity Interests shall be cancelled, Holders of AEH Equity Interests shall receive no recovery under the Plan and the Reorganized Debtors shall file a certificate of dissolution for AEH, in accordance with <u>Article V.I</u> of the Plan.

    (C)    <u>Impairment and Voting</u>: Class 1D is Impaired by the Plan, and each Holder of an AEH Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an AEH Equity Interest is not entitled to vote to accept or reject the Plan.

(ii)    ARIH Claims.

(1)    Class 2A – ARIH General Unsecured Claims.

    (A)    <u>Classification</u>: Class 2 consists of ARIH General Unsecured Claims.

(B)    <u>Treatment</u>: All Allowed ARIH General Unsecured Claims shall be Unimpaired by the Plan. The legal, equitable and contractual rights of a Holder of an Allowed ARIH General Unsecured Claim are unaltered. The Debtors believe that no Allowed AEH General Unsecured Claims exist.

(C)    <u>Impairment and Voting</u>: Class 2 is Unimpaired by the Plan. Each Holder of an ARIH General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an ARIH General Unsecured Claim is not entitled to vote to accept or reject the Plan.

(2)    Class 2B – ARIH Equity Interests.

(A)    <u>Classification</u>: Class 2C consists of ARIH Equity Interests.

(B)    <u>Treatment</u>: On the Effective Date, all ARIH Equity Interests shall be cancelled, Holders of ARIH Equity Interests shall receive no recovery under the Plan and the Reorganized Debtors shall file a certificate of dissolution for ARIH, in accordance with <u>Article V.I</u> of the Plan.

(C)    <u>Impairment and Voting</u>: Class 2C is Impaired by the Plan, and each Holder of an ARIH Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an ARIH Equity Interest is not entitled to vote to accept or reject the Plan.

(iii)    ARE Claims.

(1)    Class 3A – ARE Gathering Agreement Claims.

(A)    <u>Classification</u>: Class 3A consists of ARE Gathering Agreement Claims.

(B)    <u>Treatment</u>: Within sixty (60) days of the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all Allowed ARE Gathering Agreement Claims, each Holder of an Allowed ARE Gathering Agreement Claim shall be entitled to receive its Ratable Share of the ARE Available Cash.

(C)    <u>Impairment and Voting</u>: Class 3A is Impaired by the Plan, and each Holder of an ARE Gathering Agreement Claim is conclusively deemed to have rejected the Plan. Therefore,

each Holder of an ARE Gathering Agreement Claim is not entitled to vote to accept or reject the Plan.

(2)   Class 3B – ARE Term Loan Claims.

   (A)   <u>Classification</u>: Class 3B consists of ARE Term Loan Claims. The ARE Term Loan Claims shall be Allowed in an aggregate principal amount of approximately $233 million (including interest and fees that have been paid-in-kind and capitalized), *plus* any accrued and unpaid interest thereon as of the Petition Date, *plus* all other unpaid and outstanding obligations thereunder, as applicable, and such ARE Term Loan Claims shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

   (B)   <u>Treatment</u>: In accordance with the RSA, on the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all ARE Term Loan Claims, the Holders of such Allowed ARE Term Loan Claims shall be entitled to receive their Ratable Share of the ARE Available Cash,[3] in addition to the treatment specified in Article III.C(v)(1)(B).

   (C)   For the avoidance of doubt, each Holder of an Allowed ARE Term Loan Claim and an Allowed ARDH1 Term Loan Claim shall receive only one recovery in full and complete satisfaction of all Term Loan Claims that may be held by such Holder, which single recovery is specified in <u>Article III.C(v)(1)(B)</u>.

   (D)   <u>Impairment and Voting</u>: Class 3B is Impaired by the Plan. Each Holder of an ARE Term Loan Claim is entitled to vote to accept or reject the Plan.

(3)   Class 3C – ARE General Unsecured Claims.

   (A)   <u>Classification</u>: Class 3C consists of ARE General Unsecured Claims.

   (B)   <u>Treatment</u>: Within sixty (60) days of the Effective Date, in full and final satisfaction, settlement, discharge and release

---

[3]   Notwithstanding any entitlement of the Holders of Allowed ARE Term Loan Claims to receive their Ratable Share of ARE Available Cash under the Plan, all Holders of Allowed ARE Term Loan Claims have agreed to waive any such distribution in favor of Holders of Claims in Classes 3A and 3C.

of, and in exchange for, the Allowed ARE General Unsecured Claims, each Holder of an Allowed ARE General Unsecured Claim shall be entitled to receive its Ratable Share of the ARE Available Cash. The Debtors believe that no Allowed ARE General Unsecured Claims exist.

(C)   <u>Impairment and Voting</u>: Class 3C is Impaired by the Plan and each Holder of an ARE General Unsecured Claim is conclusively deemed to have rejected the Plan. Therefore, each Holder of an ARE General Unsecured Claim is not entitled to vote to accept or reject the Plan.

(4)   Class 3D – ARE Equity Interests.

(A)   <u>Classification</u>: Class 3E consists of ARE Equity Interests.

(B)   <u>Treatment</u>: On the Effective Date, all ARE Equity Interests shall be cancelled, Holders of ARE Equity Interests shall receive no recovery under the Plan and the Reorganized Debtors shall file a certificate of dissolution for ARE, in accordance with <u>Article V.I</u> of the Plan.

(C)   <u>Impairment and Voting</u>: Class 3E is Impaired by the Plan, and each Holder of an ARE Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an ARE Equity Interest is not entitled to vote to accept or reject the Plan.

(iv)   ARDH2 Claims.

(1)   Class 4A – ARDH2 Seller Notes Claims.

(A)   <u>Classification</u>: Class 4A consists of all ARDH2 Seller Notes Claims. The ARDH2 Seller Notes Claims shall be Allowed in an aggregate principal amount of approximately $128 million (including interest that has been paid-in-kind and capitalized), *plus* any accrued and unpaid interest thereon as of the Petition Date, *plus* all other unpaid and outstanding obligations thereunder, as applicable, and such ARDH2 Seller Notes Claims shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

(B)   <u>Treatment</u>: In accordance with the RSA, on the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all Allowed ARDH2 Seller

-26-

Notes Claims, the Holders of such Allowed ARDH2 Seller Notes Claims shall be entitled to receive the following treatment:

(1)     If each Holder of an Allowed Claim in each of Classes 1A and 4A submits a ballot to accept the Plan:

    a     7,570,392 New ARDH1 Class A Interests shall be issued to Chambers Energy Capital II, LP (or its successors or assigns), on account of the Allowed ARDH2 Seller Notes Claims it beneficially owns;

    b     927,101 New ARDH1 Class A Interests shall be issued to Chambers Energy Capital II TE, LP (or its successors or assigns), on account of the Allowed ARDH2 Seller Notes Claims it beneficially owns;

    c     25,780,361 New ARDH1 Class A Interests shall be issued to Chambers Energy Capital III, LP (or its successors or assigns), on account of the Allowed ARDH2 Seller Notes Claims it beneficially owns; and

    d     22,783,397 New ARDH1 Class A Interests shall be issued to LRMH (or its successors or assigns), on account of the Allowed ARDH2 Seller Notes Claims it beneficially owns; or

(2)     If each Holder of an Allowed Claim in each of Classes 1A and 4A does not submit a ballot to accept the Plan, all Seller Notes Claims shall be cancelled, released and discharged without any distribution.

(3)     For the avoidance of doubt, each Holder of an Allowed AEH Seller Notes Claim and an Allowed ARDH2 Seller Notes Claim shall receive only one recovery in full and complete satisfaction of all Seller Notes Claims that may be held by such Holder, which single recovery is specified in this Article III.C(iv)(1)(B).

(C)     <u>Impairment and Voting</u>: Class 4A is Impaired by the Plan. Each Holder of an ARDH2 Seller Notes Claim is entitled to vote to accept or reject the Plan.

(2)    Class 4B – ARDH2 General Unsecured Claims.

    (A)    <u>Classification</u>: Class 4B consists of ARDH2 General Unsecured Claims.

    (B)    <u>Treatment</u>: ARDH2 General Unsecured Claims shall be cancelled, released and discharged without any distribution. The Debtors believe that no Allowed ARDH2 General Unsecured Claims exist.

    (C)    <u>Impairment and Voting</u>: Class 4B is Impaired by the Plan, and each Holder of an ARDH2 General Unsecured Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an ARDH2 General Unsecured Claim is not entitled to vote to accept or reject the Plan.

(3)    Class 4C – ARDH2 Equity Interests.

    (A)    <u>Classification</u>: Class 4D consists of ARDH2 Equity Interests.

    (B)    <u>Treatment</u>: On the Effective Date, all ARDH2 Equity Interests shall be cancelled, Holders of ARDH2 Equity Interests shall receive no recovery under the Plan and the Reorganized Debtors shall file a certificate of dissolution for ARDH2, in accordance with <u>Article V.I</u> of the Plan.

    (C)    <u>Impairment and Voting</u>: Class 4D is Impaired by the Plan, and each Holder of an ARDH2 Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an ARDH2 Equity Interest is not entitled to vote to accept or reject the Plan.

(v)    ARDH1 Claims.

(1)    Class 5A – ARDH1 Term Loan Claims.

    (A)    <u>Classification</u>: Class 5A consists of ARDH1 Term Loan Claims. The ARDH1 Term Loan Claims shall be Allowed in an aggregate principal amount of approximately $233 million (including interest and fees that have been paid-in-kind and capitalized), *plus* any accrued and unpaid interest thereon as of the Petition Date, *plus* all other unpaid and outstanding obligations thereunder, as applicable, and such ARDH1 Term Loan Claims shall not be subject to disallowance, setoff, recoupment, subordination,

recharacterization or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

(B)  <u>Treatment</u>: In accordance with the RSA, on the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all ARDH1 Term Loan Claims, the Holders of such Allowed ARDH1 Term Loan Claims shall be entitled to receive the following treatment:

(1)  If each Holder of an Allowed Claim in each of Classes 1A and 4A submits a ballot to accept the Plan:

a  104,080,965 New ARDH1 Class A Interests shall be issued to Chambers Energy Capital II, LP (or its successors or assigns), on account of the ARDH1 Term Loan Claims it beneficially owns;

b  12,746,181 New ARDH1 Class A Interests shall be issued to Chambers Energy Capital II TE, LP (or its successors or assigns), on account of the ARDH1 Term Loan Claims it beneficially owns; and

c  128,321,603 New ARDH1 Class A Interests shall be issued to Mercuria (or its successors or assigns), on account of the ARDH1 Term Loan Claims it beneficially owns; or

(2)  If each Holder of an Allowed Claim in each of Classes 1A and 4A does not submit a ballot to accept the Plan, each Holder of an Allowed ARDH1 Term Loan Claim shall receive its Pro Rata share of 196,436,500 New ARDH1 Class A Interests.

(3)  For the avoidance of doubt, each Holder of an Allowed ARE Term Loan Claim and an Allowed ARDH1 Term Loan Claim shall receive only one recovery in full and complete satisfaction of all Term Loan Claims that may be held by such Holder, which single recovery is specified in this Article III.C(v)(1)(B).

(C)  <u>Impairment and Voting</u>: Class 5A is Impaired by the Plan. Each Holder of an ARDH1 Term Loan Claim is entitled to vote to accept or reject the Plan.

(2)    Class 5B – ARDH1 General Unsecured Claims.

    (A)    <u>Classification</u>: Class 5B consists of ARDH1 General Unsecured Claims.

    (B)    <u>Treatment</u>: Holders of ARDH1 General Unsecured Claims shall be cancelled, released and discharged without any distribution. The Debtors believe that no Allowed ARDH1 General Unsecured Claims exist.

    (C)    <u>Impairment and Voting</u>: Class 5B is Impaired by the Plan, and each Holder of an ARDH1 General Unsecured Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an ARDH1 General Unsecured Claim is not entitled to vote to accept or reject the Plan.

(3)    Class 5C – ARDH1 Equity Interests.

    (A)    <u>Classification</u>: Class 5D consists of ARDH1 Equity Interests.

    (B)    <u>Treatment</u>: On the Effective Date, all ARDH1 Equity Interests shall be cancelled, Holders of ARDH1 Equity Interests shall receive no recovery under the Plan and the Reorganized Debtors shall file a certificate of dissolution for ARDH1, in accordance with <u>Article V.I</u> of the Plan.

    (C)    <u>Impairment and Voting</u>: Class 5D is Impaired by the Plan, and each Holder of an ARDH1 Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an ARDH1 Equity Interest is not entitled to vote to accept or reject the Plan.

(vi)    OpCo Claims.

(1)    Class 6A – OpCo RBL Claims.

    (A)    <u>Classification</u>: Class 6A consists of OpCo RBL Claims. The OpCo RBL Claims shall be Allowed in an aggregate principal amount of approximately $117 million[4] (*less* any amount that is "rolled-up" pursuant to a Final Order and

---

[4] This amount does not include a single letter of credit issued and currently outstanding in the face amount of approximately $28 million.  In the event this letter of credit is drawn, obligations arising from such draw would become loans outstanding under the RBL Facility, constitute OpCo RBL Claims under the Plan and share ratably in the treatment of OpCo RBL Claims.

constitutes a DIP Facility Claim), *plus* any accrued and unpaid interest thereon calculated at the non-default rate as of the Petition Date, *plus* any other unpaid and outstanding obligations thereunder, as applicable. Such OpCo RBL Claims shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

(B) Treatment: On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, all Allowed OpCo RBL Claims, each Holder of an Allowed OpCo RBL Claim shall receive an amount of Cash equal to such Holder's Allowed OpCo RBL Claim from the proceeds of the New RBL Facility and/or the New Equity Issuance, unless a Holder of an OpCo RBL Claim accepts a less favorable treatment.

(C) Impairment and Voting: Class 6A is Unimpaired by the Plan. Each Holder of an OpCo RBL Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an OpCo RBL Claim is not entitled to vote to accept or reject the Plan.

(2) Class 6B – OpCo General Unsecured Claims.

(A) Classification: Class 6B consists of OpCo General Unsecured Claims.

(B) Treatment: Class 6B is Unimpaired by the Plan. In full and final satisfaction, settlement, discharge and release of, and in exchange for, any Allowed OpCo General Unsecured Claim, each Holder of an Allowed OpCo General Unsecured Claim may, at the option of the Reorganized OpCo Debtors: (i) receive Cash equal to such Allowed Claim on the later of (x) the Effective Date, and (y) the date payment on account of such Allowed Claim is due, (ii) receive payment on terms as the Reorganized OpCo Debtors and the Holder thereof may agree, (iii) have such Allowed Claim Reinstated or (iv) receive such treatment so as to render such Allowed Claim "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

(C) Impairment and Voting: Class 6B is Unimpaired by the Plan. Each Holder of an OpCo General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to

section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an OpCo General Unsecured Claim is not entitled to vote to accept or reject the Plan.

(3)    Class 6C – OpCo Equity Interests.

(A)    <u>Classification</u>: Class 6D consists of OpCo Equity Interests. All OpCo Equity Interests are Allowed.

(B)    <u>Treatment</u>: On the Effective Date, each OpCo Equity Interest shall be Reinstated and Unimpaired under the Plan.

(C)    <u>Impairment and Voting</u>: Class 6D is Unimpaired by the Plan. Each Holder of an OpCo Equity Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an OpCo Equity Interest is not entitled to vote to accept or reject the Plan.

(vii)    Other Claims Against Debtors.

(1)    Class 7A – Other Secured Claims.

(A)    <u>Classification</u>: Class 7A consists of Other Secured Claims against each Debtor.

(B)    <u>Treatment</u>: All Allowed Other Secured Claims are Unimpaired by the Plan. In full and final satisfaction, settlement, discharge and release of, and in exchange for, any Other Secured Claim, each Holder of an Allowed Other Secured Claim may, at the option of the Reorganized OpCo Debtors: (i) receive Cash equal to such Allowed Claim on the later of (x) the Effective Date, and (y) the date payment on account of such Allowed Claim is due, (ii) receive payment on terms as the Reorganized OpCo Debtors and the Holder thereof may agree, (iii) have the collateral securing such Allowed Claim conveyed to it, (iv) have such Allowed Claim Reinstated or (v) receive such treatment so as to render such Allowed Claim "unimpaired" within the meaning of section 1124 of the Bankruptcy Code.

(C)    <u>Impairment and Voting</u>: Class 7A is Unimpaired by the Plan. Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan.

(2)     Class 7B – Other Priority Claims.

    (A)     <u>Classification</u>: Class 7B consists of Other Priority Claims against each Debtor.

    (B)     <u>Treatment</u>: On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, the Other Priority Claims, at the option of the Reorganized Debtors, each Allowed Other Priority Claim shall be treated (i) consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (ii) on such other terms as the Reorganized OpCo Debtors and the Holder thereof may agree.

    (C)     <u>Impairment and Voting</u>: Class 7B is Unimpaired by the Plan. Each Holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan.

(3)     Class 7C – Intercompany Claims.

    (A)     <u>Classification</u>: Class 7C consists of Intercompany Claims.

    (B)     <u>Treatment</u>: On the Effective Date, in full and final satisfaction, settlement, discharge and release of, and in exchange for, each Intercompany Claim, at the option of the Reorganized Debtors, each Allowed Intercompany Claim shall be (i) Unimpaired and Reinstated or (ii) Impaired and cancelled and released without any distribution.

    (C)     <u>Impairment and Voting</u>: If an Intercompany Claim in Class 7C is Unimpaired by the Plan, then such Holder of an Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. If an Intercompany Claim in Class 7C is Impaired by the Plan, then such Holder of an Intercompany Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. In either case, each Holder of an Intercompany Claim is not entitled to vote to accept or reject the Plan.

(4)     Class 7D –Section 510(b) Claims.

    (A)     <u>Classification</u>: Class 7D consists of Section 510(b) Claims.

(B)  <u>Treatment</u>: Holders of Section 510(b) Claims shall be cancelled, released and discharged without any distribution. The Debtors believe that no Section 510(b) Claims exist.

(C)  <u>Impairment and Voting</u>: Class 7D is Impaired by the Plan, and each Holder of a Section 510(b) Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of a Section 510(b) Claim is not entitled to vote to accept or reject the Plan.

## D.    Special Provisions Regarding Unimpaired Claims

The Debtors, the Reorganized Debtors and any other Entity shall retain all defenses, counterclaims, rights to setoff and rights to recoupment, if any, as to Unimpaired Claims. Holders of Unimpaired Claims shall not be required to file a Proof of Claim with the Court and shall retain all their rights under applicable non-bankruptcy law to pursue their Unimpaired Claims in any forum with jurisdiction over the parties. Notwithstanding anything to the contrary in the Plan, each Holder of an Allowed ARIH General Unsecured Claim, Allowed OpCo RBL Claim, Allowed OpCo General Unsecured Claim, Allowed Other Secured Claim, Allowed Other Priority Claim or Allowed OpCo Intercompany Claim (if Unimpaired) shall be entitled to enforce its rights in respect of such Unimpaired Claim against the Debtors or the Reorganized Debtors, as applicable, until such Unimpaired Claim has been either (a) paid in full (i) on terms agreed to between the Holder of such Unimpaired Claim and the Debtors or the Reorganized Debtors, as applicable, or (ii) in accordance with the terms and conditions of the applicable documentation or laws giving rise to such Unimpaired Claim or (b) otherwise satisfied or disposed of as determined by a court of competent jurisdiction. If the Debtors or the Reorganized Debtors dispute any Unimpaired Claim, such dispute shall be determined, resolved or adjudicated pursuant to applicable non-bankruptcy law.

## E.    Subordinated Claims

Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

## A.    Presumed Acceptance of the Plan

Classes 2A, 6A, 6B, 6C, 7A, 7B and 7C (if so treated) are Unimpaired by the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**B.      Deemed Rejection of the Plan**

Classes 1B, 1C, 2B, 3A, 3C, 3D, 4B, 4C, 5B, 5C, 7C (if so treated) and 7D are Impaired by the Plan and are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.      Voting Classes**

Each Holder of an Allowed Claim in the Voting Classes as of the applicable Voting Record Date is entitled to vote to accept or reject the Plan.

**D.      Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

**E.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors may request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code or that is deemed to reject the Plan. The Debtors, with the consent of the Required Consenting Term/Seller Stakeholders, reserve the right to modify the Plan, the Plan Supplement or the Disclosure Statement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**F.      Plan Cannot Be Confirmed as to Some or All Debtors**

If the Plan cannot be confirmed as to any Debtor, then the Debtors, with the consent of the Required Consenting Term/Seller Stakeholders and without prejudice to and subject to the respective parties' rights under the RSA, (a) may revoke the Plan as to such Debtor or (b) may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted, continued or dismissed) and confirm the Plan as to the remaining Debtors to the extent required without the need for re-solicitation as to any Holder of a Claim against and/or Equity Interest in a Debtor for which the Plan is not so revoked.

**G.      Elimination of Vacant Classes**

Any Class of Claims or Equity Interests that is not populated as of the commencement of the Confirmation Hearing by an Allowed Claim or Equity Interest, or a Claim or Equity Interest that is temporarily allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the Plan for purposes of: (a) voting to accept or reject the Plan; and (b) determining the acceptance or rejection of the Plan by such Class pursuant to sections 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code.

**ARTICLE V.**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    **Corporate and Organizational Existence; Reorganized Capital Structure and the New ARDH1 Equity**

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized OpCo Debtor shall continue to exist, pursuant to its organizational documents in effect prior to the Effective Date, except as otherwise set forth herein, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable law after the Effective Date. To the extent such documents are amended on or prior to the Effective Date, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order or approval of the Bankruptcy Court.

B.    **Organizational Documents of the Reorganized Debtors**

On the Effective Date, the New ARDH1 Operating Agreement shall become effective and be deemed to amend and restate the ARDH1 Operating Agreement without the need for any further notice or approvals. To the extent necessary, the Reorganized OpCo Debtors Constituent Documents will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, each Reorganized OpCo Debtor may amend and restate its Constituent Documents, as permitted by applicable law and pursuant to the terms contained therein.

C.    **Managers, Directors and Officers of Reorganized Debtors; Corporate Governance**

The New Board shall be selected in accordance with the New ARDH1 Operating Agreement, effective as of the Effective Date. To the extent not previously disclosed, the Debtors will disclose prior to or at the Confirmation Hearing, the affiliations of each Person proposed to serve on the New Board or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a manager, director or officer, the nature of any compensation for such Person.

D.    **New RBL Loan Documents**

On the Effective Date, the Reorganized OpCo Debtors shall execute and deliver the New RBL Credit Agreement and the other New RBL Loan Documents, and shall execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (A) further notice to or order of the Bankruptcy Court or (B) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity. On the Effective Date, upon the granting of Liens under the New RBL Loan Documents, (i) the New RBL Agent, on behalf of the lenders and other

secured parties under the New RBL Loan Documents, shall have valid, binding and enforceable Liens as specified therein and (ii) the Liens granted to secure the obligations arising thereunder shall be granted in good faith as an inducement to the New RBL Agent, on behalf of the New RBL Lenders and other secured parties thereunder, to extend credit under the New RBL Facility and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such Liens shall be as set forth in the New RBL Loan Documents.

Subject to the terms of the RSA, each counterparty to an outstanding Secured Swap Agreement (as defined in the RBL Credit Agreement or DIP Credit Agreement, as applicable) as of the Effective Date has agreed to maintain such Secured Swap Agreement as outstanding following the Effective Date, to be secured as an obligation under the New RBL Credit Agreement unless otherwise agreed by such counterparty and the applicable Reorganized OpCo Debtor, and such counterparties shall accordingly not have any OpCo RBL Claims or DIP Facility Claims.

The form of the New RBL Credit Agreement, which shall be filed with the Plan Supplement, shall be consistent with the RSA and the New RBL Term Sheet, and shall be in form and substance reasonably acceptable to the Debtors, the Required Consenting Term/Seller Stakeholders and the New RBL Agent.

## E.    New Equity Issuance

On the Effective Date, the New Equity Issuance will be consummated, on the terms and subject to the conditions set forth in the RSA.

## F.    Issuance of New ARDH1 Equity and Related Documents

The New ARDH1 Equity shall be authorized under the New ARDH1 Constituent Documents. On the Effective Date, subject to the RSA, (1) the New Capital Parties shall fund $100 million in exchange for the New Equity Issuance, (2) Reorganized ARDH1 shall execute the New ARDH1 Constituent Documents, (3) Reorganized ARDH1 shall issue the New ARDH1 Equity to Holders of the ARDH1 Term Loan Claims and Holders of the AEH Seller Notes Claims (if applicable, pursuant to the Plan) and (4) Reorganized ARDH1 shall be authorized to reserve New ARDH1 Equity in an amount sufficient to implement the terms of the MIP, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity subject to the terms of the Reorganized OpCo Debtors Constituent Documents.

The issuance and distribution of the New ARDH1 Equity will be made in reliance on the exemption from registration under the Securities Act provided by section 1145(a) of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, in each case to the extent applicable, and will be exempt from registration under applicable securities laws.

## G.    Cancellation of Certain Existing Security Interests

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim shall deliver to the Debtors

or Reorganized Debtors (as applicable) any termination statements, instruments of satisfaction or releases of all security interests with respect to its Allowed Other Secured Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens or *lis pendens* and take any and all other steps reasonably requested by the Debtors, the Reorganized Debtors or any administrative agent under the New RBL Loan Documents that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Other Secured Claim.

## H.    Management Incentive Plan

The MIP shall be implemented by the New Board following the Effective Date, the terms of which shall be in form and substance as set forth in the Restructuring Term Sheet and in accordance with the New ARDH1 Constituent Documents.

## I.    Restructuring Transactions

Following Confirmation, the Debtors and/or the Reorganized Debtors, as applicable, shall take any actions as may be necessary or appropriate to effect a restructuring of the OpCo Debtors' business or the overall organization or capital structure consistent with the terms of the Plan and the RSA. The actions taken by the Debtors and/or the Reorganized Debtors, as applicable, to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, dissolution, liquidation, merger or transfer containing terms that are consistent with the terms of the Plan and the RSA and any documents contemplated hereunder or thereunder and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the RSA and any documents contemplated hereunder or thereunder and having any other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation or formation, reincorporation, merger, conversion, dissolution or other organizational documents, as applicable, pursuant to applicable state law, including certificates of dissolution with respect to the HoldCo Debtors; (iv) the execution, delivery, adoption and/or amendment of all filings, disclosures or other documents necessary to obtain any necessary third-party approvals and/or (v) all other actions that the Debtors and/or the Reorganized Debtors, as applicable, determine, with the consent of the Required Consenting Term/Seller Stakeholders, to be necessary, desirable or appropriate to implement, effectuate and consummate the Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions. All matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, managing members, members, managers, directors, or officers of any Debtor (as of or prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law, the provisions of the Reorganized OpCo Debtors Constituent Documents, and without any requirement of further action by the equity holders, managing members, members, managers, directors or officers of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

**J.      Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Board and any other board of directors or managers of any of the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, deliver, file or record such agreements, securities, instruments, releases and other documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the Restructuring Transactions, including the New RBL Loan Documents and any Constituent Documents of the Reorganized Debtors in the name of and on behalf of one or more of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan. The authorizations and approvals contemplated by this Article V.J shall be effective notwithstanding any requirements under non-bankruptcy law.

**K.      Vesting of Assets in the Reorganized Debtors**

Except as provided elsewhere in the Plan, or in the Confirmation Order, on or after the Effective Date, all property and assets of the Reorganized Debtors' Estates (including Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been waived or released pursuant to the terms of the Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the OpCo Debtors pursuant to the Plan, will vest in the Reorganized OpCo Debtors, free and clear of all Liens or Claims. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized OpCo Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan, the Confirmation Order or the Reorganized OpCo Debtors Constituent Documents.

The Debtors do not believe the HoldCo Debtors have any right to any property or other assets (including any Causes of Action or Avoidance Actions that have not been waived or released pursuant to the terms of the Plan, an order of the Bankruptcy Court or otherwise) other than the ARE Available Cash. Notwithstanding the foregoing, to the extent the HoldCo Debtors own or otherwise have rights to any property or other assets (including any Causes of Action or Avoidance Actions), any such property or other assets, and any Allowed ARIH General Unsecured Claims, will be assigned to and assumed by Reorganized ARDH1 or as Reorganized ARDH1 may direct, free and clear of all Claims and Liens, except as otherwise provided in Article VII.A with respect to the ARE Available Cash.

**L.      Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims or Equity Interests in or against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens, Claims, or Equity Interests will, if necessary, pursuant to

section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

On the Effective Date, in exchange for the treatment described herein and as set forth in Article III.C(iii)(2)(B) and Article III.C(v)(1)(B), the Term Loan Claims shall be discharged, the Liens on the Collateral (as defined in the Term Loan Credit Agreement) shall be released and the Term Loan Documents shall be cancelled and be of no further force or effect. On the Effective Date, in exchange for the treatment described herein and as set forth in Article III.C(i)(1)(B) and Article III.C(iv)(1)(B), the Seller Notes Claims shall be discharged, the Liens on the Collateral (as defined in the Seller Note Documents) shall be released and the Seller Note Documents in respect thereof shall be cancelled and be of no further force or effect. On the Effective Date, in exchange for the treatment described herein and as set forth in Article III.C(vi)(1)(B), the OpCo RBL Claims shall be discharged, the Liens on the Collateral (as defined in the RBL Documents) shall be released and the RBL Documents in respect thereof shall be cancelled and be of no further force or effect.

**M.**    **Cancellation of Stock, Certificates, Instruments and Agreements**

On the Effective Date, except as provided below, all stock, units, instruments, certificates, agreements and other documents evidencing the Equity Interests of the HoldCo Debtors will be cancelled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by any Person. On the Effective Date, the TL Agent will be released and discharged from any further responsibility under the Term Loan Credit Agreement and the Loan Documents (as defined therein). On the Effective Date, the Seller Note Agent will be released and discharged from any further responsibility under the Seller Note Documents. On the Effective Date, the RBL Agent will be released and discharged from any further responsibility under the RBL Documents.

**N.**    **Preservation and Maintenance of Debtors' Causes of Action**

(i)    Maintenance of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided in Article XI or elsewhere in the Plan or the Confirmation Order, or in any contract, instrument, release or other agreement entered into in connection with the Plan, on and after the Effective Date, the Reorganized OpCo Debtors shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action of the Debtors, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding filed in the Chapter 11 Cases. The Reorganized OpCo Debtors, as the successors in interest to the Debtors and their Estates, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all such Causes of Action, without notice to or approval from the Bankruptcy Court. The Reorganized OpCo Debtors or their respective successor(s) may pursue

such retained claims, rights or Causes of Action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized OpCo Debtors or their respective successor(s) who hold such rights. Upon the Effective Date, the Reorganized OpCo Debtors, as applicable, shall be deemed to have released all Preference Actions held by the OpCo Debtors, if any.

        (ii)      Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan (including and for the avoidance of doubt, the releases contained in Article XI of the Plan) or any Final Order (including the Confirmation Order), or (B) subject to the discharge and injunction provisions in Article XI of the Plan, and the Confirmation Order, in the case of each of clauses (A) and (B), the Debtors and the Reorganized Debtors, as applicable, expressly reserve such Cause of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

## O.    Exemption from Certain Transfer Taxes

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by the Debtors to the Reorganized Debtors or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, UCC filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the following instruments or other documents without the payment of any such tax or governmental assessment. Such exemption under section 1146(a) of the Bankruptcy Code specifically applies to (1) the creation of any mortgage, deed of trust, Lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; (4) the issuance, distribution and/or sale of any of the New ARDH1 Equity and any other securities of the Debtor or the Reorganized Debtor; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

**P.    Certain Tax Matters**

The parties will work together in good faith and will use reasonable best efforts to structure and implement the Restructuring Transactions and the transactions related thereto in a tax-efficient and cost-effective manner for the Reorganized Debtors and the Consenting Stakeholders.

**Q.    Restructuring Expenses**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided*, that the Debtors and Reorganized Debtors (as applicable) shall have the right to review and object to any such Restructuring Expenses on reasonableness grounds. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; *provided*, *further*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

**R.    Distributions**

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan will be paid from the proceeds of the New Equity Issuance, the New RBL Facility or the Cash balances of the Debtors or the Reorganized Debtors. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors, as applicable, or any designated Affiliates of the Reorganized Debtors on their behalf.

**ARTICLE VI.**

**TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES**

**A.    ARDH1 and OpCo Debtors Assumption of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan, as of the Effective Date, each of ARDH1 and each OpCo Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, without the need for any further notice to or action, order or approval of the Bankruptcy Court,  unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by such Debtor; (2) expired or terminated pursuant to its own terms prior to the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; (4) is otherwise identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be rejected before the Effective Date; or (5) is to be rejected pursuant to the terms of the Plan. The assumption of Executory Contracts and Unexpired Leases hereunder may

include the assignment of certain of such contracts to one or more Reorganized OpCo Debtors. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions and assignments.

## B.    HoldCo Debtors Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, as of the Effective Date, each Holdco Debtor shall be deemed to have rejected each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, without the need for any further notice to or action, order or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by such HoldCo Debtor; (2) expired or terminated pursuant to its own terms prior to or effective on the Effective Date; (3) is the subject of a motion to assume filed on or before the Effective Date; (4) is otherwise identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed before the Effective Date; or (5) is to be assumed pursuant to the terms of the Plan. In the case of any Executory Contract or Unexpired Lease assumed by a HoldCo Debtor, such Executory Contract or Unexpired Lease shall be assigned to any of the Reorganized OpCo Debtors, as determined by Reorganized ARDH1. For the avoidance of doubt, (1) unless the DTE-SGG Gathering Agreements are amended consensually prior to the Confirmation Hearing, on terms satisfactory to the Required Consenting Term/Seller Stakeholders, such agreements shall be rejected effective as of the Petition Date; (2) the TCO Gathering Agreements terminated automatically on November 8, 2019, in accordance with a termination notice sent by TCO to ARE on October 29, 2019, and any Claims arising thereunder, if any, constitute ARE Gathering Agreement Claims, and, for the avoidance of doubt, to the extent there are any executory obligations remaining thereunder, such obligations shall be rejected effective as of the Petition Date; (3) the Fullstream Gathering Agreements shall be assumed on the Effective Date on the terms set forth in Exhibit F to the RSA and assigned to a Reorganized OpCo Debtor, in full and final satisfaction of any and all Claims thereunder; and (4) the EQM Gathering Agreements shall be assumed on the Effective Date on the terms set forth in Exhibit F to the RSA and assigned to a Reorganized OpCo Debtor, in full and final satisfaction of any and all Claims thereunder.

## C.    Assumption of Executory Contracts and Unexpired Leases

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed, or amended and assumed, and, in either case, potentially assigned, pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption, or amendment and assumption, and, in either case, the potential assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements related thereto, and all

rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

## D.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Reorganized OpCo Debtors shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business. If a counterparty to any Executory Contract or Unexpired Lease believes any amounts are due as a result of such Debtor's monetary default thereunder, it shall assert a Cure Claim against the OpCo Debtors or Reorganized OpCo Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim. Any Cure Claim shall be deemed fully satisfied, released and discharged upon payment by the Reorganized OpCo Debtors of the applicable Cure Claim; *provided*, that nothing herein shall prevent the Reorganized OpCo Debtors from paying any Cure Claim despite the failure of the relevant counterparty to assert or file such request for payment of such Cure Claim. The Debtors, with the consent of the Required Consenting Term/Seller Stakeholders, or the Reorganized OpCo Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order or approval of the Bankruptcy Court.

As set forth in the notice of the Confirmation Hearing, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, including an objection regarding the ability of the Reorganized OpCo Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), must have been filed with the Bankruptcy Court by the deadline set by the Bankruptcy Court for objecting to Confirmation of the Plan, or such other deadline as may have been established by order of the Bankruptcy Court. To the extent any such objection is not determined by the Bankruptcy Court at the Confirmation Hearing, such objection may be heard and determined at a subsequent hearing. Any counterparty to an Executory Contract or Unexpired Lease that did not timely object to the proposed assumption of any Executory Contract or Unexpired Lease by the deadline established by the Bankruptcy Court will be deemed to have consented to such assumption.

In the event of a dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized OpCo Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption or the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after entry of a Final Order or Final Orders resolving such dispute and approving such assumption. The Debtors (with the consent of the Required Consenting Term/Seller Stakeholders), or Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any unresolved dispute or upon a resolution of such dispute that is unfavorable to the Debtors or Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Claims pursuant to the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the date that the Reorganized OpCo Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## E.      Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided in the Plan or the Plan Supplement, each Executory Contract and Unexpired Lease, if any, set forth on the Schedule of Rejected Executory Contracts and Unexpired Leases (which shall be included in the Plan Supplement) shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code. Each Gathering Agreement not already rejected prior to the Confirmation Hearing will be deemed rejected *nunc pro tunc* as of the Petition Date, unless the Debtors, with the consent of the Required Consenting Term/Seller Stakeholders, agree to assume, or amend and assume, or, in either case, potentially assign such Gathering Agreement. The Debtors reserve the right to alter, amend, modify or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including the Effective Date.

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Proofs of Claim with respect to Claims arising from termination of the TCO Gathering Agreements, if any, must be filed with the Bankruptcy Court within 30 days after the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease or termination of the TCO Gathering Agreements not filed within such time(s) will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized OpCo Debtors, the Estates or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized OpCo Debtors, as applicable, or further notice to, or action, order or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease or the termination of the TCO Gathering Agreements shall be deemed fully satisfied, released and discharged, notwithstanding anything in a Proof of Claim to the contrary.** Claims arising from the rejection of the Executory Contracts or Unexpired Leases to which any Debtor is a party shall be classified as general unsecured claims and shall be treated as an AEH General Unsecured Claim, ARDH1 General Unsecured Claim, ARDH2 General Unsecured Claim, ARE General Unsecured Claim, ARIH General Unsecured Claim or OpCo General Unsecured Claim, as applicable (depending on the Debtor party to such Executory Contract or Unexpired Lease), subject to any applicable limitation or defense under the Bankruptcy Code and applicable law; *provided*, *however*, that all Claims arising from the rejection of any Gathering Agreement, the termination of the TCO Gathering

Agreements or otherwise related to any Gathering Agreement shall be treated as a Class 3A ARE Gathering Agreement Claim.

Except as otherwise provided herein or agreed to by the Debtors (with the consent of the Required Consenting Term/Seller Stakeholders) and the applicable counterparty, each rejected Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority or amount of any Claims that may arise in connection therewith.

## F.    Assumption of Insurance Policies

Notwithstanding anything in the Plan to the contrary, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized OpCo Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto, including all D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized OpCo Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair or otherwise modify any indemnity obligations presumed or otherwise referenced in the foregoing insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized OpCo Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

After the Effective Date, the Reorganized OpCo Debtors shall take all steps necessary to secure the six-year extended reporting period under the D&O Side A DIC Liability Insurance Policies.    Such steps shall include the Reorganized OpCo Debtors' communication and coordination with ESS NexTier Insurance Group, LLC to ensure the transfer of the D&O Side A DIC Tail Pre-Paid Premium to the insurers that issued the D&O Side A DIC Liability Insurance Policies to secure the six-year extended reporting period under the D&O Side A DIC Liability Insurance Policies.

After the Effective Date, the Reorganized OpCo Debtors shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, directors and/or officers remain in such positions after the Effective Date.

## G.     Indemnification

The indemnification provisions in any Indemnification Agreement with respect to or based upon any act or omission taken or omitted by an indemnified party in such indemnified party's capacity under such Indemnification Agreement will be Reinstated (or assumed, as the case may be) and will survive effectiveness of the Plan. Notwithstanding the foregoing, nothing shall impair the Reorganized OpCo Debtors from prospectively modifying any such indemnification provisions (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts or otherwise) after the Effective Date, for indemnification claims and/or rights arising after the Effective Date.

## H.     Severance Agreements and Compensation and Benefit Programs; Employment Agreements

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all severance policies, all severance arrangements and all compensation and benefit plans, policies, and programs of the Debtors generally applicable to their employees and retirees, including all savings plans, retirement plans, healthcare plans, disability plans, severance agreements and arrangements, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized OpCo Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

## I.     Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized OpCo Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized OpCo Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance; all such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed by the Reorganized OpCo Debtors pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized OpCo Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

## J.     Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtors, Reorganized OpCo Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or Reorganized OpCo Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized OpCo Debtors, as applicable, shall have forty-five (45) calendar days following entry of a Final Order resolving such dispute to alter their

treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date or such other date the Reorganized OpCo Debtors deem appropriate.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distribution Record Date

Following the dissolution of ARE, and prior to the ARE Distribution Record Date, Reorganized ARDH1 (or its designee) shall hold the ARE Available Cash for distributions pursuant to the Plan. Distributions hereunder to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date or the ARE Distribution Record Date, as applicable. Any transfers of Claims after the Distribution Record Date or the ARE Distribution Record Date, as applicable, shall not be recognized for purposes of the Plan unless otherwise provided herein. Distributions to the Holders of ARDH1 Term Loan Claims and the Holders of AEH Seller Notes Claims shall be made in accordance with the New ARDH1 Operating Agreement.

### B.    Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

### C.    Distribution Agent

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent or by such other Entity designated by the Reorganized Debtors as a Distribution Agent on the Effective Date. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court. All distributions to the Holders of the ARDH1 Term Loan Claims and Holders of AEH Seller Notes Claims shall be made pursuant to the New ARDH1 Operating Agreement.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) empower professionals to represent it with respect to its responsibilities and (d) exercise such other powers as are necessary and proper to implement the provisions hereof. If the Distribution Agent is an entity other than the Reorganized Debtors,

such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

**D.      Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors.

**E.      Rounding of Payments**

Whenever payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar.

No fractional membership units or shares shall be issued or distributed under the Plan. Each Person entitled to receive New ARDH1 Equity shall receive the total number of whole units or shares of New ARDH1 Equity to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for the distribution of a fraction of a unit or share of New ARDH1 Equity, the actual distribution of units or shares of such Equity Interests shall be rounded down to the nearest whole number.

To the extent Cash, shares, stock or units that are to be distributed under the Plan remain undistributed as a result of the rounding down of such fraction to the nearest whole dollar or whole number of notes, shares, stock or units, such Cash, shares, stock or units shall be treated as an Unclaimed Distribution under the Plan.

**F.      Allocation Between Principal and Interest**

Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest accrued through the Effective Date, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**G.      General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

**H.      Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any Proofs of Claim filed by such Holders (to the extent such Proofs of Claim are filed in the Chapter 11 Cases), (2) at the address set forth in any written notices of address change delivered to the Debtors, (3) at the address in the Debtors' books and records or (4) in accordance with the Term Loan Credit Agreement, the Seller Notes or the RBL Credit Agreement.

## I.    Unclaimed Distributions

If the distribution to the Holder of any Allowed Claim becomes an Unclaimed Distribution, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder.

Such Unclaimed Distribution and such Holder's rights to the distribution or any subsequent distribution shall be deemed forfeit under the Plan. Notwithstanding any federal or state escheat, abandoned or unclaimed property laws to the contrary, such Unclaimed Distribution and any subsequent distributions on account of such Holder's Allowed Claim shall be deemed disallowed, discharged and forever barred as unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to and vest in the Reorganized Debtors free of any restrictions thereon. Holders that fail to claim such Unclaimed Distribution shall have no claim whatsoever on account of such Unclaimed Distribution, or any subsequent distributions, against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

## J.    Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall, to the extent applicable, comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities and shall be entitled to deduct any federal, state or local withholding taxes from any distributions made with respect to Allowed Claims, as appropriate. From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on them by any Governmental Unit in accordance with applicable law with respect to such withholding taxes. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws. Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

## K.    No Postpetition Interest on Claims

Unless otherwise specifically provided for in an order of the Court, the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Equity Interests, and no Holder of a Claim or Equity Interest shall be entitled to interest, dividends or other accruals accruing on or after the Petition Date on any such Claim or Equity Interest.

L.      **Setoffs**

Except as otherwise expressly provided for herein, the Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and Causes of Action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and Causes of Action that the Reorganized Debtors possesses against such Holder; *provided, further*, that no such setoff shall be permitted against any Allowed Term Loan Claim or Allowed Seller Notes Claim or any distributions to be made pursuant to the Plan on account of any such Allowed Claims.

M.      **Surrender of Cancelled Instruments or Securities**

Except as otherwise provided herein, as a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of an Allowed Claim in the Voting Classes based upon an instrument or other security shall be deemed to have surrendered such instrument, security or other documentation underlying such Claim and all such surrendered instruments, securities and other documentation shall be deemed cancelled pursuant to Article V.N of the Plan.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A.      **Disputed Claims Process**

Holders of Claims are not required to file a Proof of Claim with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with Article VI.E hereof. On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be paid pursuant to the Plan in the ordinary course of business of the Reorganized OpCo Debtors and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Other than Claims arising from the rejection of an Executory Contract or Unexpired Lease, if the Debtors or the Reorganized OpCo Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Solely to the extent that an Entity is required to file a Proof of Claim and the Debtors or the Reorganized OpCo Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VIII of the Plan. For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan except as otherwise provided in Article VI.E. All Proofs of Claim required to be filed by the Plan that are filed after the date that they are required to be filed pursuant to the Plan shall be disallowed and forever barred, estopped and enjoined from assertion, and shall not be enforceable against any Reorganized OpCo Debtor, without the need

for any objection by the Reorganized OpCo Debtors or any further notice to or action, order or approval of the Bankruptcy Court.

**B.      Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized OpCo Debtors shall have the sole authority to: (1) file, withdraw, or litigate to judgment, objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements, compromises or withdrawals without any further notice to or action, order or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized OpCo Debtor shall have and retain any and all rights and defenses such Debtor or its assignor had immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Article V.N of the Plan.

**C.      Estimation of Claims**

Before or after the Effective Date, the Debtors, with the reasonable consent of the Required Consenting Term/Seller Stakeholders, or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim or contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized OpCo Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of each other. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**D.      Amendments to Claims; Adjustment to Claims on Claims Register**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized OpCo Debtors, and any such new or amended Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further action, order

or approval of the Bankruptcy Court. Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized OpCo Debtors without the Reorganized OpCo Debtors having to file an application, motion, complaint, objection or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order or approval of the Bankruptcy Court.

## E.    No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

## F.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

## G.    No Interest

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

## A.    Conditions to Effective Date

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(i)    the RSA shall have been executed and shall not have been terminated and remains in full force and effect;

(ii)    the Plan shall have been confirmed by the Bankruptcy Court and all related Plan exhibits and other documents shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith;

(iii)    the Restructuring Transactions shall have been consummated, including the New Equity Issuance, and all transactions contemplated herein, in a manner consistent in all respects with the RSA, the Restructuring Term Sheet (as defined in the RSA) and the Plan;

(iv)    the orders approving the Disclosure Statement and confirming the Plan shall have been entered, consistent with the RSA, and such orders shall not have been vacated, stayed, or modified without the consent of the Required Consenting Stakeholders;

(v)    the New RBL Facility and any related documents shall have been executed and delivered, and shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred));

(vi)    the New ARDH1 Class A Interests shall have been issued, including all New ARDH1 Class A Interests to be issued pursuant to the New Equity Issuance, and the New Equity Issuance shall have been fully funded;

(vii)    all accrued and unpaid fees and expenses of the Consenting Stakeholders (including the reasonable and documented fees and expenses incurred by the Consenting Stakeholder Advisors) in connection with the Restructuring Transactions shall have been paid in accordance with the terms and conditions set forth in the RSA; and

(viii)    any and all requisite governmental, regulatory, environmental, and third-party approvals and consents shall have been obtained.

## B.    Waiver of Conditions

The conditions to the Effective Date of the Plan set forth in this Article IX may be waived only if waived in writing by the Debtors and the Required Consenting Term/Seller Stakeholders; *provided*, that the condition requiring that the Confirmation Order shall have been entered by the Bankruptcy Court may not be waived.

## ARTICLE X.

## RETENTION OF JURISDICTION

## A.    Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as is legally permissible, including jurisdiction to:

(i)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest; *provided*, that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

(ii)    grant or deny any applications for allowance of Professional Fee Claims;

(iii)    resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party and, if necessary, liquidate any Claims arising therefrom;

(iv)    resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

(v)    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(vi)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending in the Chapter 11 Cases as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date; *provided*, that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

(vii)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order, and all orders previously entered into by the Bankruptcy Court, or any Entity's obligations incurred in connection with the Plan;

(viii)    issue and enforce injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

(ix)    enforce the terms and condition of the Plan and the Confirmation Order;

(x)    resolve any cases, controversies, suits or disputes with respect to the releases, the exculpations, the indemnification provisions and other provisions contained in Article XI hereof and enter such orders or take such others actions as may be necessary or appropriate to implement, enforce or determine the scope of all such releases, exculpations, injunctions and other provisions;

(xi)    enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xii)    resolve any cases, controversies, suits or disputes that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted or entered into in connection with the Plan, the Plan Supplement or the Disclosure Statement;

(xiii)    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order previously entered by the Bankruptcy Court, including the Confirmation Order;

(xiv)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xv)    hear any other matter not inconsistent with the Bankruptcy Code; and

(xvi)    enter an order closing each of the Chapter 11 Cases.

As of the Effective Date, notwithstanding anything in this Article X to the contrary, the New RBL Credit Agreement, the New ARDH1 Operating Agreement and the other Reorganized OpCo Debtors Constituent Documents shall be governed by the respective jurisdictional provisions therein.

**B.    Failure of Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Article X.A of the Plan, the provisions of this Article X shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

<h3 style="text-align:center">ARTICLE XI.</h3>

<h3 style="text-align:center">EFFECTS OF CONFIRMATION</h3>

**A.    General Settlement of Claims**

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, the Reorganized Debtors and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

**B.    Binding Effect**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND EACH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT ANY SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR EQUITY INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.**

C.    **Discharge of the Debtors**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, and effective as of the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Equity Interests herein will be in exchange for and in complete satisfaction, settlement, discharge and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g), 502(h) or 502(i) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all Entities will be precluded from asserting against, derivatively on behalf of, or through, the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

D.    **Exculpation and Limitation of Liability**

To the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, amendment, or filing or termination of the RSA and related transactions, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the RBL Credit Agreement, the RBL Facility, the Term Loan Credit Agreement, the Term Loan Documents, the Seller Notes, the Seller Note Documents, the DIP Facility Documents, the DIP Facility, the New RBL Loan Documents, the New RBL Facility, the New Equity Issuance, or any Restructuring Transaction, contract, instrument, release or other agreement or document relating to the foregoing created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan (including the New ARDH1 Equity), or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not operate to waive or release the rights of any Entity to enforce the Plan, the RSA, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any claim or obligation arising under the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of voting classes and

distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.    **Releases by the Debtors**

PURSUANT TO SECTION 1123(B) AND ANY OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY AND ITS RESPECTIVE ASSETS AND PROPERTY ARE, AND ARE DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY THE DEBTORS, REORGANIZED DEBTORS, AND THE DEBTORS' ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RELATED PARTIES, AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, FROM ANY AND ALL CAUSES OF ACTION, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, THAT THE DEBTORS, REORGANIZED DEBTORS, OR THE DEBTORS' ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR CAUSE OF ACTION AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY (OR THAT ANY HOLDER OF ANY CLAIM, INTEREST, OR CAUSE OF ACTION COULD HAVE ASSERTED ON BEHALF OF THE DEBTORS), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' CAPITAL STRUCTURE, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN OR OUT OF COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A DEBTOR AND ANOTHER DEBTOR, AND/OR AN AFFILIATE OF A DEBTOR, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, AMENDMENT, OR FILING OF THE RSA, THE DISCLOSURE STATEMENT, THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT), THE RBL CREDIT AGREEMENT, THE RBL FACILITY, THE TERM LOAN CREDIT AGREEMENT, THE TERM LOAN FACILITY, THE SELLER NOTES, THE SELLER NOTE DOCUMENTS, THE DIP FACILITY DOCUMENTS, THE DIP FACILITY, THE NEW RBL FACILITY DOCUMENTS, THE NEW RBL FACILITY, THE NEW ARDH1 CONSTITUENT DOCUMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO BEFORE OR DURING THE CHAPTER 11 CASES, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR OTHER

APPLICABLE LAW, THE CHAPTER 11 CASES (INCLUDING THE FILING THEREOF), THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN (INCLUDING THE NEW ARDH1 EQUITY), OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE RSA, THE NEW RBL FACILITY, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES DESCRIBED IN THE PLAN BY THE DEBTORS, REORGANIZED DEBTORS, AND THE DEBTORS' ESTATES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THIS PLAN, AND FURTHER, SHALL CONSTITUTE ITS FINDING THAT EACH RELEASE DESCRIBED IN THE PLAN IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, A GOOD FAITH SETTLEMENT AND COMPROMISE OF SUCH CAUSES OF ACTION; (2) IN THE BEST INTEREST OF THE DEBTORS, REORGANIZED DEBTORS, AND THE DEBTORS' ESTATES AND ALL HOLDERS OF INTERESTS AND CAUSES OF ACTION; (3) FAIR, EQUITABLE, AND REASONABLE; (4) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (5) SUBJECT TO THE TERMS AND PROVISIONS HEREIN, A BAR TO THE DEBTORS, REORGANIZED DEBTORS, AND THE DEBTORS' ESTATES ASSERTING ANY CAUSE OF ACTION, OR LIABILITY RELATED THERETO, OF ANY KIND WHATSOEVER, AGAINST ANY OF THE RELEASED PARTIES OR THEIR ASSETS AND PROPERTY.

F.    Releases by Holders of Claims and Equity Interests

PURSUANT TO SECTION 1123(B) AND ANY OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH RELEASED PARTY AND ITS RESPECTIVE ASSETS AND PROPERTY ARE, AND ARE DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED BY EACH RELEASING PARTY, IN

EACH CASE ON BEHALF OF THEMSELVES AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION, DIRECTLY OR DERIVATIVELY, BY, THROUGH, FOR, OR BECAUSE OF THE FOREGOING ENTITIES, FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' IN OR OUT OF COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A DEBTOR, ANOTHER DEBTOR AND/OR AN AFFILIATE OF A DEBTOR, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, EXECUTION, AMENDMENT, OR FILING OF THE RSA, THE DISCLOSURE STATEMENT, THE PLAN (INCLUDING, FOR THE AVOIDANCE OF DOUBT, THE PLAN SUPPLEMENT), THE RBL CREDIT AGREEMENT, THE RBL FACILITY, THE TERM LOAN CREDIT AGREEMENT, THE TERM LOAN FACILITY, THE SELLER NOTES, THE SELLER NOTE DOCUMENTS, THE DIP FACILITY DOCUMENTS, THE DIP FACILITY, THE NEW RBL LOAN DOCUMENTS, THE NEW RBL FACILITY, THE NEW ARDH1 OPERATING AGREEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT RELATING TO ANY OF THE FOREGOING, CREATED OR ENTERED INTO BEFORE OR DURING THE CHAPTER 11 CASES, ANY PREFERENCE, FRAUDULENT TRANSFER, OR OTHER AVOIDANCE CLAIM ARISING PURSUANT TO CHAPTER 5 OF THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW, THE CHAPTER 11 CASES (INCLUDING THE FILING THEREOF), THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN (INCLUDING THE NEW ARDH1 EQUITY), OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO ANY OF THE FOREGOING. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE RSA, THE NEW RBL FACILITY, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN OR (B) ANY PERSON FROM ANY CLAIM OR CAUSES OF ACTION RELATED TO AN ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE

**CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE BY SUCH PERSON.**

**G.    Injunction**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE XI.E</u> OR <u>ARTICLE XI.F</u> OF THE PLAN, DISCHARGED PURSUANT TO <u>ARTICLE XI.C</u> OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO <u>ARTICLE XI.D</u> OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION DOES NOT ENJOIN ANY PARTY UNDER THE PLAN OR UNDER ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN FROM BRINGING AN ACTION TO ENFORCE THE TERMS OF THE PLAN OR SUCH DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE ATTACHED TO THE DISCLOSURE STATEMENT OR SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.**

**H.    Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter,

franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors has been associated, solely because such Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.    Modification of Plan

Subject in all respects to the limitations in the RSA and this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, supplement, amend and restate, or otherwise modify the Plan prior to the entry of the Confirmation Order; (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, after notice and hearing and entry of an order of the Bankruptcy Court, amend, supplement, amend and restate, or otherwise modify the Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; and (c) a Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as amended, supplemented, amended and restated, or otherwise modified, if the proposed amendment, supplement, amendment and restatement, or other modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder, or release any claims or liabilities reserved by such Holder under the Plan. Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019. Prior to the Effective Date, the Debtors may make appropriate technical adjustments to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments or modifications shall be reasonably satisfactory to the Required Consenting Term/Seller Stakeholders.

### B.    Revocation of Plan

The Debtors, with the prior written consent of the Required Consenting Term/Seller Stakeholders, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans, but without prejudice to the respective parties' rights under the RSA. If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

## C.      Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted and the Debtors, with the consent of the Required Consenting Term/Seller Stakeholders, may amend, supplement, amend and restate, or otherwise modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. Notwithstanding any such holding of the Bankruptcy Court, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## D.      Closure of Certain Chapter 11 Cases on the Effective Date; Final Decree for Remaining Chapter 11 Cases

Upon the Effective Date, without the need to obtain further approval from the Bankruptcy Court, the Chapter 11 Cases of all of the HoldCo Debtors shall be deemed closed as of the Effective Date without prejudice to the rights of any party in interest to seek to reopen such Chapter 11 Cases, and (i) all motions, contested matters adversary proceedings and other matters with respect to such Chapter 11 Cases and the HoldCo Debtors shall be administered in the Chapter 11 Cases of ARDH1 and the OpCo Debtors without prejudice to the rights of any party in interest, (ii) the caption of the remaining Chapter 11 Cases shall be amended as necessary to reflect the closure of the Chapter 11 Cases of the HoldCo Debtors and (iii) a docket entry shall be made by the clerk of the Bankruptcy Court in each of the Chapter 11 Cases of the HoldCo Debtors that reflects the closure of those cases pursuant hereto.

## E.      Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Person or Entity.

## F.      Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until the Effective Date has occurred.

## G.      Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date shall have occurred. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any

action by the Debtors or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or Equity Interest or other Entity, in each case, prior to the Effective Date.

**H.     Notices**

Any notice, request, or demand required or permitted to be made or provided to or upon the Debtors, the Consenting Term Loan Lenders, the Consenting RBL Lenders, the Consenting Seller Noteholders or the Consenting Equityholders under the Plan shall be (i) in writing; (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) facsimile transmission or (e) email transmission; and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

**If to the Debtors:**

> Arsenal Energy Holdings LLC
> 6031 Wallace Road Ext., Suite 3000
> Wexford, PA 15090
> Attn: Craig Lavender, Esq. ([clavender@arsenalresources.com](mailto:clavender@arsenalresources.com))
> Fax: (800) 428-0981

**with a copy to (which shall not constitute notice):**

Counsel to the Debtors

> Simpson Thacher & Bartlett LLP
> 425 Lexington Avenue
> New York, NY 10017
> Attn:   Michael H. Torkin, Esq. ([michael.torkin@stblaw.com](mailto:michael.torkin@stblaw.com))
>         Kathrine A. McLendon, Esq. ([kmclendon@stblaw.com](mailto:kmclendon@stblaw.com))
>         Nicholas E. Baker, Esq. ([nbaker@stblaw.com](mailto:nbaker@stblaw.com))
> Fax: (212) 455-2502

> – and –

> Young Conaway Stargatt & Taylor, LLP
> Rodney Square
> 1000 North King Street
> Wilmington, DE 19801
> Attn:   Pauline K. Morgan, Esq. ([pmorgan@ycst.com](mailto:pmorgan@ycst.com))
>         Kara Hammond Coyle, Esq. ([kcoyle@ycst.com](mailto:kcoyle@ycst.com))
>         Ashley E. Jacobs, Esq. ([ajacobs@ycst.com](mailto:ajacobs@ycst.com))
> Fax: (302) 571-1253

**If to the Consenting Term Loan Lenders and/or the Consenting Seller Noteholders:**

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attn:   Matt Pacey (matt.pacey@kirkland.com)

– and –

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attn:   Ryan B. Bennett (rbennett@kirkland.com)
            Travis M. Bayer (travis.bayer@kirkland.com)

– and –

Vinson & Elkins LLP
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Attn:   David Meyer (dmeyer@velaw.com)
            Harry Perrin (hperrin@velaw.com)
            Garrick Smith (gsmith@velaw.com)

– and –

Baker Botts L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201
Attn:   Jim Prince (jim.prince@bakerbotts.com)

**If to the Consenting RBL Lenders:**

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attn:   Andrew Tenzer (andrewtenzer@paulhastings.com)
            Randal Palach (randalpalach@paulhastings.com)
            Shekhar Kumar (shekharkkumar@paulhastings.com)

**If to the Consenting Equityholders**:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn:   Sean O'Neal (soneal@cgsh.com)
            Jane VanLare (jvanlare@cgsh.com)

## I.    Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

## J.    Exhibits

All exhibits and schedules to the Plan, including the Exhibits, are incorporated and are a part of the Plan as if set forth in full herein.

## K.    No Strict Construction

The Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Consenting Stakeholders and their respective professionals. Each of the foregoing was represented by counsel of its choice who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, the Plan, the Plan Supplement, the Disclosure Statement, and the agreements and documents contemplated therein or related thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of the Plan, the Plan Supplement, the Disclosure Statement, and the documents contemplated thereunder and related thereto.

## L.    Conflicts

In the event of a conflict between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of a conflict between the Confirmation Order and the Plan, the Confirmation Order shall control.

## M.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the Holders of Claims and Equity Interests, the Exculpated Parties, the Released Parties, and each of their respective successors and assigns.

## N.    Entire Agreement

On the Effective Date, this Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into this Plan.

**O.      Reservation of Rights**

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Equity Interests prior to the Effective Date.

[Remainder of page intentionally left blank]

November 7, 2019

ARSENAL RESOURCES DEVELOPMENT LLC

/s/ Jonathan D. Farmer

Name:  Jonathan D. Farmer
Title:   Chief Executive Officer

**<u>Exhibit B to Disclosure Statement</u>**

**<u>RSA</u>**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 12.02, this "**Agreement**") is made and entered into as of November 6, 2019 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (vi) of this preamble, collectively, the "**Parties**"):[1]

i.  Arsenal Energy Holdings LLC ("**AEH**"), a limited liability company organized under the Laws of Delaware, and each of its subsidiaries listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.  the undersigned holders of RBL Claims that have executed and delivered counterpart signatures to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting RBL Lenders**");

iii.  the undersigned holders of membership interests of AEH that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Equity Holders**");

iv.  the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Seller Notes Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iv), collectively, the "**Consenting Seller Noteholders**");

v.  the undersigned holders of Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Term Loan Lenders**" and, together with the other Entities in clause (ii) through clause (v), the "**Consenting Stakeholders**"); and

---

[1]  Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

vi.    solely for purposes of Section 4.03(c), each of the undersigned Secured Swap Parties that has executed and delivered a counterpart signature page to this Agreement or a Joinder to counsel to the Company Parties (each, a "**Consenting Secured Swap Party**").

## RECITALS

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's-length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (together with the exhibits, annexes, and schedules attached thereto, the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.    *Definitions and Interpretation.***

1.01.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the DIP Facility, the RBL Loan, the Term Loan, and/or the Seller Notes, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 12.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, assets, or other interests of or in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Approved Bidding Procedures**" means bidding procedures for the sale of all or substantially all of the Company Parties' assets pursuant to section 363 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Required Consenting Term/Seller Stakeholders and the Required Consenting RBL Lenders.

"**ARDH1**" means Arsenal Resources Development Holdings 1 LLC.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chambers**" means, collectively, Chambers Energy Capital II LP, Chambers Energy Capital II TE, LP, and Chambers Energy Capital III, LP.

"**Chambers Note**" means that certain Seller Note, dated as of October 14, 2014, in the original principal amount of $39,047,625.00, issued by Arsenal Energy Holdings LLC (f/k/a Mountaineer Energy Holdings, LLC) in favor of PDC Energy, Inc., as original seller, which note was later sold and assigned to Chambers Energy Capital II LP, Chambers Energy Capital II TE, LP, and Chambers Energy Capital III, LP, as assignees and purchasers, pursuant to the Note Purchase Agreement, dated April 28, 2017.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the DIP Facility Claims, the RBL Claims, the Term Loan Claims, and the Seller Notes Claims.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

3

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan and approving the adequacy of the Disclosure Statement, which shall be consistent with this Agreement in all material respects.

"**Consenting RBL Lenders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Secured Swap Party**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Seller Noteholders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Stakeholder Advisors**" means, collectively, (i) Kirkland & Ellis LLP, (ii) Baker Botts L.L.P., (iii) Vinson & Elkins LLP, (iv) the RBL Lender Advisors, (v) one Delaware counsel for each of Chambers, Mercuria, and LRMH, and (vi) such other advisors and/or professionals engaged by the Consenting RBL Lenders, the Consenting Term Loan Lenders, and the Consenting Seller Noteholders in connection with the Restructuring Transactions.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Term Loan Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Credit Agreement**" means the credit agreement substantially in the form attached to the Restructuring Term Sheet as Annex 1.

"**DIP Documents**" means the DIP Credit Agreement, the "Loan Documents" (as defined in the DIP Credit Agreement), the Interim DIP Order, the Final DIP Order, and all credit agreements, collateral agreements, or any other documents related thereto.

"**DIP Facility**" means any debtor in possession financing facility under the DIP Credit Agreement.

"**DIP Facility Claim**" means any Claim on account of the DIP Facility against any of the Debtors.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common

stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**EQM Gathering Agreement**" means collectively, that certain (i) Credit Agreement, dated August 18, 2010 and (ii) Transportation Service Agreement CW2239335-510, dated August 1, 2017, in each case by and between Arsenal Resources Energy, LLC and Equitrans, L.P., including all exhibits, schedules and annexes thereto.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Executory Contract or Unexpired Lease**" means any contract or unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"**Final DIP Order**" means the final order of the Bankruptcy Court approving the DIP Facility on a final basis and authorizing the use of cash collateral, which shall be consistent with this Agreement and the DIP Documents. The Final DIP Order shall authorize the Company Parties' payment of all Transaction Expenses.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**Fullstream Gathering Agreement**" means collectively, that certain (i) Gathering and Natural Gas Services Agreement, date as of November 9, 2017 and (ii) Amended & Restated Individual Transaction Confirmation, dated December 21, 2018, in each case by and between Arsenal Resources Energy, LLC and Goff Connector LLC, including all exhibits, schedules and annexes thereto.

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time, as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession).

"**Gathering Agreements**" means those certain agreements for the gathering and transportation of natural gas, and any other agreements related thereto, between Arsenal Resources Energy, LLC and Equitrans, L.P., Stonewall Gas Gathering, LLC, DTE Appalachia Gathering, LLC, Columbia Gas Transmission, LLC, and Goff Connector LLC.

"**Governance Term Sheet**" means the governance term sheet attached as Annex 4 to the Restructuring Term Sheet.

"**Interim DIP Order**" means the interim order of the Bankruptcy Court approving the DIP Facility on an interim basis and authorizing the use of cash collateral, which shall be consistent with this Agreement and the DIP Credit Agreement.

"**Joinder**" means an executed form of joinder agreement substantially in the form attached hereto as **Exhibit D-1**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**LRMH**" means LR-Mountaineer Holdings, L.P.

"**LRMH Note**" means that certain Seller Note, dated as of October 14, 2014, in the original principal amount of $39,047,625.00, issued by Arsenal Energy Holdings LLC (f/k/a Mountaineer Energy Holdings, LLC) in favor of LR-Mountaineer Holdings, L.P., as seller.

"**Material Executory Contract or Unexpired Lease**" means any Executory Contract or Unexpired Lease that is material to the Debtors' business taken as a whole (and is not a Gathering Agreement).

"**Mercuria**" means Mercuria Energy Company, LLC, or its affiliates.

"**Milestones**" has the meaning set forth in Section 6.01 of this Agreement.

"**New Capital Commitment**" has the meaning set forth in Section 4.04 of this Agreement.

"**New Capital Parties**" has the meaning set forth in the New Equity Term Sheet.

"**New Common Equity**" means the new common stock or the new common equity issued in Reorganized Arsenal pursuant to the Plan.

"**New Common Equity Documents**" means the operating agreement of Reorganized Arsenal, which shall be in form and substance consistent with this Agreement and the Restructuring Term Sheet, and shall otherwise be acceptable to the New Capital Parties, the Required Consenting Term Loan Lenders, and the Required Consenting Seller Noteholders.

"**New Equity Term Sheet**" has the meaning set forth in Section 4.04 of this Agreement.

"**New RBL Facility**" means a new revolving credit facility to be entered into on the Plan Effective Date having the terms and conditions set forth in the New RBL Facility Term Sheet.

"**New RBL Facility Commitment Letter**" means the commitment letter of the Consenting RBL Lenders to provide the New RBL Facility, dated as of the date hereof.

"**New RBL Facility Term Sheet**" means the term sheet attached to the Restructuring Term Sheet as Annex 3.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means each transfer of any Company Claims/Interests that meets the requirements of Section 7.01 or 7.04, as applicable.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests that meets the requirements of Section 7.01 or 7.04, as applicable.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code substantially in the form attached hereto as **Exhibit C**.

"**Plan Effective Date**" means the occurrence of the Effective Date of the Plan according to its terms and as defined therein.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court. The Plan Supplement shall include the New Common Equity Documents and the credit agreement governing the New RBL Facility.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**RBL Agent**" means Citibank, N.A., as administrative agent under the RBL Credit Agreement.

"**RBL Claim**" means any Claim on account of the RBL Loan against any of the Debtors.

"**RBL Credit Agreement**" means the credit agreement, dated December 21, 2018, between Arsenal Resources Development LLC, as borrower, the lenders from time to time party thereto, the RBL Agent, BMO Harris Bank, N.A. and Société Générale, as Co-syndication Agents, CIT Finance LLC, as Documentation Agent, and Citigroup Global Markets Inc., as lead arranger.

"**RBL Lenders**" means the lenders holding RBL Loans.

"**RBL Lender Advisors**" means Paul Hastings, LLP, Richards, Layton & Finger, PA, RPA Advisors, and such other advisors and/or professionals engaged by the RBL Agent (or by counsel to the RBL Agent) to the extent such advisors' or professionals' fees are reimbursable pursuant to the RBL Credit Agreement and the related loan documents.

"**RBL Loan**" means the loans outstanding under the RBL Credit Agreement.

"**Reorganized Arsenal**" means ARDH1, as reorganized pursuant to the Plan.

"**Required Consenting RBL Lenders**" means, as of the relevant date, Consenting RBL Lenders holding at least 50.01% of the aggregate outstanding principal amount of RBL Loans that are held by Consenting RBL Lenders.

"**Required Consenting Seller Noteholders**" means each of the Consenting Seller Noteholders; *provided* that in the event that any Consenting Seller Noteholder that is party hereto as of the Agreement Effective Date Transfers some, but not all of its interests in the Seller Notes to an unaffiliated Entity, Required Consenting Seller Noteholders shall mean Consenting Seller Noteholders holding at least 50.01% of the aggregate outstanding principal amount of Seller Notes that are held by all Consenting Seller Noteholders *plus* each of the Consenting Seller Noteholders party to this Agreement as of the Agreement Effective Date that remains party to this Agreement following such Transfer.

"**Required Consenting Stakeholders**" means the Required Consenting RBL Lenders, the Required Consenting Term Loan Lenders, and the Required Consenting Seller Noteholders.

"**Required Consenting Term Loan Lenders**" means each of the Consenting Term Loan Lenders; *provided* that in the event that any Consenting Term Loan Lender Transfers some, but not all of its interests in the Term Loan to an unaffiliated Entity, Required Consenting Term Loan Lenders shall mean Consenting Term Loan Lenders holding at least 50.01% of the aggregate outstanding principal amount of Term Loans that are held by all Consenting Term Loan Lenders *plus* each of the Consenting Term Loan Lenders party to this Agreement as of the Agreement Effective Date that remains party to this Agreement following such Transfer.

"**Required Consenting Term/Seller Stakeholders**" means the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Seller Note Documents**" means the Seller Notes together with the ARHD 2 Guaranty, the ARDH 2 Collateral Agreement, the Collateral Agency Agreement, dated as of December 21, 2018, and the Subordination Agreement (each as defined in the Seller Notes).

"**Seller Notes**" means, collectively, the Chambers Note and the LRMH Note.

"**Seller Notes Claim**" means any Claim on account of the Seller Notes and the Seller Note Documents against any of the Debtors.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan, together with the Disclosure Statement and the ballots.

"**Secured Swap Agreement**" has the meaning ascribed to such term in the RBL Credit Agreement.

"**Secured Swap Party**" has the meaning ascribed to such term in the RBL Credit Agreement.

"**Term Loan**" means the loans outstanding under the loan agreement, dated December 21, 2018 among ARDH1, as borrower, Chambers Energy Management, LP, as agent, and the lenders party thereto.

"**Term Loan Claim**" means any Claim on account of the Term Loan against any of the Debtors.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 10.01, 10.02, 10.03, or 10.04.

"**Transaction Expenses**" has the meaning set forth in Section 12.20 of this Agreement.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D-2**, or to the extent the Transferor is a Consenting RBL Lender, in substantially the form attached hereto as **Exhibit D-3**.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)      the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 12.10 other than counsel to the Company Parties.

**Section 2.**      *Effectiveness of this Agreement.*   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Consenting Stakeholders;

(b)      the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties:

(i)      holders of at least 66 2/3$^2$ percent of the aggregate outstanding principal amount of RBL Claims; and

(ii)      the Required Consenting Seller Noteholders; and

(iii)      the Required Consenting Term Loan Lenders; and

(c)      counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 12.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred; and

(d)      payment of the then outstanding Transaction Expenses to the extent invoiced no later than one (1) Business Day in advance of the anticipated Agreement Effective Date.

---

[2]    To the extent Consenting RBL Lenders hold less than 100% of the RBL Claims, the Plan shall be modified to provide that RBL Lenders that are not Consenting RBL Lenders shall receive alternative treatment that is acceptable to the Company Parties, the Required Consenting Term/Seller Stakeholders and the Required Consenting RBL Lenders.

**Section 3.**     *Definitive Documents.*

3.01.    The Definitive Documents governing the Restructuring Transactions, each of which shall be in form and substance consistent with this Agreement (including, as to the Plan, the form attached hereto) and the Restructuring Term Sheet and otherwise reasonably acceptable to the Required Consenting Term/Seller Stakeholders and, except for documents that relate to governance of Reorganized Arsenal, the Required Consenting RBL Lenders, shall include the following:  (A) the Plan; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the order of the Bankruptcy Court approving the Disclosure Statement; (E) the Solicitation Materials; (F) the DIP Documents; (G) the New RBL Facility Commitment Letter; (H) the First Day Pleadings and all orders sought pursuant thereto; and (I) the Plan Supplement.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 11 of this Agreement.

**Section 4.**     *Commitments of the Consenting Stakeholders.*

4.01.    <u>General Commitments, Forbearances, and Waivers</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, to:

(i)    use commercially reasonable efforts to support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate subject to the exercise of applicable fiduciary duties), in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, including obtaining approval of the releases of the Company Parties and the Consenting Stakeholders as contemplated by this Agreement;

(ii)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)    give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions; and

(iv)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)    Except as set forth in Section 5 of this Agreement, during the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan or any of the Definitive Documents;

(iii)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement or any Definitive Document;

(iv)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of its respective Company Claims/Interests; or

(v)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

4.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests that is in a voting class to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials;

(ii)    not opt out of or object to the releases set forth in the Plan; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; *provided* that nothing in this Agreement shall prevent any Consenting Stakeholder from withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement has been terminated in accordance with its terms with respect to such Consenting Stakeholder.

4.03.    <u>New RBL Facility and DIP Facility</u>.

(a)    Subject to the conditions and on the terms set forth in the New RBL Facility Term Sheet and the New RBL Facility Commitment Letter, each Consenting RBL Lender, severally and

not jointly, hereby agrees to provide commitments under the New RBL Facility in the percentage set forth on its signature page hereto.

(b)     Subject to the conditions and on the terms set forth in the DIP Credit Agreement, each Consenting RBL Lender (or, without releasing or excusing its commitments under this Section 4.03, one of its Affiliates (as defined in the RBL Credit Agreement)), severally and not jointly, hereby commits to provide the percentage of the DIP Facility set forth on its signature page hereto. Each Consenting RBL Lender agrees that this Section 4.03(b) is a binding and enforceable agreement with respect to the commitments under the DIP Facility, it being acknowledged and agreed that the commitments provided hereunder are subject solely to the conditions precedent set forth in the DIP Credit Agreement. Notwithstanding anything to the contrary in this Agreement, the commitment of each Consenting RBL Lender set forth in this Section 4.03(b) may not be Transferred without the prior written consent of the Company Parties and the RBL Agent, and the Transfer of any Company Claims/Interests, including any RBL Claims, shall not be deemed a Transfer of such commitments nor relieve the applicable Consenting RBL Lender of such commitments hereunder (which commitments shall survive any Transfer of Company Claims/Interests). Any Transfer in violation of this Section 4.03(a) shall be void *ab initio*.

(c)     The DIP Credit Agreement and the orders of the Bankruptcy Court approving the DIP Credit Agreement shall provide that each Pre-Petition Swap Agreement (as such term is defined in the DIP Credit Agreement) shall constitute a Secured Swap Agreement (as such term is defined in the DIP Credit Agreement) and be entitled to all of the rights and benefits of a Secured Swap Agreement thereunder. Each party to such Pre-Petition Swap Agreement shall continue to perform its obligations thereunder. To the extent any non-Debtor party to such Pre-Petition Swap Agreement has a right of termination based on an Event of Default or Potential Event of Default (each as defined in such Pre-Petition Swap Agreement) arising from (i) the entry into this Agreement, (ii) the commencement of a Chapter 11 Case, (iii) a default or Event of Default under (and as defined in) the RBL Credit Agreement, or (iv) insolvency, each Consenting RBL Lender party to such Pre-Petition Swap Agreement and each Consenting Secured Swap Party hereby agrees that such Event of Default or Potential Event of Default (each as defined in such Pre-Petition Swap Agreement), as applicable, shall be waived as of the Agreement Effective Date, provided, however, that in the event that: (a) a Debtor files a petition under, or a chapter 11 Case is converted to, a case under Chapter 7 of the Bankruptcy Code; (b) a Debtor has an involuntary Chapter 7 petition filed against it and such petition is not dismissed or converted to a case under chapter 11 of the Bankruptcy Code within five (5) days of the filing of such petition; or (c) during the course of a Chapter 11 Case, one of the following events occurs with respect to any Debtor: (1) a chapter 11 trustee or an examiner with expanded powers is appointed; or (2) such Debtor's obligations under the DIP Credit Agreement mature or are accelerated, then the occurrence of such event shall constitute an Event of Default under such Pre-Petition Swap Agreement.

4.04.    <u>Commitments with Respect to the New Equity Issuance.</u>  Subject to the conditions set forth in the term sheet attached to the Restructuring Term Sheet as <u>Annex 2</u> (the "<u>New Equity Term Sheet</u>"), each Consenting Stakeholder that is a New Capital Party, severally and not jointly, agrees to provide (or, without releasing or excusing its commitment in this Section 4.04, cause any of its designees to provide) its respective portion of $100 million of new capital (in the amount set forth on its signature page hereto) for the purchase of New Common Equity (the "<u>New Capital</u>

Commitment") on the terms and conditions as set forth in the New Equity Term Sheet. For the avoidance of doubt, upon termination or expiration of this Agreement by such Consenting Stakeholder in accordance with its terms (other than a termination is the result of a breach of this Agreement by such Consenting Stakeholder or the consummation of the Restructuring Transactions), the commitment of such Consenting Stakeholder made pursuant to this Section 4.04 to provide its respective portion of the New Capital Commitment shall terminate. Notwithstanding anything to the contrary in this Agreement, the commitment of each New Capital Party set forth in this Section 4.04 may not be Transferred without the prior written consent of the Company Parties, and the Transfer of any Company Claims/Interests, including any Term Loan or Seller Notes Claims, shall not be deemed a Transfer of such commitments nor relieve the applicable New Capital Party of such commitments hereunder (which commitments shall survive any Transfer of Company Claims/Interests). Any Transfer in violation of this Section 4.04 shall be void *ab initio*.

4.05.   Commitments with Respect to the UtiKey Transaction. Arsenal Resources Holdings LLC, as a Consenting Equity Holder, agrees that it shall cause UtiKey LLC to pay Arsenal Resources LLC $311,000 on or prior to the date that is five (5) business days after the Agreement Effective Date and $622,000 on or prior to the Plan Effective Date on account of certain outstanding joint operating costs and UtiKey LLC shall continue to pay the Debtors in the ordinary course of business thereafter to the extent any joint operating costs become due and payable during the Chapter 11 Cases. Each of the Parties hereby agree that no later than seven (7) days following the Agreement Effective Date, Arsenal Resources LLC shall enter into a transition services agreement with UtiKey LLC and Arsenal Resources Holdings LLC substantially in the form attached hereto as **Exhibit E**, whereby Arsenal Resources LLC will provide certain services for the winding down of the UtiKey LLC and Arsenal Resources Holdings LLC assets during the applicable transition service period.

4.06.   Assumption of Certain Gathering Agreements. Each New Capital Party, Consenting Term Loan Lender and Consenting Seller Note Holder supports the assumption, effective on the Plan Effective Date, of the EQM Gathering Agreement and the Fullstream Gathering Agreement on the amended terms described in **Exhibit F** to this Agreement, and agrees not to directly or indirectly object to such assumption by the Company Parties.

**Section 5.**   ***Additional Provisions Regarding the Consenting Stakeholders' and Company Parties' Commitments.***

5.01.   Permitted Actions. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:  (a) affect the ability of any Party to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the Office of the United States Trustee), so long as such consultation is not in breach of or inconsistent with the Restructuring Transaction, the obligations of the Consenting Stakeholders and the Company Parties hereunder, or under the terms of the Plan or for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions; (b) impair or waive the rights of the Parties under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such act, action, consultation, or appearance is not in breach of or inconsistent with the Restructuring Transactions, the obligations of the Consenting Stakeholders

14

and the Company Parties hereunder, or under the terms of the Plan or for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions; (c) prevent any of the Parties from enforcing this Agreement or any of the Definitive Documents or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any of the Definitive Documents; (d) limit the ability of a Consenting Stakeholder to purchase, sell, or enter into any transactions in connection with its Company Claims/Interests, subject to the terms hereof and applicable law; and (e) limit any right of a Consenting Stakeholder to take or direct any action relating to the maintenance, protection, or preservation of any collateral provided that such action is consistent with this Agreement and the Definitive Documents.

5.02.   <u>Approved Bidding Procedures</u>.   Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement shall prohibit the Company Parties from filing and seeking approval of Approved Bidding Procedures in order to comply with the Milestones, and the taking of such acts shall not be deemed inconsistent with this Agreement or the Restructuring Transactions, shall not be deemed a breach of the Company Parties' obligations hereunder and shall not cause a termination event hereunder.

**Section 6.**     *Commitments of the Company Parties.*

6.01.   <u>Affirmative Commitments</u>.   During the Agreement Effective Period, the Company Parties agree to:

(a)     take all steps reasonably necessary and proper to seek approval of the Plan and to complete the Restructuring Transactions, including seeking entry of the Interim DIP Order, the Final DIP Order, the order of the Bankruptcy Court approving the Disclosure Statement, and the Confirmation Order;

(b)     support and take all steps reasonably necessary to consummate the Restructuring Transactions in accordance with this Agreement, including obtaining approval of the releases contemplated by this Agreement and applicable milestones set forth on <u>Schedule 1</u> to this Agreement (collectively, the "**<u>Milestones</u>**");

(c)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary to address any such impediment;

(d)     prosecute and defend any appeals relating to the Confirmation Order or otherwise relating to the Restructuring Transactions;

(e)     use commercially reasonable efforts to obtain any and all required governmental, regulatory, and/or third-party approvals for the Restructuring Transactions or the approval by the Bankruptcy Court of the Definitive Documents;

(f)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(g)  use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(h)  timely file a formal objection to any motion filed with the Bankruptcy Court by any party seeking (i) the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, or (D) directing the appointment of an equity committee, whether pursuant to section 1102(a)(2) of the Bankruptcy Code or otherwise, in the Chapter 11 Cases; or (ii) the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization;

(i)  provide to the Consenting Stakeholders, subject to any applicable confidentiality restrictions, information with respect to all Material Executory Contracts or Unexpired Leases of the Company Parties for the purposes of concluding which such Material Executory Contracts or Unexpired Leases the Company Parties or the Debtors, as applicable, intend to assume, assume and assign, or reject in the Chapter 11 Cases (to the extent applicable), subject to the consent rights set forth herein and in the Plan;

(j)  not assume, assume and amend, or assume, amend and assign any Gathering Agreement unless the terms of such assumption, amendment and/or assignment are satisfactory to the New Capital Parties, the Required Consenting Term Loan Lenders, and the Required Consenting Seller Noteholders; *provided that*, the New Capital Parties, the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders agree that the amended terms of the Fullstream Gathering Agreement and the EQM Gathering Agreement set forth on **Exhibit F** are satisfactory.

(k)  pay the Transaction Expenses in accordance with Section 12.20 of this Agreement;

(l)  upon reasonable request of the Consenting Stakeholders, inform the Consenting Stakeholder Advisors as to: (i) the material business and financial (including liquidity) performance of the Company Parties; (ii) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(m)  inform counsel to the Consenting Stakeholders as soon as reasonably practicable after becoming aware of:

(i)  (A) any matter or circumstance that they know, or believe is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (B) any occurrence, or failure to occur, of any event that would be reasonably likely to cause (1) any representation or warranty of the Company Parties contained in this Agreement or the Definitive Documents to be untrue or inaccurate in any material respect when made or deemed to have been made, (2) any covenant of any of the Company Parties contained in this Agreement or the Definitive Documents

16

not to be or able to be satisfied in any material respect, or (3) any condition precedent contained in this Agreement, the Plan, or the Definitive Documents not to occur or to become impossible to satisfy; (C) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of material debt or securement of material security from or by any person in respect of any Company Party; (D) a breach of this Agreement (including a breach by any Company Party); (E) any representation or statement made or deemed to be made by them under this Agreement that is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made; and (F) any matter or circumstance that they know, or believe is reasonably likely to, give rise to a termination under Section 10.01; and

(ii)     the receipt by the Company Parties of any written notice (A) from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring Transactions; (B) from any governmental body in connection with this Agreement, the Plan, or the Definitive Documents or the transactions contemplated by the Restructuring Transactions; (C) of any proceeding commenced, or, to the knowledge of the Company Parties, threatened against the Company Parties, relating to or involving or otherwise affecting in any material respect this Agreement, the Definitive Documents, or the transactions contemplated by the Restructuring Transactions; or (D) of alleged default, breach, waiver, or termination of this Agreement, the Plan, or the Definitive Documents.

(n)     use commercially reasonable efforts to not (i) operate their business outside the ordinary course of business (as operated immediately prior to the Agreement Effective Date), taking into account the Restructuring Transactions, without the consent of the Required Consenting Term/Seller Stakeholders or (ii) Transfer any material asset or right of the Company Parties or any material asset or right used in the business of the Company Parties to any person or Entity outside the ordinary course of business, in each case, without the consent of the Required Consenting Term/Seller Stakeholders;

(o)     on or after the date hereof, not engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than the Restructuring Transactions; and

(p)     (i) provide counsel for the Consenting RBL Lenders, Consenting Term Loan Lenders, and the Consenting Seller Noteholders with draft copies of all First Day Pleadings at least two (2) Business Days prior to the date when any Company Party intends to file such First Day Pleadings and, (ii) to the extent reasonably practicable, provide draft copies of other documents that the Company Parties intend to file with Bankruptcy Court to counsel to any Consenting Stakeholders materially affected by such filing at least two (2) Business Days prior to the date when any Company Party intends to file such other document, as applicable, and consult in good

faith with counsel for the Consenting RBL Lenders, Consenting Term Loan Lenders, and the Consenting Seller Noteholders regarding the form and substance of any such proposed filing with the Bankruptcy Court.

6.02. <u>Negative Commitments</u>. During the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)    modify the Plan or the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)    file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(e)    withdraw or revoke the Plan or publicly announce its intention not to pursue the Plan;

(f)    other than with respect to the Gathering Agreements or as expressly contemplated by the Plan (including in respect of the HoldCo Debtors (as defined in the Restructuring Term Sheet)), move for an order authorizing or directing the rejection of a Material Executory Contract or Unexpired Lease without the consent of the Required Consenting Term/Seller Stakeholders, and, with regard to the rejection or termination of any Secured Swap Agreement, the consent of the Consenting Secured Swap Party to any such Secured Swap Agreement (except if rejection or termination is sought after a breach thereof by the Consenting Secured Swap Party);

(g)    commence an avoidance action or other legal proceeding that challenges the validity, enforceability, or priority of the obligations under the debt instruments governing the RBL Loan, the Term Loan, or the Seller Notes (including the Seller Note Documents);

(h)    commence, support, or join any litigation or adversary proceeding against the Consenting Stakeholders;

(i)    issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its Equity Interests, including capital stock or limited liability company interests;

(j)    amend or propose to amend its respective certificate or articles of incorporation, bylaws or comparable organizational documents in a manner inconsistent with this Agreement or the Restructuring Term Sheet (including the Governance Term Sheet);

(k)      split, combine or reclassify any outstanding shares of its any Equity Interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its Equity Interests in a manner inconsistent with this Agreement or the Restructuring Term Sheet (including the Governance Term Sheet);

(l)      redeem, purchase, or acquire or offer to acquire any of its Equity Interests, including capital stock or limited liability company interests in a manner inconsistent with this Agreement or the Restructuring Term Sheet (including the Governance Term Sheet);

(m)      incur or suffer to exist any indebtedness or debt, or guarantee any indebtedness or enter into any "keep well" or other agreement to maintain any financial condition of another person, except indebtedness existing and outstanding immediately before the Petition Date, trade payables, liabilities arising and incurred in the ordinary course of business, and indebtedness arising under the DIP Facility;

(n)      change materially its financial or tax accounting methods, except insofar as may have been required by a change in GAAP or applicable law, or revalue any of its material assets;

(o)      enter into, adopt or amend any other management employment agreements or management compensation or incentive plans, or increase in any manner the compensation or benefits (including severance) of any director, officer, or management level employee of any of the Company Parties or enter into or amend any existing employee agreements or any benefit or compensation plans, except in the ordinary course of business consistent with past practices in each case, or except as may be expressly permitted under this Agreement, or the Restructuring Term Sheet (including the Governance Term Sheet); or

(p)      incur any liens or security interests, other than those existing immediately prior to the date hereof, those permitted under the DIP Facility, or those granted under the DIP Facility, the Interim DIP Order, or the Final DIP Order.

**Section 7.**      *Transfer of Interests and Securities.*

7.01.    During the Agreement Effective Period, no Consenting Stakeholder, other than a Consenting RBL Lender in respect of Transfer of RBL Claims, shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      in the case of any Company Claims/Interests, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (iii) an institutional accredited investor (as defined in the Rules), or (iv) a Consenting Stakeholder or a 100%-owned subsidiary of a Consenting Stakeholder (whether owned directly or indirectly); and

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties, at least two (2) Business Days prior to the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer

(including the amount and type of Company Claim/Interest transferred) to counsel to the Company Parties and counsel to each of the Consenting Term Loan Lenders and Consenting Seller Noteholders at least two (2) Business Days prior to the time of the proposed Transfer.

7.02.    Upon compliance with the requirements of Section 7.01 or 7.04, as applicable, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests; *provided* that, the Transfer of any Company Claims/Interests shall not be deemed a Transfer of the commitments set forth in Section 4.04 nor a release of the obligations of the parties to perform under such Section.  Any Transfer in violation of Section 7.01 or 7.04 shall be void *ab initio*.

7.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided* that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties and counsel to each of the Consenting Term Loan Lenders and Consenting Seller Noteholders within five (5) Business Days of such acquisition.

7.04.    During the Agreement Effective Period, no Consenting RBL Lender shall transfer any RBL Claim to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    such transfer is in accordance with the RBL Credit Agreement; and

(b)    either (i) the transferee executes and delivers to counsel to the Company Parties, at least two (2) Business Days prior to the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of RBL Claim transferred) to counsel to the Company Parties and counsel to each of the Consenting Term Loan Lenders and Consenting Seller Noteholders at least two (2) Business Days prior to the time of the proposed Transfer

7.05.    This Section 7 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

7.06.    Notwithstanding Section 7.01 or Section 7.04, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified

Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 7.01 or Section 7.04, as applicable; and (iii) the Transfer otherwise is a Permitted Transfer under Section 7.01 or Section 7.04, as applicable.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

7.07.    Notwithstanding anything to the contrary in this Section 7, the restrictions on Transfer set forth in this Section 7 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 8.    *Representations and Warranties of Consenting Stakeholders.***  Each Consenting Stakeholder (other than the Consenting RBL Lenders, where noted) severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 7);

(b)    it has the full power and authority to act on behalf of, vote on and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; [3]

(d)    it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)    solely with respect to holders of Company Claims, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined

---

[3]    Due to institutional reasons, the Consenting RBL Lenders are not making this representation and warranty. The absence of such representation and warranty by the Consenting RBL Lender shall not be deemed to waive or be a defense to any breach of this Agreement by a Consenting RBL Lender.

in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act. [4]

**Section 9.     *Mutual Representations, Warranties, and Covenants*.**  Each of the Parties (other than the Consenting RBL Lenders, where noted) represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)     it is validly existing and in good standing under the Laws of the state or other jurisdiction of its organization or formation, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability; [4]

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement and the Plan; [4]

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law applicable to it or with any of its articles of association, memorandum of association or other constitutional documents; [4]

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement, subject to the requirements of the Bankruptcy Code, and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement, and the Company Parties further represent and warrant that the respective boards of directors or other governing bodies of each Company Party has approved, by all requisite action, the filing of the Chapter 11 Cases and the pursuit of the Restructuring Transactions; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 10.     *Termination Events*.**

10.01.  <u>Consenting Stakeholder Termination Events</u>.  This Agreement and the obligations hereunder shall automatically terminate after five (5) Business Days (or such other notice period as specifically set forth below) following the delivery of written notice from (a) with respect to the Consenting RBL Lenders, by the Required Consenting RBL Lenders, (b) with respect to the

---

[4]     Due to institutional reasons, the Consenting RBL Lenders are not making this representation and warranty. The absence of such representation and warranty by the Consenting RBL Lender shall not be deemed to waive or be a defense to any breach of this Agreement by a Consenting RBL Lender.

Consenting Term Loan Lenders, by the Required Consenting Term Loan Lenders, (c) with respect to the Consenting Seller Noteholders, by the Required Consenting Seller Noteholders, and (d) any Consenting RBL Lender, Consenting Term Loan Lender, or Consenting Seller Noteholder, solely as to itself, at any time after and during the continuance of the Consenting Stakeholder Termination Events set forth in Sections 10.01(c), (l), (q), or (s) if the events in any such sections have an adverse or material adverse effect, as applicable, on such Consenting RBL Lender, Consenting Term Loan Lender, or Consenting Seller Noteholder, in each case, by the delivery to the other Parties of a written notice in accordance with Section 12.10 hereof upon the occurrence of the following events; *provided* that if such notice is not given within (i) five (5) Business Days or (ii) such other time as agreed in writing by the Required Consenting RBL Lenders (as to a right of termination by a Consenting RBL Lender), the Required Consenting Term Loan Lenders (as to a right of termination by a Consenting Term Loan Lender), or the Required Consenting Seller Noteholders (as to a right of termination by a Consenting Seller Noteholder), after such Consenting Stakeholder first becomes aware or receives notice of any such occurrence, the Required Consenting RBL Lenders (as to the Consenting RBL Lenders, other than in relation to Section 10.10(j)), the Required Consenting Term Loan Lenders (as to the Consenting Term Loan Lenders), or the Required Consenting Seller Noteholders (as to the Consenting Seller Noteholders), in each case other than such terminating Consenting Stakeholder, may waive such Termination Event with respect to such occurrence and such waiver shall be binding on all Consenting Term Loan Lenders, Consenting Seller Noteholders, or the Consenting RBL Lenders, as applicable:

(a)     the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for seven (7) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 12.10 hereof detailing any such breach;

(b)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 12.10 hereof detailing any such issuance;

(c)     any of the Company Parties announces its intention (publically or otherwise) not to support the Restructuring Transactions on substantially the same terms as set forth in this Agreement (including the Restructuring Term Sheet), or takes any action that is inconsistent with the terms of the Restructuring Transactions as agreed to in this Agreement, the Restructuring Term Sheet, the Interim DIP Order, the Final DIP Order, and the other Definitive Documents, including by approving an Alternative Restructuring Proposal;

(d)     the Bankruptcy Court enters an order denying confirmation of the Plan;

(e)     the Gathering Agreements are (a) rejected pursuant to section 365 of the Bankruptcy Code or (b) assumed or amended and assumed and, in either case, potentially assigned in either (a) or (b) on terms that are unacceptable to the New Capital Parties, the Required Consenting Term Loan Lenders, and the Required Consenting Seller Noteholders; *provided that*, the New Capital Parties, the Required Consenting Term Loan Lenders and the Required

23

Consenting Seller Noteholders agree that the amended terms of the Fullstream Gathering Agreement and the EQM Gathering Agreement set forth on **Exhibit F** are acceptable.

(f)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Term/Seller Stakeholders and the Required Consenting RBL Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases with respect to any of the Company Parties, (iii) dismissing the Chapter 11 Cases, or (iv) rejecting this Agreement;

(g)      the Bankruptcy Court enters a final order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization;

(h)      the Bankruptcy Court grants relief that is inconsistent in any material respect with this Agreement or the Restructuring Transactions and such inconsistent relief is not dismissed, vacated or modified to be consistent with this Agreement and the Restructuring Transactions within seven (7) Business Days following notice thereof to the Company Parties by the Required Consenting RBL Lenders, Required Consenting Term Loan Lenders, or the Required Consenting Seller Noteholders;

(i)      except as necessary to implement the DIP Facility, or with the prior written consent of the Required Consenting Term/Seller Stakeholders and Required Consenting RBL Lenders (email shall suffice), the Bankruptcy Court grants a final order terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company Parties having an aggregate fair market value in excess of $1,000,000.00;

(j)      the Bankruptcy Court enters a final non-appealable order pursuant to a motion filed or supported by the Company Parties or at the direct or indirect direction of the Company Parties authorizing or directing the rejection of any Material Executory Contract or Unexpired Lease (or terminating any secured swap agreement under the RBL Loan other than for a breach thereof) other than in accordance with this Agreement, the Plan or as otherwise approved in writing by the Required Consenting Term/Seller Stakeholders and the Required Consenting RBL Lenders (email shall suffice) or, to the extent applicable, the Required Consenting RBL Lenders, which Required Consenting RBL Lenders must include the RBL Lender who is the counterparty to (or whose affiliate is the counterparty to) any such secured swap agreement sought to be rejected or terminated;

(k)      the commencement of an avoidance action or other legal proceeding by the Company Parties to challenge the validity, enforceability, or priority of the debt instruments governing the RBL Loan, the Term Loan, or the Seller Notes or the obligations thereunder;

(l)      the Plan is withdrawn, amended, or otherwise modified so as to be inconsistent with this Agreement, the Restructuring Term Sheet, or the Plan;

(m)     other than as contemplated by this Agreement, the Plan, or the Restructuring Transactions, the Company Parties hire any new executive officer or other senior manager or modify the terms of any existing employment agreement with their respective executive officers or other senior managers or otherwise pay any amount outside the ordinary course of business, including any amount contemplated by or in connection with any incentive, retention, bonus or similar plan, to their respective executive officers or other senior managers, in each case on terms not acceptable to the Required Consenting Term/Seller Stakeholders;

(n)     the Company Parties shall not have complied with or achieved any of the Milestones (unless such Milestone is waived or amended in accordance with Section 11 of this Agreement or is satisfied prior to the termination of this Agreement);

(o)     an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee shall have been appointed in one or more of the Chapter 11 Cases with respect to any of the Company Parties;

(p)     the failure of the Company Parties to pay the Transaction Expenses in accordance with Section 12.20 of this Agreement;

(q)     the filing by any Company Party of any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and the Restructuring Term Sheet, including any settlement that materially amends the terms of the Restructuring Transactions without the consent of the Required Consenting Term/Seller Stakeholders and Required Consenting RBL Lenders;

(r)     the Definitive Documents and any amendments, modifications or supplements thereto filed by the Company Parties include terms that are not consistent in all material respects with this Agreement and the Restructuring Term Sheet;

(s)     this Agreement, the Restructuring Term Sheet, any of the Definitive Documents, or any of the transactions or documents effectuating the Restructuring Transactions (including any exhibits thereto) is amended, supplemented or otherwise modified from the agreed forms thereof, or the terms or conditions thereof are waived, in each case in a manner that (i) changes adversely the economic treatment for the terminating Consenting Term Loan Lender, the terminating Consenting Seller Noteholder or the terminating Consenting RBL Lender proposed in the Plan and the Restructuring Term Sheet, (ii) materially and adversely affects the economic interests or rights of the terminating Consenting Term Loan Lender, the terminating Consenting Seller Noteholder or the terminating Consenting RBL Lender, or adversely affects the governance interests or rights of the terminating Consenting Term Loan Lender or the terminating Consenting Seller Noteholder, (iii) adds any material obligations to or requirements on the terminating Consenting Term Loan Lender, the terminating Consenting Seller Noteholder or the terminating Consenting RBL Lender, or (iv) materially improves the economic interests or rights, or improves the governance interests or rights, of other parties to such documents or transactions, in each case without written consent to such amendment, supplement, modification or waiver by such terminating party; provided that, no Consenting RBL Lender may exercise a termination right under the immediately foregoing clause (iv); or

(t)      the Restructuring Transactions are not consummated in accordance with the terms of this Agreement, the Restructuring Term Sheet, and the Plan.

10.02.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 12.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Stakeholders of any of the representations, warranties or covenants of such Consenting Stakeholders set forth in this Agreement that (i) is adverse to the Company Parties and (ii) remains uncured for a period of seven (7) Business Days after the Company Parties transmit notice of such breach in accordance with Section 12.10 hereof detailing any such breach;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines in good faith, based on the advice of counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; *provided* that no later than five (5) Business Days in advance of exercising such a termination right under the foregoing clause (ii), the Company Parties shall provide to counsel to the Consenting Stakeholders a copy of the written offer or proposal for such Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 12.10 hereof detailing any such issuance; <u>provided</u>, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan.

10.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Term/Seller Stakeholders and Required Consenting RBL Lenders; and (b) each Company Party.

10.04.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

10.05.  <u>Effect of Termination.</u>  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have otherwise been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of

action.  Upon the occurrence of a Termination Date by a Consenting Stakeholder prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by such Consenting Stakeholder before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions, this Agreement, any of the Definitive Documents, or otherwise; provided that any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 10.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court (but the provisions and filing of such notice shall not be a precondition to the effectiveness of such consents or ballots being null and void) in accordance with this sentence. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with the terms hereof or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or other Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 10.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 10.02(b) or Section 10.02(d) and termination of this Agreement shall not relieve a Party of any liability for breach of this Agreement.  Nothing in this Section 10.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 10.02(b). For the avoidance of doubt, a termination of this Agreement in respect of a Consenting Stakeholder that is also a New Capital Party, shall relieve such Consenting Stakeholder of any obligation to provide its portion of the New Capital Commitment (unless the termination of this Agreement is as a result of a breach by such Consenting Stakeholder of its obligations hereunder and all conditions precedent to such New Capital Party's commitment to fund have been satisfied or would be satisfied but for such breach).

## Section 11.    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 11.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the following Parties, solely with respect to any modification, amendment, waiver or supplement that adversely affects the rights of such Parties and unless otherwise specified in this Agreement: (i) the Required Consenting RBL Lenders; (ii) the Required Consenting Term Loan Lenders; and (iii) the Required Consenting Seller Noteholders; *provided* that (1) if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse

effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; (2) if the proposed modification, amendment, waiver or supplement modifies or affects the releases and injunctions proposed to be granted to, or received by the Consenting Equity Holders pursuant to this Agreement, or the Plan, then the consent of the Consenting Equity Holders shall also be required to effectuate such modification, amendment, waiver or supplement; and (3) any extensions of the dates set forth in clauses (7) through (10) of the Milestones shall only require the consent of the Required Consenting Term Loan Lenders and Required Consenting RBL Lenders.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 11 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 12.    *Miscellaneous.***

12.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

12.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement for all purposes, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and any one or more of the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

12.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

12.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter

hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

12.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, in the United States District Court for the Southern District of New York, or, if that Court lacks jurisdiction, any New York State court located in New York County (the "**<u>Chosen Courts</u>**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; *provided* that if the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive jurisdiction rather than any Chosen Court, except that, in the event that the Bankruptcy Court declines to exercise jurisdiction, any such action or proceeding shall be brought in the Chosen Courts.

12.06. <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.07. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

12.08. <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

12.09. <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and, subject to the terms hereof, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

12.10. <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered,

by electronic mail or overnight courier, to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Company Party, to:

Arsenal Energy Holdings LLC
6031 Wallace Road Ext., Suite 300
Wexford, PA 15090
Attention: Craig Lavender, General Counsel
E-mail address: craig.lavender@arsenalresources.com

with copies to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attention: Michael Torkin; Nicholas Baker
E-mail address: michael.torkin@stblaw.com; nbaker@stblaw.com

(b)    if to a Consenting Term Loan Lender and/or Consenting Seller Noteholder, to:

Chambers Energy Capital
600 Travis Street, Suite 4700
Houston, Texas 77002
Attention:  Guy Hoffman
E-mail address:  ghoffman@chambersenergy.com

with copies to:

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attention:  Matt Pacey
E-mail address:  matt.pacey@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:   Ryan B. Bennett; Travis M. Bayer; Timothy Bow
E-mail address:  rbennett@kirkland.com; travis.bayer@kirkland.com; timothy.bow@kirkland.com

and

Mercuria Energy America, Inc.

20 Greenway Plaza, Suite 650
Houston, TX 77046
Attention: Mark Greenberg – Legal Department
E-mail address: mgreenberg@mercuria.com

with copies to:

Vinson & Elkins LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Attention:  David Meyer, Harry Perrin, and Garrick Smith
E-mail address:  dmeyer@velaw.com; hperrin@velaw.com; gsmith@velaw.com

and

LR-Mountaineer Holdings, L.P.
Heritage Plaza
1111 Bagby Street, Suite 4600
Houston, Texas 77002
Attention:  Will Franklin
E-mail address:  wf@lrpartners.com

with copies to:

Baker Botts L.L.P.
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Attention:  Jim Prince
E-mail address:  jim.prince@bakerbotts.com

(c)     if to a Consenting Equity Holder, to:

Arsenal Resource Holdings LLC
Annex MK Holdings III LLC
MK Note Co-Invest Holdings LLC
600 Travis, Suite 6000
Houston, TX 77002
Attention: Juan Diego Vargas, First Reserve
E-mail address: jvargas@firstreserve.com

and

PEC Marcus On-Holdings, LLC
PEC Marcus Off-Holdings, LLC
PEC Marcus Off-Holdings II, LLC
200 West Street, 34th Floor
New York, NY 10282

Attention: Kevin Spark
E-mail address: peg-reporting@gs.com

and

Mozart Properties Five Blue Hills, LLC
2965 Colonnade Dr, Suite 300
Roanoke, VA 24018
Attention: Nicholas F. Taubman
E-mail address: nick.taubman@mozartinvestments.com

with copies to:

Moss & Rocovich, P.C.
4415 Electric Rd
Roanoke, VA 24018-0723
Attention: Dennis A. Barbour
E-mail Address: dbarbour@mossandrocovich.com

and

Arthur Taubman Trust
4415 Electric Rd
Roanoke, VA 24018-0723
Attention: Dennis A. Barbour, Trustee
Email address: dbarbour@mossandrocovich.com

and

First PREMIER Bank, Trustee
c/o Anne Marie Feiock
PO Box 2640
Sioux Falls, SD 57101

and

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: Sean O'Neal; Jane VanLare
E-mail address: soneal@cgsh.com; jvanlare@cgsh.com


(d)    if to a Consenting RBL Lender, to:

Citibank, N.A.
1615 Brett Road, Building III

New Castle, Delaware 19720
Attention: Loan Administration
E-mail address: GLOriginationOps@citigroup.com

with copies to:
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Andrew Tenzer; Randal Palach; Shekhar Kumar
E-mail address:  andrewtenzer@paulhastings.com;
                randalpalach@paulhastings.com;
                shekharkumar@paulhastings.com

Any notice given by electronic mail or overnight courier shall be effective when received during regular business hours on a Business Day. The Company Parties (i) recognize and agree that any notice provided under this Agreement shall not be subject to or limited by section 362(a) of the Bankruptcy Code and (ii) hereby waive any right to assert or claim otherwise, to the maximum extent permitted by law.

12.11.   <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

12.12.   <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

12.13.   <u>Reservation of Rights; Admissibility of Agreement</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

12.14.   <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; *provided* that specific performance shall not be an available remedy against the Company Parties if the Company

Parties terminate this Agreement in accordance with, and subject to, Section 10.02(b) hereof.

(a)    Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.

12.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

12.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party's rights and obligations hereunder remain valid, binding, and enforceable.

12.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

12.18.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

12.19.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Company Parties, the Required Consenting Term/Seller Stakeholders, the Required Consenting RBL Lenders, or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

12.20.  <u>Transaction Expenses</u>.

(a)    Regardless of whether the Restructuring Transactions are consummated, the Company Parties shall promptly pay in cash all reasonable and documented (i) out-of-pocket costs of the Consenting RBL Lenders, the Consenting Term Loan Lenders and the Consenting Seller Noteholders up to $25,000 per class of Consenting Stakeholder incurred after the Agreement Effective Date and (ii) fees and expenses of each of the Consenting Stakeholder Advisors (such fees and expenses the "**Transaction Expenses**") incurred up to the Petition Date in full prior to the Petition Date (without deducting any retainers).  The Company Parties shall pay all reasonable and documented Transaction Expenses incurred thereafter when due in accordance with the penultimate sentence of this Section 12.20(a).  The Company Parties shall obtain entry of an order of the Bankruptcy Court within the first thirty-five (35) days following the Petition Date, which

order may be the Final DIP Order, approving the Company Parties monthly payment of all Transaction Expenses incurred through the effective date of a termination of this Agreement, to the extent permitted under applicable bankruptcy law, and to the extent any amounts remain unpaid following the Plan Effective Date, those amounts shall be paid in connection with the Debtors' emergence from the Chapter 11 Cases.  In accordance with the foregoing, all accrued and unpaid Transaction Expenses incurred up to (and including) the date of termination of this Agreement (other than a termination occurring pursuant to Section 10.02(a)) shall be paid promptly (but in any event within three (3) Business Days or such later period set forth in the Final DIP Order or other order authorizing such payment) against receipt of invoices in respect of such Transaction Expenses. Notwithstanding the termination of this Agreement or anything in this Section 12.20 to the contrary, any fees or expenses payable to the RBL Lender Advisors, the Consenting Stakeholder Advisors, or otherwise under the Interim DIP Order or the Final DIP Order (including, without limitation, fees or expenses payable as adequate protection for the RBL Facility Agent, the RBL Lenders, the Term Loan Lenders, the Seller Noteholders) shall be payable in accordance with the terms of the Interim DIP Order or the Final DIP Order (as applicable).

(b)    The terms set forth in this Section 12.20 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement are consummated.  The Company Parties hereby acknowledge and agree that the Consenting Stakeholders have expenses associated with the negotiation of this Agreement, and will continue to expend, considerable time, effort, and expense in connection with this Agreement, and that this Agreement provides substantial value to, is beneficial to, and is necessary to preserve, the Company Parties, and that the Consenting Stakeholders have made a substantial contribution to the Company Parties.  The Parties acknowledge that the agreements contained in this Section 12.20 are an integral part of the transactions contemplated by this Agreement, are actually necessary to preserve the value of the Company Parties and constitute liquidated damages and not a penalty, and that, without these agreements, the Consenting Stakeholders would not have entered into this Agreement.  If and to the extent not previously reimbursed or paid in connection with the foregoing, the Company Parties shall reimburse or pay (as the case may be) all documented Consenting Stakeholder Fees and Expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise to the extent payable hereunder.  The obligations set forth in this Section 12.20 are in addition to, and do not limit, the Company Parties' other obligations under this Agreement.

12.21.    <u>Relationship Among Parties</u>.  It is understood and agreed that, except as expressly provided in this Agreement, none of the Consenting Stakeholders (a) have any duty of trust or confidence in any kind or form with any other Party; (b) have or owe any other duties (fiduciary or otherwise) whatsoever to any other Party; or (c) have commitments to any of the other Parties; *provided* that representatives of the Consenting Equity Stakeholders may serve on the board of directors of the Company Parties and may hold indirect limited partnership interests in other Consenting Stakeholders.  In this regard, it is understood and agreed that subject to the terms and conditions of this Agreement, the Consenting Stakeholders may trade in the loans or other debt or equity securities of the Company Parties, subject to applicable securities laws and the terms of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  Notwithstanding anything in this Agreement to the contrary, the duties and obligations of the Consenting

Stakeholders under this Agreement shall be several, not joint.

     12.22.  <u>Compliance with DIP Documents</u>.  Notwithstanding Section 6.01, 6.02, or any other provision of this Agreement to the contrary, nothing in this Agreement shall relieve any of the Company Parties from any obligation or covenant under any DIP Document.

**Section 13.**     ***Releases and Covenants Not to Sue***

     13.01.  <u>Consenting Stakeholders' Mutual Releases</u>. Subject to and immediately upon the occurrence of the Plan Effective Date, without any further action, the releases set forth in Annex 5 of the Restructuring Term Sheet shall be effective as to each of the Released Parties and Releasing Parties that are Consenting Stakeholders.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Company Parties' Signature Page to
the Restructuring Support Agreement**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Arsenal Energy Holdings LLC
Arsenal Resources Intermediate Holdings LLC
Arsenal Resources Energy LLC
Arsenal Resources Development Holdings 2 LLC
Arsenal Resources Development Holdings 1 LLC
Arsenal Resources Development LLC
Arsenal Gas Marketing LLC
Arsenal Midstream LLC
Arsenal Water LLC
Ulysses Gathering LLC
Mar Key LLC
Arsenal Resources LLC
River Ridge Energy Holdings, LLC
River Ridge Energy, LLC
River Ridge Pennsylvania, LLC
River Ridge Operating, LLC
Seneca-Upshur Petroleum, LLC**

By: _____
     Name: Jonathan D. Farmer
     Title: Chief Executive Officer

**[ All other signature pages intentionally omitted ]**

## Schedule 1
### Milestones

1.   The Company Parties shall have commenced solicitation of votes on the Plan on or before November 8, 2019.

2.   The Debtors shall have filed the Chapter 11 Cases on or before November 11, 2019.

3.   The Debtors shall have filed on the Petition Date the Disclosure Statement, Plan, and a motion seeking approval of the Disclosure Statement and scheduling a confirmation hearing on the Plan no later than forty-five (45) days after the Petition Date.

4.   The Debtors shall have obtained approval of the Interim DIP Order by the date that is no later than five (5) days following the Petition Date.

5.   The Debtors shall have obtained approval of the Final DIP Order by the date that is no later than thirty (30) days following the Petition Date.

6.   Unless the Bankruptcy Court shall have entered the Confirmation Order prior to such date, the Debtors shall have obtained approval of Approved Bidding Procedures by the date that is no later than seventy-five (75) days after the Petition Date.

7.   The Bankruptcy Court shall have entered the Confirmation Order by the date that is no later than ninety (90) days after the Petition Date.

8.   The Plan shall become effective by the date that is no later than the earlier of (x) fifteen (15) days after entry of the Confirmation Order and (y) 105 days after the Petition Date.

## EXHIBIT A

### Company Parties

**Arsenal Energy Holdings LLC**
**Arsenal Resources Intermediate Holdings LLC**
**Arsenal Resources Energy LLC**
**Arsenal Resources Development Holdings 2 LLC**
**Arsenal Resources Development Holdings 1 LLC**
**Arsenal Resources Development LLC**
**Arsenal Midstream LLC**
**Arsenal Water LLC**
**Ulysses Gathering LLC**
**Arsenal Gas Marketing LLC**
**Arsenal Resources LLC**
**River Ridge Energy Holdings, LLC**
**River Ridge Energy, LLC**
**Seneca-Upshur Petroleum, LLC**
**River Ridge Pennsylvania, LLC**
**River Ridge Operating, LLC**
**Mar Key, LLC**

**<u>EXHIBIT B</u>**

**Restructuring Term Sheet**

_____

**ARSENAL ENERGY HOLDINGS LLC**

**RESTRUCTURING TERM SHEET**

**November 6, 2019**

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY EXCHANGE OR PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 4(A)(2) OF THE SECURITIES ACT OF 1933 AND/OR SECTION 1145 OF THE BANKRUPTCY CODE AND APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.

_____

This Term Sheet (including the annexes attached hereto, the "Term Sheet") sets forth the principal terms of a financial restructuring of the capital structure and financial obligations of Arsenal Energy Holdings LLC ("AEH") and its subsidiaries (collectively, the "Company Parties" or the "Debtors," as applicable) (the "Restructuring Transactions"). Unless a mutually satisfactory out-of-court transaction can be implemented, the Restructuring Transactions will be accomplished through the Company Parties commencing cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to implement the chapter 11 plan of reorganization described herein (the "Plan"). The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Restructuring Transactions have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring Transactions. The Restructuring Transactions detailed in this Term Sheet are subject in all respects to the negotiation, execution, and delivery of definitive documentation.

This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use by or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

This Term Sheet does not purport to summarize all of the terms, conditions, covenants, and other provisions that may be contained in the fully negotiated and definitive documentation necessary to implement the Restructuring Transactions. Capitalized terms used but not initially defined in this Term Sheet shall have the meaning hereinafter ascribed to such terms, or if not defined in this Term Sheet, such terms shall have the meaning ascribed to such terms in the Restructuring Support Agreement (as defined below).

| Restructuring Summary | |
| --- | --- |
| *Overview* | The Company Parties will implement the Restructuring Transactions in accordance with the Restructuring Support Agreement (the "Restructuring Support Agreement"), to which this Term Sheet shall be attached and incorporated by reference. The Restructuring Transactions will be implemented pursuant to the Plan to be confirmed by the Bankruptcy Court and occur on the date the Plan becomes effective (the "Plan Effective Date"). |
| *Claims and Interests to be Restructured* | **RBL Facility.** All claims for unpaid principal, interest, fees, costs, charges, premiums and other amounts arising under or in connection with that certain Credit Agreement, dated as of December 21, 2018 (as may be amended, amended and restated, supplemented, or otherwise modified from time to time, the "RBL Credit Agreement"), by and among Arsenal Resources Development LLC ("ARD")—as borrower, the |

guarantors party thereto, Citibank N.A., as administrative agent (the "RBL Agent"), and the lenders party thereto from time to time (the "RBL Lenders"), shall be deemed allowed in the aggregate principal amount of approximately $117 million as of the Petition Date, plus outstanding letters of credit in an aggregate amount of approximately $28 million as of the Petition Date, less any principal that is "rolled up" into the DIP Facility (as defined below), plus all accrued but unpaid interest, fees, costs, charges, premiums or other amounts arising under the RBL Credit Agreement at the non-default rate (collectively, the "RBL Claims").

***Term Loan Facility***.  All claims for unpaid principal, interest, fees, costs, charges, premiums and other amounts arising under or in connection with that certain Credit Agreement, dated as of December 21, 2018 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Term Loan Credit Agreement"), by and among Arsenal Resources Development Holdings 1 LLC ("ARDH1"), as borrower, Chambers Energy Management, LP, as administrative agent (the "Term Loan Agent"), and the lender parties thereto from time to time (the "Term Loan Lenders"), shall be deemed allowed in the aggregate principal amount of approximately $233 million as of the Petition Date (including interest and fees that have been paid-in-kind and capitalized), plus all accrued but unpaid interest, fees, costs, charges, premiums or other amounts arising under the Term Loan Credit Agreement (collectively, the "Term Loan Claims").

***Seller Notes***.  All claims for unpaid principal, interest, fees, costs, premiums and other amounts arising under or in connection with:  (a) that certain Seller Note, dated as of October 14, 2014 (as amended, supplemented, or otherwise modified from time to time, the "Chambers Seller Note"), in the original principal amount of $39,047,625.00, issued by AEH in favor of PDC Energy, Inc., as original seller, which note was sold and assigned pursuant to the Note Purchase Agreement, dated April 28, 2017, to Chambers Energy Capital II LP, Chambers Energy Capital II TE, LP and Chambers Energy Capital III, LP, as assignees and purchasers; (b) that certain Seller Note, dated as of October 14, 2014, in the original principal amount of $39,047,625.00, issued by AEH in favor of LR-Mountaineer Holdings, L.P., as seller (as amended, supplemented, or otherwise modified from time to time, the "LRMH Seller Note," and, together with the Chambers Seller Note, each as amended by Amendment No. 1 to the Notes, dated December 21, 2018, the "Seller Notes"); and (c) the ARHD 2 Guaranty, the ARDH 2 Collateral Agreement, under which LR-Mountaineer Holdings, L.P. is the collateral agent (the "Seller Notes Agent"), the Collateral Agency Agreement, dated December 21, 2018, and the Subordination Agreement (each as defined in the Seller Notes) (together with the Seller Notes, the "Seller Notes Documents") shall be deemed allowed in the aggregate principal amount of approximately $128 million as of the Petition Date (including interest that has been paid-in-kind and capitalized), plus all accrued but unpaid interest, fees, costs, charges, premiums or other amounts arising under the Seller Notes Documents (collectively, the "Seller Notes Claims").

***Existing HoldCo Equity Interests.*** The equity interests in AEH, Arsenal Resources Intermediate Holdings LLC ("ARIH"), Arsenal Resources Energy LLC ("ARE") and Arsenal Resources Development Holdings 2 LLC ("ARDH2") issued and outstanding as of the Petition Date (the "Existing HoldCo Equity Interests").

***Existing ARDH1 Equity Interests***.  The equity interests in ARDH1 issued and outstanding as of the Petition Date (the "Existing ARDH1 Equity Interests").

***Existing OpCo Equity Interests***.  The equity interests in the OpCo Debtors (as defined below) issued and outstanding as of the Petition Date (the "Existing OpCo Equity Interests").

| *Securities to be Issued* | *New Common Equity*<br><br>On the Plan Effective Date, or in the case of units issued in connection with a Management Incentive Plan (as defined below), on or as soon as reasonably practicable following the Plan Effective Date, Reorganized Arsenal shall issue the New Common Equity, consisting of Class A units and units issued in connection with a Management Incentive Plan (as defined below) (if any), subject to dilution as set forth herein. The Class A units of New Common Equity shall carry voting rights in accordance with the Governance Term Sheet. | |
|---|---|---|
| **Treatment of Claims and Interests of the Debtors Under the Plan** | | |
| **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | |
| DIP Facility Claims | Except to the extent that a holder of an allowed DIP Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed DIP Facility Claim, on the Plan Effective Date each holder of an allowed DIP Facility Claim shall be paid in full in cash from proceeds of the New RBL Facility and/or the New Equity Issuance.<br><br>"<u>DIP Facility Claim</u>" means an allowed claim arising under the DIP Facility. | N/A |
| Administrative Claims | Except to the extent that a holder of an allowed Administrative Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed Administrative Claim, each holder thereof shall receive, at the option of the Debtors and with the reasonable consent of the Required Consenting Term/Seller Stakeholders: (a) payment in full in cash of the due and unpaid portion of its Administrative Claim on the later of (x) the Plan Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as practicable after the date such claim becomes due and payable; (b) such other treatment to render such Administrative Claim unimpaired under section 1124 of the Bankruptcy Code; or (c) such other treatment as such holder may agree to or as otherwise permitted by section 1129(a)(9) of the Bankruptcy Code.<br><br>"<u>Administrative Claim</u>" means a claim for costs and expenses of administration of each of the Debtors' respective estates (the "<u>Estates</u>") under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) allowed professional fee claims in the Chapter 11 Cases; (c) all allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; and (d) all fees and charges assessed against the Estates under | N/A |

3

| | | |
|---|---|---|
| | chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930. | |
| Priority Tax Claims | Except to the extent that a holder of a Priority Tax Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during the Chapter 11 Cases in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed Priority Tax Claim, on the Plan Effective Date each holder of such allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.<br><br>"Priority Tax Claim" means any claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | |
| Other Secured Claims | Except to the extent that a holder of an allowed Other Secured Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Other Secured Claim, each holder thereof shall receive, at the option of the Debtors and with the reasonable consent of the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders: (a) payment in full in cash of the due and unpaid portion of its Other Secured Claim on the later of (x) the Plan Effective Date (or as soon thereafter as reasonably practicable) and (y) as soon as practicable after the date such claim becomes due and payable; (b) the collateral securing its allowed Other Secured Claim; (c) reinstatement of its allowed Other Secured Claim; or (d) such other treatment rendering its allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code.<br><br>"Other Secured Claim" means any secured claim against any Debtor, other than an RBL Claim, a Term Loan Claim, a Seller Notes Claim, or a DIP Facility Claim, including any secured tax Claim. | Unimpaired; deemed to accept |
| Other Priority Claims | Except to the extent that a holder of an allowed Other Priority Claim agrees to less favorable treatment, to the extent such claim has not already been paid in full during the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Other Priority Claim, each holder thereof shall receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, in each case, as determined by the Debtors with the reasonable consent of the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders.<br><br>"Other Priority Claim" means any claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. | Unimpaired; deemed to accept |
| RBL Claims | Except to the extent that a holder of an allowed RBL Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed RBL Claim, on the Plan Effective Date each holder of an allowed RBL Claim shall be paid in full in cash from proceeds of the New RBL Facility and/or the New Capital Commitment. | Unimpaired; deemed to accept |

| Term Loan Claims | Except to the extent that a holder of an allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Term Loan Claim, on the Plan Effective Date each holder thereof shall receive its interest in the Term Loan Recovery.<br><br>"Term Loan Recovery" means (a) if the Seller Notes Claims vote to accept the Plan, 104,080,965 Class A Units to Chambers Energy Capital II, LP, 12,746,181 Class A Units to Chambers Energy Capital II TE, LP and 128,321,603 Class A Units to Mercuria Energy Company, LLC; or (b) if the Seller Notes Claims vote to reject the Plan, its pro rata share of 196,436,500 Class A Units, in each case subject to dilution on account of the New Capital Commitment. | Impaired; entitled to vote |
|---|---|---|
| Seller Notes Claims | Except to the extent that a holder of an allowed Seller Notes Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed Seller Notes Claim, on the Plan Effective Date each holder thereof shall receive:<br><br>(A) if the Seller Notes Claims vote to accept the Plan, 7,570,392 Class A Units to Chambers Energy Capital II, LP, 927,101 Class A Units to Chambers Energy Capital II TE, LP, 25,780,361 Class A Units to Chambers Energy Capital III, LP and 22,783,397 Class A Units to LR-Mountaineer Holding, L.P., subject to dilution on account of the New Capital Commitment; or<br><br>(B) if the Seller Notes Claims vote to reject the Plan, no recovery, and such claim shall receive no recovery, be cancelled, released, and discharged without any distribution. | Impaired; entitled to vote |
| OpCo GUC Claims | Except to the extent that a holder of an allowed OpCo GUC Claim has already been paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its allowed OpCo GUC Claim, each holder of an allowed OpCo GUC Claim shall receive, at the Debtors' option and with the reasonable consent of the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders: (i) if such allowed OpCo GUC Claim is due and payable on or before the Plan Effective Date, payment in full, in Cash, of the unpaid portion of its allowed OpCo GUC Claim on the Plan Effective Date; (ii) if such allowed OpCo GUC Claim is not due and payable before the Plan Effective Date, payment in the ordinary course of business consistent with past practices; or (iii) other treatment, as may be agreed upon by the Debtors, the Required Consenting Term Loan Lenders, and the Required Consenting Seller Noteholders, and the holder of such allowed OpCo GUC Claim, such that the allowed OpCo GUC Claim shall be rendered unimpaired pursuant to section 1124(1) of the Bankruptcy Code.<br><br>"OpCo GUC Claim" means any claim that is not an Administrative Claim, DIP Facility Claim, Priority Tax Claim, Other Priority Claim, RBL Claim, Term Loan Claim, Seller Note Claim, Gathering Agreement Claim, Intercompany Claim or Section 510(b) Claim, AEH GUC Claim, ARIH GUC Claim, ARDH2 GUC Claim, ARDH1 GUC Claim and that also is a Claim against any of the following Debtors: ARD, Arsenal Gas Marketing LLC, Arsenal Midstream LLC, Arsenal Water LLC, Ulysses Gathering LLC, Mar Key LLC, Arsenal | Unimpaired; deemed to accept |

|  | Resources LLC, River Ridge Energy Holdings, LLC, River Ridge Energy, LLC, River Ridge Pennsylvania, LLC, River Ridge Operating, LLC, Seneca-Upshur Petroleum or Arsenal Resources Development LLC (collectively, the "OpCo Debtors"). |  |
|---|---|---|
| AEH GUC Claims | On the Plan Effective Date, holders of allowed AEH GUC Claims (if any) shall receive no recovery, and such claims shall be cancelled, released, and discharged without any distribution.<br><br>"AEH GUC Claim" means any claim against AEH that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Term Loan Claim, Seller Notes Claim, Gathering Agreement Claim, Intercompany Claim, DIP Facility Claim or Section 510(b) Claim. | Impaired; deemed to reject |
| ARIH GUC Claims | Except to the extent that a holder of an allowed ARIH GUC Claim has already been paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its allowed ARIH GUC Claim, each holder of an allowed ARIH GUC Claim shall receive, at the Debtors' option and with the reasonable consent of the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders: (i) if such allowed ARIH GUC Claim is due and payable on or before the Plan Effective Date, payment in full, in Cash, of the unpaid portion of its allowed ARIH GUC Claim on the Plan Effective Date; (ii) if such allowed ARIH GUC Claim is not due and payable before the Plan Effective Date, payment in the ordinary course of business consistent with past practices; or (iii) other treatment, as may be agreed upon by the Debtors, the Required Consenting Term Loan Lenders, and the Required Consenting Seller Noteholders, such that the allowed ARIH GUC Claim shall be rendered unimpaired pursuant to section 1124(1) of the Bankruptcy Code.<br><br>"ARIH GUC Claim" means any claim against ARIH that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Term Loan Claim, Seller Notes Claim, Gathering Agreement Claim, Intercompany Claim, DIP Facility Claim or Section 510(b) Claim. | Unimpaired; deemed to accept |
| ARDH2 GUC Claims | On the Plan Effective Date, holders of allowed ARDH2 GUC Claims (if any) shall receive no recovery, and such claims shall be cancelled, released, and discharged without any distribution.<br><br>"ARDH2 GUC Claim" means any claim against ARDH2 that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Term Loan Claim, Seller Note Claim, Gathering Agreement Claim, Intercompany Claim, DIP Facility Claim or Section 510(b) Claim. | Impaired; deemed to reject |
| ARDH1 GUC Claims | On the Plan Effective Date, holders of allowed ARDH1 GUC Claims (if any) shall receive no recovery, and such claims shall be cancelled, released, and discharged without any distribution.<br><br>"ARDH1 GUC Claim" means any claim against ARDH1 that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Term Loan Claim, Seller Notes Claim, Gathering Agreement Claim, Intercompany Claim, DIP Facility Claim or Section 510(b) Claim. | Impaired; deemed to reject |
| Gathering Agreement Claims | On the Plan Effective Date, holders of allowed Gathering Agreement Claims (if any) shall receive no recovery, and such claims shall be cancelled, released, and discharged without any distribution. | Impaired; deemed to reject |

6

| | "Gathering Agreement Claim" means any claim arising under the Gathering Agreements. | |
|---|---|---|
| Intercompany Claims | On the Plan Effective Date, each Intercompany Claim shall be, at the option of the Debtors and with the reasonable consent of the Required Consenting Term/Seller Stakeholders, either reinstated, compromised, or canceled and released without any distribution. | Impaired, deemed to reject; Unimpaired, deemed to accept |
| Existing OpCo Equity Interests | On the Plan Effective Date, the Existing OpCo Equity Interests shall be reinstated. | Unimpaired, deemed to accept |
| Existing ARDH1 Equity Interests | On the Plan Effective Date, the Existing ARDH1 Equity Interests shall be canceled and the New Equity Interests shall be issued pursuant to the Plan. Holders of Existing ARDH1 Equity Interests shall receive no recovery on account of such Existing ARDH1 Equity Interests. | Impaired; deemed to reject |
| Existing HoldCo Equity Interests | On the Plan Effective Date, the Existing HoldCo Equity Interests shall be canceled and ARDH2, ARE, ARIH and AEH shall be dissolved pursuant to the Plan. Holders of Existing HoldCo Equity Interests shall receive no recovery on account of such Existing HoldCo Equity Interests. | Impaired; deemed to reject |
| Section 510(b) Claims | Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to holders of such claims. | Impaired; deemed to reject |

| **Implementation & Material Provisions** |
|---|

| | |
|---|---|
| ***DIP Facility and Cash Collateral*** | On or after the Petition Date, the Debtors will enter into a new debtor-in-possession financing facility with Citibank, N.A., as the administrative agent (the "<u>DIP Agent</u>") and the RBL Lenders party thereto from time to time (in such capacity, the "<u>DIP Lenders</u>"), having a principal amount of up to $90 million (the "<u>DIP Facility</u>" and the documents governing the DIP Facility, including the DIP Credit Agreement, the "<u>DIP Facility Documents</u>"), of which $45 million shall be rolled-up RBL Loans on the terms set forth in the credit agreement attached as **Annex 1** to this Term Sheet (the "<u>DIP Credit Agreement</u>").  The milestones under the DIP Facility shall be consistent with the Milestones set forth in <u>Schedule 1</u> of the Restructuring Support Agreement, subject to such additional milestones to reflect the six month tenor of the DIP Facility. |
| ***New Equity Issuance*** | Subject to the satisfaction of the conditions and requirements set forth on **Annex 2** to this Term Sheet (the "<u>New Equity Term Sheet</u>"), each Consenting Stakeholder that is a New Capital Party, severally and not jointly, agrees to provide (or, without releasing its commitments, cause any of its designees to provide) its respective portion of $100 million of new capital (in the amount set forth on its signature page hereto) to Reorganized Arsenal for the purchase of New Common Equity (the "<u>New Capital Commitment</u>") on the terms and conditions as set forth in the New Equity Term Sheet.  For the avoidance of doubt, upon termination or expiration of the Restructuring Support Agreement by such Consenting Stakeholder in accordance with its terms, the commitment of such Consenting Stakeholder made pursuant to Section 4.04 of the Restructuring Support Agreement to provide its respective portion of the New Capital Commitment shall terminate except to the extent such termination is the result of a breach by such Consenting Stakeholder or consummation of the Restructuring Transaction. |
| ***New RBL Facility*** | Subject to the terms of the New RBL Facility Commitment Letter, on the Plan Effective Date, Reorganized Arsenal and each holder of an RBL Claim (each, a "<u>New RBL Lender</u>") shall enter into a new revolving credit facility (the "<u>New RBL Facility</u>" and the documents governing the New RBL Facility, the "<u>New RBL Facility Documents</u>"), with commitments equal to $130 million, on the terms set forth on **Annex 3** to this Term Sheet (the "<u>New RBL Facility Term Sheet</u>").  Proceeds of the New RBL Facility shall be used to repay the DIP Facility Claims and RBL Claims and for working capital. |
| ***Conditions Precedent to the Plan Effective Date*** | The occurrence of the Plan Effective Date shall be subject to the following conditions precedent:<br><br>• the Restructuring Support Agreement shall have been executed and shall not have been terminated and remains in full force and effect;<br><br>• the Plan shall have been confirmed by the Bankruptcy Court and all related Plan exhibits and other documents shall have been executed and delivered, and any conditions (other than the occurrence of the Plan Effective Date or certification by the Debtors that the Plan Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith;<br><br>• the Restructuring Transactions shall have been consummated, including the New Capital Commitment, and all transactions contemplated herein, in a manner consistent in all respects with the Restructuring Support Agreement, this Term Sheet, and the Plan;<br><br>• the orders approving the Disclosure Statement and confirming the Plan shall have been entered, consistent with the Restructuring Support Agreement, and such orders shall not have been vacated, stayed, or modified without the consent of the Required Consenting Term/Seller Stakeholders; |

|  | <ul><li>the New RBL Facility and any related documents shall have been executed, delivered, and be in full force and effect (with all conditions precedent thereto having been satisfied or waived (other than the occurrence of the Plan Effective Date or certification by the Debtors that the Plan Effective Date has occurred));</li><li>the New Common Equity contemplated to be issued pursuant to the Plan shall have been issued, including all New Common Equity to be issued in exchange for the New Capital Commitment, which shall have been fully funded in an amount equal to $100,000,000;</li><li>all accrued and unpaid fees and expenses of the Consenting Stakeholders (including the reasonable and documented fees and expenses incurred by the Consenting Stakeholder Advisors) in connection with the Restructuring Transactions shall have been paid in accordance with the terms and conditions set forth in the Restructuring Support Agreement; and</li><li>any and all requisite governmental, regulatory, environmental, and third-party approvals and consents shall have been obtained.</li></ul> |
|---|---|
| ***Dissolution*** | On the Plan Effective Date, each of AEH, ARIH, ARE and ARDH2 shall be dissolved under the laws of the applicable state of formation for each such Debtor (each a "<u>HoldCo Debtor</u>"). |

| **Miscellaneous Provisions** ||
|---|---|
| ***Management Incentive Plan*** | On or as soon as reasonably practicable following the Plan Effective Date, Reorganized Arsenal will implement a management incentive plan (the "<u>Management Incentive Plan</u>") that will reserve a percentage to be determined by the New Board (acting in its sole discretion) of up to 10% of the New Common Equity (which may be in the form of a combination of profits interests and/or full value units awards, as determined by the New Board in its sole discretion), on a fully diluted basis, to be issued to management and/or other employees of Reorganized Arsenal after the Plan Effective Date at the discretion of the New Board and on terms to be determined by the New Board (including with respect to allocation, timing, and structure of such issuance and the Management Incentive Plan). |
| ***Corporate Governance*** | On the Plan Effective Date, the Company Parties other than the HoldCo Debtors will enter into new corporate governance documents, including charters, bylaws, operating agreements, or other organization or formation documents, as applicable (the "<u>New Organizational/Governance Documents</u>"), on terms materially consistent with those set forth on **Annex 4** to this Term Sheet (the "<u>Governance Term Sheet</u>"), which shall otherwise be in form and substance acceptable to the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders. |
| ***Board of Directors*** | On the Plan Effective Date, the board of directors of Reorganized Arsenal (the "<u>New Board</u>") shall be constituted in accordance with the Governance Term Sheet and the New Organizational/Governance Documents. |
| ***Good Faith Negotiations/Tax Issues*** | The Parties shall negotiate in good faith any amendments or modifications to the Restructuring Support Agreement, this Term Sheet, and/or any final agreement (including, but not limited to, those provisions relating to the organization structure of the Debtors and the Governance Term Sheet) to achieve (as agreed to by the Parties) the most tax efficient and advantageous structure of the Restructuring Transactions. |

| | |
|---|---|
| **Releases** | The Plan and the Confirmation Order will contain the exculpation provisions, the Debtor releases, and the "third-party" releases substantially in the form set forth in **Annex 5** to this Term Sheet. |
| **Gathering Agreements** | The Gathering Agreements shall be either (a) rejected pursuant to section 365 of the Bankruptcy Code or (b) assumed, assumed and amended or assumed, amended and assigned, in each (a) or (b) on terms acceptable to the New Capital Parties, the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders; *provided that,* the EQM Gathering Agreement and the Fullstream Gathering Agreement shall be assumed on the amended terms described in Exhibit F to the Restructuring Support Agreement. |
| **Executory Contracts and Unexpired Leases** | On the Plan Effective Date, each Executory Contract and Unexpired Lease of ARDH1 and the OpCo Debtors shall be assumed by the Company Parties, unless determined to be rejected by the Debtors, with the reasonable consent of the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders and, to the extent any one or more of the Debtors seeks to reject any Secured Swap Agreement, as defined in the RBL Credit Agreement, the consent of the Secured Swap Party who is a party to such Secured Swap Agreement. <br><br> On the Plan Effective Date, each Executory Contract and Unexpired Lease of the HoldCo Debtors (except with respect to the Gathering Agreements, which shall be treated as above) shall be rejected by the HoldCo Debtors, unless determined to be assumed by the HoldCo Debtors, with the reasonable consent of the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders. Any Executory Contract or Unexpired Lease to be assumed by a HoldCo Debtor shall be assigned to an OpCo Debtor on the Plan Effective Date. |
| **Survival of Indemnification Obligations and D&O Insurance** | Any obligations of the Debtors  pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of the Debtors  will not be discharged or impaired by confirmation of the Plan. All such obligations, including such obligations of the HoldCo Debtors,  will be deemed and treated as executory contracts to be assumed by the OpCo Debtors. <br><br> In addition, after the Plan Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Reorganized Debtor who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date. |
| **KERP** | The Company Parties have adopted an employee retention program, whose terms and conditions may not be modified in any material respect without the consent of the Required Consenting Term Loan Lenders and the Required Consenting Seller Noteholders. The retention program will be assumed pursuant to the Plan. |

**<u>Annex 1</u>**

**DIP Credit Agreement**

**Execution Version**

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

dated as of November [●], 2019,

among

ARSENAL RESOURCES DEVELOPMENT LLC,
as Borrower,

and

the other Loan Parties party hereto,

and

CITIBANK, N.A.,
as Administrative Agent

and

the Lenders party hereto

CITIGROUP GLOBAL MARKETS INC.,
as Lead Arranger and Bookrunner

# TABLE OF CONTENTS

**Page**

### ARTICLE I
### DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01   Terms Defined Above ............................................................................................ 1
Section 1.02   Certain Defined Terms ........................................................................................... 1
Section 1.03   Types of Loans and Borrowings ........................................................................... 32
Section 1.04   Terms Generally; Rules of Construction ............................................................. 32
Section 1.05   Accounting Terms and Determinations; GAAP .................................................. 33
Section 1.06   Reserved. ............................................................................................................... 33
Section 1.07   Times of Day ......................................................................................................... 33
Section 1.08   Timing of Payment or Performance ..................................................................... 33
Section 1.09   Currencies Generally ............................................................................................ 33
Section 1.10   Negative Covenant Compliance ........................................................................... 33
Section 1.11   Letter of Credit Amounts ..................................................................................... 33
Section 1.12   Rounding .............................................................................................................. 34
Section 1.13   Divisions .............................................................................................................. 34

### ARTICLE II
### THE CREDITS

Section 2.01   Commitments ........................................................................................................ 34
Section 2.02   Loans and Borrowings ......................................................................................... 34
Section 2.03   Requests for Borrowings ...................................................................................... 35
Section 2.04   Interest Elections .................................................................................................. 36
Section 2.05   Funding of Borrowings ........................................................................................ 37
Section 2.06   Termination and Reduction of Aggregate Commitments ..................................... 38
Section 2.07   Letters of Credit ................................................................................................... 38
Section 2.08   Collateral; Guarantee ........................................................................................... 44

### ARTICLE III
### PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01   Repayment of Loans ............................................................................................ 45
Section 3.02   Interest ................................................................................................................. 45
Section 3.03   Inability to Determine Rates ................................................................................ 46
Section 3.04   Prepayments ......................................................................................................... 47
Section 3.05   Fees ...................................................................................................................... 49

### ARTICLE IV
### PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01   Payments Generally; Pro Rata Treatment; Sharing of Set-offs .......................... 50
Section 4.02   Presumption of Payment by the Borrower ........................................................... 51
Section 4.03   Disposition of Proceeds ....................................................................................... 51
Section 4.04   Defaulting Lenders ............................................................................................... 51

### ARTICLE V
### INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01   Increased Costs ..................................................................................................... 53
Section 5.02   Break Funding Payments ..................................................................................... 55
Section 5.03   Taxes .................................................................................................................... 55

Section 5.04    Matters Applicable to All Requests for Compensation ............................................... 58
Section 5.05    Mitigation Obligations ............................................................................................... 59
Section 5.06    Illegality ..................................................................................................................... 59

ARTICLE VI
CONDITIONS PRECEDENT

Section 6.01    Interim Facility Effective Date .................................................................................. 59
Section 6.02    Final Facility Effective Date ...................................................................................... 61
Section 6.03    Conditions Precedent to Each Borrowing .................................................................. 62

ARTICLE VII
REPRESENTATIONS AND WARRANTIES

Section 7.01    Organization; Powers ................................................................................................. 63
Section 7.02    Authority; Enforceability ........................................................................................... 63
Section 7.03    Approvals; No Conflicts ............................................................................................. 63
Section 7.04    Financial Condition; No Material Adverse Change .................................................... 64
Section 7.05    Litigation .................................................................................................................... 64
Section 7.06    Environmental Matters ............................................................................................... 64
Section 7.07    Compliance with Laws ............................................................................................... 65
Section 7.08    Investment Company Act ........................................................................................... 65
Section 7.09    Taxes .......................................................................................................................... 65
Section 7.10    ERISA ........................................................................................................................ 65
Section 7.11    Disclosure; No Material Misstatements ...................................................................... 66
Section 7.12    Subsidiaries ................................................................................................................ 66
Section 7.13    Location of Business and Offices ............................................................................... 66
Section 7.14    Properties; Maintenance of Properties; Titles, Etc. .................................................... 67
Section 7.15    Gas Imbalances, Prepayments .................................................................................... 67
Section 7.16    Marketing of Production ............................................................................................. 67
Section 7.17    Swap Agreements ....................................................................................................... 68
Section 7.18    Use of Loans and Letters of Credit ............................................................................ 68

ARTICLE VIII
AFFIRMATIVE COVENANTS

Section 8.01    Financial Statements; Other Information .................................................................... 68
Section 8.02    Notices of Material Events ......................................................................................... 70
Section 8.03    Existence; Conduct of Business .................................................................................. 70
Section 8.04    Payment of Tax Obligations ....................................................................................... 71
Section 8.05    Operation and Maintenance of Properties ................................................................... 71
Section 8.06    Insurance .................................................................................................................... 71
Section 8.07    Books and Records; Inspection Rights ....................................................................... 71
Section 8.08    Compliance with Laws ............................................................................................... 72
Section 8.09    Environmental Matters ............................................................................................... 72
Section 8.10    Further Assurances ..................................................................................................... 72
Section 8.11    Additional Collateral; Additional Guarantors ............................................................ 73
Section 8.12    ERISA Compliance .................................................................................................... 73
Section 8.13    Swap Agreements ....................................................................................................... 73
Section 8.14    [Reserved] .................................................................................................................. 73
Section 8.15    Cash Management ....................................................................................................... 73
Section 8.16    Use of Proceeds ......................................................................................................... 73
Section 8.17    Milestones .................................................................................................................. 74
Section 8.18    Post-Interim Facility Effective Date Covenants ......................................................... 74

ii

# ARTICLE IX
## NEGATIVE COVENANTS

Section 9.01    Financial Performance Covenant ........................................................ 74
Section 9.02    Indebtedness ................................................................................... 74
Section 9.03    Liens ............................................................................................. 75
Section 9.04    Dividends, Distributions and Redemptions ...................................... 75
Section 9.05    Investments, Loans and Advances .................................................. 76
Section 9.06    Nature of Business; International Operations ................................... 76
Section 9.07    Limitation on Operating Leases ..................................................... 77
Section 9.08    Mergers, Etc. ................................................................................ 77
Section 9.09    Sale of Properties .......................................................................... 77
Section 9.10    Transactions with Affiliates ........................................................... 78
Section 9.11    Subsidiaries ................................................................................... 78
Section 9.12    Negative Pledge Agreements; Dividend Restrictions ...................... 78
Section 9.13    Gas Imbalances, Take-or-Pay or Other Prepayments ...................... 79
Section 9.14    Swap Agreements .......................................................................... 79
Section 9.15    Marketing Activities ...................................................................... 79
Section 9.16    Accounting Changes ...................................................................... 80
Section 9.17    Key Employee Plans ...................................................................... 80
Section 9.18    Superpriority Claims ..................................................................... 80

# ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01    Events of Default ......................................................................... 80
Section 10.02    Remedies ..................................................................................... 82

# ARTICLE XI
## THE ADMINISTRATIVE AGENT

Section 11.01    Appointment; Powers .................................................................... 83
Section 11.02    Duties and Obligations of Administrative Agent ............................ 83
Section 11.03    Action by Administrative Agent ..................................................... 84
Section 11.04    Reliance by Administrative Agent .................................................. 84
Section 11.05    Subagents ..................................................................................... 85
Section 11.06    Resignation or Removal of Administrative Agent ........................... 85
Section 11.07    Administrative Agent as Lender ..................................................... 86
Section 11.08    No Reliance ................................................................................... 86
Section 11.09    Administrative Agent May File Proofs of Claim ............................. 86
Section 11.10    Authority of Administrative Agent to Release Guarantors, Collateral and
                 Liens ............................................................................................. 87
Section 11.11    The Arranger ................................................................................ 87
Section 11.12    Secured Cash Management Agreements ......................................... 87

# ARTICLE XII
## MISCELLANEOUS

Section 12.01    Notices ......................................................................................... 88
Section 12.02    Waivers; Amendments ................................................................... 90
Section 12.03    Expenses; Indemnity; Damage Waiver ........................................... 92
Section 12.04    Successors and Assigns; Holdings Term Loan Creditors ................. 94
Section 12.05    Survival; Revival; Reinstatement ................................................... 98
Section 12.06    Counterparts; Integration; Effectiveness ........................................ 98
Section 12.07    Severability ................................................................................... 99

Section 12.08     Right of Setoff ................................................................................... 99
Section 12.09     GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF
                  PROCESS ...................................................................................... 100
Section 12.10     Headings ....................................................................................... 101
Section 12.11     Confidentiality ............................................................................. 101
Section 12.12     Interest Rate Limitation ............................................................... 102
Section 12.13     Collateral Matters; Secured Swap Agreements ......................... 102
Section 12.14     PATRIOT Act Notice ................................................................... 102
Section 12.15     Electronic Execution of Assignments ........................................ 103
Section 12.16     Release of Liens and Release from Loan Guarantee ................. 103
Section 12.17     Flood Insurance Provisions ......................................................... 104
Section 12.18     No Advisor or Fiduciary Responsibility ..................................... 104
Section 12.19     Cashless Settlement ..................................................................... 105
Section 12.20     Acknowledgement Regarding Any Supported QFCs ................ 105

ARTICLE XIII<br>LOAN GUARANTEE

Section 13.01     Guarantee ...................................................................................... 106
Section 13.02     Guarantee of Payment ................................................................. 106
Section 13.03     Special Guaranty to Confer ECP Status ..................................... 106
Section 13.04     No Limitations ............................................................................. 106
Section 13.05     Reinstatement ............................................................................... 107
Section 13.06     Contribution; Subrogation ........................................................... 107
Section 13.07     Information .................................................................................... 108
Section 13.08     Taxes ............................................................................................. 108
Section 13.09     Limitation of Liability ................................................................. 108
Section 13.10     Indemnity; Subrogation and Subordination ................................ 108
Section 13.11     Representations and Warranties .................................................. 109

<u>Annexes, Exhibits and Schedules</u>

Annex I                  Refinanced Loan Amounts
Annex II                 New Money Loan Commitments and LC Issuance Limits

Exhibit A                Form of Note
Exhibit B                Form of Borrowing Request
Exhibit C                Form of Interest Election Request
Exhibit D                Form of Compliance Certificate
Exhibit E                Form of Assignment and Assumption
Exhibit F                Form of Interim Order
Exhibit G                Form of Partial Release of Liens
Exhibit H                Form of Cash Management Order

Schedule 1.1(a)          Interim Facility Effective Date Guarantors
Schedule 1.1(b)          Existing Letters of Credit
Schedule 7.05            Litigation
Schedule 7.06            Environmental Matters
Schedule 7.12            Subsidiaries and Partnerships
Schedule 7.15            Gas Imbalances
Schedule 7.16            Marketing Contracts
Schedule 7.17            Swap Agreements

iv

Schedule 9.02(b)          Interim Facility Effective Date Indebtedness
Schedule 9.03(b)          Interim Facility Effective Date Liens
Schedule 9.12(a)          Negative Pledge Agreements
Schedule 12.01            Certain Addresses for Notices

LEGAL_US_E # 144284119.14

This **SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of November [●], 2019, is among Arsenal Resources Development LLC, a Delaware limited liability company (the "<u>Borrower</u>"), each of the Lenders from time to time party hereto, Citibank, N.A., as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "<u>Administrative Agent</u>"), and each Issuing Bank from time to time party hereto.

## R E C I T A L S

The Borrower has entered into a Credit Agreement, dated as of December 21, 2018 (as amended and in effect prior to the date hereof, the "<u>Pre-Petition Credit Agreement</u>"), among the Borrower, Citibank, N.A., as administrative agent, and each lender and each issuing bank from time to time party thereto.

On November [●], 2019, (the "<u>Petition Date</u>"), each of the Loan Parties (collectively, the "<u>RBL Debtors</u>") filed a voluntary petition for relief (collectively, the "<u>Cases</u>") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). The Debtors are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

In conjunction with the Cases, Arsenal Energy Holdings LLC, a Delaware limited liability company, Arsenal Resources Intermediate Holdings LLC, a Delaware limited liability company, Arsenal Resources Energy LLC, a Delaware limited liability company, Arsenal Resources Development Holdings 2 LLC, a Delaware limited liability company and Arsenal Resources Development Holdings 1 LLC, a Delaware limited liability company, (the "<u>Parent Company Debtors</u>" and, collectively with the RBL Debtors, the "<u>Debtors</u>") have also filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

The Borrower has requested that the Lenders provide the Borrower with a senior secured super-priority debtor-in-possession revolving credit facility in an aggregate principal amount of up to $90,000,000 (the "<u>DIP Facility</u>") in commitments and loans from the Lenders, which shall consist of (a) a new money revolving loan facility in the aggregate principal amount of up to $45,000,000, which shall include a sub-facility of up to $5,000,000 for the issuance of Letters of Credit (collectively, the "<u>New Money Facility</u>") and (b) a $45,000,000 term loan upon entry of the Final Order, to roll up a portion of the existing outstanding obligations under the Pre-Petition Credit Agreement (the "<u>Refinancing Facility</u>"), in each case to be afforded the liens and priority set forth in the DIP Order and as set forth in the other Loan Documents and to be used during the Cases for the purposes set forth in <u>Section 8.16</u>, and up to $30,000,000 of which New Money Facility shall be available for borrowings and other extensions of credit as of the Interim Facility Effective Date.

In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    <u>Terms Defined Above</u>.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02    <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms have the meanings specified below:

"ABR" when used in reference to any Loan or Borrowing, refers to such Loan, or the Loans comprising such Borrowing, bearing interest at a rate determined by reference to the Alternate Base Rate.

"Adequate Protection Obligations" means the entitlement of parties to adequate protection of their interests in certain pre-petition collateral in an amount equal to the aggregate diminution in value of such interests as set forth (a) in respect of parties to the Pre-Petition Credit Agreement, the definition of "Prepetition First Lien Adequate Protection", (b) in respect of parties to the Holdings Term Loan Facility, the definition of  "Prepetition Term Loan Adequate Protection" and (c) in respect of parties to the Seller Notes, the definition of "Prepetition Seller Note Adequate Protection", in each case as defined in and to the extent set forth in the DIP Order.

"Adjusted Aggregate Commitments" means, at any time, the Aggregate Commitments minus the aggregate amount of the Commitments of all Defaulting Lenders.

"Administrative Agent" has the meaning set forth in the preamble hereto.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent Parties" has the meaning set forth in Section 12.01(e).

"Aggregate Commitments" means the sum of the Commitments of all New Money Lenders.  The Aggregate Commitments shall be $45,000,000.

"Agreement" means this Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Alternate Base Rate" means, for any day a fluctuating rate per annum equal to the greatest of (a) the Federal Funds Effective Rate plus one-half of one percent (1/2 of 1.0%), (b) the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its Prime Rate and (c) the Eurodollar Rate having an Interest Period of one (1) month on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus one percent (1.0%).  "Prime Rate" means a rate of interest per annum publicly announced by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Eurodollar Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Eurodollar Rate, respectively.

"Applicable Margin" means for any day with respect to Loan that is (a) an ABR Loan, 4.50% and (b) a Eurodollar Loan, 5.50%.

"Applicable Percentage" means, with respect to any New Money Lender, the percentage of the Aggregate Commitments represented by such Lender's Commitment.

"Approved Bidding Procedures" means bidding procedures for the sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Administrative Agent.

"Approved Counterparty" means (a) any Lender or any Affiliate of a Lender or (b) any other Person whose long term senior unsecured debt rating is BBB-/Baa3 by S&P or Moody's (or their equivalent) or higher (or any other Person whose obligations under Swap Agreements entered into with the Borrower or any of its Subsidiaries are guaranteed by a Person whose long term senior unsecured debt is BBB-/Baa3 by S&P or Moody's (or their equivalent) or higher).

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Plan of Reorganization" means either (a) the plan of reorganization, dated November [●], 2019, and filed with the Bankruptcy Court [Docket No. [●]], as such plan may be, amended or modified in accordance with its terms and the RSA, which has been accepted by each class of creditors entitled to vote thereon, (b) such other plan of reorganization which (i) provides for termination of the Commitments under the DIP Facility and, except as may be provided herein with respect to the Refinanced Loans, including under Section 2.01(b), payment in full in cash of all Obligations under the Loan Documents owed to the Lenders in respect of the DIP Facility on the effective date of such Approved Plan of Reorganization and (ii) does not impair the Pre-Petition Obligations or (c) a plan of reorganization which is otherwise approved by the Administrative Agent and the Majority Lenders in their sole discretion.

"Approved Sale" means a sale of all or substantially of all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code consummated in accordance with the Approved Bidding Procedures.

"Arranger" means Citigroup Global Markets Inc., in its capacity as lead arranger and bookrunner hereunder.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, substantially in the form of Exhibit E or any other form approved by the Administrative Agent.

"Attorney Costs" means and includes all reasonable fees, expenses and disbursements of any law firm or other external legal counsel.

"Availability Limit" means (a) during the Interim Period, Interim Facility Cap and (b) during the Final Period, the Aggregate Commitments.

"Availability Period" means the period from the Interim Facility Effective Date to the earlier of (a) the Business Day immediately preceding the Maturity Date and (b) the termination of the Commitments in full.

"Available Funds" means, as of any date of determination, the amount by which the Availability Limit on such date exceeds the total Revolving Credit Exposure of all Lenders on such date.

"Avoidance Action Proceeds" means any and all proceeds of any Avoidance Action.

"Avoidance Actions" means all claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11, U.S. Code, as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Bankruptcy Law" means the Bankruptcy Code or any similar federal or state law for the relief of debtors.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" has the meaning set forth in the preamble.

"Borrower Materials" has the meaning set forth in Section 12.01(d).

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Budget" means the "Initial Budget" or any "Supplemental Approved Budget," as such term is defined in the DIP Order, as such Budget may be amended, modified or otherwise updated from time to time by the Borrower as set forth in the DIP Order.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Houston, Texas are authorized or required by law to remain closed and if such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment, prepayment, conversion or Interest Period, any day which is also a day on which dealings in dollar deposits are carried out in the London interbank market.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of that Person.

4

"Capital Stock" means:

(a)      in the case of a corporation, corporate stock or shares;

(b)      in the case of an association or business entity that is not a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(c)      in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(d)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Capitalized Lease Obligations" means, as applied to any Person, all obligations under Capital Leases of such Person or any of its Subsidiaries, in each case, taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Carve-Out" has the meaning assigned to such term in the applicable DIP Order.

"Cases" has the meaning specified in the recitals hereto.

"Cash Collateralize" means, with respect to any amount to be cash collateralized, to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Banks (and/or the Lenders, other Secured Parties and other Person as the context requires) as collateral such (a) cash or deposit account balances in an amount equal to such amount required to be Cash Collateralized (the "Required Cash Collateral Amount") or (b) if the relevant Issuing Bank benefiting from such collateral shall agree in its reasonable discretion, other forms of credit support (including any backstop letter of credit) in a face amount equal to one-hundred-three percent (103.0%) of the Required Cash Collateral Amount from an issuer reasonably satisfactory to such Issuing Bank, in each case under clause (a) and (b) above pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant Issuing Bank (which documents are hereby consented to by the Lenders).  Derivatives of Cash Collateralize shall have a corresponding meaning.

 "Cash Equivalents" means:

(a)      United States dollars;

(b)      securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (provided that the full faith and credit of the United States is pledged in support of those securities) having maturities of not more than two (2) years from the date of acquisition;

(c)      securities or readily marketable direct obligations issued or fully guaranteed by any state, territory or commonwealth of the United States of America or any political subdivision of any such state, territory or commonwealth or any public instrumentality thereof or any political subdivision of any such state, territory or commonwealth or any public instrumentality thereof having maturities of not more than two (2) years from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's of at least "A+" and "A-1", respectively (or, if at

any time neither S&P nor Moody's shall be rating such obligations, then from another nationally-recognized rating service);

(d)        certificates of deposit, time deposits and eurodollar time deposits with maturities of one (1) year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one (1) year and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus in excess of 250,000,000;

(e)        repurchase obligations for underlying securities of the types described in clauses (b), (c) and (d) above entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)        commercial paper issued by a corporation (other than an Affiliate of the Borrower) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and, in each case, maturing within one (1) year after the date of acquisition;

(g)        money market and investment funds at least ninety-five percent (95.0%) of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (e) of this definition;

(h)        money market funds and similar funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $500,000,000; and

(i)        indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A-2" from Moody's with maturities of two (2) years or less from the date of acquisition.

"Cash Management Bank" means any Person that (a) at the time it provides Cash Management Services, (b) on Interim Facility Effective Date or (c) at any time after it has provided any Cash Management Services, in each case is a "Bank" (as such term is defined in the Cash Management Order) and is a Lender, the Administrative Agent or an Affiliate of a Lender or the Administrative Agent.

"Cash Management Obligations" means all debt, liabilities and obligations owed by any Loan Party or any Subsidiary in connection with, or in respect of, any Cash Management Services.

"Cash Management Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit H, or as otherwise reasonably acceptable to the Administrative Agent.

"Cash Management Services" means (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automated clearing house services, return items, interstate depository network services, electronic funds transfer services, lockbox services and stop payment services), (c) any other demand deposit or operating account relationships and (d) any other cash management services, including for collections and for operating, payroll and trust accounts of any Loan Party or any of the Borrower's Subsidiaries.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Collateral of the Debtors having a fair market value in excess of $500,000.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Chambers" means, collectively, Chambers Energy Capital II LP, Chambers Energy Capital II TE, LP, Chambers Energy Capital III, LP, and each of their Sponsor Fund Affiliates.

"Change in Law" means the occurrence, after the Interim Facility Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued to the extent, but only to the extent, that a Lender is generally imposing applicable increased costs or costs on similarly situated borrowers in connection with capital adequacy and liquidity requirements similar to those described in Sections 5.01(a) and 5.01(b) under other syndicated credit facilities to which such borrowers and Lender are a party.

"Change of Control" means that the Permitted Holders shall collectively cease to own beneficially (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the Interim Facility Effective Date), directly or indirectly, Equity Interests representing at least a majority of the aggregate ordinary voting power and economic interest represented by the issued and outstanding Equity Interests of the Borrower.

"Chapter 11 Milestones" has the meaning assigned to such term in Section 8.17.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Collateral" means the "DIP Collateral" as defined in the DIP Order; provided that the Collateral shall not include the Excluded Assets; provided, further, that the Collateral shall not include any assets or property upon which, and solely to the extent that, the grant of a "DIP Lien" as contemplated in the DIP Order would constitute a default or event of default under any of the Debtors' contracts or leases (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable non-bankruptcy law), but shall include the proceeds thereof and; provided, further, notwithstanding anything in this Agreement or any other Loan Document to the contrary, the Collateral does not include any Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Insurance Regulations) and no Building or Manufactured (Mobile) Home will be encumbered by any Loan Documents unless and until the Lenders are given 30 days' prior written notice thereof and each Lender confirms within such 30 day period to the Administrative Agent that its flood due diligence has been completed and flood insurance compliance has been confirmed (including the receipt of evidence of any required flood insurance).

"Commitment" means, with respect to each Lender, the obligation of such Lender to make or continue New Money Loans and to incur or acquire participations in Letters of Credit hereunder in an aggregate principal amount at any one time outstanding not to exceed the amounts set forth opposite such Lender's name as its "Commitment" on Annex II, as such obligation may be (a) modified from time to time pursuant to Section 2.06, (b) modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04(b) or (c) otherwise modified pursuant to the terms of this Agreement.

"Commitment Fee Rate" means a percentage per annum equal to 1.00%.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time, and any successor statute.

"Compliance Certificate" means the Compliance Certificate substantially in the form of Exhibit D.

"Confirmation Order" means an order, in form and substance reasonably satisfactory to the Administrative Agent, confirming an Approved Plan of Reorganization (it being understood and agreed that the Confirmation Order shall be deemed reasonably satisfactory to the Administrative Agent so long as the Bankruptcy Court approves the Approved Plan of Reorganization (and does not modify, amend or supplement the Approved Plan of Reorganization to the extent such modification, amendment or supplement would require the consent of the Administrative Agent and the Majority Lenders as set forth in the definition of "Approved Plan of Reorganization" and such consent has not been obtained).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Continuing Directors" means the directors of the Borrower or a Subsidiary, as applicable, on the Petition Date, and each other director, if, in each case, such other director's nomination for election to the Board of Directors of the Borrower, the Borrower or such Subsidiary, as applicable, is recommended by a majority of the then Continuing Directors or such other director receives the vote of the Permitted Holders in his or her election by the stockholders of the Borrower, the Borrower or such Subsidiary, as applicable.

"Contractual Requirement" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debtors" has the meaning specified in the recitals hereto.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived or otherwise remedied, become an Event of Default.

"Defaulting Lender" means any Lender whose acts or failure to act, whether directly or indirectly, cause it to meet any part of the definition of "Lender Default".

"Developed Producing Reserves" means oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves".

"DIP Facility" has the meaning specified in the recitals hereto.

"DIP Order" means the Interim Order and the Final Order, as applicable.

"Disclosure Restrictions" has the meaning set forth in Section 8.07.

"Dispose" or "Disposed of" has a correlative meaning to the defined term of "Disposition".

"Disposition" has the meaning set forth in Section 9.09.

"Disqualified Stock" means, with respect to any Person, any Equity Interest of such Person that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Equity Interest), or, upon the happening of any event, matures or is mandatorily redeemable (other than solely for Qualified Equity Interests) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is ninety-one (91) days after the Maturity Date hereunder as in effect at the time of issuance.   Notwithstanding the preceding sentence, any Capital Stock will not constitute Disqualified Stock because (a) the holders of the Capital Stock have the right to require the Borrower to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale, (b) with respect to any Capital Stock issued pursuant to any plan for the benefit of employees of any Debtor or by any such plan to such employees, any Debtor may be required to repurchase it in order to satisfy applicable statutory or regulatory obligations or (c) with respect to any Capital Stock held by any future, present or former employee, director, manager or consultant of the Debtors or any of their Parent Entities or any other entity in which any Debtor has an Investment and is designated in good faith as an "affiliate" by the board of directors or managers of the Borrower, in each case pursuant to any equity holders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement, any Debtor may be required to repurchase it.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Borrower and its Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"Distressed Person" has the meaning set forth in the definition of Lender-Related Distress Event.

"Dollar Equivalent" means, at any time, with respect to any amount denominated in any currency other than dollars, the equivalent amount thereof in dollars, at the rate at which such currency may be exchanged into dollars, as set forth at approximately 12:00 noon (New York time) on such day on the Reuters Fedspot page for such currency.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Engagement Letter" means that certain letter dated as of November [•], 2019 entered into by an among the Borrower and the Arranger.

9

"Environmental Laws" means any and all applicable Governmental Requirements relating to the protection of the environment, the preservation or reclamation of natural resources, or the prevention of human exposure to Hazardous Material, including without limitation, the Oil Pollution Act of 1990, as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980, as amended, the Federal Water Pollution Control Act, as amended, the Resource Conservation and Recovery Act of 1976, as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended and the Superfund Amendments and Reauthorization Act of 1986.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) human exposure to any Hazardous Materials, (c) the Release or threatened Release of any Hazardous Materials into the environment or (d) any contract, agreement or other legally binding consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, the regulations promulgated thereunder, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower or a Subsidiary would be deemed to be a "single employer" within the meaning of subsections (b) or (c) of section 414 of the Code.

"ERISA Event" means (a) a "reportable event" described in section 4043 of ERISA and the regulations issued thereunder (other than an event for which the thirty (30) day notice period is waived), (b) the failure to meet the minimum funding standard of section 412 of the Code or section 302 of ERISA with respect to any Plan (whether or not waived in accordance with section 412(c) of the Code), (c) the withdrawal of the Borrower, a Subsidiary or any ERISA Affiliate from a Plan during a year in which it was a "substantial employer" as defined in section 4001(a)(2) of ERISA, (d) the filing of a notice of intent to terminate a Plan in a distress termination under section 4041 of ERISA or the treatment of a Plan amendment by the PBGC as a termination under section 4041 or 4041A of ERISA, (e) the institution of proceedings to terminate a Plan or to appoint a trustee to administer a Plan by the PBGC, (f) a complete or partial withdrawal within the meaning of ERISA section 4203 or 4205 by the Borrower, Subsidiary or any ERISA Affiliate from a Multiemployer Plan or a cessation of operations which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization within the meaning of ERISA section 4241 or is insolvent within the meaning of ERISA section 4245, (g) the Borrower, a Subsidiary or any ERISA Affiliate incurs a substantial cessation of operations with respect to any Plan under ERISA section 4062(e), (h) the imposition of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under ERISA section 4007 upon the Borrower, a Subsidiary or any ERISA Affiliate or (i) any other event or condition that might reasonably be expected to constitute grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar" when used in reference to any Loan or Borrowing, refers to such Loan, or the Loans comprising such Borrowing, bearing interest at a rate determined by reference to clause (a) of the definition of Eurodollar Rate.

10

"Eurodollar Rate" means (a) for any Interest Period with respect to a Eurodollar Loan, the rate per annum equal to the London Interbank Offered Rate ("LIBOR") or a comparable or successor rate, which rate is approved by the Administrative Agent and Borrower, as published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(b)      for any interest calculation with respect to an ABR Loan on any date, the rate per annum equal to LIBOR, at approximately 11:00 a.m., London time determined two (2) Business Days prior to such date for dollar deposits with a term of one (1) month commencing that day;

provided that to the extent a comparable or successor rate is approved by the Administrative Agent and Borrower in connection herewith or Section 3.03, the approved rate shall be applied in a manner consistent with market practice; provided, further, that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent, in consultation with the Borrower, and; provided, further, that the Eurodollar Rate shall not be less than zero.

"Event of Default" has the meaning set forth in Section 10.01.

"Excepted Debt" means:

(a)      Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations that are (i) required by Governmental Requirements or by Governmental Authorities in connection with the operation of the Oil and Gas Properties and (ii) not incurred in connection with money borrowed, which are provided in the ordinary course of business or consistent with past practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice;

(b)      endorsements of negotiable instruments for collection in the ordinary course of business;

(c)      Indebtedness (other than Indebtedness for borrowed money) secured by Liens permitted under clauses (b) and (n) of the definition of Excepted Liens;

(d)      Cash Management Obligations incurred in the ordinary course of business;

(e)      Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business or consistent with past practice or industry practice in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(f)      Indebtedness (other than Indebtedness for borrowed money) arising from agreements of the Debtors providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case assumed or entered into in connection with the Transactions, the Exchange Agreement, any Permitted Acquisitions, other Investments permitted by Section 9.05 and the Disposition of any business, assets or Equity Interests not prohibited hereunder;

(g)      Indebtedness of the Debtors consisting of obligations to pay insurance premiums;

11

(h)    Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Borrower (or, to the extent such work is done for the Debtors, any direct or indirect parent thereof) and the Subsidiaries incurred in the ordinary course of business;

(i)    Indebtedness consisting of promissory notes issued by the Borrower or any Guarantor to current or former officers, managers, consultants, directors and employees (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) to finance the purchase or redemption of Equity Interests of the Borrower (or any direct or indirect parent thereof) permitted by Section 9.04;

(j)    Indebtedness in respect of Adequate Protection Obligations to the extent, and subject to the conditions set forth in, the DIP Order;

(k)    Indebtedness (other than Indebtedness for borrowed money) existing on the Petition Date and consisting of obligations of the Debtors under deferred compensation or other similar arrangements incurred by such person in connection with the Prior Transactions or as a permitted Investment.

"Excepted Liens" means:

(a)    Liens for taxes, assessments or governmental charges or claims (i) which are not yet overdue, (ii) the nonpayment of which is permitted by the Bankruptcy Code, or (iii) that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP (or in the case of any Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction), or for property taxes on property that any Debtor has determined to abandon if the sole recourse for such tax, assessment, charge or claim is to such property;

(b)    Liens in respect of property or assets of the Debtors imposed by law, such as landlords', vendors', suppliers', carriers', warehousemen's, repairmen's, construction contractors', workers' and mechanics' Liens and other similar Liens arising in the ordinary course of business or which are incidental to the exploration, development, operation or maintenance of Oil and Gas Properties, in each case so long as such Liens (i) are not overdue for a period of more than sixty (60) days or (ii) are being contested in good faith by appropriate action and for which the applicable Loan Party maintains adequate reserves in accordance with GAAP;

(c)    Liens arising from judgments or decrees in circumstances not constituting an Event of Default under Section 10.01(g);

(d)    Liens (i) incurred or pledges or deposits (A) made in connection with workers' compensation, unemployment insurance and other types of social security, old age pension, public liability obligations or similar Governmental Requirements, in each case, in the ordinary course of business, or (B) securing (or securing the Liens securing) (1) liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations or (2) for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Debtors or (ii) on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(e)    deposits and other Liens securing (or securing the bonds or similar instruments securing) the performance of tenders, statutory obligations, plugging and abandonment obligations, surety, stay, customs and appeal bonds, completion and performance guarantees, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (including letters of credit issued in lieu of such bonds or to support the issuance thereof) incurred in the ordinary course of

business and not securing Indebtedness for borrowed money, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(f)     ground leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Debtors are located;

(g)     easements, rights-of-way, restrictive covenants, licenses, restrictions (including zoning restrictions), title defects, exceptions, deficiencies or irregularities in title, encroachments, protrusions, servitudes, permits, conditions and covenants and other similar charges or encumbrances (including in any rights-of-way or other property of the Debtors for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil or other minerals or timber, and other like purposes, or for joint or common use of real estate, rights of way, facilities and equipment) not interfering in any material respect with the business of the Debtors, taken as a whole;

(h)     (i) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease, liens reserved in oil, gas or other Hydrocarbons, minerals, leases for bonus, royalty or rental payments and for compliance with the terms of such lease, (ii) any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under any lease, sublease, license or sublicense entered into by the Debtors in the ordinary course of business or otherwise permitted by this Agreement or (iii) the rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Debtors or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit or bankers' acceptance issued for the account of the Debtors; provided that such Lien secures only the obligations of the Debtors in respect of such letter of credit or bankers' acceptance to the extent permitted under Section 9.02;

(k)     (i) leases, licenses, consignments, bailments, subleases or sublicenses granted to others not interfering in any material respect with the business of the Debtors, taken as a whole and (ii) the prior right of consignees and their lenders under consignment arrangements entered into in the ordinary course of business (including agreements to subordinate any interest of the Debtors in any accounts receivable or other proceeds arising from inventory consigned by the Debtors pursuant to an agreement entered into in the ordinary course of business);

(l)     Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Debtors in the ordinary course of business;

(m)     Liens (including the right of set-off and similar rights and remedies) (i) created in the ordinary course of business in favor of banks and other financial institutions over credit balances of, or attaching to, any bank accounts, commodity trading accounts or other brokerage accounts of the Debtors held at such banks or financial institutions, as the case may be, (ii) relating to pooled deposit or sweep accounts of the Debtors to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Debtors or (iii) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection.

(n)    (i) Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, Farm-Out Agreements, Farm-In Agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements that are usual or customary in the oil and gas business and are for claims which are not delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP; provided that any such Lien referred to in this clause does not materially impair the use of the property covered by such Lien for the purposes for which such property is held by the Debtors and (ii) Liens arising pursuant to Section 9.343 of the Texas UCC or other similar statutory provision of other states or sovereigns with respect to production purchased from others in the ordinary course of business;

(o)    Liens on pipelines and pipeline facilities that arise by operation of law or other like Liens arising by operation of law in the ordinary course of business and incident to the exploration, development, operation and maintenance of Oil and Gas Properties, each of which is in respect of obligations that do not constitute Indebtedness for borrowed money and are not yet overdue for a period of more than thirty (30) days or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(p)    any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Debtors, taken as a whole;

(q)    Liens on equipment of the Debtors granted in the ordinary course of business to the Debtors' client at which such equipment is located;

(r)    security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business;

(s)    Liens (i) that are contractual rights of set-off relating to purchase orders and other agreements entered into with customers of the Debtors in the ordinary course of business and (ii) arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Debtors in the ordinary course of business permitted by this Agreement;

(t)    Liens deemed to exist or arise under repurchase agreements in connection with Investments permitted under Section 9.05;

(u)    To the extent existing on the Petition Date, Liens relating to or in connection with the Joint Development Agreement; and

(v)    Pre-Petition Prior Liens;

provided that (i) all such Liens described in clauses (a) through (e) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced (except any such action that is subject to the automatic stay of Section 362 of the Bankruptcy Code or as otherwise permitted by a final order of the Bankruptcy Court) and no intention to subordinate the Liens granted in favor of the Administrative Agent and/or the other Secured Parties is to be hereby implied or expressed by, or as a result

14

of, the permitted existence of such Excepted Liens and (ii) except with respect to clause (u) above, the term "Excepted Liens" shall not include any Lien securing Indebtedness for borrowed money other than the Obligations.

"Excluded Accounts" means (a) each account all or substantially all of the deposits in which consist of amounts utilized to fund payroll, employee benefit or tax obligations of the Debtors, (b) fiduciary accounts and accounts consisting solely of deposits or similar arrangements in connection with Liens permitted by Section 9.03 and (c) "zero balance" accounts.

"Excluded Assets" means (a) Avoidance Actions, (b) the Excluded Accounts, (c) Excluded Equity Interests and any assets or property upon which, and solely to the extent that, the grant of a Lien for the benefit of the Secured Parties would constitute a default or event of default under any contract or lease (and such default would not be excused or rendered ineffective by operation of the Bankruptcy Code or applicable law) and (d) proceeds of any of the foregoing, but only to the extent such proceeds would otherwise independently constitute "Excluded Assets" under clauses (a) through (d); provided that "Excluded Assets" shall not include any Avoidance Action Proceeds.

"Excluded Equity Interests" means (a) any Equity Interests to the extent the pledge thereof would be prohibited by any Governmental Authority, and (b) in the case of any Equity Interests of any Subsidiary to the extent the pledge of such Equity Interests is prohibited by Contractual Requirements (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable Governmental Requirements) in existence on the Interim Facility Effective Date.

"Excluded Subsidiary" means (a) each Subsidiary that is prohibited by any applicable Contractual Requirement or Governmental Requirement from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Subsidiary, including in connection with any Permitted Acquisition, (and for so long as such restriction or any replacement or renewal thereof is in effect) or that would require consent, approval, license or authorization of a Governmental Authority to guarantee or grant Liens to secure the Obligations at the time such Subsidiary becomes a Subsidiary (unless such consent, approval, license or authorization has been received), (b) any captive insurance subsidiaries and (c) any not-for-profit subsidiaries.

"Excluded Swap Obligations" means any obligation of any Guarantor to pay or perform under any Swap Agreement, if, and to the extent that, all or a portion of the guarantee by such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Agreement (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) or any other applicable Governmental Requirement.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, each Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such recipient being organized under the laws of, or having its principal office (or in the case of a Lender, its applicable lending office) located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, any U.S. federal withholding Tax that is imposed pursuant to a law in effect on the date on which such Lender becomes a party to this Agreement or designates a new lending office, except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding tax pursuant to Section 5.03(a) or Section 5.03(b), (c) any

withholding Tax that is attributable to a Lender's failure to comply with Section 5.03(e) and (d) U.S. federal withholding Taxes imposed under FATCA.

"Exit Facility Commitment Letter" means that certain Commitment Letter dated as of November [•], 2019 entered into by an among the Borrower and each of the Lenders party to this Agreement on the date hereof."

"Facility" means, collectively, the DIP Facility and the Refinancing Facility.

"Fair Market Value" means, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a Disposition of such asset at such date of determination assuming a Disposition by a willing seller to a willing purchaser dealing at arm's-length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as determined by the Borrower in good faith.

"Farm-In Agreement" means an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of one or more exploratory or development wells (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interests therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well or wells as all or a part of the consideration provided in exchange for an ownership interest in an Oil and Gas Property.

"Farm-Out Agreement" means a Farm-In Agreement viewed from the standpoint of the party that transfers an ownership interest to another.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreements entered into in connection with the implementation of such Section of the Code (or any such amended or successor version thereof).

"FCPA" has the meaning set forth in Section 7.07(d).

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates (not less than zero) on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published on the next succeeding Business Day by the Federal Reserve Bank of New York; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Final Facility Effective Date" has the meaning set forth in Section 6.02.

"Final Order" means the order or judgment of the Bankruptcy Court in substantially in the form of the Interim Order with such changes as are reasonably acceptable to the Administrative Agent.

"Final Period" means the period from and including the Final Facility Effective Date to but excluding the Termination Date.

"Financial Officer" means, for any Person, the chief financial officer, president, any vice president of such Person, principal accounting officer, comptroller, treasurer or assistant treasurer of such Person. Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"Financial Performance Covenant" means the covenants of the Borrower set forth in Section 9.01.

"Flood Insurance Regulations" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, *et seq.*), as the same may be amended or recodified from time to time, (d) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder and (e) the Biggert-Waters Flood Insurance Reform Act of 2012 and the regulations issued in connection therewith by the Office of the Comptroller of the Currency, the Federal Reserve Board and other Governmental Authorities.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"FRC" has the meaning set forth in the definition of Sponsors.

"Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to any Issuing Bank, such Defaulting Lender's Pro Rata Share of the outstanding LC Exposures other than LC Exposures as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time, as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), subject to the terms and conditions set forth in Section 1.05; provided that the accounting for operating leases and capital leases under GAAP as in effect on the date hereof (including, without limitation, Accounting Standards Codification 840) shall apply for the purposes of determining compliance with the provisions of this Agreement, including the definition of Capitalized Lease Obligations (it being understood, for avoidance of doubt, that no operating leases, or obligations in respect of operating leases, shall be treated as Capital Leases or Capitalized Lease Obligations, respectively, hereunder).

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government over the Borrower, any Subsidiary, any of their Properties, the Administrative Agent, any Issuing Bank or any Lender.

"Governmental Requirement" means, collectively, all applicable international, foreign, state and local statutes, treaties, rules, regulations, ordinances, codes and legally binding administrative or judicial precedents or authorities, and all applicable legally binding administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

17

"<u>Guarantors</u>" means, collectively, (a) each of the Parent Company Debtors, (b) the Subsidiaries of the Borrower (other than any Excluded Subsidiary), which are listed on <u>Schedule 1.1(a)</u> and (c) those Subsidiaries that enter into a Joinder Agreement after the Interim Facility Effective Date pursuant to <u>Section 8.11(b)</u>, in each case, until any such Person is released from its obligations under the Loan Guarantee in accordance with the terms hereof.

"<u>Guaranty Obligations</u>" means, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain financial condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; <u>provided</u>, <u>however</u>, that the term "Guaranty Obligations" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and indemnity obligations in effect on the Interim Facility Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guaranty Obligation shall be deemed to be an amount equal to the lesser of (x) the stated or determinable amount of the Indebtedness in respect of which such Guaranty Obligation is made and (y) the maximum amount of the Indebtedness in respect of which such Person may be liable under such Guaranty Obligation or, if not so stated or determinable or no maximum amount is determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"<u>Hazardous Material</u>" means any substance regulated as hazardous or deleterious or as to which liability would reasonably be expected to arise under any applicable Environmental Law and including, without limitation:  (a) any chemical, compound, material, product, byproduct, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; (b) petroleum hydrocarbons, petroleum products, natural gas, oil, oil and gas waste, crude oil, and any fractions thereof; and (c) radioactive materials, asbestos containing materials, polychlorinated biphenyls or radon.

"<u>Highest Lawful Rate</u>" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loans or on other Indebtedness under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"<u>Holdings Term Loan Facility</u>" means that certain Credit Agreement, dated as of December 21, 2018 (as amended, restated, or otherwise modified from time to time, including the "Loan Documents" (as defined therein)) entered into in connection therewith, among Arsenal Resources Development Holdings 1 LLC, as borrower, the lenders from time to time party thereto, and Chambers Energy Management, LP, as administrative agent.

"<u>Holdings Term Loan Creditor</u>" means the holders of any Claim (as defined in the RSA) on account of the Holdings Term Loan Facility against any of the Debtors.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests relating to oil, gas or other hydrocarbons, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Impacted Loans" has the meaning set forth in Section 3.03.

"Indebtedness" of any Person means the following, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be required to be shown as a liability on the balance sheet of such Person (other than obligations resulting under firm transportation contracts or take/ship or pay contracts), (d) the face amount of all bankers' acceptances and letters of credit issued for the account of such Person, (e) the principal component of all Capitalized Lease Obligations of such Person, (f) all indebtedness (excluding prepaid interest thereon) of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (g) the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase in respect of Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock), (h) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment and (i) without duplication, all Guaranty Obligations of such Person in respect of the items described in clauses (a) through (h) above; provided that Indebtedness shall not include (i) ordinary-course accounts payables and accrued expenses, (ii) deferred or prepaid revenues, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) in the case of the Debtors, all unsecured intercompany Indebtedness incurred in the ordinary course of business having a term not exceeding three hundred sixty-four (364) days (inclusive of any roll-over or extensions of terms), (v) Production Payments and Reserve Sales, (vi) in-kind obligations relating to net oil, natural gas liquids or natural gas balancing positions arising in the ordinary course of business and (vii) any obligation in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property.

The amount of Indebtedness of any Person for purposes of clause (g) above shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness, (ii) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith and (iii) the maximum amount for which such Person may be liable in respect of such Indebtedness.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" has the meaning set forth in Section 12.03(b).

"Information" has the meaning set forth in Section 12.11.

"Initial Budget" has the meaning set forth in Section 6.01(n).

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each calendar month and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than one (1) months' duration, each day prior to the last day of such Interest Period that occurs at intervals of one (1) months' duration after the first day of such Interest Period.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one (1), two (2), three (3) or six (6) months (or, if available to each Lender, a period shorter than one (1) month) thereafter, as the Borrower may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) and that has a duration of one (1) month or longer shall end on the last Business Day of the last calendar month of such Interest Period and (c) no Interest Period may have a term which would extend beyond the Scheduled Maturity Date. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Facility Cap" means $30,000,000.

"Interim Facility Effective Date" has the meaning set forth in Section 6.01.

"Interim Facility Effective Date Financial Statements" means the consolidated financial statement or statements of the Borrower and its Subsidiaries referred to in Section 7.04(a).

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court in the Cases substantially in the form of Exhibit F and otherwise reasonably acceptable to the Administrative Agent, approving, inter alia, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by the Borrower of interim secured indebtedness in accordance with this Agreement, (b) providing for the lifting of the automatic stay (to the extent applicable) arising under section 362 of the Bankruptcy Code to enable the Administrative Agent or any Lender effectuate, among other things, their respective rights and remedies under Section 10.02 and the Loan Documents, and (c) subject to the terms thereof, approving the payment by the Borrower of the fees and other amounts contemplated by this Agreement.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on (but excluding) the earlier to occur of (i) the Final Facility Effective Date and (ii) the Maturity Date.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of another Person; (b) the making of any advance, loan or capital contribution to, or the purchase or other acquisition of any other Indebtedness or equity participation or interest in, any other Person (but excluding (i) any such advance or loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory, services or supplies sold by such Person in the ordinary course of business and (ii) in the case of the Debtors, all unsecured

intercompany Indebtedness incurred in the ordinary course of business having a term not exceeding three hundred sixty-four (364) days (inclusive of any roll-over or extensions of terms)) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be (i) the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment <u>minus</u> (ii) the amount of the amount of dividends or distributions received in connection with such Investment and any return of capital and any payment of principal received in respect of such Investment that in each case is received in cash, cash equivalents or short-term marketable debt securities by the Person holding such Investment.  For the purpose of clarity, a Swap Agreement shall not be considered an Investment.

"<u>ISP</u>" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"<u>Issuing Banks</u>" means (a) Citibank, N.A., each in its capacity as the issuers of Letters of Credit hereunder, and their successors in such capacity as provided in <u>Section 2.07(i)</u> and (b) if requested by the Borrower and reasonably acceptable to the Administrative Agent, any other Person who is a Lender at the time of such request and who accepts such appointment (it being understood that, if any such Person ceases to be a Lender hereunder, such Person will remain an Issuing Bank with respect to any Letter of Credit issued by such Person that remained outstanding as of the date such Person ceased to be a Lender).  Each Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.  References herein and in the other Loan Documents to an Issuing Bank shall be deemed to refer to such Issuing Bank in respect of the applicable Letter of Credit or to all Issuing Banks, as the context requires.  Any Lender may, from time to time, become an Issuing Bank under this Agreement with the protections and rights afforded to Issuing Banks hereunder by executing a joinder, in a form reasonably satisfactory to (and acknowledged and accepted by) the Administrative Agent and the Borrower, indicating such Lender's "<u>LC Issuance Limit</u>" and upon the execution and delivery of any such joinder, such Lender shall be an Issuing Bank for all purposes hereof.

"<u>Joinder Agreement</u>" has the meaning set forth in <u>Section 8.11(a)</u>.

"<u>Joint Development Agreement</u>" means the joint development agreement entered into between certain of the Debtors and IOG Resources, LLC (or its affiliates), relating to the funding of the development of certain assets located in Barbour, Harrison and Taylor Counties, West Virginia as amended, restated, supplemented or otherwise modified from time to time.

"<u>LC Borrowing</u>" means a LC Disbursement which has not been reimbursed or refinanced as a Borrowing.

"<u>LC Commitment</u>" at any time means, $5,000,000.

"<u>LC Disbursement</u>" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

"<u>LC Exposure</u>" means, as at any date of determination, the <u>sum</u> of (a) the aggregate amount available to be drawn under all outstanding Letters of Credit <u>plus</u> (b) the aggregate of all LC Borrowings. The LC Exposure of any New Money Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.  For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with <u>Section 1.11</u>.  For all

21

purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"LC Issuance Limit" means, at any time, with respect to any Issuing Bank, the amount of its LC Issuance Limit set forth on Annex II, as modified or supplemented from time to time in accordance with this Agreement.  Any reduction in the LC Commitment shall reduce the LC Issuance Limit of Citibank, N.A. each other Issuing Bank on a pro rata basis (except to the extent otherwise agreed by the applicable Issuing Bank).

"Lender Default" means (a) the refusal (which may be given verbally or in writing and which has not been retracted) or failure of any Lender to make available its portion of any incurrence of revolving loans or reimbursement obligations required to be made by it, which refusal or failure is not cured within two (2) Business Days after the date of such refusal or failure; (b) the failure of any Lender to pay over to the Administrative Agent, any Issuing Bank or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, unless subject to a good faith dispute; (c) a Lender has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations, or has made a public statement to that effect with respect to its funding obligations, under the Facility or under other agreements generally in which it commits to extend credit; (d) a Lender has failed, within three (3) Business Days after request by the Administrative Agent, to confirm that it will comply with its prospective funding obligations under the Facility; (e) a Lender has admitted in writing that it is insolvent or such Lender becomes subject to a Lender-Related Distress Event or (f) a Lender has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action.  For the avoidance of doubt, a Lender Default shall only apply with respect to a Lender in respect of each Facility with respect to which such Lender Default applies; unless, in the case of clauses (a) and (c) above, such Lender has notified the Administrative Agent in writing that such failure is the result of such Lender's reasonable determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied.

"Lender-Related Distress Event" means, with respect to any Lender or any person that directly or indirectly controls such Lender (each, a "Distressed Person"), as the case may be, a voluntary or involuntary case with respect to such Distressed Person under any debtor relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person or any person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any Equity Interests in any Lender or any person that directly or indirectly Controls such Lender by a Governmental Authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Lenders" means, collectively, the New Money Lenders and the Refinancing Lenders.

"Letter of Credit" means any letter of credit issued pursuant to this Agreement (including the Existing Letters of Credit pursuant to Section 2.07(m)).

"Letter of Credit Agreements" means all Letter of Credit Applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower, or entered into by the Borrower, with an Issuing Bank relating to any applicable Letter of Credit.

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by an Issuing Bank.

"Letter of Credit Expiration Date" has the meaning set forth in Section 2.07(a)(ii).

"LIBOR" has the meaning set forth in the definition of Eurodollar Rate.

"Lien" means, with respect to any asset, (a) any mortgage, preferred mortgage, deed of trust, lien, notice of claim of lien, hypothecation, pledge, charge, security interest or similar encumbrance in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset or (c) Production Payments and Reserve Sales payable out of Oil and Gas Properties; provided that in no event shall an operating lease be deemed to be a Lien.

"Loan Documents" means this Agreement (including, without limitation, the Loan Guarantee set forth herein), the Notes and the Letters of Credit, in each case, in effect, and the Security Instruments and all other agreements, instruments, consents and certificates heretofore or hereafter executed and delivered by the Borrower, any other Loan Party or any of their respective Affiliates in connection with this Agreement.

"Loan Guarantee" means Article XIII of this Agreement.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Loans" means, individually, any New Money Loan or Refinanced Loan made by any Lender pursuant to this Agreement, and collectively, the New Money Loans and Refinanced Loans made by the Lenders to the Borrower pursuant to this Agreement.

"Long-Term Debt" means all Indebtedness of the Borrower and the Subsidiaries that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of the Borrower or any Subsidiary, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all amounts of Long Term Debt required to be paid or prepaid within one year from the date of its creation.  For the avoidance of doubt, LC Exposure shall not constitute Long Term Debt.

"LRMH" means LR-Mountaineer Holdings, L.P. and its Sponsor Fund Affiliates.

"Majority Lenders" means, (a) at any time while no Loans or LC Exposure is outstanding, Lenders having more than fifty percent (50.0%) of the Adjusted Aggregate Commitments and (b) at any time while any Loans or LC Exposure is outstanding, Lenders holding more than fifty percent (50.0%) of (i) the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit minus the principal amounts of Loans and participation interests in Letters of Credit of Defaulting Lenders (in each case, without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)) and (ii) the unused Adjusted Aggregate Commitments.

"Management Group" means the group consisting of the directors, executive officers and other management personnel of the Borrower, any Subsidiary or Parent Entity, as the case may be, on the Interim Facility Effective Date together with (a) any Continuing Directors and (b) executive officers and other management personnel of the Borrower, any Subsidiary or Parent Entity, as the case may be, hired at a time when the Continuing Directors constituted a majority of the directors of the Borrower, any Subsidiary or Parent Entity, as the case may be.

"Material Adverse Effect" means a material adverse change in, or material adverse effect on (a) the business, operations, Property or financial condition of the Borrower and the Subsidiaries, taken as a whole, other than any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Bankruptcy Cases or the announcement of the filing or commencement of the Cases, (b) the ability of the Borrower and the other Loan Parties, taken as a whole, to perform their payment obligations under the Loan Documents, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of the Administrative Agent, any Issuing Bank or any Lender under any Loan Document.

"Maturity Date" means the earliest of (a) the Scheduled Maturity Date; (b) the effective date of an Approved Plan of Reorganization; and (c) the closing of a sale of substantially all of the equity or assets of the Debtors (unless consummated pursuant to an Approved Plan of Reorganization).

"Mercuria" means Mercuria Energy Company, LLC and its Sponsor Fund Affiliates.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgage" means a mortgage, deed of trust or similar security document entered into by any Loan Party and the Administrative Agent for the benefit of the Secured Parties in respect of Mortgaged Property owned by such Loan Party, that is substantially in the form of Exhibit K, subject to any modifications that may be required based on the State in which the Mortgaged Property is located or as may otherwise be agreed by the Borrower and the Administrative Agent (it is understood that each mortgage and deed of trust shall be governed by the law of the state in which the properties that are the subject of the applicable mortgage or deed of trust are located).  The term "Mortgage" as a verb has a corresponding meaning.

"Mortgaged Property" means, as of any date of determination, any Property which is subject to a Lien and security interest in favor of the Administrative Agent (or its designee pursuant to any mortgage and/or any other Loan Document) and existing under the terms of the Pre-Petition Security Instruments to secure the Pre-Petition Obligations.

"Multiemployer Plan" means a multiemployer plan as defined in section 3(37) or 4001(a)(3) of ERISA, to which the Borrower, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six (6) plan years, has made or been obligated to make contributions.

"Net Income" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"New Money Facility" has the meaning specified in the recitals hereto.

"New Money Lenders" means the Persons listed on Annex II and any Person that becomes a party hereto pursuant to an Assignment and Assumption (other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption) with respect to a New Money Loan or a Commitment

and, as the context requires, includes any Issuing Bank and, in each case, includes their respective successors and permitted assigns.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Notes" means the promissory notes of the Borrower described in Section 2.02(d) and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"Obligations" means (a) any and all advances to, and debts, liabilities, covenants and obligations of, any Loan Party arising under any Loan Document whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, and including interest and fees that accrue after the commencement by any Loan Party in any proceeding under any debtor relief laws naming any Loan Party as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding; (b) all Secured Cash Management Obligations; (c) all Secured Swap Obligations; and (d) all renewals, extensions and/or rearrangements of any of the above. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include the obligation (including Guaranty Obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnitees and other amounts to the extent required to be paid by any Loan Party under any Loan Document.

"OFAC" has the meaning set forth in Section 7.07(c).

"OID" means original issue discount.

"Oil and Gas Properties" means (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Ongoing Swaps" has the meaning set forth in Section 9.14(a).

"Other Connection Taxes" means, with respect to the Administrative Agent or any Lender, Taxes imposed as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction imposing such Tax (other than connections arising from the Administrative Agent's or such Lender's having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced in, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes arising from any payment made hereunder or from the execution, delivery, performance, registration, or enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Parent Company Debtors" has the meaning specified in the recitals hereto.

"Parent Entity" means any Person that is a direct or indirect parent company (which may be organized as a partnership) of the Borrower.

"Participant" has the meaning set forth in Section 12.04(c)(i).

"Participant Register" has the meaning set forth in Section 12.04(c)(i).

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"Payment in Full" means, subject to the terms of Section 12.02(g), the time at which (a) no Lender or Issuing Bank shall have (i) any Commitments, Loan or other amounts payable under the Loan Documents unpaid, unsatisfied or outstanding (other than in respect of contingent obligations, indemnities and expenses related thereto that are not then payable or in existence) and (ii) any Letters of Credit outstanding that (A) have not been Cash Collateralized in a manner reasonably satisfactory or (B) have not had other arrangements made with respect to them that are reasonably satisfactory, in each case, to the applicable Issuing Bank and (b) the Commitments and the LC Commitments have been terminated.

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"Permitted Acquisition" means any acquisition, merger or similar transaction permitted as an Investment under Section 9.05.

"Permitted Holders" means (a) the Sponsors, (b) the Management Group and any immediate family member of any such individual, (c) Chambers, (d) Mercuria and (e) LHRM.

"Permitted Variance" has the meaning set forth in Section 9.01.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals hereto.

26

"<u>Petroleum Industry Standards</u>" means the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"<u>Plan</u>" means any employee pension benefit plan, as defined in section 3(2) of ERISA other than a Multiemployer Plan, that is subject to Title IV of ERISA and (a) is sponsored, maintained or contributed to by the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six (6) calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower or a Subsidiary or an ERISA Affiliate and with respect to which the Borrower or a Subsidiary or an ERISA Affiliate may have any liability, contingent or otherwise.

"<u>Platform</u>" has the meaning set forth in <u>Section 12.01(d)</u>.

"<u>Pre-Petition</u>" means the time period ending immediately prior to the filing of the Cases.

"<u>Pre-Petition Collateral Agreement</u>" means the "Collateral Agreement" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Credit Agreement</u>" has the meaning specified in the recitals hereto.

"<u>Pre-Petition Guaranty Agreement</u>" means the "Guaranty Agreement" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Lenders</u>" means the lenders party to the Pre-Petition Credit Agreement.

"<u>Pre-Petition Letters of Credit</u>" means the outstanding letters of credit issued by the Issuing Banks under the Pre-Petition Credit Agreement and set forth on <u>Schedule 1.1(b)</u> hereto.

"<u>Pre-Petition Loan Documents</u>" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Loans</u>" means the "Loans" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Obligations</u>" means all of the "Obligations" as set forth in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Prior Liens</u>" shall have the meaning set forth in the DIP Order.

"<u>Pre-Petition Security Instruments</u>" means the "Security Instruments" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Swap Agreements</u>" means all Swap Agreements entered into by the Borrower or any of its Subsidiaries that were outstanding immediately prior to the Petition Date.

"<u>Prime Rate</u>" has the meaning set forth in the definition of Alternate Base Rate.

"<u>Prior Transactions</u>" means the transactions related to the incurrence of the Term Loan Holding Facility, the effectiveness of the Joint Development Agreement and the closing of the Pre-Petition Credit Facility.

"<u>Pro Rata Share</u>" means, with respect to each Lender, at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the

Commitments such Lender at such time and the denominator of which is the amount of the Aggregate Commitments at such time; provided that, if such Commitments have been terminated, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"Proceeding" has the meaning set forth in Section 12.03(b).

"Production Payments and Reserve Sales" means the grant or transfer by the Borrower or any of its Subsidiaries to any Person of a royalty, overriding royalty, net profits interest, production payment (whether volumetric or dollar-denominated), partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties where the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the oil and gas business, including any such grants or transfers.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proposed Plan" has the meaning set forth in Section 12.02(g).

"Public Lender" has the meaning set forth in Section 12.01(d).

"Qualified Equity Interests" means any Equity Interests of any Person other than Disqualified Stock.

"RBL Debtors" has the meaning specified in the recitals hereto.

"Redemption" means with respect to any Indebtedness, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value of such Indebtedness.  "Redeem" has the correlative meaning thereto.

"Refinanced Loans" has the meaning set forth in Section 2.01(b).

"Refinanced Loan Amount" means, as to each Refinancing Lender, the amount set forth opposite such Refinancing Lender's name on Annex I under the caption "Refinanced Loan Amount".

"Refinancing Facility" has the meaning specified in the recitals hereto.

"Refinancing Lenders" means the Persons listed on Annex I and any Person that becomes a party hereto pursuant to an Assignment and Assumption (other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption) with respect to a Refinanced Loan and includes their respective successors and permitted assigns.

"Register" has the meaning set forth in Section 12.04(b)(iv).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the respective directors, officers, employees and agents of such Person and such Person's Affiliates.

"<u>Release</u>" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping or disposing into the environment.

"<u>Reserve Report</u>" means that certain Reserve Report dated as of September 4, 2019 and delivered to the Administrative Agent prior to the Petition Date.

"<u>Resignation Effective Date</u>" has the meaning set forth in <u>Section 11.06(a)</u>.

"<u>Responsible Officer</u>" means, as to any Person, (a) any chief executive officer, president, vice president, general counsel, chief operating officer, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party, (b) any manager, managing member or general partner, in each case, of such Person, (c) any other similar officer designated as such in writing to the Administrative Agent by such Person and (d) as to any corporate document, any secretary or assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references to a Responsible Officer herein means a Responsible Officer of the Borrower.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in any Debtor, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of (a) any such Equity Interests in any Debtor or (b) any option, warrant or other right to acquire any such Equity Interests in any Debtor.

"<u>Revolving Credit Exposure</u>" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans and its LC Exposure at such time.

"<u>RSA</u>" means the Restructuring Support Agreement, dated as of November [●], 2019, among the Debtors, the Lenders, and the other Consenting Stakeholders (as defined in RSA) as such agreement may be amended, modified or supplemented from time to time.

"<u>Scheduled Maturity Date</u>" means the date that is the six (6) month anniversary of the Petition Date.

"<u>SEC</u>" means the Securities and Exchange Commission or any successor Governmental Authority.

"<u>Secured Cash Management Agreement</u>" means any agreement related to Cash Management Services by and between the Borrower or any of its Subsidiaries and any Cash Management Bank.

"<u>Secured Cash Management Obligations</u>" means any Cash Management Obligations owing to any Cash Management Bank under a Secured Cash Management Agreement.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, each Issuing Bank, each Lender, each Secured Swap Party that is party to any Secured Swap Agreement, each Cash Management Bank that is a party to any Secured Cash Management Agreement, Indemnitees, and each sub-agent appointed by the Administrative Agent pursuant to <u>Section 11.05</u>.

"<u>Secured Swap Agreement</u>" means any Swap Agreement between the Borrower or any Subsidiary and any Person that is entered into during the time, that such Person was a Lender or an Affiliate of a Lender

(including any Pre-Petition Swap Agreements), even if such Person ceases to be a Lender or an Affiliate of a Lender for any reason; provided that, for the avoidance of doubt, the term "Secured Swap Agreement" shall not include any transactions entered into after the time that such Secured Swap Party ceases to be a Lender or an Affiliate of a Lender.

"Secured Swap Obligations" means all Swap Obligations owing to any Secured Swap Party under any Secured Swap Agreement other than Excluded Swap Obligations.

"Secured Swap Party" has the meaning set forth in the definition of Secured Swap Agreement.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Instruments" means, collectively, each security agreement, the DIP Order, the Loan Guarantee, mortgages, deeds of trust and any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by the Borrower or any other Person (other than any Secured Cash Management Agreements, Secured Swap Agreements or participation or similar agreements between any Lender and any other lender or creditor with respect to any Obligations pursuant to this Agreement) in connection with, or as security for the payment or performance of the Obligations, the Notes, this Agreement or reimbursement obligations under the Letters of Credit, as such agreements may be amended, modified, supplemented or restated from time to time.

"Seller Notes" means, collectively, (a) that certain Seller Note, dated as of October 14, 2014 (as amended, supplemented, or otherwise modified from time to time), in the original principal amount of $39,047,625.00, issued by Arsenal Energy Holdings LLC (f/k/a Mountaineer Energy Holdings, LLC) in favor of PDC Energy, Inc., as original seller, which note was sold and assigned pursuant to the Note Purchase Agreement, dated April 28, 2017, to Chambers Energy Capital II LP, Chambers Energy Capital II TE, LP and Chambers Energy Capital III, LP, as assignees and purchasers; and (b) that certain Seller Note, dated as of October 14, 2014 in the original principal amount of $39,047,625.00, issued by issued by Arsenal Energy Holdings LLC (f/k/a Mountaineer Energy Holdings, LLC) in favor of LR-Mountaineer Holdings, L.P.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Sponsor Fund Affiliate" means (a) each Controlled Affiliate, as applicable, of (i) FRC Founders Corporation, (ii) Chambers, (iii) Mercuria, and (iv) LHRM, in each case that is neither a portfolio company nor a company Controlled by a portfolio company and (b) each general partner or managing member of any such Affiliate.

"Sponsors" means FRC Founders Corporation and each of its Sponsor Fund Affiliates.

"Subsidiary" means, with respect to any Person: (a) any corporation, association or other business entity of which more than fifty percent (50.0%) of the total ordinary voting power of Equity Interests entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof) and (b) any partnership (i) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (ii) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).  Unless otherwise indicated herein, each reference to the term "Subsidiary" means a Subsidiary of the Borrower.

"Subsidiary Guarantor" means each Subsidiary that is a Guarantor.

"Superpriority Claim" means a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code against a Debtor in any of the Cases having priority over any or all administrative expense claims, adequate protection and other diminution claims, priority and other unsecured claims, and all other claims against a Debtor or its estate, including claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546, 552(b), 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more interest rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that (a) no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement and (b) any right of a Person to 'put' an asset to another Person that arises in connection with any acquisition agreement or disposition agreement shall not be a Swap Agreement.

"Swap Obligations" means, with respect to the Borrower or any Subsidiary, all debt, liabilities and obligations of such Person under Swap Agreements to the counterparties under such Swap Agreements.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Agreements (which may include a Lender or any Affiliate of a Lender) (it being understood that any such termination values and marked-to-market values shall take into account any assets posted as collateral or security for the benefit of a party to the Swap Agreement).

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, assessments, fees or other charges, or withholdings (including backup withholdings) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of: (a) the Maturity Date; (b) the date of Payment in Full and (c) the date of termination of the Commitments (including the LC Commitment) and/or the acceleration of all of the Obligations under this Agreement and the other Loan Documents following the occurrence and continuance of an Event of Default in accordance with Section 10.02.

"Test Period" means, for any date of determination under this Agreement, the most recent four consecutive fiscal quarters of the Borrower ending with the most recently ended fiscal quarter for which financial statements were required to have been delivered pursuant to Section 8.01.

"Transaction Expenses" means any fees or expenses incurred or paid by any Debtor in connection with the Transactions and the transactions contemplated thereby.

"<u>Transactions</u>" means, collectively, (a) any extensions of credit hereunder on or after the Interim Facility Effective Date and the execution and delivery of the Loan Documents on the Interim Facility Date, and (b) the payment of Transaction Expenses.

"<u>Type</u>" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Eurodollar Rate.

"<u>UCP</u>" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the time of issuance).

"<u>Uniform Commercial Code</u>" or "<u>UCC</u>" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"<u>Up-Front Fees</u>" has the meaning set forth in <u>Section 3.05(d)</u>.

"<u>U.S. Tax Compliance Certificate</u>" has the meaning set forth in <u>Section 5.03(e)(ii)(C)</u>.

"<u>Variance Testing Period</u>" means "Testing Period" as set forth in the applicable DIP Order.

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.03    <u>Types of Loans and Borrowings</u>.  For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (e.g., a "Eurodollar Loan" or a "Eurodollar Borrowing").

Section 1.04    <u>Terms Generally; Rules of Construction</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument, certificate, organization document or other document herein shall be construed as referring to such agreement, instrument, certificate or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents), (b) any reference herein to any Governmental Requirement shall be construed as referring to such Governmental Requirement as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" and "until" means "to but excluding" and the word "through" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.05    Accounting Terms and Determinations; GAAP.    Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP, applied on a basis consistent with the Interim Facility Effective Date Financial Statements or the December 31, 2018 financial statements of the Borrower, except for changes in which the Borrower's independent certified public accountants concur and which are disclosed to the Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a); provided that, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed and all such computations shall be conducted utilizing financial information presented consistently with prior periods.

Section 1.06    Reserved.

Section 1.07    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.08    Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

Section 1.09    Currencies Generally.    For purposes of any determination under any other provision of this Agreement requiring the use of a current exchange rate, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than dollars shall be translated into dollars at the Dollar Equivalent then in effect on the date of such determination; provided, however, that for purposes of determining compliance with Article IX with respect to the amount of any Indebtedness, Investment, Disposition, Restricted Payment or other relevant amount in a currency other than dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred or Disposition, Restricted Payment or other relevant amount is made.

Section 1.10    Negative Covenant Compliance.  With respect to determining whether the Debtors comply with any negative covenant in Article IX (other than the Financial Performance Covenant), to the extent that any obligation or transaction could be attributable to more than one exception to any such negative covenant, the Borrower may elect to categorize all or any portion of such obligation or transaction to any one or more exceptions to such negative covenant that permit such obligation or transaction.  It is understood that, with respect to any negative covenant in Article IX (other than the Financial Performance Covenant), if an exception to any such negative covenant permits Permitted Refinancing Indebtedness, such exception shall be deemed to permit any subsequent Permitted Refinancing Indebtedness of such Permitted Refinancing Indebtedness.

Section 1.11    Letter of Credit Amounts.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Letter of Credit Agreement related thereto, provides for one or more automatic increases in the stated amount thereof which are not subject to the approval of the relevant Issuing Bank, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit that is available for drawing after giving effect to all such potential increases, whether or not such maximum stated amount is in effect at such time, that is identified in writing by the Issuing Bank to the Administrative Agent and the

33

Borrower at the time of issuance (or at the time of any amendment thereto, if such amendment relates to such maximum stated amount) (it is understood that this proviso only applies to automatic reinstatement Letters of Credit, which are identified to the Administrative Agent and Borrower as such at the time of issuance).

Section 1.12   Rounding.   Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.13   Divisions.   For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II
## THE CREDITS

Section 2.01   Commitments.

(a)   Subject to the applicable terms and conditions set forth herein, each Lender agrees to make new money loans (the "New Money Loans") in dollars to the Borrower from time to time on any Business Day during the Availability Period in an aggregate principal amount that will not result in (i) such Lender's Revolving Credit Exposure exceeding such Lender's Commitment, (ii) during the Interim Period, such Lender's Revolving Credit Exposure exceeding its Applicable Percentage of the Interim Facility Cap and (iii) the aggregate Revolving Credit Exposures of the Lenders exceeding the lesser of (x) the Aggregate Commitments of the New Money Lenders and (y) the Availability Limit.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the New Money Loans.

(b)   Subject to the terms and conditions set forth herein, including entry of the Final Order, upon entry of the Final Order (i) the Pre-Petition Loans under the Pre-Petition Credit Agreement shall be deemed refunded, refinanced, replaced and made hereunder and, on and after the entry of the Final Order, shall constitute Loans for all purposes hereunder and under the Loan Documents in the principal amount for each Lender set forth on Annex I beneath the column entitled "Existing Loans" (the "Refinanced Loans").  Amounts rolled up under this Section 2.01(b) and repaid or prepaid may not be reborrowed.

Section 2.02   Loans and Borrowings.

(a)   Borrowings; Several Obligations.   Each New Money Loan shall be made as part of a Borrowing consisting of New Money Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any New Money Loan required to be made by it shall not relieve any other New Money Lender of its obligations hereunder; provided that the Commitments are several and no New Money Lender shall be responsible for any other New Money Lender's failure to make Loans as required.

(b)   Types of Loans.   Subject to Section 3.03, each Borrowing of New Money Loans shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance

34

herewith.  Each New Money Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such New Money Lender to make such Loan; provided that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such New Money Loan and (ii) in exercising such option, such New Money Lender shall use its reasonable efforts to minimize any cost to the Borrower resulting therefrom that would arise under Article V (so long as, in the reasonable judgment of such New Money Lender, such efforts would not subject such New Money Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such New Money Lender).

(c)    Minimum Amounts; Limitation on Number of Borrowings.  At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1,000,000 and not less than $1,000,000.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $500,000 and not less than $500,000; provided that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.07(e).  Borrowings of more than one Type may be outstanding at the same time, provided that there shall not at any time be more than a total of ten (10) Eurodollar Borrowings outstanding.  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(d)    Notes.  If requested by a New Money Lender, the New Money Loans made by such New Money Lender shall be evidenced by a single promissory note of the Borrower in substantially the form of Exhibit A, dated, in the case of (i) any New Money Lender party hereto as of the Interim Facility Effective Date, as of such date or (ii) any New Money Lender that becomes a party hereto pursuant to an Assignment and Assumption, as of the effective date of the Assignment and Assumption, payable to the order of such Lender in a principal amount equal to its Commitment as in effect on such date, and otherwise duly completed.  Upon reasonable request from a Lender, in the event that any Lender's Commitment increases or decreases for any reason (whether pursuant to Section 2.06, Section 12.04(b) or otherwise), the Borrower shall promptly deliver or cause to be delivered a new Note payable to the order of such Lender in a principal amount equal to its Commitment after giving effect to such increase or decrease, and otherwise duly completed, and, upon receipt by such Lender of such new Note, the existing Note of the Lender shall be deemed cancelled and the Lender shall promptly return its prior Note to the Borrower upon the request of the Borrower.  The date, amount, Type, interest rate and, if applicable, Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be endorsed by such Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by such Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans.

Section 2.03    Requests for Borrowings.  To request a Borrowing of New Money Loans, the Borrower shall notify the Administrative Agent of such request by email or telephone (a) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., New York time, three (3) Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York time, on the date of the proposed Borrowing; provided that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in Section 2.07(e).  Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery, email or fax to the Administrative Agent of a written Borrowing Request in substantially the form of Exhibit B and signed by the Borrower.  Each such telephonic and written Borrowing Request shall specify the following information:

(i)    the aggregate amount of the requested Borrowing;

(ii)      the date of such Borrowing, which shall be a Business Day;

(iii)      whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)      in the case of a Eurodollar Borrowing, the Interest Period to be applicable thereto;

(v)      the amount of (A) the then-effective Aggregate Commitments, (B) the amount of Available Funds and the then-effective Availability Limit, (C) the current total Revolving Credit Exposures (without regard to the requested Borrowing) and (D) the pro forma total Revolving Credit Exposures (giving effect to the requested Borrowing);

(vi)      the location and number of the Borrower's account to which funds are to be disbursed; and

(vii)      a certification that the intended use of proceeds of such Borrowing are in accordance with the Budget.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one (1) month's duration.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04    Interest Elections.

(a)      Conversion and Continuance. Each Borrowing of New Money Loans initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.04. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the New Money Lenders holding the New Money Loans comprising such Borrowing, and the New Money Loans comprising each such portion shall be considered a separate Borrowing.

(b)      Interest Election Requests. To make an election pursuant to this Section 2.04, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic Interest Election Request shall be irrevocable, and shall be confirmed promptly by hand delivery or fax to the Administrative Agent of a written Interest Election Request in substantially the form of Exhibit C and signed by the Borrower.

(c)      Information in Interest Election Requests. Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to Section 2.04(c)(ii) and (iii) shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one (1) month's duration.

(d)    Notice to New Money Lenders by the Administrative Agent.  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each New Money Lender of the details thereof and of such New Money Lender's portion of each resulting Borrowing.  Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from a Responsible Officer of the Borrower.

(e)    Effect of Failure to Deliver Timely Interest Election Request and Events of Default on Interest Election.  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  If an Event of Default has occurred and is continuing on the date when an Interest Period continuation or conversion from an ABR Borrowing to a Eurodollar Borrowing is to take place and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation or conversion, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05    Funding of Borrowings.

(a)    Funding by Lenders.  Each New Money Lender shall make each New Money Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the New Money Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower designated by the Borrower in the applicable Borrowing Request; provided that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.07(e) shall be remitted by the Administrative Agent to the applicable Issuing Bank.

(b)    <u>Presumption of Funding by the Lenders</u>.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.05(a)</u> and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a New Money Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from the date such amount is made available to the Borrower to the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such New Money Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrower, the interest rate applicable to such Borrowing hereunder.  If such New Money Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.06    <u>Termination and Reduction of Aggregate Commitments</u>.

(a)    <u>Scheduled Termination of Commitments</u>.  Unless previously terminated, the Commitments shall terminate on the Maturity Date.  If at any time the Aggregate Commitments are terminated or reduced to zero, then the Commitments shall terminate on the effective date of such termination or reduction.

(b)    <u>Optional Termination and Reduction of Aggregate Commitments</u>.

(i)    The Borrower may at any time terminate, or from time to time reduce, the Aggregate Commitments; <u>provided</u> that (A) each reduction of the Aggregate Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 and (B) the Borrower shall not terminate or reduce the Aggregate Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with <u>Section 3.04(c)</u>, the total Revolving Credit Exposures would exceed the Aggregate Commitments.

(ii)    The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Commitments under <u>Section 2.06(b)(i)</u> at least three (3) Business Days (or such shorter time as the Administrative Agent may agree) prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Any election by the Borrower to terminate or reduce the Maximum Credit Amounts pursuant to a notice delivered by the Borrower pursuant to this <u>Section 2.06(b)(ii)</u> may be made to be contingent upon the consummation of a refinancing or other event and such notice may otherwise be extended or revoked, in each case, with the requirements of <u>Section 5.02</u> to apply to any failure of the contingency to occur and any such extension or revocation.  Any termination or reduction of the Aggregate Commitments shall be permanent and may not be reinstated. Each reduction of the Aggregate Commitments shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

Section 2.07    <u>Letters of Credit</u>.

(a)    <u>Generally</u>.  (i) Subject to the terms and conditions set forth herein, the Borrower may request any Issuing Bank to issue dollar denominated Letters of Credit for the account of the Borrower or for the account of any of its Subsidiaries, in a form reasonably acceptable to the Administrative Agent and the applicable Issuing Bank, at any time and from time to time during the Availability Period; <u>provided</u>

38

that the Borrower may not request the issuance, amendment, renewal or extension of Letters of Credit hereunder if, immediately after giving effect to the requested issuance, amendment, renewal or extension, as applicable, (A) the LC Exposure would exceed the LC Commitment, (B) the total Revolving Credit Exposures would exceed the lesser of (I) the Aggregate Commitments of the Lenders and (II) the Availability Limit or (C) the sum of (I) the aggregate undrawn amount of all outstanding Letters of Credit issued by any Issuing Bank plus (II) the aggregate amount of all LC Disbursements made by such Issuing Bank that have not yet been reimbursed by or on behalf of the Borrower would exceed such Issuing Bank's LC Issuance Limit.  No Issuing Bank shall be under any obligation to issue any Letter of Credit if any Lender is at that time a Defaulting Lender, unless such Issuing Bank has entered into arrangements reasonably satisfactory to such Issuing Bank with the Borrower or such Lender to eliminate or Cash Collateralize such Issuing Bank's actual or potential Fronting Exposure (after giving effect to Section 4.04(a)(iv)) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or any LC Exposure as to which such Issuing Bank has actual or potential Fronting Exposure.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any Letter of Credit Agreement or any Letter of Credit, the terms and conditions of this Agreement shall control.

(ii)     In addition, an Issuing Bank shall not issue or amend any Letter of Credit, if the expiry date of the requested Letter of Credit would occur after the close of business on the date that is five (5) Business Days prior to the Scheduled Maturity Date (the "Letter of Credit Expiration Date"), unless such Letter of Credit has been Cash Collateralized in a manner reasonably satisfactory or has had other arrangements made with respect to it that is reasonably satisfactory, in each case, to such Issuing Bank.

(iii)     An Issuing Bank shall not be under any obligation to issue any Letter of Credit if:

(A)     any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing the Letter of Credit, or any Governmental Requirement applicable to the Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit, or request that the Issuing Bank refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon the Issuing Bank with respect to the Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Bank is not otherwise compensated hereunder) not in effect on the Interim Facility Effective Date, or shall impose upon the Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Interim Facility Effective Date and which the Issuing Bank in good faith deems material to it;

(B)     except as otherwise agreed by the Administrative Agent and the Issuing Bank, the Letter of Credit is in an initial stated amount less than $100,000;

(C)     the Letter of Credit is to be denominated in a currency other than dollars;

(D)     the Letter of Credit contains any provisions for automatic reinstatement of the stated amount after any drawing; or

(E)     other than the Pre-Petition Letters of Credit, the expiry date of the requested Letter of Credit would occur more than one (1) year (or eighteen (18) months with respect to Letters of Credit issued for the benefit of the Texas Railroad Commission) after the date of issuance or last extension of such Letter of Credit.

(iv)     Each Issuing Bank shall be under no obligation to amend any Letter of Credit if (A) the Issuing Bank would have no obligation at such time to issue the Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of the Letter of Credit does not accept the proposed amendment to the Letters of Credit.

(v)     Each Issuing Bank shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the Issuing Bank shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article XI with respect to any acts taken or omissions suffered by the Issuing Bank in connection with Letters of Credit issued by it or proposed to be issued by it and Letter of Credit Agreements pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article XI included the Issuing Banks with respect to such acts or omissions and (B) as additionally provided herein with respect to it.

(b)     Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Letter of Credit or the amendment, renewal or, the Borrower shall hand deliver or fax (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to such Issuing Bank and the Administrative Agent (not less than three (3) Business Days in advance of the requested date of issuance, amendment, renewal or extension) a notice:

(i)     requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)     specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)     specifying the date on which such Letter of Credit is to expire (which shall comply with Section 2.07(a)(ii));

(iv)     specifying the amount of such Letter of Credit; and

(v)     specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit.

If requested by the applicable Issuing Bank, the Borrower also shall submit a Letter of Credit Application on such Issuing Bank's standard form in connection with any request for a Letter of Credit.

(c)     [Reserved].

(d)     Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable Issuing Bank or the New Money Lenders, such Issuing Bank hereby grants to each New Money Lender, and each New Money Lender hereby acquires from such Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each New Money Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of such Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by such Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.07(e), or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each New Money Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.07(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, the aggregate

40

Revolving Credit Exposure exceeding the Availability Limit, or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    Reimbursement.  If an Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement (i) if such Issuing Bank provides notice to the Borrower prior to 10:00 a.m., New York time on the date of such payment or disbursement, on such date or (ii) if such notice is received after such time, on the next Business Day following the receipt of such notice; provided that if such LC Disbursement is not less than $1,000,000, the Borrower shall be deemed to have requested, and the Borrower does hereby request under such circumstances, that such payment be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing, which shall not be subject to the conditions to Borrowing set forth herein.  If the Borrower fails to make such payment when due, the Administrative Agent shall notify each New Money Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such New Money Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each New Money Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.05 with respect to Loans made by such New Money Lender (and Section 2.05 shall apply, *mutatis mutandis*, to the payment obligations of the New Money Lenders), and the Administrative Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from the New Money Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.07(e), the Administrative Agent shall distribute such payment to the applicable Issuing Bank or, to the extent that New Money Lenders have made payments pursuant to this Section 2.07(e) to reimburse the applicable Issuing Bank, then to such New Money Lenders and such Issuing Bank as their interests may appear.  Any payment made by a New Money Lender pursuant to this Section 2.07(e) to reimburse the applicable Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)    Obligations Absolute.  The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.07(e) shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the applicable Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not strictly comply with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.07(f), constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Administrative Agent, the New Money Lenders nor any Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the applicable Issuing Bank; provided that the foregoing shall not be construed to excuse the applicable Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the

41

Borrower that are caused by the applicable Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of proof of gross negligence or willful misconduct on the part of the applicable Issuing Bank (as finally determined by a court of competent jurisdiction), the applicable Issuing Bank shall be deemed to have exercised all requisite care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the applicable Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     Disbursement Procedures. The applicable Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The applicable Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by electronic transmission) of such demand for payment and whether the applicable Issuing Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the applicable Issuing Bank and the New Money Lenders with respect to any such LC Disbursement.

(h)     Interim Interest. If the applicable Issuing Bank shall make any LC Disbursement, then until the Borrower shall have reimbursed the applicable Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under Section 2.07(e)), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made, but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Loans. Interest accrued pursuant to this Section 2.07(h) shall be for the account of the applicable Issuing Bank, except that interest accrued on and after the date of payment by any New Money Lender pursuant to Section 2.07(e) to reimburse the applicable Issuing Bank shall be for the account of such New Money Lender to the extent of such payment.

(i)     Replacement of an Issuing Bank. Each Issuing Bank may be replaced or retire at any time by written agreement among the Borrower, the Administrative Agent and as applicable, such Issuing Bank or a successor Issuing Bank. The Administrative Agent shall notify the New Money Lenders of any such replacement or retirement of the applicable Issuing Bank. At the time any such replacement or retirement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 3.05(b). In the case of a replacement, from and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the replaced Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor and any other Issuing Banks or to any previous Issuing Bank, or to such successor and any other Issuing Banks and all previous Issuing Banks, as the context shall require. After the replacement or retirement of any Issuing Bank hereunder, the replaced or retired Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement or retirement until such time as those Letters of Credit have expired, or until the Borrower has fully and finally repaid such Issuing Bank for any LC Disbursement under such Letters of Credit, but shall not be required to issue additional Letters of Credit.

(j)     Cash Collateralization. If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent or the Majority Lenders demanding the deposit of cash collateral pursuant to this Section 2.07(j), or (ii) the Borrower is required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment

pursuant to Section 3.04(c), then the Borrower shall Cash Collateralize, in the case of an Event of Default, the LC Exposure, and in the case of a payment required by Section 3.04(c), the amount of such excess as provided in Section 3.04(c), as of such date plus any accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower or any Subsidiary.  At any time that there shall exist a Defaulting Lender, within one (1) Business Day of a request of the Administrative Agent or the applicable Issuing Bank, the Borrower shall deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover the remaining Fronting Exposure of the Defaulting Lender (after giving effect to Section 4.04(a)(iv) and any Cash Collateral provided by the Defaulting Lender) for so long as such Fronting Exposure exists (it being understood that if such Fronting Exposure is reduced and both the Defaulting Lender and the Borrower have provided Cash Collateral, the Borrower will receive its Cash Collateral back first).  The Borrower hereby grants to the Administrative Agent, for the benefit of the applicable Issuing Bank and the Secured Parties, a first priority and continuing perfected security interest in and Lien on such account and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in such account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor.  The Borrower's obligation to deposit amounts pursuant to this Section 2.07(j) shall be absolute and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a Letter of Credit, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which any Debtor may now or hereafter have against any such beneficiary, the applicable Issuing Bank, the Administrative Agent, the Lenders or any other Person for any reason whatsoever (other than payment).  Such deposit shall be held as collateral securing the payment and performance of the Borrower's and the Guarantors' obligations to reimburse Letters of Credit and any other obligations under this Agreement and the other Loan Documents.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account.  In addition to any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall bear interest.  Interest or profits, if any, on such investments shall accumulate in such account.  Moneys in such account shall be applied by the Administrative Agent to reimburse the applicable Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors under this Agreement or the other Loan Documents.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three (3) Business Days after all Events of Default have been cured or waived.

(k)    Applicability of ISP and UCP.  Unless otherwise expressly agreed by an Issuing Bank and the Borrower when a Letter of Credit is issued, the rules of the ISP shall apply to each standby Letter of Credit and the rules of the UCP shall apply to each commercial Letter of Credit.

(l)    Issuing Bank Reports to the Administrative Agent.  Unless otherwise agreed by the Administrative Agent, the Issuing Bank shall, in addition to its notification obligations set forth elsewhere in this Section, report in writing to the Administrative Agent (i) periodic activity (for such period or recurrent periods as shall be requested by the Administrative Agent) in respect of Letters of Credit issued

43

by the Issuing Bank, including issuances, extensions, amendments and renewals, expirations and cancelations and disbursements and reimbursements, (ii) at least one Business Day prior to the time that the Issuing Bank issues, amends, renews or extends a Letter of Credit, the date of such issuance, amendment, renewal or extension and the stated amount of the applicable Letters of Credit after giving effect to such issuance, amendment, renewal or extension (and whether the amounts thereof shall have changed), (iii) on each Business Day on which the Issuing Bank makes a payment pursuant to a Letter of Credit, the date and amount of such payment, (iv) on any Business Day on which the Borrower fails to reimburse a payment made pursuant to a Letter of Credit required to be reimbursed to the Issuing Bank on such day, the date of such failure and the amount of such payment and (v) on any other Business Day, such other information as the Administrative Agent shall reasonably request as to the Letters of Credit issued by the Issuing Bank.

(m)     Pre-Petition Letters of Credit.  Simultaneously with the occurrence of the Interim Facility Effective Date, and subject to execution and delivery by the Issuing Banks, the Administrative Agent and the Borrower of an issuer acknowledgement regarding the Pre-Petition Letters of Credit, in form and substance reasonably satisfactory to the Issuing Banks and the Administrative Agent, each of the Existing Letters of Credit shall be deemed issued under this Agreement (and shall comprise Letters of Credit under this Agreement and the other Loan Documents).

Section 2.08     Collateral; Guarantee.

(a)     Priority and Liens.  The parties hereto acknowledge and agree that, upon entry of the DIP Order and the delivery and execution of this Agreement, the Obligations shall at all times be secured and perfected pursuant to, and have the superpriority claims and liens as set forth in the DIP Order, subject at all times to the Carve-Out.

(b)     Payment of Obligations.  On the Termination Date, the Lenders shall be entitled to immediate payment of all Obligations without further application to, or order of, the Bankruptcy Court.

(c)     No Discharge; Survival of Claims.  Each Debtor agrees that (i) any Confirmation Order entered in the Cases shall not discharge or otherwise affect in any way any of the Obligations, other than after Payment in Full and termination of the Commitments on or before the effective date of an Approved Plan of Reorganization and (ii) to the extent the Obligations are not satisfied in full, (A) the Obligations shall not be discharged by the entry of a Confirmation Order (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (B) the Superpriority Claim granted to the Secured Parties pursuant to the DIP Order and the Liens granted to the Administrative Agent pursuant to the DIP Order shall not be affected in any manner by the entry of a Confirmation Order.

(d)     Perfection and Protection of Security Interests and Liens.  The Loan Parties will from time to time deliver to the Administrative Agent all financing statements, amendments, assignments and continuation statements, extension agreements and other documents, properly completed and executed (and acknowledged when required) by each Loan Party, as applicable, in form and substance reasonably satisfactory to the Administrative Agent, in each case, which the Administrative Agent reasonably requests for the purpose of perfecting, confirming, or protecting its lien and security interest in Collateral for the purpose of securing the Obligations; provided that the Loan Parties acknowledge that all such liens and security interests are perfected upon entry of the Interim Order.

(e)     [Reserved]

(f)     [Reserved]

(g)     The Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (i) the motions seeking approval of the Loan Documents and the DIP Facility and (ii) the hearings for the approval of the Interim Order and the Final Order were given in each case.  The Borrower has given, on a timely basis as specified in the Interim Order, all notices required to be given on or prior to the date of this representation to all parties specified in the Interim Order.

(h)     All Obligations of the Debtors to the Lenders under the Loan Documents, including all Loans made under the DIP Facility, shall, subject to the Carve-Out, at all times:

(i)     pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several Superpriority Claim status in the Case, which claims in respect of the New Money Facility and the Refinancing Facility shall be *pari passu* and shall be senior in priority and payment to the obligations under the Pre-Petition Credit Agreement;

(ii)     pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority Lien on the Collateral to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date or liens that were in existence immediately prior to the Petition Date that are perfected as expressly permitted by the Bankruptcy Code; provided that Avoidance Action Proceeds shall not be so secured or perfected until entry of the Final Order;

(iii)     pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected junior lien on the Collateral that is subject only to the Pre-Petition Prior Liens; and

(iv)     pursuant to Bankruptcy Code section 364(d), be secured by a perfected first priority senior priming Lien on all other Collateral not described in clauses (ii) and (iii) above, which Lien (x) shall be senior to the Prepetition First Lien Adequate Protection Liens (as defined in the DIP Order) and senior and priming to (A) the Liens securing the Pre-Petition Credit Agreement, Holdings Term Loan and Sellers Notes,  and (B) any Liens that are junior to the Liens securing the Pre-Petition Credit Agreement or the First Lien Adequate Protection Liens (as defined in the DIP Order), after giving effect to any intercreditor or subordination agreements and shall be junior only to the Pre-Petition Prior Liens and the Carve-Out.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01     Repayment of Loans.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Maturity Date.

Section 3.02     Interest.

(a)     ABR Loans.  The outstanding principal amount of the Loans comprising each ABR Borrowing shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b)     Eurodollar Loans.  The outstanding principal amount of the Loans comprising each Eurodollar Borrowing shall bear interest at a rate per annum equal to the Eurodollar Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)      Default Rate.  If any principal of or interest on any Loan or any fee or other amount payable by the Borrower or any Guarantor hereunder or under any other Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, then such overdue amount shall bear interest, after as well as before judgment, from the date of such non-payment to the date on which such amount is paid in full at a rate per annum, not to exceed the Highest Lawful Rate, equal to two percent (2.0%) plus (i) in the case of overdue principal, the rate that would otherwise be applicable thereto and (ii) in the case of overdue interest or other overdue amount, the rate applicable to ABR Loans as provided in Section 3.02(a); provided that no such interest shall accrue or be payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(d)      Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Maturity Date; provided that (i) interest accrued pursuant to Section 3.02(c) shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Maturity Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)      Interest Rate Computations.  All interest hereunder shall be computed on the basis of a year of three hundred sixty (360) days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), except that interest computed by reference to clause (b) of the Alternate Base Rate definition shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Eurodollar Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error and be binding upon the parties hereto.

Section 3.03      Inability to Determine Rates.  If in connection with any request for a Eurodollar Loan or a conversion to or continuation thereof, (a) the Administrative Agent reasonably determines that (i) dollar deposits are not being offered to banks in the London interbank market for the applicable amount and Interest Period of such Eurodollar Loan, or (ii) (A) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Loan or in connection with an existing or proposed ABR Loan, or (B) the administrator (or supervisor thereof) of LIBOR, or a Governmental Authority having jurisdiction over the Administrative Agent, has made a public statement identifying a specific date after which LIBOR will permanently or indefinitely cease to be published (and there is no successor administrator that will continue publication of LIBOR) or used for determining interest rates for loans (in each case with respect to clause (a) above, "Impacted Loans"), or (b) the Majority Lenders reasonably determine that for any reason the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Loan does not adequately and fairly reflect the cost to such Lenders of funding such Eurodollar Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter (in the case of clause (a)(ii)(B) above, being after the date of cessation of publication of LIBOR or, if earlier, such date as indicated by the applicable Governmental Authority), (x) the obligation of the Lenders to make or maintain Eurodollar Loans shall be suspended (to the extent of the affected Eurodollar Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence is made with respect to the Eurodollar Rate component of the Alternate Base Rate, the utilization of the Eurodollar Rate component in determining the Alternate Base Rate shall be suspended, in each case until the Administrative Agent revokes such notice (upon the instruction of the Majority Lenders, in the case of clause (b) above, who agree to so instruct the Administrative Agent once the relevant circumstances giving rise to such notice no longer exist); provided that, in the case of clause

(a)(ii) above, the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to LIBOR that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Loans (to the extent of the affected Eurodollar Loans or Interest Periods) and may revise such request to be a Borrowing of, conversion to, or continuation of Eurodollar Loans of a non-affected Interest Period in the event that the circumstances set forth in clause (b) apply or, failing that, will be deemed to have converted such request into a request for a ABR Loans in the amount specified therein.

Notwithstanding the foregoing, (a) if the Administrative Agent has made the determination described in Section 3.03(a) (other than with respect to an actual or potential cessation of the publication of LIBOR), the Administrative Agent with the consent of the Borrower and in consultation with the affected Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (1) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans, which it agrees to do once the relevant circumstances giving rise to such notice no longer exist, or (2) the Majority Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans and (B) if the Administrative Agent has made the determination described in Section 3.03(a) with respect to an actual or potential cessation of the publication of LIBOR, then the Administrative Agent and the Borrower shall endeavor to enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin) (provided that, if such alternate rate of interest as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement) and, notwithstanding anything to the contrary in Section 12.02, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Majority Lenders stating that such Majority Lenders object to such amendment; provided that, in the case of each of the foregoing clause (a) and (b), if any Lender reasonably determines that any Governmental Requirement has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof then the provisions of Section 5.06 shall apply to such Lender as if such Impacted Loans of such Lender were Eurodollar Loans.

Section 3.04    Prepayments.

(a)    Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part without premium or penalty, subject to prior notice in accordance with Section 3.04(b).

(b)    Notice and Terms of Optional Prepayment.  The Borrower shall notify the Administrative Agent by telephone (confirmed by fax or other method acceptable to the Administrative Agent) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., New York time, three (3) Business Days (or such shorter time as the Administrative Agent may agree) before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York time, on the date of prepayment.  Each such notice shall specify the prepayment date and the principal amount of such prepayment and the Type(s) of Loans to be prepaid and, if Eurodollar Loans are to be prepaid, the Interest Period(s) of such Loans.  Promptly following receipt of any such notice

relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02. Any election by the Borrower to voluntarily prepay any Borrowing pursuant to a notice delivered by the Borrower pursuant to this Section 3.04(b) may be made to be contingent upon the consummation of a refinancing or other event and such notice may otherwise be extended or revoked, in each case, with the requirements of Section 5.02 to apply to any failure of the contingency to occur and any such extension or revocation.

> (c)    Mandatory Prepayments.

> > (i)    Upon Optional Terminations and Reductions. If, after giving effect to any termination or reduction of the Aggregate Commitments pursuant to Section 2.06(b), or for any other reason, the aggregate Revolving Credit Exposure exceeds the Availability Limit, then the Borrower shall (A) prepay the New Money Loans, to be applied ratably to each New Money Loan on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (B) if such excess remains after prepaying all of the Borrowings as a result of LC Exposure, Cash Collateralize such remaining deficiency as provided in Section 2.07(j). The Borrower shall be obligated to make such prepayment and/or deposit of Cash Collateral substantially concurrently with the effectiveness of such termination or reduction.

> > (ii)    Subject to the payment priorities set forth in the DIP Order, if the Debtors (A) sell any Property outside of the ordinary course of business pursuant to Section 9.09 or otherwise sell any Property outside of the ordinary course of business as not otherwise permitted by this Agreement or (B) receive any insurance proceeds or condemnation proceeds, in each case, including when an Event of Default exists, then the Borrower shall prepay the Refinanced Loans (ratably to each Refinancing Lender) in an aggregate amount equal to the lesser of (x) 100% of net cash proceeds received from such sale or proceeds and (y) the aggregate principal amount of Refinanced Loans then outstanding. The Borrower shall be obligated to make such prepayment and/or Cash Collateralize such excess on the date it or any Subsidiary receives net cash proceeds, provided that payments required to be made pursuant to this Section 3.04(c)(ii) must be made on or prior to the Termination Date. Each prepayment made pursuant to this Section 3.04(c)(ii) shall be applied ratably to the Refinanced Loans. Prepayments pursuant to this Section 3.04(c)(ii) shall be accompanied by accrued interest to the extent any interest under such Loans being repaid remains unpaid.

> > (iii)    Application of Prepayments to Types of Borrowings. Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied, first, ratably to any ABR Borrowings then outstanding, and, second, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto.

> > (iv)    Interest to be Paid with Prepayments. Prepayments pursuant to this Section 3.04(c) shall be accompanied by accrued interest to the extent required by Section 3.02.

> (d)    No Premium or Penalty. Prepayments permitted or required under this Section 3.04 shall be without premium or penalty, except as required under Section 5.02.

(e)     No Effect on Secured Swap Agreements and Secured Cash Management Agreements. Prepayments permitted or required under this Section 3.04 shall not affect the Borrower's obligation to continue making payments under any Secured Swap Agreement or Secured Cash Management Agreement, as applicable, each of which shall remain in full force and effect notwithstanding such prepayment, subject to the terms of such Secured Swap Agreement or Secured Cash Management Agreement, as applicable.

Section 3.05     Fees.

(a)     Commitment Fees.  The Borrower agrees to pay to the Administrative Agent for the account of each New Money Lender, in accordance with each such Lender's Applicable Percentage, a commitment fee, which shall accrue at a rate equal to the Commitment Fee Rate on the daily amount of the unused amount of the Commitments (taking into account the Availability Limit for the Interim Period) of such Lender during the period from the date of this Agreement to the Maturity Date.  Accrued commitment fees shall be payable in arrears on the third Business Day following the last day of each month of each year and on the Maturity Date, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)     Letter of Credit Fees.  The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Eurodollar Loans on the daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from the date of this Agreement to the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, (ii) to the applicable Issuing Bank a fronting fee, which shall accrue at the rate of one-eighth of one percent (0.125%) per annum on the daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, and (iii) to the applicable Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.  Participation fees and fronting fees accrued through and including the last day of each month of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after the date of this Agreement; provided that all such fees shall be payable on the Maturity Date and any such fees accruing after the Maturity Date shall be payable on demand.  Any other fees payable to the applicable Issuing Bank pursuant to this Section 3.05(b) shall be payable within thirty (30) days after demand.  All participation fees and fronting fees shall be computed on the basis of a year of three hundred sixty (360) days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)     Administrative Agent Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon in writing between the Borrower and the Administrative Agent.

(d)     Up-Front Fees.  The Borrower agrees to pay to the Administrative Agent, for the ratable benefit of each New Money Lender, an up-front fee (the "Up-Front Fee") in an amount equal to 2.00% of the Aggregate Commitments of New Money Loans, which fee shall be earned and due and payable

in full on the Interim Facility Effective Date (and which shall be paid out of (or netted from) the proceeds of a Borrowing made on the Interim Facility Effective Date).

# ARTICLE IV
# PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01      Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)      Payments by the Borrower.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Sections 5.01, 5.02 or 5.03 or otherwise) prior to 1:00 p.m., New York time, on the date when due, in immediately available funds.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except payments to be made directly to the planned Issuing Bank as expressly provided herein and except that payments pursuant to Sections 5.01, 5.02, 5.03 and Section 12.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.  Fees, once paid, shall be fully earned and shall not be refundable under any circumstances.

(b)      Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)      Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 4.01(c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from, or setoff happening as a result of the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary (as to which the provisions of this Section 4.01(c) shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender

50

acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 4.02    Presumption of Payment by the Borrower.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders and/or any applicable Issuing Bank that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders and/or any applicable Issuing Bank, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders and/or any applicable Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender and/or any applicable Issuing Bank with interest thereon, for each day from the date such amount is distributed to it to the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03    Disposition of Proceeds.  The Security Instruments contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Administrative Agent for the benefit of the Lenders of all of the Borrower's or each Guarantor's interest in and to production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property.  The Security Instruments further provide in general for the application of such proceeds to the satisfaction of the Obligations and other obligations described therein and secured thereby.  Notwithstanding the assignment contained in such Security Instruments, until the occurrence of an Event of Default, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Debtors and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Subsidiaries.

Section 4.04    Defaulting Lenders.

(a)    Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 12.02(f).

(ii)    Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article X or otherwise), shall be applied at such time or times as may be determined by the Administrative Agent as follows:  first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a *pro rata* basis of any amounts owing by that Defaulting Lender to any Issuing Bank hereunder; third, if so determined by the Administrative Agent or requested by any Issuing Bank, to be held as Cash Collateral or deposit balances for future funding obligations of that Defaulting Lender of any Letter of Credit; fourth, as the Borrower may request (so long as no Default or Event of Default has occurred and is continuing), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so

51

determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; sixth, to the payment of any amounts owing to the Lenders and Issuing Banks as a result of any judgment of a court of competent jurisdiction obtained by any Lender and/or Issuing Bank against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default has occurred and is continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and eighth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or LC Borrowings in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans or LC Borrowings were made at a time when the conditions set forth in Section 6.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and LC Borrowings owed to, all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of, or LC Borrowings owed to, that Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateralized cash or deposit account balances pursuant to this Section 4.04(a)(ii) shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees. That Defaulting Lender (A) shall not be entitled to receive any commitment fee pursuant to Section 3.05(a) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender) and (B) shall not be entitled to receive any Letter of Credit participation fee pursuant to Section 3.05(b)(i) for any period during which such Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to such Defaulting Lender); provided that the Borrower shall pay (A) to such Defaulting Lender the portion of such fee which is proportionate to the portion of the Defaulting Lender's LC Exposure for which it has provided Cash Collateral satisfactory to the applicable Issuing Bank pursuant to Section 2.07(a), (B) to each Non-Defaulting Lender that portion of any such fee which is proportionate to its Pro Rata Share of the Defaulting Lender's LC Exposure which has been allocated to it pursuant to Section 4.04(a)(iv) and (C) to pay to the Issuing Bank the remaining portion of such fee (except to the extent that the Borrower has Cash Collateralized the LC Exposure attributable thereto (it being understood that the Borrower shall not be required to pay such fees on the portion of the Defaulting Lender's LC Exposure that it has Cash Collateralized)).

(iv)    Reallocation of Pro Rata Share to Reduce Fronting Exposure. During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each Non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit pursuant to Section 2.07, the "Pro Rata Share" of each Non-Defaulting Lender's Loans and LC Exposure shall be computed without giving effect to the Commitment of that Defaulting Lender (except to the extent that the Defaulting Lender has Cash Collateralized any LC Exposure attributable to it); provided that (i) each such reallocation shall be given effect only if, at the date the applicable Lender becomes a Defaulting Lender, no Default or Event of Default has occurred and is continuing; and (ii) the aggregate obligation of each Non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit shall not exceed the positive difference, if any, of (A) the Commitment of that Non-Defaulting Lender minus (B) the aggregate Revolving Credit Exposure of that Lender. Subject to clause (c) of this Section 4.04, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(b)      Defaulting Lender Cure.  If the Borrower, the Administrative Agent and each Issuing Bank agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateralized cash or deposit account balances), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a *pro rata* basis by the Lenders in accordance with their Pro Rata Share (without giving effect to Section 4.04(a)(iv)), whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

(c)      Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(ii)      the effects of any Bail-In Action on any such liability, including, if applicable:

(A)      reduction in full or in part or cancellation of any such liability;

(B)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(C)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**ARTICLE V**
**INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES**

Section 5.01      Increased Costs.

(a)      Eurodollar Changes in Law.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender;

(ii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender; or

(iii)    subject any Lender to any Taxes (other than (A) Indemnified Taxes or Other Taxes, (B) Taxes described in clauses (b) through (e) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its Loans, Loan principal, Letters of Credit, Commitments, or other Obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or otherwise), excluding for purposes of this Section 5.01(a) any such increased costs or reduction in amount resulting from capital requirements contemplated by Section 5.01(b) or any amount owed under Section 5.01(f), then from time to time upon written demand of such Lender setting forth in reasonable detail such increased costs or reduction suffered, the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)    Capital Requirements.  If any Lender or Issuing Bank reasonably determines that any Change in Law regarding capital adequacy or liquidity requirements occurring after the Interim Facility Effective Date has the effect of reducing the rate of return on such Lender's or any Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy or liquidity), then from time to time, upon receipt of a certificate of a Lender as required under Section 5.01(c), the Borrower will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender and/or Issuing Bank or such Lender's and/or such Issuing Bank's holding company for any such reduction suffered.

(c)    Certificates.  A certificate of a Lender or Issuing Bank setting forth in reasonable detail the calculation and the amount or amounts necessary to compensate such Lender or such Issuing Bank or its holding company, as the case may be, as specified in Section 5.01(a) or Section 5.01(b) shall be delivered to the Borrower and the Administrative Agent and shall be conclusive absent manifest error. The Borrower shall pay such Lender or such Issuing Bank, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

(d)    Requests for Compensation.  If any Lender requests compensation from the Borrower under Section 5.01, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another applicable Eurodollar Loan, or, if applicable, to convert ABR Loans into Eurodollar Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 5.01(e) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(e)    Making, Continuing or Converting Loans.  If the obligation of any Lender to make or continue any Eurodollar Loan, or to convert ABR Loans into Eurodollar Loans shall be suspended pursuant to Section 5.01(d) hereof, such Lender's applicable Eurodollar Loans shall be automatically

54

converted into ABR Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such Eurodollar Loans and:

      (i)      to the extent that such Lender's Eurodollar Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurodollar Loans shall be applied instead to its ABR Loans;

      (ii)      all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurodollar Loans shall be made or continued instead as ABR Loans (if possible), and all ABR Loans of such Lender that would otherwise be converted into Eurodollar Loans shall remain as ABR Loans; and

      (iii)      if any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 5.01 hereof that gave rise to the conversion of any of such Lender's Eurodollar Loans pursuant to this Section 5.01 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Loans made by other Lenders hereunder are outstanding, if applicable, such Lender's ABR Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurodollar Loans hereunder and by such Lender are held *pro rata* (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments.

      (f)      Eurocurrency Liabilities. The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits in respect of Eurodollar Loans, additional interest on the unpaid principal amount of each Eurodollar Loan equal to the actual cost of such reserves allocated to such Loan by such Lender (as reasonably determined by each such Lender in good faith), which shall be due and payable on each date on which interest is payable on such Loan; provided that the Borrower shall have received a ten (10) days' prior written notice (with a copy to the Administrative Agent) of such additional interest from such Lender. If a Lender fails to give notice ten (10) days prior to the relevant Interest Payment Date, such additional interest shall be due and payable ten (10) days from receipt of such notice.

      Section 5.02      Break Funding Payments. In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan into an ABR Loan other than on the last day of the Interest Period applicable thereto or (c) the failure by the Borrower (for reasons other than the failure of a Lender to make a Loan) to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, then, upon written demand of any Lender (with a copy to the Administrative Agent), the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event (exclusive of lost profits or opportunity costs).

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

      Section 5.03      Taxes.

      (a)      Payments Free of Taxes. Any and all payments by or on account of any obligation of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if the Borrower or any Guarantor shall

be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all such required deductions or withholdings of Indemnified Taxes or Other Taxes (including deductions applicable to additional sums payable under this Section 5.03(a)), the Administrative Agent, Lender or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Borrower or such Guarantor shall make such deductions or withholdings and (iii) the Borrower or such Guarantor shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

       (b)       Payment of Other Taxes by the Borrower.  The Borrower shall timely pay, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

       (c)       Indemnification by the Borrower.  The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.03) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate of the Administrative Agent, a Lender or the Issuing Bank as to the amount and reasonable detail as to basis and calculation of such payment or liability under this Section 5.03 shall be delivered to the Borrower and shall be conclusive absent manifest error.

       (d)       Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower or a Guarantor to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

       (e)       Withholding Documentation.  Any Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement or any Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Each Lender shall promptly notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any such claimed exemption or reduction, or notify the Borrower and Administrative Agent in writing of its legal inability to do so.

       Without limiting the generality of the foregoing,

              (i)       any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent),

executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(ii)    any Foreign Lender, to the extent it is legally entitled to do so, shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(A)    duly completed originals of Internal Revenue Service Form W 8BEN or Form W-8BEN-E;

(B)    duly completed originals of Internal Revenue Service Form W 8ECI;

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, such Foreign Lender shall deliver to Borrower and the Administrative Agent a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10-percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate");

(D)    to the extent a Foreign Lender is not the beneficial owner, executed originals of Internal Revenue Service Form W-8IMY, accompanied by Internal Revenue Service Form W-8ECI, Internal Revenue Service Form W-8BEN or Form W-8BEN-E, a U.S. Tax Compliance Certificate, Internal Revenue Service Form W-9, and/or other certification documents from each beneficial owner, as applicable; and/or

(E)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or Administrative Agent to determine the withholding or deduction required to be made (however, the completion, execution and submission of documentation pursuant to this Section 5.03(e) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender).

(f)    Tax Refunds.  If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 5.03, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 5.03 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this clause (f), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this clause (f) the payment of which would place the Administrative Agent or Lender in a less favorable net after-Tax position than the Administrative Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted,

57

withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 5.03 shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

(g)       If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA, or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 5.03(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement. Each Lender shall promptly notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any such previously delivered documentation, and shall update such documentation or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)       Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes or Other Taxes attributable to such Lender (but only to the extent that the Borrower or any Guarantor has not already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Borrower and Guarantors to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to setoff and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this clause (h).

Section 5.04       Matters Applicable to All Requests for Compensation.

(a)       The Administrative Agent or any Lender claiming compensation under Section 5.01 and Section 5.03 shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error. In determining such amount, the Administrative Agent or such Lender may use any reasonable averaging and attribution methods.

(b)       With respect to any Lender's claim for compensation under Section 5.01 or Section 5.03, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; provided that, if the circumstance giving rise to such claim is retroactive, then such one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.05    <u>Mitigation Obligations</u>.  If any Lender requests compensation under <u>Section 5.01</u>, if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 5.03</u> or if any Lender provides notice pursuant to <u>Section 5.06</u>, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 5.01</u> or <u>Section 5.03</u> or eliminate the need to give a notice pursuant to <u>Section 5.06</u>, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.

Section 5.06    <u>Illegality</u>.  If any Lender reasonably determines that as a result of any Change in Law it has become unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its lending office to make, maintain or fund Eurodollar Loans, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (a) any obligation of such Lender to make or continue Eurodollar Loans or to convert ABR Loans to Eurodollar Loans shall be suspended and (b) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Eurodollar Rate component of ABR, the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of ABR, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist (it being understood that such Lender agrees to so advise the Administrative Agent once the relevant circumstances giving rise to such determination no longer exists).  Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Loans of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurodollar Rate component of ABR), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurodollar Loans and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar Rate, the Administrative Agent shall during the period of such suspension compute ABR applicable to such Lender without reference to the Eurodollar Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate (it being understood that such Lender agrees to so advise the Administrative Agent once such illegality no longer exists).  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

## ARTICLE VI
## CONDITIONS PRECEDENT

Section 6.01    <u>Interim Facility Effective Date</u>.  The obligation of each Lender to enter into and execute this Agreement and make Loans and of the Issuing Bank to issue Letters of Credit, in each case, during the Interim Period shall commence when each of the following conditions precedent shall have been satisfied (or waived in accordance with <u>Section 12.02</u>) (such date, the "<u>Interim Facility Effective Date</u>"):

(a)    the Petition Date shall have occurred.

(b)    (i) within three (3) Business Days following the Petition Date, the Interim Order shall have been entered on the docket of the Bankruptcy Court, (ii) the Interim Order shall be in full force

and effect and shall not have been (A) vacated, stayed or reversed, or (B) modified or amended in any respect without the prior written consent of the Administrative Agent in its reasonable discretion, and (iii) the Loan Parties shall be in compliance with the terms of the Interim Order in all material respects.

(c)     (i) all first-day motions filed by the Loan Parties in the Cases (including any motions related to cash management or any critical vendor or supplier motions) shall not be materially inconsistent with  the RSA or the Approved Plan of Reorganization and (ii) the Cash Management Order entered by the Bankruptcy Court shall be in form and substance reasonably acceptable to the Administrative Agent.

(d)     the Administrative Agent shall have received (i) duly executed and delivered counterparts (in such numbers as may be requested by the Administrative Agent) of this Agreement and the other Loan Documents to be executed and delivered on or prior to such date, from each party hereto or thereto, as applicable, signed on behalf of such party, in each case in form and substance acceptable to the Administrative Agent and Lenders, and (ii) the duly executed Notes payable to each Lender that requests a Note in the principal amount equal to such Lender's Commitment and Loans.

(e)     the Administrative Agent shall have received a certificate of a Responsible Officer of the Loan Parties setting forth as of the Interim Facility Effective Date (i) resolutions of the board of directors or other appropriate governing body with respect to the authorization of each of the Loan Parties to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of each Loan Party (A) who are authorized to sign the Loan Documents to which such Loan Party is a party and (B) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers and (iv) the articles or certificate of incorporation and by-laws or other applicable organizational documents of the Loan Parties, certified as being true and complete.  The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from the Borrower to the contrary.

(f)     the RSA shall have been executed and shall be in full force and effect.

(g)     the Administrative Agent shall have received certificates of good standing (to the extent such concept exists) from the applicable Secretary of State (or equivalent) of the state of organization of each Loan Party as of a recent date prior to the Petition Date.

(h)     an Approved Plan of Reorganization shall have been filed with the Bankruptcy Court.

(i)     the Administrative Agent shall have received three (3) Business Days prior to the Interim Facility Effective Date (or such later date as the Administrative Agent reasonably agree) all documentation and other information required by regulatory authorities with respect to the Borrower and the Guarantors under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that has been reasonably requested by the Administrative Agent at least ten (10) days in advance of the Interim Facility Effective Date.  No later than three (3) Business Days prior to the Interim Facility Effective Date, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, then the Borrower shall have delivered to the Administrative Agent a Beneficial Ownership Certification, which shall be true and correct in all respects.

(j)     subject to the Interim DIP Order, all reasonable and documented pre- and post-petition fees, charges and expenses including, without limitation, (i) the fees, charges and expenses of Paul

Hastings LLP, RPA Advisors, LLC and Richards, Layton & Finger, PA, in each case pursuant to invoices delivered to the Borrower at least three (3) Business Days before the Interim Facility Effective Date, (ii) the Up-Front Fee, (iii) the fees agreed to in the Engagement Letter and (iv) all other amounts due and payable under Section 12.03 pursuant to invoices delivered to the Borrower at least three (3) Business Days before the Interim Facility Effective Date, in each case as required to be paid to the Administrative Agent and Lenders on or before the Interim Facility Effective Date, shall have been paid or shall be paid out of (or netted from) the proceeds of the Initial Borrowing.

(k)    the Administrative Agent shall have received a budget in form satisfactory to the Administrative Agent in its reasonable discretion and in substance reasonably acceptable to the Administrative Agent, the Majority Lenders and RPA Advisors, LLC (the "Initial Budget"), together with a certificate of the Borrower stating that such Initial Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Borrower to be reasonable at the time made and from the best information then available to the Borrower.

(l)    there shall not exist any action, suit, investigation, litigation or proceeding pending or threatened (other than the Cases) in any court or before any Governmental Authority or facts or circumstances that, in the reasonable opinion of the Administrative Agent and the Majority Lenders, materially and adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to result in a Material Adverse Effect.

(m)    all Obligations shall be secured by a perfected lien and security interest on all Collateral of the Loan Parties pursuant to, and such Lien and security interest shall have the priorities set forth in the Interim Order, subject only to the Liens permitted by Section 9.03 and the Carve-Out and all filing and recording fees and taxes with respect to such Liens and security interests that are due and payable as of the Interim Facility Effective Date shall have been duly paid.

(n)    the Administrative Agent shall have received the duly executed Engagement Letter.

(o)    all Pre-Petition Swap Agreements shall continue to be in full force and effect after giving effect to the Petition Date, without any amendments thereto that are adverse to the interests of the Borrower or its applicable Subsidiaries.

For purposes of determining compliance with the conditions specified in this Section 6.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Interim Facility Effective Date specifying its objection thereto.

Section 6.02    Final Facility Effective Date.  The obligation of each Lender to make its Loans hereunder and the obligation of the Issuing Bank to issue Letters of Credit hereunder during the Final Period shall commence as of the Business Day when each of the following conditions precedent shall have been satisfied (or waived in accordance with Section 12.02) (the "Final Facility Effective Date"):

(a)    the Bankruptcy Court shall have entered the Final Order within thirty (30) days (or such later date consented to by the Administrative Agent and the Majority Lenders) following the Petition Date, which Final Order shall (i) be in substantially the form of the Interim Order, with only such modifications thereto as are reasonably satisfactory in form and substance to the Administrative Agent, (ii) shall have been entered on the docket of the Bankruptcy Court and (iii) shall be in full force and effect and

61

shall not have been (A) vacated, stayed or reversed, or (B) modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders in their reasonable discretion.

(b)       the Debtors shall be in compliance in all material respects with (i) the DIP Order and (ii) subject to application of the Permitted Variance, the Budget.

(c)       The RSA shall have been executed and shall be in full force and effect.

For purposes of determining compliance with the conditions specified in this Section 6.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Final Facility Effective Date specifying its objection thereto.

Section 6.03    Conditions Precedent to Each Borrowing.  The obligation of each Lender to make Loans in respect of a Borrowing (including the Refinanced Loans and the initial funding of the New Money Loans on the Interim Facility Effective Date) and of any Issuing Bank to issue, amend, renew or extend any Letters of Credit, is subject to the satisfaction (or waiver in accordance with Section 12.02) of the following conditions:

(a)       At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default or Event of Default shall have occurred and be continuing.

(b)       The representations and warranties of the Borrower and the Guarantors set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, such representations and warranties shall be true and correct in all material respects as of such specified earlier date.

(c)       The receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 or a request for a Letter of Credit in accordance with Section 2.07(b), as applicable.

(d)       At the time of and immediately after giving effect to each such Borrowing or the issuance, amendment, renewal or extension of each such Letter of Credit, or both, as applicable, the aggregate Revolving Credit Exposures for all Lenders shall not exceed the then-effective Availability Limit.

(e)       (i) the Interim Order shall be in full force and effect and shall not have been (A) vacated, stayed or reversed or (B) modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders in their reasonable discretion and (ii) the Final Order shall be in full force and effect and shall not have been (A) vacated, stayed or reversed or (B) modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders in their reasonable discretion and (iii) the Loan Parties shall be in compliance with the applicable Order.

(f)       At the time of such Borrowing, no trustee or examiner (other than a fee examiner) shall have been appointed with respect to the Loan Parties or their Property.

(g)    No amendment, waiver or other modification to any Approved Plan of Reorganization shall have been made without the consent of the Administrative Agent in its reasonable discretion.

Each request for a Borrowing and each request for the issuance, amendment, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section 6.03.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders (including on the Interim Facility Effective Date) that:

Section 7.01    Organization; Powers.    Subject to any restrictions arising on account of any Debtor's status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, each Debtor (a) is (i) duly organized and validly existing and (ii) in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted and (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such good standing, power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02    Authority; Enforceability.    Subject to any restrictions arising on account of any Debtor's status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, the Transactions are within the Borrower's and each Guarantor's corporate, limited liability company or partnership powers, as applicable, and have been duly authorized by all necessary organizational and, if required, action by any holders of its Equity Interests.  Each Loan Document to which the Borrower and each Guarantor is a party has been duly executed and delivered by the Borrower and such Guarantor and, upon entry of the Interim Order or the Final Order, as applicable, constitutes a legal, valid and binding obligation of the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to entry of each DIP Order and subject to any restrictions arising on account of any Debtor's status as a "debtor" under the Bankruptcy Code, and further subject to other applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights or enforceability thereof generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03    Approvals; No Conflicts.    Subject to the entry of the DIP Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person, nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the Transactions, except such as have been obtained or made and are in full force and effect other than the recording and filing of the Security Instruments to effect and maintain perfection of Liens granted by this Agreement and required by the applicable DIP Order, (b) will not violate any Governmental Requirements (including the PATRIOT Act and OFAC) applicable to any Loan Party, (c) will not violate the charter, by-laws or other organizational documents of any Loan Party, (d) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party, or give rise to a right thereunder to require any payment to be made by any such Loan Party and (e) will not result in the creation or imposition of any Lien on any Property of any Loan Party (other than the Liens and security interests in favor of the Administrative Agent (or any designee) created by the Loan Documents), except in each case referred to in clauses (a), (b), (d) or (e) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

63

Section 7.04    <u>Financial Condition; No Material Adverse Change</u>.

(a)    The Borrower has heretofore furnished to the Administrative Agent (i) the audited financial statements of the Borrower for the fiscal year ended December 31, 2018 and (ii) the unaudited balance sheet and statements of income, members' equity and cash flows as of and for the fiscal quarters ended March 31, 2019, and June 30, 2019.

(b)    Each of the foregoing financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the entities for which such financial statements have been provided as of such date and for such period in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited quarterly financial statements.

(c)    Since the Petition Date, there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

(d)    Other than the Facility, no Debtor has on the Interim Facility Effective Date, after giving effect to the Transactions, any Indebtedness in excess of one million dollars ($1,000,000) in the aggregate (other than the Loans and Letters of Credit, but including Disqualified Stock) of any one or more of the Borrower and its Subsidiaries or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in the Interim Facility Effective Date Financial Statements or as otherwise disclosed to the Administrative Agent.

Section 7.05    <u>Litigation</u>.  Subject to any restrictions arising on account of the Borrower's or any Debtor's status as a "debtor" under the Bankruptcy Code and except as set forth on <u>Schedule 7.05</u>, and other than the Cases, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Debtors (a) which materially affect or pertain to the Transactions or this Agreement or any other Loan Document, (b) after giving effect to insurance, as to which there is a reasonable possibility of an adverse determination that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (c) that, as of the Interim Facility Effective Date, question the validity or enforceability of any of the Loan Documents or (d) which is not otherwise subject to the automatic stay as a result of the Cases.

Section 7.06    <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 7.06</u> or as could not be reasonably expected to have a Material Adverse Effect:

(a)    the operations of any Debtor and any Property of and Debtor are, and since December 31, 2018 have been, in compliance with all Environmental Laws;

(b)    no Property of any Debtor, nor the operations currently conducted thereon, are subject to any existing, or to the knowledge of the Borrower, threatened, administrative enforcement action, lawsuit, or proceeding by or before any court or Governmental Authority or to any order or judgment imposing remedial obligations under Environmental Laws;

(c)    all permits, licenses, exemptions, approvals or similar authorizations, if any, required under applicable Environmental Law to be obtained or filed in connection with the current operation or use of any and all Property of any Debtor have been duly obtained or filed, and each Debtor is in compliance with the terms and conditions of all such permits, licenses and similar authorizations;

(d)    there has been no Release or threatened Release by any Debtor, or to the Borrower's knowledge by any other Person, of Hazardous Materials at, on, under or from any of the Debtors' Properties that currently requires investigation, remediation, abatement, removal or monitoring of Hazardous Materials under applicable Environmental Laws; and

(e)    no Debtor has received any written notice asserting an alleged Environmental Liability or obligation under any applicable Environmental Laws with respect to the Debtors' Properties or with respect to real properties the Debtors do not own or operate.

Section 7.07    Compliance with Laws.

(a)    Each Debtor is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    The use of proceeds of the Loans will not violate the PATRIOT Act in any material respect.

(c)    To the extent applicable, each Debtor is in compliance, in all material respects, with the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) ("OFAC").

(d)    In all material respects, no part of the proceeds of any Loan will be used, directly or, to the knowledge of any Debtor, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended ("FCPA").

Section 7.08    Investment Company Act.    No Debtor is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 7.09    Taxes.    Each Debtor has timely filed or caused to be filed all Tax returns and reports required to have been filed by it and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Debtor has set aside on its books adequate reserves in accordance with GAAP (b) to the extent otherwise excused or prohibited by the Bankruptcy Code and not otherwise authorized by the Bankruptcy Court or (c) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

Section 7.10    ERISA. Except to the extent excused by the Bankruptcy Court or as a result of the filing of the Cases:

(a)    Except as could not reasonably be expected to result in a Material Adverse Effect, each Plan is, and has been, maintained in substantial compliance with ERISA and, where applicable, the Code.  Except as could not reasonably be expected to result in a Material Adverse Effect, there has been no non-exempt prohibited transaction under ERISA section 406 or Code section 4975 with respect to any Plan which could reasonably be expected to result in liability to any Debtor or ERISA Affiliate.

(b)    No ERISA Event has occurred which could reasonably be expected to result in a Material Adverse Effect.

(c)      As of the Interim Facility Effective Date, the excess of the present value of all benefit liabilities under the Plan of each Debtor and the ERISA Affiliates (based on those assumptions used to fund such Plan), as of the last annual valuation date applicable thereto for which a valuation is available, over the value of the assets of such Plan could not reasonably be expected to have a Material Adverse Effect, and the excess of the present value of all benefit liabilities of all underfunded Plans (based on those assumptions used to fund each such Plan) as of the last annual valuation dates applicable thereto for which valuations are available, over the value of the assets of all such underfunded Plans could not reasonably be expected to have a Material Adverse Effect.

Section 7.11     Disclosure; No Material Misstatements.  To the best of the Borrower's knowledge, no report, financial statement, certificate or other written information furnished by or on behalf of any Debtor (other than projected financial information, *pro forma* financial information, the Reserve Report and information of a general economic or industry nature) to the Administrative Agent or any Lender in connection with the Transactions and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished), when taken as a whole, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading.  With respect to projected financial information, *pro forma* financial information and the Reserve Report, the Borrower represents pursuant to this Section 7.11 only that (w) such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation and when delivered to the Administrative Agent or the Lenders (it being understood that such projections may vary from actual results and that such variances may be material and that, with respect to the Reserve Report, projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in the Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Debtors do not warrant that such opinions, estimates and projections will ultimately prove to be accurate), (x) as of the Interim Facility Effective Date, there has been no decrease in the amount of the estimated Proved Reserves shown in the Reserve Report since the date thereof, except for changes which have occurred as a result of production in the ordinary course of business and (y) as of the Interim Facility Effective Date, at the time furnished, the Reserve Report did not omit any material statement or information necessary to cause the same not to be misleading to the Administrative Agent and the Lenders in any material respect.

Section 7.12     Subsidiaries.  The Debtors have maintained insurance policies sufficient to comply with Section 8.06.  As of the Interim Facility Effective Date, Arsenal Energy Holdings LLC has no Subsidiaries other than those set forth on Schedule 7.12 and no Debtor has Foreign Subsidiaries.  Each Subsidiary Guarantor or Parent Company Debtor as of the Interim Facility Effective Date (after giving effect to the Transactions) has been so designated on Schedule 7.12.

Section 7.13     Location of Business and Offices.  The Borrower's jurisdiction of organization is the State of Delaware; the name of the Borrower as listed in the public records of its jurisdiction of organization is Arsenal Resources Development LLC; the tax identification number of the Borrower is 83-2064072; and the organizational identification number of the Borrower in its jurisdiction of organization is 7078253 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to Section 8.01(i)).  The Borrower's principal place of business and chief executive office is located at the address specified in Section 12.01(a) (or as set forth in any notice delivered pursuant to Section 8.01(i) or Section 12.01(a)).  Each Subsidiary's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on Schedule 7.12 (or as set forth in any notices delivered pursuant to Section 8.01(i)).

Section 7.14    <u>Properties; Maintenance of Properties; Titles, Etc.</u>  Except as a result of the filing of the Cases (and subject to any necessary order or authorization of the Bankruptcy Court), and except as could not have a Material Adverse Effect:

(a)    Subject to any Liens permitted hereunder, the Debtor specified as the owner owns (or will own if and when acquired) the net interests in production attributable to the Hydrocarbon Interests as reflected in the Reserve Report, and the ownership of such Properties shall not in any material respect obligate such Debtor to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount materially in excess of the working interest of each Property set forth in the Reserve Report that is not offset by a corresponding proportionate increase in the such Debtor's net revenue interest in such Property.

(b)    All material leases and agreements necessary for the conduct of the business of the Debtors are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which, with the giving of notice or the passage of time or both, would give rise to a default under any such lease or leases.

(c)    The rights and Properties presently owned, leased or licensed by the Debtors including all easements and rights of way, include all rights and Properties necessary to permit the Debtors to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof (subject to any changes to the business resulting from transactions permitted hereunder).

(d)    Each Debtor owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual Property material to its business, and the use thereof by any Debtor does not infringe upon the rights of any other Person.  The Debtors either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons.

(e)    All of the Properties of the Debtors which are reasonably necessary for the operation of their respective businesses are in good working condition and are maintained in accordance with prudent business standards and in compliance with <u>Section 8.05</u>.

Section 7.15    <u>Gas Imbalances, Prepayments</u>.  Except (a) as set forth on <u>Schedule 7.15</u> or (b) thereafter as either disclosed in writing to the Administrative Agent or included in the Reserve Report Certificate, on a net basis there are no gas imbalances, take or pay or other prepayments which would require any Debtor to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding two percent (2.0%) of the aggregate volumes of Hydrocarbons (on an Mcf equivalent basis) listed in the Reserve Report.

Section 7.16    <u>Marketing of Production</u>.  Except (a) for contracts listed and in effect on the date hereof on <u>Schedule 7.16</u> or (b) thereafter either disclosed in writing to the Administrative Agent or included in the Reserve Report (with respect to all of which contracts the Borrower represents that the Debtors are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on sixty (60) days' notice or less without penalty or detriment for the sale of production from the Debtors' Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are

67

currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 7.17    Swap Agreements.  Schedule 7.17, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 8.01(d), sets forth, as of the date indicated on such schedule or report, a true and complete list of all material Swap Agreements of each Debtor, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof, all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 7.18    Use of Loans and Letters of Credit.  The proceeds of the Loans and the Letters of Credit shall be used in accordance with Section 8.16.

# ARTICLE VIII
# AFFIRMATIVE COVENANTS

Until Payment in Full, the Borrower covenants and agrees with the Lenders that:

Section 8.01    Financial Statements; Other Information.  The Borrower will furnish to the Administrative Agent for distribution to each Lender:

(a)    Annual Financial Statements.  As soon as available, but in any event not later than one hundred twenty (120) days after the end of each fiscal year of the Borrower, commencing with the fiscal year of the Borrower ending December 31, 2019, the audited consolidated balance sheet of the Borrower and its Subsidiaries and related consolidated statements of operations, member's equity and cash flows as of the end of and for such year and, in each case, setting forth in comparative form the figures for the previous fiscal year, all reported on by an independent public accounting firm of recognized national standing (without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Debtors on a consolidated basis in accordance with GAAP.

(b)    Quarterly Financial Statements.  As soon as available, but in any event not later than sixty (60) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, commencing with the fiscal quarter ending September 30, 2019, the consolidated balance sheet of the Borrwer and its Subsidiaries and related consolidated statements of operations, member's equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth, in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Debtors on a consolidated basis in accordance with GAAP, subject to changes resulting from normal year-end audit adjustments and the absence of footnotes.

(c)    Certificate of Financial Officer -- Compliance.  Concurrently with the delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer of the Borrower in substantially the form of Exhibit D hereto (i) certifying, to the knowledge of the certifying Financial Officer, as to whether a Default has occurred and is continuing and, if a Default has occurred and is continuing, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth a reasonably detailed calculation of the Financial Performance Covenant and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 1.05, which has not been previously disclosed pursuant to this

Section 8.01(c), and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(d)    <u>Certificate of Financial Officer – Swap Agreements</u>.  Concurrently with the delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer, in form and substance satisfactory to the Administrative Agent, setting forth as of the last Business Day of the most recently ended fiscal quarter or fiscal year, a true and complete list of all material Swap Agreements of each Debtor, the counterparty, type of Swap Agreement, trade date, effective date, termination date, notional amounts or volumes, the remaining notional amounts or volumes, the net mark-to-market value of each such Swap Agreement for which a mark-to-market value is reasonably available as of such day, the strike or fixed rate payor price and any new credit support agreements relating thereto not listed on Schedule 7.17 or previously disclosed to the Administrative Agent, any margin required or supplied under any credit support document and any other material terms reasonably requested to be set forth therein by the Administrative Agent in advance of delivery.

(e)    <u>Other Accounting Reports</u>.  Promptly upon receipt thereof, a copy of each other material financial accountant's letter (other than in the ordinary course of business) submitted to any Debtor by independent accountants in connection with any annual, interim or special audit made by them of the books of such Debtor.

(f)    <u>Lists of Purchasers</u>.  Concurrently with the delivery of financial statements under Section 8.01(a) or Section 8.01(b), a list of all Persons purchasing Hydrocarbons from the Debtors who collectively account for at least eighty-five percent (85.0%) of the revenues resulting from the sale of all Hydrocarbons by the Debtors during the then most recently completed fiscal quarter.

(g)    <u>Notice of Sales of Oil and Gas Properties</u>.  In the event any Debtor intends to Dispose of any Oil and Gas Properties for net cash proceeds in excess of one hundred thousand dollars ($100,000.00) individually or one million dollars ($1,000,000.00) in the aggregate, prior notice of such Disposition, the price thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent.

(h)    <u>Notice of Casualty Events</u>.  Prompt written notice of the occurrence of any Casualty Event with respect to any Oil and Gas Properties.

(i)    <u>Information Regarding Borrower and Guarantors</u>.  Promptly (and in any event within ten (10) Business Days (or such later time as the Administrative Agent may agree) of the following), written notice of any change in (i) any Debtor's corporate name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its Properties, (ii) the location of any Debtor's chief executive office or principal place of business, (iii) any Debtor's identity or corporate form, (iv) any Debtor's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization and (v) any Debtor's federal taxpayer identification number.

(j)    <u>Production Report and Lease Operating Statements</u>.  Concurrently with the delivery of financial statements under Section 8.01(a) or Section 8.01(b), a report setting forth, for each calendar month during the then current fiscal year to date, the volume of sold production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month.

69

(k)     Notices of Certain Changes.  Promptly, (and in any event within ten (10) Business Days (or such later time as the Administrative Agent may agree) of the following, after the execution thereof), copies of any material amendment, modification or supplement to the certificate or articles of incorporation, by-laws, any preferred stock designation or any other governance document of any Debtor.

(l)     Other Requested Information.  With reasonable promptness, following any request therefor, (i) such other information regarding the operations, business affairs and financial condition of any Debtor (including, without limitation, any Plan or Multiemployer Plan and any reports or other information required to be filed under ERISA), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent may reasonably request in writing from time to time; provided that notwithstanding anything to the contrary in this Section 8.01(l)(i), the obligations of the Debtors hereunder shall be subject to the Disclosure Restrictions and (ii) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering, anti-terrorism or anti-corruption laws, including Beneficial Ownership Certifications.

Section 8.02     Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender promptly, after a Responsible Officer of any Debtor obtains actual knowledge, notice of the following:

(a)     Defaults.  The occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(b)     Governmental Matters.  Other than the Cases, the filing or commencement of, or the threat in writing of, any action, suit, notice, proceeding, investigation or arbitration (alleging, without limitation, Environmental Liability) by or before any arbitrator or Governmental Authority against or affecting any Debtor not previously disclosed in writing to the Lenders or any material adverse development in any such action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lenders) that, in either case, would reasonably be expected to result in a Material Adverse Effect;

(c)     ERISA Events.  The occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred after the date of this Agreement, would reasonably be expected to result in a Material Adverse Effect;

(d)     To the extent reasonably practicable at least one (1) day prior to filing (or such shorter period as the Administrative Agent may agree), the Borrower shall use commercially reasonable efforts to provide the Administrative Agent copies of all material pleadings and motions (other than "first day" motions and proposed orders, and other than emergency pleadings or motions where, despite such Debtor's commercially reasonable efforts, such one day notice) to be filed by or on behalf of the Borrower or any of the other Loan Parties with the Bankruptcy Court in the Cases, or to be distributed by or on behalf of the Borrower or any of the other Loan Parties to any official committee appointed in the Cases, which such pleadings shall include the Administrative Agent as a notice party;

(e)     Events Resulting in MAEs.  Any other development that results in, or would reasonably be expected to result in a Material Adverse Effect.

Section 8.03     Existence; Conduct of Business.  Each Debtor will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and take all commercially reasonable actions to maintain the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which

its Oil and Gas Properties is located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any transaction permitted under Section 9.08.

Section 8.04    Payment of Tax Obligations.    Each Debtor shall pay, discharge or otherwise satisfy its obligations in respect of all Tax liabilities of the Debtors, before the same shall become due and payable, except (x) to the extent such payment is excused by, or is otherwise prohibited by the provisions of the Bankruptcy Code or order of the Bankruptcy Court and (y) where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and such Debtor has set aside on its books adequate reserves with respect thereto in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction) or (b) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 8.05    Operation and Maintenance of Properties.    Subject to any necessary order or authorization of the Bankruptcy Court, each Debtor will, except in each case, where the failure to so comply could not reasonably be expected to result in a Material Adverse Effect (it being understood that this Section 8.05 shall not restrict any transaction otherwise permitted by Sections 9.05, 9.08 or 9.09):

(a)    operate its Oil and Gas Properties and other material Properties or take reasonable action to cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements;

(b)    keep and maintain all Property material and reasonably necessary to the conduct of its business in good working order and condition (ordinary wear and tear and casualty and condemnation excepted) in accordance with prudent business standards; and

(c)    to the extent the Borrower is not the operator of any Property, the Borrower shall use commercially reasonable efforts to cause the operator to operate such Property in accordance with customary industry practices.

Section 8.06    Insurance.    Each Debtor will maintain, with financially sound and reputable insurance companies, insurance (subject to customary deductibles and retentions) in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.  The loss payable clauses or provisions in said insurance policy or policies insuring any of the Collateral for the Loans shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear (it being understood that, unless there is an Event of Default and the Majority Lenders instruct the Administrative Agent otherwise, the proceeds of any property insurance shall go to the Borrower) and such policies shall name the Administrative Agent and the Lenders as "additional insureds" and provide, to the extent the insurer will do so based on the commercially reasonable efforts of the Borrower, that the insurer will endeavor to give at least thirty (30) days prior notice of any cancellation to the Administrative Agent.  Notwithstanding the foregoing, the Debtors may self-insure with respect to such risks with respect to which companies of established reputation in the same general line of business in the same general area usually self-insure.

Section 8.07    Books and Records; Inspection Rights.    Each Debtor will maintain financial records in accordance with GAAP.  Each Debtor will permit any representatives designated by the Administrative Agent or any Lender (who shall be accompanied by the Administrative Agent), upon reasonable prior notice to the Borrower, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times during normal business hours as often as reasonably

requested; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights under this Section 8.07 and the Administrative Agent shall not exercise such rights more often than two times during any calendar year absent the existence of a continuing Event of Default and only one such visit per fiscal year shall be at the Borrower's expense; provided, further that, when an Event of Default exists, the Administrative Agent, any Lender or any respective representatives or independent contractors of the Administrative Agent or any Lender may do any of the foregoing at any time during normal business hours upon reasonable advance notice.  The Administrative Agent and the Majority Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 8.07, no Debtor will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Governmental Requirement or any binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product (collectively, the "Disclosure Restrictions").

Section 8.08    Compliance with Laws.  Subject to any necessary order or authorization of the Bankruptcy Court, each Debtor will comply with all laws, rules, regulations and orders of any Governmental Authority, whether now in effect or hereafter enacted, applicable to it or its Property, including the PATRIOT Act, OFAC, FCPA and ERISA, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 8.09    Environmental Matters.  Subject to any necessary order or authorization of the Bankruptcy Court, and except in each case with respect to this Section to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Debtor will: (i) comply with all Environmental Laws; (ii) to the extent required of them under any Environmental Laws, conduct any investigation, study, sampling and testing required by Environmental Laws, and undertake any cleanup, removal, remedial or other action required by Environmental Laws to remove and clean up any Releases of Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws; and (iii) take reasonable action to obtain and renew all material authorizations and permits required pursuant to Environmental Law for its operations.

Section 8.10    Further Assurances.

(a)    Each Debtor will promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments necessary or proper to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings or file any notices and financing statements in connection therewith.

(b)    The Borrower hereby authorizes the Administrative Agent to file one (1) or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of the Borrower or any other Guarantor where permitted by law, which financing statements may contain a description of collateral that describes such property in any manner as the Administrative Agent may reasonably determine is necessary or advisable to ensure the perfection of the security interest in the Collateral, including describing such property as "all assets" or "all property" or words of similar effect.

(c)    Notwithstanding anything in the Loan Document to the contrary, no actions in any jurisdiction outside of the United States or that are necessary to comply with any Governmental Requirement of any jurisdiction outside of the United States shall be required in order to create any security

72

interest in assets located, titled, registered or filed outside of the United States or to perfect such security interests (it being understood that there shall be no collateral or pledge agreements or similar agreements governed under the laws of any jurisdiction outside of the United States).

Section 8.11    Additional Collateral; Additional Guarantors.

(a)    Each Debtor shall guarantee the Obligations pursuant to the Loan Guarantee. In connection with any such guarantee, each Debtor shall promptly, (A) execute and deliver this Agreement or a joinder to this Agreement, in form and substance reasonably acceptable to the Administrative Agent (the "Joinder Agreement"), and any other Loan Document reasonably requested by the Administrative Agent and (B) pledge all of the Equity Interests of owned by Debtor pursuant to a Security Instrument or other Loan Document (other than Excluded Equity Interests).

(b)    Each Subsidiary of a Loan Party now existing or created, acquired or coming into existence after the date hereof, other than the Guarantors party hereto, shall promptly execute and deliver to the Administrative Agent a Joinder Agreement and any Security Instrument or other Loan Document (or joinder thereto) as may be required by the Administrative Agent. Such Subsidiary shall deliver to the Administrative Agent, simultaneously with its delivery of such Joinder Agreement and any such Security Instrument or other Loan Document (or joinder), (x) written evidence reasonably satisfactory to the Administrative Agent that such Subsidiary has taken all organizational action necessary to duly approve and authorize its execution, delivery and performance of such Joinder Agreement (including under the Loan Guarantee), any such Security Instrument and any other documents which it is required to execute, and (y) such additional closing documents, certificates and opinions of counsel as the Administrative Agent shall reasonably require.

Section 8.12    ERISA Compliance.  Each Debtor will promptly furnish to the Administrative Agent (i) promptly after a reasonable request therefore by the Administrative Agent, a copy of each annual and other report with respect to each Plan most recently filed with the United States Secretary of Labor, the Internal Revenue Service or the PBGC and (ii) promptly upon receipt thereof, copies of any notice of the PBGC's intention to terminate or to have a trustee appointed to administer any Plan.

Section 8.13    Swap Agreements.  The Pre-Petition Swap Agreements shall continue to be in full force and effect without any amendments thereto that are adverse to the interest of the Borrower or its Subsidiaries.

Section 8.14    [Reserved].

Section 8.15    Cash Management. Each Debtor shall maintain their cash management system as required by the Cash Management Order.

Section 8.16    Use of Proceeds. The proceeds of the Loans and Letters of Credit shall be used (a) to pay related transaction costs, fees and expenses; (b) to provide working capital and for other general corporate purposes of the Debtors in accordance with the Budget; (c) to make adequate protection payments as authorized by the Bankruptcy Court in the Interim Order or the Final Order, as applicable; (d) to pay obligations arising from or related to the Carve-Out; (e) to pay restructuring costs incurred in connection with the Cases; and (f) in the case of the Refinancing Facility, to refinance amounts outstanding under the Pre-Petition Credit Agreement, pursuant to the terms set forth in Article II. The Borrower and the other Loan Parties are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board). No part of the proceeds of any Loan or

Letter of Credit will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

Section 8.17    Milestones. Each Debtor shall take the following actions by the following dates (such dates, collectively, the "Chapter 11 Milestones"):

(a)    the Debtors shall have obtained approval of the Interim Order by the date that is no later than five (5) days following the Petition Date;

(b)    the Debtors shall have obtained approval of the Final Order by the date that is no later than thirty (30) days following the Petition Date;

(c)    unless the Bankruptcy Court shall have entered the Confirmation Order prior to such date, the Debtors shall have obtained approval of the Approved Bidding Procedures no later than seventy five (75) days after the Petition Date;

(d)    unless the Approved Plan of Reorganization is consummated prior to such date, an Approved Sale is not consummated by the date that is no later than one hundred seventy (170) days following the Petition Date.

Section 8.18    Post-Interim Facility Effective Date Covenants. The Borrower shall have used commercially reasonable efforts to deliver to the Administrative Agent, on or prior to the date that is ten (10) days following the Interim Facility Effective Date, (a) a certificate of insurance coverage of the Borrower evidencing that the Debtors, if any, are carrying insurance in accordance with Section 8.06 and (b) title information (including customary title opinions or reports or other documents) consistent with usual and customary standards for the geographic regions in which the existing Oil and Gas Properties are located, taking into account the size, scope and number of leases and wells of the Debtors, in respect of at least eighty-five percent (85%) of the aggregate present net value of the existing Oil and Gas Properties as set forth in the Reserve Report.

## ARTICLE IX
## NEGATIVE COVENANTS

Until Payment in Full, the Borrower covenants and agrees with the Lenders that:

Section 9.01    Financial Performance Covenant.  The Debtors shall not allow, during any Variance Testing Period, the Debtors' actual aggregate cash expenses and disbursements during such Variance Testing Period to be more than one-hundred-and-fifteen percent (115%) of the projected aggregate cash expenses and disbursements for such Variance Testing Period, as set forth in the Budget (the "Permitted Variance"), provided that the cash expenses and disbursements considered for determining compliance with this covenant shall exclude (i) disbursements and expenses in respect of professional fees incurred in the Cases during such Variance Testing Period, (ii) to the extent not included in the Budget, the Up-Front Fees  and other debt service payable to the RBL Lenders, as set forth in the Exit Term Sheet (as defined in the Final Order) and (iii) disbursements owed to third parties on account of royalty interests and working interests and provided, further that the Debtors may carry forward budgeted but unused disbursements in such Testing Period set forth in the Budget.

Section 9.02    Indebtedness.  No Debtor will, incur, create, assume or suffer to exist any Indebtedness, except:

(a)    the Obligations (including any Indebtedness arising under the Loan Documents);

(b)     Indebtedness (i) outstanding on the Petition Date and set forth on Schedule 9.02(b) and (ii) in respect of the Seller Notes and the Holdings Term Loan Facility;

(c)     Indebtedness arising under Capital Leases incurred prior to the Petition Date;

(d)     unsecured indebtedness incurred by the Debtors owing to the Debtors; provided that any such Indebtedness shall be subject to subordination terms reasonably satisfactory to the Administrative Agent;

(e)     the Excepted Debt of the Debtors in existence as of the Petition Date;

(f)     Guaranty Obligations of the Debtors in respect of Indebtedness of the Debtors otherwise permitted hereunder; and

(g)     other Indebtedness in an amount not to exceed one million dollars ($1,000,000).

Section 9.03     Liens.  No Debtor will create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)     Liens securing the Obligations or arising pursuant to any Loan Document;

(b)     (i) Liens on any Property of the Debtors existing on the Petition Date in respect of borrowed money and set forth on Schedule 9.03(b); provided that (A) no such Lien shall at any time be extended to cover any additional Property not subject thereto on the Petition Date and (B) the principal amount of the Indebtedness secured by such Liens shall not be extended, renewed, refunded or refinanced and (ii) Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code;

(c)     Excepted Liens;

(d)     Liens securing Indebtedness permitted pursuant to Section 9.02(c);

(e)     Liens securing any Indebtedness permitted by Sections 9.02(f) (solely and to the same extent that the Indebtedness guaranteed by such Guaranty Obligations are permitted to be subject to a Lien hereunder);

(f)     Liens securing Secured Cash Management Agreements and Secured Swap Obligations that were not entered into for speculative purposes;

(g)     Liens securing Pre-Petition Obligations, the Holdings Term Loan Facility and the Seller Notes; provided that such Liens are subject to the terms and conditions of the DIP Order;

(h)     Liens in an aggregate amount not to exceed five hundred thousand dollars ($500,000) at any time outstanding; and

(i)     Liens in respect of Adequate Protection Obligations to the extent, and subject to the conditions set forth in, the DIP Order.

Section 9.04     Dividends, Distributions and Redemptions.

(a)     Dividends and Distributions.  The Debtors will not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make

75

any distribution of their Property to their respective Equity Interest holders, except that (i) the Subsidiaries of the Borrower may declare and pay dividends or distributions ratably with respect to their Equity Interests and (ii) the Debtors may make Restricted Payments in an aggregate amount not to exceed five hundred thousand dollars ($500,000) in connection with stock option plans or other benefit plans for management or employees of the Debtors that have been approved by an order of the Bankruptcy Court reasonably satisfactory to the Administrative Agent.

(b)    Prepayments, Redemptions of Pre-Petition Obligations; Certain Amendments. The Debtors will not make any Redemption or any other prepayments of principal, interest or payment of fees on, or in connection with, the Pre-Petition Loan Documents, other than payments expressly provided for herein or pursuant to orders entered upon pleadings in form and substance reasonably satisfactory to the Administrative Agent. No Debtor shall consent to any amendment, supplement, waiver or other modification of the terms or provisions contained in any of (i) the Pre-Petition Loan Documents or (ii) any other Indebtedness for borrowed money.

Section 9.05    Investments, Loans and Advances.  No Debtor shall make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)    Investments in the other Debtors outstanding on the Petition Date;

(b)    (i) accounts or notes receivable arising from the grant of trade credit by the Debtors or the purchase of assets and services from the Debtors, in each case, in the ordinary course of business, (ii) in the form of a prepayment of fees and expenses by the Debtors, so long as such expenses are being paid in accordance with customary trade terms of the Debtors, (iii) advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business and (iv) Investments received in satisfaction or partial satisfaction thereof from account debtors and other credits to suppliers in the ordinary course of business arising from the settlement of delinquent obligations or disputes in respect of a secured Investment;

(c)    (i) Investments in assets that constituted Cash Equivalents at the time such Investments were made and (ii) pledges and deposits of cash earnest money and endorsements of negotiable instruments in connection with transactions otherwise permitted by Section 9.05;

(d)    Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 9.05 owing to the Debtors received as satisfaction or potential satisfaction of such debts or as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of any Debtor; provided that the Borrower shall give the Administrative Agent prompt written notice in the event that the aggregate amount of all Investments held at any one time under this Section 9.05(d) exceeds two million dollars ($2,000,000); and

(e)    Solely to the extent in existence on the Petition Date, (i) Investments in direct ownership interests in additional Oil and Gas Properties, related Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint venture or area of mutual interest agreements, gathering systems, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America and (ii) Investments in respect of the Joint Development Agreement.

Section 9.06    Nature of Business; International Operations.  Subject to any restrictions arising on account of the Debtors' status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, no

LEGAL_US_E # 144284119.14

Debtor will allow any material changes (a) to the character of its business as an independent oil and gas exploration and production company and business ancillary or reasonably related thereto or a reasonable extension thereof or (b) to the Debtor's identity or corporate structure, the jurisdiction in which such Person is incorporated or formed, or any organizational documents of such Debtor.  No Debtor will acquire or make any other expenditures (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States.

Section 9.07    <u>Limitation on Operating Leases</u>.  No Debtor will create, incur, assume or suffer to exist any operating lease constituting an obligation for the payment of rent for office space (excluding, for avoidance of doubt, leases of Hydrocarbon Interests and any leases constituting Indebtedness permitted under <u>Section 9.02</u>) unless all such amounts permitted pursuant to this <u>Section 9.07</u> do not, in the aggregate, exceed one million dollars ($1,000,000.00) per fiscal year.

Section 9.08    <u>Mergers, Etc.</u>  No Debtor will merge into or with or consolidate with any other Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of their Property (whether now owned or hereafter acquired) to any other Person, or liquidate or dissolve or divide, in each case except as permitted by <u>Section 9.09</u>.

Section 9.09    <u>Sale of Properties</u>.  No Debtor will sell, assign, farm-out, convey, dispose or otherwise transfer (including by (A) any sale and leaseback transaction or (B) an allocation of assets among newly divided limited liability companies pursuant to a "division" or "plan of division" under the Delaware Limited Liability Company Act) (each of the foregoing, a "<u>Disposition</u>") any Property except:

(a)    Dispositions of Hydrocarbons, inventory and other goods held for sale in the ordinary course of business;

(b)    (i) Dispositions of Hydrocarbon Interests to which no Proved Reserves are attributable and (ii) Farm-Out Agreements with respect to undeveloped acreage to which no Proved Reserves are attributable and assignments in connection with such Farm-Out Agreements;

(c)    Dispositions of (i) equipment, vehicles and immaterial assets (other than accounts receivable) that are no longer necessary for the business of the Borrower or such Subsidiary or is replaced by equipment, vehicles and other assets of at least comparable value and use and (ii) Cash Equivalents;

(d)    Dispositions of any Property of any Debtor pursuant to an order of the Bankruptcy Court; <u>provided</u> that such disposition shall be subject to the prior consent of the Administrative Agent and the Majority Lenders;

(e)    the Borrower and the Subsidiaries may lease, sublease, license or sublicense (on a non-exclusive basis with respect to any intellectual property) real, personal or intellectual property (other than Oil and Gas Properties) in the ordinary course of business;

(f)    transfers of Property subject to a Casualty Event or in connection with any other casualty event or condemnation proceeding with respect to Property of any Debtor;

(g)    the unwinding of any Swap Agreement;

(h)    Dispositions to the extent set forth in the Budget in an aggregate amount not to

exceed one million dollars ($1,000,000); and

(i)    Liens permitted under <u>Section 9.03</u> and Restricted Payments permitted under <u>Section 9.04</u> and transactions permitted by <u>Section 9.05</u> (other the intercompany transactions) and <u>Section 9.08</u> (other than <u>Section 9.08(d)</u>).

Section 9.10    <u>Transactions with Affiliates</u>.  No Debtor will enter into any transaction, including any purchase, sale, lease or exchange of Property or the rendering of any service, with any non-Debtor Affiliate other than (i) transactions or arrangements in place as of the Petition Date (including contractual obligations in place at such time), (ii) those approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to the Administrative Agent and the Majority Lenders (iii) transactions contemplated by the RSA or (iv) to the extent such transactions are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate; <u>provided</u> that the foregoing restriction will not apply to any Restricted Payment permitted by <u>Section 9.04</u>, and fees and compensation to, and indemnity provided on behalf of, officers, directors and employees of the Debtors in their capacity as such to the extent such fees and compensation are customary..

Section 9.11    <u>Subsidiaries</u>.  The Borrower shall have no Foreign Subsidiaries.

Section 9.12    <u>Negative Pledge Agreements; Dividend Restrictions</u>.  No Debtor will create, incur, assume or suffer to exist any Contractual Requirement (other than this Agreement, any other Loan Document, the Pre-Petition Loan Documents, the prepetition loan documents in existence on the date hereof relating to the Seller Notes and the Holdings Term Loan Facility and the documentation in existence on the date hereof related to the Joint Development Agreement) which prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Properties in favor of the Administrative Agent and the Lenders or secure the Obligations except restrictions imposed pursuant to an agreement entered into in connection with a Disposition permitted under <u>Section 9.09</u>:

(a)    (i) exist on the Petition Date and (to the extent not otherwise permitted by this <u>Section 9.12</u>) are listed on <u>Schedule 9.12(a)</u> and (ii) to the extent Contractual Requirements permitted by <u>subclause (i)</u> are set forth in an agreement evidencing Indebtedness or other obligations, are set forth in any agreement evidencing any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness or obligation so long as such Permitted Refinancing Indebtedness does not expand the scope of such Contractual Requirement;

(b)    are customary restrictions on leases, subleases or licenses otherwise permitted hereby so long as such restrictions relate to the assets subject thereto;

(c)    are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Debtors;

(d)    are customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(e)    restrict the use of cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(f)    are imposed by Governmental Requirements;

(g)    are restrictions regarding licenses or sublicenses by the Debtors of intellectual property in the ordinary course of business (in which case such restriction shall relate only to such intellectual property); or

(h)    are encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (l) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower's board of directors, no more restrictive in any material respect with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 9.13    Gas Imbalances, Take-or-Pay or Other Prepayments.  Except (a) as set forth on Schedule 7.15 or (b) thereafter either disclosed in writing to the Administrative Agent or included in the Reserve Report Certificate, the Borrower will not, and will not permit any Subsidiary to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Subsidiary that would require the Borrower or any such Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor exceeding two percent (2.0%) of the aggregate volumes of Hydrocarbons (on an Mcf equivalent basis) listed in the Reserve Report.

Section 9.14    Swap Agreements.  No Debtor will enter into any Swap Agreements (other than the Pre-Petition Swap Agreements) with any Person other than:

(a)    Swap Agreements in respect of commodities (i) with an Approved Counterparty and (ii) the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect other than puts, floors and basis differential swaps on volumes already hedged pursuant to other Swap Agreements) do not exceed, as of the date of the latest Swap Agreement entered into, eighty-five percent (85.0%) of the reasonably anticipated Hydrocarbon production from the Debtors' total Proved Reserves as forecast based on the Reserve Report, for the sixty six (66) month period from the most recent date any such Swap Agreement was entered into (the "Ongoing Swaps"); and

(b)    subject to Section 9.14(a), other Swap Agreements with an Approved Counterparty (other than Swap Agreements in respect of equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions) which are not entered into for speculative purposes (it is understood that the following Swap Agreements are not entered into for speculative purposes:  (i) any commodity Swap Agreement intended, at inception of execution, to hedge or manage any of the risks related to existing and or forecasted Hydrocarbon production of the Debtors (whether or not contracted) and (ii) any Swap Agreement intended, at inception of execution, (A) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of any Debtor, (B) for foreign exchange or currency exchange management, (C) to manage commodity portfolio exposure associated with changes in interest rates or (D) to hedge any exposure that any Debtor may have to counterparties under other Swap Agreements such that the combination of such Swap Agreements is not speculative taken as a whole).

Section 9.15    Marketing Activities.  No Debtor will engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (a) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their proved Oil and Gas Properties during the period of such contract, (b) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from proved Oil and Gas Properties of third parties during the period of such contract associated with the Oil and Gas Properties of the Debtors that any Debtor has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business, (c) transactions consistent with the terms of the RSA and as assumed by Borrower in the Cases and (d) other contracts for the purchase and/or sale of Hydrocarbons of third parties (i) which have generally offsetting provisions (i.e., corresponding pricing mechanics, delivery dates and points and

volumes) such that no "position" is taken and (ii) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto.

Section 9.16    <u>Accounting Changes</u>.  No Debtor will (a) make any significant change in accounting treatment or reporting practices, except as required by GAAP, or (b) change the fiscal year of any Debtor.

Section 9.17    <u>Key Employee Plans</u>.  No Debtor shall (a) enter into any key employee incentive plan, other than such plans in effect as of the Petition Date or (b) amend or modify any existing key employee retention plan and incentive plan, unless such plan, amendment or modification, as applicable, is either consistent with the terms of the RSA or reasonably satisfactory to the Administrative Agent and Majority Lenders; <u>provided</u> that the entry into any key employee incentive plan (or any amendment or modification thereof) shall be deemed reasonably satisfactory to the Administrative Agent and Majority Lenders if the aggregate plan amount contemplated to be distributed to key employees does not exceed two million dollars ($2,000,000) in the aggregate through the Scheduled Maturity Date.

Section 9.18    <u>Superpriority Claims</u>.  No Debtor will create or permit to exist any Superpriority Claim other than Superpriority Claims permitted by the DIP Order (including the Carve-Out).

## ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01    <u>Events of Default</u>.  While continuing, one or more of the following events shall constitute an "<u>Event of Default</u>":

(a)    the Borrower shall fail to pay any principal of any Loan as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

(b)    the Loan Parties shall fail to pay any interest on any Loan, any reimbursement obligation in respect of any LC Disbursement or any fee or any other amount (other than an amount referred to in <u>Section 10.01(a)</u>) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) days;

(c)    any representation or warranty made or deemed made by or on behalf of the Borrower or any Guarantor in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any certificate (or other document containing a certification from a Loan Party or a Responsible Officer thereof) delivered pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    the Borrower shall fail to observe or perform any covenant, condition or agreement contained in <u>Section 8.01(i)</u>, <u>Section 8.02(a)</u>, <u>Section 8.03</u> (solely with respect to the maintenance of the Borrower's existence), <u>Section 8.17</u>, <u>Section 8.18</u> or <u>Article IX</u>;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in <u>Section 10.01(a)</u>, <u>Section 10.01(b)</u>, <u>Section 10.01(c)</u> or <u>Section 10.01(d)</u>) or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender);

80

(f)      any event or condition exists that results in Indebtedness for borrowed money incurred after the Petition Date in an aggregate principal amount in excess of one million dollars ($1,000,000) (other than the Loans and Letters of Credit) of any one or more of any Parent Company Debtor, the Borrower or its Subsidiaries becoming due prior to its scheduled maturity or that enables or permits (after giving effect to any applicable grace periods) the holder or holders of such Indebtedness or any trustee or agent on its or their behalf to cause any such Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness;

(g)      (i) one or more judgments following the Petition Date for the payment of money in an aggregate amount in excess of one million dollars ($1,000,000) (to the extent not covered by independent third party insurance as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) or (ii) any one or more non-monetary judgments that have, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against any Parent Company Debtor, the Borrower or any Subsidiary or any combination thereof and such judgment shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days;

(h)      the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any material portion of the Collateral purported to be covered thereby, except, in each case, to the extent permitted by the terms of the Loan Documents, or the Borrower or any Subsidiary shall so state in writing;

(i)      an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(j)      a Change of Control shall occur;

(k)      the RSA is terminated or ceases to be in full force and effect and the Debtors have not filed a motion for approval of the Approved Bidding Procedures within fifteen (15) Business Days of the date the RSA is terminated or ceasing to be in full force and effect;

(l)      dismissal of the Cases or conversion of the Cases to a Chapter 7 case;

(m)      appointment of a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers (other than a fee examiner) beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code relating to the operation of the business of any Loan Party in the Cases;

(n)      the Bankruptcy Court's granting of any superpriority claim or lien on the Collateral which is *pari passu* with or senior to the Superiority Claims or Liens of the Lenders in the Cases, in each case other than with respect to the Carve-Out;

(o)      failure of the Final Order to be entered within thirty (30) days (or a later date consented to by the Administrative Agent and the Majority Lenders) after the Petition Date;

(p)      (i) failure of any material provision of the Interim Order or Final Order to be in full force and effect, (ii) the Interim Order or Final Order being (A) vacated, stayed or reversed, or (B)

81

modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders in their reasonable discretion, (iii) the entry of any order in the Cases charging any of the Collateral, including under Section 506(c) or Section 552(b) of the Bankruptcy Code or (iv) the commencement of any action by any Loan Party which is adverse to the Lenders or their rights and remedies under the DIP Facility in the Cases;

(q)    failure of any Loan Party to comply with any material provisions of the applicable DIP Order;

(r)    payment by any Loan Party (by way of adequate protection or otherwise) of any principal or interest or other amount on account of any prepetition Debt or payables (other than as agreed herein or pursuant to the consent of the Majority Lenders, or as described in the Interim Order, the Final Order or pursuant to any orders approving any "first day" motions);

(s)    entry of an order or orders granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party or third parties to proceed against assets of any Loan Party valued in excess of five million dollars ($5,000,000) or to permit other actions that would have a Material Adverse Effect on any Loan Party or its estate;

(t)    Prior to the consummation of an Approved Sale, subject to Section 12.02(c), unless otherwise agreed by the Majority Lenders or pursuant to the terms of the DIP Order, the filing by the Debtors or any party to the RSA, or confirmation of, a plan of reorganization, other than an Approved Plan of Reorganization; and

(u)    failure to satisfy any of the Chapter 11 Milestones in accordance with the terms relating to such Chapter 11 Milestone.

Section 10.02    Remedies.

(a)    In the case of an Event of Default, at any time thereafter during the continuance of such Event of Default, the Administrative Agent may, and upon the request of the Majority Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments and/or LC Commitments, and thereupon the Commitments and/or LC Commitments shall terminate immediately, and (ii) declare the Notes and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.07(j)), shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor.

(b)    In the case of the occurrence of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity including, without limitation, all rights and remedies set forth in paragraph [16] of the Interim Order (and any corresponding paragraph of the Final Order), subject to any notice requirements set forth therein.

(c)    All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the Notes, whether by acceleration or otherwise, shall be applied:

(i)      first, to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Administrative Agent in its capacity as such;

(ii)      second, *pro rata* to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Lenders and the Issuing Banks;

(iii)      third, *pro rata* to payment of accrued interest on the Loans and LC Disbursements;

(iv)      fourth, *pro rata* to payment of principal outstanding on the Loans and payment of Secured Swap Obligations and Secured Cash Management Obligations;

(v)      fifth, to serve as cash collateral to be held by the Administrative Agent to secure the LC Exposure;

(vi)      sixth, *pro rata* to any other Obligations; and

(vii)      seventh, any excess, after all of the Obligations shall have been indefeasibly paid in full in cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

## ARTICLE XI
## THE ADMINISTRATIVE AGENT

Section 11.01   Appointment; Powers.   Each of the Lenders and each Issuing Bank hereby irrevocably (subject to Section 11.06) appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.

Section 11.02   Duties and Obligations of Administrative Agent.   The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; rather, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties), (b) the Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except as provided in Section 11.03, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Debtor that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article VI or elsewhere herein,

other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of the Debtors or any other obligor or guarantor or (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein.  For purposes of determining compliance with the conditions specified in Article VI, each Lender and Issuing Bank shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender or Issuing Bank unless the Administrative Agent shall have received written notice from such Lender or Issuing Bank prior to the proposed closing date specifying its objection thereto.

Section 11.03    Action by Administrative Agent.  The Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lender or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action.  The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders.  If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this Section 11.03, provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Lenders.  In no event, however, shall the Administrative Agent be required to take any action which, in its opinion, or the opinion of its counsel, exposes the Administrative Agent to liability or which is contrary to this Agreement, the Loan Documents or applicable law, including, for the avoidance of doubt, any action that may be in violation of the automatic stay under any debtor relief law or that may effect a forfeiture, modification or termination property of a Defaulting Lender in violation of any debtor relief law.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, including its own ordinary negligence, except for its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

Section 11.04    Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Borrower, the Lenders and the Issuing Banks hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  The Administrative Agent may consult with legal counsel (who may

84

be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Administrative Agent may deem and treat the payee of any Note as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.

Section 11.05    Subagents.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of this Article XI shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct.

Section 11.06    Resignation or Removal of Administrative Agent.

(a)    The Administrative Agent may resign upon thirty (30)-days' notice to the Lenders, any Issuing Bank and the Borrower.  If the Administrative Agent becomes a Defaulting Lender, then the Administrative Agent may be removed as the Administrative Agent at the reasonable request of the Borrower and the Majority Lenders.  Upon receipt of any such notice of resignation or removal, the Majority Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) unless an Event of Default has occurred and is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no successor shall have been so appointed by the Majority Lenders (and, if applicable, consented to by the Borrower) and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Majority Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above.

(b)    With effect from the Resignation Effective Date (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents regardless of whether a successor has been appointed (except that in the case of any Collateral held by the Administrative Agent on behalf of the Lenders and the Issuing Banks under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such Collateral until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender or Issuing Bank directly, as the case may be, until such time, if any, as the Majority Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired or removed) Administrative Agent (other than in respect of fees payable under Section 3.05 and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 11.06).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the

retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article XI and Section 12.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

(c)    Any resignation of the Administrative Agent pursuant to this Section shall also constitute a resignation as Issuing Bank. If the Administrative Agent resigns as an Issuing Bank, it shall retain all the rights, powers, privileges and duties of the Issuing Bank hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as an Issuing Bank and all LC Exposure with respect thereto, including the right to require the Lenders to make ABR Loans or fund risk participations in LC Disbursements pursuant to Section 2.07(d). Upon the appointment by the Borrower of a successor Issuing Bank hereunder (which successor shall in all cases be a Lender other than a Defaulting Lender), (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, as applicable, (ii) the retiring Issuing Bank shall be discharged from all of the respective duties and obligations hereunder or under the other Loan Documents and (iii) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the Administrative Agent to effectively assume the obligations of the Administrative Agent with respect to such Letters of Credit.

Section 11.07    Administrative Agent as Lender. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders. The term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Administrative Agent hereunder in its individual capacity, but not sub-agents of such Person.

Section 11.08    No Reliance. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder. The Administrative Agent shall not be required to keep itself informed as to the performance or observance by any Debtor of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of any Debtor. Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Arranger shall have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of the Administrative Agent or any of its Affiliates. In this regard, each Lender acknowledges that Paul Hastings LLP is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document. Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 11.09    Administrative Agent May File Proofs of Claim. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or

other judicial proceeding relative to any Debtor, the Administrative Agent (irrespective of whether the principal of any Loan or LC Disbursement shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Disbursements and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Banks and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, Issuing Banks and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 2.07, Section 3.05 and Section 12.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Issuing Banks to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Banks, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 3.05 and Section 12.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 11.10    Authority of Administrative Agent to Release Guarantors, Collateral and Liens. Each Lender and Issuing Bank hereby authorizes the Administrative Agent to release (a) any Guarantor from the Loan Guarantee pursuant to a transaction permitted hereunder or pursuant to the terms hereof and (b) any collateral that is permitted to be sold or released pursuant to the terms of the Loan Documents. Each Lender and Issuing Bank hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all releases of a Guarantor, Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any sale or other disposition of Property in accordance with Section 12.16 or as otherwise authorized under the Loan Documents. Upon request by the Administrative Agent at any time, the Majority Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Loan Guarantee pursuant to Section 12.16.

Section 11.11    The Arranger.    The Arranger  shall not have any duties, responsibilities or liabilities under this Agreement and the other Loan Documents other than its respective duties, responsibilities and liabilities in its capacity as the Administrative Agent and/or a Lender hereunder.

Section 11.12    Secured Cash Management Agreements. No Cash Management Bank that obtains the benefits of Section 10.02(c), any Loan Guarantee or any Collateral by virtue of the provisions hereof or of any Loan Guarantee, any Security Instrument or any other Loan Document shall have any right to notice of any action or consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in

its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Section 11.12 to the contrary, the Administrative Agent shall not be required to verify the payment or, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements unless the Administrative Agent has received written notice of such Obligations together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01    Notices.

(a)    Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower (or any other Loan Party), to it at

Arsenal Resources Development LLC
6031 Wallace Road Extension, Suite 300
Wexford, Pennsylvania
Fax:  (800) 428-0981
Email:  agoetz@arsenalresources.com
Attn:  Allen Goetz, Senior Vice President, Chief Financial Officer & Chief Accounting Officer

and

Simpson Thacher & Bartlett LLP
600 Travis St., Suite 5400
Houston, TX  77002
Fax:  713-821-5602
Email:  emodesto@stblaw.com
Attn:  Erland Modesto

(ii)    if to the Administrative Agent, to it at:

Citibank, N.A.
1615 Brett Road, Building III
New Castle, Delaware 19720
Attention:  Loan Administration
Telephone:  302-894-6010
Facsimile:  212-994-0847
Electronic Mail:  GLOriginationOps@citigroup.com

(iii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower and the Administrative Agent.

88

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II, Article III, Article IV and Article V unless otherwise agreed by the Administrative Agent and the applicable Lender.  Documents required to be delivered pursuant to Section 8.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or any direct or indirect parent of the Borrower) posts such documents, or provides a link thereto on the website on the Internet at the Borrower's website address listed on Schedule 12.01 (or subsequently identified in writing to the Administrative Agent) or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions of such documents.

(c)    Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d)    The Borrower hereby acknowledges that (i) the Administrative Agent and the Arranger may, but shall not be obligated to, make available to the Lenders and the Issuing Banks materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on Debt Domain, IntraLinks, Syndtrak or another similar electronic system (the "Platform") and (ii) certain of the Lenders may be "public side" Lenders (each, a "Public Lender") that may have personnel who do not wish to receive material non-public information with respect to any Debtor, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arranger, the Issuing Banks and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 12.11); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  Notwithstanding the foregoing, the Borrower shall not be under any obligation to mark any Borrower Materials "PUBLIC."  Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal and state securities laws, to make reference to communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States federal or state securities laws.

(e)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM,

AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender, the Issuing Bank or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's, any Loan Party's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other similar electronic platform related to this Facility except to the extent that such losses, claims, damages, liabilities or expenses resulted from the bad faith, willful misconduct or gross negligence of an Agent Party, as determined by a final non-appealable judgment of a court of competent jurisdiction.

Section 12.02    Waivers; Amendments.

(a)    No failure on the part of the Administrative Agent, any Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent, any Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by this Section 12.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender or any Issuing Bank may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any provision hereof nor any Loan Document nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders and acknowledged by the Administrative Agent or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; provided that no such agreement shall (i) increase the Availability Limit or the Commitment of any Lender without the written consent of such Lender, (ii) [reserved], (iii) reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Obligations hereunder or under any other Loan Document, without the written consent of each Lender adversely affected thereby; provided that only the consent of the Majority Lenders shall be necessary to waive or postpone any obligation of the Borrower to pay interest at the default rate under, or amend, Section 3.02(c), (iv) subject to the provisos to Section 12.02(b)(ii), postpone the scheduled date of payment or prepayment of the principal amount of any Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or any other Obligations hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone or extend the Maturity Date without the written consent of each Lender adversely affected thereby, (v) change Section 4.01(b) or Section 4.01(c) in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender adversely affected thereby, (vi) waive or amend Section 10.02(c) or Section 12.13, without the written consent of each Lender; provided that any waiver or amendment to Section 10.02(c), to Section 12.13 or to this proviso in this Section 12.02(b)(vi), or any amendment or modification to any Security Instrument that results in the Secured Swap Obligations secured by such Security Instrument no longer

being secured thereby on an equal and ratable basis with the principal of the Loans, or any amendment or other change to the definition of the terms "Secured Swap Agreement," "Secured Swap Obligations" or "Secured Swap Party," shall also require the written consent of each Secured Swap Party adversely affected thereby, (vii) release substantially all of the Guarantors or Collateral (except as expressly permitted by the Loan Documents), without the consent of each Lender, or (viii) change any of the provisions of this Section 12.02(b) or the definition of "Majority Lenders" or reduce the voting rights of any Lender, without the written consent of each Lender, (ix) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or any Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or any Issuing Bank, as the case may be; provided that the LC Issuance Limit of any Issuing Bank may be increased solely with the written consent of such Issuing Bank and no other Person so long as the aggregate LC Commitment is not increased and (x) nothing in this Section 12.02 shall cause any waiver, amendment, modification or consent to (1) any engagement, fee or similar letter between the Borrower and any Lender or the Administrative Agent or the Issuing Bank to require the consent of the Majority Lenders, (2) any Letter of Credit Agreements between the Borrower or any Subsidiary of the Borrower and the Issuing Bank to require the consent of the Majority Lenders, (3) any Letter of Credit issued by the Issuing Bank pursuant to the terms of this Agreement to require the consent of the Majority Lenders except as specifically required by Section 2.07 or (4) any Secured Cash Management Agreement to require the consent of the Majority Lenders.

(c)    Notwithstanding anything to the contrary in any Loan Document, any Security Instruments or related documents executed by the Debtors in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order (i) to comply with any local Governmental Requirement or advice of local counsel or (ii) to cure ambiguities, omissions, mistakes or defects.

(d)    Notwithstanding anything to the contrary contained in the Loan Documents, the Administrative Agent, without the consent of any Lender, shall be permitted to enter into any amendments, waivers, modifications or supplements to the Engagement Letter.

(e)    Notwithstanding anything in the Loan Documents to the contrary, the Administrative Agent and the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender in order to (i) correct, amend, cure or resolve any ambiguity, omission, defect, typographical error or inconsistency or other manifest error therein, (ii) with respect to the Loan Documents, add a guarantor or collateral or otherwise enhance the rights and benefits of the Lenders, (iii) make administrative or operational changes not adverse to any Lender or (iv) adhere to any local Governmental Requirement or advice of local counsel.

(f)    Notwithstanding anything in the Loan Documents to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (A) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (B) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender, where such Defaulting Lender is an affected Lender, shall require the consent of such Defaulting Lender.

(g)    Anything herein to the contrary notwithstanding, if the Debtors' proposed plan of reorganization ("Proposed Plan") provides for (in whole or in part) the refinancing of the Refinanced Loans and the Obligations on the effective date of an Approved Plan of Reorganization in lieu of Payment in Full, then, if such Proposed Plan has been accepted by a class consisting solely of the Lenders, then the holders of not less than sixty-six-and-two-thirds percent (66 2/3%) of the Refinanced Loans (the "Required

Refinanced Lenders") may (without the consent of any other Lenders or the Administrative Agent) agree on behalf of all Lenders that the full amount of the Refinanced Loans will not be required to be repaid in cash on the Maturity Date, but instead shall be treated in any manner approved by the Required Refinanced Lenders. No amendment or waiver shall, unless signed by all Lenders, amend this clause (g) or change the definition of the term Required Refinanced Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder, in each case without the consent of all Lenders.

Section 12.03    Expenses; Indemnity; Damage Waiver.

(a)    The Borrower agrees (i) if the Interim Facility Effective Date occurs, to pay or reimburse the Administrative Agent, each Issuing Bank and the Arranger for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution, performance and administration of this Agreement, the other Loan Documents, the Exit Facility Commitment Letter and any fee letter entered into in connection therewith and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby (including all Attorney Costs, but excluding allocated costs of in-house counsel, where counsel shall be limited to one primary counsel, one local counsel as reasonably necessary in each relevant jurisdiction material to the interests of the Administrative Agent, the Issuing Banks or the Lenders, taken as a whole, one special bankruptcy counsel for each Secured Swap Party in connection with the structuring and preparation of any Secured Swap Agreement to be entered into after the Petition Date (with fees for each such counsel not to exceed fifteen thousand dollars ($15,000)) or, with the Borrower's consent (not to be unreasonably withheld or delayed), other counsel) and (ii) from and after the Interim Facility Effective Date, to pay or reimburse the Administrative Agent, each Issuing Bank, the Arranger and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement, the other Loan Documents and the Exit Facility Commitment Letter and any fee letter entered into in connection therewith (including, in each case all such costs and expenses incurred during any legal proceeding, including any enforcement or bankruptcy proceeding, and including all respective Attorney Costs (but not allocated costs of in-house counsel) which shall be limited to Attorney Costs of one counsel to the Administrative Agent, the Lenders and the Arranger (and one local counsel as reasonably necessary in each relevant jurisdiction material to the interests of the Administrative Agent, the Issuing Banks or the Lenders taken as a whole (or, with the Borrower's consent (not to be unreasonably withheld or delayed), other counsel))).  The foregoing costs and expenses shall include all reasonable search, filing and recording charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by the Administrative Agent.  The agreements in this Section 12.03 shall survive the termination of the Commitments and repayment of all other Obligations.  All amounts due under this Section 12.03 shall be paid within thirty (30) days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail including, if requested by the Borrower and to the extent reasonably available, backup documentation supporting such reimbursement request.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.  This Section 12.03 shall not apply with respect to any Taxes other than Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever resulting from a non-Tax claim.

(b)    The Borrower shall indemnify and hold harmless the Administrative Agent, the Arranger, each Issuing Bank, each Lender and each of their respective Affiliates, and each of the officers, directors, employees, partners, agents, controlling persons, members, representatives and the successors of each of the foregoing (collectively, the "Indemnitees") from and against any and all losses, claims, damages, liabilities and other expenses (including Attorney Costs but limited in the case of legal fees and expenses

to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interests of the Indemnitees, and solely in the case of an actual or perceived conflict of interest where the Indemnitee(s) affected by such conflict notifies the Borrower of the existence of such conflict and thereafter retain another firm of counsel for each group of similarly situated affected Indemnitees, one additional counsel in each relevant jurisdiction) of any kind or nature whatsoever (i) relating to the use of proceeds of the Facility, including any refusal by an Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, (ii) to the extent relating to the Facility, including the execution, delivery, enforcement, performance or administration of any Loan Document, to which any Indemnitee may become subject arising out of or in connection with any actual or threatened action, suit, litigation, investigation, proceeding or any governmental or regulatory action, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (each, a "Proceeding"), (iii) to the extent relating to the foregoing, any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability related in any way to any Loan Parties or any Subsidiary or (iv) relating to the Exit Facility Commitment Letter, including the execution, delivery, enforcement, performance or administration of the Exit Facility Commitment Letter and any fee letter entered into in connection therewith, to which any Indemnitee may become subject arising out of or in connection with any Proceeding; provided that, notwithstanding the foregoing, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities and other expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its controlled Affiliates or their respective directors, officers, employees, agents, controlling persons, members and representatives (in the case of an agent or a representative, to the extent that such agent or representative acted on behalf of, or at the express instruction of, such Indemnitee), as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) a material breach of any obligations under any Loan Document by such Indemnitee or of any of its controlled Affiliates or its or their respective directors, officers, employees, members, agents, controlling persons, partners or representatives (in the case of agents and representatives, acting on behalf of, or at the express instructions of, such Indemnitee), as determined by a final non-appealable judgment of a court of competent jurisdiction or (z) any Proceeding not involving an act or omission by the Borrower or its Affiliates that is brought by an Indemnitee against another Indemnitee (other than any disputes involving claims against an Indemnitee in its capacity or in fulfilling its role as an Arranger, Issuing Bank or Administrative Agent).  No Indemnitee or Loan Party shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee, Loan Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Interim Facility Effective Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party and for any out-of-pocket expenses); it being agreed that this sentence shall not limit the indemnification obligations of the Borrower or any Subsidiary.  In the case of a Proceeding to which the indemnity in this Section 12.03 applies, such indemnity shall be effective whether or not such Proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated.  All amounts due under this Section 12.03 shall be paid within thirty (30) days after written demand therefor (together with backup documentation supporting such reimbursement request); provided, however, that such Indemnitee shall promptly refund such amount to the extent that there is a final and non-appealable judicial determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 12.03.

(c)    To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent, the Arranger or Issuing Banks under Section 12.03(a) or (b), each Lender severally agrees to pay to the Administrative Agent, the Arranger or any Issuing Bank, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Arranger or Issuing Banks in its capacity as such.

Section 12.04    Successors and Assigns; Holdings Term Loan Creditors.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void); provided that the foregoing shall not prohibit a merger or consolidation by the Borrower with another Person that is approved by the Majority Lenders or otherwise permitted hereunder, (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.04; provided that any such assignment or participation must comply with any restrictions on assignments or participations, as applicable, as agreed to by the transferring Lender in the RSA or any other restructuring support agreement, (iii) no Lender may assign to the Borrower or to an Affiliate of the Borrower all or any portion of such Lender's rights and obligations under the Agreement or all or any portion of its Commitments or the Loans owing to it hereunder and (iv) no Lender may assign or otherwise transfer its rights or obligations hereunder to any Person that is at such time a Defaulting Lender or a natural person.

(b)    (i) Subject to the conditions set forth in Section 12.04(b)(ii), any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent and each Issuing Bank, provided that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender, an Affiliate of a Lender or an Approved Fund immediately prior to giving effect to such assignment.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    the Borrower (such consent not to be unreasonably withheld, conditioned or delayed), provided that no consent of the Borrower shall be required if such assignment is (1) to a Lender, an Affiliate of a Lender, an Approved Fund, or (2) if a Payment Event of Default has occurred and is continuing, to any other assignee and (B) subject to clause (C) below, and except in the case of an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than five million dollars ($5,000,000) (or a lesser amount if the assigning Lender's outstanding Commitment or Loans, as applicable, amounts to less than five million dollars ($5,000,000)) (and shall be in increments of one million dollars ($1,000,000) in excess thereof);

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

94

(C)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (unless waived by the Administrative Agent in its sole discretion);

(D)      the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent, (x) an Administrative Questionnaire and (y) all documentation and other information that the Administrative Agent reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act;

(E)      each assignment of any Lender's Commitment and/or Loan (including any portion thereof) hereunder shall include an assignment in the same proportion of such Lender's commitment under the Exit Facility Commitment Letter; ; and

(F)      each assignment of any Lender's Commitment and/or New Money Loan (including any portion thereof) shall include an assignment in the same proportion of such Lender's Refinanced Loans.

(iii)      Subject to Section 12.04(b)(iv) and the acceptance and recording thereof, and except in the case of an assignment to an Affiliate of a Lender, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 5.01, Section 5.02, Section 5.03 and Section 12.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.04(c).

(iv)      The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, any Issuing Bank and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)      Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and, if required hereunder, applicable tax forms (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 12.04(b) and any written consent to such assignment required by Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 12.04(b). Prior to such recording, the Borrower and the Administrative Agent may continue to deal solely and directly with the assigning Lender.

(vi)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, any Issuing Bank or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans and participations in Letters of Credit in accordance with its *pro rata* share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Governmental Requirements without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Notwithstanding anything to the contrary in this Agreement, in connection with any assignment pursuant to the foregoing clause (vii), the Administrative Agent and each Issuing Bank shall be entitled to resign effective upon the consummation of such assignment and the administrative agent and/or trustee under the Holdings Term Loan Facility shall be entitled to appoint a replacement Administrative Agent; provided that, (a) the resigning Administrative Agent shall be entitled to the rights afforded to a resigning Administrative Agent pursuant to Section 11.06 (excluding its right to appoint a successor Administrative Agent) and (b) the resigning Issuing Bank shall be entitled to the rights afforded to a replaced Issuing Bank pursuant to Section 2.07(i).

(c)    (i) Any Lender may, without the consent of the Borrower, the Administrative Agent or any Issuing Bank, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) [reserved], (B) such Lender's obligations under this Agreement shall remain unchanged, (C) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (D) the Borrower, the Administrative Agent, any Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement (and for the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 12.03(c) without regard to the existence of any participation). Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver to the extent that such amendment, consent or waiver would adversely affect the superpriority status of the claims or liens on the Collateral or require unanimous consent of the Lenders or the consent of any Lender affected thereby under Section 12.02(b)(i), Section 12.02(b)(iii), Section 12.02(b)(iv), Section 12.02(b)(vi), Section 12.02(b)(vii) and Section 12.02(b)(viii). Subject to Section 12.04(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 5.01, Section 5.02 and Section 5.03 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.04(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, provided such Participant agrees to be subject to Section 4.01(c) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or

any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or Letters of Credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary in connection with an audit or other proceeding to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.   For the avoidance of doubt, the Administrative Agent (in its capacity as such) shall have no responsibility for maintaining the Participant Register.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 5.01, Section 5.02 or Section 5.03 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent, not to be unreasonably withheld or delayed; for the avoidance of doubt, the Borrower shall have reasonable basis for withholding consent if such Participant after the sale would result in materially increased obligations to the Borrower or any Guarantors at such time under Section 5.01 and/or Section 5.03.  A Participant shall be entitled to the benefits of Section 5.03 subject to the requirements and limitations therein, including the requirements under Section 5.03(e) (it being understood that the documentation required under Section 5.03(e) shall be delivered to the participating Lender).

(iii)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations, including to a Federal Reserve Bank, and this Section 12.04(c)(iii) shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(iv)    Notwithstanding anything to the contrary contained herein, if at any time an Issuing Bank assigns all of its Commitments and Loans pursuant to subsection (b) above, the Issuing Bank may, upon thirty (30) days' notice to the Borrower and the Lenders, resign as an Issuing Bank.  In the event of any such resignation as an Issuing Bank, the Borrower shall be entitled to appoint from among the Lenders a successor Issuing Bank hereunder; provided, however, that no failure by the Borrower to appoint any such successor shall affect the resignation of the retiring Issuing Bank; provided that on or prior to the expiration of such thirty (30) day period with respect to such resignation, the relevant Issuing Bank shall have identified a successor Issuing Bank willing to accept its appointment as successor Issuing Bank, and the effectiveness of such resignation shall be conditioned upon such successor assuming the rights and duties of the Issuing Bank.  If an Issuing Bank resigns as Issuing Bank, it shall retain all the rights, powers, privileges and duties of an Issuing Bank hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as an Issuing Bank and all LC Exposure with respect thereto (including the right to require the Lenders to make ABR Loans or fund risk participations in LC Disbursements pursuant to Section 2.07(d)).  Upon the appointment of a successor Issuing Bank, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank and (b) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

(d)    Notwithstanding anything to the contrary contained herein:

LEGAL_US_E # 144284119.14

(i)       no Holdings Term Loan Creditor that is a Secured Party hereunder and/or under the other Loan Documents shall have the right to (x) receive information, reports or other materials provided solely to Lenders by the Administrative Agent or any other Lender in connection with any enforcement (or contemplated enforcement) of remedies hereunder or under the other Loan Documents, (y) attend or participate in meetings attended solely by the Lenders and the Administrative Agent relating to any enforcement (or contemplated enforcement) of remedies hereunder or under the other Loan Documents or (z) access any confidential communications from counsel to or financials advisors of the Administrative Agent or the Lenders relating to any enforcement (or contemplated enforcement) of remedies hereunder or under the other Loan Documents; and

(ii)      no Holdings Term Loan Creditor that is a Secured Party hereunder and/or under the other Loan Documents, in its capacity as such, will be entitled to challenge the attorney client privilege of the respective counsel of the Administrative Agent or any other Lender.

Section 12.05    Survival; Revival; Reinstatement.

(a)       All representations and warranties made hereunder and in any other Loan Document or other document delivered in connection with or pursuant to this Agreement or any other Loan Document shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent, the Issuing Banks and the Lenders, regardless of any investigation made by any such party or on their behalf and notwithstanding that the Administrative Agent, any Issuing Bank or any Lender may have had notice or knowledge of any Default at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated.  The provisions of Section 5.01, Section 5.02, Section 5.03 and Section 12.03 and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, Payment in Full or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)       To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights or otherwise, then (i) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall, to the fullest extent possible under provisions of applicable law, be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (ii) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Effective Rate from time to time in effect.

Section 12.06    Counterparts; Integration; Effectiveness.

(a)       This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by fax or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Administrative Agent may

also require that any such documents and signatures delivered by fax or other electronic transmission be confirmed by a manually signed original thereof; <u>provided</u> that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by fax or other electronic transmission.

(b)    **THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY SEPARATE LETTER AGREEMENTS WITH RESPECT TO FEES PAYABLE TO THE ADMINISTRATIVE AGENT CONSTITUTE THE ENTIRE CONTRACT AMONG THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND SUPERSEDE ANY AND ALL PREVIOUS AGREEMENTS AND UNDERSTANDINGS, ORAL OR WRITTEN, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; <u>provided</u> that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof; <u>provided, further, that</u> in the event of any inconsistency between the terms and conditions of the DIP Loan Documents and a DIP Order, the provisions of the DIP Order shall govern and control.

(c)    This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent, and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties and thereafter shall be binding upon and inure to the benefit of the Loan Parties, the Administrative Agent and each Lender and their respective successors and assigns, in each case in accordance with <u>Section 12.04</u> (if applicable).

(d)    Loan Documents may be signed electronically.  The effectiveness of any such signatures shall, subject to applicable law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Administrative Agent, any Issuing Bank and the Lenders.

Section 12.07    <u>Severability</u>.  If any provision of this Agreement or any other Loan Document is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 12.08    <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, each Lender, each Issuing Bank, the Administrative Agent and their respective Affiliates is authorized at any time and from time to time, to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including, without limitations Secured Swap Obligations) at any time owing by the Administrative Agent, such Lender or Issuing Bank to or for the credit or the account any Debtor against any of and all the obligations of such Debtor owed to the Administrative Agent, such Lender or Issuing Bank now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not the Administrative Agent, such Lender or such Issuing Bank shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured.  The rights of each Lender, each Issuing Bank and the Administrative Agent under this <u>Section 12.08</u> are in addition to other rights and remedies (including other rights of setoff) which the Administrative Agent, such Lender or

such Issuing Bank may have.  Each Lender and each Issuing Bank agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender or Issuing Bank, as applicable; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS.

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR THE RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING CONTAINED HEREIN OR IN ANY OTHER LOAN DOCUMENT WILL PREVENT ANY LENDER OR THE ADMINISTRATIVE AGENT FROM BRINGING ANY ACTION TO ENFORCE ANY AWARD OR JUDGMENT OR EXERCISE ANY RIGHT UNDER THE SECURITY INSTRUMENTS OR AGAINST ANY COLLATERAL OR ANY OTHER PROPERTY OF ANY LOAN PARTY IN ANY OTHER FORUM IN WHICH JURISDICTION CAN BE ESTABLISHED.

(c)    EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 12.01.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.10    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11    Confidentiality.  Each of the Administrative Agent, each Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority (including any self-regulatory authority), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) if required in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 12.11, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement for purposes of evaluating whether to become an assignee or Participant or (ii) any actual or prospective counterparty (or its advisors) to any Swap Agreement relating to the Borrower and its obligations for purposes of evaluating whether to become a Secured Swap Party, (g) with the consent of the Borrower, (h) on a confidential basis to (i) any rating agency in connection with rating any Debtor or the credit facilities provided hereunder or (ii) the CUSIP Service Bureau or any similar agency to the extent required in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 12.11 or (ii) becomes available to the Administrative Agent, any Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower and its Affiliates and, to the Administrative Agent, Issuing Bank or Lender's knowledge, such source was not subject to a confidentiality agreement with respect to such information.  For the purposes of this Section 12.11, "Information" means all information received from the Borrower or any of its Permitted Holders relating to any Debtor and their businesses, other than any such information that is available to the Administrative Agent, any Issuing Bank or any Lender on a non-confidential basis prior to disclosure by any Debtor or a Permitted Holder; provided that, in the case of information received from the Borrower or any Permitted Holder after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 12.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

101

Section 12.12    <u>Interest Rate Limitation</u>.  It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Notes, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Notes shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower) and (ii) in the event that the maturity of the Obligations is accelerated by reason of an election of the holder thereof under this Agreement, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans evidenced by the Notes until Payment in Full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this <u>Section 12.12</u> and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this <u>Section 12.12</u>.

Section 12.13    <u>Collateral Matters; Secured Swap Agreements</u>.  Except for as expressly set forth in <u>Section 12.02(b)(vi)</u>, no Secured Swap Party or Cash Management Bank shall have any voting rights under any Loan Document as a result of the existence of any Secured Swap Obligations or Secured Cash Management Obligations owed to it and the Administrative Agent shall have no responsibility for determining the value of any Secured Swap Obligations or Secured Cash Management Obligations. All Secured Cash Management Agreements are independent agreements governed by the terms thereof and will remain in full force and effect, unaffected by any repayment, prepayment, acceleration, reduction, increase or change in the terms of the Loans created under this Agreement except as otherwise provided in such Secured Cash Management Agreements, and any payoff statement from any Lender relating to this Agreement shall not apply to Secured Cash Management Agreements, except as otherwise expressly provided in such payoff statement.

Section 12.14    <u>PATRIOT Act Notice</u>.  Each Lender that is subject to the PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower and each Guarantor that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes the name, address and tax identification number of the Borrower and the Guarantors and other information regarding the

Borrower and the Guarantors that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower and the Guarantors in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to the Lenders and the Administrative Agent.

Section 12.15    <u>Electronic Execution of Assignments</u>.    The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other modifications, Borrowing Request, Interest Election Request, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 12.16    <u>Release of Liens and Release from Loan Guarantee</u>. Notwithstanding anything to the contrary in the Loan Documents:

(a)    after Payment in Full, the Collateral shall be automatically released from any Liens created by the Loan Documents, and the Loan Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent, the Issuing Banks, the Lenders and each Loan Party under the Loan Documents shall terminate and each Guarantor shall be released from the Loan Guarantee, all without delivery of any instrument or performance of any act by any Person;

(b)    the following Collateral shall be automatically released from the Liens created by the Loan Documents without delivery of any instrument or performance of any act by any Person:

(i)    upon a permitted Disposition of Collateral (including the termination or expiration of a lease) to any Person other than a Loan Party, any Person that was required to become a Loan Party or any Affiliate of any of the foregoing, the Disposed of Collateral;

(ii)    upon (and only for so long as) any Property no longer constituting Collateral as defined, such Property;

(iii)    upon the approval, authorization or ratification in writing by the Majority Lenders (or such other percentage of the Lenders whose consent is required by <u>Section 12.02(b)</u>) of the release of any Collateral, such Collateral;

(iv)    upon a release of any Collateral under the terms of each applicable Security Instrument, such Collateral;

(v)    upon a Guarantor no longer being a Guarantor by virtue of the definition thereof or a transaction permitted hereunder, the Collateral owned by such Guarantor; or

(vi)    upon a transaction permitted under <u>Section 9.08</u>, any releases necessary or desirable (as reasonably determined by the Administrative Agent and Borrower) to effectuate such transaction;

LEGAL_US_E # 144284119.14

(c)      a Guarantor shall be automatically released from the Loan Guarantee without delivery of any instrument or performance of any act by any Person:

(i)      in respect of a Guarantor, upon such Guarantor no longer being a Guarantor by virtue of the definition thereof or a transaction permitted hereunder, or

(ii)      upon the approval, authorization or ratification in writing by the Majority Lenders (or such other percentage of the Lenders whose consent is required by Section 12.02(b));

(d)      In connection with any termination or release of Collateral from the Liens securing the Obligations or a release of a Guarantor from the Loan Guarantee, the Administrative Agent shall:

(i)      in the case of termination or release of Collateral from the Liens securing the Obligations, (A) execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release (including (1) UCC termination statements and (2) in the case of a release of Mortgaged Property, a partial release substantially in the form of Exhibit G) and (B) return to the Borrower, the Pledged Collateral (as defined in the Pre-Petition Collateral Agreement) that is in the possession of the Administrative Agent and is the subject of such release (provided that, upon request by the Administrative Agent, the Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer certifying that such transaction has been or was consummated in compliance with the Loan Documents); and

(ii)      in the case of a release of a Guarantor, execute and deliver a written release to evidence the release of the Guarantor promptly upon the request of the Borrower;

(e)      any execution and delivery of documents by the Administrative Agent pursuant to this Section 12.16 shall be without recourse to or warranty by the Administrative Agent; and

(f)      the relevant Loan Party shall be permitted to take any action in connection therewith consistent with such release including the filing of UCC termination statements.

Section 12.17    Flood Insurance Provisions.  Notwithstanding anything in this Agreement or any other Loan Document to the contrary, in no event is any "Building" (as defined in the applicable Flood Insurance Regulation) or "Manufactured (Mobile) Home" (as defined in the applicable Flood Insurance Regulation) included in the definition of "Mortgaged Property" (as defined in any Loan Document) and no "Building" or "Manufactured (Mobile) Home" is hereby encumbered by this Agreement or any other Loan Document.

Section 12.18    No Advisor or Fiduciary Responsibility.  In connection with all aspects of the Loan Documents (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Debtor acknowledges and agrees that: (a) (i) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arranger, each Issuing Bank and the Lenders are arm's-length commercial transactions between the Borrower, each other Loan Party, on the one hand, and the Administrative Agent, the Arranger, each Issuing Bank and the Lenders, on the other hand, (ii) the Borrower and each of the other Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Borrower and each other Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) the Administrative Agent, the Arranger and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any other Loan Party and (ii) neither the Administrative Agent, the Arranger, each

Issuing Bank nor any Lender has any obligation to the Borrower or any other Loan Party with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Administrative Agent, the Arranger, each Issuing Bank and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and the other Loan Parties, and neither the Administrative Agent, the Arranger, each Issuing Bank nor any Lender has any obligation to disclose any of such interests to the Borrower or any other Loan Party.  To the fullest extent permitted by law, each of the Borrower and each other Loan Party hereby waives and releases any claims that it may have against the Administrative Agent, the Arranger or any Lender with respect to any breach or alleged breach of fiduciary duty in connection with any aspect of the Loan Documents.

Section 12.19   <u>Cashless Settlement</u>. Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any amendment, repayment, refinancing, incremental, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender and such cashless settlement shall be deemed to comply with any requirement hereunder or any other Loan Document or DIP Order that such payment be made "in dollars," in "immediately available funds," "in cash" or any other similar concept.

Section 12.20   <u>Acknowledgement Regarding Any Supported QFCs</u>.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)      In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)      As used in this <u>Section 12.20</u>, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:

(i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

### ARTICLE XIII
### LOAN GUARANTEE

Section 13.01    Guarantee. Each Guarantor and the Borrower unconditionally guarantees to the Administrative Agent, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the due and punctual payment and performance of the Obligations (the "Guaranteed Obligations") for the ratable benefit of the Secured Parties.  Each Guarantor further agrees that the Guaranteed Obligations may be extended, modified, amended or renewed, in whole or in part, without notice to or further assent from it, and that it will remain bound upon its guarantee notwithstanding any extension, modification, amendment or renewal of any Guaranteed Obligation.  Each Guarantor waives presentment to, demand of payment from and protest to the Borrower or any other Loan Party of any of the Guaranteed Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment.  The guarantee made by the Borrower hereunder relates solely to the Secured Swap Obligations and Secured Cash Management Obligations of the Restricted Subsidiaries of the Borrower.

Section 13.02    Guarantee of Payment. Each Guarantor and the Borrower further agrees that its guarantee hereunder constitutes a guarantee of payment when due and not of collection, and waives any right to require that any resort be had by the Administrative Agent or any other Secured Party to any security held for the payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of the Administrative Agent or any other Secured Party in favor of the Borrower or any other person.

Section 13.03    Special Guaranty to Confer ECP Status.    The Borrower, unconditionally and irrevocably, with respect to each other Guarantor, guarantees such Guarantor's guarantee under Section 2(a) of any Secured Swap Agreement.  The obligations of the Borrower under this Section 13.03 shall remain in full force and effect until Payment in Full.  The Borrower intends that this Section 13.03 and Section 2(a) shall be deemed to constitute, a guarantee or other agreement for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 13.04    No Limitations.  Except for termination or release of a Guarantor's obligations hereunder as expressly provided for in Section 12.16 hereof, the obligations of each Guarantor hereunder

shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise (other than defense of payment or performance). Without limiting the generality of, or the exception in, the foregoing, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by (and each Guarantor hereby waives, to the fullest extent permitted by law, any defense arising out of or relating to):  (i) the failure of the Administrative Agent or any other Secured Party to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Loan Document or otherwise; (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, any Loan Document or any other agreement, including with respect to any other Guarantor under this Guaranty; (iii) the release of, or the failure to perfect any security interest in, or the exchange, substitution, release or any impairment of, any security held by the Administrative Agent or any other Secured Party for the Guaranteed Obligations; (iv) any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations; (v) any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than Payment in Full); (vi) any illegality, lack of validity or enforceability of any Guaranteed Obligation; (vii) any change in the corporate existence, structure or ownership of the Borrower, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or its assets or any resulting release or discharge of any Guaranteed Obligation (other than Payment in Full); (viii) the existence of any claim, set-off or other rights that the Guarantor may have at any time against the Borrower, the Administrative Agent, or any other corporation or person, whether in connection herewith or any unrelated transactions; provided that nothing herein will prevent the assertion of any such claim by separate suit or compulsory counterclaim; and (ix) any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Administrative Agent that might otherwise constitute a defense to, or a legal or equitable discharge of, the Borrower or any other Loan Party (other than Payment in Full).  Each Guarantor expressly authorizes the Secured Parties to take and hold security for the payment and performance of the Guaranteed Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the Guaranteed Obligations, all without affecting the obligations of any Guarantor hereunder.  The Administrative Agent and the other Secured Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with the Borrower or any other Loan Party or exercise any other right or remedy available to them against the Borrower or any other Loan Party, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Guaranteed Obligations have been Paid in Full.

Section 13.05    Reinstatement.  Notwithstanding the provisions of Section 12.16 or anything herein or in any other Loan Document to the contrary, the Borrower and each Guarantor agrees that its guarantee hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation is rescinded or must otherwise be restored or returned by the Administrative Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any other Loan Party, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any other Loan Party or any substantial part of its property, or otherwise, all as though such payment had not been made.

Section 13.06    Contribution; Subrogation.  Upon payment by any Guarantor or the Borrower of any sums to the Administrative Agent as provided above, all rights of such Guarantor against the Borrower

or Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be fully subordinated to the indefeasible Payment in Full.

Section 13.07    Information.  Each Guarantor and the Borrower assumes all responsibility for being and keeping itself informed of the Borrower's and each other Loan Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that neither the Administrative Agent nor any other Secured Party will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

Section 13.08    Taxes.  The provisions of Section 5.03 shall apply mutatis mutandis to all payments by the Guarantors of the Guaranteed Obligations.

Section 13.09    Limitation of Liability.  Each Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each other Secured Party, hereby confirms that it is the intention of all such Persons that this Guaranty and the Guaranteed Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Guaranteed Obligations of each Guarantor hereunder.  To effectuate the foregoing intention, the Administrative Agent, the other Secured Parties and the Guarantors hereby irrevocably agree that the Guaranteed Obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Guaranteed Obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

Section 13.10    Indemnity; Subrogation and Subordination.

(a)    Indemnity and Subrogation.  In addition to all such rights of indemnity and subrogation as the Guarantors may have under applicable law (but subject to Section 13.10(c)), the Borrower agrees that (i) in the event a payment shall be made by any Guarantor under this Guaranty in respect of any Obligation of the Borrower, the Borrower shall indemnify such Guarantor for the full amount of such payment and such Guarantor shall be subrogated to the rights of the person to whom such payment shall have been made to the extent of such payment and (ii) in the event any assets of any Guarantor shall be sold pursuant to this Guaranty or any other Security Instrument to satisfy in whole or in part an Obligation of the Borrower, the Borrower shall indemnify such Guarantor in an amount equal to the greater of the book value or the fair market value of the assets so sold.

(b)    Contribution and Subrogation.  Each Guarantor (a "Contributing Guarantor") agrees (subject to Section 13.10(c)) that, in the event a payment shall be made by any other Guarantor hereunder in respect of any Obligation or assets of any other Guarantor shall be sold pursuant to any Security Instrument to satisfy any Obligation owed to any Secured Party and such other Guarantor (the "Claiming Guarantor") shall not have been fully indemnified by the Borrower as provided in Section 13.10(a), the Contributing Guarantor shall indemnify the Claiming Guarantor in an amount equal to the amount of such payment or the greater of the book value or the fair market value of such assets, as applicable, in each case multiplied by a fraction of which the numerator shall be the net worth of such Contributing Guarantor on the date hereof and the denominator shall be the aggregate net worth of all the Guarantors on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 8.11 of the Credit Agreement, the date of the supplement hereto executed and delivered by such Guarantor). Any Contributing Guarantor making any payment to a Claiming Guarantor pursuant to this Section 13.10(b) shall be subrogated to the rights of such Claiming Guarantor under Section 13.10(a) to the extent of such payment. The provisions of this Section 13.10(b) shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the other Secured Parties, and each Guarantor shall remain

108

liable to the Administrative Agent and the other Secured Parties for the full amount guaranteed by such Guarantor hereunder.

(c)    Subordination.  Notwithstanding any provision of this Guaranty to the contrary, all rights of the Guarantors under Sections 13.10(a) and 13.10(b) and all other rights of indemnity, contribution or subrogation of any Guarantor under applicable law or otherwise shall be fully subordinated until Payment in Full.  Notwithstanding any payment or payments made by any of the Guarantors hereunder or any set-off or appropriation or application of funds of any of the Guarantors by any Secured Party, no Guarantor shall be entitled to be subrogated to any of the rights of the Administrative Agent or any other Secured Party against the Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by any Secured Party for the payment of the Obligations until Payment in Full, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrower or any other Guarantor in respect of payments made by such Guarantor hereunder until Payment in Full.  If any amount shall be paid to any Guarantor on account of such subrogation rights at any time prior to Payment in Full, such amount shall be held by such Guarantor in trust for the Administrative Agent and the other Secured Parties, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be paid to the Administrative Agent to be credited and applied against the Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement.  No failure on the part of the Borrower or any Guarantor to make the payments required by Sections 13.10(a) and 13.10(b) (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder

Section 13.11    Representations and Warranties. Each Guarantor hereby represents and warrants to the Administrative Agent and each Lender that:

(a)    the representations and warranties set forth in Article VII as they relate to such Guarantor or to the Loan Documents to which such Guarantor is a party are true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects after giving effect to such qualification), provided that each reference in each such representation and warranty to the Borrower's knowledge shall, for the purposes of this clause, be deemed to be a reference to such Guarantor's knowledge.

(b)    on the date hereof, the correct legal name of such Guarantor, all names and trade names that such Guarantor has used in the last five (5) years, such Guarantor's jurisdiction of organization and each jurisdiction of organization of such Guarantor over the last five (5) years, organizational number, taxpayor identification number, and the location(s) of such Guarantor's chief executive office or sole place of business over the last five years are specified on Schedule 1.1(a).

[SIGNATURES BEGIN NEXT PAGE]

109

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**BORROWER:**                                    **ARSENAL RESOURCES DEVELOPMENT LLC**

By: _____
Name: _____
Title: _____

[Signature Page to RBL DIP Credit Agreement]

**CITIBANK, N.A.**, as Administrative Agent

By: _____
Name: _____
Title: _____

**CITIBANK, N.A.**, as Lender and Issuing Bank

By: _____
Name: _____
Title: _____

[  ], as a Lender

By: _____
Name: _____
Title: _____

**ANNEX I**
**REFINANCED LOAN AMOUNTS**

| Name of Lender | Applicable Percentage | Commitment |
|---|---|---|
| Citibank, N.A. | 20.690% | $9,310,500.00 |
| BMO Harris Bank, N.A. | 27.586% | $12,413,700.00 |
| Société Générale | 20.690% | $9,310,500.00 |
| CIT Finance LLC | 17.241% | $7,758,450.00 |
| The Huntington National Bank | 6.897% | $3,103,650.00 |
| Goldman Sachs Bank USA | 3.448% | $1,511,600.00 |
| Mercuria Energy Company, LLC | 3.448% | $1,511,600.00 |
| **TOTAL:** | 100.00% | $45,000,000.00 |

**ANNEX II**
**NEW MONEY LOAN COMMITMENTS AND LC ISSUANCE LIMITS**

| Name of Lender | Applicable Percentage | Commitment | LC Issuance Limit |
|---|---|---|---|
| Citibank, N.A. | 20.690% | $9,310,500.00 | $5,000,000.00 |
| BMO Harris Bank, N.A. | 27.586% | $12,413,700.00 | --- |
| Société Générale | 20.690% | $9,310,500.00 | --- |
| CIT Finance LLC | 17.241% | $7,758,450.00 | --- |
| The Huntington National Bank | 6.897% | $3,103,650.00 | --- |
| Goldman Sachs Bank USA | 3.448% | $1,511,600.00 | --- |
| Mercuria Energy Company, LLC | 3.448% | $1,511,600.00 | --- |
| **TOTAL:** | 100.00% | $45,000,000.00 | $5,000,000.00 |

LEGAL_US_E # 144284119.14

**<u>Annex 2</u>**

**New Equity Term Sheet**

**Annex 2**

**New Equity Term Sheet**

This New Equity Term Sheet is attached to and made a part of the Arsenal Energy Holdings LLC Restructuring Term Sheet dated November 6, 2019 (the "Restructuring Term Sheet"), is incorporated therein for all purposes and is also made a part of and incorporated into the Restructuring Support Agreement dated November 6, 2019 (the "Restructuring Support Agreement") to which the Restructuring Term Sheet is attached.  This New Equity Term Sheet sets forth the terms, conditions, and requirements to be satisfied prior to certain Consenting Stakeholders (such parties, as identified on the signature pages to the Restructuring Support Agreement, the "New Capital Parties") funding their respective portion of $100,000,000 in cash (the "New Equity Capital") in exchange for the issuance by Reorganized Arsenal on the Plan Effective Date of Class A Units of New Common Equity equal to, in aggregate, 33.7 percent of the New Common Equity (or 43.9 percent of the New Common Equity if the Seller Noteholders vote to reject the Plan) issued on the Plan Effective Date (and subject to any dilution by a Management Incentive Plan).  The amount of each New Capital Party's New Equity Capital commitment is set forth on its signature page to the Restructuring Support Agreement.

Capitalized terms used but not initially defined in this New Equity Term Sheet shall have the meaning hereinafter ascribed to such terms, or if not defined in this New Equity Term Sheet, such terms shall have the meaning ascribed to such terms in the Term Sheet or Restructuring Support Agreement (including an Annex affixed thereto), as applicable.

| | |
|---|---|
| Gathering Agreements: | Subject to and without limiting any of the Consenting RBL Lenders' rights, the Consenting Term Loan Lenders' rights, or the Consenting Seller Noteholders' rights under Section 10.01(s) of the Restructuring Support Agreement, the Company's Gathering Agreements will either be (1) rejected or (2) amended, assumed and/or assigned on terms acceptable to the New Capital Parties in their sole discretion; *provided that*, the EQM Gathering Agreement and the Fullstream Gathering Agreement shall be assumed on the amended terms described in Exhibit F to the Restructuring Support Agreement. |
| Conditions of the New Equity Commitment: | The obligation of each of the New Capital Parties to provide the New Equity Capital is subject to the prior or concurrent satisfaction of the following conditions: |
| | (i) *Plan Effective Date Occurrence*.  The Plan Effective Date and the Restructuring Transactions related thereto shall have occurred, or shall be deemed to have occurred, in accordance with the terms and conditions in the Plan, the Plan Supplement and in the Confirmation Order. |

(ii) *Approval of Organizational Documents*. The New Organizational/Governance Documents shall be in full force and effect.

(iii) *Governmental Approvals*. All waiting periods imposed by any governmental entity or antitrust authority in connection with the transactions contemplated by the Restructuring Support Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under any antitrust laws or otherwise required by any governmental entity in connection with the transactions contemplated by the Restructuring Support Agreement shall have been obtained or filed.

(iv) *No Legal Impediment to Issuance*. No law or order shall have become effective or been enacted, adopted or issued by any governmental entity that prohibits the implementation of the Plan or the transactions contemplated by the Restructuring Support Agreement.

(v) *No Material Adverse Effect*. Since the Agreement Effective Date under the Restructuring Support Agreement, there shall not have occurred, and there shall not exist, any Material Adverse Effect (as defined below).

(vi) *Minimum Liquidity of the Company*. The Company Parties, on a consolidated basis, shall have at least $40 million in available liquidity as of the Plan Effective Date after taking into account any disbursements necessary to consummate the Restructuring Transactions and after giving effect to the consummation of the Plan.

(vii) *Exit Facility*. The New RBL Facility shall have become effective and shall be in an aggregate principal amount of no less than $130 million.

(viii) *Restructuring Support Agreement*. The Restructuring Support Agreement shall not have been terminated as to the New Capital Parties.

"***Material Adverse Effect***" means any event, change, effect, circumstance, occurrence, development, condition, result, state of facts or change of facts (each, an "Event") occurring after the date hereof that, individually or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on the business, results of operations or condition (financial or otherwise) of the Company Parties, or the properties, assets, finances or liabilities of the Company Parties, taken as a whole; *provided* that "Material Adverse Effect" shall not include any Event occurring after the date hereof and arising out of or resulting from: (a) conditions or effects that generally affect persons or entities comparable in size and scale to the Company Parties

2

engaged in the industries, businesses, markets (financial or otherwise) or geographic areas in which the Company Parties operate taking into consideration any Event that is related to the operations of the Company Parties in the specific geographical and geological areas in which they operate, (b) general economic conditions in regions and markets in which the Company Parties operate, (c) regional, national or international political or social conditions, including acts of war, terrorism or natural disasters, escalation or material worsening of hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or its territories, possessions, diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (d) financial, banking, securities, credit, or commodities markets, prevailing interest rates or general capital markets conditions, (e) changes in United States generally accepted accounting principles, (f) changes in Laws, orders, or other binding directives issued by any governmental entity, (g) the taking of any action or any inaction required by this Agreement, the Restructuring Term Sheet, the DIP Term Sheet, the Equity Term Sheet, the Governance Term Sheet, the Plan, or any action or inaction in connection with the Chapter 11 Cases, including the commencement, announcement and pendency of the Chapter 11 Cases, (h) the execution, announcement or performance of this Agreement or the other transaction agreements contemplated by this Agreement or the transactions contemplated hereby or thereby (including any act or omission of the Company Parties expressly required or prohibited, as applicable, by this Agreement or such other Agreement), or (i) any action or inaction consented to or requested by the Consenting Stakeholders; *provided, further*, that exceptions set forth in clauses (a), (b), (c) and (d) of this definition shall not apply to the extent that such Event is disproportionately adverse to the Company Parties, taken as a whole, as compared to other companies comparable in size and scale to the Company Parties operating in the industries and same geographical areas in which the Company Parties operate.

Active 42025354

**<u>Annex 3</u>**

**New RBL Facility Term Sheet**

**Execution Version**

**CONFIDENTIAL**

**ARSENAL RESOURCES DEVELOPMENT LLC**

EXIT REVOLVING FACILITY

Summary of Principal Terms and Conditions

_____

    Set forth below is a statement of the principal indicative terms and conditions for the exit revolving loan facility to be made available to the Borrower (as defined below) and used as described under "Purpose and Availability".  It does not purport to summarize all terms of the Credit Documentation (as defined below).

## I. <u>Parties and Transactions</u>

| | |
|---|---|
| <u>Borrower</u>: | Arsenal Resources Development LLC, a Delaware limited liability company (the "<u>Borrower</u>"), a direct wholly-owned subsidiary of Arsenal Resource Development Holdings 1, LLC ("<u>Holdings</u>"). |
| <u>Pre-Petition RBL Credit Agreement</u>: | That certain Credit Agreement, dated as of December 21, 2018, among the Borrower, as the borrower thereunder, the lenders party thereto, and Citibank, N.A., as administrative agent (as amended, modified, refinanced and/or restated prior to the date hereof, the "<u>Pre-Petition RBL Credit Agreement</u>"). |
| <u>Existing DIP Credit Agreement</u>: | That certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated on or around the Petition Date, among the Borrower, as the borrower thereunder, the lenders party thereto, and Citibank, N.A., as administrative agent (as amended, modified, refinanced and/or restated prior to the date hereof, the "<u>Existing DIP Credit Agreement</u>"). |
| <u>Transactions</u>: | In connection with the Restructuring Transactions (as defined in the Restructuring Support Agreement to which this Exit Revolving Facility Summary of Principal Terms and Conditions is attached (the "<u>RSA</u>")), the Borrower intends, among other things, that on the Plan Effective Date (as such term is defined in the RSA): |
| | (a) the Borrower will obtain the Revolving Facility described herein; |
| | (b) (i) all existing indebtedness of the Borrower under the Existing DIP Credit Agreement will be refinanced or repaid in full, all commitments in respect thereof terminated, and all security and guaranties in respect thereof discharged and released and (ii) all existing indebtedness of the Borrower under the Pre-Petition RBL Credit Agreement will be refinanced or repaid in full, all commitments in respect thereof terminated, and all security and guaranties in respect thereof discharged and released (clauses (i) and (ii), collectively, the "<u>Refinancing</u>"); |

(c) (i) Holdings will issue the Class A Units and the Borrower will receive the proceeds of the New Capital Commitment (as defined in the Restructuring Term Sheet), in each case, in accordance with the terms of the New Equity Term Sheet (as defined in the RSA) and (ii) all indebtedness under the Term Loans and the Seller Notes (each as defined in the RSA) shall be cancelled and extinguished; and

(d) the Borrower shall pay the fees and expenses in connection with the foregoing (the "Transaction Costs").

The foregoing transactions (including payment of the Transaction Costs) are collectively referred to herein as the "Transactions".

| | |
|---|---|
| Guarantors: | Holdings and each of the Borrower's existing and subsequently acquired or organized direct and indirect wholly-owned domestic material restricted subsidiaries (other than any unrestricted subsidiaries, captive insurance companies and not-for-profit subsidiaries) (the "Guarantors"; the Guarantors and the Borrower, the "Credit Parties") shall unconditionally guarantee, on a joint and several basis (the "Guarantees"), all obligations of the Credit Parties (the "Obligations") under (a) the Revolving Facility and (b) each interest rate or commodity price protection or other hedging arrangements and cash management agreements entered into (i) with a Lender (as defined below) or an agent under the Revolving Facility or any affiliate of a Lender or agent under the Revolving Facility at the time of the entering into of such arrangements or (ii) prior to the Closing Date (as defined in the Commitment Letter) with a person that on the Closing Date becomes a Lender or an agent under the Revolving Facility, or an affiliate thereof, in each case. to the extent otherwise permitted by applicable law, regulation and, to the extent existing on the Closing Date (or applicable acquisition date), contractual provisions and to the extent such guarantee would not result in material adverse tax consequences as reasonably determined by the Borrower. |
| Lead Arranger and Bookrunner: | Citi (as defined below) (the "Arranger"). |
| | "Citi" shall mean Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate to consummate the Transactions contemplated hereby. |
| Administrative Agent: | Citi (in its capacity as administrative agent, the "Administrative Agent"). |
| Lenders: | As set forth in the commitment letter (the "Commitment Letter") to which this Summary of Principal Terms and Conditions is attached (such lenders, the "Lenders"). |

2

| | |
|---|---|
| Majority Lenders: | Lenders holding more than 50.0% of the aggregate amount of the Loans (as defined below) and participations in Letters of Credit (as defined below) and unused Commitments (as defined below) under the Revolving Facility (the "Majority Lenders"). |
| Required Lenders: | Lenders holding not less than 66.67% of the aggregate amount of the Loans and participations in Letters of Credit and unused Commitments under the Revolving Facility (the "Required Lenders"). |

## II. Facility

| | |
|---|---|
| Exit Revolving Facility: | A senior secured first lien reserve-based revolving credit facility (the "Revolving Facility"; the definitive financing documentation with respect thereto, subject to the Documentation Principles (as defined below), the "Credit Documentation") having a maximum aggregate credit amount of $200.0 million (the commitments under Revolving Facility, which are subject to the Borrowing Base (as defined below) then in effect, the "Commitments"; the loans thereunder, the "Loans"). |
| Initial Borrowing Base: | The Borrowing Base shall be $130.0 million on the Closing Date until the completion of the Initial Redetermination, subject to any permitted interim redetermination and any required interim adjustments to the Borrowing Base, in each case, as more fully set forth herein; provided that no interim redeterminations will occur prior to the completion of the Initial Redetermination. |
| Closing Date: | The date of the consummation of the Refinancing and the satisfaction or waiver of the Initial Conditions (the "Closing Date"). |
| Maturity Date: | The Revolving Facility will mature, and lending Commitments will terminate, on April 1, 2023 (the "Maturity Date"). |
| | The Credit Documentation shall provide the right for individual Lenders under the Revolving Facility to agree to extend the maturity date of their outstanding Loans upon the request of the Borrower and without the consent of any other Lender (it being understood that each Lender under the tranche that is being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other Lender under such tranche). |
| Ranking: | The Revolving Facility will be senior secured on a first priority basis with the Collateral (as defined below). |
| Purpose and Availability: | The proceeds of Loans will be used by the Borrower (i) for the Refinancing and (ii) for working capital and other general corporate purposes (which may include consummating the Transactions and paying transaction costs, fees and expenses in |

connection therewith).  Subject to the Borrowing Base then in effect and satisfaction of the conditions precedent set forth herein, Loans will be available on and after the Closing Date and at any time before the final maturity of the Revolving Facility, in minimum principal amounts as set forth in the Credit Documentation.  Amounts repaid under the Revolving Facility may be reborrowed.

Extensions of credit under the Revolving Facility will be available in an amount equal to the lesser of (x) the Commitments and (y) the then-applicable Borrowing Base at such time, in each case, after giving effect to all outstanding borrowings of Loans, unreimbursed Letter of Credit drawings and outstanding Letters of Credit thereunder.

Borrowing Base:

The borrowing base (the "Borrowing Base") shall be the loan value to be assigned to the proved reserves attributable to the Borrower's and the Guarantors' oil and gas properties located in the United States (the "Borrowing Base Properties").  The Borrowing Base will be redetermined on a semi-annual basis, with the parties having the right to interim unscheduled redeterminations as described below.  Scheduled Borrowing Base redeterminations will be on a semi-annual basis on or about April 1st and October 1st, based upon a reserve report evaluating such proved reserves as of the immediately preceding January 1st and July 1st, respectively; provided that the initial redetermination of the Borrowing Base following the Closing Date shall occur on or about the earlier of (i) the first anniversary of the Closing Date and (ii) April 1, 2021 (the "Initial Redetermination").  The January 1st reserve report will be prepared by certain approved petroleum engineering firms as set forth in the Credit Documentation or other independent petroleum engineering firms reasonably acceptable to the Administrative Agent and such reserve report will be accompanied by a 12-month cash flow and capital expenditure forecast, and the July 1st reserve report will be prepared internally by the Borrower in a form reasonably acceptable to the Administrative Agent.

Based in part on the reserve report, the Administrative Agent shall, within 15 days after receipt of such report (or such later date, within 30 days thereof, as the Borrower and Administrative Agent may agree), make an initial determination of the Borrowing Base and promptly notify the Lenders and the Borrower of such determination.  Within 15 days after receipt of such proposed amounts, each Lender will, in good faith in accordance with its customary oil and gas lending criteria as its exists at such time, approve or reject the Administrative Agent's initial determination of the Borrowing Base.  In the case of any decreases in, or reaffirmations of, the Borrowing Base, if at the end of such 15-day period, any Lender has not communicated its

approval or disapproval in writing to the Administrative Agent, it shall be deemed to have approved the Administrative Agent's initial determination of the Borrowing Base, unless the Administrative Agent and Borrower otherwise agree.  Any increase in the Borrowing Base shall require (a) the consent of all Lenders, each acting in good faith in accordance with its customary oil and gas lending criteria as it exists at such time and (b) the consent of the Borrower.  The consent of the Required Lenders, each acting in good faith in accordance with its customary oil and gas lending criteria as it exists at such time, will be required for decreases in, or reaffirmations of, the Borrowing Base; provided that the Borrower on any redetermination date may elect to reduce the Borrowing Base.

Following the completion of the Initial Redetermination, the Borrower may request two additional unscheduled Borrowing Base redeterminations during any calendar year and the Administrative Agent, at the request of the Required Lenders, may request two additional unscheduled Borrowing Base redeterminations during any calendar year.  The Borrower shall also have the right to request customary additional interim redeterminations in connection with material acquisitions as set forth in the Credit Documentation.

In addition to the foregoing, the Borrowing Base will be subject to interim adjustments in connection with (subject to certain customary exceptions as set forth in the Credit Documentation):

(a) the incurrence of unsecured or subordinated debt and junior lien debt;

(b) the termination of hedging arrangements;

(c) sales of oil and gas properties, including, without limitation, the pipeline assets owned by or equity interest in Midstream (as defined below) (such interim adjustments pursuant to clauses (a), (b) and (c), collectively, the "Specified Interim Borrowing Base Adjustments"); and

(d) unresolved title deficiencies on the oil and gas properties evaluated in the most recent reserve report to the extent such title information is required to be provided pursuant to the "Title Information" Affirmative Covenant.

The thresholds for Borrowing Base adjustments in connection with clauses (b) and (c) above will be set at 5.0% of the Borrowing Base in the aggregate for all such events, determined from the later of the most recent scheduled redetermination date and the last date of any such adjustments of the Borrowing Base (and in the case of clause (b), giving effect to any hedging arrangements executed during such period, including those executed substantially concurrently with the taking of any such

5

action); <u>provided</u> that in the case of any adjustment pursuant to <u>clause (c)</u> above, the Borrower shall have the right (but not the obligation) to provide updated reserve engineering to be considered in connection with such adjustment.

The Borrowing Base adjustment in connection with clause (a) above, will (i) in the case of any such incurrence of unsecured, subordinated or junior lien debt prior to the completion of the Initial Redetermination, reduce the Borrowing Base by an amount equal to the product of 1.0 multiplied by the stated principal amount of such unsecured, subordinated or junior lien debt and (ii) in the case of any such incurrence of unsecured, subordination or junior lien debt from and after the completion of the Initial Redetermination, reduce the Borrowing Base by an amount equal to the product of 0.25 multiplied by the stated principal amount of such unsecured, subordinated debt and junior lien debt.

|   |   |
|---|---|
| <u>Letters of Credit</u>: | Up to $10.0 million of the Revolving Facility shall be available for the issuance of letters of credit (the "<u>Letters of Credit</u>") by Citi and one or more Revolving Lenders that agree to serve in the capacity as an issuing bank (in such capacity, each an "<u>Issuing Lender</u>"); <u>provided</u>, <u>however</u>, the fronting exposure in respect of Letters of Credit shall be borne by each Issuing Lender on a *pro rata* basis. No Letter of Credit shall have an expiration date after the earlier of (a) one (1) year (or eighteen (18) months with respect to Letters of Credit issued for the benefit of the Texas Railroad Commission) or such longer period as the Issuing Lender may agree after the date of issuance and (b) five (5) business days prior to the final maturity of the Revolving Facility; <u>provided</u> that any Letter of Credit with a one-year (or eighteen (18) months, with respect to Letters of Credit issued for the benefit of the Texas Railroad Commission) tenor may provide for the renewal thereof for additional one-year or eighteen month, as applicable, periods or such longer periods as the Issuing Lender may agree (which shall in no event extend beyond the date referred to in <u>clause (b)</u> above, except to the extent the applicable Letter of Credit is cash collateralized or backstopped in a manner reasonably acceptable to the applicable Issuing Lender). |

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Loans (with any borrowings of Loans for such purpose not being subject to the conditions to borrowing)), within one business day. To the extent that the Borrower does not so reimburse the Issuing Lender within one business day, the Lenders under the Revolving Facility shall be irrevocably and unconditionally obligated to reimburse the Issuing Lender on a *pro rata* basis based on their respective Commitments.

Interest Rates and Fees:    As set forth on <u>Annex I</u> hereto.

**III. <u>Collateral</u>**

<u>Security</u>:    The Obligations and Guarantees shall, subject to the exceptions set forth in the Credit Documentation, be ratably secured, subject to permitted liens, by a perfected first priority lien on the assets as described below (the "<u>Collateral</u>"):

- A perfected pledge of all the capital stock directly held by the Borrower or any Guarantor in (a) any wholly-owned restricted subsidiary (which pledge, in the case of the capital stock of any foreign subsidiary of a U.S. entity or of a U.S. entity substantially all of whose assets consist of capital stock and/or indebtedness of one or more foreign subsidiaries and any other assets incidental thereto, shall be limited to 65% of the voting stock and 100% of the non-voting stock of such foreign subsidiary or such U.S. entity, as the case may be) and (b) Arsenal Midstream LLC ("<u>Midstream</u>");

- A first priority, perfected lien on the Borrowing Base Properties comprising not less than 90.0% of with respect to proved reserves, the PV-10 of the oil and gas properties evaluated in the most recently completed reserve report delivered to the Administrative Agent and after giving effect to exploration and production activities, acquisitions, dispositions and production;

- A first priority, perfected lien and security interest on deposit accounts, securities accounts and commodities accounts of the Borrower and the Guarantors in a manner consistent with the Pre-Petition RBL Credit Agreement;

- A first priority, perfected lien and security interest on substantially all hedging agreements of the Borrower and the Guarantors; and

- A first priority, perfected lien and security interest on (a) substantially all other personal property (including, without limitation, property of Midstream, general intangibles, accounts, investment property and intellectual property (including, but not limited to, such assets and property related to the Borrowing Base Properties)) of the Borrower and the Guarantors and (b) all pipelines owned by Midstream.

The Borrower shall provide title information (including customary title opinions or reports or other documents) consistent with usual and customary standards for the

geographic regions in which the Borrowing Base Properties are located, taking into account the size, scope and number of leases and wells of the Borrower and the Guarantors, in respect of at least 90.0% of the aggregate net present value of the Borrowing Base Properties (the "Title Diligence Obligation").

Notwithstanding anything to the contrary, the Collateral shall not include (a) those assets as to which the Administrative Agent shall determine in its reasonable discretion that the costs of obtaining such security interest are excessive in relation to the value of the security to be afforded thereby and (b) those assets over which the granting of security interests in such assets would be prohibited by contract (to the extent existing on the Closing Date or upon the acquisition of a subsidiary, and in each case, not in contemplation thereof), applicable law or regulation or the organizational documents of any non-wholly owned subsidiary (including permitted liens, leases and licenses) (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code), or to the extent that such security interests or the granting thereof would result in material adverse tax consequences as reasonably determined by the Borrower.  The Borrower and its restricted subsidiaries will not be required to take any action with respect to the perfection of security interests in motor vehicles or other assets subject to certificates of title.

Notwithstanding anything to the contrary in the foregoing, no actions in any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. or to perfect any security interests in such assets, including any intellectual property registered in any non-U.S. jurisdiction (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction).

## IV.  Certain Payment Provisions

| | |
|---|---|
| Optional Prepayments and Reductions in Commitments: | Optional prepayments of borrowings under the Revolving Facility, and optional reductions of the unutilized portion of the Commitments, will be permitted at any time, in minimum principal amounts as set forth in the Credit Documentation, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period. |
| Mandatory Prepayments: | If, between scheduled Borrowing Base determinations, there occurs a Specified Interim Borrowing Base Adjustment, the Borrower shall eliminate any Borrowing Base Deficiency (as defined below) resulting from such adjustment on the third business day after the Required Lenders determine the |

appropriate adjustment to the Borrowing Base and the Borrower receives the proceeds associated with such Specified Interim Borrowing Base Adjustment. In addition to the foregoing, in the event the Borrower or any of its restricted subsidiaries incurs junior lien, unsecured or subordinated indebtedness prior to the completion of the Initial Redetermination, 100% of the net cash proceeds of any such incurrence of indebtedness shall be required to be applied to repay the Loans and permanently reduce the Commitments pro rata among the Lenders on a dollar-for-dollar basis within one business day of the incurrence thereof.

Other than the prepayments set forth above, if the Borrowing Base or Commitments at any time are less than the outstanding principal balance of the Revolving Facility (including the aggregate amount of all issued and outstanding Letters of Credit (including all unreimbursed disbursements on any Letter of Credit but excluding all Letters of Credit that have been cash collateralized or backstopped in a manner reasonably satisfactory to the Issuing Lender)) (a "Borrowing Base Deficiency"), the Borrower will eliminate such deficiency by one or a combination of the following methods and, within 10 business days after being notified of the deficiency, indicate by written notice to the Administrative Agent, its election to do one or a combination of the following:

(i)     prepay such Borrowing Base Deficiency within 30 days of such election;

(ii)    prepay such Borrowing Base Deficiency in six equal consecutive monthly installments (with the first installment to occur 30 days after the Borrower receives notice of such Borrowing Base Deficiency) and, in connection therewith, dedicate a sufficient amount of monthly cash flow from the oil and gas properties of the Borrower to satisfy such payments;

(iii)   provide new reserve and engineering reports (and, to the extent necessary to satisfy mortgage coverage requirements, perfected security interests) on properties not evaluated previously, the value of which shall be sufficient to cover such Borrowing Base Deficiency (or remaining portion thereof), and otherwise reasonably acceptable to the Administrative Agent, within 30 days of such election; or

(iv)    a combination of the foregoing options (i), (ii) and (iii) sufficient to eliminate such Borrowing Base Deficiency.

Except as expressly set forth above, any mandatory prepayment made by the Borrower shall not require or trigger a reduction of the Commitments under the Revolving Facility.

Application of Prepayments:    All optional prepayments applicable to the Revolving Facility shall be applied to the Loans of each Lender on a *pro rata* basis.

## V. Certain Conditions

Conditions Precedent to the Closing Date:    The availability of the initial borrowing under the Revolving Facility on the Closing Date shall be conditioned only upon satisfaction or waiver of the conditions set forth in Exhibit B (such requirements, the "Initial Conditions").

Conditions Precedent to Borrowings after the Closing Date:    Conditions precedent to each borrowing or issuance under the Revolving Facility will be (a) the absence of any default or event of default at the time of such borrowing, (b) the accuracy in all material respects of all representations and warranties and (c) the delivery of a borrowing notice.

## VI. Documentation

Documentation Principles:    The Credit Documentation shall be negotiated in good faith and shall contain only those conditions, mandatory prepayments, prepayment premiums (if any), representations, warranties, covenants and events of default expressly set forth in this Summary of Principal Terms and Conditions (applicable to Holdings, the Borrower and each of its restricted subsidiaries, as applicable) and, except as set forth herein, those terms and conditions usual for facilities and transactions of this type and which will be based on, and give due regard to, the Pre-Petition RBL Credit Agreement and related credit documentation, in each case, as modified to reflect the Transactions and the terms and conditions set forth herein or as otherwise mutually agreed and with standards, limitations, qualifications, thresholds, exceptions, "baskets" and grace and cure periods and other changes necessary to be agreed upon in order to take into account (i) the Plan, (ii) the post-bankruptcy business, operational and strategic requirements of Holdings, the Borrower and its subsidiaries in light of their capitalization, size, geographic location and business industries and practices and (iii) the Borrower's proposed business plan and financial model after giving effect to the Transactions; provided that, except as expressly set forth herein, prior to the completion of the Initial Redetermination, the thresholds, exceptions and baskets shall be set as if a Restructuring Completion Date under the Pre-Petition RBL Credit Agreement had not occurred.  The principles set forth in this paragraph are referred to as the "Documentation Principles".

10

**VII. Certain Documentation Matters**

Representations and Warranties:

Limited to the following representations and warranties (to be applicable to Holdings (in certain customary cases), the Borrower and its restricted subsidiaries):

1. Organization; Powers.

2. Authority; Enforceability.

3. Approvals; No Conflicts.

4. Financial Condition; No Material Adverse Change.

5. Litigation.

6. Environmental Matters.

7. Compliance with Laws.

8. Investment Company Act.

9. Taxes.

10. ERISA.

11. Disclosure; No Material Misstatements.

12. Subsidiaries.

13. Location of Business and Offices.

14. Properties; Maintenance of Properties; Title; Etc.

15. Gas Imbalances, Prepayments.

16. Marketing of Production.

17. Swap Agreements.

18. Use of Loans and Letters of Credit.

19. Solvency.

Affirmative Covenants:

Limited to the following affirmative covenants (to be applicable to Holdings (in certain customary cases), the Borrower and its restricted subsidiaries):

1. Financial Statements of the Borrower and its restricted subsidiaries; Other Information.

2. Notice of Material Events.

11

3.      Existence; Conduct of Business.

4.      Payment of Tax Obligations.

5.      Operation and Maintenance of Properties.

6.      Insurance.

7.      Books and Records; Inspection Rights.

8.      Compliance with Laws.

9.      Environmental Matters.

10.     Further Assurances.

11.     Reserve Reports.

12.     Compliance with the Title Diligence Obligation.

13.     Additional Collateral; Additional Guarantors.

14.     ERISA Compliance.

15.     Swap Agreements.

16.     Marketing Activities.

17.         Unrestricted Subsidiaries; Designation and Re-Designation.

18.     On or prior to the date that is thirty (30) days after the Closing Date (subject to extension (i) by the Administrative Agent as may be reasonably agreed or (ii) for a period to be agreed in the event that the counterparties to the hedge agreements are unable to hedge within such initial time period), the Borrower shall have entered into hedge agreements that are reasonably satisfactory to the Administrative Agent (it being understood that hedge agreements which are substantially similar to the hedge agreements existing pursuant to the Pre-Petition RBL Credit Agreement shall be deemed to be reasonably satisfactory to the Administrative Agent), in each case, for notional volumes equaling at least 80% of the reasonably anticipated hydrocarbon production from the Credit Parties' total proved developed producing reserves (as such production is projected by the most recently delivered reserve report) for a period of at least 12 months following the Closing Date.

12

Negative Covenants:    Limited to the following negative covenants (to be applicable to Holdings (in the case of the passive holdings covenant set forth below), the Borrower and its restricted subsidiaries):

1.    Debt (provided that there shall be a debt basket for the incurrence of any unsecured, subordinated and/or junior lien debt, subject to (i) the Borrowing Base adjustment and mandatory prepayment provisions set forth herein, (ii) there being no default or event of default at the time of any such incurrence and (iii) compliance with the Financial Covenants (set forth below) calculated on a pro forma basis).

2.    Liens.

3.    Dividends, Distributions and Redemptions (which covenant shall include a basket exception for, among other things, (a) customary tax and overhead payment distributions to the extent (i) attributable to Holdings' ownership of the Borrower and its subsidiaries or (ii) relating to ordinary course Holdings operating expenses, but limited, in the case of this clause (ii) to an amount to be agreed, and (b) following the completion of the Initial Redetermination, a restricted payments basket for dividends, distributions on or redemptions of capital stock and unsecured or subordinated debt or junior lien debt, subject to (i) there being no default or event of default, (ii) the Borrower having available, undrawn Commitments, calculated on a pro forma basis, equal to or greater than 17.5% of the then-effective Borrowing Base, (iii) compliance with a Consolidated Total Net Leverage Ratio (as defined below) of less than 2.75:1.00, calculated on a pro forma basis, and (iv) there being no Borrowing Base Deficiency after giving effect to such dividends, distributions or redemptions (the "Restricted Payment Conditions").

4.    Investments, Loans and Advances; provided that, following the completion of the Initial Redetermination, there shall be an investment basket for investments, loans and advances, subject to the Restricted Payments Conditions.

5.    Nature of Business; International Operations.

6.    Limitation on Operating Leases.

7.    Mergers, Etc.

8.    Sale of Properties.

9.      Transactions with Affiliates.

10.     No Foreign Subsidiaries.

11.     Negative Pledge Agreements; Dividend Restrictions.

12.     Gas Imbalances; Take-or-Pay or Other Prepayments.

13.     Swap Agreements (it being understood that the Borrower and its restricted subsidiaries shall be permitted to enter into (a) hedging arrangements with respect to notional volumes not to exceed 85% of the reasonably anticipated hydrocarbon production of its and its restricted subsidiaries' proved reserves for a period not exceeding 60 months from the date of entry into any such hedging arrangement, where compliance with such threshold shall be determined as of the date the latest such hedging arrangement is entered into based on the most recently delivered reserve reports, subject to updates, (b) hedge interest rate risk in a manner that is not speculative in nature and (c) incremental hedging arrangements in respect of reasonably anticipated projected production from oil and gas properties to be acquired not to exceed 15% of the reasonably anticipated hydrocarbon production of the Borrower and its restricted subsidiaries prior to such acquisition (based on the most recently delivered reserve report) for a period not exceeding 36 months from the date any such incremental hedging arrangement is created, during the period from (i) the date on which the Borrower or a restricted subsidiary signs a definitive acquisition agreement in connection with such acquisition to (ii) the earliest of (A) the date such acquisition is consummated, (B) the date such acquisition is terminated and (C) 90 days after such definitive acquisition agreement was executed (or such longer period as to which the Administrative Agent may agree)).  It is understood that the foregoing limitations on the amount of commodity hedges that may be put in place shall not restrict the ability of the Borrower and its subsidiaries to enter into puts, floors and basis differential swaps.

14.     Passive nature of Holdings.

Unrestricted Subsidiaries:          The Credit Documentation will contain provisions pursuant to which, subject to customary pro forma compliance with the Borrowing Base (and subject to limitations on investments, loans, advances to, and other investments in unrestricted subsidiaries as described in the immediately following proviso), the Borrower will be permitted to designate, subject to compliance with the investment covenant, any existing or

14

subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary; provided that the applicable investment basket for the designation of such unrestricted subsidiaries shall (i) only be available following the Initial Redetermination, (ii) be capped at an amount to be agreed upon and (iii) in any case subject to the Restricted Payment Conditions. Unrestricted subsidiaries will not be subject to the representations and warranties, affirmative or negative covenants or event of default provisions of the Credit Documentation and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of determining any financial ratio or covenant contained in the Credit Documentation and assets of unrestricted subsidiaries will not be included in the Borrowing Base.

Financial Covenants:

1.      Maximum Consolidated Total Net Leverage Ratio for the Borrower and its restricted subsidiaries of 3.75:1.00 (the "Leverage Ratio"), with testing to be done quarterly (on a rolling four quarter basis) commencing with the first fiscal quarter ending after the Closing Date.

Subject to the Documentation Principles, Consolidated Total Net Leverage Ratio (and the financial definitions included therein) will be defined in the Credit Documentation to be the ratio of total net debt to consolidated adjusted EBITDAX (but which shall, in any event (i) be calculated net of up to $25.0 million of unrestricted cash and cash equivalents of the Credit Parties as of the Closing Date, subject to step-ups of $5.0 million for every $50 million increase in the Borrowing Base and (ii) include the maximum face amount of all issued and outstanding letters of credit that are not cash collateralized in the calculation of consolidated indebtedness); provided that (a) fees, expenses and other restructuring transaction costs which are incurred through the date that is 120 days following the Closing Date, in connection with the Transactions, the Chapter 11 Cases (as defined in the RSA) and the other transactions contemplated hereby or thereby and other non-recurring costs and expenses and (b) certain expenses attributable to Arsenal Water LLC from the provision of water services to the Borrower and its restricted subsidiaries, will each be permitted to be added back when calculating consolidated adjusted EBITDAX.

For purposes of calculating the Consolidated Total Net Leverage Ratio, (A) for the first full fiscal quarter ending after the Closing Date, consolidated adjusted EBITDAX shall be calculated by multiplying consolidated adjusted EBITDAX for such fiscal quarter by 4, (B) for the period of the first two full fiscal quarters ending after the Closing Date, consolidated adjusted EBITDAX shall be calculated by multiplying consolidated adjusted EBITDAX for such two fiscal quarters by 2, and (C) for the

period of the first three full fiscal quarters ending after the Closing Date, consolidated adjusted EBITDAX shall be calculated by multiplying consolidated adjusted EBITDAX for such three fiscal quarters by 4/3.

2.      Minimum Current Ratio (and the financial definitions included therein) will be defined in the Credit Documentation (subject to the Documentation Principles) to be the ratio of consolidated current assets to consolidated current liabilities of not less than 1.00:1.00, with testing to be done quarterly (on a rolling four quarter basis) commencing with the first fiscal quarter ending after the Closing Date.

3.      The PV-10 of the oil and gas properties constituting proved developed producing reserves (as evaluated in the most recently completed reserve report delivered to the Administrative Agent and after giving effect to exploration and production activities, acquisitions, dispositions and production) shall be no less than 1.50x total funded indebtedness (net of cash equivalents) of the Borrower, with testing to be done quarterly (on a rolling four quarter basis) commencing with the first fiscal quarter ending after the Closing Date and ending upon the occurrence of the Initial Redetermination (it being understood that such covenant shall not be required to be tested from and after the date of the Initial Redetermination).

4.      Liquidity (to be defined in a manner consistent with the Documentation Principles) shall not, at any time, be less than $10.0 million.

For purposes of determining compliance with the foregoing financial covenants, any equity contribution (which equity shall be common equity or other qualified equity interests on terms and conditions reasonably acceptable to the Administrative Agent) made, directly or indirectly, to the Borrower after the last day of a fiscal quarter and on or prior to the day that is 12 business days after the day on which financial statements are required to be delivered for such applicable fiscal quarter (or, solely in the case of the Liquidity covenant set forth above, within five business days after the breach thereof), will, at the request of the Borrower, be included in the calculation of EBITDAX, and current assets and/or Liquidity, as applicable, for the purposes of determining compliance with the applicable financial covenants (any such equity contribution so included in the calculation of one or more financial covenants, a "Specified Equity Contribution"); provided that (a) in each four fiscal quarter period, there shall be at least two fiscal quarters in which no Specified Equity Contribution is made, (b) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Borrower and its subsidiaries to be in pro forma compliance with the financial covenants, (c) there

16

shall be no more than four Specified Equity Contributions during the life of the Revolving Facility, (d) all Specified Equity Contributions shall be disregarded for all purposes under the Credit Documentation other than for determining compliance with the financial covenants and (e) there shall be no pro forma reduction of indebtedness in connection with such Specified Equity Contribution for the fiscal quarter with respect to which such Specified Equity Contribution was made.

Events of Default:                While continuing, limited to the following Events of Default:

1.   Failure to pay principal when due.

2.   Failure to pay any reimbursement obligation, interest, fees or any other amount when due, subject to a five (5) day grace period.

3.   Representations and warranties materially incorrect when given.

4.   Failure to comply with negative covenants, certain hedging obligations set forth in the Credit Documentation, maintain the Borrower's existence or deliver notice of a default or event of default and certain information about the Credit Parties (with cure periods as set forth in the Credit Documentation).

5.   Failure to comply with other provisions (with notice and cure periods as set forth in the Credit Documentation).

6.   Cross-acceleration and cross-default to debt aggregating the greater of (a) $10.0 million and (b) 7.5% of the Borrowing Base by the Borrower or any of its significant subsidiaries (or a group of the Borrower's restricted subsidiaries that taken as a whole would constitute a significant subsidiary of the Borrower).

7.   Bankruptcy or insolvency with respect to Holdings, the Borrower or any of its significant subsidiaries (or a group of the Borrower's restricted subsidiaries that taken as a whole would constitute a significant subsidiary of the Borrower).

8.   Failure of Holdings, the Borrower or any of its significant subsidiaries (or a group of the Borrower's restricted subsidiaries that taken as a whole would constitute a significant subsidiary of the Borrower) to pay final and non-appealable judgments aggregating in excess of the greater of (a) $10.0 million and (b) 7.5% of the Borrowing Base.

9.     Credit Documentation ceases to be valid and enforceable or create a valid and perfected lien except as permitted or due any action or omission by the Administrative Agent.

10.    Change of Control (to be defined in a manner to be reasonably agreed).

11.    ERISA.

12.    Certain matters relating to Holdings.

Voting:              Amendments and waivers of the Credit Documentation will require the approval of the Majority Lenders, except that (a) the consent of each directly and adversely affected Lender shall be required with respect to: (i) increases in Commitments, (ii) reductions of principal, interest or fees, (iii) extensions of scheduled amortization, final maturity or other payment dates, (iv) releases of all or substantially all of the Collateral (other than in connection with any permitted sale of the Collateral) or Guarantees (other than in connection with a release or sale of the relevant Guarantor permitted by the Credit Documentation) and (v) changes to the Required Lender and Majority Lender definitions and the amendment provisions of the Credit Documentation and (b) the consent of the Required Lenders shall be required with respect to any redetermination which does not increase the Borrowing Base and the consent of all Lenders shall be required with respect to any redetermination which increases the Borrowing Base (it being understood that (x) a scheduled redetermination or the delivery of a reserve report may be postponed with the consent of the Majority Lenders and (y) the Commitments of a Lender may not be increased without its written consent).  The Administrative Agent and the Borrower may agree to amend, modify or supplement the Credit Documentation from time to time, without the consent of any Lender or the Majority Lenders, as may be necessary to correct, amend, cure or resolve any ambiguity, omission, defect, typographical error, inconsistency or other manifest error therein, add collateral or otherwise enhance the rights and benefits of the Lenders, make administrative or operational changes not adverse to any Lender or adhere to local law or to the reasonable advice of local counsel.

For avoidance of doubt: (a) amendments and waivers of the financial covenants (or any of financial definitions included in (and for purposes of) the financial covenants) will require only the consent of the Majority Lenders and (b) the Credit Documentation may be amended in order to modify any provision relating to *pro rata* sharing of payments among the Lenders (and, in any case, any provision requiring *pro rata*

payments or sharing of payments in connection with "amend and extend" transactions) with the consent of the Majority Lenders.

In the event a prohibited lender becomes a Lender or participant despite the restrictions in the Credit Documentation preventing such occurrence, the voting and other rights of such prohibited lender shall be limited as set forth in the Credit Documentation (in their capacity as a lender or participant). No prohibited lender shall, in any event, be permitted to attend any lender conference calls or meetings or receive any related information.

The Credit Documentation shall include customary "yank-a-bank" provisions relating to non-consenting Lenders and prohibited lenders and customary defaulting lender provisions.

|  |  |
|---|---|
| Assignment and Participation: | After the Closing Date, the Lenders will have the right to assign Loans and Commitments under the Revolving Facility: (a) to Lenders holding Commitments under the Revolving Facility and affiliates of such Lenders and (b) to other financial institutions, not constituting a prohibited lender with the consent, not to be unreasonably withheld or delayed, of the Administrative Agent, each Issuing Lender and, so long as no event of default shall have occurred and be continuing, the Borrower. Minimum aggregate assignment level (except to other Lenders) of $5.0 million and increments of $1.0 million in excess thereof will apply to assignments of Loans and Commitments under the Revolving Facility. |
|  | Each Lender will have the right to sell participations in its rights and obligations under the Credit Documentation to financial institutions that are not prohibited lenders (so long as the list of prohibited lenders is made available to all Lenders) without restriction and in accordance with applicable law. Voting rights of participants shall be limited to matters set forth in clause (a) of the first paragraph of "Voting" above. |
| Yield Protection, Taxes and Other Deductions, Etc.: | Subject to the Documentation Principles, usual and customary for facilities and transactions of this nature. |
| EU Bail-in Provisions: | Subject to the Documentation Principles, usual and customary for facilities and transactions of this nature. |
| QFC Provisions: | Subject to the Documentation Principles, usual and customary for facilities and transactions of this nature. |
| Expenses and Indemnification: | Subject to the Documentation Principles, usual and customary for facilities and transactions of this nature. |
| Governing Law and Forum: | State of New York (except with respect to any mortgages, where in each case the governing law shall be the law of State where |

the properties that are the subject of the applicable mortgage are located).

Counsel to the Arranger and
Administrative Agent:                    Paul Hastings LLP.

**ANNEX I**
**Senior Secured First Lien Revolving Facility**
**Interest Rates and Fees**

All capitalized terms used herein but not defined herein shall have the meanings provided in the term sheet to which this Annex I is attached.

Interest Rates:    The Borrower will be entitled to make borrowings based on ABR <u>plus</u> the Applicable Margin or LIBOR <u>plus</u> the Applicable Margin.

"<u>Applicable Margin</u>" and "<u>Commitment Fee Rate</u>" will be determined based upon the Borrowing Base Utilization Percentage (to be defined in the Credit Documentation) then being utilized, as follows:

| Borrowing Base Utilization Percentage | < 25% | ≥ 25% and < 50% | ≥ 50% and < 75% | ≥ 75% and < 90% | ≥ 90% |
|---|---|---|---|---|---|
| LIBOR Margin | 3.00% | 3.25% | 3.50% | 3.75% | 4.00% |
| ABR Margin | 2.00% | 2.25% | 2.50% | 2.75% | 3.00% |
| Commitment Fee Rate | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% |

The Borrower may elect interest periods of 1, 2, 3 or 6 months (or if available to all Lenders, 12 months or a period shorter than 1 month) for LIBOR borrowings.

Calculation of interest shall be on the basis of actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR Loans based on the prime rate). Interest will be payable in arrears (a) for Loans accruing interest at a rate based on LIBOR, at the end of each interest period (or every 90 days in arrears for interest periods greater than 90 days) and on the applicable maturity date and (b) for Loans accruing interest based on the ABR, quarterly in arrears and on the applicable maturity date.

"<u>ABR</u>" means the highest of (a) the rate that the Administrative Agent announces from time to time as its prime or base commercial lending rate, as in effect from time to time, (b) the Federal Funds Effective Rate <u>plus</u> ½ of 1% and (c) LIBOR for a one-month interest period <u>plus</u> 1%.

LIBOR is the London interbank offered rate for dollars, adjusted for customary Eurodollar reserve requirements, if any.

The Credit Documentation will contain customary replacement LIBOR provisions reasonably acceptable to the Administrative Agent and the Borrower.

Upfront Fees:    The Borrower shall pay an upfront fee (the "<u>Upfront Fee</u>") in an amount equal to 0.45% of the Borrowing Base in effect on the Closing

Date, which Upfront Fee shall be earned, due and payable in full on the Closing Date and shall be paid to each Lender ratably in accordance with its Commitment in respect of the Revolving Facility as in effect on the Closing Date.

Default Rate:    The applicable interest rate plus 2% per annum on amounts overdue, payable upon demand.

Commitment Fees:    An amount computed on a daily basis equal to the Commitment Fee Rate for the relevant day multiplied by the undrawn portion of the Borrowing Base on such day, payable quarterly in arrears.

Letter of Credit Fees:    The Borrower shall pay a fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to LIBOR Loans under the Revolving Facility on the face amount of each such Letter of Credit.  Such fee shall be shared ratably among the Lenders participating in the Revolving Facility and shall be payable quarterly in arrears.

Fronting fee equal to 0.125% per annum.  Customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account.

**ARSENAL RESOURCES DEVELOPMENT LLC**
EXIT REVOLVING FACILITY
Conditions Precedent

Capitalized terms used but not defined in this <u>Exhibit B</u> shall have the meanings set forth in the Summary of Principal Terms and Conditions to which this <u>Exhibit B</u> is attached.

The Closing Date and the making of the initial extensions of credit under the <u>Revolving Facility</u> will be subject to the satisfaction of only the following conditions precedent:

1.      The Administrative Agent shall have received: (a) the Credit Documentation, which shall, in each case, be consistent with the terms of the Summary of Principal Terms and Conditions to which this <u>Exhibit B</u> is attached, shall have been executed and delivered by each of parties thereto, including all documents and instruments required to create and perfect the Administrative Agent's security interest in the Collateral, (b) customary officer's closing certificates (including incumbency certificates of officers), organizational documents, customary evidence of authorization and good standing certificates in jurisdictions of formation/organization, in each case, with respect to the Credit Parties, (c) customary legal opinions related to the Loan Documents, including an opinion on no conflicts with applicable laws in addition to other customary opinions, (d) a solvency certificate (with respect to the Borrower and its subsidiaries on a consolidated basis as of the Closing Date after giving effect to the Transactions contemplated to occur on the Closing Date) certified by a senior authorized financial officer of the Borrower, (e) a customary borrowing notice and (f) such other documents and instruments as are customary for transactions of this type (including evidence of insurance in accordance with the Credit Documentation).

2.      The Administrative Agent and the Lenders shall have received the Upfront Fee and all other accrued fees and all reasonable and documented out-of-pocket costs and expenses due and payable by the Borrower to the Administrative Agent, the Arranger and the Lenders on or prior to the Closing Date pursuant to the terms of the Commitment Letter and the Agency Fee Letter (as defined in the Commitment Letter), and in the case of expenses, to the extent invoiced at least one business days prior to the Closing Date.

3.      After the making of the Loans on the Closing Date, the application of the proceeds thereof and after giving effect to the other Transactions contemplated hereby, the Borrower and the Guarantors shall have aggregate liquidity (which shall include cash and cash equivalents and the amount of unused Commitments) of not less than $40.0 million.

4.      After the making of the Loans on the Closing Date, the application of the proceeds thereof and after giving effect to the other Transactions contemplated hereby, the Borrower and the Guarantors shall have unused availability under the Revolving Facility of not less than 20% of the Borrowing Base.

5.      The Administrative Agent shall have received an internal reserve report dated as of a recent date, prepared in a manner consistent with (or otherwise reasonably acceptable to the Administrative Agent) the last reserve report prepared by an independent third party engineer and delivered to the administrative agent under the Pre-Petition RBL Credit Agreement.

6.      All actions necessary to establish that the Administrative Agent will have a perfected first priority security interest in the Collateral (as described in the section titled "<u>Collateral</u>" in the Summary of Principal Terms and Conditions) shall have been taken, including: (a) delivery of counterparts and exhibits for mortgages or deeds of trust, as applicable, which are necessary and appropriate for filing in the

appropriate jurisdictions and (b) the Borrower's execution and delivery of control agreements in connection with its deposit accounts, commodities accounts or securities accounts (other than excluded accounts to be agreed), as applicable.

7.       The Administrative Agent shall have received from the Borrower title information (including customary title opinions or reports or other documents) consistent with usual and customary standards for the geographic regions in which the Borrowing Base Properties are located, taking into account the size, scope and number of leases and wells of the Borrower and the Guarantors, in respect of at least 90.0% of the aggregate net present value of the Borrowing Base Properties.

8.       The occurrence of the "Plan Effective Date" and the entry of a Confirmation Order (as defined in the RSA) in form and substance reasonably satisfactory to the Administrative Agent with respect to the Plan (as defined in the RSA) (it being understood and agreed that the Confirmation Order shall be deemed reasonable satisfactory to the Administrative Agent so long as the Bankruptcy Court approves the Plan (and does not modify, amend or supplement the Plan to the extent that such modification, amendment or supplement would require the consent of the Consenting RBL Lenders as set forth in the RSA), which Confirmation Order shall be in full force and effect, final and non-appealable, and shall not have been vacated, reversed, or stayed or modified or amended without the consent of the Administrative Agent in its reasonable discretion.)

9.       The Administrative Agent and each Lender who has requested the same shall have received, at least three (3) business days prior to the Closing Date: (a) all documentation and other information regarding the Borrower in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, and (b) to the extent applicable, in connection with "beneficial ownership" rules and regulations, a customary certification regarding beneficial ownership or control of the Borrower in a form reasonably satisfactory to the Administrative Agent and each requesting Lender, in the case of clauses (a) and (b), to the extent reasonably requested in writing at least ten (10) business days prior to the Closing Date.

10.      (i) The Borrower shall have received the proceeds of the New Capital Commitment in accordance with the terms of the New Equity Term Sheet and (ii) the Refinancing shall have occurred, in each case, substantially contemporaneously with the proceeds of the initial funding under the Revolving Facility.

11.      All representations and warranties shall be true and correct in all material respects with the same effect as though made on and as of such date, except in the case of any representation and warranty which (a) expressly relates to a given date, such representation and warranty shall be true and correct in all material respects as of the respective date and (b) is qualified by a materiality or material adverse effect standard in which case such representation and warranty shall be true and correct in all respects.

12.      No default or event of default under the Credit Documentation shall have occurred that is continuing.

13.      Since the Execution Date (as defined in the RSA), there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.  As used herein, "Material Adverse Effect" shall mean any event, change, effect, circumstance, occurrence, development, condition, result, state of facts or change of facts (each, an "Event") occurring after the date hereof that, individually or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on the business, results of operations or condition (financial or otherwise) of the Borrower or the Guarantors, or the properties, assets, finances or liabilities of the Borrower or the Guarantors, taken as a whole; provided that "Material Adverse Effect" shall not include any Event occurring after the date hereof and arising out of or resulting from: (a) conditions or effects that generally affect persons

or entities comparable in size and scale to the Borrower or the Guarantors engaged in the industries, businesses, markets (financial or otherwise) or geographic areas in which the Borrower or the Guarantors operate, taking into consideration any Event that is related to the operations of the Borrower or the Guarantors in the specific geographical and geological areas in which they operate, (b) general economic conditions in regions and markets in which the Borrower or the Guarantors operate, (c) regional, national or international political or social conditions, including acts of war, terrorism or natural disasters, escalation or material worsening of hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or its territories, possessions, diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (d) financial, banking, securities, credit, or commodities markets, prevailing interest rates or general capital markets conditions, (e) changes in United States generally accepted accounting principles, (f) changes in laws, orders, or other binding directives issued by any governmental entity, (g) the taking of any action or any inaction required by the RSA  (including the Restructuring Term Sheet, the DIP Term Sheet, the Equity Term Sheet, the Governance Term Sheet, the Plan, or any action or inaction in connection with the Chapter 11 Cases, including the commencement, announcement and pendency of the Chapter 11 Cases, in each case, with such defined terms as defined in the RSA), (h) the execution, announcement or performance of this Agreement or the other transaction agreements contemplated by the RSA or the transactions contemplated hereby or thereby (including any act or omission of the Borrower or the Guarantors expressly required or prohibited, as applicable, by the RSA), or (i) any action or inaction consented to or requested by the Consenting Stakeholders (as defined in the RSA); provided, further, that exceptions set forth in clauses (a), (b), (c) and (d) of this definition shall not apply to the extent that such Event is disproportionately adverse to the Borrower or the Guarantors, taken as a whole, as compared to other companies comparable in size and scale to the Borrower or the Guarantors operating in the industries and same geographical areas in which the Borrower or the Guarantors operate.

      14.    Entry by the Bankruptcy Court of an order (which order may be the Confirmation Order (as defined in the RSA)) approving the Revolving Facility and all related documentation (including, for the absence of doubt, this Commitment Letter and the Agency Fee Letter), in form and substance satisfactory to the Administrative Agent, which order shall: (i) specifically provide that the right to receive all amounts due and owing, including indemnification obligations, the fees and other payments as set forth herein and in the Agency Fee Letter, and reimbursement of all reasonable costs and expenses incurred in connection with the transactions contemplated herein and as set forth herein and in the Agency Fee Letter, shall be entitled to priority as administrative expense claims under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, regardless of whether the Closing Date occurs (except to the extent the payment of such fee or amount is expressly subject to the occurrence of the Closing Date by the terms of the Commitment Letter or Agency Fee Letter) and (ii) be in full force and effect, final and non-appealable, and shall not have been have been vacated, reversed, or stayed or modified or amended without the consent of the Administrative Agent in its reasonable discretion.

**<u>Annex 4</u>**

**Governance Term Sheet**

**Annex 3**

**Governance Term Sheet**

This Governance Term Sheet is attached to and made a part of the Arsenal Energy Holdings LLC Restructuring Term Sheet dated November 6, 2019 (the "Term Sheet"), is incorporated therein for all purposes and is also made a part of and incorporated into the Restructuring Support Agreement dated November 6, 2019 to which the Term Sheet is attached. This Governance Term Sheet is intended to reflect the Restructuring Transaction that will be implemented under the Plan, to be effective on the Plan Effective Date, relative to the post-Plan Effective Date governance of reorganized Arsenal Resources Development Holdings 1 LLC ("Arsenal" or the "Company").

Capitalized terms used but not initially defined in this Governance Term Sheet shall have the meaning hereinafter ascribed to such terms, or if not defined in this Governance Term Sheet, such terms shall have the meaning ascribed to such terms in the Term Sheet or Restructuring Support Agreement (including any Annex affixed thereto), as applicable.

| | |
|---|---|
| Amended Operating Agreement: | Pursuant to the Plan to be confirmed by Bankruptcy Court, on the Plan Effective Date, the Members (defined below) will enter into an Amended and Restated Operating Agreement (the "Amended Operating Agreement") of Arsenal, the primary terms of which are included in this Term Sheet. Entities owning or holding Units (defined below) in Arsenal on the Plan Effective Date and from time to time thereafter are referred to herein each as a "Member" and, collectively, the "Members". Entities owning or holding Class A Units in Arsenal on or from time to time thereafter are referred to herein each as a "Class A Member" and collectively, the "Class A Members". |
| Units: | After giving effect to the issuance of the New Common Equity and the New Equity Issuance, on the Plan Effective Date, the Company will have one class of membership interests designated as "Class A Units" and may designate additional classes of units, including as part of the MIP, all which shall collectively be referred to as the "Units". |
| | On the Plan Effective Date, the following number of Class A Units (the "Exchange Units") shall be issued to the Consenting Seller Noteholders and Consenting Term Loan Lenders (collectively, the "Initial Members") in connection with the consummation of the Restructuring Transactions as follows: (a) 111,651,357 Class A Units to Chambers Energy Capital II, LP ("CEC II"), (b) 13,673,282 Class A Units to Chambers Energy Capital II TE, LP ("CEC II TE"), (c) 25,780,361 Class A Units to Chambers Energy Capital III, LP ("CEC III", and together with CEC II and CEC II TE, "Chambers"), (d) 128,321,603 Class A Units to Mercuria Energy Company, LLC (or its nominee) ("Mercuria"), and (e) 22,783,397 Class A Units to |

LR-Mountaineer Holding, L.P. ("Lime Rock").  The Class A Units will be voting Units.

The Company acknowledges and agrees that the Class A Units will be issued in compliance with Section 1145 of the Bankruptcy Code or under another applicable exemption to registration under the Securities Act.

On or as soon as reasonably practicable following the Plan Effective Date, Reorganized Arsenal will create a management incentive plan (the "MIP") that will reserve a percentage to be determined by the Board (acting in its sole discretion) of up to 10% of the equity of Reorganized Arsenal, on a fully diluted basis, for issuance to employees of Reorganized Arsenal (which may be in the form of a combination of profits interests and/or full-value Unit awards, as determined by the Board in its sole discretion) (the "MIP Units"). The New Board shall consult with the CEO of Reorganized Arsenal in respect of the allocation of the MIP Units among employees (other than allocation reserved for the CEO).

**Additional Capital Raise:**

In addition to the Exchange Units, Arsenal shall issue on the Plan Effective Date, in exchange for $100,000,000 of cash, additional Class A Units (the "New Equity Units") to Chambers and Mercuria as follows:  Chambers and Mercuria shall purchase 115,384,615 New Equity Units and 38,461,538 New Equity Units, respectively, for $100,000,000, such purchase price to be paid 75% by Chambers and 25% by Mercuria; *provided* that, without limiting or releasing their commitments in the Restructuring Support Agreement, Chambers and Mercuria shall have the right to syndicate the New Equity Units to their respective limited partners and/or other managed accounts, which syndicated parties shall be deemed Affiliates of Chambers or Mercuria, as applicable, solely for Voting Manager appointment purposes as set forth below (unless such parties otherwise qualify as such).

**Board:**

The power to manage the business and affairs of Arsenal shall be vested in a board of managers (the "Board", and any such member of the Board, a "Manager").  The composition of the initial Board shall consist of four (4) Managers: three (3) voting Managers (the "Voting Managers"), one (1) Manager appointed by each of Chambers, Mercuria and Lime Rock; and one (1) non-voting Manager (the "Observing Manager"), who shall be the CEO; provided, however, the Observing Manager shall not be a director, officer, employee or other representative (in any capacity) of either Chambers, Mercuria or Lime Rock, or any Related Party to any of the foregoing.  Each Initial Member shall be entitled to appoint and remove a Voting Manager for so long as it (together with its Affiliates) is not in default of any of its obligations under the

Amended Operating Agreement and either (a) holds five percent (5%) (or, if less, then such percent ownership outstanding by Lime Rock immediately prior to the one-time transfer of its interest to a Lime Rock Transferee) or more of the issued and outstanding Class A Units or (b) has not transferred or sold at least fifty percent (50%) of the Class A Units it held on the Plan Effective Date to an unaffiliated Entity.  The Voting Manager appointed by each Initial Member shall have the right to be appointed to any committees of the Board.  For purposes hereof, "Affiliates" shall mean, with respect to any Entity, any other Entity which, directly or indirectly, controls, or is controlled by, or is under common control with, such Entity (for this purpose, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of an Entity, whether through the ownership or voting of securities or partnership or other ownership interests, by contract or otherwise).  For the avoidance of doubt, if two or more Key Holders are Affiliates, such Key Holders shall be entitled to collectively appoint only one (1) Voting Manager who shall be deemed to represent the collective interests of all such Key Holders.

On or prior to the thirty-six (36) month anniversary of the Plan Effective Date, Lime Rock may make a one-time transfer of its right as an Initial Member to appoint a Voting Manager to any purchaser of all, but not less than all, of the Class A Units held by Lime Rock (such transferee, a "Lime Rock Transferee"); provided, that (i) for the avoidance of doubt, such Lime Rock Transferee will not be deemed an Initial Member (and any transferee of such Lime Rock Transferee will not be a Key Holder for any purpose unless it otherwise qualifies as such), and (ii) the Lime Rock Transferee's right to appoint a Voting Manager shall terminate on the earliest to occur of (a) the Lime Rock Transferee (together with its Affiliates) defaulting on any of its obligations under the Amended Operating Agreement and (b) the Lime Rock Transferee selling any portion of its Class A Units such that the total percentage of Class A Units it holds after any such transfer is less than the percentage of Class A Units it received in the transfer from Lime Rock.

In addition to the initial Voting Managers, any new Class A Member that is not an Affiliate of an Initial Member and that becomes a Key Holder shall be entitled to appoint one (1) additional Voting Manager to the Board for so long as such new Class A Member remains a Key Holder.  Each Voting Manager shall have a number of votes equal to the number of Class A Units held by the Class A Member that appointed such Voting Manager as of the time of any applicable vote (collectively, the "Voting Units"), subject in all

3

cases to the foregoing provisions relative to Key Holders who are Affiliates.

A quorum shall be constituted by the participation of at least two (2) Voting Managers holding a majority of the Voting Units of all Managers.  The affirmative vote of a majority of the Voting Units entitled to be voted by all of the Voting Managers present and entitled to vote at a meeting at which a quorum is present shall be the act of the Board ("Board Approval"), unless the express provisions of the Amended Operating Agreement or any applicable law requires that the composition of the Voting Members required to constitute a quorum for any such vote shall state otherwise.  Written notice shall be provided at least two (2) business days in advance of any Board meeting.  Each Member entitled to appoint a Voting Manager shall have the right to appoint a designee employed by such Member or its Affiliates in place of such Member's absent Voting Manager.  Notwithstanding the foregoing, the Board may take any action that may be taken at any meeting, without prior notice and without a vote, by written consent signed by the Voting Managers whose vote would be required to take such action at a duly called meeting at which a quorum is present; provided, however, that the Board shall provide a copy of any such executed written consent to any Voting Managers who did not execute such written consent within two (2) business days following the execution of such written consent.

| | |
|---|---|
| Key Holder: | For purposes of the Amended Operating Agreement, any Member shall be a "Key Holder" for so long as such member meets either of the following criteria: |

(1)      such Member owns or holds at least ten percent (10%) of the issued and outstanding Class A Units; or

(2)      such Member is (a) an Initial Member and (b) entitled to appoint a Voting Manager.

| | |
|---|---|
| Required Approvals: | *Board Approvals* |

Board Approval will generally be required for actions taken by Arsenal, subject to delegation of authority as to certain day-to-day activities to be undertaken by Arsenal's management team.

*Majority-Plus Approvals*

Notwithstanding the foregoing, Board Approval, including the affirmative vote of at least two (2) Voting Managers ("Majority-Plus Approval"), will be required for Arsenal or any of its subsidiaries to take any of the following actions:

(1)    consummating any merger, consolidation or other business combination, including, but limited to, effecting (a) subject to the Key Holder Approval right below, a Drag-Along Transaction (defined below) or (b) other final exit event;

(2)    consenting to an Approved Budget (defined below);

(3)    other than in connection with a Permitted Acquisition or Permitted Disposition, consummating any material acquisition or divestiture;

(a)    "Permitted Acquisition" means acquisitions of assets or businesses (including through an equity purchase) that (i) do not involve consideration in excess of $20,000,000 in the aggregate for the fiscal year or (ii) are contemplated by an Approved Budget and

(b)    "Permitted Disposition" means disposition of assets or businesses (including through an equity sale) of Arsenal or one of its subsidiaries that does not involves consideration in excess of $20,000,000 in the aggregate for the fiscal year;

(4)    (a) creating any new subsidiaries (other than wholly-owned subsidiaries) or issuing any equity securities in such subsidiaries other than Arsenal or its wholly-owned subsidiaries or (b) entering into any partnership or joint venture that would reasonably be expected to require payments from, or result in revenues to, the Company Parties, individually or in the aggregate, in excess of $20,000,000 in any calendar year;

(5)    taking any action with respect to the management incentive plan which requires Board Approval pursuant to the terms thereof; and

(6)    any voluntary dissolution, liquidation or winding up.

*Key Holder Approvals*

Additionally, notwithstanding the foregoing, the affirmative vote of each Key Holder will be required for Arsenal or any of its subsidiaries to take any of the following actions (such consent, "Key Holder Approval"):

(1)    (a) incurring indebtedness for borrowed money or granting a lien on any material assets except for certain customary exceptions (e.g., (i) under pre-existing agreements (e.g., any exit lending facility) approved by the Board or implemented as part of the Plan, (ii) intercompany arrangements or (iii) trade payables, credit or similar indebtedness), (b) lending money (other than customary trade debt and accounts receivable) or (c) entering into any guarantees, in each case, for amounts equal to or greater than RBL borrowing base plus $20,000,000, individually or in the aggregate,

in any transaction or series of related transactions in any calendar year;

(2)     authorizing or issuing any equity securities (other than in accordance with the previously approved management incentive plan, unless Board Approval is otherwise required thereunder) with a value equal to or greater than $20,000,000, individually or in the aggregate, in any transaction or series of related transactions in any calendar year; provided that the Arsenal valuation cannot be less than $296,000,000 at the time of such issuance;

(3)     effecting an initial public offering (an "IPO");

(4)     (a) entering into any transportation, minimum volume commitment or similar contract that would reasonably be expected to require payments from, or result in revenues to, the Company Parties, individually or in the aggregate, in excess of $20,000,000 in any calendar year or (b) entering into any supplement, modification, amendment or restatement of, or agreeing to any written waiver of any material economic terms under, any such contract;

(5)     voluntarily filing for bankruptcy or similar relief;

(6)     changing Arsenal's or its subsidiaries' independent public accountants or auditors; and

(7)     changing its tax classification.

Board Approval will be required to amend Arsenal's or its subsidiaries' governing documents; provided that, in addition to such affirmative action:

(1)     Any amendment that would change the rights or obligations of any Member in its capacity as a holder of a specific class of Units in a disproportionate and adverse manner (other than in a *de minimis* non-economic respect) as compared to other Members holding the same class of Units shall also require the consent of the holders of at least a majority of the class of the Units so disproportionately and adversely affected;

(2)     Other than in connection with the creation and issuance of a new class of Units, any amendment that would change the rights or obligations of a particular class of Units in a manner that would be reasonably likely to disproportionately and adversely affect the economic rights of such class of Units as compared to the rights and obligations specific to any other class of Units shall also require the consent of the holders of at least a majority of the class of Units so disproportionately and adversely affected; and

(3)     Any amendment that would impose a material obligation on a Member shall also require the consent of such Member.

*Approval of Related Party Transactions*

(1)     For a period of three (3) years after the Plan Effective Date, any transaction between Arsenal or any of its subsidiaries, on the one hand, and any Member or Affiliate of any Member (other than Arsenal and its subsidiaries), on the other hand, shall require the affirmative vote of a majority of the Voting Units held by Managers appointed by unaffiliated Members; and

(2)     Thereafter, any transaction between Arsenal or any of its subsidiaries, on the one hand, and any Member or Affiliate of any Member (other than Arsenal and its subsidiaries), on the other hand, shall require Key Holder Approval.

Budgets:    On the Plan Effective Date, the Board, with Key Holder Approval, will approve an initial budget to cover the periods from the Plan Effective Date through the end of the calendar year 2020. Thereafter, Arsenal will develop subsequent annual budgets to be approved by Majority-Plus Approval (each, an "Approved Budget").  If any subsequent annual budget is not approved by Majority-Plus Approval, such budget may be approved by Board Approval; provided that such budget may not include any increase of any previously budgeted item in excess of five percent (5%) of the amount set forth for such item in the prior annual budget or require capital from any third party (other than under any agreement previously entered into by the Company and for which, if required hereunder, proper approvals have been previously obtained). For the avoidance of doubt, separate Key Holder Approval shall be required for any actions contemplated by a budget that would otherwise require Key Holder Approval hereunder.

Transfers:    Units will be transferable by the holders thereof only in compliance with the drag-along, tag-along and/or right of first offer requirements of the Amended Operating Agreement, in each case if applicable, or as otherwise may be approved by Board Approval, subject to customary exceptions for affiliate transfers and estate planning and similar purposes ("Permitted Transfers"). MIP Units will be subject to such restrictions on transfer as may be determined by the Board in connection with the approval of the MIP.

Right of First Offer:    Prior to a qualified IPO (to be further defined in the Amended Operating Agreement), each Key Holder shall have customary rights of first offer with respect to any proposed sales of Class A Units by any other Class A Member. Each Key Holder will have fifteen (15) days following receipt of a written notice from a Class A Member of any such proposed sale in which to provide a written binding offer to purchase such Class A Units, which offer shall include the price in cash to be paid for such Class A Units. If the

offering Class A Member elects to accept any such offer, then the Class A Member and the Key Holder shall consummate the purchase and sale of the Class A Units within fifteen (15) days following such acceptance. If no Key Holder provides a written binding purchase offer within such fifteen (15) day period, or if the Class A Member does not find the proposed price in any offers to be acceptable, then the Class A Member will have one hundred and eighty (180) days from the expiration of the foregoing fifteen (15) day period in which to complete the sale of the Class A Units to a third party, provided that the purchase price paid in any such sale shall be greater than the highest price offered by any Key Holder for such Class A Units.

Tag-Along Rights:

Prior to a qualified IPO, if one or more Class A Members desire to sell, transfer or assign their Class A Units representing, on an aggregate basis at least twenty-five percent (25%) of the then issued and outstanding Class A Units to any Entity or group of Entities, each other Class A Member shall have the right to sell, transfer or assign its pro rata portion of Class A Units in such sale transaction. Customary terms and conditions related to notice, participation and approval shall be incorporated into the Amended Operating Agreement.

Drag-Along Rights:

Prior to a qualified IPO, the Board (with Majority-Plus Approval), will have the right to effect a sale of Arsenal, whether by merger, consolidation, sale of all or substantially all of the assets of Arsenal and its subsidiaries or all of the Units in Arsenal without the approval of any other Member in its capacity as such (a "Drag-Along Transaction"). Proceeds from a Drag-Along Transaction may include proceeds that are subject to earn-outs or similar arrangements and will be distributed in accordance with the Amended Operating Agreement. Customary terms and conditions related to (a) notice, participation and approval and (b) representations and warranties, covenants and indemnification (which shall be on a several, and not joint, basis) shall be incorporated into the Amended Operating Agreement.

Preemptive Rights:

Prior to a qualified IPO, each Class A Member shall have customary preemptive rights to participate in the sale of additional equity securities of Arsenal *pro rata* based on their respective ownership of outstanding Class A Units. Notwithstanding the foregoing, preemptive rights will not apply to: (a) the New Equity Units, (b) MIP Units, (c) equity securities issued in connection with a merger, consolidation, acquisition or similar business combination, (d) equity securities issued in connection with any split, dividend or similar recapitalization by the Company, or (e) equity securities issued in connection with any debt financing or equipment leasing arrangements.

8

Information Rights:    The Company shall provide the following information to each Key Holder:

(1)    within one hundred and twenty (120) days following the end of each fiscal year, annual audited financial statements prepared in accordance with GAAP by an independent accounting firm approved by the Board, including the auditor's letters to the Board;

(2)    within ninety (90) days following the end of each calendar year, (i) a third party reserve report describing proved, probable and possible reserves prepared by an independent reserve engineering firm approved by the Board, and (ii) all tax information required to be provided to the Members, including but not limited to Schedules K-1;

(3)    within sixty (60) days following the end of each quarter other than Arsenal's fourth quarter of each fiscal year, quarterly unaudited financial statements;

(4)    within thirty (30) days following the end of Arsenal's second quarter, an updated reserve report prepared by the appropriate management team members of Arsenal based upon pricing and other assumptions specified by the Board;

(5)    within forty-five (45) days following the end of each month, (i) a management report discussing the financial condition and operations of Arsenal for the most recent period ended for which such information is available, and (ii) a call with management to discuss the financials and any significant issues, events, and investment opportunities encountered in the preceding month and expected in the coming month;

(6)    by December 1 of each year, an annual capital and operating budget for the coming year, as approved in accordance with the Amended Operating Agreement;

(7)    by February 15 following the end of each year, a good faith estimate prepared by Arsenal of Arsenal's estimated full-year tax position for the preceding calendar year, and subsequently by March 31, a revised "extension" estimate of Arsenal's estimated tax position for such preceding calendar year;

(8)    promptly, and in any event within five (5) business days, upon the occurrence of any of the following, notification of (i) material defaults under Arsenal's Material Contracts, and (ii) the filing of any material litigation by or against Arsenal or its subsidiaries or any material regulatory or other governmental investigations;

(9)      at least three (3) days prior to scheduled quarterly Board meetings, copies of the materials provided to the Board containing a description of the business activities that took place during the quarter, a plan for the upcoming quarter, any material issues or events, operational and financial performance versus budget, and any other analyses as may be requested by the Board; and

(10)    any additional information that may be reasonably requested.

Arsenal Opportunities;
Member Duties:                  Each Member, its Affiliates and any Voting Manager designated by the foregoing (other than holders of MIP Units) shall be entitled to pursue corporate opportunities that may be in conflict with those of Arsenal and its subsidiaries except to the extent an opportunity is presented to a Voting Manager appointee solely in his or her position as a Voting Manager.  Neither any Member nor any Voting Manager will have any fiduciary duties to Arsenal, its subsidiaries or any Member or other Member, as the case may be, in its capacity as a Member or a Manager.

Fees and Expenses:              Legal and other reasonable and documented professional fees and expenses of each of the Initial Members incurred in connection with the preparation, negotiation and implementation of the Amended Operating Agreement and related transactions shall, in each case, be paid or reimbursed by Arsenal; provided, however, to the extent any of the foregoing are deemed to be Professional Fee Claims under the Plan or requests for compensation or expense reimbursement for making substantial contribution to the Chapter 11 Cases, each of the foregoing shall not be reimbursable by Arsenal until deemed allowed by the Bankruptcy Court.  Subsequent to the Plan Effective Date, the legal and other reasonable professional fees and expenses of each Member shall be borne solely by such Member and not be reimbursable by Arsenal or its subsidiaries.   The Amended Operating Agreement will provide that reasonable travel and board expenses incurred by the Voting Managers shall be reimbursed by Arsenal.

Lender Relationship:            No provision in the Amended Operating Agreement shall be deemed to restrict any actions taken or to be taken by a Member or its Affiliates in its role as a lender to Arsenal or its subsidiaries, as applicable, including, but not limited to, being a lender to any of the foregoing under any credit facility contemplated to be put in place with Arsenal or any of its subsidiaries on the Plan Effective Date.

Other Terms and Conditions: The Amended Operating Agreement will not contain terms or conditions which would give the impression or lead to a conclusion that Arsenal (or any of its subsidiaries) is or is intended to be structured as an investment fund, investment vehicle, management

fund or other similar vehicle or that the Board is or is intended to be or act in any manner as a fund advisor, fund advisory board, financial advisor for any investment fund, investment vehicle, management fund or other similar vehicle, notwithstanding the composition, objectives investments or other business(es) of any one or more of its Members.

Governing Law:              Delaware.

**<u>Annex 5</u>**

**Exculpation and Release Language**

1.      "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) Reorganized Arsenal; (c) the RBL Lenders; (d) the Term Loan Lenders; (e) holders of the Seller Notes; (f) each Agent; (g) the Consenting Stakeholders; (h) the New Capital Parties; (i) each current and former Affiliate of each Entity in clause (a) through (h); and (j) each Related Party of each Entity in clause (a) through (h).

2.      "*Related Party*" means, collectively, with respect to any Entity or Person, including each Released Party and Exculpated Party, such Entity or Person's, current, former and future affiliates, member firms and associated entities, and with respect to each of the foregoing, their affiliates, current and former directors, current and former managers, current and former officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

3.      "*Released Party*" means, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the RBL Lenders; (d) the Term Loan Lenders; (e) holders of the Seller Notes; (f) each Agent; (g) each Consenting Stakeholder; (h) the New Capital Parties; (i) each holder of an equity interest in AEH; (j) each current and former Affiliate of each Entity in clause (a) through (i); and (k) each Related Party of each Entity in clause (a) through (i); *provided* that any holder of a Claim or Interest that votes against the Plan (to the extent eligible to vote), objects to the Plan, or objects to or opts out of the third party releases contained therein, shall not be a "Released Party."

4.      "*Releasing Party*" means, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the RBL Lenders; (d) the Term Loan Lenders; (e) holders of the Seller Notes; (f) each Agent; (g) each Consenting Stakeholder; (h) each holder of an equity interest in AEH; (i) each holder of a Claim entitled to vote to accept or reject the Plan that (1) votes to accept the Plan or (2) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; (j) each holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan; (k) each holder of a Claim or Interest that is deemed to reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting  formally or informally in writing to the Plan's third-party release provisions; (l) the New Capital Parties; (m) each current and former Affiliate of each Entity in clause (a) through (l); and (n) each Related Party of each Entity in clause (a) through (l).

\* \* \*

A.  *Exculpation*

**Except as otherwise specifically provided in the Plan, to the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, amendment, or filing or termination of the Restructuring Support Agreement and related transactions, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the RBL Credit Agreement, the RBL Facility, the Term Loan Credit Agreement, the Term Loan Facility, the Seller Notes, the Seller Note Documents, the DIP Facility Documents, the DIP Facility, the New RBL Facility Documents, the New RBL Facility, the New Equity Issuance, or any Restructuring Transaction, contract, instrument, release or other agreement or document relating to the foregoing created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan (including the New Common Equity), or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the**

exculpation set forth above shall not operate to waive or release the rights of any Entity to enforce this Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any claim or obligation arising under the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

B.  *Releases by the Debtors*

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtors, Reorganized Arsenal, and the Debtors' Estates, in each case on behalf of themselves and their Related Parties, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, Reorganized Arsenal, or the Debtors' Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or Cause of Action against, or interest in, a Debtor or other Entity (or that any holder of any claim, interest, or Cause of Action could have asserted on behalf of the Debtors), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in  or out of court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, and/or an Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, amendment, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the RBL Credit Agreement, the RBL Facility, the Term Loan Credit Agreement, the Term Loan Facility, the Seller Notes, the Seller Note Documents, the DIP Facility Documents, the DIP Facility, the New RBL Facility Documents, the New RBL Facility, the New Equity Issuance, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (including the New Common Equity), or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post Plan Effective Date obligations of any party or Entity under the Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan by the Debtors, Reorganized Arsenal, and the Debtors' Estates, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (2) in the best interest of the Debtors, Reorganized Arsenal, and the Debtors' Estates

and all holders of Interests and Causes of Action; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) subject to the terms and provisions herein, a bar to the Debtors, Reorganized Arsenal, and the Debtors' Estates asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their assets and property.

C. *Third Party Releases*

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Plan Effective Date, in exchange for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party, in each case on behalf of themselves and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in or out of court restructuring efforts, intercompany transactions between or among a Debtor, another Debtor and/or an Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, amendment, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the RBL Credit Agreement, the RBL Facility, the Term Loan Credit Agreement, the Term Loan Facility, the Seller Notes, the Seller Note Documents, the DIP Facility Documents, the DIP Facility, the New RBL Facility Documents, the New RBL Facility, the New Equity Issuance, or any Restructuring Transaction, contract, instrument, release, or other agreement or document relating to any of the foregoing, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (including the New Common Equity), or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post Plan Effective Date obligations of any party or Entity under the Plan, the Restructuring Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan or (b) any Person from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence by such Person

## Exhibit C

**The Plan**

**The Plan**

**[*see* Exhibit A to the Disclosure Statement]**

## EXHIBIT D-1

**Joinder Agreement**

The undersigned (the "**Joining Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"), by and among Arsenal Energy Holdings LLC and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, and agrees to be bound by the terms and conditions thereof as a Consenting Stakeholder, and shall be deemed a "Consenting Stakeholder" and a ["Consenting Term Loan Lender"/"Consenting Seller Noteholder"/ "Consenting RBL Lender" / Consenting Equity Holder"] under the terms of the Agreement.

The Joining Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date first set forth below.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Seller Notes | |
| Term Loans | |
| RBL Loans | |
| Equity Interests | |

[JOINING PARTY]

_____

Name:
Title:

## <u>EXHIBIT D-2</u>

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"), by and among Arsenal Energy Holdings LLC and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a ["Consenting Term Loan Lender" / "Consenting Seller Noteholder" / Consenting RBL Lender / Consenting Equity Holder] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Seller Notes | |
| Term Loans | |
| RBL Loans | |
| Equity Interests | |

[TRANSFEREE]

_____
Name:
Title:

## <u>EXHIBIT D-3</u>

**Provision for Transfer Agreement for Consenting RBL Lender**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"), by and among Arsenal Energy Holdings LLC and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof, other than Section 4.03(a) and Section 4.03(b) thereof, to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a ["Consenting Term Loan Lender" / "Consenting Seller Noteholder" / Consenting RBL Lender / Consenting Equity Holder] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement as set forth above and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

[The Transferor specifically agrees that, notwithstanding the transfer contemplated hereby, it will continue to be bound by the terms and conditions of Section 4.03(b), whereby it has agreed to provide commitments in respect of the DIP Facility in the principal amount set forth on its signature page to the Agreement.  The Transferor agrees that, notwithstanding the transfer contemplated hereby, Section 4.03(b) is a binding and enforceable agreement with respect to the commitments under the DIP Facility, it being acknowledged and agreed that the commitments provided under the Agreement are subject solely to the conditions precedent set forth in the DIP Credit Agreement.][1]

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Seller Notes | |
| Term Loans | |
| RBL Loans | |

---

[1] Bracketed paragraph to be removed only if prior written consent of Company Parties and RBL Agent is received.

| Equity Interests | |
|---|---|

[TRANSFEREE]

_____
Name:
Title:


[TRANSFEROR]

_____
Name:
Title:

## **EXHIBIT E**

**Form of UtiKey Transition Services Agreement**

*Execution Version*

# TRANSITION SERVICES AGREEMENT

This Transition Services Agreement (this "<u>Agreement</u>"), dated as of November 7, 2019 (the "<u>Effective Date</u>"), is by and between (i) Arsenal Resources LLC, a West Virginia limited liability company ("<u>Service Provider</u>") and (ii) Arsenal Resources Holdings LLC, a Delaware limited liability company ("<u>ARH</u>"), and UtiKey LLC, a Delaware limited liability company ("<u>UtiKey</u>" and together with ARH, "<u>Service Recipient</u>").  Service Provider and Service Recipient each are sometimes referred to herein as a "<u>Party</u>" and together are sometimes referred to as the "<u>Parties</u>."  Certain terms are defined below, while others are defined in <u>Annex I</u> (Defined Terms).

## RECITALS

WHEREAS, UtiKey is a wholly-owned subsidiary of ARH, and Service Recipient has resolved to wind down the business and affairs of UtiKey; and

WHEREAS, the Parties desire to enter into this Agreement to set forth the terms and conditions pursuant to which Service Provider shall provide or cause to be provided the Services (as defined below) to Service Recipient for the time period set forth herein for purposes of winding down the business and affairs of UtiKey.

NOW, THEREFORE, in consideration of the foregoing and mutual covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

## ARTICLE I

## SERVICES

Section 1.1    <u>Services to be Provided</u>.

(a)    Subject to the terms and conditions of this Agreement, and in consideration of the Fees payable by Service Recipient pursuant to <u>ARTICLE II</u>, during the Services Period, Service Provider shall provide, or cause to be provided, to Service Recipient, the services described on <u>Schedule A</u> attached hereto (each, a "<u>Service</u>", and collectively, the "<u>Services</u>").  "<u>Services Period</u>" means the period commencing as of the Effective Date and, subject to earlier termination pursuant to <u>ARTICLE III</u>, continuing until the date the Services are completed.

(b)    Notwithstanding the contents of <u>Schedule A</u>, Service Provider agrees to respond in good faith to any reasonable request by Service Recipient for any additional services that are necessary to wind down the business and affairs of Service Recipient and which are not currently contemplated in <u>Schedule A</u>, at a price to be agreed upon after good faith negotiations between the Parties.  Any such additional services so provided by Service Provider shall constitute Services under this Agreement and be subject in all respect to the provisions of this Agreement as if fully set forth on <u>Schedule A</u> as of the date hereof.

Section 1.2    <u>Employees and Contractors</u>.  Service Provider shall be responsible

for the appointment of the appropriate Personnel to carry out and perform the Services.  At all times during the provision of Services, Personnel shall continue to be solely an employee, agent or contractor, as applicable, of Service Provider and shall not, unless otherwise agreed in writing by Service Provider and Service Recipient, become an employee, agent or contractor of Service Recipient, and such Personnel shall not be entitled to receive any compensation, benefits, perquisites or privileges from Service Recipient, unless otherwise agreed in writing by Service Provider and Service Recipient.  Service Recipient shall not be responsible for paying any employment taxes, salary and incidental appointment and employment costs, as may be required by applicable Law with respect to any such Personnel.  Notwithstanding the foregoing to the contrary, any and all Personnel of Service Recipient shall, for all purposes of this Agreement and the Services, remain the Representatives of Service Recipient and shall not, in any manner or fashion, become or be deemed to become a Representative of Service Provider for any purposes hereunder or in the performance of the Services.  All such Representatives of the Service Recipient shall have no authority to bind or otherwise commit Service Provider to perform any Services or any other obligations, in any manner.

              Section 1.3    <u>Use of Affiliates and Vendors</u>.  Service Provider may use any of its Affiliates or a qualified third party provider (each a "<u>Vendor</u>" and collectively, "<u>Vendors</u>") to provide the Services; <u>provided</u>, <u>however</u>, that (a) Service Provider shall remain responsible at all times for the performance of Services by its Affiliates under this Agreement and (b) a Vendor may only be used by Service Provider following the written consent of Service Recipient, such consent not to be unreasonably withheld, delayed or conditioned.

              Section 1.4    <u>Standard of Care</u>.  Service Provider shall perform the Services and its other obligations hereunder in a commercially reasonable manner and with the degree of skill and judgment normally exercised by a reasonably prudent operator consistent with industry practices in the oil and gas industry and in material compliance with this Agreement and applicable Law, without willful misconduct or gross negligence.  Except as set forth in this Agreement, Service Provider makes no, and Service Recipient represents that it has not received or relied upon, any other guarantee, representation or warranty of any kind (whether express or implied) regarding any of the Services provided hereunder.  Except as set forth in this Agreement, Service Provider expressly disclaims all, and Service Recipient expressly represents that it has not and is not relying upon, any other guarantees, representations and warranties of any nature whatsoever, whether statutory, oral, written, express or implied, including any warranties of merchantability or fitness for a particular purpose and any warranties arising from course of dealing or usage of trade.  Subject to the other provisions of this Agreement, Service Provider shall only be obligated to provide Services in a commercially reasonable manner.

              Section 1.5    <u>Responsibility for Errors</u>.  Without limiting <u>Section 5.2</u>, Service Provider is responsible to Service Recipient for errors or omissions in Services caused by Service Provider or Vendor and as a non-exclusive remedy to Service Recipient, Service Provider shall re-perform or cause the re-performance of such Services or furnish correct information, payment or adjustments in the Services, in each case at no additional cost or expense to Service Recipient if Service Recipient promptly advises Service Provider of such error or omission. Notwithstanding the foregoing, but without limiting <u>Section 5.2</u>, Service Provider shall not be obligated to re-perform or cause the re-performance of such Services or furnish correct information, payment or adjustments in the Services at no additional cost or expense to Service

Recipient if the error or omission was directly or indirectly caused by the (i) provision of inaccurate or incomplete information by, or (ii) gross negligence or willful misconduct of, Service Recipient or its Personnel.

Section 1.6    Cooperation; Alternatives.  Unless otherwise provided for in this Agreement, the Parties shall use reasonable best efforts to cooperate with each other in all matters relating to the provision of the Services, including to obtain any consents or licenses from third parties that Service Provider reasonably believes are necessary for the provision of the Services, as applicable, and each of the Parties shall use their respective reasonable best efforts to cause each of their respective employees, contractors or agents to reasonably cooperate to the extent required for effective delivery of the Services.

Section 1.7    TSA Contact.  Each Party shall designate a contact person (each, a "TSA Contact"), as set forth on Schedule B, to facilitate communications and performance with respect to this Agreement and the Services and to ensure that this Agreement is fulfilled consistently with the intent of the Parties as of the date hereof.  Unless otherwise authorized in writing or specified in the specific Schedule related to a Service, the Parties shall direct all communications relating to this Agreement and the Services to the TSA Contact for the other Party.  The TSA Contact for each Party shall meet (in person or via telephone or video conference) at least bi-weekly during the Services Period, or more often as otherwise determined necessary by the Parties, in order to discuss the progress of the Services and fulfilment of each Party's obligations hereunder.  Each Party shall have the right at any time and from time to time to replace its TSA Contact by written notice to the other Party in accordance with Section 6.3, following which Schedule B shall be automatically amended to reflect such Party's new TSA Contact.

Section 1.8    Records.  During the term of this Agreement and for one (1) year thereafter, Service Provider and Service Recipient shall each use commercially reasonable efforts to maintain complete and accurate records related to any Service provided, Fees invoiced and payments made hereunder (the "Service Records"); provided that if Service Provider at any time offers in writing to transfer the Service Records in Service Provider's possession to Service Recipient, Service Recipient shall have sixty (60) days thereafter to take possession of the Service Records, after which Service Provider shall no longer have an obligation to retain, and may thereafter delete or destroy, such Service Records.  Upon reasonable advance notice, and subject to ARTICLE IV, each Party in possession of Service Records shall use commercially reasonable efforts to permit the other Party or its Representatives, as applicable, reasonable access to or, at the requesting Party's expense, copies of, such Service Records during regular business hours; provided that (a) such access shall not disrupt the normal operations of such first Party's business and (b) nothing herein shall require any Party to provide to the other Party, its Affiliates or its Representatives with access to or copies of any information to the extent that such access to or the provision of such information would violate any applicable Law or contractual obligation (including any Law or contractual obligation relating to the collection, transfer, storage, disposal, use, processing and disclosure of personally identifiable information); provided, further, that such first Party and its Affiliates shall use commercially reasonable efforts to provide such information in a manner that does not violate such Law or is in accordance with such agreement.

# ARTICLE II

# CHARGES AND PAYMENTS FOR SERVICES

Section 2.1    Compensation.  As consideration for the provision of the Services, Service Recipient shall pay, or cause to be paid, to Service Provider or its designee(s) the fee for such Services as set forth on Schedule A (the "Service Fees").  In addition to the Service Fees, in the event that Service Provider or any of its Affiliates incurs reasonable and documented out-of-pocket expenses in the provision of any Service, including, without limitation, payments to third-party service providers or subcontractors, but excluding payments made to employees of Service Provider or any of its Affiliates pursuant to Section 1.2 (such included expenses, collectively, "Out-of-Pocket Costs" and together with the Service Fees, the "Fees"), Service Recipient shall reimburse Service Provider for all such Out-of-Pocket Costs in accordance with Section 2.2. Service Provider shall obtain Service Recipient's prior written consent for Out-of-Pocket Costs prior to their incurrence (such consent not to be unreasonably withheld).

Section 2.2    Payments.  Service Recipient shall pay Service Fees in arrears in accordance with Section 2.1.  Any payments pursuant to this Agreement shall be made in U.S. Dollars within thirty (30) calendar days after the date of receipt by Service Recipient of an invoice.

Section 2.3    Taxes.

(a)    Service Provision Taxes.  The Parties hereby acknowledge that the Fees specified in Schedule A include all applicable taxes, including sales, use, excise, value-added, business, service, goods and services, consumption, withholding and other similar taxes or duties. Notwithstanding anything in this Section 2.3 to the contrary, each Party shall be responsible for its own income, gross receipts and franchise taxes, employment taxes and real or personal property taxes.

(b)    Withholding.  Service Recipient shall be entitled to withhold and deduct from the Fees payable the amount of any taxes that Service Recipient is required under applicable Law to withhold and deduct therefrom.

# ARTICLE III

# TERMINATION

Section 3.1    Termination for Convenience.  Except as otherwise set forth on Schedule A and subject to the next sentence, Service Recipient, upon 5 days' prior written notice to Service Provider, may reduce or terminate for Service Recipient's convenience any individual Service.  Service Recipient may not reduce or terminate an individual Service if such early reduction or termination would prevent Service Provider, its Affiliates or Vendors from performing another Service that is not also being terminated.  If Service Recipient's early reduction or termination of any Service results in Service Provider having to pay any out-of-pocket fees or expenses to a third party (including termination charges), Service Recipient shall reimburse Service Provider for such charges, if Service Recipient is notified prior to the

incurrence of such charges.  Upon notification of such charges, Service Recipient, at its sole discretion, may choose to continue, reduce or terminate the applicable Service. After 18 months from the date hereof, Service Provider, upon 5 days' prior written notice to Service Recipient, may immediately terminate this Agreement or its obligations with respect to any individual Service, in each case at its sole discretion.  In connection with any early reduction or termination of Services by Service Recipient in accordance with the provisions of this <u>Section 3.1</u>, Service Recipient and Service Provider shall coordinate in good faith regarding the early termination or continuation of preexisting service contracts with Vendors.

Section 3.2    <u>Mutual Termination Rights</u>.

(a)    Subject to the next sentence, either Party may terminate (i) an individual Service in the event of a material breach of this Agreement with respect to such Service by the other Party if such material breach is curable by the breaching Party and the breaching Party fails to cure the breach within 20 days following its receipt of written notice of the breach from the non-breaching Party or (ii) this Agreement in the event of an assignment with respect to which the non-assigning Party has not consented in accordance with <u>Section 6.2</u>.  If a material breach is not curable by the breaching Party, the non-breaching Party may immediately terminate any Service to which the breach relates following the non-breaching Party's delivery of written notice to the breaching Party pursuant to <u>Section 6.3</u>.  Notwithstanding anything herein to the contrary, Service Recipient's failure to pay, or cause to be paid, any Fees when due and payable shall not constitute a breach of the terms of this Agreement if there exists a good faith disagreement regarding such Fees.

(b)    Except as otherwise provided herein, the obligation of Service Provider to provide, or cause to be provided, any Service shall cease on the earliest to occur of (i) the date on which such Service is completed or (ii) the date on which such Service is terminated in accordance with the terms of this <u>ARTICLE III</u>.  This Agreement shall automatically terminate without notice, and all provisions of this Agreement shall become null and void and of no further force and effect, except for the provisions set forth in Section <u>3.3</u> and <u>Section 6.4</u>, on the date on which Service Provider does not have any obligation to provide any Service under this Agreement.

Section 3.3    <u>Obligations on Termination</u>.  Upon termination of this Agreement, Service Provider shall invoice Service Recipient for all outstanding Out-of-Pocket Costs rendered through the effective date of termination of this Agreement and, within thirty (30) days following receipt of such invoice, Service Recipient shall pay all outstanding Out-of-Pocket Costs.

**ARTICLE IV**

**CONFIDENTIALITY**

Section 4.1    <u>Confidential Information</u>.  "<u>Confidential Information</u>" means any nonpublic information whether disclosed in oral, written, visual, electronic or other form, that (a) one Party or one of its Affiliates (the "<u>Disclosing Party</u>") discloses to the other Party or one of its Affiliates (the "<u>Receiving Party</u>"), including information received as a result of data or

system access during the term of this Agreement, (b) relates to or is disclosed in connection with this Agreement and (c) is or reasonably should be understood by the Receiving Party to be confidential or proprietary to the Disclosing Party (whether or not such information is marked "Confidential" or "Proprietary").

Section 4.2    Treatment of Confidential Information.  The Receiving Party shall (a) restrict disclosure of the Disclosing Party's Confidential Information to its and its Affiliates' Personnel with a need to know such Confidential Information to fulfill its obligations under this Agreement, (b) instruct those Personnel of their obligation not to disclose the Confidential Information or use the Confidential Information except to fulfill the Receiving Party's obligations under this Agreement and (c) protect the Confidential Information, and require those Personnel to protect it, using the same degree of care as the Receiving Party uses with its own Confidential Information, but no less than reasonable care.  The Receiving Party shall notify the Disclosing Party as soon as reasonably practicable after obtaining knowledge of any disclosure, or suspected disclosure, of any Confidential Information to a third party in a manner prohibited by applicable Law or the terms of this Agreement.

Section 4.3    Liability for Unauthorized Disclosure.  The Receiving Party shall be liable to the Disclosing Party for any unauthorized disclosure of Confidential Information in violation of this Agreement by it, its Affiliates and any of its or its Affiliates' current or former Personnel.

Section 4.4    Return or Destruction.  Without limiting the foregoing, when any Confidential Information is no longer needed for the purposes contemplated by this Agreement, the Receiving Party shall, promptly upon the request of the Disclosing Party, either return such Confidential Information in tangible form or certify to the other Party that it has destroyed such Confidential Information.

Section 4.5    Exceptions to Confidential Treatment.  The obligations under Section 4.2 do not apply to any information that the Receiving Party can demonstrate (a) was disclosed to the Receiving Party by a third party without an obligation of confidentiality to the Disclosing Party, its Affiliates or any other third party, as applicable, (b) is or becomes available to the public other than by disclosure by the Receiving Party or its Affiliates in violation of this Agreement or (c) was or is independently developed by the Receiving Party or its Affiliates without use of the Disclosing Party's Confidential Information.

Section 4.6    Protective Arrangement.  A Receiving Party may disclose the Disclosing Party's Confidential Information upon the advice of the Receiving Party's legal counsel that (a) such information is required to be disclosed by Law or the rules and regulations of any applicable Governmental Authority and the Receiving Party has complied with this Section 4.6 or (b) such information is required to be disclosed in response to a valid subpoena or Order of a court or other Governmental Authority of competent jurisdiction or other valid legal process and the Receiving Party has complied with this Section 4.6.  Prior to any such disclosure, the Receiving Party shall give the Disclosing Party, to the extent legally permitted and reasonably practicable, prompt prior written notice of such disclosure and an opportunity to contest such disclosure, and the Receiving Party shall use commercially reasonable efforts to cooperate, at the expense of the Receiving Party, in seeking any reasonable protective

arrangements requested by the Disclosing Party.  If such appropriate protective order or other remedy is not obtained, the Receiving Party may furnish, or cause to be furnished, only that portion of such information that the Receiving Party is advised by legal counsel is legally required to be disclosed.  The Receiving Party shall take commercially reasonable steps to ensure that confidential treatment is accorded such information.

Section 4.7    Ownership of Information.  Except as otherwise provided in this Agreement, all Confidential Information provided by or on behalf of a Party (or its Affiliates) that is provided to the other Party or its Affiliates shall remain the property of the Disclosing Party and nothing herein shall be construed as granting or conferring rights of license or otherwise in any such Confidential Information.

## ARTICLE V

## INDEMNIFICATION; LIMITATION OF LIABILITY

Section 5.1    Indemnification by Service Recipient.  Notwithstanding anything to the contrary in Section 5.4, Service Recipient shall defend, indemnify and hold harmless Service Provider and its Affiliates and its Vendors and Personnel (each, a "Service Provider Indemnitee") from and against any and all Damages of every kind and nature to the extent caused by or resulting from a third party claim whatsoever kind or character, including reasonable out-of-pocket attorneys' fees and expenses arising out of or directly or indirectly relating to the Service Provider's performance of this Agreement, except for any such Damages arising out of or directly or indirectly relating to any fraud, gross negligence or willful misconduct of Service Provider, EVEN IF SUCH DAMAGES ARE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF THE SERVICE PROVIDER, ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, MEMBERS, SHAREHOLDERS OR REPRESENTATIVES (collectively, the "Service Recipient Claims").

Section 5.2    Indemnification by Service Provider.  Notwithstanding anything to the contrary in Section 5.4, Service Provider shall defend, indemnify and hold harmless Service Recipient and its Affiliates and Personnel (each, a "Service Recipient Indemnitee") from and against any and all Damages actually incurred or suffered by Service Recipient Indemnitee of every kind and nature to the extent caused by or resulting from a third party claim arising from or relating to:  (a) a breach of any provision of this Agreement by Service Provider (including pursuant to Section 1.3), its Affiliates or any of their respective Personnel; or (b) the gross negligence, willful misconduct or fraud of Service Provider, its Affiliates or any of their respective Personnel in the performance (or non-performance) of the Services (the "Service Provider Claims").  Notwithstanding the obligations set forth above in this Section 5.2, Service Provider shall not defend, indemnify or hold harmless Service Recipient Indemnitees to the extent that such Service Provider Claims set forth in clauses (a)-(b) of this Section 5.2 were caused by:  (i) a breach of any provision of this Agreement by Service Recipient, its Affiliates or any of their respective Personnel or (ii) the gross negligence, willful misconduct or fraud of Service Recipient, its Affiliates or Personnel in the performance (or non-performance) of this

Agreement.  Service Recipient Claims and Service Provider Claims are each individually referred to as a "Claim."

        Section 5.3    <u>Procedure</u>.  In the event of a Claim that arises from a third party claim, the indemnified Party shall give the indemnifying Party prompt notice in writing of the Claim; but the failure to provide such notice shall not release the indemnifying Party from any of its obligations under this <u>ARTICLE V</u>, except to the extent the indemnifying Party is materially prejudiced by such failure.  Upon receipt of such notice, the indemnifying Party shall be entitled to assume and control the defense of the Claim at its expense and through counsel of its choice that is reasonably satisfactory to the indemnified Party, and shall give notice of its intention to do so to the indemnified Party within thirty (30) days of the receipt of such notice from the indemnified Party; <u>provided</u>, <u>however</u>, that the indemnifying Party shall not, without the prior written consent of the indemnified Party, (a) enter into any settlement or compromise with respect to any Claim or consent to the entry of any judgment that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to applicable Service Provider Indemnitee or Service Recipient Indemnitee of a written release from all liability in respect of the Claim or (b) enter into any settlement or compromise with respect to any Claim in any manner that may adversely affect the applicable Service Provider Indemnitee or Service Recipient Indemnitee other than as a result of money damages or other monetary payments that are indemnified hereunder.  The applicable Service Provider Indemnitee or Service Recipient Indemnitee shall have the right at its own cost and expense to employ separate counsel and participate in the defense of any Claim.

        Section 5.4    <u>Limitation of Liability</u>.  IN NO EVENT WILL SERVICE PROVIDER AND ITS AFFILIATES' LIABILITY ARISING OUT OF THIS AGREEMENT EXCEED THE AMOUNT OF THE COMPENSATION ACTUALLY PAID BY SERVICE RECIPIENT TO THE SERVICE PROVIDER HEREUNDER.  EXCEPT FOR (A) LIABILITIES THAT ARE PAYABLE BY THE APPLICABLE INDEMNIFIED PARTY IN CONNECTION WITH A THIRD PARTY CLAIM IN ACCORDANCE WITH THIS AGREEMENT OR (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY, NOR ITS AFFILIATES OR ITS OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS OR REPRESENTATIVES, BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES OR LOST PROFITS HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY ARISING IN ANY WAY OUT OF THIS AGREEMENT.  EXCEPT AS OTHERWISE LIMITED IN THIS SECTION 5.4, SERVICE PROVIDER AND ITS AFFILIATES' LIABILITY UNDER THIS AGREEMENT AND THE SERVICES PROVIDED PURSUANT HERETO SHALL BE LIMITED TO (1) SERVICE PROVIDER'S OBLIGATION TO RE-PERFORM A SERVICE (IF SERVICE PROVIDER IS THEN CAPABLE OF PROVIDING SUCH SERVICE PURSUANT TO THE TERMS OF THIS AGREEMENT AS DETERMINED BY THE SERVICE PROVIDER IN ITS REASONABLE DISCRETION) OR FURNISH CORRECT INFORMATION, PAYMENT OR ADJUSTMENT IN THE SERVICES AT NO ADDITIONAL COST OR EXPENSE TO SERVICE RECIPIENT IF SERVICE RECIPIENT PROMPTLY ADVISES SERVICE PROVIDER OF SUCH ERROR OR OMISSION AND (2) OTHER SPECIFIC PERFORMANCE (OR OTHER EQUITABLE RELIEF) AS PROVIDED IN Section 6.8.

# ARTICLE VI

# MISCELLANEOUS

Section 6.1    Amendment; Waiver.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each Party.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.  Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.  No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

Section 6.2    Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by either Party without the prior written consent of the other Party, and any purported assignment or delegation in contravention of this Section 6.2 shall be null and void and of no force and effect. Notwithstanding the preceding sentence, either Party may assign any or all of its rights and obligations under this Agreement to an Affiliate, so long as the assigning Party will remain liable to the non-assigning Party for the performance of the assigning Party's obligations hereunder. Subject to the preceding sentences of this Section 6.2, this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the Parties and their respective successors and permitted assigns.

Section 6.3    Notices.  Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) via e-mail or (c) by a nationally recognized courier for overnight delivery service.  A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if via e-mail, on the date of successful transmission and (iii) if by nationally recognized courier, one Business Day after delivery to such courier.  Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt.  Any such notice, election, demand, request or response shall be addressed as follows:

If to Service Provider, then to:

Arsenal Resources LLC
6031 Wallace Road Ext., Suite 300
Wexford, PA 15090
Attention: Craig Lavender, General Counsel
E-mail: craig.lavender@arsenalresources.com

with a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attention: Michael Torkin; Nicholas Baker
E-mail: michael.torkin@stblaw.com; nbaker@stblaw.com

If to Service Recipient, then to:

Arsenal Resources Holdings LLC
First Reserve
600 Travis, Suite 6000
Houston, TX 77002
Attention:  Trevor Tamlyn
Facsimile:  (832) 667-9536
E-mail: Trevor.Tamlyn@firstreserve.com

with a copy (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention:  Sean A. O'Neal and Jane VanLare
Facsimile:  (212) 225-3999
E-mail:  soneal@cgsh.com; jvanlare@cgsh.com

Section 6.4     Survival.  Each term of this Agreement that would, by its nature, survive the termination or expiration of this Agreement shall so survive, including the obligation of either Party to pay all amounts accrued hereunder and including the provisions of Section 1.5 (Responsibility for Errors; Delays); Section 1.8 (Records); Section 3.3 (Obligations on Termination); ARTICLE IV (Confidentiality); ARTICLE V (Indemnification; Limitation of Liability); Section 6.3 (Notices); Section 6.4 (Survival); Section 6.5 (Parties in Interest; No Third Party Beneficiaries); Section 6.6 (Severability); Section 6.7 (Entire Agreement; Interpretation); Section 6.10 (No Agency); Section 6.11 (Construction and Interpretation); Section 6.13 (Dispute Resolution); and Section 6.14 (Governing Law; Jurisdiction and Forum; Waiver of Jury Trial).

Section 6.5     Parties in Interest; No Third Party Beneficiaries.  Except for the indemnification rights under this Agreement of any Service Provider Indemnitee or Service Recipient Indemnitee in their respective capacities as such, or unless otherwise expressly specified herein, nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or permitted assignee of a Party.

Section 6.6     Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the

application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 6.7    Entire Agreement; Interpretation. This Agreement (including the Annex and Schedules hereto) contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter.  Each of the Parties acknowledge that it has been represented by legal counsel in connection with this Agreement.  Accordingly, any rule of Law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting party has no application and is expressly waived.

Section 6.8    Specific Performance.  The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement by the breaching Party or Parties.  If any Legal Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law.

Section 6.9    Force Majeure.  Service Provider shall use commercially reasonable efforts to provide, or cause to be provided, the Services without interruption. Notwithstanding the foregoing, neither Party shall be responsible to the other for any delay in or failure of performance of its obligations under this Agreement, to the extent such delay or failure is caused by events or circumstances outside of such Party's control which could not be avoided or otherwise mitigated using commercially reasonable efforts to perform, including if attributable to any act of God, act of terrorism, fire, war, embargo or other governmental act or riot (each, a "Force Majeure Event"); provided, however, that the Party affected thereby gives the other Party prompt written notice of the occurrence of any event which is likely to cause (or has caused) any delay or failure setting forth its best estimate of the length of any delay and any possibility that it shall be unable to resume performance; provided, further, that said affected Party shall use its commercially reasonable efforts to prevent, mitigate and expeditiously overcome the effects of that event and resume performance.  Service Recipient is not required to pay for those Services that are not performed, to the extent such Services are not performed, due to excused performance in a Force Majeure Event or otherwise.

Section 6.10    No Agency. Nothing in this Agreement creates (or shall be claimed or intended to create) a relationship of agency, partnership or employer/employee between Service Provider and Service Recipient and it is the intent and desire of the Parties that the relationship be and be construed as that of independent contracting parties and not as agents, partners, joint venturers or a relationship of employer/employee.

Section 6.11    <u>Construction and Interpretation</u>.  For purposes of this Agreement, (a) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day; (b) any reference in this Agreement to "dollars" or to "$" means U.S. dollars; (c) any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa; (d) the provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified; (e) words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires; (f) the word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not merely mean "if"; (g) the word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; and (h) references to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or."

Section 6.12    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts (including via electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.  This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party.  Delivery of an executed counterpart hereof by means of electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 6.13    <u>Dispute Resolution</u>.

(a)    <u>Negotiation</u>.  If a dispute, controversy or claim ("<u>Dispute</u>") arises between the Parties relating to the interpretation or performance of this Agreement, within 10 days from a written request from a TSA Contact of a Party to the TSA Contact of the other Party, such TSA Contacts, who shall have the authority to resolve the matter, shall meet to attempt in good faith to negotiate a resolution of the Dispute prior to pursuing other available remedies. The date of the initial meeting between the TSA Contacts shall be referred to herein as the "<u>Dispute Resolution Commencement Date</u>."  Any discussions and correspondence relating to trying to resolve such Dispute by meetings between TSA Contacts shall be treated as Confidential Information developed for the purpose of settlement and shall be exempt from any discovery or production, if any, in connection with any resolution of such Dispute and shall not be admissible as evidence in such Dispute resolution.  If any Dispute is not resolved by the TSA Contacts within 30 calendar days from the Dispute Resolution Commencement Date pursuant to this <u>Section 6.13(a)</u>, the Dispute shall be resolved by the courts set forth in <u>Section 6.13</u> of this Agreement.

(b)    <u>Continuity of Service and Performance</u>.  Unless otherwise agreed in writing, the Parties shall continue to honor all commitments, including Service Provider's obligation to provide the Services and Service Recipient's obligation to make payments, under this Agreement during the course of Dispute resolution pursuant to the provisions of this <u>Section 6.13</u>.

Section 6.14    <u>Governing Law; Jurisdiction and Forum; Waiver of Jury Trial</u>.

(a)    This Agreement and all matters arising out of or relating to this Agreement or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise), shall be interpreted, construed and governed by and in accordance with the internal Laws of the State of Ohio without giving effect to any choice or conflict of law provision or rule (whether of the State of Ohio or any other jurisdiction) that would cause the application of the Law of any jurisdiction other than those of the State of Ohio.

(b)    Subject to <u>Section 6.13</u>, each of the Parties (i) consents to submit itself to the exclusive jurisdiction of the Bankruptcy Court for the District of Delaware in any Legal Proceeding arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that all claims in respect of any such Legal Proceeding may be heard and determined in any such court, (iii) agrees that it shall not attempt to deny or defeat such jurisdiction by motion or other request for leave from any such court, (iv) agrees not to bring any Legal Proceeding arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement (whether in contract, tort, common or statutory law, equity or otherwise) in any other court and (v) agrees that a final judgment in any such Legal Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.  Each of the Parties waives any defense of inconvenient forum to the maintenance of any Legal Proceeding brought in accordance with this Section 6.14.

(c)    EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY (i) CERTIFIES THAT NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 6.14(c)</u>, (iii) UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER AND (iv) MAKES THIS WAIVER VOLUNTARILY.

*[Remainder of page left intentionally blank]*

IN WITNESS WHEREOF, the Parties have caused their respective duly authorized representatives to execute this Agreement effective as of the date first written above.

Arsenal Resources LLC

By:_____
      Name:
      Title:

Arsenal Resources Holdings LLC

By:_____
      Name:
      Title:

UtiKey LLC

By:_____
      Name:
      Title:

*[Signature Page to Transition Services Agreement]*

**Annex I**

**DEFINED TERMS**

The following defined terms used in this Agreement will have the meanings ascribed to them below.  Other terms are defined in the body of this Agreement to which this Annex I is attached.  All defined terms include the singular and the plural form of such terms.

"Affiliate" means, when used with respect to any Party, any Person who is an "affiliate" of that party within the meaning of Rule 405 promulgated under the Securities Act.

"Business Day" means any day ending at 11:59 p.m. (Eastern Time) other than a Saturday or Sunday or other day on which banks are required or authorized to close in the City of New York.

"Damages" means all claims, actions, causes of action, liabilities, damages, fines, penalties, costs or expenses (including, without limitation, court costs and reasonable consultants' and attorneys' fees).

"Governmental Authority" means any supranational, national, federal, state, local, provincial, municipal, foreign or other government or quasi-governmental authority or any department, regulatory or administrative agency, commission, board, subdivision, bureau, agency, instrumentality, court or other tribunal of any of the foregoing.

"Law" or "Laws" means any domestic or foreign laws, statutes, ordinances, rules (including rules of common law), regulations, codes, Orders or legally enforceable requirements enacted, issued, adopted, or promulgated by any Governmental Authority.

"Legal Proceeding" means any civil, criminal or administrative actions, claims, audits, suits, hearings, arbitrations or mediations or other proceedings by or before any Governmental Authority, arbitor or mediator.

"Licenses and Permits" means all grants, authorizations, licenses, permits, variances, consents or certificates issued pursuant to any Governmental Authority.

"Order" means any order, judgment, injunction, award, decree or writ adopted or imposed by, including any consent decree, settlement agreement or similar written agreement with, any Governmental Authority.

"Person" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Authority or other entity of any kind or nature.

"Personnel" means the officers, managers, directors, employees, agents, suppliers, licensors, licensees, contractors, subcontractors, advisors (including attorneys, accountants, technical consultants or investment bankers) and other representatives, from time to time, of a Party and its Affiliates; provided that the Personnel of any Service Provider shall not be deemed

Personnel of Service Recipient and the Personnel of Service Recipient shall not be deemed Personnel of Service Provider.

"Representative" means with respect to any Person, such Person's directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives.

"Soinski Wells" means the six wells located in Ohio identified as follows: (1) Soinski 99-04-06 Well No. 201 (API No. 34133244400100 and/or API No. 34133244400000); (2) Soinski 99-04-06 Well No. 202 (API No. 34133244410000); (3) Soinski 211-214 Well No. 211 (API No. 34133244460000); (4) Soinski 211-214 Well No. 212 (API No. 34133244440000); (5) Soinski 211-214 Well No. 213 (API No. 34133244430000); and (6) Soinski 211-214 Well No. 214 (API No. 34133244450000 and/or API No. 34133244450100).

**Schedule A**

**SERVICES**

| Service | Service Description | Services Period | Fees |
|---|---|---|---|
| Wind-Down Activities | Service Provider shall complete (or cause to be completed) all tasks necessary to wind down the business and affairs of Service Recipient, including, but not limited to, the following:<br><br>• <u>Plug and Abandonment</u>: Service Provider shall plug and abandon the Soinski Wells, including fully restoring the related surface locations, in accordance with all applicable Laws, Licenses and Permits, and contractual agreements related to the ownership and operation of the Soinski Wells and the lands on, in, and under which they are located, including without limitation obtaining any and all permits and authorizations (whether regulatory or otherwise), providing all notices (including notices to working interest owners as required by the Joint Operating Agreement between Mountaineer Keystone, LLC, Reserve Energy Exploration Company ("<u>Reserve</u>"), Summit Petroleum Company, Inc. ("<u>Summit</u>" and together with Reserve, the "<u>Third Party Well Owners</u>"), and Utikey, dated April 27, 2012 (the "<u>JOA</u>")) and reports to regulatory agencies and others, and removing associated appurtenances, equipment, and facilities, as may be required by such Laws, Licenses and Permits, and contractual agreements.  The plug and abandonment services under this Agreement shall commence no later than two (2) weeks after the Effective Date.<br><br>• <u>Transfer of Acreage</u>: Service Provider shall sell, transfer or otherwise dispose of all acreage owned by Service | From the Effective Date until completion of all Services | Service Fees in the amount of $25,000.00 per month and for all Out-of-Pocket Costs.<br><br>If the total amount for all Out-of-Pocket Costs incurred is less than $750,000.00 (such lower amount, the "<u>Cost Savings Amount</u>"), Service Provider shall be entitled to receive an amount equal to (i) $750,000.00 minus (ii) the Cost Savings Amount (the "<u>Cost Savings Incentive Payment</u>").<br><br>If, and only if, the Service Provider completes all Services within 120 calendar days from the Effective Date and the total Out-of-Pocket Costs are equal to or less than $750,000.00, Service Provider shall be entitled to an additional incentive payment in the amount of $100,000.00.<br><br>In the event Service Provider is reimbursed for any Out-of-Pocket Costs from one or more of the Third Party Well Owners, Service Provider shall remit 50% of such reimbursed funds to Service Recipient. |

Recipient, including without limitation each lease subject to the JOA. After the Soinski Wells have been plugged and abandoned, with the surface locations fully restored, pursuant to this <u>Schedule A</u>, Service Provider shall conduct reasonable efforts to sell each lease owned by Service Recipient for a market rate.  For any lease(s) sold, Service Provider shall cause all parties with a working interest in the sold lease(s) to execute an assignment of said lease(s) to the purchaser and file said assignment in the Portage County, Ohio Recorder's Office. If, after conducting reasonable efforts, Service Provider is not able to sell any of the leases owned by Service Recipient within 3 months, then Service Provider shall cause all parties with a working interest in said lease(s) to execute releases of the lease(s) and file said releases in the Portage County, Ohio Recorder's Office.

- <u>Notice to and Reimbursement from Third Party Well Owners</u>:  Service Provider shall provide notice of plug and abandon activities to all landowners and interest holders of the Soinski Wells, including the Third Party Well Owners. Service Provider shall pursue reimbursement from the Third Party Well Owners, for their share of the costs and expenses associated with the plugging and abandonment activities contemplated herein.

- <u>Other Wind Down Activities</u>: Service Provider shall complete all other  tasks to wind down the assets and liabilities, excluding cash, of Service Recipient

**Schedule B**

**TSA CONTACT**

For Service Provider:

Name:  Craig Lavender

Email:  craig.lavender@arsenalresources.com

Phone: [●]


For Service Recipient:

Name:  Trevor Tamlyn

Email: Trevor.Tamlyn@firstreserve.com

Phone: (832) 667-7366

**<u>EXHIBIT F</u>**

**Amended Terms of Certain Gathering Agreements**

# Fullstream Term Sheet

| | |
|---|---|
| **Term** | > 15 years<br>> Acreage dedication life of lease |
| **Dedications** | > Acreage dedication to gather all gas produced from Arsenal's Marcellus properties in the Simpson area |
| **Gathering** | > $0.18 /Mmbtu minimum |
| **Compression** | > $0.15 /Mmbtu |
| **Compression Lease Pass-Through** | > Actual Lease expense |
| **POP** | > Additional 10% of realized prices above $2.30 for any month where average realized price closes above $2.30, subject to $0.25 cap (e.g. at $3.50, increase of $0.12 /Mmbtu) |
| **FL&U** | > 1.25% LAUF<br>> Actual fuel consumed |
| **Minimum Volume Commitments** | > None |

# EQM Term Sheet

| | |
|---|---|
| **Term** | > Extend to 12/31/2030 |
| **Minimum Volume Commitments** | > 90% of PDP<br>> Amounts shown on following page |
| **Dedications** | > None |
| **Gathering & Compression Rates** | > Reservation Fee: $0.25 / Mmbtu<br>> Overrun: $0.15 / Mmbtu<br>> Islay (RX): IT as available, incremental $0.25 / Mmbtu<br>> Traveler (Rover): IT as available, incremental $0.25 / Mmbtu |
| **FL&U** | > 0.5% LAUF |
| **Other** | > Payment of Sept., Oct., and Nov. (prepay) amounts |

# EQM Term Sheet (Cont'd)

## *Minimum Volume Commitments*

| Illustrative Company Counter | | | |
|---|---|---|---|
| Year | Company MVC Proposal (Mmbtu/d) | Goff + Comet PDP Forecast (Mmbtu/d) | MVCs % of PDP |
| 2020 | 80,000 | 89,164 | 90% |
| 2021 | 65,000 | 74,535 | 87% |
| 2022 | 55,000 | 65,210 | 84% |
| 2023 | 50,000 | 58,499 | 85% |
| 2024 | 45,000 | 53,325 | 84% |
| 2025 | 40,000 | 49,150 | 81% |
| 2026 | 40,000 | 45,671 | 88% |
| 2027 | 35,000 | 42,681 | 82% |
| 2028 | 35,000 | 40,034 | 87% |
| 2029 | 30,000 | 37,614 | 80% |
| 2030 | 30,000 | 35,358 | 85% |

**<u>Exhibit C to Disclosure Statement</u>**

**<u>Structure Chart</u>**

# Corporate Organizational Structure





**<u>Exhibit D to Disclosure Statement</u>**

**<u>Financial Projections</u>**

## EXHIBIT D

## Financial Projections

For purposes of demonstrating feasibility of the Plan, the Debtors have prepared the forecasted consolidated financial projections (the "Financial Projections") for the Reorganized OpCo Debtors for the fiscal years 2020 through 2023 (the "Projection Period"). The Financial Projections were prepared based on assumptions made by the Debtors' management as to the future performance of the Reorganized OpCo Debtors, and reflect management's judgment and expectations regarding their future operations and financial position. The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond management's control, incident to the exploration for and development, production, and sale of natural gas. Factors that may cause actual results to differ from expected results include:

1.  fluctuations in natural gas prices and the Reorganized OpCo Debtors' ability to hedge against movements in prices;
2.  the uncertainty inherent in estimating reserves, future net revenues, and discounted future cash flows;
3.  the timing and amount of future production of natural gas;
4.  changes in the availability and cost of capital;
5.  environmental, drilling and other operating risks, including liability claims as a result of natural gas operations;
6.  proved and unproved drilling locations and future drilling plans; and
7.  the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing, and climate change regulation.

Should one or more of the risks or uncertainties referenced above or in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of Reorganized OpCo Debtors' future performance.

The Financial Projections have not been audited or reviewed by a registered independent accounting firm, and were not prepared with a view toward compliance with the guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants, or the Financial Accounting Standards Board ("FASB"), particularly for reorganization accounting. The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR ADVISERS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH WILL BE BEYOND THE CONTROL OF THE REORGANIZED OPCO DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF

GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS AND REORGANIZED OPCO DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED OPCO DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED OPCO DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING AFTER THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED OPCO DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

## I.   OVERVIEW

The Debtors are a Pittsburgh, Pennsylvania-based independent gas company engaged in the acquisition and development of natural gas resources in the Appalachian Basin.

## II.   ACCOUNTING AND PRESENTATION POLICIES

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements (GAAP consolidated basis). The Financial Projections have not been prepared under the intention of compliance with published guidelines of the SEC, the American Institute of Certified Public Accountants, the FASB, or any other standard-setting body. The Financial Projections do not include adjustments or write-downs related to the predecessor Debtors' extinguishment of debt or other liabilities. The projected financial information does not reflect the impact of fresh start accounting, which could result in material changes to the projected values.

The Financial Projections do not reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations ("ASC 852"). Overall, the implementation of ASC 852 may or may not have a material impact on the underlying economics of the Plan.

## III.    METHODOLOGY

The Financial Projections were prepared using a bottoms-up approach incorporating multiple sources of statistical analyses, including regional, geological, stratigraphic and well-level analyses from the Debtors' operations. The projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

## IV.    ASSUMPTIONS

The Financial Projections include projected financial statements on a consolidated basis for 2020–2023 assuming that the Effective Date of the Plan is December 31, 2019.

## V.    GENERAL ASSUMPTIONS

### A.    Total Revenue

Total revenue consists of production revenue and other revenue. Production revenue is generated from the exploration for and development, production, and sale of natural gas. Other revenue amounts include proceeds received from hedging activities.

### B.    Commodity Pricing

Natural gas price assumptions are based on October 25, 2019 New York Mercantile Exchange forward pricing. Management estimates realized pricing based on forecasted gas differentials, derived from forward pricing as traded on the Intercontinental Exchange, for each producing area.

### C.    Other

The Financial Projections include forecasts with respect to the Company's joint interest venture partner based on the current agreement with that counterparty, but is subject to change based on mutual agreement.

In the current agreement, the joint interest partner, IOG, has indicated a preference to the Debtors to participate at terms consistent with the existing Joint Development Agreement through the next two well pads to be developed.

### D.    Lease Operating Expenses

Lease operating expenses for the Reorganized OpCo Debtors' reserves are forecasted at the well level and are expected to be approximately $0.12 per mmcf over the Projection Period.

### E.    Production Taxes

Production and property taxes include severance and ad-valorem taxes, and are forecasted at the well level based on tax rates applicable in the jurisdiction of production.

### F.    Transportation Costs

Transportation costs consist of gathering, processing, and trunkline expenses, liquids handling charges, and transportation charges. Midstream rates are based on negotiated agreements that are subject to approval as part of the Plan, and market transportation terms where appropriate, which

are subject to change.

**G.  General and Administrative Expenses**

General and administrative ("G&A") expenses primarily consist of personnel costs, rent, insurance, and other corporate overhead costs necessary to manage operations and comply with regulatory requirements. The Reorganized OpCo Debtors' projected G&A expenses are based on the current development and operational plans, and exclude non-cash expenses.

**H.  Other Income/Expenses**

Other income/expenses primarily consist of the ARD Water EBITDA contribution, which represents the cash flow that is retained through the ownership of the Neptune Water Line, a 17-mile, 20-inch pipeline used to source fresh water for the Debtors' completions operations.

**I.  Capital Expenditures**

Capital expenditures include all capital costs incurred to acquire, develop and produce the Company's assets, which include future well pad construction, drilling, completions, facilities and pipeline installation investment. All projections are net of the Company's interests in the properties developed.

**J.  Changes in Net Working Capital**

Working capital accounts, including receivables and payables, change pursuant to levels of operating activity and the terms realized with various operating partners such as gas purchasers and vendors. Other cash expenses consist of cash expenses related to non-operating activities.

**K.  Cash Interest Expense**

Cash interest includes estimated interest disbursements payable on the Reorganized OpCo Debtors' outstanding debt.

**L.  Capital Structure**

The Financial Projections assume a new-money investment and post-emergence capital structure consisting of:

- A new Reserve Based Loan ("RBL") with a $130 million borrowing base
- $100 million new equity proceeds received on the Effective Date

### REORGANIZED OPCO DEBOTORS' FINANCIAL PROJECTIONS

| ($ in 000's) | Fiscal Year | | | |
| --- | --- | --- | --- | --- |
| | **2020** | **2021** | **2022** | **2023** |
| Net Sales (MMcf) | 39,152 | 39,895 | 41,324 | 42,547 |
| Net Sales (MMcf/d) | 107.3 | 109.3 | 113.2 | 116.6 |
| | | | | |
| **Total Revenue** | **$80,096** | **$79,885** | **$85,043** | **$89,140** |
| (-) Lease Operating | (4,683) | (4,886) | (5,019) | (5,145) |
| (-) Production Taxes | (3,746) | (3,780) | (4,068) | (4,302) |
| (-) Transportation Costs | (20,638) | (22,479) | (23,870) | (25,063) |
| (-) General & Administrative | (14,056) | (12,275) | (12,546) | (12,826) |
| (+ / -) Other Income/(Expenses) | 341 | 6,555 | 3,344 | 1,739 |
| **Consolidated EBITDAX** | **$37,315** | **$43,021** | **$42,884** | **$43,544** |
| | | | | |
| (+ / -) Capital Expenditures, Net | $6,181 | ($60,263) | ($46,695) | ($30,781) |
| (+ / -) Changes in Net Working Capital | 111 | (193) | 4,347 | (1,603) |
| **Unlevered Cash Flow** | **$43,607** | **($17,436)** | **$537** | **$11,160** |
| (-) Cash Interest Expense, Net | (4,179) | (4,546) | (4,606) | (4,744) |
| **Levered Cash Flow** | **$39,429** | **($21,981)** | **($4,069)** | **$6,416** |
| Beginning Cash | 10,000 | 10,000 | 10,000 | 10,000 |
| (+ / -) RBL Draw/(Paydown) | (39,429) | 21,981 | 4,069 | (6,416) |
| **Ending Cash** | **$10,000** | **$10,000** | **$10,000** | **$10,000** |
| **Memo:** | | | | |
| RBL Balance | $52,682 | $74,663 | $78,732 | $72,316 |
| RBL Availability | 77,318 | 55,337 | 51,268 | 57,684 |
| **Liquidity Available** | **$87,318** | **$65,337** | **$61,268** | **$67,684** |
| | | | | |
| RBL Utilization | *40.5%* | *57.4%* | *60.6%* | *55.6%* |

**Exhibit E to Disclosure Statement**

**Liquidation Analysis**

## EXHIBIT E

Liquidation Analysis

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN OR IN THE DISCLOSURE STATEMENT OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IF THE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY OR AMEND THE LIQUIDATION ANALYSIS SET FORTH HEREIN.

NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION, ADMISSION OR ALLOWANCE BY THE DEBTORS (OR ANY OTHER PARTY) OR OF ANY CLAIMS BY OR AGAINST THE DEBTORS. THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH HEREIN SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS OR ALLOWED EQUITY INTERESTS UNDER THE PLAN, OTHER THAN THE PRESENTATION OF A HYPOTHETICAL LIQUIDATION ANALYSIS. ACCORDINGLY, THE ASSET VALUES, AMOUNTS AND/OR PRIORITY OF ALLOWED CLAIMS IN THIS LIQUIDATION ANALYSIS COULD DIFFER MATERIALLY FROM THE AMOUNTS SET FORTH IN THE PLAN, THE DISCLOSURE STATEMENT OR ANY OF THE CHAPTER 11 CASES.

## 1) Introduction

The Debtors, with the assistance of their restructuring, legal, and financial advisors have prepared this hypothetical liquidation analysis (this "Liquidation Analysis") in connection with the Plan and Disclosure Statement. The analysis permits parties in interest to evaluate whether the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, also referred to as the "best interests of creditors" test. The test requires that each Holder of an Impaired Allowed Claim or Equity Interest must either:

i)      accept the Plan; or

ii)      receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To substantiate these findings, the Bankruptcy Court must:

i)      estimate the cash proceeds (the "Liquidation Proceeds") a Chapter 7 trustee (the "Trustee") would generate if each Debtor's Chapter 11 Case was converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated;

ii)      determine the distribution (the "Liquidation Distribution") each holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7 of the Bankruptcy Code; and

iii)      compare each Holder's Liquidation Distribution to such Holder's distribution under the Plan if it were confirmed and consummated.

Accordingly, asset values discussed herein may be different than amounts referred to in the Plan and the Disclosure Statement.

## 2)  Process and Assumption Overview

This Liquidation Analysis was prepared by the Debtors with the assistance of their advisors and assumes that the Debtors' assets would be liquidated in a jointly administered but nonconsolidated basis. This analysis has been prepared assuming that the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code on or about December 31, 2019 (the "Conversion Date"). The Debtors have assumed that the liquidation would occur over a three-month time period in order sell substantially all of the Debtors' assets, monetize and collect receivables and other assets on the pro forma balance sheet, and administer and wind-down the Estates.

Except as otherwise noted herein, this Liquidation Analysis is based upon the Debtors' projected consolidated balance sheets as of December 31, 2019, which values are assumed to be representative of the Debtors' assets and liabilities. Any projected balance sheet amounts presented in this Liquidation Analysis are intended to be a proxy for actual balances on the Conversion Date. In addition, this Liquidation Analysis incorporates certain adjustments to account for the effects of the chapter 7 liquidation process, including post-conversion operating cash flow, costs of winding down the Debtors' Estates, employee-related costs, and professional and trustee fees.

This Liquidation Analysis assumes that, on the Conversion Date, the Bankruptcy Court would appoint a Trustee who would sell the assets of the Estates and distribute the cash proceeds, net of liquidation related costs, to creditors in accordance with relevant bankruptcy law. To maximize recovery in an expedited process, this analysis assumes that the Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of the Debtors' assets for distribution to creditors. This Liquidation Analysis assumes the appointed Trustee will retain lawyers and other necessary advisors to assist in the liquidation.

All assets are contemplated to be sold within the three-month wind-down period. Asset values in the liquidation process are assumed to be driven by, among other things:

- the time frame in which the assets are marketed and sold;

- the potential loss of key personnel;

- forward commodity price curves;

- partner and vendor reaction;

- current market conditions; and

- the general forced nature of the sale

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a Plan absent a liquidation. Examples of these kinds of claims include various potential employee claims (such as potential severance or WARN Act claims), new bonding or letters of credit for plugging and abandonment ("P&A") liabilities, executory contracts, litigation, and unexpired lease rejection damages in addition to other potential claims. Such Claims could be material and can receive administrative or priority payment status. Priority claims would be paid in full from the Liquidation Proceeds before the balance would be made available to general unsecured claims.

No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preferences or fraudulent transfer actions due to, among other issues, the cost of such litigation, the uncertainty of the outcome and anticipated disputes regarding these matters. Additionally, the Liquidation Analysis does not include estimates for tax consequences, both

Federal and state, that may be triggered upon the liquidation and sale of assets; tax consequences could be material.

### 3)  Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to Holders of Claims and Equity interests in accordance with section 726 of the Bankruptcy Code, which provides for the following strict priority:

- Liquidation Adjustments - includes estimated fees paid to the United States Trustee, wind-down costs, Trustee fees and expenses and fees and expenses of advisors and brokers including those retained by the Trustee;

- Superpriority and Structurally Senior Claims - includes Claims arising under the DIP Facility and estimated Claims from counterparties that are able to assert liens on corresponding assets, including certain trade vendors as well as taxing authorities;

- Secured Claims - includes estimated Claims arising under the Debtors' secured funded debt;

- Administrative Claims - includes estimated chapter 11 non-lien vendor Claims, including Claims for post-petition accounts payable, post-petition accrued expenses, taxes, and employee obligations, Claims arising under section 503(b)(9) of the Bankruptcy Code, and certain unsecured Claims entitled to priority under section 507 of the Bankruptcy Code;

- General Unsecured Claims - includes estimated deficiency claims arising from the Debtors' funded debt and chapter 11 prepetition trade Claims, and numerous other types of prepetition liabilities; and

- Equity Interests - includes estimated Equity Interests in the Debtors.

Under the absolute priority rule, no junior creditor would receive any distributions until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

When considering the generation of cash proceeds and the distribution thereof, the Debtors believe that the present value of distributions, to the extent available, may be further reduced because such distributions in a Chapter 7 may not occur until well after the three-month period assumed in the analysis.  Moreover, in the event that litigation becomes necessary to resolve claims asserted in a Chapter 7, distributions to creditors may be further delayed, which both decreases the present value of those distributions and increases administrative expenses that could diminish the liquidation proceeds available to creditors.  The effects of this potential delay on the value of distributions under this Liquidation Analysis have not been considered in this analysis.

### 4)  Conclusion

The determination of hypothetical proceeds from this liquidation is a highly uncertain process involving the extensive use of estimates and assumptions, which, while considered reasonable by the Debtors and the Debtors' advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors.

This analysis was prepared before any applicable deadline for filing Claims against the Debtors' Estates, and so the Debtors have not had an opportunity to fully evaluate potential Claims against the Debtors or to adjudicate such Claims before the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Debtors' Estates may differ from the Claim amounts used in this Liquidation Analysis. Additionally, asset values discussed herein may be different than amounts referred to in the Plan, which presumes the reorganization of the Debtors' assets and liabilities under chapter 11 of the Bankruptcy

Code. The estimated liquidation recoveries and proceeds waterfall are presented herein as a summary of each individual Debtor with their estimated recoveries.

The Debtors determined, as summarized in the table below, upon the Effective Date, the Plan will provide all Holders of Impaired Claims and Equity Interests with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code and thus believe the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

## Summary of Recoveries

*$ in millions*

| Class | Claim/Equity Interest | Projected Claims | Plan Recovery | Projected Mid Liquidation Recovery | Pass/ Fail |
|-------|----------------------|------------------|---------------|-------------------------------------|------------|
| 6A | OpCo RBL Claims | $ 145.0 | 100% | 76.3% | Pass |
| 3B, 5A | Term Loan Claims | 242.3 | Less than 100% | 0.0% | Pass |
| 1A, 4A | Seller Notes Claims | 129.8 | Less than 100% | 0.0% | Pass |
| 7A | Other Secured Claims[1] | 0.0 | 100% | 0.0% | Pass |
| 7B | Other Priority Claims | 1.7 | 100% | 0.0% | Pass |
| 3A | ARE Gathering Agreement Claims | U/L | Less than 0.1% | 0.0% | Pass |
| 1B, 2A, 3C, 4B, 5B | General Unsecured Claims: AEH, ARIH, ARE, ARDH2, ARDH1[2] | 0.0 | 0% / 100% | 0.0% | Pass |
| 6B | General Unsecured Claims: OpCo[3] | 5.0 | 100% | 0.0% | Pass |
| 6C | Equity Interests | - | 0% | 0.0% | N/A |
| 7C | Intercompany Interest | - | N/A | 0.0% | N/A |
| 7D | Section 510(b) Claims | N/A | 0% | 0.0% | N/A |

[1] Other Secured Claims are presumed to receive their collateral or distribution equivalent to that, and therefore, would expect a recovery of 100%. The Debtors are not aware of Other Secured Claims in this case.

[2] To the best of the Debtors' knowledge and belief, there are no General Unsecured Claims against AEH, ARIH, ARE, ARDH2, or ARDH1 (other than the ARE Gathering Agreement Claims and the Term Loan Claims).

[3] Amount does not include potential OpCo RBL Deficiency Claims that may be asserted in a liquidation.

**The following table summarizes the Liquidation Analysis for the Debtors, presented on a consolidated basis. The Liquidation Analysis should be reviewed with the accompanying "Specific Notes to the Liquidation Analysis" set forth on the following pages.**

Liquidation Proceeds

| $ in millions | Notes | Pro Forma BS 12/31/19 | Recovery Estimate % | | | Recovery Estimate $ | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| **Current Assets** | | | | | | | | |
| Cash | [1] | $    2.3 | 100.0% | 100.0% | 100.0% | $    2.3 | $    2.3 | $    2.3 |
| Accounts Receivable, Gas Sales | [2] | 10.4 | 90.0% | 95.0% | 100.0% | 9.3 | 9.8 | 10.4 |
| Accounts Receivable, Joint Interest Billings | [3] | 7.5 | 0.0% | 0.0% | 100.0% | - | - | 7.5 |
| Prepaid And Other Current Assets | [4] | 2.2 | 50.0% | 55.0% | 60.0% | 1.1 | 1.2 | 1.3 |
| Total Current Assets | | 22.3 | 56.9% | 59.7% | 96.0% | 12.7 | 13.3 | 21.4 |
| **Long Term Assets** | | | | | | | | |
| O&G Properties | [5] | 831.9 | 16.7% | 17.7% | 19.3% | 138.7 | 147.6 | 160.6 |
| Derivative Assets | [6] | 10.9 | 100.0% | 100.0% | 100.0% | 10.9 | 10.9 | 10.9 |
| Other PP&E | [7] | 2.2 | 20.0% | 30.0% | 40.0% | 0.4 | 0.6 | 0.9 |
| Other Assets | [8] | 6.2 | 0.0% | 0.0% | 0.0% | - | - | - |
| Total Long Term Assets | | 851.3 | 17.6% | 18.7% | 20.3% | 150.0 | 159.2 | 172.4 |
| **Gross Liquidated Assets** | | $  873.6 | 18.6% | 19.8% | 22.2% | $ 162.7 | $ 172.6 | $ 193.9 |
| **Less Liquidation Costs** | | | | | | | | |
| Wind Down Costs | [9] | | | | | (5.3) | (5.3) | (5.3) |
| Chapter 7 Trustee Fees | [10] | | | | | (4.5) | (4.8) | (5.2) |
| Chapter 7 Professional Fees | [11] | | | | | (3.8) | (4.0) | (4.3) |
| **Total Liquidation Adjustments** | | | | | | $ (13.6) | $ (14.1) | $ (14.9) |
| **Net Liquidated Assets** | | | | | | **$ 149.1** | **$ 158.4** | **$ 179.0** |

Summary of Estimated Claims Recovery

| Claims and Recoveries[1] | Notes | Estimated Claims[2] | Recovery Estimate % | | | Recovery Estimate $ | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| Structurally Senior Claims | [12] | 5.2 | 100.0% | 100.0% | 100.0% | 5.2 | 5.2 | 5.2 |
| Superpriority Professional Carve-Out Claims | [13] | 8.1 | 100.0% | 100.0% | 100.0% | 8.1 | 8.1 | 8.1 |
| DIP Claims | [14] | 34.3 | 100.0% | 100.0% | 100.0% | 34.3 | 34.3 | 34.3 |
| OpCo RBL Claims | [15] | 145.0 | 69.9% | 76.3% | 90.5% | 101.4 | 110.7 | 131.2 |
| Term Loan Claims | [16] | 242.3 | 0.0% | 0.0% | 0.0% | 0.0 | 0.0 | 0.0 |
| Seller Notes Claims | [17] | 129.8 | 0.0% | 0.0% | 0.1% | 0.1 | 0.1 | 0.1 |
| Other Secured Claims | [18] | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Other Priority Claims | [19] | 1.7 | 0.0% | 0.0% | 0.0% | - | - | - |
| Unsecured Admin Claims | [20] | 0.7 | 0.0% | 0.0% | 0.0% | - | - | - |
| General Unsecured Claims | | | | | | | | |
| RBL Deficiency Claims[3] | [21] | 34.3 | 0.0% | 0.0% | 0.0% | - | - | - |
| ARE Gathering Agreement Claims | [22] | U/L | 0.0% | 0.0% | 0.0% | - | - | - |
| Other General Unsecured Claims | [23] | 5.0 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total General Unsecured Claims** | | 39.3 | 0.0% | 0.0% | 0.0% | - | - | - |
| Existing AEH Equity Interests | [24] | - | 0.0% | 0.0% | 0.0% | - | - | - |
| | | $   572.2 | 26.1% | 27.7% | 31.3% | $ 149.1 | $ 158.4 | $ 179.0 |

[1] Reflects impact of intercompany balances.

[2] Estimated claims total does not include RBL deficiency claim.

[3] Claim is based on midpoint recovery estimate.

5

## SPECIFIC NOTES TO THE LIQUIDATION ANALSIS

**Liquidation Proceeds**

*Gross Liquidation Proceeds*

1. <u>Cash & Cash Equivalents:</u> Pro-forma cash estimate as of December 31, 2019. The projected cash balance is net of accrued payroll and revenue payable. All projected cash and equivalents on hand have an expected recovery of 100%.

2. <u>Accounts Receivable, Gas Sales:</u> Gas production amounts are assumed to be highly collectible based on counterparty credit quality and payment history. Receipts are related to sale of natural gas, due within 30 days following the month of production. Outstanding receivables have an expected recovery range of 90% to 100%.

3. <u>Accounts Receivable, Joint Interest Billing:</u> Joint interest billing receivables arise from billing an entity who owns partial interests in a concentrated number of wells the Debtors operates. Outstanding joint interest receivables have an expected recovery of 0% to 100%. Low range contemplates that counterparty may not pay due to potential offsets and/or disputes.

4. <u>Prepaid and Other Current Assets:</u> Includes prepaid expenses, inventory and notes and other receivables. The recovery range is estimated at 50% to 60% for each of the assets:
   a. Prepaid Expenses - comprised of prepayments made on account of expenses, insurance, and deposits, with total net book value of $1.7 million.
   b. Inventory - consists of production equipment, including casings, equipment, and structures, with total net book value of $0.5 million.

5. <u>O&G Properties:</u> This Liquidation Analysis assumes that the Trustee sells or otherwise monetizes the reserves and associated equipment owned by the Debtors, in logical regional or geological packages, or on a piecemeal basis, with sales to buyers during the three-month period. The estimated values realized for such assets reflect, among other things, the following factors:
   a. long-term supply and demand fundamentals for natural gas;
   b. projected natural gas prices;
   c. production and operating performance for each asset;
   d. operating and maintenance costs for each asset; and
   e. capital and environmental expenditure requirements.

   In assessing the liquidation value of the reserves, the Debtors considered a range of discount rates across stratified reserve categories including proved developed producing, proved developed  non-producing, and proved undeveloped reserves, in addition to assessing the Debtors' other land and pipeline assets. The reserves reviewed were a roll-forward of the Debtors' internal reserve report and valued as of January 1, 2020.

   Due to the appointment of a Trustee and the Debtors' assumed insufficient liquidity and access to capital to maintain, develop, or expand production and future reserves, sale values of gas and pipeline assets would be depressed and would likely result in a valuation discount relative to "fair value." This Liquidation Analysis assumes an estimated range of gross liquidation proceeds

from gas property and pipeline assets between approximately $138.7 million and $160.6 million, resulting in an expected recovery range between 16.7% and 19.3%.

6. <u>Derivative Assets:</u> At the Conversion Date, derivative asset value is estimated to be $10.9 million based on the October 25, 2019 New York Mercantile Exchange forward pricing. The derivative value has an expected recovery of 100%.

7. <u>Other PP&E:</u> Represents vehicles, furniture and fixtures, a field office building and other equipment. Liquidated assets have been depreciated according to accounting policies by the Debtors, and in a liquidation would be expected to be sold at a further discount. As a result, Other PP&E assets are assumed to have a blended recovery in the range of 20% to 40% of net book value.

8. <u>Other Assets:</u> Includes capitalization of debt discount and issuance expenses incurred with the issuance of long-term debt. The Liquidation Analysis assumes no recovery.

*Chapter 7 Liquidation Adjustments*

9. <u>Wind Down Costs:</u> The total Wind Down Costs are estimated to be approximately $5.3 million, which includes personnel and overhead costs. For those employees that are retained during the liquidation process, the analysis includes estimated salary, retention, and severance expense.

10. <u>Chapter 7 Trustee Fees:</u> This would be limited to the fee guidelines in Section 326(a) of the Bankruptcy Code. The Liquidation Analysis includes trustee fees of 3.0% of entity gross Liquidation Proceeds excluding cash and accounts receivable.

11. <u>Chapter 7 Professional Fees:</u> This includes the estimated cost for advisors, attorneys and other professionals retained by the Trustee. In this Liquidation Analysis, chapter 7 professional fees are estimated to be $3.8 million to $4.3 million. These fees are applied on a pro rata basis across Debtor entities based on the estimated Liquidation Proceeds available to each Estate. However, this amount can fluctuate based on length and complexity of the wind-down process and could be substantially greater than the amounts assumed herein.

**Claims & Recoveries**

*Superpriority and Structurally Senior Claims*

12. <u>Structurally Senior Payables:</u> Includes estimated Claims from counterparties that can assert liens on corresponding assets, including those accounted for in post-petition accounts payable and post-petition accrued expenses.

13. <u>Superpriority Professional Carve-out Claims:</u> Includes Allowed Professional fees incurred prior to notice of conversion to a chapter 7 liquidation for each professional retained by the court pursuant to sections 327, 328, or 363 of the Bankruptcy Code, and the DIP Facility Carve-Out.

14. <u>DIP Claims:</u> This Liquidation Analysis assumes that the outstanding principal balance on the DIP Facility would be $34.3 million on the Conversation Date based on the cash flow budget. The Liquidation Analysis provides that the repayment of the outstanding principal under the DIP

Facility would be done on a pro rata basis across Debtor entities based on the estimated Liquidation Proceeds available at each of the Debtors' Estates.

*Secured Claims*

15. OpCo RBL Claims: This Liquidation Analysis assumes that the outstanding principal balance under the RBL Facility is approximately $145.0 million, which assumes that the issued and outstanding letter of credit will be drawn and therefore constitute OpCo RBL Claims. Implied Liquidation Proceeds to claimants would range from $101.4 million to $131.2 million which represents 69.9% and 90.5% recovery of the total RBL Claims, with a mid-point recovery of 76.3%.

16. Term Loan Claims: This Liquidation Analysis assumes that the outstanding principal balance under the Term Loan Facility is approximately $242.3 million, and projects that there would be de minimis recovery for the Term Loan Claims.

17. Seller Notes Claims: This Liquidation Analysis assumes that the outstanding principal balance under the Seller Notes is approximately $129.8 million, and projects that there would be de minimis recovery for the Seller Notes Claims.

18. Other Secured Claims: Other Secured Claims are estimated to be zero and receive no recovery.

19. Other Priority Claims: Other Priority Claims are estimated to be $1.7 million and include accrued and unpaid property and other taxes. The Liquidation Analysis projects that there would be no recovery for the Other Priority Claims.

*Unsecured Chapter 11 Administrative Claims*

20. Administrative Claims: These Claims consist of post-petition unsecured trade vendor claims that are unable to assert statutory liens against collateral. The Liquidation Analysis assumes $0.7 million in such Claims as of the Conversion Date, and projects that there would be no recovery.

21. RBL Deficiency Claims: Represents the deficiency balance on the RBL Facility, which is entitled to receive distributions along with other general unsecured claimants. This Liquidation Analysis projects that there would be no recovery.

22. ARE Gathering Agreement Claims: This Liquidation Analysis does not ascribe a specific value to potential claims Gathering Agreement Counterparties could assert if Gathering Agreements are rejected. These Claims are structurally subordinated to the RBL Facility, Term Loan Facility, and Seller Notes, and therefore would get no recovery.

23. Other General Unsecured Claims: This Liquidation Analysis assumes $5.0 million in other general unsecured Claims, and projects that there would be no recovery for such Claims.

*Equity Interests*

24. Existing AEH Equity Interests: Existing AEH Equity Interests are projected to receive no recovery.